# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.

REHAB MOHAMED,

    Plaintiff,

v.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

    Defendant.

---

## COMPLAINT AND JURY DEMAND

---

"Workplace bias and racial inequity bloom in the dark. If we continue to be silent—unable to speak candidly about our uncomfortable experiences and those of others—nothing will change. And businesses will pay the price."

- Johnny C. Taylor Jr., President and CEO,
  Society for Human Resource Management

---

Plaintiff Rehab Mohamed, by and through her undersigned counsel SWAIN LAW, LLC and LOWREY PARADY LEBSACK, LLC, submits this Complaint and Jury Demand for race/color discrimination and retaliation against Defendant Society for Human Resource Management ("Defendant" or "SHRM") as follows:

## **INTRODUCTION**

1.      Defendant SHRM is a professional human resources organization with hundreds of employees and hundreds of thousands of members across the world.

2.      SHRM holds itself out as a leading expert in human resources best practices and touts its educational programming, human resources accreditation programs, and lobbying muscle as a powerful force for good in fostering ethical leadership, fairness, and justice in the workplace.

3.      In fact, SHRM and its leadership have frequently – and publicly – declared the organization's dedication to eliminating workplace race/color discrimination and dismantling racism at work.

4.      But behind its principled public façade, SHRM has knowingly allowed race/color discrimination and unlawful retaliation to fester within its own workplace.

5.      Plaintiff Rehab Mohamed[1] ("Plaintiff" or "Ms. Mohamed") is a thirty-four-year-old brown-skinned Egyptian Arab woman who worked for SHRM in its educational design department beginning in 2016 until her abrupt termination on September 1, 2020.

6.      Throughout Ms. Mohamed's employment, she consistently earned glowing performance reviews and promotions for her quality work and dedication to SHRM's stated mission.

---

[1] Though not her legal name, Ms. Mohamed goes by the nickname "Ruby" and will be referred to by that throughout the remainder of this Complaint and Jury Demand.

7.      Ms. Mohamed's ability to succeed at SHRM came to an abrupt halt, however, following her promotion to Senior Instructional Designer in January 2020, at which time she became the target of race and/or color discrimination by her new direct supervisor, Carolyn Barley.

8.      Barley, an Instructional Design Manager, systematically favored the white employees she supervised over their non-white colleagues, including Ms. Mohamed.

9.      On June 3, 2020, empowered by the public zeitgeist following the high-profile murder of George Floyd a few days earlier, Ms. Mohamed complained of race/color discrimination to Barley's supervisor, Vice President of Education Jeanne Morris.

10.     Barley immediately began retaliating against Ms. Mohamed for her discrimination complaints by attempting to exclude Ms. Mohamed from meetings and opportunities for professional advancement within SHRM, unjustifiably criticizing her work, and setting her up to be fired within weeks.

11.     Ever hopeful that SHRM would live up to its public commitment to dismantle racism at work, Ms. Mohamed raised concerns about race/color discrimination and retaliation over a dozen times throughout the summer of 2020, including to SHRM's CEO Johnny C. Taylor and its Chief Human Resources Officer Sean Sullivan.

12.     Rather than taking meaningful steps to address the systemic race/color discrimination within the organization's education department, however, SHRM's

leadership empowered Barley and Morris to silence Ms. Mohamed by firing her on September 1, 2020.

13.     Ms. Mohamed brings this race/color discrimination and retaliation action against SHRM under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964.

## JURISDICTION AND VENUE

14.     This action arises under the Constitution and laws of the United States of America, including Article III, Section 1 of the United States Constitution.

15.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331 & 1343, and 42 U.S.C. § 1988, as amended by the Civil Rights Attorney Fee Award Act of 1976.

16.     This action is authorized and instituted pursuant to 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

17.     This action is further authorized and instituted pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981A.

18.     Jurisdiction of this Court is further invoked pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists among the Parties and the amount in controversy (exclusive of interest and costs) exceeds $75,000.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e-5(f)(3), because the employment practices and other conduct alleged to be unlawful were committed in the District of Colorado of the United States of America.

## PARTIES

20.     Plaintiff Ruby Mohamed is a thirty-four-year-old brown-skinned Arab woman who was born in Egypt.

21.     At all material times Ms. Mohamed has been a resident of the State of Colorado, including during the discriminatory and retaliatory events described in this Complaint and Jury Demand.

22.     Defendant SHRM is a nonprofit corporation with its principal offices located at 1800 Duke Street, Alexandria, Virginia 22314.

23.     At all material times, including during the events described in this Complaint and Jury Demand, Ms. Mohamed was an "employee" of Defendant SHRM, as the term "employee" is defined by Title VII, U.S.C. § 2000e(f).

24.     At all material times, including during the events described in this Complaint and Jury Demand, SHRM was an "employer," as the term "employer" is defined by Title VII, U.S.C. § 2000e(b).

## GENERAL ALLEGATIONS

### *Ms. Mohamed was a dedicated and consistently high-performing SHRM employee for over four years.*

25.     SHRM hired Ms. Mohamed as an eLearning Products Specialist in April 2016.

26.     SHRM moved Ms. Mohamed into an Instructional Designer role in 2018, and promoted her to Senior Instructional Designer in January 2020.

27.     At the time SHRM hired Ms. Mohamed, she lived in Alexandria, Virginia, where SHRM is headquartered.

28.     During Ms. Mohamed's employment, she moved to Denver, Colorado, where she continued working for SHRM as a remote employee. Ms. Mohamed lived in Colorado during the discriminatory events alleged in this Complaint and Jury Demand (including at the time of her termination).

29.     Throughout Ms. Mohamed's more than four years of employment at SHRM, she was a consistently high-performing employee with a documented history of stellar job performance.

30.     Throughout Ms. Mohamed's employment at SHRM, SHRM conducted regular performance reviews to evaluate Ms. Mohamed's performance.

31.     In 2016 and 2017, SHRM evaluated Ms. Mohamed's performance on an annual basis. For both of those years, SHRM rated Ms. Mohamed's job performance overall as "meets expectations."

32.     At the beginning of 2018, SHRM began evaluating its employees' job performance on a quarterly basis.

33.     Between the first quarter of 2018 and Ms. Mohamed's September 2020 termination, SHRM rated Ms. Mohamed's performance as a "solid performer" or a "role model" (the two highest ratings) for each performance metric of every performance evaluation she received.

***In January 2020, SHRM recognizes Ms. Mohamed's years of strong performance by promoting her to Senior Instructional Designer.***

34.   In January 2020, SHRM promoted Ms. Mohamed to Senior Instructional Designer.

35.   In her role as Senior Instructional Designer, Ms. Mohamed started reported directly to Instructional Design Manager Carolyn Barley.

36.   The job description created by SHRM for Ms. Mohamed's Senior Instructional Designer role described her principal job duties as follows: "The Senior Instructional Designer is responsible for the development and delivery of SHRM's eLearning and Seminar product portfolio directed to both organizations and HR professionals. These products help HR professionals develop their skills, competencies, and in turn, support the advancement of the HR profession. In this capacity, the Senior Instructional Designer conducts analyses and audits to assess customer needs and designs, develops and enhances new and existing education programs. Using instructional design methodologies and adult learning principles, the Senior Instructional Designer leads the development of eLearning, virtual, classroom, and blended programs for both domestic and global audiences."

37.   Soon after she began reporting directly to Barley, Ms. Mohamed observed that Barley treated her and other non-white employees differently than their white peers.

38.    For instance, Barley subjected Ms. Mohamed's work to undeserved scrutiny and unreasonably strict supervision compared to her white peers.

39.    For example, rather than allow Ms. Mohamed to freely communicate with the subject matter expert vendors on Ms. Mohamed's projects, Barley required Ms. Mohamed to ghost-write emails to vendors so Barley could send them out herself. And on the rare occasions when Barley did allow Ms. Mohamed to send emails to vendors herself, Barley required Ms. Mohamed to copy her on each one.

40.    Barley also demanded to be present in each of Ms. Mohamed's vendor meetings without justification.

41.    In contrast, Barley allowed white Senior Instructional Designers Ann Godmere and Carrie Mills the freedom to independently schedule meetings and communicate with SHRM management and external vendors without her personal involvement.

42.    Barley further minimized Ms. Mohamed's role at SHRM by frequently taking credit for Ms. Mohamed's work. Before vendor meetings, Barley often asked Ms. Mohamed for a summary of what she planned to say to the vendor they were meeting with. Then, Barley would begin the meeting by regurgitating Ms. Mohamed's summary, taking credit for and passing Ms. Mohamed's ideas off as her own.

43.    Similarly, while giving status reports about Ms. Mohamed's projects to SHRM educational department managers Liz Lacey and Jeanne Morris, Barley minimized Ms. Mohamed's role by again taking credit for Ms. Mohamed's work and

ideas, thereby denying her the opportunity to demonstrate her strong work performance and valuable contributions within the organization.

44.    Barley also regularly withheld critical information from Ms. Mohamed about her projects, including project background and launch dates, assigned instructors, the identities of reviewers, and other updates. Barley's actions impaired Ms. Mohamed's ability to move her projects forward.

45.    Even more, Barley assigned Ms. Mohamed menial tasks such as searching for and downloading stock photos for educational courses for which Ms. Mohamed was not responsible; these assignments were typically assigned to the Senior Instructional Designer responsible for creating the course.

46.    Barley neither withheld critical information from nor assigned menial tasks to Ms. Mohamed's white colleagues.

47.    Barley had one other non-white subordinate, Senior Instructional Designer Ebony Thompson (who is Black), who Barley treated poorly.

48.    In 2020 Ms. Mohamed and Thompson frequently discussed their shared experience that Barley was much more strict, less supportive, and more antagonistic towards them than towards their white counterparts Carrie Mills and Ann Godmere.

49.    In late May 2020, Barley justified her excessive involvement in Ms. Mohamed's relationship with an attorney vendor by claiming that Ms. Mohamed was not "assertive" enough to manage the relationship on her own.

50.     Barley's unfounded and negative view of Ms. Mohamed's "assertiveness" was based on stereotypes that non-white women are less capable than their white counterparts.

### *In June 2020, Ms. Mohamed formally complains of Barley's race-discriminatory treatment.*

51.     Following Barley's statement that Ms. Mohamed was not "assertive" enough to be treated the same as her white coworkers, Ms. Mohamed felt compelled to formally complain about the discriminatory treatment she had been experiencing.

52.     On June 3, 2020, Ms. Mohamed contacted Vice President of Education Jeanne Morris (Barley's direct supervisor) to schedule a meeting via phone to discuss her concerns.

53.     During their call that afternoon, Ms. Mohamed explicitly complained to Morris that Barley had been discriminating against her by treating her differently and holding her to stricter standards than her white coworkers.

54.     Morris responded by scheduling a meeting with the two of them and Barley for the next day, June 4.

55.     The June 4 meeting was unproductive at best: Barley reacted defensively and broke down in tears and Morris ended the meeting by asking Barley to think about how she could change her behaviors to make Ms. Mohamed feel like a valuable and equal member of their team.

56.     On or about June 12, Ms. Mohamed met with Barley one-on-one to discuss Ms. Mohamed's concerns again in more detail. During their meeting, Ms. Mohamed reiterated that she believed Barley was treating her differently than her white peers and provided examples. Barley again became upset and reacted defensively, stating definitively that Ms. Mohamed was "wrong."

57.     Barley dismissively insisted that Ms. Mohamed was "misremembering" events and taking things "out of context." Like the June 4 meeting, the second meeting ended with no resolution of Ms. Mohamed's race/color discrimination complaints.

### *Immediately following Ms. Mohamed's discrimination complaints, Barley begins retaliating against Ms. Mohamed.*

58.     Promptly after Ms. Mohamed raised concerns about race/color discrimination, Barley began retaliating against Ms. Mohamed by attempting to exclude her from meetings and opportunities for professional advancement within SHRM.

59.     For instance, during the last week of June, Ms. Mohamed was scheduled to attend a highly-anticipated people managers qualification ("PMQ") project meeting to discuss comments from participants in a pilot test of the project.

60.     The purpose of the meeting was to decide as a group which participant feedback should be implemented.

61.     Several of the pieces of feedback related to racial inclusivity and eliminating implicit bias from the program materials, including that black female

characters should not be portrayed as loud and angry and that not all of the managers should be portrayed as white men.

62.     A day or two before the June 25 PMQ meeting, Barley instructed Ms. Mohamed not to attend because "big decisions will be made," implying that Ms. Mohamed had no role in any such "big decisions."

63.     Barley also warned Ms. Mohamed that, if she did choose to attend the PMQ meeting, she should silently listen and not speak at any point during the meeting.

64.     Ms. Mohamed was stunned by Barley's directives because Ms. Mohamed had been a vital contributor to the PMQ project since its inception and was credited by SHRM as one of the project's developers.

65.     On June 25, before the scheduled PMQ meeting later that day, Morris organized a separate meeting with a group of the education department's individual contributors to discuss the results of a recent internal engagement survey.

66.     Morris wanted to discuss some of the results that troubled her, namely that educational employees had given the department low scores in trust and management effectiveness.

67.     Shortly before the meeting, Morris texted Ms. Mohamed asking her to take the lead in starting the group conversation by sharing some of her concerns about Barley's treatment of her.

68.     At Morris's request, Ms. Mohamed began the meeting by sharing with the group that earlier in the month she had reached out to Morris to complain about

Barley's discriminatory behavior. Ms. Mohamed further explained that Barley held her to stricter standards than other colleagues, and gave the same examples she had given to Morris earlier in the month. Ms. Mohamed also told the group that she had reached out to Morris to discuss her concerns and that the differential treatment had continued.

69.     Ms. Mohamed then described Barley's most recent attempt to exclude her from participating in the PMQ meeting.

70.     During the meeting, Ebony Thompson also shared her experience of being discriminated against on the basis of her race/color by Barley to the group.

71.     At the conclusion of the meeting, Morris texted Ms. Mohamed saying that she was upset with Barley's handling of the PMQ meeting; Morris then followed up with an email personally inviting Ms. Mohamed to attend the PMQ meeting and saying that she was looking forward to hearing Ms. Mohamed's input.

72.     Ms. Mohamed attended and actively participated in the PMQ meeting remotely.

73.     After the meeting, coworkers who were physically present in the office that day alerted Ms. Mohamed that Barley had been visibly angry and openly venting about Ms. Mohamed's attendance and active participation.

74.     Soon afterward, Ms. Mohamed received a meeting invitation from Barley for a "facilitated discussion" to which SHRM human resources employee Mike Jackson was also invited.

75.     When Ms. Mohamed asked Barley about the purpose of the meeting, Barley responded that she wanted to discuss Ms. Mohamed's "concerns" with a human resources employee present.

76.     Ms. Mohamed, Barley, and Jackson met on July 7, and the meeting unfolded just the same as Ms. Mohamed's two prior meetings with Barley in early June, i.e., Barley denied Ms. Mohamed's discrimination complaints and accused Ms. Mohamed of taking Barley's behaviors out of context.

77.     Jackson simply listened and ended the meeting by stating that he would follow up with Ms. Mohamed and Barley separately; Jackson never did follow up with Ms. Mohamed.

78.     Throughout the summer of 2020, SHRM persistently failed to follow its own written anti-harassment and anti-retaliation policies with respect to Ms. Mohamed's concerns about on-going discrimination and retaliation.

79.     By late July, Ms. Mohamed's repeated discrimination complaints were still unresolved two months after she had first raised them. Meanwhile, Barley's discriminatory behavior had worsened, and she had become increasingly aggressive in her interactions with Ms. Mohamed.

80.     On July 20, Ms. Mohamed attended a meeting scheduled by Morris for members of the educational design team to share issues they were having. Mike Jackson and Morris began the meeting by asking all in attendance to share any issues they were having with Barley.

81.     Both Ms. Mohamed and Thompson expressed concerns that Barley had been subjecting them to discriminatory treatment.

82.     Thompson specifically explained that Barley had been micromanaging her work while she allowed white colleagues (including Carrie Mills, who was hired the exact same day as Thompson) the freedom to work independently.

83.     Thompson also complained that – unlike with her white counterparts – Barley consistently treated her with disrespect, which she viewed as a form of race/color discrimination.

84.     Just 17 days after Thompson shared these details with SHRM's management on July 20, SHRM terminated her on August 6.

85.     On July 21, Ms. Mohamed reached out to SHRM Chief Executive Officer Johnny C. Taylor Jr. pursuant to SHRM's "open door" policy.

86.     Ms. Mohamed informed Taylor about the race/color discrimination complaints she had made to Morris, and that other non-white employees like Thompson had shared similar stories of discriminatory treatment by Barley.

87.     Ms. Mohamed also explained to Taylor that retaliatory behavior by Barley (and Morris) was interfering with her ability to do her job.

88.     Taylor responded by admitting that SHRM as a whole was struggling with "people manager" and diversity issues.

89.     After their call, Taylor personally connected Ms. Mohamed with Chief Human Resources Officer Sean Sullivan. Ms. Mohamed once again described her

discrimination concerns to Sullivan and gave him a timeline of pertinent events, starting with her promotion early in the year and continuing through Barley's ongoing discriminatory treatment of her and other non-white coworkers.

90.     Like she had with Morris, Jackson, and Taylor Jr., Ms. Mohamed explicitly told Sullivan that she was being subjected to discrimination because of her race/color, and that she felt humiliated and dehumanized. Sullivan responded that it sounded like Barley was not qualified to be in that position and that he would explore organizational changes to move her to a different role.

91.     Despite his representations to the contrary, Sullivan apparently took no action to address Ms. Mohamed's complaints other than to ask *Ms. Mohamed* to attend internal mediation sessions with SHRM's Director of Organizational Learning and Talent Development Bernée Long to which Ms. Mohamed agreed.

92.     During Ms. Mohamed's first session with Ms. Long on August 10, Long said that she would speak to Barley to explain how non-white employees are damaged by implicit bias in the workplace.

93.     By the very next day, however, Long's tone had changed dramatically. Long began blaming Ms. Mohamed for low morale on her team, and told Ms. Mohamed that Barley had been crying "a lot." Long chided Ms. Mohamed that she herself needed to change the way she interacted with Barley.

94.     Long also forecasted Ms. Mohamed's impending termination by subtly threatening: "You better finish your projects by the end of the month."

95.    Ms. Mohamed was puzzled by Long's remark because SHRM had not set end-of-month deadlines for either of her projects.

***After Ms. Mohamed complains of race/color discrimination to Taylor Jr. and Sullivan, SHRM begins maneuvering to silence Ms. Mohamed by firing her within weeks.***

96.    After Ms. Mohamed's discrimination and retaliation complaints to Taylor and Morris, Barley immediately began setting her up to be fired within weeks.

97.    Throughout early August, Barley began regularly chastising Ms. Mohamed with vague and unfounded complaints about Ms. Mohamed's "tone," both in emails and in conversations. (These vague criticisms echoed Long's statements during their mediation sessions.)

98.    Meanwhile, SHRM fired Ebony Thompson in early August 2020 in retaliation for the race/color discrimination complaints she had raised about Barley.

99.    On August 10, Barley emailed Ms. Mohamed and the rest of the instructional design team (i.e., Ms. Mohamed's white colleagues Ann Godmere and Carrie Mills) requesting updates on the status of their current projects and when they would be complete.

100.    The August 10 email was the first time that Barley had updated Ms. Mohamed on the timelines for these two projects since she sent out an ISD Operations Report on July 16; in that Report, Barley had indicated that Ms. Mohamed's Digital HR and Compliance in HR programs had a "target completion date" of "July 2020" and "August 2020," respectively.

101.   Earlier in 2020, Barley had sent out more frequent and regular reports updating departmental employees about project timelines; these inexplicably stopped after Ms. Mohamed brought forward concerns about race discrimination.

102.   On August 11, Ms. Mohamed responded to Barley's email with updates about both of her projects.

103.   First, with respect to the Digital HR program, Ms. Mohamed noted that the updated July 2020 "target completion date" for the Digital HR program had been set before SHRM management had decided to make significant changes to the program's substantive contents, greatly increasing the amount of work that needed to be done by Ms. Mohamed and the project vendor before the project could be completed.

104.   Second, regarding the Compliance in HR program, Ms. Mohamed reported to Barley that Ms. Mohamed believed that the program would be ready for legal department review by the end of the month.

105.   Finally, Ms. Mohamed also noted that – like with all educational projects – SHRM's ability to meet timelines for both projects would necessarily depend on cooperation by the vendors who were writing content.

106.   Godmere and Mills responded similarly to Barley's request for an update, describing various circumstances that might impact estimated project completion timelines.

107.   SHRM frequently extends or revises expected completion dates for education projects based on content changes, lack of vendor responsiveness, and other circumstances. In some cases, employees miss deadlines outright without prior notice, and without being disciplined or fired.

108.   Barley's preferential treatment of her white subordinates also extended to deadlines: she was lax about enforcing deadlines with the white employees she supervised, allowing them to miss deadlines multiple times, and by several weeks.

109.   When white employees asked for deadline extensions (or even missed deadlines with no prior notice to Barley), Barley reacted with compassion and understanding, publicly stating that she believed extending their deadlines was justified because of circumstances outside of the employees' control.

110.   Barley went to incredible lengths to give one white subordinate, Carrie Mills, extra leeway because Mills had previously worked in a stressful job and Barley wanted to make sure Mills was getting enough sleep and not "over-stressed."

111.   Despite Ms. Mohamed's reasoned response to Barley's inquiry, Barley responded by setting a firm deadline for the very first time: "Both programs to be finished by August 31."

112.   Carrie Mills responded to Barley's August 10 email that her course would be completed by August 28th, which was far past the deadline for her project that had previously been communicated by Barley.

113.   Mills unilaterally extended her own deadline twice: first from July to August 14 and then to August 28.

114.   Even so, it was clear that Mills's project was not completed by August 28. On August 28, Ms. Mohamed reached out to Mills to ask for Mills's "project workbook"; Mills responded by admitting that neither the project workbook nor her other materials were complete.

115.   On September 1, shortly before Barley fired Ms. Mohamed that same morning, Barley sent out a congratulatory email to the instructional design team announcing Mills's project completion and praising her efforts (despite the fact that Mills had missed her deadline several times).

116.   In contrast to Barley's willingness to accommodate Mills, Barley expected Ms. Mohamed to singlehandedly build the entire "Compliance in HR" program from scratch in only two months without assistance or a reliable subject matter expert vendor.

117.   Over the remainder of August, Ms. Mohamed and Barley continued to email back and forth about the feasibility of completing both projects by the end of the month.

118.   In her communications with Barley throughout August 2020, Ms. Mohamed repeatedly explained that she would likely need either additional time or permission to delegate some aspects of the project to meet the unrealistic deadlines, particularly given the recent revisions to the content of the Digital HR program.

119.    Barley remained inflexible. Instead of working with Ms. Mohamed to ensure that she could continue to be successful in her role, Barley began vaguely criticizing Ms. Mohamed's "tone" and repeatedly cancelling their check-in meetings.

120.    On August 19, Ms. Mohamed formally complained to Chief Global Development Officer Nick Schacht that she was being subjected to retaliation because of her earlier discrimination complaints. Specifically, she wrote:

> Now, just weeks after I made my discrimination complaints, SHRM is setting me up to fail by imposing an inflexible and unrealistic deadline on me while denying me the support I need to successfully complete the project before the deadline. Meanwhile, white colleagues are given support, allowed to delegate tasks to others when necessary to complete deadlines, and are allowed to freely miss or extend similar deadlines.

121.    Two days later, Schacht responded generally denying that any discrimination or retaliation had occurred. Though he also claimed that Ms. Mohamed's new firm end-of-month deadlines were "neither unfair nor unrealistic," he failed to respond to Ms. Mohamed's complaint that white colleagues were provided additional resources, permission to delegate project tasks, and seemingly-unlimited extensions and forgiveness of missed deadlines.

122.    Throughout the rest of the month, Ms. Mohamed continued diligently working on the projects and, on Friday, August 28, she delivered her work on the Digital HR and Compliance in HR programs to Barley.

123.    As anticipated given the abbreviated timeline, some of the Compliance in HR program content was not complete because one of Ms. Mohamed's vendors had

continued to be unresponsive despite her best efforts. Ms. Mohamed asked Barley for guidance about how they could wrap up the project without meaningful input from the vendor; Barley did not respond.

124.   Despite Ms. Mohamed's multiple requests for guidance from Barley throughout August about how she should deal with the unresponsive vendor, Barley waited until just five days before the August 31 deadline to respond to Ms. Mohamed.

125.   On the morning of Monday, August 31, Sean Sullivan sent Ms. Mohamed a letter explaining his decision that her discrimination and retaliation complaints were unfounded.

126.   On that same day, SHRM prepared Ms. Mohamed's termination paperwork.

127.   Also on August 31, unaware that her termination was already in motion before any "deadlines" had even passed, Ms. Mohamed sent Barley multiple emails providing updates and asking questions about certain aspects of her projects.

128.   Barley responded to Ms. Mohamed by asking for a meeting to "check in" about the status of Ms. Mohamed's projects.

129.   During the "check-in" meeting, Barley terminated Ms. Mohamed allegedly for failing to complete her two projects by the August 31 deadline.

130.   On February 24, 2021, Ms. Mohamed filed a charge of discrimination against SHRM with the Colorado Civil Rights Division. The Charge of Discrimination

was dual-filed with the United States Equal Employment Opportunity Commission ("EEOC").

131.    On April 18, 2022, the EEOC issued Ms. Mohamed a notice of right to sue against SHRM. Ms. Mohamed received the EEOC's right to sue notice on May 9, 2022.

132.    Ms. Mohamed has filed this Complaint and Jury Demand within 90 days of receiving the right to sue notice from the EEOC.

## FIRST CLAIM FOR RELIEF:
(Discriminatory Treatment Because of Race in Violation of 42 U.S.C. § 1981)

133.    Plaintiff realleges and incorporates by reference all allegations in each and every preceding and subsequent paragraph as if fully set forth herein forth herein.

134.    During Ms. Mohamed's employment, Defendant SHRM engaged in unlawful discriminatory employment practices by discriminating against her with respect to the terms and conditions of her employment based on her race (Arab/Egyptian/non-White).

135.    The unlawful employment practices include, without limitation, disparate treatment, discipline, and termination because of Ms. Mohamed's race (Arab/Egyptian/non-White).

136.    These unlawful employment practices infringed upon Ms. Mohamed's enjoyment of all benefits, privileges, terms and conditions of her contractual

relationship with Defendant because of her race through a pattern or practice of discrimination.

137.    The effect of these practices deprived Ms. Mohamed of equal employment opportunities and otherwise adversely affected her employment status because of her race (Arab/Egyptian/non-White).

138.    These unlawful employment practices were intentional.

139.    SHRM engaged in these unlawful employment practices with malice or with reckless indifference to Ms. Mohamed's federally protected rights.

140.    As a proximate result of SHRM's actions, Ms. Mohamed has suffered and continues to suffer a loss of wages and benefits, a loss of job, emotional distress, inconvenience, mental anguish, loss of enjoyment of life and other consequential damages.

## SECOND CLAIM FOR RELIEF:
(Retaliation for Engaging in Protected Activity in Violation of 42 U.S.C. § 1981)

141.    Plaintiff realleges and incorporates by reference all allegations in each and every preceding and subsequent paragraph as if fully set forth herein forth herein.

142.    Ms. Mohamed had a good faith belief that SHRM was engaged in discriminatory and retaliatory conduct in violation of § 1981.

143.    Ms. Mohamed engaged in protected opposition to Defendant's unlawful employment practices by complaining about discrimination and retaliation against her.

144.    In retaliation for Ms. Mohamed's opposition to what she reasonably believed to be Defendant's unlawful discrimination and retaliation against her, Defendant engaged in unlawful retaliatory employment practices.

145.    The unlawful employment practices include, without limitation, discipline and discharge because of Ms. Mohamed's engagement in protected activity.

146.    The illegal retaliation to which Ms. Mohamed was subjected infringed upon her ability to make, perform, modify, and/or terminate her employment relationship or contract with SHRM, and infringed upon her enjoyment of all benefits, terms and conditions of their employment relationship.

147.    These unlawful employment practices were intentional.

148.    SHRM engaged in these unlawful employment practices with malice or with reckless indifference to Ms. Mohamed's federally protected rights.

149.    As a proximate result of SHRM's actions, Ms. Mohamed has suffered and continues to suffer a loss of wages and benefits, a loss of job, emotional distress, inconvenience, mental anguish, loss of enjoyment of life and other consequential damages.

## THIRD CLAIM FOR RELIEF
(Race/Color Discrimination in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*)

150.    Plaintiff realleges and incorporates by reference all allegations in each and every preceding and subsequent paragraph as if fully set forth herein.

151.   By virtue of her race (non-White) and skin color (brown), Ms. Mohamed belongs to protected groups under Title VII.

152.   During Ms. Mohamed's employment, Defendant engaged in unlawful discriminatory employment practices by discriminating against her with respect to the terms and conditions of her employment based on her race (non-White) and skin color (brown).

153.   The unlawful employment practices include, without limitation, disparate treatment, discipline, and discharge because of Ms. Mohamed's race and color.

154.   The effect of these practices deprived Ms. Mohamed of equal employment opportunities and otherwise adversely affected her employment status because of her race and color.

155.   These unlawful employment practices were intentional.

156.   SHRM engaged in these unlawful employment practices with malice or with reckless indifference to Ms. Mohamed's federally protected rights.

157.   As a direct and proximate result of SHRM's actions, Ms. Mohamed has suffered damages, including lost wages and benefits, diminished reputation and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

## FOURTH CLAIM FOR RELIEF

(Retaliation for Engaging in Protected Activity in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*)

158.   Plaintiff realleges and incorporates by reference all allegations in each and every preceding and subsequent paragraph as if fully set forth herein forth herein.

159.   Ms. Mohamed had a good faith belief that SHRM was engaged in discriminatory and retaliatory conduct in violation of Title VII.

160.   Ms. Mohamed engaged in protected opposition to Defendant's unlawful employment practices by complaining about discrimination and retaliation against her.

161.   In retaliation for Ms. Mohamed's opposition to what she reasonably believed to be Defendant's unlawful discrimination and retaliation against her, Defendant engaged in unlawful retaliatory employment practices.

162.   The unlawful employment practices include, without limitation, discipline and discharge because of Ms. Mohamed's engagement in protected activity.

163.   These unlawful employment practices were intentional.

164.   SHRM engaged in these unlawful employment practices with malice or with reckless indifference to Ms. Mohamed's federally protected rights.

165.   As a direct and proximate result of SHRM's actions, Ms. Mohamed has suffered damages, including lost wages and benefits, diminished reputation and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests:

1. That this Court assume jurisdiction;

2. That this Court enter judgment in Plaintiff's favor and against Defendant;

3. That this Court declare the actions of Defendant described in this Complaint and Jury Demand to be in violation of 42 U.S.C. § 1981;

4. That this Court declare the actions of Defendant described in this Complaint and Jury Demand to be in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*;

5. That this Court award Plaintiff all appropriate relief at law and equity, including but not limited to back pay and benefits with pre-judgment interest, front pay, a gross-up adjustment for taxes and any subrogation interests and all other make whole relief, including all available consequential/compensatory damages;

6. That this Court grant compensatory and consequential damages against Defendant, including but not limited to damages for emotional distress, humiliation, loss of income and enjoyment of life, and other pain and suffering on all claims by law in the amount to be determined at trial against the Defendant, as allowed by law;

7. That this Court grant punitive damages as allowed by law.

8. That this Court award Plaintiff her attorney fees and costs of this action, including expert witness fees, on all claims allowed by law;

9.      That this Court award pre-judgment and post-judgment interest at the highest lawful rate; and

10.     That this Court award such additional or alternative relief as may be just, proper and equitable.

## JURY TRIAL DEMAND

Plaintiff respectfully demands a trial by jury on all issues so triable.


Respectfully submitted this 30th day of June, 2022 by:

SWAIN LAW, LLC                          LOWREY PARADY LEBSACK, LLC

/s/ Hunter A. Swain                     /s/ Ariel DeFazio
Hunter A. Swain                         Ariel DeFazio
1490 North Lafayette Street, Suite 303  1490 North Lafayette Street, Suite 304
Denver, CO 80218                        Denver, CO 80218
Tel: (720) 815-5281                     Tel: (303) 593-2595
Email: hunter@swainemploymentlaw.com    Email: ariel@lowrey-parady.com

Attorney for Plaintiff                  Attorney for Plaintiff




Plaintiff's Address:        Rehab "Ruby" Mohamed
                            3324 North Glencoe Street
                            Denver, CO 80207