```
 1              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO
 2
      Civil Action No. 1:22-cv-01625-RM-SKC
 3
      _____
 4
      REHAB MOHAMED,
 5
           Plaintiff,
 6
      vs.
 7
      SOCIETY FOR HUMAN RESOURCE MANAGEMENT,
 8
           Defendant.
 9
      _____
10
11         VIDEOCONFERENCE DEPOSITION OF JEANNE MORRIS
12                    April 26, 2023
13    _____
14          PURSUANT TO WRITTEN NOTICE and the
15    appropriate rules of civil procedure, the
16    videoconference deposition of Jeanne Morris, called
17    for examination by the Plaintiff, was taken remotely
18    commencing at 8:33 a.m. on April 26, 2023, before
19    Jennifer Bajwa Melius, Verbatim Stenographic Reporter
20    and Registered Professional Reporter.
21
22
23
24
25
```

```
 1    APPEARANCES

 2    ON BEHALF OF THE PLAINTIFF:

 3            ARIEL DeFAZIO, ESQ.
              Lowrey Parady Lebsack, LLC
 4            1490 Lafayette Street, Suite 304
              Denver, Colorado 80218
 5            (303)593-2595
              ariel@lowrey-parady.com
 6
              HUNTER A. SWAIN, ESQ.
 7            Swain Law, LLC
              1490 Lafayette Street, Suite 303
 8            Denver, Colorado 80218
              (720)815-5281
 9            hunter@swainemploymentlaw.com

10

11    ON BEHALF OF THE DEFENDANT:

12            KAITLIN SPITTELL, ESQ.
              Hall & Evans, LLC
13            1001 Seventeenth Street, Suite 300
              Denver, Colorado 80202
14            (303)628-3300
              spittellk@hallevans.com

15

16    ALSO PRESENT:

17            Ruby Mohamed

18

19

20

21

22

23

24

25
```

```
1                        I N D E X

2    EXAMINATION:                                    PAGE

3    By Ms. DeFazio                                    5

4                                             INITIAL

5    EXHIBITS:                                  REFERENCE

6    Exhibit 19   2019 Quarter 4 and Year-End Overall   101
                  Performance Review
7                 (SHRM 0745 to 0746)

8    Exhibit 20   Email                                108
                  Subject:  Farewell and Thank You
9                 All
                  Date:  1/24/2020
10                (MOHAMED 004359)
                  (CONFIDENTIAL)
11
     Exhibit 21   Meeting Invitation                   126
12                Subject:  Discussion
                  Date:  6/4/2020
13                (MOHAMED 003147)
                  (CONFIDENTIAL)
14
     Exhibit 22   Text Messages                        152
15                (MOHAMED 017110 to 017112)

16   Exhibit 23   Email Chain                          176
                  Subject:  Bi-Weekly Education Team
17                Meetings
                  Date:  1/22/2020 to 7/14/2020
18                (MOHAMED 007172 to 007173)
                  (CONFIDENTIAL)
19
     Exhibit 24   Email Chain                          213
20                Subject:  A suggestion
                  Date:  8/13/2020
21                (SHRM 0541 to 0542)
                  (CONFIDENTIAL)
22
     Exhibit 25   Email Chain                          235
23                Subject:  Compliance in HR Training
                  Program
24                Date:  8/26/2020 to 8/31/2020
                  (SHRM 0148 to 0151)
25                (CONFIDENTIAL)
```

```
 1    Exhibit 26   Carolyn Barley Performance Reviews,   249
                   2020, 2021
 2                 (SHRM 0866 to 0878)
                   (CONFIDENTIAL)
 3
      Exhibit 27   Rehab Mohamed Letter, 8/13/2020      264
 4                 (MOHAMED 00623 to 627)

 5
                                            INITIAL
 6    PREVIOUSLY MARKED EXHIBITS:          REFERENCE

 7
      Exhibit 12                                111
 8    Exhibit 15                                201
      Exhibit 17                                240
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2                    JEANNE MORRIS,
 3     having been first duly sworn/affirmed, was examined
 4     and testified as follows:
 5                    EXAMINATION
 6     BY MS. DeFAZIO:
 7          Q.   Good morning, Ms. Morris.  We met off
 8     the record; but, again, my name is Ariel DeFazio, and
 9     I am one of Ms. Mohamed's attorneys in this case.  The
10     other is Hunter Swain, who is also signed on here.
11               Can you please state your full name and
12     your home address for the record.
13          A.   Sure.  Jeanne Leslie Morris.
14     7726 Harwood Place, Springfield, Virginia 22152.
15          Q.   And what is your current employer and
16     position there?
17          A.   Society for Human Resource Management,
18     known as SHRM, and I am the vice president of
19     education.
20          Q.   How long have you been in that role?
21          A.   Since August of 2019.
22          Q.   And how long have you been at SHRM as an
23     employee?
24          A.   This November it will be 30 years.
25          Q.   Wow.  Okay.  How many other positions
```

1    have you held before the one you're in currently?

2         A.    Let's see.  Probably three to four or

3    more.  I've traveled across SHRM in positions.

4         Q.    Okay.  Great.

5               Have you been deposed before?

6         A.    No.

7         Q.    All right.  Well, I'm going to give you

8    a brief orientation.  I'm sure you've met with an

9    attorney for SHRM, I imagine at some point before this

10   deposition, to talk about what to expect; is that

11   right?

12        A.    Correct.

13        Q.    Okay.  And I don't want to know what you

14   discussed with them, but just that that happened.

15              So you've been sworn in.  You're under

16   oath.  Even though there may be a semblance of kind of

17   informality about this because we're on Zoom, it's

18   still a formal proceeding.  Our court reporter is

19   taking down anything that, you know, you and I and

20   anyone else in the room say.  This is the same oath

21   that you would take if you testify in court if this

22   matter proceeds to trial.

23              Do you understand that?

24        A.    Yes.

25        Q.    And thank you for giving me, you know,

1    affirmative yeses and noes.  I think in conversation,

2    people will often shake heads, nod, say "uh-huh."

3    Those things just don't translate in a court reporter

4    transcription.  So if that happens, if you, you know,

5    say "uh-huh" or nod your head, I'll follow up and just

6    say, "Is that a yes?  Is that a no?"  I'm not trying

7    to be rude.  I'm just trying to make sure we have a

8    clear record.

9              I think with Zoom it's especially

10   important that we not talk over each other.  There's

11   delay, there's people, you know, dropping off because

12   their internet gets funky.  So I'll make sure to try

13   not to interrupt you.  You'll do the same for me.

14             You'll also want to, you know, give your

15   counsel, Ms. Spittell, the opportunity to object to a

16   question.  If she does, just know that unless she

17   actually directs you not to respond to the question,

18   you do still need to answer.

19             Does that make sense?

20        A.   It does.  Thank you.

21        Q.   Okay.  And if you don't understand a

22   question, maybe there's a time period you're not sure

23   what I'm talking about, there's a word I use that you

24   don't understand the meaning of, do you promise to let

25   me know?

1          A.    I will.

2          Q.    Okay.  And if you need a break, let me

3     know.  Otherwise, we'll probably be breaking every

4     hour to hour and a half just to give our court

5     reporter an opportunity to, you know, stretch her

6     hands, and all of us can take care of our needs.

7               You will have the opportunity after this

8     deposition is over to review a transcript and to make

9     any corrections if there have been mistranscriptions.

10    Although if they are significant, so if you change,

11    you know, a yes from a no or add quite a bit of text,

12    I do reserve the right to reopen this deposition and

13    ask you questions about why those changes were made.

14              Does that make sense?

15         A.    It does.

16         Q.    Okay.  Do you have any questions for me?

17    This is your opportunity before we get started.

18         A.    I don't.

19         Q.    Okay.  Great.

20         A.    Thank you for the overview.  I

21    appreciate it.

22         Q.    Certainly.

23              Tell me what other positions you've held

24    at SHRM since you started with employment there about

25    30 years ago.

1          A.     So I started as an accounting manager,

2     and then moved into customer service for a little bit.

3     Then I moved into a role where I was kind of the

4     business manager for professional development, that

5     division.  And then from there, I became a manager

6     over our business academy.  And then from there,

7     assumed management of the business academy courses and

8     our SHRM seminars.

9               And then from that role I moved into

10    strategic planning in HR, and I was in that role for a

11    few years.  And then I think it was about

12    November 2012 I moved into -- back to the education

13    area as the director of educational programs.

14         Q.    Got it.  And so that position where you

15    were in strategic planning in HR, you were actually in

16    a position supporting SHRM employees in HR?

17         A.     Yeah.

18         Q.     Okay.

19         A.     It was more -- it was more of the

20    strategic planning.  So the goals of the organization

21    and kind of the strategic direction and reporting into

22    the CHRO.

23         Q.     And you said the CHRO?

24         A.     Yes.

25         Q.     Who was that at the time?

1          A.    Jeff Pon.

2          Q.    And that individual's -- that role is

3    held by Sean Sullivan at present?

4          A.    No.   The current role is held by Jim

5    Link.

6          Q.    Okay.  All right.  When did you graduate

7    from -- or did you attend college?

8          A.    I did.

9          Q.    Okay.  When did you graduate?

10         A.    Oh, my goodness.

11         Q.    Around when?  I'll take an estimate.

12         A.    I think May of '91 maybe.

13         Q.    Okay.

14         A.    Something like that.

15         Q.    So is it fair to say that you've spent

16   the majority of your working career with SHRM?

17         A.    It would.

18         Q.    Okay.

19         A.    I worked for government contractors

20   after graduation around here, but I've been at SHRM

21   since November 1993.

22         Q.    Got it.

23               THE STENOGRAPHER:  And I need to

24   interrupt.

25               What did you say at the very beginning?

```
 1    You worked what with contractors?

 2                 THE DEPONENT:  I worked with a couple

 3    government contractors on the side of -- before SHRM.

 4         Q.    (By Ms. DeFazio)  All right.

 5    Ms. Morris, who made the decision to terminate

 6    Ms. Mohamed?

 7         A.    It was a collaborative decision with me,

 8    Carolyn Barley and -- (Zoom audio disruption) -- along

 9    with the HR team.

10         Q.    Okay.  And I missed -- you cut out

11    there.  Who did you have in that list?

12         A.    Myself; Carolyn Barley, her manager; my

13    boss, chief global development -- or chief commercial

14    officer is his title now, Nick Schacht; along with

15    Sean Sullivan.

16         Q.    Okay.

17                 THE STENOGRAPHER:  Can we go off the

18    record for just a moment?

19                 (Discussion held off the record.)

20         Q.    (By Ms. DeFazio)  All right.  When was

21    the decision made?

22         A.    The decision made to terminate Ruby was

23    made right around -- I would say when she missed her

24    deadlines, which was, I think, August 31.

25         Q.    Okay.  And you mentioned it being a
```

1    collaborative decision.  Implied in that, were there

2    discussions -- multiple discussions between all of you

3    about the decision or just one meeting?  How did that

4    work?

5          A.    There was one meeting, I believe,

6    that --

7          Q.    Okay.

8          A.    -- where she missed the deadlines and we

9    made the decision that it was -- it was time for

10   the -- for the business that we separate.

11         Q.    Okay.  And tell me about that meeting.

12               When did it take place and by what

13   means?

14         A.    It was over the phone.

15         Q.    Okay.

16         A.    Sean called me and just wanted to

17   corroborate kind of that I supported the decision.

18   And we spoke about, again, the missed deadlines and

19   Carolyn supported it as well.

20         Q.    Okay.  So it sounds like that was a

21   phone call from Sean to you --

22         A.    Yes.

23         Q.    -- correct?

24         A.    Yes.

25         Q.    Was anyone on that call?

1          A.    No.

2          Q.    Okay.  So did the four of you ever

3    jump --

4          A.    So then --

5          Q.    Wait.  Let me just finish.  I'm sorry.

6                Did the four of you actually jump on the

7    phone and have a meeting to discuss the termination

8    decision?

9          A.    No.

10         Q.    Okay.  So sorry.  What were you going to

11   say?

12         A.    I was going to say that Nick came to my

13   office, and we discussed it on August 31 shortly, I

14   believe, after Sean called me.

15         Q.    Okay.  So the order was Sean calls you

16   and says that -- what?

17         A.    Sean said, "I wanted to confirm that

18   you're moving forward" -- "we're going to move forward

19   with separating Ruby, and I just wanted to make sure

20   that you were on board."

21         Q.    Okay.  And did he mention anything about

22   whether Carolyn supported it, Nick supported it,

23   anyone else?

24         A.    I don't recall specifically.

25         Q.    Okay.  So Sean calls you.  Nick pops

1    into your office and says what?

2        A.    He just said, "We're moving forward.

3    She missed her deadlines, we're moving," you know, "I

4    understand we're moving forward with the separation,

5    and let me know how I can support you."

6        Q.    Okay.  And did you have some sort of

7    communication with Ms. Barley that same day on

8    August 31?

9        A.    I -- that, I cannot recall if it was in

10   person, if she was in the office at that time because

11   some of us were still remote.  But, yes, we had a call

12   as well, and I confirmed with her that I spoke with

13   Sean.

14       Q.    Okay.  So you think it happened call

15   with Sean, Nick comes into your office, and then you

16   have a call or an in-person meeting with Carolyn

17   Barley?

18       A.    The way I recall it.

19       Q.    Okay.  And who -- was it understood

20   that -- who was actually going to be doing the

21   terminating?

22       A.    Carolyn would be doing the termination

23   with Mike Jackson, who was part of the HR team.

24       Q.    All right.  And was that the first time

25   that all of you had talked about terminating

1    Ms. Mohamed?

2         A.    Yes, I believe so --

3         Q.    Okay.

4         A.    -- because we were waiting -- we were

5    waiting to see if she would meet her deadlines for her

6    programs.

7         Q.    Okay.  So had it been decided that if

8    she did not meet that August 31 deadline, she would be

9    terminated?

10        A.    I think that, as I recall, we decided

11   when we talked about it, if she did not meet her

12   deadlines, that termination and separation would be an

13   option.

14        Q.    And when did --

15        A.    Yes.

16        Q.    And when did you talk about it?

17        A.    Probably in the weeks leading up to it.

18        Q.    Okay.  Do you have a recollection of how

19   far in advance from the deadline you had that

20   discussion?

21        A.    I would say, if we had the discussion,

22   it was probably maybe -- when we were talk -- you

23   know, talking about how we could really move forward,

24   we wanted to all move forward together.  So I'd say

25   when we got to the talk about the separation, maybe

16

1    within three to five business days of that might be

2    what we take -- what we do.

3                    And, again, this is to my best

4    recollection.

5           Q.    Okay.  And you said three to five

6    business days before August 31?

7           A.    Is when we talked about would that be an

8    option if she missed her deadlines again.

9           Q.    Got it.  Okay.  And tell me about -- and

10   I know you're already struggling to remember exactly

11   when this happened, but was that a phone call with all

12   four of you, or was it, again, you know, kind of

13   disparate meetings with each person?  Or by email

14   perhaps?

15          A.    It was not by email.  At this point

16   there was a lot of communication between Nick and Sean

17   about this, so he would probably be a little closer to

18   it, that time frame.

19          Q.    Okay.  Well, tell me what you remember

20   about the meeting with all four of you or however many

21   there were.

22          A.    I don't recall that there was a

23   collective meeting between all four of us.

24          Q.    Okay.  So what do you recall in that

25   three to five business days before August 31 when some

1    number of you had a discussion about termination being

2    an option if Ms. Mohamed missed the August 31

3    deadline?

4          A.    What I recall is there were discussions

5    around the mediation that Bernée was trying to do with

6    the two employees, and I believe that was not going to

7    continue.  So there were discussions around that.

8                There were discussions around if Ruby

9    was actually, during this time frame, working,

10   communicating with her team, communicating, you know,

11   what was going on.  And those discussions probably

12   happened more in person, in passing, because then

13   we -- you know, I do recall a phone call with Mike

14   Jackson probably during that time frame talking maybe

15   perhaps to Bernée, because she communicated that Ruby

16   had not -- had declined mediation.

17         Q.    Okay.  And with whom do you recall

18   discussing prior to the August 31 deadline if

19   Ms. Mohamed doesn't meet this deadline, termination is

20   an option?

21         A.    Sean and Nick.

22         Q.    Okay.  And do you think that that

23   happened in two -- in one call with both of them or

24   meeting with both of them?

25         A.    It did not.

1          Q.     Okay.

2          A.     Most of these discussions were Nick

3     popping into my office after he talked to Sean --

4          Q.     Okay.

5          A.     -- because they were -- they were peers.

6          Q.     I see.  So tell me what you recall about

7     your conversations with Nick about the possibility of

8     terminating Ms. Mohamed if she did not meet the

9     August 31 deadline.

10         A.     I think we were just -- we would discuss

11    kind of how operations were moving forward, how we

12    could get the work completed, what we should do to,

13    you know, for -- what was right for the business, and,

14    you know -- and we both decided, you know, let's wait

15    and see what happens on August 31.  Because for all

16    intents and purposes, we wanted Ruby to meet her

17    deadlines, and we were hoping that's what would

18    happen.

19         Q.     Why was there a business need to

20    terminate her if those deadlines weren't met?

21         A.     There was a business need because we --

22    these were programs that we had advertised to be held,

23    and we needed to get them completed.  And when you

24    have at that point an employee that is not

25    communicating or delivering on content that needs to

1    keep the business going, that you have to make a

2    decision for the business at that point of what is

3    right.

4              And terminating an employee who is not

5    contributing value and has shut down in mediation, it

6    was just -- it was the right decision for the business

7    at that time.

8              MS. DeFAZIO:  And off the record for a

9    sec.

10             (Recess from 8:50 a.m. to 8:53 a.m.)

11        Q.   (By Ms. DeFazio)  All right.  Thank you,

12   Ms. Morris.  So returning to your recollection that

13   you were sharing about those discussions with Nick,

14   you were talking about the business reason that you

15   felt that was relevant here.

16             So can you repeat again what you all

17   felt that the business reason was for having to

18   terminate Ms. Mohamed if she didn't meet her August 31

19   deadline?

20        A.   There were programs scheduled.  So when

21   programs were open on the website and they're

22   scheduled and the work is not being completed and the

23   deadlines are not met -- and we just got to a point

24   where these deadlines had been extended three or four

25   times and -- with no meeting, with -- you know, when

1    an employee is not contributing, it's -- at that point

2    it -- has not agreed to mediation and is not

3    communicating with the organization about the progress

4    they're making, it just -- it became time that it was

5    time for us to separate in order to move forward and

6    get these programs developed.

7             And that was the decision that was made.

8        Q.   With respect to the mediation, my

9    understanding is that it was -- it was offered as an

10   option to help Ms. Barley and Ms. Mohamed move through

11   the issues in their relationship.

12            Is that fair to say?

13       A.   Yes.

14       Q.   Okay.  So what's the relevance of

15   whether Ms. Mohamed was willing to participate in the

16   mediation?  How is that relevant to her being able to

17   meet her deadlines?

18       A.   Well, it's relevant because you have to

19   be able to communicate with your manager who has

20   oversight of those programs and is keeping things

21   moving forward.  And if the two of them could not

22   communicate and there was no desire to improve the

23   communication -- and there was a complete lack of

24   communication, from what I recall, with the

25   organization and team at that point.

1          Q.    Okay.  And are you -- where does your

2    assumption come from that Ms. Mohamed had no desire to

3    improve her communication with Ms. Barley?

4          A.    I -- that is what I was told from Bernée

5    when she pulled out of mediation.

6          Q.    Okay.  So --

7          A.    That she no longer wanted to continue

8    working on the relationship.

9          Q.    That's what Ms. Long told you that

10   Ms. Mohamed communicated to her?

11         A.    Yes.

12         Q.    Okay.

13         A.    Something in that vein.

14         Q.    Okay.  So Ms. Long didn't say anything

15   about Ms. Mohamed just not wanting to work with

16   Ms. Long?

17         A.    No.

18         Q.    Okay.  Did you follow up with

19   Ms. Mohamed directly to find out why she had opted out

20   of mediation?

21         A.    No.

22         Q.    Why didn't you do so?

23         A.    I was told during the process that HR

24   was working the process, that Nick was working the

25   process, and I was told to remove myself from the

1    process at that point.

2          Q.    Okay.  And the process being just

3    dealing with Ms. Mohamed?

4          A.    The process of letting them -- them

5    work, HR work -- what they were doing as far as

6    mediation, et cetera, they didn't want any

7    interference there, outside interference from me with

8    that.

9          Q.    Okay.

10         A.    That's how I would summarize it.

11         Q.    I see.  And so, to the extent you know,

12   was there another plan for helping Ms. Barley and

13   Ms. Mohamed work through communication issues they

14   were having other than mediation?

15         A.    Not that I'm aware of.

16         Q.    Okay.  And, again, you relied on what

17   Ms. Long told you about why Ms. Mohamed had opted out

18   of those sessions; is that right?

19         A.    I relied on what Sean Sullivan and

20   Ms. Long told me about that, yes.

21         Q.    Okay.  But Ms. -- okay.  Gotcha.

22               All right.  You also mentioned that at

23   the time -- so in the, you know, week or so leading up

24   to the August 31 deadline -- that Ms. Mohamed had shut

25   down and stopped communicating with her team.

1          Did I hear you right?

2          A.    That's what I was told, yes.

3          Q.    Okay.  Who told you that?

4          A.    Carolyn Barley.

5          Q.    Okay.  And did she -- what else did she

6     share with you --

7          A.    That they were no longer --

8          Q.    -- about that?  Oh, sorry.

9          A.    That was what I recall was said in that

10    time frame.

11         Q.    So Ms. Barley told you that

12    Ms. Mohamed --

13         A.    Just that she had --

14         Q.    -- was not communicating?

15         A.    -- not -- yeah.

16         Q.    Okay.  Sorry.

17               So tell me again, what else do you

18    recall Ms. Barley telling you about Ms. Mohamed's

19    communication in that last week or two with her team?

20         A.    I just recall during that time frame of,

21    let's say, probably -- again, that three to five days,

22    or even -- and it could have been longer -- that there

23    was no communication from Ruby showing up for team

24    meetings, et cetera.

25         Q.    Okay.  And Ms. Barley said no

1      communication whatsoever?

2              A.      From what I recall, yes.

3              Q.      Okay.

4              A.      And, again, I don't recall if there were

5      some emails.  I don't believe there were Zoom meetings

6      or anything of that nature.

7              Q.      All right.  And during that, let's say,

8      three to five days, maybe up to two weeks before the

9      August 31 deadline, did you reach out to Ms. Mohamed

10     to check in with her and see why she was supposedly

11     not communicating with her team?

12             A.      I did not.

13             Q.      Okay.

14             A.      HR was working on that.

15             Q.      Okay.  And is that because HR had told

16     you to not basically involve yourself in this

17     situation?

18             A.      Yes.  At that point, Ruby was

19     communicating with HR, from what I understood, and

20     perhaps Nick at that point to some degree.  And,

21     again, the exact dates, I don't recall.

22             Q.      Okay.  And who -- who did that directive

23     come from to not interfere or be involved in this

24     process?

25             A.      I believe it came from the HR team

 1     during this time because they were trying to -- again,

 2     they were trying to investigate.  They were -- and

 3     they told me that they would be taking care of the

 4     communications and the mediation.

 5          Q.   Who specifically?

 6          A.   I don't recall.  I -- it could have been

 7     a collective communication from Sean Sullivan and Mike

 8     Jackson.

 9          Q.   Okay.  Now, at this point, you had known

10     Ms. Mohamed for a number of years; is that right?

11          A.   Yes.

12          Q.   Okay.  And you had -- is it fair to say

13     you had a great amount of respect for her personally

14     and professionally?

15          A.   Yes.

16          Q.   Okay.  And so you didn't feel any need

17     to reach out to her just person to person to find out

18     what was going on?

19          A.   No.

20          Q.   All right.  Now, let's talk about the

21     deadlines being extended, I think you said, three to

22     four times; is that accurate?

23          A.   Yes.

24          Q.   Okay.  So there are two projects that

25     Ms. Mohamed was working on; is that right?

1          A.     Uh-huh.

2          Q.     And --

3          A.     Yes.

4          Q.     And the first was, I think, Digital HR,

5    correct?

6          A.     Correct.

7          Q.     And the second was Compliance and

8    Employment, I think; is that right?

9          A.     Yes.

10         Q.     Okay.  So each one of those had

11   deadlines that had been extended three to four times?

12         A.     Not both of them.  Digital -- Digital HR

13   was extended several times, and Compliance was

14   extended as well.  I'd have to think about that one.

15         Q.     Okay.  So how many times was Digital

16   HR's deadline extended?

17         A.     The project commenced in January and

18   then it was due end of April.  And then we extended it

19   to May, then it was extended to July, and then it was

20   extended to August 31.

21         Q.     Okay.  All right.  And then how about

22   Compliance?

23         A.     Compliance was picked up in February --

24   I want to say somewhere in February she picked up

25   Compliance.  And that was due probably -- it had to --

1    it had less work to be done in it.  So I want to say

2    that one was probably due maybe -- it could have been

3    end of April, May, and then was extended out again

4    into later in the summer of -- I want to say maybe

5    June, and then August 31.

6            The exact specifics on that one, I can't

7    recall the exact date.

8        Q.    Got it.  And are you looking at notes in

9    front of you, or are you just remembering from your

10   own recollection?

11       A.    My own recollection.

12       Q.    Okay.

13       A.    There are -- I have no notes in front of

14   me.

15       Q.    Great.  So Digital HR, it's my

16   understanding that that program had actually already

17   been completed and was offered up for people to sign

18   up for in 2020; is that right?

19       A.    Completed by Ruby or completed?

20       Q.    Just completed, that the program had

21   already been completed once.

22       A.    Not to my recollection.

23       Q.    Okay.  And then it -- and it may have

24   not been 2020, but that at some point before

25   Ms. Mohamed was given the project to work on, it had

1    been completed, put up on the website, people were

2    able to sign up for it, but then it was taken down

3    because not enough people had registered.

4              Does that sound familiar?

5        A.    That does not.  But we will put programs

6    up on the website and advertise them before they're

7    completed.

8        Q.    Okay.  But, again, you don't recall that

9    Digital HR specifically had actually been a completed

10   offering, but then it had been delayed by SHRM because

11   not enough people had signed up for it?

12       A.    It was delayed because not enough people

13   had signed up for it at some point.  But I don't

14   recall that there was an existing program of Digital

15   Transformation at that time.

16       Q.    Okay.  And then Compliance, you said

17   that there was less work to be done on that program.

18   Tell me what you mean about that.

19       A.    It is my recollection that another

20   designer had started that, and there was more existing

21   content for that program.

22       Q.    Okay.  Do you recall a SME, a subject

23   matter expert -- I'll refer to it as SME, S-M-E.

24              Do you recall a SME named Lou Lessig

25   being involved in the Compliance project?

1            A.    I do.  I do.

2            Q.    Okay.  And originally, was he the one

3       who was actually creating that program?

4            A.    He was helping us to write the content

5       for it.

6            Q.    Okay.  But at some point Ms. Mohamed

7       volunteered to take on the project as its creator and

8       to use Mr. Lessig as a SME; is that right?

9            A.    Correct.

10           Q.    Okay.  And did -- when did that happen?

11           A.    I would say that was probably Q1 of

12      2020.

13           Q.    Okay.  Do you think it may have occurred

14      later in -- maybe in June or July?

15           A.    That she took on the project in June or

16      July of Compliance?

17           Q.    Well, let me back up and say it's my

18      understanding that at some point the -- her role with

19      Mr. Lessig switched, so he was going to be the one who

20      was in charge of marshaling the project with her

21      support, and then it became Ms. Mohamed moving in and

22      actually being the one in charge of the project using

23      him as a SME.

24                 Does that sound familiar?

25           A.    It -- I would have to go back, because

1    it wouldn't be -- we wouldn't usually have someone

2    writing a program like that, so I can't answer for

3    sure on that.

4         Q.    Okay.  Do you recall some change --

5         A.    Lou would have -- Lou would have been

6    the SME, so the designer would have been really doing

7    the analysis.  Perhaps there was some -- more of a

8    collaboration around that, but I would have to go back

9    and kind of think about that a bit more.

10        Q.    Okay.  Do you recall there being a

11   change of roles between Mr. Lessig and Ms. Mohamed in

12   the context of that Compliance program?

13        A.    I don't recall the specifics of that.

14        Q.    Okay.  Do you recall Mr. Lessig being

15   not terribly timely in him providing information for

16   that program?

17        A.    Yes.

18        Q.    Okay.  Tell me what you recall in that

19   regard.

20        A.    I recall that pulling content from him,

21   there were delays at times.  So I believe that -- I

22   wasn't involved in the day-to-day of this project, so

23   to give you exact of what happened there -- I do

24   believe that he did -- there were delays, but that he

25   finally did respond and meet and get more involved in

1    his commitment.

2         Q.    Who would be more familiar with the

3    day-to-day proceeding of this project?

4         A.    Carolyn Barley.

5         Q.    Okay.

6              THE STENOGRAPHER:  Ms. Spittell, would

7    you mind muting your computer audio, please?

8              MS. SPITTELL:  Sorry.

9         Q.    (By Ms. DeFazio)  And with respect to

10   the Digital HR program, do you remember the SME who

11   was involved in that program?

12        A.    It was I believe a lady named Deborah

13   Waddill.

14        Q.    That sounds familiar to me.

15        A.    Does that sound familiar?

16              And then I believe there were some other

17   SMEs that they used as well.  We could -- we could go

18   back and provide that list to you.

19        Q.    Okay.  Do you recall that Ms. Waddill

20   had quite a bit of information to share with you, her

21   thoughts about the program?

22        A.    I do.

23        Q.    Okay.  Did she email you quite a bit

24   with ideas and thoughts and reflections about it in

25   the summer of 2020?

1           A.    I don't recall if she emailed the

2   thoughts.  I think that she called us at one point --

3           Q.    Okay.

4           A.    -- and . . .

5           Q.    But she had some fairly robust comments

6   on a draft of the presentation, did she not?

7           A.    I'm trying to recall.  I know that she

8   did have a lot she wanted us to incorporate.  But I

9   don't -- but we -- although I know we wanted to

10  incorporate some of her book, we did not -- I believe

11  the thinking back -- she had a different vision for

12  the program of how she wanted it to look versus kind

13  of how she taught it versus the HR lens and how SHRM

14  wanted to take the course.

15          But the specifics of that, you would

16  have to probably talk to Carolyn Barley about that.

17          Q.    Okay.  Is it safe to say, though, that

18  Ms. Mohamed was put in a position where she had to try

19  to balance those competing visions?

20          A.    Yes.

21          Q.    Okay.

22          A.    And that would be standard practice for

23  a senior designer, to balance what the SME wants and

24  what their original analysis was for the course.

25          Q.    Okay.  What is the -- switching gears,

```
 1   what is the evaluation process at SHRM now for

 2   employees?

 3           A.    The evaluation process for SHRM

 4   currently is -- they're incorporating a new process

 5   right now.  So they have not presented us with the new

 6   performance management process.

 7           Q.    Ah.  Okay.  So why don't we talk about

 8   what was in effect in 2020, so during Ms. --

 9                 MS. SPITTELL:  Objection.  Foundation.

10                 MS. DeFAZIO:  Okay.  I'm not

11   completed -- I haven't completed my question yet.

12           Q.    (By Ms. DeFazio)  Are you aware of what

13   the evaluation procedure was in place in 2020?

14           A.    Yes.

15           Q.    Okay.  Can you please tell me about

16   that?

17           A.    We had quarterly review processes where

18   the manager would complete the employee's review.

19           Q.    Okay.  And what was the timeline for

20   that?

21           A.    They were quarterly reviews.

22           Q.    Okay.  But when were -- was there a

23   self-evaluation involved that then the manager

24   reviewed?  What was the process in a bit more detail?

25           A.    So some managers, I believe the
```

```
 1    instructional design team, they would submit kind of

 2    what their successes were, what they had completed, to

 3    make sure the manager was aware.

 4         Q.    Okay.  And that would happen in advance

 5    of the due date for the quarterly reviews?

 6         A.    It would.

 7         Q.    Okay.

 8         A.    But not, I would say -- I'm trying to

 9    think of the process here.

10               Yep.  It -- that's how it was.

11         Q.    Okay.  What is your approach to --

12         A.    Sorry.

13         Q.    That's fine.

14               What is your approach in providing

15    written evaluations to employees?

16         A.    My approach is that -- I'm evaluating

17    usually at a director level, so my approach is to make

18    sure that I outline what their successes are, where I

19    would like to see them develop, and show recognition

20    where it's earned, but also make sure that I give them

21    growth possibility.

22         Q.    Okay.  And are growth possibilities

23    areas where they need to improve or where they could

24    potentially improve?

25         A.    It could be that or it could be
```

1      growth -- to make sure they're growing professionally.

2           Q.    Would you agree with me that it's

3      important that employees receive feedback on their

4      performance?

5           A.    Yes.

6           Q.    Okay.  And -- so that they know of

7      what's expected from them, right?

8           A.    Correct.

9           Q.    Okay.  And it's also important that they

10     know if there's any areas where they need to improve?

11          A.    Yes.

12          Q.    Okay.  Do you think it's important to

13     have evaluations accurately reflect how an employee is

14     doing at work?

15          A.    Yes.

16          Q.    Did SHRM provide any training to you on

17     the process of providing these quarterly and annual

18     reviews in 2020?

19          A.    Yes.  SHRM always provides training for

20     performance reviews --

21          Q.    Okay.

22          A.    -- through HR.

23          Q.    Got it.  And is that -- who is that

24     geared towards?  What level of employee?

25          A.    It's open to anyone who is a people

1    manager.

2         Q.    So if you have a direct report, one or

3    more, then that's for you?

4         A.    Uh-huh.

5         Q.    Okay.

6         A.    Yes.

7         Q.    In 2020, did SHRM have a progressive

8    discipline policy?

9         A.    I don't believe we did at that point.

10         Q.    Okay.  Do you currently?

11         A.    No.

12         Q.    Okay.  Has SHRM ever had --

13         A.    I don't believe so.

14         Q.    Sorry.  Has SHRM ever had a progressive

15    discipline policy during your employment there?

16         A.    Yes.

17         Q.    Okay.  And when's the last time you

18    recall that being in place?

19         A.    I recall a performance improvement plan

20    being in place probably -- 2018 is the last time

21    maybe.  I could not answer accurately right now.  But

22    there was a -- there was a -- it was in place at one

23    point in time.

24         Q.    Okay.  Have you received training as a

25    people manager about progressive discipline generally?

1          A.     Yes.

2          Q.     Okay.  And when is the last time you

3     remember that training happening?

4          A.     I would say there's always ongoing

5     training about leadership and improving and discipline

6     and really in general making sure that you do

7     everything you can to set an employee up for success,

8     if not formal training, through a conversation.

9          Q.     Okay.  When's the last time you recall a

10    formal training?

11         A.     I would say, at the management level,

12    there's a program that managers are put through called

13    the People Manager Qualifications.  So there's

14    formalized -- there's training there in that program.

15    And I would say that launched towards the end of 2020,

16    but SHRM managers are actively going through that now.

17         Q.     Got it.  And when you complete it, do

18    you get an icon that you can put under your signature?

19         A.     Yes, a digital badge.

20         Q.     Got it.  I have seen that.

21                What is your understanding generally

22    about progressive discipline and when it should be

23    used?

24         A.     When -- it should be used -- when

25    there's an issue with an employee and they can't meet

1    their goals, I think it's important to understand why

2    they can't meet their goals and deadlines.  And I

3    think that you should give them all the tools and

4    resources they need to get there.

5        Q.    Okay.  And formally, what does that look

6    like, giving them the tools they need to get there?

7        A.    Formally, for me it would be offering

8    them coaching, offering them maybe courses to develop

9    further skill sets.  It would be -- empathize --

10   showing empathy and getting their perspective and

11   understanding of what's going on.  So a lot of talking

12   through what's going on.

13          But then also making sure that they are

14   very clear on the goals we need them to reach as

15   employees of the organization.

16       Q.    Okay.  And as a matter of course, does

17   SHRM formalize that in some way, for example, through

18   a performance improvement plan?

19       A.    I would say SHRM wants conversations to

20   happen regularly around performance.  They don't want

21   an employee to be surprised at a performance review.

22       Q.    So are performance improvement plans

23   utilized at SHRM?

24       A.    To my knowledge, no.  Not formalized

25   ones.

1      Q.    Okay.  Informal ones?

2      A.    I would say HR can -- will get involved

3  where there's issues and where you want to set someone

4  up for success, but I have not seen a formal

5  performance improvement plan where it's actually

6  written up through HR since around 2018.  But I could

7  not answer that exact of what's currently in place.

8           Because there's a code of conduct.  You

9  know, there's policies around, you know,

10  antiharassment.  You know, there's policies of, you

11  know, nonretaliation and making sure there's an

12  open-door policy for open communication.

13      Q.    Well, wouldn't you agree with me that

14  there are times that perhaps verbal coaching, talking

15  things through, that an employee -- even with that, an

16  employee could actually benefit from having something

17  written of what's expected of them, right?

18      A.    They could.  And I think that can --

19  that can happen if it's through email.  Sometimes

20  you'll be coached or you have a conversation with

21  someone and say, "Per our discussion today, here's A,

22  B, C, D of what we need to have happen by X date," or

23  something along those lines.

24      Q.    Okay.  But maybe in a document there --

25      A.    But there would -- yes, there would be a

1    record of that.

2         Q.    Okay.  But do you think there would be

3    some value for a document like a performance

4    improvement plan that can be returned to periodically

5    to revisit what the goals are and how an employee is

6    progressing?

7         A.    I think whether there's a form -- there

8    is a formal document.  And when you have your

9    one-on-one meetings and you're going through your

10   goals, then you have a project management software in

11   place or however it is that you're documenting

12   progress.  That is the formal plan.

13        Q.    And you're referring --

14        A.    When you -- I just -- sorry.  Did you

15   have a question?

16        Q.    Yeah.  Are you referring to the

17   quarterly reviews or a different document?

18        A.    I'm saying when you have one-on-one

19   meetings with your boss, you go through where you are

20   in relation to your deadlines, and you have that

21   conversation on a weekly basis, maybe a biweekly

22   basis.

23        Q.    Does SHRM actively discourage managers

24   from using PIPs, performance improvement plans?

25        A.    No.

1          Q.    Do they actively discourage you from

2    using some sort of other written documentation of

3    performance?

4          A.    Not at all.  They encourage it.

5          Q.    Okay.  Do you provide warnings to

6    employees that you're aware of?

7          A.    I'm not aware of that.

8          Q.    Okay.  So if an employee is not

9    performing up to par, are there any formal

10   documents -- any formal documentation of that other

11   than what you've described, for instance, in emails?

12         A.    There is formal documentation as far as,

13   I would say, notes.  As far as conversations that

14   might happen with HR, HR will be documenting what

15   happened, and, again, the emails of "You are" -- "We

16   need you to perform up into your role," I think the

17   formalization through the previous performance

18   management system.  So I think you come at it

19   collectively.

20         Q.    What is SHRM's performance management

21   system?

22         A.    Right now, I'm unaware of what the new

23   system is called because we haven't used it yet.

24         Q.    What was it effective in 2020?

25         A.    It was through -- I want to say it was

1    through Dayforce.  I would have to go back to the

2    original name of the software.  It's escaping me right

3    now.

4         Q.    Sure.  And is Dayforce something that

5    both employees and their managers have access to?

6         A.    Yes.  The performance management system,

7    you have the opportunity to accept and comment on your

8    performance review.

9         Q.    Okay.  So the performance management

10   system that was in place in 2020, Dayforce,

11   presumably, if that's it, was that used only to manage

12   the quarterly and annual reviews?

13        A.    Can you repeat that?

14        Q.    Sure.  Let me ask it a different way.

15            So if an employee is exhibiting some

16   issues with performance and that's documented in some

17   way, would that be documented in Dayforce or whatever

18   the performance management system is?

19        A.    It would -- depending on the timing of

20   the review and what's going on, it would be documented

21   in the review and/or it would likely be documented in

22   the communications of email between the manager and

23   employee.

24        Q.    So there's not a place in the -- in

25   Dayforce where there would be some formalized

 1    documentation of a performance issue?

 2         A.    No.

 3         Q.    Okay.  I guess I'm not understanding the

 4    reliance on --

 5         A.    But there could be --

 6         Q.    Sorry.

 7         A.    Oh, sorry.

 8         Q.    I'm not understanding the reliance on

 9    email going back and forth if an employee is

10    struggling with some sort of performance issue.

11               Why is SHRM resistant to putting that --

12    formalizing that in some way, either in a warning or a

13    performance improvement plan or some other written

14    document?

15         A.    So I wouldn't say SHRM is resistant to

16    that.  I think SHRM is more encouraging kind of a

17    day-to-day communication and assurance that you're

18    helping and guiding and coaching and making sure that

19    this employee has what they need to successfully do

20    their job.

21               So I would say that -- also, in this

22    point in time, most of these conversations -- and

23    being that Ruby was remote, it did happen through

24    technology.  So it might have happened through email,

25    it might have happened through Slack, over the phone,

1    Zoom, things of that nature.

2         Q.    Would you agree with me that the

3    effectiveness of that coaching really relies on the

4    effectiveness of a manager?

5         A.    Yes.

6         Q.    You mentioned Slack.  Is that the

7    primary way in which employees at SHRM communicated in

8    2020 other than email?

9         A.    Uh-huh.  I would say so.

10        Q.    Okay.  Have you ever -- have you been

11   asked to look through your Slack messages for

12   documents or communications relevant to this lawsuit?

13        A.    No, because I don't use Slack really

14   that often.

15        Q.    Did you use it at all --

16        A.    I --

17        Q.    -- in 2020?

18        A.    I -- if I did, it was very rare, from

19   what I recall.

20        Q.    Okay.  So, again -- but you have never

21   been instructed --

22        A.    I --

23        Q.    Go ahead.

24        A.    Okay.  No, I haven't.

25        Q.    Okay.  You've never been instructed to

 1    actually review your Slack messages for relevant

 2    communications to this lawsuit, have you?

 3            A.    No.

 4            Q.    Have you been directed to search for

 5    relevant text messages to -- that are relevant to this

 6    lawsuit?

 7            A.    I could have -- I would have to go back

 8    and look.  I think it could have -- it -- I'm probably

 9    misspeaking that it said to go back and look through

10    anything, yeah.

11            Q.    Okay.

12            A.    Related to communications.

13            Q.    And same question for emails.

14            A.    Yes.

15            Q.    Okay.  So you were directed to search

16    for emails that were relevant to this lawsuit?

17            A.    This particular one, I -- I'm thinking

18    of the CCRD complaint -- or request of -- at that

19    time.  I would have to go -- I can't answer that

20    accurately --

21            Q.    Okay.

22            A.    -- right now.

23            Q.    Okay.  But to your --

24            A.    I'd have to go back.

25            Q.    But, to your knowledge, have you ever

```
 1    been directed either by an external attorney or

 2    in-house attorney to not delete any of your

 3    communications because of this case?

 4         A.    Yes.

 5         Q.    Okay.

 6         A.    Yes.  But I can't recall the exact

 7    words.

 8         Q.    Okay.  Do you recall around when that

 9    was?

10         A.    No.

11         Q.    All right.  Do you think it was after

12    Ms. Mohamed's termination at some point after August

13    of 2020?

14         A.    I'd have to go back and look.

15         Q.    Okay.  So I'll represent to you that I

16    haven't seen a single text message or Slack from your

17    account, so we don't have anything.

18              Have you provided anything to the

19    attorneys either on this call or in-house?

20         A.    No.

21         Q.    Okay.  Do you still have the text

22    messages on your cell phone that you exchanged with

23    Ms. Mohamed and Ms. Barley, Mr. Schacht, Mr. Sullivan

24    during the relevant time period here in 2020?

25         A.    I'm -- what specific ones with Nick or
```

1    Sean?

2         Q.    Do you have text messages with them from

3    that period?

4         A.    I don't with Sean or Nick or -- I don't

5    have any text messages from that period right now.

6         Q.    Where are they?

7         A.    I have changed phones and I delete my

8    text messages.

9         Q.    Okay.  So you remember receiving a

10   letter that told you not to delete communications, but

11   you may have not done that with your cell phone?

12        A.    I can't answer that.

13        Q.    Okay.  When was the last time you

14   changed your phone?

15        A.    I just changed my phone in December.

16   And prior to that, I would have to look.  It was

17   probably somewhere in 20- -- 2021 or something.

18        Q.    Do you still have your old phones?

19        A.    No.

20        Q.    Okay.  What do you do with them?

21        A.    I mail them back.

22        Q.    Do they give you a discount for doing

23   that?

24        A.    Yes.

25        Q.    I have a lot of old phones sitting

1    around.

2                    Okay.  All right.  Along the lines of

3    that progressive discipline that we were just talking

4    about, do you think it's important to give employees

5    the opportunity to improve their performance before

6    they're terminated?

7            A.    Yes.

8            Q.    And why is that?

9            A.    Because you want to give an employee

10   every chance and set them up for success.

11           Q.    Yeah.  So you're presently the VP over

12   education; is that right?

13           A.    Uh-huh.

14           Q.    How large is that -- and that's a yes?

15           A.    I believe there's a -- 17 positions,

16   something in that range.

17           Q.    Okay.  So 17 employees in education?

18           A.    Yes.  There's some open positions right

19   now.

20           Q.    Okay.  All right.  Has that changed

21   since 20- -- August of 2020?

22           A.    I would say we've added some positions

23   in the program side, yes.

24           Q.    Okay.  About how many?

25           A.    I believe we've added -- I'd say we've

1    added a couple of instructional design positions, some

2    eLearning positions.

3            Q.    So you think about two since 2020?

4            A.    Well, I'd say anywhere between three to

5    four.

6            Q.    Okay.  Who are your direct reports

7    currently?

8            A.    Currently, I have two directors

9    reporting to me.

10           Q.    Okay.  And what are their names?

11           A.    Liz Lacey, Susie Davis.  I have an

12   education specialist, Carol Spears --

13           Q.    Okay.

14           A.    -- Carolyn Barley, and Ann Godmere.

15           Q.    And both Ms. Barley and Ms. Godmere

16   report to you directly?

17           A.    They do.

18           Q.    Okay.  And am I right that there's

19   typically someone between you and Ms. Godmere?

20           A.    Yes.

21           Q.    Okay.  And is that --

22           A.    (Zoom audio disruption.)

23           Q.    Okay.  And that position was last held

24   by Brian Simms, correct?

25                 THE STENOGRAPHER:  I'm sorry.  I didn't

1    hear what you said -- "between you and Ms. Godmere,"

2    Ms. Morris.

3             THE DEPONENT:  Can you repeat the

4    question so I know which one I am answering?

5             MS. DeFAZIO:  Jenny, can you read it

6    back?

7             THE STENOGRAPHER:  Yes.

8             MS. DeFAZIO:  That would be great.

9             THE STENOGRAPHER:  The question was "Am

10   I right that there's typically someone between you and

11   Ms. Godmere?"  And you said, "Yes, and then you added

12   something to the end of your answer that I did not

13   hear.

14            THE DEPONENT:  I said, "Yes," and then I

15   believe I was asked a second question about -- (Zoom

16   audio disruption).

17            THE STENOGRAPHER:  About what?

18            THE DEPONENT:  Was I asked a second -- a

19   different question after that?

20            MS. DeFAZIO:  Okay.  Well, we'll stick

21   with "yes."

22       Q.    (By Ms. DeFazio)  So since Mr. Simms was

23   terminated, is that position now open?

24       A.    That position is not open.  We've made

25   the decision that we are going to outsource a large

1    part of the instructional design work.

2        Q.    I see.  So is -- Ms. Barley and

3    Ms. Godmere, are they the only remaining instructional

4    designers?

5        A.    Currently, yes.

6        Q.    Okay.  Is there a plan to hire any more?

7        A.    Yes.  We're going to look at either

8    hiring another senior or perhaps a senior and a -- a

9    lower-level instructional design.  We're just kind of

10    thinking about how we're going to balance internal

11    needs with outsourcing.

12        Q.    How is that -- that group of direct

13    reports that you just listed, were they the same group

14    that you had in August of 2020?

15        A.    Ann did not report to me in 2020.  But

16    in 2020, Susie did, Liz did, Carol Spears did.

17        Q.    And Ms. Barley as well?

18        A.    And Ms. Barley, yes.

19        Q.    Okay.

20            MS. DeFAZIO:  Okay.  Well, why don't we

21    take a five-minute break just to give Jenny the chance

22    to rest her hands.  Sorry.  We can go off the record.

23                (Recess from 9:38 a.m. to 9:48 a.m.)

24        Q.    (By Ms. DeFazio)  All right.  So,

25    Ms. Morris, we're back on the record.  I did want to

1    ask a couple of clarifying questions from your

2    testimony a little bit earlier.

3                 So we were talking about -- or I was

4    asking you a series of questions about the decision

5    being made to terminate Ms. Mohamed's employment.

6                 Do you recall that testimony?

7         A.    Yes.

8         Q.    Okay.  And you, I think at first,

9    mentioned that the decision was made collectively by

10   you, Mr. Sullivan, Ms. Barley, Mr. Schacht; is that

11   right?

12        A.    Yes.

13        Q.    Okay.

14        A.    Nick.

15        Q.    Okay.  And I think at some point you

16   said maybe with the HR team.

17                 Was that right?

18        A.    Referring to Sean.

19        Q.    Ah.  Okay.  So Sean, Nick, Carolyn, and

20   you.  That's a complete list of the group that made

21   that decision; is that right?

22        A.    Yes, to my recollection.

23        Q.    Okay.  And we were also talking about

24   some conversations that you had had with Mr. Schacht

25   prior to the August 31 deadline.

```
 1              Do you recall that?
 2        A.    Yes.
 3        Q.    Okay.  What other options were being
 4   considered other than termination, if any, if
 5   Ms. Mohamed did not complete the projects by
 6   August 31?
 7        A.    I would say that the other options we
 8   had already been exercising by extending deadlines,
 9   et cetera.
10        Q.    Okay.  Were there any other options that
11   were under consideration other than termination if she
12   did not purportedly meet the deadline on August 31?
13        A.    If they were, they weren't discussed at
14   that point.
15        Q.    And you -- you testified that
16   Ms. Mohamed and Ms. Barley not being able to
17   communicate was a problem, correct?
18        A.    Correct.
19        Q.    Was it considered by you or anyone else,
20   to your knowledge, moving Ms. Mohamed to a different
21   supervisor?
22        A.    No.
23        Q.    Do you know why not?
24        A.    I believe we -- when we thought about --
25   we viewed it as, I'd say, more of -- let me get
```

1    this . . .

2                   It was an instructional design role,

3    which is a very niche role in any organization.  So to

4    move it out of the collective of the design and

5    development team would not make sense for the business

6    because they are integrated roles.

7          Q.    What about having Ms. Mohamed report to

8    you directly?

9          A.    That would -- that wouldn't have

10   solved -- that wouldn't have been a good option.  As

11   an instructional designer, she would report into the

12   instructional design team, and that was not something

13   that was suggested or asked for at that point in time.

14         Q.    But you -- and you didn't consider it

15   independent?

16         A.    I would say I -- of course, I

17   considered -- would have considered it at the time.

18   But it just -- it wasn't the right decision for the

19   way we have the teams organized in the business.  That

20   wouldn't be the fitting solution for an employee who

21   wasn't performing to their goals and deadlines to move

22   their manager --

23         Q.    Okay.  But regardless --

24         A.    -- move them to a different manager.

25                   I don't think that's kind of normally

1    what you would see happen in a business.  It

2    wouldn't -- that solution really wouldn't fit the

3    situation.

4            Q.    But regardless, you didn't consider it

5    at the time?

6            A.    No.

7            Q.    And no one else at SHRM considered it at

8    the time, did they?

9            A.    No.

10           Q.    Okay.  Part of the function of this

11   deposition is for me to find out more about what

12   universe of documents might exist that are relevant in

13   this case that we've either asked for or maybe should

14   ask for, so I apologize if this is redundant.  I just

15   want to be really clear about whether there's

16   another --

17           A.    Sure.

18           Q.    -- source of documents that we may need

19   to ask for.

20                 So if an employee -- and I won't be

21   theoretical -- Ms. Mohamed here was having purportedly

22   performance issues, and it was occurring outside of

23   the normal written review cycle.

24                 Would you agree with that?

25           A.    If it was -- can you repeat that?

1          Q.    Sure.  Ms. Mohamed's purported

2    performance issues were happening outside of the cycle

3    of a review, correct?

4          A.    Correct.

5          Q.    Okay.  So the universe of documents that

6    would exist regarding her performance issues during

7    that time would be limited to what?  Tell me what

8    documents or where that would be documented.

9          A.    It would be documented between -- in

10   the, I would say, communications between Carolyn and

11   Ruby --

12         Q.    Okay.

13         A.    -- which would be -- I -- mostly email.

14         Q.    Okay.  Emails, maybe Slack messages,

15   would you agree with that?

16         A.    It could be Slack messages, yes.

17         Q.    Okay.  And text messages as well?

18         A.    Phone calls.  That, I don't know.

19         Q.    Okay.

20         A.    I don't know their text relationship.

21         Q.    Would it have been part of SHRM's

22   process for Ms. Barley to have documented any of her

23   concerns about Ms. Mohamed's performance in Dayforce

24   or whatever SHRM's performance management software was

25   at the time?

1          A.    They -- they would -- it would not be

2     documented necessarily in Dayforce, but I would assume

3     that Carolyn was documenting conversations.  And that

4     would be a question for Carolyn how she specifically

5     documented these conversations.

6          Q.    Certainly.  We talked a bit about this

7     before, but in the absence of a formal process like a

8     PIP, some other contract between the employee and the

9     manager, how do you ensure that employees aren't being

10    subjected to arbitrary discipline?

11         A.    Because there is a -- at the time of the

12    formalized performance review process, I think there's

13    a large communication, and we make sure that there is

14    also a reporting process.

15               If the employee feels they're being

16    unfairly evaluated, if they feel that they are

17    having -- that the feedback they're receiving is not

18    right, we have an open-door policy where people can go

19    to their managers, their manager's manager.  They can

20    go to HR.  Our CEO has an open-door policy.

21               So it's a collective decision.  We don't

22    allow just for a manager to make one decision.  We

23    make sure that we're all involved to understand what's

24    really going on.

25         Q.    Okay.  Would you agree with me that

1    Ms. Mohamed did have those resources available to her

2    when she felt she was being unjustly disciplined and

3    scrutinized?

4         A.    She did, yes.

5         Q.    And it's your testimony that SHRM

6    responded well to that?

7         A.    Yes.  I would say that SHRM absolutely

8    responded well and, you know, immediately, you know,

9    stepped in, and HR was involved from the start.  There

10   were discussions with Ruby, with Ruby and Carolyn.

11   And, you know, there was a process and there was no

12   arbitrary decisions that were made.

13        Q.    And you think she was treated fairly?

14        A.    Yes.

15        Q.    Okay.  And that process that you

16   mentioned, there was a process.  What was that

17   process?

18        A.    I would say that it was a combination of

19   things, of trying to have -- understand how best we

20   could help Ruby get there.  I think Carolyn and Ruby

21   had several conversations.  HR stepped in and they

22   investigated, and they set up the mediation process.

23   And I think everybody wanted to help Ruby.  There

24   was -- there was no intent of not having that happen.

25        Q.    Have you terminated anyone at SHRM?

```
1                A.    Yes.

2                Q.    How many people?

3                A.    I believe three.

4                Q.    Okay.  Who were those people?

5                A.    Carlos Marroquin, Kim Lang, and Brian

6      Simms.

7                Q.    Okay.  Can you spell Carlos's last name?

8                A.    M-a-r-r-o-q-u-i-n.

9                Q.    Q-u-i-n?

10               A.    Yes.

11               Q.    Great.  When did you terminate

12     Mr. Marroquin?

13               A.    I would say that was probably around

14     2014, somewhere in that neighborhood.

15               Q.    And how about Ms. Lang?

16               A.    I think she was November of 2019.

17               Q.    And Mr. Simms was in 2022?

18               A.    Yes.  He was November 2022.  I believe

19     October or November 2022.

20               Q.    And why did you terminate Mr. Marroquin?

21               A.    HR had found a discrepancy in his

22     resume.

23               Q.    All right.  So he had misrepresented

24     something?

25               A.    Yes.
```

```
1              Q.    Okay.  And that's why he was terminated?

2              A.    Yes.

3              Q.    Okay.  What -- do you know what race

4     Mr. Marroquin is?

5              A.    Hispanic.

6              Q.    And how about Ms. Lang?  Why was she

7     terminated?

8              A.    She was terminated for performance

9     issues.

10             Q.    Okay.  And what specifically were her

11    performance issues?

12             A.    She was terminated for -- she was not

13    completing assignments, and she was having conflicts

14    with her team.

15             Q.    Any other reason?

16             A.    It was mainly performance-driven and

17    work -- delivery of work.

18             Q.    Okay.  What assignments did she not

19    complete?

20             A.    I would have to go back specifically to

21    what those programs were.

22             Q.    And she was the manager of the

23    instructional design team?

24             A.    She was.  She was.  And she vacillated

25    if she wanted to be the people manager or could we
```

1    move into a senior role.  And this went on for quite

2    some time.

3        Q.    Got it.  So she enjoyed being an

4    individual contributor maybe more than managing

5    people?

6        A.    I would assume.

7        Q.    So if -- she was the manager over those

8    projects, but she was being held accountable, it

9    sounds like, for them not being completed; is that

10   right?

11       A.    She was actually designing programs

12   herself as well.

13       Q.    I see.  So how many of those programs

14   did she fail to complete that she was working on

15   directly?

16       A.    I would have to go back --

17       Q.    Okay.  Do you think it was --

18       A.    -- and look --

19       Q.    Sorry.  Was it more than one?

20       A.    I would have to go back and check the

21   specifics of all of that.

22       Q.    Okay.  Was she terminated close in time

23   to missing a deadline?

24       A.    Yes, I believe so.

25       Q.    Okay.  Do you remember when the deadline

1    was?

2          A.    I would have to go back.  That was

3    several years ago.

4          Q.    Okay.

5          A.    To get the details of all of that.

6          Q.    Got it.  And for Mr. Simms, why was he

7    terminated?

8          A.    Mr. Simms could not perform to the role

9    in any capacity, and we made the decision for the

10   business that it was time for him to be separated.

11         Q.    He had missed deadlines on a couple of

12   projects, right?

13         A.    Mr. Simms?

14         Q.    Yes.

15         A.    Yes.  But in general he just could not

16   perform to the role.

17         Q.    Got it.  His team was very unhappy under

18   him too; is that right?

19         A.    I would say so, yes.

20         Q.    Okay.  You received complaints from

21   Ms. Barley about his performance?

22         A.    I wouldn't say about his performance.

23   She was -- she was really helping to onboard him.  He

24   relied on her as his person to really help him do the

25   work that he should have been doing himself in some

1    relation.

2        Q.    Okay.  So you don't recall her sending

3    you a list of concerns she had about his performance?

4        A.    There might have been something like

5    that.  I would have to go back and check.

6        Q.    Okay.  And did Ann Godmere also send you

7    concerns about his performance?

8        A.    I believe -- I believe so, yes.

9        Q.    Okay.  Now, it sounds like Mr. Marroquin

10   is a bit of an outlier in that there was a discrepancy

11   in his resume.

12           So with Ms. Lang and Mr. Simms in

13   particular, what efforts did you make to help them

14   improve their performance before they were terminated?

15       A.    So with Ms. Lang, there -- we worked a

16   lot with her and her team.  And Ms. Bernée Long worked

17   with the team to work through some of their conflicts.

18   We also helped Kim -- she took -- I think she was

19   working on maybe an analytics class or something at

20   that point.

21           So she actually -- we helped -- gave her

22   the resources to enroll in courses around the

23   programs, and gave her, you know, the tools, the time

24   that she needed for some of the first missed

25   deadlines.  But then it just all -- it got to the

1    point where we needed to have a managed team, and she

2    wanted to move into a senior role, and it was -- the

3    decision was made that she was not effectively

4    performing her role.

5             Q.    What is Ms. Lang's race?

6             A.    African-American.  She identifies as

7    African-American.

8             Q.    Okay.  And how about Mr. Simms?

9             A.    White.

10            Q.    And then what efforts were made with

11   Mr. Simms to help him prior to become terminated to

12   perform?

13            A.    So I personally spent a lot of time with

14   Mr. Simms.  I encouraged him to -- he struggled with

15   the content around HR, so I encouraged him to really

16   enroll in the Essentials of HR program.  I encouraged

17   him to really kind of focus on his team, focus on the

18   day-to-day of what was going on within the team in

19   getting -- getting some of these programs developed.

20            He -- I was trying to keep him focused

21   and kind of -- he was out here (indicating).  You

22   can't see my hands, but he was out here, and we were

23   trying to bring him in.  You've got to learn the basic

24   components of your role before you're moving on to

25   really significantly changing the business.

1          Q.     Okay.  When was Mr. Simms hired?

2          A.     I believe he came in, in end of May.

3          Q.     Of 2021?

4          A.     May of 2022.

5          Q.     May of 2022.  Okay.

6                 And he was terminated, you said, either

7     in October or November of 2022, correct?

8          A.     Yes.

9          Q.     Okay.  And how soon into his -- after

10    his hire did you begin to have concerns about his

11    performance?

12         A.     He came in at a director level, and

13    usually there will be more of a level of understanding

14    in team management and really understanding

15    development and design.

16                And I would say a couple -- a month or

17    so in, based on an assignment -- assignment we asked

18    for him to do, that it was evident that he -- there

19    were concern -- there was concern, but then the

20    concern built over the next six months.

21         Q.     Got it.  So within a month of him being

22    hired that your radar was up about his

23    understanding --

24         A.     He was not what you would expect of

25    someone with that level of experience of what you

1    would expect to see.  So we connected him with

2    different SMEs, we connected him with instructors in

3    the organization.  Again, he asked to spend more time

4    with me.  We gave him -- connected him with vets

5    across the organization to try to make sure that he

6    felt that he was growing in his role and he could

7    contribute.

8              But Brian also himself felt and had

9    expressed that he didn't feel he was succeeding in the

10   role on several occasions.

11        Q.    When was Ms. Lang hired?  Do you recall?

12        A.    Oh, I don't.

13        Q.    Okay.

14              THE STENOGRAPHER:  I'm sorry.  I didn't

15   hear the last thing you said, Ms. Morris.

16              THE DEPONENT:  I said I don't recall

17   Kim's hire date.

18        Q.    (By Ms. DeFazio)  How long was she in

19   the position that she held -- the last position that

20   she held at SHRM?

21        A.    Kim?

22        Q.    Yes.

23        A.    Kim started as the manager of ISD and

24   was terminated as the manager of ISD.

25        Q.    I know you don't recall her exact hire

1    date, but do you recall about how much time she spent

2    in that role before she was terminated?

3            A.    Maybe one and a half years or so.

4            Q.    Okay.  And how far into her tenure did

5    you have concerns about her performance?

6            A.    I'm sorry.  It was many years ago.  I'm

7    just trying to -- to think about.  With Kim it was --

8    it would be difficult to say because she had a -- she

9    struggled with a regular office -- a predictable

10   office presence, if that makes sense.

11            So she could have really strong

12   performance at times, but then it just -- as she

13   became unhappy with her people management, then her

14   performance kind of continued to wane.

15            Q.    So you terminated her November of 2019,

16   right?

17            A.    I believe so.

18            Q.    Okay.  So do you recall how much time in

19   advance of that termination date you were

20   contemplating terminating her for performance issues?

21            A.    That would -- that's something we

22   would -- we should talk with Nick about as well

23   because he might recall -- I do recall at some point

24   that Nick, Sean, and I met to walk through kind of the

25   steps that we had done to help Kim.

1          Q.    And the purpose of that discussion being

2     what?

3          A.    I recall meeting with Sean Sullivan at

4     some point about the progress Kim was making with her

5     team and the progress Bernée was making as the

6     mediator.

7          Q.    And do you recall when that was in

8     relation to when you terminated her?

9          A.    I don't.

10         Q.    Okay.  Have you ever given someone the

11    option to resign rather than being terminated at SHRM?

12         A.    I personally have not.  I can't answer

13    for SHRM.

14         Q.    Okay.  Tell me about the process of

15    creating an educational program at SHRM.  What does

16    that look like?

17         A.    So we follow the ADDIE model.  And so

18    when we -- would you prefer to start from when we

19    decide on a topic?

20         Q.    Yes.  That would be great.

21         A.    Okay.  So let's say that we decide on a

22    topic and we're going to produce a two-day seminar

23    live delivery.

24              Typically what will happen is the

25    designer will start kind of their inception

1    product process.  So they'll start to look at things

2    like what -- what competitors are out there?  Who's

3    offering this program, price points.  They'll look at

4    kind of content and they'll present to us kind of an

5    initial idea and its look and feel.  And in that

6    analysis phase is when they'll start to really do the

7    research -- around what -- what belongs in this

8    program.

9                    And I would say, from beginning to end,

10   for a senior designer, it could be they would produce

11   something from -- they might have the course completed

12   in about four months.  So it goes through the

13   analysis, the design and development stage, the

14   implementation, and then the evaluation.

15                   And --

16       Q.    Okay.

17       A.      -- during that time, they work very

18   closely with subject matter experts who will help

19   guide them on what should be in these programs.

20       Q.    Okay.  And ADDIE is actually an acronym,

21   right?

22       A.    Yes.

23       Q.    So it's A-D-D-I-E?

24       A.    Yes.

25       Q.    And that stands for analysis, design,

1    development, implementation, and evaluation?

2            A.    Yes.

3            Q.    Okay.

4            A.    There's different iterations of it,

5    but . . .

6            Q.    Sure.  And then are design and

7    development together in the same period?

8            A.    They can be.  And I think that our

9    designers do a lot of the development.  And in some

10   places people -- there might be the case where

11   somebody might do all the content and somebody might

12   actually do the actual design and look and feel of the

13   program.

14           Q.    Okay.  So is implementation when it's --

15           A.    So our designers do it -- do it all --

16                 THE STENOGRAPHER:  Can you repeat --

17           A.    -- with the support of the SMEs.

18                 Our designers do it all with the support

19   of their subject matter experts.  So they're going to

20   present the actual combined -- the completed course.

21                 THE STENOGRAPHER:  Thank you.

22           Q.    (By Ms. DeFazio)  Is implementation when

23   it's actually -- it goes live?

24           A.    Yes.  That's when it's delivered.

25           Q.    And then evaluation is the feedback

1    after it's gone live, people have attended?

2          A.    The instructors will tell us how it

3    went.  We'll have evaluations that go out to the

4    participants.

5          Q.    So that four-month period that you

6    mentioned, what parts of the ADDIE process are

7    encompassed in that four months?

8          A.    Up to implementation.

9          Q.    I see.

10          A.    Because that's the actual delivery of

11    the program.

12          Q.    So the four months is from the time when

13    the idea has already been generated and is given to an

14    instructional designer through the time that it's

15    delivered, correct?

16          A.    Correct.

17          Q.    Okay.  So if someone created -- you

18    know, created a program that was in its final state,

19    as in ready to be, you know, uploaded and utilized in

20    a course, would that occur -- you know, how soon would

21    the course actually be available for someone to

22    attend?

23          A.    So once the course is ready, uploaded,

24    ready to go -- it would depend what company too.  I

25    mean, we're talking about a seminar course that would

1    be offered live, right?

2              There could be -- somebody could be

3    designing for eLearning.  So once it's ready to go,

4    it's uploaded, it's put into the eLearning management

5    system, given kind of the process to go through our

6    accounting and, you know, being able to take the money

7    for the program, all that kind of -- there's a couple

8    weeks in there that things can happen too during that

9    process.

10             But essentially, you would have kind of

11   that turnkey coursework done within that four-month

12   period.  So if you're asking at the end of that

13   four-month should that course be delivered?  Yes.  In

14   theory, yes.

15        Q.    Okay.  But really, the four months

16   encompasses the time the designer is given the idea

17   through they have a completed presentation that could

18   be implemented?

19        A.    Yes.

20        Q.    Okay.  Who actually generates the ideas

21   for programs at SHRM?

22        A.    It's -- it's collective.  So we look at

23   kind of what's relevant and what's going on in the

24   profession.

25             So, for example, we might look at the

 1    knowledge center and how many calls they're getting on

 2    a topic and are they increasing?  Are they being able

 3    to answer these questions, or do we feel that they --

 4    people need or want further education?

 5              We'll take a look at conferences.  So

 6    we'll say, you know, where -- what are the sessions

 7    that are filling up and what are the most popular

 8    sessions at a conference?

 9              We'll look at our -- we'll talk to our

10    chapters.  What are they hearing?  What issues are

11    they facing?  Because not everything is going to be an

12    education program; it might just be an article.  So

13    then we just decide, do we have the right courses in

14    front of us and are these courses following the BASK?

15    It's the body of applied skills and knowledge.

16              So that is the basis, that is SHRM's

17    blueprint for our certification, and then that is the

18    blueprint for the profession according to SHRM.

19         Q.    And what individuals are --

20         A.    So just making sure that -- (Zoom audio

21    disruption.)

22              THE STENOGRAPHER:  Can you repeat your

23    objection, Ms. Spittell?

24              MS. DEFAZIO:  Yeah, I don't think she

25    objected.

```
 1                    And you're muted, Kaitlin.

 2                    MS. SPITTELL:  Can you hear me?

 3                    THE STENOGRAPHER:  Yes.

 4                    MS. SPITTELL:  Sorry.  I was not

 5      objecting.

 6                    MS. DEFAZIO:  I think that was just

 7      Ms. Morris's response.

 8                    THE STENOGRAPHER:  I apologize.

 9         Q.    (By Ms. DeFazio)  So who is that -- part

10      of that collective "we" of generating these ideas?

11      What individuals?

12         A.    It can -- it can vary from time to time.

13      Sometimes it will be, you know, something could float

14      up through our knowledge development area where we

15      want to have content on this, and you -- you should

16      and will develop something like this and/or

17      collectively we'll notice that we have some type of

18      gap in the content.

19                    So, for example, we might recognize

20      that, you know, we've got a program on analytics, but

21      through looking at our evaluations, et cetera, people

22      want something more in depth.  Or, you know, you look

23      at kind of how programs are performing.  If they're

24      performing well, then, hey, you might do some more

25      add-on to that.  And/or if they're not, you sunset --
```

1      you retire them.

2              So it comes in all directions, and we

3      look at kind of -- we have conversations, again,

4      across the organization of what we're going to do.

5          Q.    My question is what specific individuals

6      are involved in these conversations?  And I understand

7      that there may be -- you know, it sounds like you

8      receive feedback from other parts of the organization,

9      but who's the typical --

10          A.    Sure.

11          Q.    -- suspects?

12          A.    So the typical people will be myself --

13      generally the education team in general will talk

14      about it initially.  And then we always involve my

15      boss, Nick Schacht, to make sure that Nick is on board

16      and supports this as our executive sponsor, that we're

17      going to resource the topic and move forward with

18      developing a topic.

19          Q.    Got it.  And who is -- who in the

20      education team is involved in these discussions?

21          A.    Liz Lacey, who is the director of

22      education programs, so she has oversight for the

23      delivery of the -- the operations side of the

24      business.  And then it would be the manager of

25      instructional design.  Usually the designers

1    themselves will talk about it and what makes sense.

2              And then we will pull in at times

3    various people across the organization.  At times we

4    might even pull in people in the knowledge development

5    or certification side as well just to make sure that

6    what we're doing makes sense and doesn't compete with

7    something someone else in the organization is doing.

8         Q.    How do you decide when the course is

9    actually going to be offered?

10         A.    You mean on dates?

11         Q.    Yes.

12         A.    So we -- we've looked -- we do our

13    programming usually in the spring and the fall, so we

14    try to -- we'll look at the calendar.  We work around,

15    obviously, dates, holidays, religious holidays.  We

16    look at timing of more successful formats.  So, for

17    example, you might have a virtual delivery that could

18    go three days in a row, you might have one that will

19    go for four weeks, seven weeks, et cetera.  So we just

20    kind of split up the pie with what makes sense.

21              For -- as far as design and development,

22    usually we have -- we want to give everyone time to

23    digest content, such as instructors who will be

24    teaching it.  So we might schedule -- let's say, have

25    a program that once it's ready for the implementation

and delivery, we want to give the instructors several

months, if possible, to really get into that content

and feel comfortable about teaching it.

        Q.    You said several months?

        A.    It could be several months, yes.

        Q.    Okay.  So that would be -- again, the

topic is generated, it's given to a designer, they

have about four months to come up with a complete

product.  Then, in an ideal world, you give it an

instructor who has several months to digest it before

actually teaching it; is that right?

        A.    Yes.  In an ideal world.

        Q.    All right.  How many months is several

months that's ideal?

        A.    Two.  I'd say about two months.

        Q.    So, then how -- again, how did you --

how do you come up with the dates that these programs

are going to be launched, whether they're in-person or

virtual?

        A.    So let's just use a topic.  So say

talent acquisition.  We decide that we're going to

introduce a new program on talent acquisition.  We

would likely want to launch it in conjunction with our

talent conference, so then we would kind of build out

from that date back is how we would build out our

78

1    design plan.

2                And then that kind of gets us launching

3    in the right place, the right time, it's by the right

4    people.  And then in general just kind of thinking

5    about how we develop our program schedule -- right? --

6    the whole curriculum that's being offered.

7                Again, we schedule that out just making

8    sure the topics are spaced out enough so you're not

9    offering talent acquisition 40 times in March.  You

10   want to make sure you're spreading it out over the

11   year.  You want to make sure that you're -- let's say

12   a Workplace Investigations course again.  That's a

13   popular course.  That you're offering it enough, that

14   you're offering -- you also want to make sure that

15   you're, again, making sure you can fill those classes.

16               So it's about how often do you offer it

17   and when you offer it.

18        Q.    So generally, what comes first?  The

19   top -- the -- you know, the final -- or the idea or

20   the launch date or kind of both?  I mean, when --

21        A.    It could happen at the same time.

22        Q.    Okay.

23        A.    It could happen at the same time.  And

24   usually we involve the director of ed programs in the

25   decisions, too, because she could be building out her

1    budgets, et cetera, and we want to make sure that she

2    spreads revenue in the time that the program will

3    launch.  So it can happen in different ways.

4         Q.   Okay.  So it sounds like there is no

5    defined time when you come up with the launch date?

6    You try and work it in to the existing schedule, if

7    there's some relevant conference.

8         Does that sound right?

9         A.   Yes.

10         Q.   Okay.

11         A.   If there's topics that we can launch in

12    conjunction with our conferences, that's the best way

13    to launch them --

14         Q.   Okay.

15         A.   -- so that's -- that's usually the path

16    that we choose.  And/or we'll say we might design in

17    spring for a fall release, if that makes sense.  Or we

18    might say we're going to design in fall for a spring

19    release.

20         Q.   Okay.  But you don't do the

21    programming -- you know, sit down in the spring and

22    plan out the entire next year of when programs are

23    going to launch?

24         A.   Well, we already have so many existing

25    programs, that they -- it's just kind of a -- you can

1    almost -- it's a puzzle of putting them all in there.

2         Q.    Gotcha.  But you can do -- on an ad hoc

3    basis, it sounds like you come up with an idea and

4    then plan to launch it within -- what? -- six months?

5    Is that typical?

6         A.    Something of that nature.  Yes, that's

7    typical.

8         Q.    All right.  And that creates time for

9    the four months to actually develop the product and

10   then the two months for the instructor to digest it

11   and get comfortable with it?

12        A.    No -- yes.  Normally, yes.

13        Q.    Okay.

14        A.    But, again, can I clear -- you know,

15   there's pieces that move at times.

16        Q.    Sure.  Are there outliers where

17   sometimes programs take, you know, less than six

18   months to launch or maybe longer than six months to

19   launch?

20        A.    Oh, yes.  There -- it depends on what

21   you're developing.

22        Q.    All right.

23        A.    Because it can take much longer to

24   design, say, an e-learning course, a self-paced

25   course, than it does for a live course.

1        Q.    Got it.  What other factors would make

2   it so that you need additional time from -- you know,

3   additional to the four to six months?

4        A.    Things could occur that someone might be

5   removed from the project for a greater SHRM need or

6   project that's going on.

7        Q.    Okay.

8        A.    There's many reasons where somebody

9   might need to stop, and that -- designing and the --

10   you need to adjust the schedule.

11        Q.    Okay.  So that's -- that's not an

12   outlier?  There are situations where the time is

13   delayed for getting a -- a program launched?

14        A.    If there's a business need of why it

15   needs to be delayed, then yes.

16        Q.    Okay.  And you gave one example where

17   someone might be removed from the project, in which

18   case you need to find somebody else to work on it,

19   right?

20        A.    Correct.

21        Q.    Okay.  What other examples can you think

22   of that have actually occurred where programs had been

23   maybe delayed beyond the four to six months?

24        A.    Well, you think about -- a project might

25   be delayed because you might decide to take a whole

1    other -- you -- with the project.  You might decide

2    that maybe a strong competitor comes into the field or

3    maybe a new partner comes up that you've decided that

4    you're going to delay the project and incorporate

5    something in.

6              Many, many different things can occur.

7         Q.    Got it.  But it sounds like the process

8    is meant to be nimble in that way so there can be

9    adjustments made to the launch date accordingly?

10        A.    There can -- there can.  But each -- it

11   would each -- each situation is unique, and then you

12   balance it against the business need.

13        Q.    Sure.  And this process we've talked

14   about, ADDIE, and your testimony over the last few

15   moments, was this all in place in 2020 when

16   Ms. Mohamed was an employee?

17        A.    Yes.

18        Q.    Okay.  So you mentioned SMEs, the

19   subject matter experts.

20        A.    Uh-huh.

21        Q.    Who decides when a SME is going to be

22   involved in a project?

23        A.    We do.

24        Q.    Okay.  Who is "we"?

25        A.    Collectively.  And/or the designers can

1    source their SMEs and sometimes do.  Or we have a --

2    an instructor bench.  They will go to whoever the

3    expert might be who practices maybe in what specialty.

4    And/or the designers will go to our knowledge

5    development center, our knowledge advisors, who are

6    very well -- and close to HR so they can serve as SMEs

7    and/or recommend SMEs.  Or we go -- we can ask our

8    certification team and our knowledge development team

9    in chief, do they have recommendations for SMEs?

10        Q.    So is it -- is it left up to the

11   designer, then, if they utilize a SME?

12        A.    For the most part, yes.  They're senior

13   designers.  They can choose their SME.

14        Q.    Do they always have to utilize one for a

15   project?

16        A.    Yes.

17        Q.    And then it sounds like you -- you are

18   in a role where you help --

19        A.    Me -- oh, sorry.  Finish.  My apologies.

20        Q.    No problem.  So you are in a role where

21   you help them to identify who that appropriate person

22   would be?

23        A.    I am not as involved as prior years,

24   but, yes.  If they -- if somebody comes to me and

25   needs a SME, I will help source one for them.

```
 1            Q.    Okay.

 2            A.    Liz Lacey also helps as well.

 3            Q.    Okay.  Were you more involved in 2020?

 4            A.    I was -- I believe Liz Lacey identified

 5      Lou Lessig as the SME -- helped recruit him as the

 6      SME.

 7            Q.    Okay.  Does she have a personal

 8      relationship with him?

 9            A.    I'm not aware of one.

10            Q.    Okay.  Is he --

11            A.    I think they've worked -- I think they

12      might have worked together through her earlier roles

13      in the chapter network.

14            Q.    Okay.  Is he married to a friend of

15      hers, perhaps?

16            A.    Lou Lessig?

17            Q.    Yeah.

18            A.    I'm not aware.

19            Q.    Okay.  So then once a SME is identified,

20      who is in charge of managing that relationship?

21            A.    The designer.

22            Q.    Okay.  And how do SMEs generally

23      contribute to programs?

24            A.    They -- they will give you kind of the

25      big picture of what should be in the program, but then
```

1    as -- they'll help you write content.  They'll share

2    whatever content that they've already written for

3    programs in most cases, so they'll give us their IP.

4    They review as -- they have review cycles where

5    they'll weigh in on what you've done.

6         Q.    Okay.  So it wouldn't be unusual to have

7    a SME actually contribute, like, written content for

8    the program?

9         A.    No.

10        Q.    And what happens if a SME becomes

11   nonresponsive or is not, you know, doing an effective

12   job in their role?

13        A.    I'm trying to think outside of Lou where

14   that's been a problem because . . .

15             Well, I think at some point, usually you

16   contact -- SHRM will contact the SME to say, you know,

17   "Are you committed?"  But usually in most cases, they

18   are and they will respond.  And sometimes if they

19   don't, then you just have to move on to another SME.

20        Q.    So are you challenged to even think of

21   another example of a SME who was as nonresponsive as

22   Mr. Lessig?

23        A.    I can -- I can think of some other folks

24   that are slow to respond at times.

25        Q.    Okay.  Who comes to mind?

1          A.    You want their specific names --

2          Q.    Yes.

3          A.    -- of people who are less . . .

4          I would say at times -- we have an

5    instructor, Milton Perkins, Todd Brodie.  I'm thinking

6    of some of them off the top of my head.  Tim Sackett,

7    I think there were issues at times with talent.  And

8    these are things I think that Carolyn could probably

9    speak to more closely because she's in tighter with

10   these folks.

11         Q.    So you mentioned Milton Perkins, Todd

12   Brodie, and Tim Sackett, right?

13         A.    Yes.

14         Q.    Okay.

15         A.    And that's just to my recollection

16   because --

17         Q.    Sure.

18         A.    -- I haven't been as in depth with some

19   of these projects.  I'm just thinking of when I've

20   heard of us -- "When we're waiting to hear back on X,"

21   something along those lines.

22         Q.    Sure.  And are those situations where

23   you -- SHRM did that reach-out to confirm that the

24   person was committed?

25         A.    Yes.

1          Q.    Okay.  And --

2          A.    In fact, I -- Liz Lacey has stepped in

3     before to make the calls to some of these people in

4     these situations.

5          Q.    Okay.  All right.  And what -- what

6     situations are coming to mind for you where Liz had to

7     step in?

8          A.    I think she probably did with Lou.  I

9     know that she's had to reach out before in situations

10    where I say there's differing opinions of SMEs that

11    she's stepped into.  And I'm trying to think of -- I

12    think there was some issues in developing a program

13    with an HR department of one where the SME was

14    struggling with writing assessment questions and

15    delaying the project.

16              So -- and I believe she had to step in

17    there as well.

18         Q.    Okay.  And you said you believe that she

19    did --

20         A.    From an operations standpoint usually

21    steps in for things like that because she manages the

22    instructor bench, so she has a closer relationship to

23    the instructors.

24         Q.    Got it.  And are the SMEs who assist

25    with a program, are they usually the instructor who is

1    going to present it?

2            A.    In some cases, yes.

3            Q.    Okay.

4            A.    And that's why they have an -- a vested

5    interest in helping us because they're going to

6    deliver.

7            Q.    Gotcha.  And you mentioned that you

8    thought Liz would have stepped in with Lou, but do you

9    know that she did?

10           A.    I don't recall, to be honest with you,

11   if she did or she did not.

12           Q.    Did the slower response of any of these

13   individuals -- Mr. Perkins, Mr. Brodie, or

14   Mr. Sackett -- delay the completion of any programs

15   with SHRM that you're aware of?

16           A.    No, I don't think they delayed the

17   program.

18           Q.    Okay.  Do you still --

19           A.    I should say --

20                 THE STENOGRAPHER:  You should say who?

21                 THE DEPONENT:  I said if they were

22   making delays, we made the appropriate adjustments.

23           Q.    (By Ms. DeFazio)  Okay.  But you don't

24   recall the details around that right now?

25           A.    At this time, I don't.  I'm sorry.

1          Q.     Does SHRM still use Mr. Lessig as a SME?

2          A.     Yes.

3          Q.     Okay.  What's the most recent project

4     he's worked on?

5          A.     I believe he still teaches the

6     Compliance program for us.

7          Q.     Do you recall when that was fir --

8          A.     But he hadn't been -- he hadn't been

9     serving at this point.

10         Q.     You said he has not been serving as a

11    SME?

12         A.     I don't believe he's been serving in the

13    design part just because we don't have a topic that he

14    would be weighing in on right now.  But he does teach

15    the Compliance program, I believe, and that's

16    something we can confirm for you.

17         Q.     Okay.  So is the Compliance program the

18    last one on which he served as a SME in the

19    development process?

20         A.     As far as I know.

21         Q.     And given the delay that he -- the

22    delayed fashion with which he communicated during the

23    development of that program, why did SHRM keep him on

24    as a SME?

25         A.     From what I recall, we kept him on as a

1    SME because he was giving us some of his content.  He

2    was going to teach the program for us.

3          Q.    Okay.  So his -- part of his value was

4    that he was providing --

5          A.    And -- and I believe he had an

6    outline -- he had something going on that was an

7    outlier of why he wasn't responding to us, if I recall

8    correctly.

9          Q.    What was that outlier?

10         A.    I don't recall that.  That's something

11   specific that I would have to -- I don't know if he

12   had a case going on or what was going on.  But then he

13   did -- he did eventually respond, and we -- it was in

14   the -- he -- I believe he had something going on with

15   COVID, if I recall -- a case or something.  I can't

16   really recall.

17         Q.    And you said that part of his value as a

18   SME was that he provided content to SHRM for that

19   program; is that right?

20         A.    Correct.  And he presents at our

21   conferences as well.

22         Q.    Okay.  So he was actually providing

23   written content for the development of that Compliance

24   program?

25         A.    As far -- that's my understanding.

```
 1              Q.    Okay.  And that would be appropriate

 2      because -- he's an attorney, correct?

 3              A.    Yes.

 4              Q.    Okay.  And that particular program

 5      relied heavily on employment laws which require an

 6      attorney perspective?

 7              A.    Uh-huh.

 8              Q.    Is that a yes?

 9              A.    Yes.

10              Q.    Okay.

11              A.    You told me not to do that.

12              Q.    That's the first time.  Not bad.

13                    When do you recall first meeting

14      Ms. Mohamed?

15              A.    I recall meeting her probably when she

16      started.  Was it around 2016?

17              Q.    And what was the context of that

18      meeting?

19              A.    Oh, I don't remember, like, the very

20      first time I actually met her.  But we always had a

21      very friendly relationship, a good relationship.

22              Q.    And was it obvious to you upon meeting

23      her that she is Black?

24              A.    Yes.

25              Q.    And is it fair to say that over the
```

1    years you began to have more exposure to her work

2    product?

3              A.    Yes.

4              Q.    Okay.  And tell me about -- tell me

5    about that.

6              A.    So I became involved with Ruby's work

7    product during an eLearning program that she was

8    developing on workplace investigations.

9              Q.    And when was that?

10             A.    Probably somewhere in the neighborhood

11   of 2018, 2019.

12             Q.    Is that Workplace Investigations

13   eLearning product still on SHRM's website?

14             A.    It is.

15             Q.    Is it one of -- to your knowledge, is it

16   one of the most popular items?

17             A.    Now that we have the full credential,

18   the actual credential and the instructor-led delivery

19   program is more popular, that -- I'll have to check

20   specific sales of that stand-alone eLearning program.

21             Q.    Sure.  But before the -- that credential

22   was available, was it quite popular?

23             A.    It was popular, yes, in the sense of

24   what those eLearning programs contribute to the

25   overall revenue line.

1          Q.    Sure.   Throughout Ms. Mohamed's

2    employment, she was basically an indirect report of

3    yours, right?

4          A.    Throughout her entire employment at

5    SHRM?

6          Q.    Yes.

7          A.    No, she was not.

8          Q.    Okay.  So did that start in 2018 that

9    she became, then, the direct report of one of your

10   direct reports?

11         A.    We'll have to go back and check the

12   exact dates, but, yes, she moved over to the education

13   team somewhere in that time frame.

14         Q.    Gotcha.  So when she became an

15   instructional designer, I believe that was in '18,

16   then she became one of your indirect reports; is that

17   right?

18         A.    Yes.

19         Q.    Okay.  When you would -- when you meet

20   with your direct reports, how do you support them in

21   their people management?

22         A.    I listen to their concerns that are

23   going on.  I try to get them into the minds and the

24   perspectives of the employees and their needs.  But I

25   also have an open-door policy.  So if that employee

1    wants to come talk to me as well, then I will talk to

2    them and work through things the best that we can.

3        Q.    And --

4        A.    And I also ask the manager what they're

5    doing to help the employee.

6        Q.    Okay.  Do you get regular updates from

7    your direct reports about their subordinates, or do

8    you essentially just hear from them when there's an

9    issue?

10       A.    No.  When we have one-on-one meetings,

11   usually I will say to my team, you know, "How is your

12   team doing?  How are you guys doing?"

13       Q.    Gotcha.  So you encourage them to share

14   both positive and negative updates about their

15   subordinates?

16       A.    Yes.

17       Q.    Okay.  So is it safe to say that if

18   there are concerns that one of your direct reports has

19   about a subordinate, you would hear about it?

20       A.    Yes.

21       Q.    Okay.

22       A.    I would assume so.

23       Q.    Do you remember hearing any concerns

24   from one of your direct reports other than Ms. Barley

25   about Ms. Mohamed's performance?

```
 1          A.    When she was reporting -- indirectly

 2   reporting to me or when she was not?

 3          Q.    When -- during the time that she was an

 4   instructional designer -- both, I guess, regular and

 5   senior.

 6          A.    Okay.  Under my indirect leadership,

 7   correct?

 8          Q.    Correct.  Correct.  Yes.

 9          A.    And can you repeat?  Did I ever hear --

10          Q.    Did you ever hear of concerns about her

11   performance from your --

12          A.    Yes.

13          Q.    -- direct report --

14          A.    Yes.

15          Q.    -- who was her supervisor?

16          A.    Yes.

17          Q.    Okay.  So tell me what you recall about

18   that.

19          A.    I recall Kim Lang having concerns about

20   the length of time it was taking Ruby to develop the

21   investigations program.  And I recall Kim having

22   concerns that she wasn't using the project management

23   tool that they had in place.

24          Q.    Any other concerns that you remember?

25          A.    I recalled -- at times Kim had feedback
```

1    on her designs for Ruby that she didn't feel Ruby was

2    implementing.

3              Q.    Anything else?

4              A.    That's the general recollection that I

5    have.

6              Q.    Okay.  So there's no other performance

7    issues you learned of that came from Ms. Mohamed's

8    supervisors other than Ms. Barley?

9              A.    Just Ms. Lang and Ms. Barley when --

10   when Ruby was reporting into the education area.

11             Q.    Gotcha.  Yeah.  And we're not talking

12   about pre --

13             A.    Yeah.

14             Q.    -- you know, her time as an

15   instructional designer.  Thank you for clarifying.

16                   What happened with the -- Ms. Lang's

17   concerns about the length of time that Ms. Mohamed was

18   taking to develop that eLearning program?

19             A.    I believe Ms. Lang stepped in.  And I

20   think she was talking to Ruby about the extent of her

21   designs.  From what I recall, there was -- Ruby was

22   incorporating a lot of bells and whistles into the

23   course that Kim felt like that was what was delaying

24   it.  So she was offering her some coaching around

25   that.

1          I think that -- I recall them having a

2     difficult period where Kim -- I don't know if Kim felt

3     there was some kind of lack of respect that was going

4     on or her feedback wasn't being taken and incorporated

5     into programs.

6          Q.    And is that the same concern you said

7     that Kim didn't feel that Ms. Mohamed was implementing

8     her feedback?

9          A.    Her feedback, she had concerns about the

10    timeliness of getting this program done.  Because I

11    want to say it took quite a long time, maybe over a

12    year, close to two years, to get this program

13    developed.

14         Q.    But it was --

15         A.    And then, I believe -- I believe Kim

16    then actually had repeatedly asked Ruby to update the

17    project management system they were using at the time,

18    and that wasn't happening.

19          So Kim wanted to have one source of

20    truth and to make sure that she understood where she

21    was in the project.

22         Q.    But the project was completed

23    ultimately?

24         A.    Ultimately it was completed, yes.

25         Q.    Okay.  And the issue resolved with

1    respect to implementing feedback from Ms. Lang?

2          A.    Could you repeat that?

3          Q.    You mentioned that Ms. Lang had a

4    concern that Ms. Mohamed wasn't implementing her

5    feedback on a program.

6                Did that issue resolve as well?

7          A.    Yes, it did.

8          Q.    Okay.  And if those issues were serious

9    enough, would they have been included in Ms. Mohamed's

10   annual reviews or quarterly reviews?

11         A.    I think there was something included

12   about using the project management system and

13   timeliness.

14         Q.    Okay.

15         A.    To some degree.  Again, I -- it was a

16   while ago, but I do -- I do think Kim identified that.

17         Q.    Okay.  But it obviously -- it never rose

18   to the severity of being disciplined or terminated for

19   Ms. Mohamed at that time?

20         A.    No.

21         Q.    And have you told me all the concerns

22   that you heard about under supervisors other than

23   Ms. Barley that -- concerns about Ms. Mohamed's

24   performance that you can recall?

25         A.    She had just reported to Kim and then

1    Carolyn.  So Kim -- again, Kim had mediation with

2    Ruby, Ann, and Carolyn with Bernée.  So that's where

3    some of those issues were resolved.

4         Q.    I see.  And you testified earlier that

5    one of the reasons that Ms. Lang was terminated

6    ultimately was because she had some issues with her

7    team, right?

8         A.    Can you repeat that?

9         Q.    That Ms. Lang was terminated in part

10    because of issues she had with her team?

11         A.    In part with issues that she had.  It

12    was more or less that she wanted to step out of the

13    role.  She started not completing her work, and it --

14    it was -- the decision it was made for the business to

15    move forward.

16         Q.    Did Ms. Long -- did Ms. Lang -- no,

17    Long.  No.

18              Ms. Bernée Long, did she facilitate

19    mediation between Ms. Lang and anybody else on her

20    team besides Ms. Mohamed?

21         A.    Yes.  She facilitated mediation with

22    Kim, Ann Godmere, Ruby, and Carolyn Barley.

23         Q.    I see.  Okay.  So Ms. Mohamed wasn't the

24    only individual involved in that mediation?

25         A.    No.

1    Q.    But what was your general impression of

2    Ms. Mohamed's work product prior to her time under

3    Ms. Barley from what you could observe directly?

4    A.    So the workplace investigation course

5    that she did deliver, I thought it was a very good

6    work product.  It got very good reviews, and she had a

7    good creative flair through it.

8    Q.    Is it safe to say that you viewed

9    Ms. Mohamed as having a lot of potential at SHRM?

10    A.    Yes.

11    Q.    Okay.  And you wanted her to have

12    exposure throughout the organization?

13    A.    Yes.

14    Q.    So did that change at some point?

15    A.    No.

16    Q.    Okay.  Even when she was terminated, you

17    still had those feelings about her?

18    A.    I always want to see the best happen for

19    Ruby.

20    Q.    I'm going to put an exhibit in the chat

21    box to share with you.

22    A.    Okay.

23    Q.    So just make sure you've got that open.

24    A.    Okay.

25    Q.    And you should see it in there any

1    moment.

2            A.    Gotcha.

3            Q.    Do you see it?

4            A.    Yes.

5            Q.    Great.  So download that and open it

6    when you have a moment.

7                 MS. DEFAZIO:  We're going to mark this,

8    I think, as Exhibit -- because we had a few yesterday.

9                 This will be Exhibit 19, Jenny, if

10   that's okay.

11                (Exhibit Number 19 was marked.)

12           A.    Okay.

13           Q.    (By Ms. DeFazio)  Great.  So do you have

14   that document open in front of you?

15           A.    I do.

16           Q.    Okay.  So what is this?

17           A.    This is Ruby's performance review.  And

18   we're going to have to go back to check on who was her

19   actual manager at this time, because I recall my name

20   came in as the reviewer but that I wasn't -- let me

21   read down to make sure that this is the right one.

22           Q.    I did have that question for you.

23           A.    Okay.

24                Okay.  Question?

25           Q.    Sure.  That you're -- it's indicated

1   that you're the reviewer, but were you her manager at

2   the time?

3           A.    I don't recall.

4           Q.    Okay.  When did Ms. Barley -- when was

5   she promoted to the manager of the instructional

6   design team?

7           A.    I can't recall, as I'm trying to figure

8   out in my mind.  But Kim, I believe, was 2019,

9   somewhere in October, November.  And I'm trying to --

10  I'm trying to figure out the time frame when Kim left,

11  the team briefly reported to me, and then the time

12  frame of when Carolyn was promoted.

13          Q.    Ah.  So is it possible that this review

14  occurred in that interim period when the team reported

15  to you directly before Ms. Barley started as their

16  manager?

17          A.    It is.  I'm just -- I'm -- the details

18  are failing me.

19          Q.    Can you help me find a date on this

20  document that would indicate when it was actually

21  completed?

22          A.    Okay.  I'm going to go back over.

23                I see 12/7/19.

24          Q.    Yeah.  I see that in the upper left-hand

25  corner.  Is that what you're looking at?

1           A.    Yes.

2           Q.    Okay.  And does that strike you as the

3    right time frame when this would have been completed?

4           A.    Sorry.  I'm just trying to think of --

5    does this say the fourth quarter?  Yes, it does.

6           Q.    Okay.  Because this is fourth quarter

7    and year-end; is that right?

8           A.    Yes.

9           Q.    All right.  And what portion of this do

10   you believe you completed?

11          A.    So this is where -- if you look down, it

12   looks to me as though Carolyn wrote the review, but at

13   the time they still had, because of whatever was going

14   on in the system, they had my name in here.

15          Q.    Uh-huh.  And is that --

16          A.    And that --

17          Q.    I'm sorry.

18                Down on the second page in the bottom

19   right-hand corner that's a Bates number that says

20   SHRM 0746, and on that page it does have Carolyn's

21   name signing off saying "Many thanks for a great

22   quarter and year.  Carolyn."

23                Do you see that?

24          A.    Correct.  Yes.  That's why when I was

25   looking at this I kind of had the confusion because I

1    remembered there was something with this review --

2         Q.    So is --

3         A.    -- where it had my name as the reviewer

4    but Carolyn wrote the review.

5         Q.    Okay.  But you think that you

6    actually -- you did not write the content that's under

7    "Manager Feedback"?

8         A.    No.

9         Q.    Okay.  Do you recall contributing to it

10   in any way?

11        A.    I review -- I review all the -- I'm the

12   second-level reviewer on these.  So Carolyn would have

13   written it, and then I would review it and sign off on

14   it.

15        Q.    But you don't recall contributing in any

16   way to the manager feedback portion of this before it

17   was finalized?

18        A.    I'm sorry.  I'm reading back through it

19   to see.

20        Q.    That's fine.  Take your time.

21        A.    I would say that we probably talked

22   through kind of where we thought Ruby was and how we

23   thought she was performing.  And I can't recall if I

24   edited any of this to say -- you know, sometimes I

25   might say, "Here's a better way you might consider

1    saying this.  Here's how an employee might respond to

2    something like this in a better manner."

3         Q.    But you can't recall specifically if you

4    did that?

5         A.    I don't.  I -- you know, I -- sometimes

6    I wordsmith things and/or I -- again, I want to make

7    sure they're written from a positive perspective -- a

8    constructive, positive perspective.  And so I might --

9    you know, I might meet with the manager and say, "Have

10   you thought about voicing it in this way," and/or, you

11   know, "You left something out and/or this should be

12   added in for their development and next steps."

13        Q.    But you -- in this particular instance

14   for this review, Exhibit 19, you remember sitting down

15   with Ms. Barley before she wrote it to actually

16   discuss the content of it?

17        A.    No.  They'll usually write it, and then

18   we'll sit down and look at it together.

19        Q.    I see.  Is there anything in here that

20   you disagree with now looking back at it?

21        A.    Let's go back and look.

22             Uh-huh.  This is accurate.

23        Q.    Okay.  Do you see anything in this

24   review regarding timeliness or using the project

25   management software?

1          A.    I see where it's identified that "You

2    will have an opportunity to grow in efficiency as a

3    designer" . . . "continue to cultivate your natural

4    talent" . . . "think about your long-term career

5    goals."  And then "exploring background knowledge of

6    adult learning theory and learning strategies."

7          Q.    Okay.  But would you agree with me that

8    there's nothing in here specifically about timeliness

9    or meeting deadlines expressed as an area of growth?

10         A.    There is not specifically.

11         Q.    Were you involved in the decision to

12   promote Ms. Mohamed to a senior instructional

13   designer?

14         A.    Yes.

15         Q.    Okay.  Tell me about that.

16         A.    We had an open position, senior

17   instructional designer, and Ruby applied for the

18   position.  And we felt that, while Ruby might have

19   been on the earlier stages of a senior designer, that

20   we wanted to give her that chance and promote her and

21   make sure we were promoting from within.

22         Q.    And who is "we" in that scenario?

23         A.    I would include myself, Carolyn Barley,

24   Nick Schacht.  I believe Liz Lacey was a part of the

25   process and strongly supported Ruby 's promotion.

1    Q.    So all four of you made that decision to

2    select her for that opening then?

3    A.    Yes.  Yes.

4    Q.    And at the time you saw her as a

5    tremendous asset to the team, correct?

6    A.    I did.  I thought she had a lot of

7    growth potential.

8    Q.    At the time she was promoted, was she

9    already doing some of the duties of a senior

10   instructional designer?

11   A.    I think -- and I'm looking back here --

12   that I would say she had just started some of those

13   duties, and that's -- that's when she started -- the

14   workplace communications was her first program that

15   she designed on her own as a senior designer.

16             But I believe, from what I recall, that

17   she still at that point in time, although she took on

18   her first seminar instructor-led program to design,

19   she still had a lot of leaning in from her manager at

20   that time and/or coaching from her fellow teammates.

21   Q.    Okay.  So she was starting to do more

22   advanced work, but still with the support of her

23   teammates --

24   A.    Yes.

25   Q.    -- and manager?

1          A.    She was.

2          Q.    Generally, what is the difference

3    between just an instructional designer and a senior

4    instructional designer?

5          A.    So I'd say, A, years of experience.

6    It's also the level of design that you can do as far

7    as kind of independently leading the project.  So the

8    more they gain the experience, the confidence, kind of

9    understanding kind of all the steps, the timing, how

10   to really manage their time and building into their

11   project plan that SMEs are going to be -- I believe

12   could be one of the biggest problems that you might

13   have in a lot of ways.

14              So I think that it's really going from

15   more of a collaboration of thinking about the look,

16   feel into operating more as an independent designer.

17              MS. DEFAZIO:  Okay.  I'm going to share

18   with you Exhibit 20.

19         A.    Okay.

20              (Exhibit Number 20 was marked.)

21         Q.    (By Ms. DeFazio)  And just let me know

22   when you've downloaded it and opened it.

23         A.    Yes.

24         Q.    Okay.  What do you know about -- well,

25   let me back up and say this is an email from a former

1       employee of SHRM, correct?

2            A.    Uh-huh.

3            Q.    And her name is Obianuju Orakwue; is

4       that right?

5            A.    Yes.

6            Q.    Okay.  What is your understanding of why

7       she left SHRM?

8            A.    So Obi started at SHRM, and from what I

9       recall, a couple months in she lived -- SHRM is

10      located in Alexandria, Virginia, and Obi lived out

11      past Baltimore.

12                 So initially, Obi struggled with the

13      commute and she was Ubering to work at times and she

14      wanted -- it was an in-office job, so eventually the

15      group -- Obi's course of -- at SHRM, she had some

16      personal issues, the loss of a parent.  She -- the

17      commute was a huge, huge factor, which is what she

18      told me of why she wanted to leave in the end.

19                 I wasn't -- I would say I probably

20      didn't know Obi as well as some of the other designers

21      on the team just because she wasn't in the office as

22      much.

23           Q.    So is it your understanding that she

24      resigned?

25           A.    She resigned.

1          Q.     Okay.  And was Ms. Barley her manager at

2    the time?

3          A.     Sorry.  I'm going to go back into this

4    document.

5                 I believe she was.

6          Q.     Okay.  And in this email where she's

7    saying, you know, farewell to colleagues, she writes,

8    "I had planned to leave on February 7, 2020, but my

9    official" -- "my last official day is today."

10                And she --

11         A.     Uh-huh.

12         Q.     -- wrote this on January 24.

13                Do you have any understanding as to why

14   she -- her final day was two weeks earlier than she

15   had anticipated?

16         A.     I recall that it was going to be remote

17   those two weeks, and I -- the decision, I believe, was

18   just made that we would just end the employment at

19   that point in time.

20         Q.     Who made that decision?

21         A.     I would say collectively Nick, Carolyn,

22   and I.

23         Q.     And Obi is a Black woman, correct?

24         A.     Correct.

25         Q.     Okay.  Before she resigned or before her

1    last day at SHRM, did she express any concerns to you

2    about Ms. Barley's management of her?

3         A.    Not that I recall.

4         Q.    Okay.  Do you recall Ms. Barley being

5    privy to any concerns about that from Obi?

6         A.    I don't think so.

7         Q.    Okay.

8         A.    I don't recall.

9         MS. DEFAZIO:  All right.  I'm going to

10   share with you a document that was marked in a

11   deposition yesterday as Exhibit 12.

12        Q.    (By Ms. DeFazio)  And just let me know

13   when you've opened it.

14        A.    I'm opening now.  Okay.

15        Okay.  I have it open.

16        Q.    Great.  And is this Ms. Mohamed's 2020

17   review for the first quarter of 2020?

18        A.    Yes.  Period 1 to 4.  Correct.

19        Q.    Okay.  And it looks -- ah, it looks like

20   this is from Dayforce.  So does that confirm that the

21   performance management software in 2020 was Dayforce?

22        A.    Yes.

23        Q.    Okay.

24        A.    Yes.

25        Q.    My question for you is did you

1    contribute in any way to this review other than

2    signing off on it as the reviewer?

3            A.    Can I look at it quickly?

4            Q.    Please.  Please do.

5            A.    Okay.  Can you repeat your question?

6            Q.    Oh, sure.  In what way, if at all, did

7    you contribute to this review other than just signing

8    off on it?

9            A.    I would -- I read through it, and I

10   agreed with it.

11           Q.    Got it.  So you testified earlier that

12   with Ms. Mohamed's end-of-year '19 review, you and

13   Ms. Barley had actually sat down and reviewed, I

14   guess, the first draft that Ms. Barley had written; is

15   that correct?

16           A.    Yes.  But that would have been probably

17   because we were in office.

18           Q.    Uh-huh.  Would you have done the same

19   thing here except maybe remotely talking about it?

20           A.    We probably -- in our one-on-ones I

21   usually say, "What are you thinking for reviews?  What

22   are you rating folks?  And how are you feeling about

23   it?"

24           Q.    Okay.

25           A.    And then we'll talk through kind of what

1    the narrative was going to be.

2        Q.    Gotcha.  What do you recall about

3    that --

4        A.    So, yes, same process, but that -- what

5    do I recall about that?

6        Q.    About that discussion with Ms. Barley in

7    advance of her completing this review for Ms. Mohamed

8    in April of 2020.

9        A.    I recall she was starting to have

10   concerns about the deadlines slipping for the digital

11   program.  Because it was going to be due, I believe,

12   at the end of April.  So I think that -- that she was

13   providing resources in there, I think, that would give

14   Ruby maybe some stronger tools in her design process

15   toolbox.

16            And that that's where I see kind of

17   where she gives her the book and the things to review.

18       Q.    Okay.  Anything else that you remember

19   from that decision with Ms. Barley about Ms. Mohamed's

20   Q1 review?

21       A.    No.  Not specifically, no.

22       Q.    Okay.  Do you remember overall how

23   Ms. Barley thought Ms. Mohamed was performing?

24       A.    At that point in time, I think that she

25   thought -- and in reading back through the review,

1    that she was creative, that she wanted to see her

2    really kind of get some more formalized knowledge in

3    design and development, which I think is reflected

4    here.  And then, again, she had concerns about her

5    deadline -- meeting her deadline for that one program.

6         Q.    Got it.  And at the time it was her

7    concern about -- Ms. Barley's concern about

8    Ms. Mohamed complying with deadlines was based only on

9    that one deadline for Digital HR?

10        A.    I believe so, yes.

11        Q.    Okay.

12        A.    And I believe Compliance was just picked

13   up, so I can't recall if we discussed that.

14        Q.    And tell me about the scale that was in

15   place for rating.  So I see Ms. Mohamed, for example,

16   was rated "solid performer" in two categories and then

17   "role model" -- I'm sorry -- "solid performer" in

18   three categories and "role model" in one.

19             What were the other options?

20        A.    I believe the other options -- I believe

21   there were only -- oh, let's look.  They're probably

22   here.  Good role model.  The other one may have been

23   "underperform."

24        Q.    So there were only three options as far

25   as you can recall?

1          A.    I'm going to look at the one in the

2    prior year because it was a different format, right?

3          Q.    It looked like a different format, but I

4    think the same options.

5          A.    The same -- the same options, yes.  Down

6    here.  For some reason I feel like there was only

7    three.

8          Q.    So role model being the highest, solid

9    performer, and then --

10         A.    Role model being the highest, yes.  And

11   then I believe there was a lower-level one.

12         Q.    Got it.  So solid performer and then one

13   underneath it, whatever that may have been?

14         A.    Uh-huh.

15         Q.    What does solid performer communicate

16   when a manager selects it as the -- under one of these

17   categories?

18         A.    Solid performer means that you're

19   showing up and you're doing the job that's expected of

20   you --

21         Q.    Okay.

22         A.    -- to -- you know, a degree.  And then,

23   you know, there's levels within that, I would say.

24   You could have someone who is a really, really strong

25   solid performer.  You could be -- you know, there

1    would be -- I would just say there's shades in there.

2         Q.    Okay.  But the shade could be --

3         A.    Solid means you're doing your job.

4              THE STENOGRAPHER:  What did you say

5    before "doing your job"?

6              THE DEPONENT:  I said, "I would say."  I

7    started it with "I would say."

8              Solid performer, in my mind, is you're

9    doing your job.

10             THE STENOGRAPHER:  Thank you.

11        Q.    (By Ms. DeFazio)  And those shades of

12   gray or the nuance would be borne out in the narrative

13   portion of the review, correct?

14        A.    Yes, I would say that.

15        Q.    And you've told me all of the concerns

16   that Ms. Barley had about Ms. Mohamed's performance at

17   this juncture, correct?

18        A.    I believe so.

19             MS. DeFAZIO:  All right.  Why don't we

20   take -- we'll go off the record.

21             (Recess from 11:25 a.m. to 11:41 a.m.)

22        Q.    (By Ms. DeFazio)  So, Ms. Morris, let's

23   talk about a complaint that Ms. Mohamed brought to you

24   on June 3 of 2020.

25        A.    Okay.

 1          Q.    Do you remember her reaching out to you

 2    on that day?

 3          A.    Yes.

 4          Q.    Okay.  And tell me -- tell me how that

 5    all went.

 6          A.    So I recall Ruby talking about Carolyn

 7    micromanaging her.  And Ruby talked about that she

 8    felt that Ann and Carrie were allowed to work more

 9    independently and/or that they were given maybe a

10    little more leeway on things that she wasn't given,

11    and she was very frustrated.

12          Q.    Okay.  Got it.  And did she, you know,

13    reach out to you by email to schedule a time to talk

14    to you that day?

15          A.    I think we talked on Zoom or we talked

16    on our cell phones.  I can't recall.

17          Q.    Okay.  But you connected that day?

18          A.    We did connect that day.

19          Q.    Okay.  About how long did you speak to

20    her?

21          A.    I'd say it might have been close to an

22    hour, if I recall correctly.

23          Q.    What else do you remember her bringing

24    up during that hour-long conversation?

25          A.    I just recall her immense frustration

1    with Carolyn as her manager.  And, again, that she

2    felt that the other two ladies were being treated

3    differently as far as not being micromanaged to

4    getting more independent, things of that nature.

5         Q.    Do you recall her mentioning anything

6    about race playing a role?

7         A.    Not on that first call, no.

8         Q.    Okay.  So you don't remember her using

9    the term "discrimination" or "race" or anything to

10   that effect?

11        A.    No.  No.

12        Q.    Are Ann and Carrie white?

13        A.    Yes.

14        Q.    Okay.  Did it occur to you, given

15   Ms. Mohamed's concern that they were being treated

16   differently that there may be a race issue?

17        A.    No.

18        Q.    Okay.  During that call, did Ms. Mohamed

19   mention anything about how Ms. Ebony Thompson was

20   being treated by Ms. Barley?

21        A.    I don't recall that we talked about

22   Ebony on that call.

23        Q.    Okay.  You don't believe you did or

24   you're not sure?

25        A.    I couldn't say exactly if Ebony was a

1    part of that call because I strongly remember talking

2    to Ruby about her feelings.

3           Q.    Okay.  And you mentioned that -- is it

4    Ms. Mohamed seemed frustrated?

5           A.    She seemed frustrated, she seemed that

6    she wanted to -- she wanted things to improve, and

7    she -- from what I recall, she wanted to make sure

8    that she could express her concerns to Carolyn.

9           Q.    Okay.  Did Ms. Mohamed seem open to

10   feedback from you on what she could also do to improve

11   the situation?

12          A.    I believe so.

13          Q.    Did she seem upset during the

14   conversation?

15          A.    More frustrated, I would say.

16          Q.    Do you recall Ms. Mohamed saying

17   anything about how Ms. Barley's behavior was actually

18   impacting her?

19          A.    I think, again, going back to she was

20   very frustrated, and she felt -- I think it was she

21   felt probably a little disengaged at that point in

22   time.

23          Q.    Do you recall her saying that

24   Ms. Barley's behavior was making it difficult for her

25   to complete her work?

1          A.     No.

2          Q.     Okay.  What about the fact that she

3   found Ms. Barley's behavior upsetting?

4          A.     Yes.  I think she found it upsetting.

5          Q.     And did you find anything inappropriate

6   about Ms. Mohamed bringing her concerns to you rather

7   than going to Ms. Barley directly?

8          A.     Not at all.  I was happy to speak with

9   her.

10         Q.     And was that consistent within the

11  culture of SHRM, this, you know, going to your

12  second-level supervisor with concerns?

13         A.     Some people do, yes.  I would say it is.

14         Q.     Okay.  I've seen the term "collaborative

15  openness" in a lot of emails.  Is that still one of

16  SHRM's principles?

17         A.     Yes.

18         Q.     Okay.  Would you classify Ms. Mohamed

19  bringing these concerns to you as collaborative

20  openness?

21         A.     I would.

22         Q.     Did you take notes during your meeting

23  with her?

24         A.     I don't think I did because it was the

25  first time we were starting to talk a lot about this,

1    so I really wanted to listen to Ruby versus taking

2    notes.

3         Q.    Sure.  Do you --

4         A.    And it -- she seemed very open to she

5    wanted to make this -- you know, she just wanted --

6    she wanted to make things right.

7         Q.    Did she tell you why she chose you to

8    disclose her concerns to you?

9         A.    I think that Ruby -- she was trying to

10   work it independently with Carolyn, and I think that

11   she felt that she was not making progress with

12   Carolyn.  So she wanted to get kind of my thoughts of

13   what we could do and make sure that I understood kind

14   of where she was coming from.

15        Q.    Do you recall reducing your recollection

16   of the conversation to notes at any point?  So I know

17   you didn't take notes at the time it was happening,

18   but was there another time that you actually wrote

19   down what you recalled from the call?

20        A.    From this first call?

21        Q.    Yes.

22        A.    No, I don't have any notes that I took

23   from that first one.

24        Q.    At the end -- at the conclusion of this

25   phone call with Ms. Mohamed, what did you both decide

1    were next steps?

2         A.    At the conclusion of the call, I thanked

3    her.  I said that she was courageous, that -- you

4    know, that was brave of her to come to me and talk to

5    me, and I told her that.  And we talked about our next

6    steps would be that Carolyn, Ruby, and I would meet to

7    discuss some of the frustrations and that way Ruby

8    would feel that, you know, there was someone there

9    that was going to -- she didn't want to feel like she

10   was going to be on her own and there would be someone

11   there that heard what was going on.

12        Q.    What was your response to her concerns

13   about Ms. Barley?

14        A.    I told her I wanted to, you know, "Let's

15   talk to Carolyn, let's get through this, let's figure

16   it out.  I want to improve the culture.  I don't want

17   you to feel this way."  And I was empathetic.  I put

18   myself in her perspective and how she might be

19   feeling.  So I was open and listened to everything she

20   had to say.

21        Q.    Had you observed any of the behaviors

22   that she, you know, brought up to you about

23   Ms. Barley's conduct?

24        A.    No.

25        Q.    Okay.  Did you have concerns at that

1    point about Ms. Barley's skills as a manager?

2            A.    At that point, no.

3            Q.    Did you at some point develop concerns

4    about Ms. Barley as a manager?

5            A.    During this time frame, any concerns I

6    had would have been that I just wanted to make sure

7    that she was listening, she was open, she had her --

8    you know, emotional intelligence was playing a factor

9    in there.  So I just -- those were just all things I

10   did talk to Carolyn about at that point in time of

11   hearing Ruby versus having an answer for Ruby of why

12   she did or didn't do something.

13           Q.    Did you ever develop concerns about

14   Ms. Barley's management of people at any point?

15           A.    Yes.

16           Q.    When would you say that occurred?

17           A.    I would say -- I'm trying to just think

18   through.  I was thinking about the structuring of

19   the -- so I'd say probably around the end of -- or

20   early in 2020 -- the -- 2021, I want to say.  But we'd

21   have to check the exact time frame of when I started

22   thinking about restructuring the department and

23   getting in a director and someone that would be at

24   that kind of higher level and somebody who could

25   contribute at a more strategic level.

124

1              And I did look across kind of is Carolyn

2    going to -- is she developing into the leader that we

3    need?  Is she -- and just looking across kind of what

4    the business needed is when we decided to move to a

5    director role.  And we felt that Carolyn would be

6    effective more as a lead specialist role, contributing

7    more into the enterprise side of the business than her

8    design and development function.

9         Q.    And you said that was early 2021?

10        A.    I think that was more late 2021.

11        Q.    Okay.  And it sounds like you made

12   that --

13        A.    I'd have to go back -- I'd have to go

14   back and look exactly.

15        Q.    Okay.  And you made that determination

16   in the context of a restructure, right?

17        A.    In the context of a restructure, yes.

18        Q.    Okay.

19        A.    And just in kind of the team and in

20   general and the difficulty we had in recruiting new

21   instructors in, et cetera.

22        Q.    Apart from that restructure, when did

23   you start to develop concerns about Ms. Barley as a

24   people manager?

25        A.    Again, I think it was later in the 2021

1    time frame.

2          Q.   Okay.  And was there a particular

3    incident that led to that development -- you

4    developing --

5          A.   There was --

6          Q.   -- those concerns?

7          A.   There was not a specific incident.  It

8    was just kind of looking, again, at the effectiveness

9    of the whole team overall and what we really needed

10   and the level of management that we were looking for

11   in that role.

12         Q.   And had she -- had Ms. Barley also

13   expressed in late 2021 that she really didn't want to

14   manage people anymore also?

15         A.   I'm trying to think of a -- how that

16   worked out.

17          She never, from my recollection, came

18   out and exactly said she didn't want to manage people

19   anymore.  I think it was more of we told her, "Here's

20   kind of the changes we're going to make."  And I think

21   that she was open to it.

22         Q.   And the changes being putting her into a

23   lead specialist role?

24         A.   Yes.

25         Q.   Okay.  So after that phone call with

1    Ms. Mohamed on June 3, 2020, did you, in fact,

2    schedule a call or a meeting with the three of you --

3    you, Ms. Barley, and Ms. Mohamed?

4          A.    Yes.

5          Q.    And that was the next day, correct?

6          A.    I don't know if that was the next day.

7    It was shortly thereafter we scheduled it.

8                MS. DEFAZIO:  Okay.  All right.  I'm

9    going to share with you what will be marked as

10   Exhibit 21.

11         A.    Okay.

12               (Exhibit Number 21 was marked.)

13         A.    Oh, so it was the next day.

14         Q.    (By Ms. DeFazio)  We don't have to

15   guess.

16         A.    Thank you.

17         Q.    Sure.  And would you have sent this on

18   June 3, do you think?

19         A.    Probably.

20         Q.    Okay.

21         A.    2 to 3.  Does it say down here anywhere?

22         Q.    Yeah, frustratingly, I think the top

23   only indicates when the meeting is and not when it was

24   actually sent as an invitation.

25         A.    I would say -- normally, if I talk to

127

1   someone and it's, you know, they're feeling upset or

2   disengaged or their manager is making them feel a

3   certain way or doing certain things, I'm pretty good

4   about scheduling it right away, so I would say I

5   probably scheduled it that same day.

6          Q.   Sure.  Before you -- before the call

7   happened with Ms. Barley, yourself, and Ms. Mohamed,

8   did you talk to Ms. Barley about what to anticipate

9   from this call?

10         A.   I just told her there was going to be a

11  meeting.  And she said, "Do you know what about?"  And

12  I said, "I'd rather talk about it when we're in the

13  meeting."

14         Q.   Do you think that --

15         A.   I think that was respectful of Ruby.

16         Q.   Okay.  Do you think that provoked some

17  anxiety in Ms. Barley, not knowing what it was about?

18         A.   It could have.

19         Q.   So tell me what you recall from that

20  meeting on June 4.  And it sounds like it was a call

21  between you, Ms. Mohamed, and Ms. Barley.

22         A.   We were on a Zoom together.

23         Q.   Zoom.  Okay.

24         A.   And -- yep.  And Carolyn and I were on

25  video.  I can't recall if Ruby was on video.

1            So Ruby just started sharing kind of her

2     frustrations with Carolyn and talking to her about

3     feeling micromanaged at times and that she didn't feel

4     that she did that with the other two ladies on the

5     team.

6            And Carolyn started -- now, the exact

7     specifics of what -- what was said on that day, I

8     can't recall.  But I can recall that Carolyn reverted

9     into a self-defense mode, which was something I had to

10    talk to her afterwards is, when Ruby or anyone you're

11    supervising is telling you something of how they felt

12    or something -- the way they perceived what you did,

13    let them finish talking, and, first and foremost,

14    apologize how you made them feel, which I think she

15    did do that day.

16            But you can't always have an excuse of

17    why you did something, right?  Not everything is going

18    to be justified and perfect.  We're not perfect

19    people.  So that was, I think, a learning time for

20    Carolyn as well is to not explain herself with

21    everything.

22            They were both -- Carolyn started

23    crying, and Carolyn got very defensive.  And, you

24    know, she was sorry Ruby felt that way.  And Ruby

25    responded that she had no empathy for Carolyn, she

1    didn't feel sorry for her, she didn't care that she

2    was crying.

3             And so I believe we ended things at that

4    point in time that they were going to maybe have a

5    post meeting, the two of them.  They did not want me

6    there.  I believe that's how things ended.

7             Q.    What do you remember Ms. Mohamed sharing

8    specifically about what she was finding upsetting

9    about Ms. Barley's conduct?

10            A.    So as far as timing, I can't -- I can't

11   recall how these all shifted out.  I do recall --

12            Q.    Sure.

13            A.    -- then we had a follow-up meeting with

14   HR at one point in time.  That was kind of the next

15   meeting of what I recall.

16            Q.    Okay.

17            A.    And so, again, I believe that it is

18   during that third exchange is when collectively I

19   heard that Ruby felt that she was being treated

20   differently based on race.  And that was in the

21   meeting that we had with Mike Jackson.

22            Q.    Okay.

23            A.    So that's the first time I was exposed

24   to that.

25            Q.    But in this meeting on June --

```
1              A.    Go ahead.  Sorry.

2              Q.    Sure.  Thank you.

3                    This meeting on June 4, Ms. Mohamed did

4       bring up that she was being -- she felt that she was

5       being treated differently than her two coworkers?

6              A.    Yes.  In the respect that she, again,

7       felt that they were given more independence, that they

8       were given -- they weren't micromanaged, that they

9       were allowed to -- their delays were more palatable

10      than her delays, things of that nature.

11             Q.    Right.  And you said that Ms. Barley

12      responded in a self-defense mode?

13             A.    She -- in the respect that she -- yes.

14      She defended everything, all of her actions, and she

15      started crying and she got very emotional.  She kept

16      apologizing to Ruby and saying, "That was not my

17      intent."  That's what I recall as far as the emotional

18      temperature there that was happening on that call.

19             Q.    Got it.  So she --

20             A.    And that's when we responded --

21             Q.    Sorry.  Go ahead.

22             A.    Oh, I was just saying that's when Ruby

23      responded to her and said, "I have no empathy.  I

24      have" -- "I don't care that you're crying.  You know,

25      you've been making me feel upset too."
```

131

 1              And it was -- it was a very -- they were

 2    both extremely upset on the call, so we got to the

 3    point where nothing was going to be resolved.

 4              And, again, I -- I was -- I was proud

 5    that Ruby was able to say and do what she was able to

 6    do that -- it took courage for her to do that.

 7         Q.    Okay.  And in Ms. Barley's apologies, it

 8    sounds that they were of the tenor of "I'm sorry

 9    that" -- "that that wasn't my intent."

10              Was that how she was apologizing?

11         A.    That was.  And she, you know -- and her

12    intent too was -- her intent seemed, you know, good

13    and well.  And there was no malicious intent on

14    Ms. Barley's responses, in my opinion.  I think that

15    there was absolutely no malicious intent there.  It

16    was just she got very defensive, I think, and wanted

17    to explain herself to Ruby because she wanted to get

18    to the right place just like Ruby wanted to get to the

19    right place.

20         Q.    Okay.  That was your interpretation of

21    what you heard?

22         A.    That's my interpretation.

23         Q.    And earlier that day, had SHRM -- or had

24    Mr. Taylor held a town hall, an all-staff town hall?

25         A.    He could have.  I can't say for sure.

```
 1              Q.     Okay.  Now --

 2              A.     That was June 4?

 3              Q.     June 4, yes.

 4              A.     Okay.

 5              Q.     Okay.  And George Floyd had been

 6      murdered the week before.

 7              A.     Uh-huh.

 8              Q.     Do you remember that?  Okay.

 9              So did Mr. Taylor have a town hall to

10      process that or discuss it at all with staff members?

11              A.     If he -- he did have a town hall.  And I

12      can't say it was specifically for that, but it

13      might -- it probably was.

14              Q.     What do you remember about what he

15      shared during that town hall?

16              A.     I remember that he shared empathy and

17      sympathy for Mr. Floyd's family.  I remember that he

18      talked about how -- kind of how people were feeling

19      and giving people the right to talk about it and/or

20      the right not to talk about it if they wanted to.  And

21      how families were just feeling in general.

22              And from what I recall, his -- he just

23      came across -- he spoke from an empathetic place, that

24      he knew that there -- there were people with families

25      that probably were feeling frightened, there were
```

133

1    people who worked at SHRM that probably associated or

2    knew people of law enforcement that were coming at

3    this in a certain way.

4            And it was more of -- I think he felt

5    more for the collective and kind of that we were all

6    respectful and -- of how people were feeling.

7        Q.    So at the conclusion of that meeting

8    with Ms. Barley and Ms. Mohamed on June 4, I think you

9    said that the next step was that they were going to

10   have another meeting without you; is that right?

11       A.    I believe that was what they said.  I

12   believe that was how we concluded, that they didn't

13   think I needed to be at the next meeting, and that

14   they were going to meet.

15       Q.    Okay.  Do you remember if Ms. Barley

16   actually requested that you be in a subsequent meeting

17   with her and Ms. Mohamed?

18       A.    Are you asking did they invite me to

19   that meeting?

20       Q.    Do you recall if in your one-on-one with

21   Ms. Barley the week following this conversation did

22   she actually request that you be on a call with her

23   and Ms. Mohamed?

24       A.    I don't remember.  I thought they did

25   not want me at that meeting, that they thought they

134

1    could work through it.

2         Q.    Did you meet with the two of them again

3    in an effort to try and help them through the -- this

4    period?

5         A.    Just the three of them?

6         Q.    Yeah, yeah.  You and Ms. Barley and

7    Ms. Mohamed.

8         A.    I don't know if I specifically met with

9    just the three of them, but I might have joined some

10   instructional design meetings in general just to hear

11   kind of how the team was doing --

12        Q.    Okay.

13        A.    -- subsequent to that.

14              And I joined the meeting, like I said,

15   with -- I believe the first meeting was with Mike

16   Jackson and the instructional design team without

17   Carolyn there.

18        Q.    Okay.

19        A.    And then there might have been then

20   another meeting where Mike was there, I was there, and

21   the full team was there.

22        Q.    Got it.  But it sounds --

23        A.    And he might have held a meeting where I

24   was not there as well.

25        Q.    Got it.  But it sounds like you did not

1     have a subsequent meeting, as far as you can recall,

2     with just Ms. Mohamed and Ms. Barley after that June 4

3     meeting?

4            A.    They did not ask for that, no.

5            Q.    Okay.  And you mentioned that you

6     thought that Ms. Mohamed was quite brave in having

7     shared her feelings with Ms. Barley during that

8     meeting on June 4, right?

9            A.    Uh-huh.

10           Q.    Is that a yes?

11           A.    Yes.

12           Q.    Okay.  Did you -- and you recognize that

13    it was an upsetting experience for her; is that right?

14           A.    Yes.  For both of them.

15           Q.    Let's talk about that meeting that you

16    mentioned with, I think you said Mike Jackson and the

17    ISD team.

18           A.    Uh-huh.

19           Q.    Did that occur on June 25?

20           A.    It could -- that could be the right time

21    frame.

22           Q.    Okay.  And was that -- what was the

23    intent of that meeting?

24           A.    So I believe at that point Mike had

25    talked to everyone independently.  So I believe he had

136

1    talked to Carolyn, he had talked to Ruby, he had

2    talked to me.  And I think that at that point he -- he

3    brought everyone in together because he wanted to

4    collectively hear what was going on for himself rather

5    than just having all these one-off conversations.

6           Q.    And was that with respect to Ms. Mohamed

7    and Ms. Barley's issues with one another, or is this a

8    different issue?

9           A.    It was about Ruby.  I think he -- yes.

10   He was just trying to understand what was going on

11   across the team.  And he was trying to understand --

12   from what I recall, the reason Ann, Ebony, and Carrie

13   were there is I think he was wondering if they were

14   having the same issues.  And that's to the best of my

15   recollection --

16          Q.    Sure.

17          A.    -- of why that was.

18          Q.    It's my understanding that --

19          A.    And he -- at that time --

20          Q.    I'm sorry.  Go ahead.

21          A.    -- he was having -- I believe, too, at

22   this point in time he was having these types of group

23   meetings with some teams, too, across the

24   organization.

25          Q.    Okay.  Yeah.  I was going to say that

1    it's my understanding that there were some employee

2    survey results that had come out around this time and

3    that there was a meeting with the ISD team without

4    Ms. Barley present that was, I think, designed to

5    process or discuss those in more detail.

6              Does that sound familiar?

7         A.   It does, but I think he had a meeting

8    with the larger education team around the results, not

9    just the ISD team.

10        Q.   I see.  Well, tell me, were you at

11   that --

12        A.   And it could be a combination.

13        Q.   Okay.  Were you present at that meeting

14   with Mr. Jackson, Ms. Mohamed, Ms. Mills, Ms. Godmere,

15   and Ms. Thompson?

16        A.   Yes.

17        Q.   Okay.  And is it your recollection that

18   happened sometime around mid- to late June of 2020?

19        A.   Yes.

20        Q.   Okay.  So tell -- and that was the one

21   you said that was designed to just try and figure out

22   what's going on in the team with respect to

23   Ms. Mohamed's --

24        A.   Yes.

25        Q.   -- concerns?

```
 1              A.      In -- Yes.  In general, how was the team

 2      feeling.

 3              Q.      Okay.  So what do you recall about that

 4      meeting?

 5              A.      In that meeting, that's the first time

 6      that I heard that Ruby was feeling she was treated

 7      differently based on race.

 8              Q.      Okay.  What do you remember her saying?

 9              A.      I remember her saying that she felt that

10      she and Ebony were being treated -- well, I don't know

11      if Ruby spoke on behalf of Ebony or Ebony spoke up and

12      said that she too felt that she was being treated

13      differently based on race.

14              Q.      And it was being treated differently by

15      Ms. Barley, correct?

16              A.      Yes.

17              Q.      Okay.  And do you recall in what way

18      they said they were being treated differently?

19              A.      I believe it was around kind of the

20      level of micromanagement they were receiving in

21      relation to Ann and Carrie.

22              Q.      And what do you recall anyone else

23      saying during this meeting?

24              A.      I recall that Ann and Carrie did not

25      express specific issues with Carolyn Barley during
```

1    this meeting.

2          Q.    So they did not seem to have any

3    concerns with Carolyn's management of them?

4          A.    Not at that time, I don't recall.

5    During that meeting, nothing was expressed.

6          Q.    Okay.  Did they at any time express

7    concerns about her management of them?

8          A.    Ann expressed concerns about a

9    performance review that occurred, that she didn't --

10    she felt her ratings were lower than they should have

11    been.

12          Q.    Okay.  Was there any other way that

13    Ms. Godmere --

14          A.    And that wasn't specifically at that

15    point in time.  That was a more recent complaint.

16    Ann -- no.  Ann has -- I'm just trying to think if

17    there's anything during that time frame of what she

18    said on that call.

19          Q.    Well, I'm -- my question --

20          A.    Ann might have said -- sorry.

21          Q.    No.  My question, it sounds like on

22    that -- during that meeting in mid- to late June with

23    this -- the ISD group, that Ann and Carrie did not

24    express concerns about Ms. Barley's management style,

25    correct?

1          A.    Correct.

2          Q.    Okay.

3          A.    From what I recall, yes.

4          Q.    Okay.  So my question is did they at any

5     point after that ever, you know, up to the present,

6     express concerns about Ms. Barley's management of

7     them?

8          A.    Up to the present.

9                So I think that Carolyn -- Ann did to

10    the extent of at times she said she had felt

11    micromanaged, but she just told Carolyn, "Listen, I

12    got this," and, you know, they worked it out, what

13    have you.

14                Carrie Mills, she -- she did not express

15    concerns about Carolyn.  And I'm trying to think back

16    of when she resigned, and she said that Carolyn was

17    one of the best managers she had had and it was moving

18    forward.

19         Q.    That's what Ms. Mills said?

20         A.    Ms. Mills.

21         Q.    Okay.

22         A.    But I'm trying to remember too, because

23    I remember -- I had a conversation with Carrie at some

24    point, but I'm trying to think about what it was

25    about.

1        Q.    Well, did Ms. Mills ever tell you that

2    she thought that Ms. Barley was a racist?

3        A.    No.

4        Q.    Okay.  Or that she was concerned that

5    she was witnessing Ms. Barley treat people of color

6    differently?

7        A.    No.

8        Q.    Okay.

9        A.    I recall her saying the opposite of

10    that.

11        Q.    Huh.  When do you recall that?

12        A.    It had to have been in that time frame

13    of June and July.

14        Q.    Okay.  Do you remember what she said

15    about Ms. Barley?

16        A.    I'm trying to sort through.

17        Q.    And I realize a lot of these meetings

18    probably blend into one another.

19        A.    I'm really thinking back.  I remember we

20    were working on a PMQ project, so I think Carrie

21    expressed some frustrations with Carolyn at the time,

22    thinking -- I think she wanted Carolyn to take a

23    stronger stance with leadership about the content in

24    the PMQ.

25        Q.    Okay.  Do you remember any more context

1    to that?

2           A.    No.  I remember Carrie had a

3    frustration -- I'm trying to think of -- what she

4    would share with me was more around she had a very

5    strong frustration with Johnny.

6           Q.    Ms. Mills did?

7           A.    Yes.

8           Q.    Okay.  So you mentioned that, again,

9    this is regarding concerns from Ms. Godmere and

10   Ms. Mills about Ms. Barley's management outside of --

11   you know, beyond that June 25 meeting.

12                From --

13          A.    Right.

14          Q.    -- Ms. Godmere, she had concerns about

15   her performance review rating being lower than she'd

16   like, it sounds like?

17          A.    And that happened more recently.

18          Q.    More recently.  Is that the only concern

19   that you can recall Ms. Godmere bringing up about

20   Ms. Barley's management?

21          A.    I'm trying to think what Ann might have

22   said over the years that's significant here.

23                No.  I -- because I think Ann would tell

24   her how -- the only thing was if Carolyn was pressing

25   in on something and they disagreed on the way a design

1    document looked or something, they seemed to work

2    through --

3         Q.    Okay.

4         A.    -- through things.  So she never -- the

5    only time Ann came to me of a more formal nature was

6    about the performance review.

7         Q.    I see.  And from Ms. Mills you remember

8    her having some frustration around how Ms. Barley was

9    handling the PMQ, the content, correct?

10        A.    The specific content.

11        Q.    Okay.

12        A.    She wanted -- I think she was -- had

13   a -- wanted to head in one direction along with our

14   company SweetRush we worked with.  And it was at the

15   direction of the ET how they wanted to see how the

16   content moved.

17        Q.    And other than that frustration, do you

18   recall Ms. Mills bringing up any other concerns about

19   Ms. Barley's management of her at any point?

20        A.    I can't recall because I remember when

21   she resigned saying that, you know, she had a good

22   experience with her.

23        Q.    With Ms. Barley?

24        A.    Yes, but that she was leaving the

25   organization.  And in her -- I believe her last words

1    to me were if -- she would come back if Johnny was no

2    longer there.

3         Q.    Huh.  So he seemed to be the one that

4    she had the issue with?

5         A.    I think so.  I believe so.

6         Q.    Okay.

7         A.    I don't want to put words in her mouth.

8         Q.    Sure.  So just to clarify, you mentioned

9    that in this meeting with Mike Jackson and the ISD

10   team, that is the first time you remember Ms. Mohamed

11   bringing up race specifically as a concern; is that

12   right?

13        A.    I do.

14        Q.    Okay.  Is it that you don't believe that

15   came up on June 3 or 4, or do you just not recall?

16        A.    I don't believe it came up until that

17   meeting.  That's when I recall really feeling it and

18   hearing it.

19        Q.    Okay.  So your testimony is that in your

20   call with Ms. Mohamed on June 3 and your call with

21   Ms. Mohamed and Ms. Barley on -- or Zoom call on

22   June 4, that race did not come up?

23        A.    No.

24        Q.    Okay.  So is there anything else about

25   that meeting with Mike Jackson and the ISD team

1    without Ms. Barley present that you haven't already

2    told me?

3            A.    Can -- you went out there for a second.

4    Can you repeat --

5            Q.    Sure.

6            A.    -- that question again.

7            Q.    Sure.  So in that meeting with Mike

8    Jackson and the ISD team, yourself, and without

9    Ms. Barley present, is there anything else about that

10   meeting you recall that you haven't shared with me

11   already?

12           A.    Not that I can think of.

13           Q.    Okay.  Did you and Mr. Jackson talk

14   about it after the meeting to debrief about what you

15   heard?

16           A.    Yes.  I believe he called me down to the

17   HR conference room within a few days of that.

18           Q.    Okay.  All right.  And tell me what you

19   discussed.

20           A.    So then -- and, again, just to be

21   100 percent honest, how these -- the sequence of

22   events played out, what I recall, he had told me that

23   he had discussed kind of what was going on with his

24   boss, Sean, and that they were going to talk to people

25   and understand what was going on.  And just his was

1     more of an informative of "Here's where I'm going.

2     Here's the next steps" --

3              Q.    Okay.

4              A.    -- type of thing.

5              Q.    Do you know what people he was going to

6     talk to?

7              A.    No.  Because at that point I want to say

8     that shortly thereafter was when Ruby went to my boss,

9     Nick Schacht.  And then she went to -- after her

10    conversation with Nick, I believe that's when she went

11    to Johnny, and then things really moved into -- Sean

12    Sullivan kind of took the lead from there --

13             Q.    Okay.

14             A.    -- with Nick --

15             Q.    Okay.

16             A.    -- from what I recall.

17             Q.    So during this meeting with Mike Jackson

18    and Ms. Mohamed, Ms. Thompson, Ms. Mills, and

19    Ms. Godmere, it sounds like you heard the two women of

20    color, Ms. Thompson and Ms. Mohamed, share concerns

21    about being treated differently; is that right?

22             A.    Yes.

23             Q.    And you heard the two white women,

24    Ms. Mills and Ms. Godmere, not share concerns about

25    being micromanaged or treated poorly by Ms. Barley,

```
 1    correct?

 2              A.    Correct.

 3                    MS. SPITTELL:  Objection.  Foundation.

 4              Q.    (By Ms. DeFazio)  So did that concern

 5    you, that -- the demographic of those concerns?

 6                    What was your response to that -- --

 7              A.    I think.

 8              Q.    -- I guess, is the question.

 9              A.    The concern to me overall was the

10    culture of what was happening there and really kind of

11    understanding why they weren't making -- why people

12    were having different experiences and what were kind

13    of the facts of the experiences.

14                    And I didn't see any overt sign of

15    racism, and I think that at that point it was to where

16    we have to figure this out.  HR has to open an

17    investigation, and that's where we're going with this.

18                    So I was very concerned.

19              Q.    What is an overt sign of racism to you?

20              A.    Well, I don't even think I -- I should

21    clarify that it shouldn't be overt, but there's other

22    signs of racism, right?  There's conscious racism,

23    unconscious racism, you know, microaggressions, things

24    of that nature where people might not realize that

25    they're doing it.
```

1          So a sign of racism to me, would you --

2     can you -- how -- what kind of context would you like

3     me to give you one in?

4          Q.   Well, I -- whatever makes the most sense

5     for you.  Well, let me back up and say, in this

6     situation, in that meeting, what would you -- what

7     could you have heard -- excuse me -- what could you

8     have heard from those four people that would have made

9     you think, I think there might be racism going on?

10         A.   I think I -- I would need to hear is she

11    talking to them one way -- is she talking to Ruby and

12    Ebony one way and is she talking to Carrie and Ann in

13    another?  Are there microaggressions there?  Is she

14    making assumptions about them based on something

15    that's out of their control such as their skin color?

16    And has she made remarks to me that would make me

17    think that there was racism going on there?

18         You know, if I -- if somebody said

19    something to me along the lines of, "Well, you know,

20    that person isn't finishing their job" -- or I'm

21    thinking of things like "Oh, well, that person is not

22    going to be at their job" -- "good at their job.

23    They're Asian, so they're going" -- "let's put them in

24    a math" -- "a more technical job.  They'll be better."

25    That would be a strong sign of racism to me --

```
 1            Q.    I would agree with you.

 2            A.    -- you know?

 3                  If somebody said -- and I'll tell you,

 4      you know, at one point, you know, I had an

 5      African-American woman on the team, Carol Spears, come

 6      to me.  Her feelings were hurt because somebody

 7      remarked on somebody having nappy hair.  She's like,

 8      "That's racism to me, Jeanne."  And I said, "I would

 9      be hurt too, Carol."

10                  So there --

11            Q.    Who was that person who made that

12      comment?

13            A.    About the nappy hair?

14            Q.    Yes.

15            A.    It was someone in technology.  I think

16      it might have been Chris Morrison.

17            Q.    Okay.  Was any -- anything done with

18      respect to his comment?

19            A.    No, because they worked it -- they all

20      worked it out directly.  And Carol said, "I don't

21      think he meant anything.  It just felt racist at this

22      time and I don't think he knew it."  And Carol just

23      wanted to share that with me.  She said it just kind

24      of made her feel weird.

25            Q.    Sure.  And you understood why?
```

150

1          A.     Absolutely.  Yes.

2          Q.     Do you think that more subtle types of

3     racism like the microaggressions you mentioned, that

4     those could be things like micromanaging an employee,

5     maybe not letting them meet individually with a SME

6     who is assigned to a project?  Could that be a sign of

7     racism?

8          A.     I think that -- no, not in this context.

9     I don't think.

10         Q.     And why not?

11         A.     Micromanaging -- I don't think

12    micromanaging is a sign of racism.  I think it could

13    be a sign of a bad manager or someone that thinks

14    they're trying to help, but they're micromanaging.

15         Q.     What if that manager is --

16         A.     I --

17         Q.     -- micromanaging -- what if that manager

18    is micromanaging their subordinates of color but not

19    their white subordinates?  Is that not a sign of

20    racism?

21              MS. SPITTELL:  Objection.  Foundation.

22         Q.     (By Ms. DeFazio)  You can go ahead and

23    answer.

24         A.     I don't think that's a sign of racism.

25    I think, again, that's a sign of you've got to look at

1    how these jobs were being performed and what level of

2    management people needed.

3         Q.    So it's your testimony that if

4    Ms. Barley was in fact micromanaging Ms. Thompson and

5    Ms. Mohamed, but not micromanaging Ms. Mills and

6    Ms. Godmere, you don't believe that that supports the

7    fact that Ms. Barley was treating people of color

8    differently?

9         A.    I can't answer that it was based on the

10   color of their skin.  I think that she was managing

11   the projects as she saw fit at that point in time.

12        Q.    Other than that comment you shared that

13   Ms. Spears disclosed to you, during your time at SHRM,

14   have you ever witnessed any racism occurring among

15   employees?

16        A.    No.

17        Q.    Do you think that discriminatory

18   treatment based on race does happen in the workplace?

19        A.    Yes.

20        Q.    Okay.  You've just not seen it at SHRM

21   personally?

22        A.    I have personally not seen it at SHRM.

23             MS. DEFAZIO:  Okay.  All right.  I'm

24   going to share with you what will be marked as

25   Exhibit 22.

```
 1              THE DEPONENT:  Okay.

 2              (Exhibit Number 22 was marked.)

 3         A.    Yes.

 4         Q.    (By Ms. DeFazio)  Okay.  Great.

 5              So are these text messages between you

 6    and Ms. Mohamed?

 7         A.    Yes.

 8         Q.    Okay.  And your texts are on the left in

 9    gray, correct?

10         A.    Yes.

11         Q.    Okay.  And then Ms. Mohamed's are on the

12    right in blue?

13         A.    Yes.

14         Q.    Great.  So on the first page of this

15    exhibit in the bottom right-hand corner, it says

16    MOHAMED 017110.  You write "I'm hoping you will get

17    the team going today on our call."

18         A.    Yes.

19         Q.    So do you think that's the call you were

20    just referring to with Mike Jackson and the ISD team?

21         A.    No.  This was the -- this was a call

22    that I had with all individual contributors --

23         Q.    Okay.

24         A.    -- from results from the employee

25    engagement survey.
```

         1              Q.    Got it.  So this is a different meeting

         2      than the one you just described?

         3              A.    Yes.

         4              Q.    Okay.  All right.  And sorry to beat

         5      what I think is definitely a dead horse or nearing

         6      death.

         7                    In this situation that we were just

         8      talking about with hearing concerns from Ms. Thompson

         9      and Ms. Mohamed and not from Ms. Godmere and

        10      Ms. Mills, that didn't raise a suspicion in your mind

        11      that there was any kind of differential treatment

        12      based on race on behalf of -- by Ms. Barley, right?

        13              A.    No.

        14              Q.    Okay.  And it appears to not have raised

        15      that suspicion with Mr. Jackson either.

        16                    Is that accurate as far as you know?

        17              A.    As far as I know.

        18              Q.    Okay.  All right.  And, again, you know,

        19      looking at Exhibit 22, these are text messages between

        20      Ms. Mohamed and yourself.  You've never been asked for

        21      text messages -- copies of your text messages in this

        22      proceeding, have you?

        23              A.    No.  I don't believe so.

        24              Q.    Okay.  But clearly, you have at least a

        25      few because we have a couple of exchanges between you

1    and Ms. Mohamed.

2         A.    Do I have text messages at this time?

3         Q.    Yes.

4         A.    Is that what you're asking?

5         Q.    Or you did at some point?

6         A.    I did, but I clear my messages.  I would

7    have probably cleared this as soon as we talked.

8         Q.    You clear --

9         A.    I don't keep text messages.

10         Q.    Oh.  So as a matter of course, do you

11    delete them?

12         A.    Yes.

13         Q.    How often do you do that?

14         A.    Probably almost on a daily basis.  I

15    just -- I'm weird and I delete my text messages.

16         Q.    It does have a nice feel to it when

17    they're gone.

18               Did you continue -- have you stopped

19    doing that, or have you continued, you know, through

20    the present do that?

21         A.    I still delete them.  I still delete

22    them.

23         Q.    Okay.  Even ones that are work-related?

24         A.    Yes.

25         Q.    Okay.  All right.  So let's talk about

1    what you remember from the meeting that this text

2    message is referring to.  So you said this was a

3    larger group.  So who was in that group?

4         A.   So in that group were all the individual

5    contributors that were there at the time, so Ebony,

6    Ann, Carrie, Ruby, Eddice Douglas, Juan Carlos

7    Estrella, Shawnetta Walker.  I want to say Kevin

8    Lewis, Nicole Hall, Stephanie Dunmore, Carol Spears.

9              I'm probably missing someone, but I --

10   it's escaping me right now.

11        Q.   Sure.  And then was Mike Jackson there

12   as well?

13        A.   He was not for that meeting, no.

14        Q.   Okay.  So it was this group of people

15   you just listed and yourself?

16        A.   Yes.

17        Q.   Okay.  And no one else?

18        A.   No.

19        Q.   Okay.  And you think that that occurred

20   on June 25, 2020?

21        A.   That sounds about right.

22        Q.   Okay.  So tell me what you remember

23   about that meeting.

24        A.   So what I remember about that meeting is

25   we talked about managers in general.  And the seminars

1     team had a manager at that point in time, Samantha

2     Hawa.  And I believe they felt they were doing her job

3     for her.  So that she wasn't really managing them,

4     that they kind of had to manage up and manage her, and

5     that -- and they didn't give specific names, but of

6     course I knew who they were talking about.

7                    And that they talked about managing up.

8     They talked about being open to new ideas and ways to

9     do things and not being resistant to change.  They

10    talked about wishing their managers were more subject

11    matter experts, and that they didn't want to feel like

12    they were the single point of failure.

13            Q.    And was that --

14            A.    Those are the --

15            Q.    Sure.  And are these the direct reports

16    of Ms. Hawa specifically?

17            A.    It was Hawa; the manager of eLearning,

18    Sara Beth Davis; Susie Davis; and Liz Lacey.

19            Q.    Did anyone express concerns about

20    Ms. Barley?

21            A.    Yes.  Ruby just reiterated in that

22    meeting that, from what I recall, about the

23    micromanage -- micromanagement and that she -- I don't

24    recall if she talked about in that -- and that

25    different people were treated differently.

1          Q.    Do you remember pressing Ms. Mohamed to

2    share her experience with the group?

3          A.    Yeah.  I encouraged her to in the texts

4    that you just saw.  Because Ruby -- I felt like Ruby

5    would get them to open up if she talked first.

6          Q.    Okay.  Was she upset at the time?

7          A.    In the meeting?

8          Q.    Yes.

9          A.    I don't think so.  I felt that -- that

10   whole meeting, I felt, had a -- it had a good vibe to

11   it.  I think that people -- we were just trying to

12   think about -- they wanted to share, they wanted a

13   voice.  I wanted to listen and hear what was going on

14   so I could understand --

15         Q.    Okay.

16         A.    -- how I could help, how I could, you

17   know --

18         Q.    When --

19         A.    -- listen to some of these -- these

20   scores that were pointing towards the managers.

21         Q.    Gotcha.  When Ms. Mohamed shared her

22   concerns, did she mention race discrimination again?

23         A.    She didn't mention race discrimination

24   on this call.

25         Q.    She did not?

        1              A.    No.

        2              Q.    Do you remember Ms. Thompson sharing

        3      anything during this call?

        4              A.    She was sharing that she was just -- she

        5      was unhappy, she didn't -- you know, Ms. Thompson's

        6      message would always vacillate between she wasn't

        7      getting the help that she was needing or she was being

        8      micromanaged.

        9              Q.    Okay.  And do you remember Ms. Thompson

       10      bringing up race during this meeting?

       11              A.    She did not bring it up in this meeting.

       12              Q.    Okay.

       13              A.    From what I recall.

       14              Q.    Now, I don't think we -- do you still

       15      have a copy of the employee survey results that came

       16      out in 2020?

       17              A.    I don't, but I'm sure HR does.

       18              Q.    Okay.  Did -- and were they broken down

       19      by department?  So this is kind of talking about the

       20      results that had come in from education?

       21              A.    Yes.  They were broken down by

       22      department.

       23              Q.    All right.  Were you concerned about

       24      some of those results?

       25              A.    Yes, I was concerned about the results.

1          Q.    Okay.  Does it sound right that 50 --

2     that employees had rated -- "58 percent say that

3     supervisors/managers at SHRM are active role models in

4     our guiding principles compared to 72 percent in SHRM

5     overall."

6                Does that sound familiar?

7          A.    That sounds familiar.

8          Q.    Okay.  So you were interested in getting

9     to the bottom of why that number was so low?

10         A.    I was.  And the course of action that

11    our chief had put forward was that he wanted the VPs

12    to meet with the ICs.

13         Q.    Got it.  And then who was your chief?

14         A.    Nick Schacht.

15         Q.    Nick.  Okay.  Gotcha.  So that was by

16    his directive?  He wanted you to kind of take the

17    temperature of the individual contributors?

18         A.    He did.  And I -- you know, I had heard

19    from Ruby they were unhappy, so I probably would have

20    done something like that anyway.

21         Q.    When did Ms. Mohamed share that with

22    you?

23         A.    Oh, I don't know.  In one of our

24    conversations she might have said, "Would you be

25    willing to talk to other people as well?" something

1    along those lines.  She didn't get specific because

2    she would keep her -- her friends in --

3              I'm sorry.  Someone is at my door.  If

4    you could hold on one moment --

5         Q.    Sure.

6         A.    -- I'll go make sure.

7              MS. DeFAZIO:  Let's go off the record

8    for a second.

9              (Recess from 12:48 p.m. to 12:50 p.m.)

10        Q.    (By Ms. DeFazio)  So, Ms. Morris, is

11   there anything else that you recall about that meeting

12   with the independent -- or the individual contributors

13   that you described earlier?  Is there anything else

14   you recall about that meeting that you haven't shared?

15        A.    I don't believe so.  Not from that

16   particular meeting.

17        Q.    What was the next -- your next step as

18   you worked to get to the bottom of those low --

19   that -- those low ratings?

20        A.    Sure.  So after that meeting, there was

21   a report out in Nick's all-hands meeting.  So -- or

22   actually, Nick met with the spokesperson for each

23   education -- or for each group where he had suggested

24   these meetings.

25              Our spokesperson was Stephanie Dunmore.

1    So he met with her, and then she did that report out

2    at the all-hands meeting.  And then subsequent -- and

3    Mike Jackson was present for that.  And then

4    subsequent to that, I believe that Mike Jackson met

5    with Liz Lacey's entire team, and they went over the

6    survey results, and they went over the contents of

7    that discussion.

8         Q.    Okay.  What time period was that all

9    taking place in?

10         A.    That, I would say, would -- that had to

11    have been probably July, somewhere in that time frame.

12         Q.    Okay.  And you mentioned that Stephanie

13    Dunmore had been kind of selected as the spokesperson

14    for education; is that right?

15         A.    Yes.  Yes.

16         Q.    Okay.  Were you in the meeting where she

17    reported out, you know --

18         A.    Yes.

19         Q.    -- feedback from your department?

20         A.    Uh-huh.

21         Q.    Who was present at that meeting?

22         A.    Our entire department and Nick's entire

23    division.

24         Q.    So Mr. Schacht was there -- am I saying

25    his last name right?

```
1              A.    Yeah.  Schacht.  Yes.

2              Q.    Schacht.  Okay.  Great.  Lots of Cs in

3       there.

4              So Mr. Schacht was there, you were

5       there, all the individual contributors under you, all

6       of your direct reports, so Ms. Lacey, Ms. Barley?

7              A.    Yes.

8              Q.    Okay.  Any other executives were there

9       as well -- besides Mr. Schacht?

10             A.    No.  And Mike Jackson was there --

11             Q.    Oh, Mike Jackson.

12             A.    -- if I recall correctly.

13             Q.    Okay.  What did Ms. Dunmore share in her

14      report-out?

15             A.    She shared essentially most of the

16      things that we talked about.  But then she also said

17      things like there was unethical managers, unethical

18      behaviors going on, which was very surprising to me

19      because words like "unethical" were not expressed in

20      our meeting.  So I was very surprised by that.

21             Q.    Okay.  Did she say anything about

22      concerns about race discrimination being brought up?

23             A.    In that all-hands meeting?

24             Q.    Yes.

25             A.    I remembered more about what I was
```

163

1    surprised about was the unethical leadership.  That's

2    what I think was said.

3            Q.    Okay.

4            A.    And then I remember -- I don't remember

5    if there was something around diversity and leadership

6    or something that she had brought up, but I remember

7    that what our meeting had been about and what she

8    reported out, there was a -- there was a difference

9    there because it -- we had not talked about that

10   leaders were "unethical."  That was the first time I

11   heard a word like that.

12           Q.    Sure.

13           A.    And she actually said that the entire --

14   she said that the leadership of the SHRM education

15   team was unethical.  I recall that.

16           Q.    And when she was presenting that, was it

17   in the context of this is what individual contributors

18   are saying, or did she kind of state it as a matter of

19   fact?

20           A.    She said that's what she had heard.

21   That's what was shared in the meeting.

22           Q.    Okay.  And this was reporting out from

23   the meeting that you had had with all the individual

24   contributors?

25           A.    Yeah.  And I think they might have met

1    with Stephanie without me there --

2          Q.    I see.

3          A.    -- and then -- and then I met with them.

4    But I think also that -- Stephanie also told me what

5    they had reported to her as well in their private

6    meeting.  So it was kind of a layered approach.

7          Q.    I see.

8          A.    But she did not bring up racism to me

9    before that meeting and that all-hands.  That did not

10   come up.

11         Q.    Okay.  And you think that all-hands

12   meeting happened in July?

13         A.    Probably.  It had to have been somewhere

14   in that time frame.

15         Q.    Okay.  Did you meet with Ms. Dunmore

16   about what she learned from her meeting with the

17   individual contributors without you before that

18   all-hands meeting or afterwards?

19         A.    I met with Stephanie before because she

20   was sharing kind of what they shared with her without

21   me there, and then we were layering it in with what

22   they did share with me.

23               And then after the meeting, she came in,

24   and I think that -- and I told her I was surprised,

25   that I felt blindsided about this unethical

165

1    leadership, that we had not talked about that.

2         Q.    Okay.  And just so I make sure I get the

3    timing right, you had the meeting with the individual

4    contributors, just you and them; you had a --

5    Ms. Dunmore at some point met with the individual

6    contributors without you?

7         A.    Yes.

8         Q.    Then you met with Ms. Dunmore about what

9    had come from that meeting?

10        A.    Yes.

11        Q.    And then this all-hands meeting --

12        A.    And I think she might have --

13        Q.    -- occurred?

14        A.    And Stephanie might have met at some

15   point with Liz and Susie, the directors, about what

16   was talked about.  They kind of had a heads-up before

17   the all-hands.

18        Q.    Okay.  And the all-hands happened after

19   those meetings?

20        A.    Yes.

21        Q.    Okay.

22        A.    I believe so.

23        Q.    Okay.

24        A.    Stephanie and I met after the all-hands.

25        Q.    Okay.  So kind of four discrete

1    meetings.

2                    So tell me about the meeting you had

3    with Stephanie after she had met with the individual

4    contributors without you before the all-hands meeting.

5                    So what did she share with you about

6    what she had learned?

7           A.    I'm sorry.  Could you repeat that

8    question?

9           Q.    Sure.  So the meeting you had with

10   Stephanie Dunmore after she had met with the

11   individual contributors without you, what did she

12   share with you during that meeting?

13          A.    Oh, okay.  I think that it was along the

14   lines of what I heard in the meeting with them.  But,

15   again, it was about managers really being just better

16   leaders in day-to-day management and being able to

17   offer advice and not ask the team to make the

18   decisions.  And that she shared that the

19   single-point-of-failure concept came up, and being

20   opening -- open to change.

21                   And in one of these conversations, I

22   heard that they would like to see more opportunities

23   and -- for diversity to be represented across the

24   management team.

25          Q.    Okay.  At that time the managers in

1    education were all white, correct?

2        A.    Yes.

3        Q.    Okay.  And the individual

4    contributors -- the people of color were in individual

5    contributor roles?

6        A.    Individual contributors, yes.

7        Q.    Did Ms. Dunmore tell you that concerns

8    about race discrimination had come up in her meeting

9    with the individual contributors?

10       A.    No.

11       Q.    Okay.

12       A.    Not before the all-hands meeting.

13       Q.    Okay.  And Ms. Dunmore is Black, right?

14       A.    Correct.

15       Q.    Okay.  And then the issue of race,

16   different treatment based on race, did not come up

17   during the all-hands meeting from Ms. Dunmore; is that

18   right?

19       A.    I recall hearing "unethical leadership,"

20   because I remember when I asked her what she meant by

21   that, that's when she said, "People of color are

22   feeling they might be treated differently" or

23   something along those lines.

24       Q.    Okay.

25       A.    I can't remember exactly how she said

1    it.

2         Q.    Okay.  So now let's talk about the sort

3    of debrief meeting you had with her after the

4    all-hands.  So it sounds like you then brought up the

5    unethical piece then.

6              So tell me what you remember --

7         A.    Yes, I did.

8         Q.    -- about that meeting with her.

9         A.    That's when I asked her about it.  And I

10   said I felt blindsided.  I didn't -- we didn't -- we

11   didn't talk about that you felt that there was a lack

12   of ethics or that, you know, -- I'm trying to think

13   that there was less -- I can't remember how I posed it

14   to her.

15             But her answer about the unethical

16   behavior was around that they felt that people of

17   color were being treated differently in some areas and

18   that -- I'm trying to think what else she said.  And

19   she might have said, "And Ruby's upset because she

20   said she told you in that meeting," or something along

21   those lines.  I can't recall exactly.

22        Q.    Did she tell you --

23        A.    But Stephanie felt -- she felt that she

24   had brought it up to me before and that she had

25   expressed this with Susie and Liz in her report-out to

them.

Q.    Do you think that treating employees

differently because of race could be considered

unethical?

A.    Not considered.  It is unethical.

Q.    Did you say anything to Ms. Dunmore in

your -- that meeting with her after the all-hands

meeting about whether you thought Ms. Barley was

treating people differently based on race?

A.    I think I told her I didn't think it was

a race issue.

Q.    Okay.  What did you tell her --

A.    But I also told her I recognized that

everybody was -- you know, we were all at a high

emotional state of -- you know, I was kind of shocked

and surprised and, you know, I told her, "What did I

miss?"  You know, "How did I not hear that?"  I

remember saying something to her like that.

So that was when I said, "Let's just

take a step back."  You know, "I don't want us to

have" -- you know, "I appreciate what you did."

And I know she was feeling like -- then

that she -- you know, felt that she was put in the

middle of everything as the spokesperson.  So I think,

you know, then we just kind of decided, let's take a

1    step back.  And I don't know if she went back to the

2    team then and talked to them again or what really

3    transpired after that.

4            I just said, "I don't think it's a good

5    idea for us to start getting, you know, on" -- "having

6    conversations" -- "additional conversations right now

7    in this moment because everyone is heated.  And let's

8    all take a step back and find solutions.  That's what

9    we need to do is think about solutions for this."

10           Q.    Okay.  Do you remember telling

11   Ms. Dunmore that you didn't think that Ms. Barley was

12   racist because she has a child who is part Hispanic?

13           A.    I could have said something along those

14   lines about her having a biracial child or something

15   like that.

16           Q.    Do you --

17           A.    I think if I said -- if I did say

18   something like that -- and I do recall a conversation

19   like that, yes.

20           I think it was more about thinking, too,

21   of Carolyn's -- I think I was probably thinking

22   Carolyn was really upset because she feels, because of

23   her biracial child, she's -- it's making her just as

24   upset to have this said about her, something along

25   those lines.

1    Q.    Do you remember the context of that

2    conversation -- or when you might have said that?

3    A.    It was when Stephanie and I were talking

4    about it.

5    Q.    Okay.

6    A.    Like, how we got to that point.  I

7    certainly -- I can't -- I wouldn't say someone can't

8    be racist because they have a biracial child.

9    Q.    So what did you -- and you may have just

10    said it, and I apologize -- but how did you frame it

11    when you said that to Ms. Dunmore?

12    A.    I think I was framing it in the context

13    of Carolyn -- like, everyone is upset, right?  That's

14    the context I was putting it in.  Everyone is very

15    upset.  Carolyn is reacting to the -- hearing about

16    that she's racist.  And, again, I don't know what the

17    sequence was.  And she's feeling especially upset

18    about it because she has a biracial child, and how,

19    you know, he's going to feel and how she is so upset

20    by being accused of that, right?  It's the worst --

21    one of the worst things that, when you realize someone

22    could be, but even to be accused of that.

23    So I think that was the context.  I was

24    trying to put everyone's perspective in place, and

25    I -- I didn't do it in a perfect manner.

1          Q.    You don't think you did?

2          A.    I think that I was -- if I -- if I said

3     something and she didn't understand how -- context, I

4     was not saying anyone was or couldn't be a racist.

5     Everyone has the possibility that they could be a

6     racist, and I couldn't state -- I can't state who is

7     and who isn't.  I was just stating kind of where

8     Carolyn was coming from.

9          Q.    Sure.  And had you -- outside of this

10    conversation with Ms. Dunmore, had you had

11    conversations with Ms. Barley following June 4 where

12    she talked about being upset by Ms. Mohamed accusing

13    her of treating her differently because of race?

14         A.    I'm trying to think of where the

15    sequence of the -- when it came up with Carolyn of

16    race was when -- I believe for her the first time she

17    heard it was in one-on-ones with Ruby, and then in --

18    subsequent from Mike Jackson that there were.

19              So when I talked to Carolyn about it,

20    again, it would go down the road of it -- that her

21    decisions or her behaviors weren't at all about race.

22    And then she would explain kind of why she did

23    something, and that's where -- how we would have those

24    conversations.  And she did say to me, "I have a

25    biracial child, and I" -- "I can't operate from that

173

 1   type of mind" -- "racial mindset," something along

 2   those lines.

 3        Q.    Sure.  So how many conversations do you

 4   think you had with Ms. Barley where race -- her being

 5   accused of treating someone in a racist manner came

 6   off -- or a racially discriminatory matter?

 7        A.    If we -- we discussed it after it came

 8   to light after it was being investigated with HR.  I'm

 9   just trying to put an accurate number on it for you --

10        Q.    Sure.

11        A.    -- and I can't --

12        Q.    Do you --

13        A.    -- because there were times when she'd

14   come in my office really emotional after hearing

15   something from HR or talking to Sean and -- you know.

16   So I'm just thinking -- and the time span of when it

17   started to when it ended, I would say it came up

18   several times.  But I think the majority of the

19   conversations she had when it came to that at that

20   point were with HR.

21        Q.    Okay.  But it sounds like you -- you

22   talked to her at least a few times, even if it was in

23   passing with her popping into your office or maybe

24   during a one-on-one?

25        A.    Yes, because I wanted -- to help me

1    understand why -- why this and that with someone else.

2    Help me to understand that.

3            Q.    That was --

4            A.    That she would explain her thought

5    process.

6            Q.    Got it.  But is it safe to say that

7    she -- Ms. Barley was quite distressed by being

8    accused of treating people differently because of

9    race?

10           A.    Yes.

11           Q.    Okay.  And she was trying to defend

12    herself against that?

13           A.    She was trying to -- she wanted us to

14    understand why she -- she had kind of a different

15    level of involvement, say, with Ruby than more

16    independence, say, with Carrie or something along

17    those lines.  So, yes, she was very distressed, she

18    was very upset, and she wanted to make sure that Ruby

19    and the organization understood where she was coming

20    from and her decision-making in her management of

21    people.

22           Q.    Does SHRM do trainings for people

23    managers about implicit bias?

24           A.    There are two episodes in the people

25    management training, workplace bias and social

1    justice.  And then SHRM has a training, yes, as well.

2              And Carolyn also was the lead designer

3    in some of the areas of the inclusive workplace

4    culture program that we have.  And then SHRM also has

5    the -- the mandatory harassment training as well.

6         Q.   Okay.  And implicit bias is discussed in

7    that harassment training?

8         A.   I can't say specifically.  I know it is

9    in the programs that she worked on and designed for --

10   and the inclusive workplace culture.

11        Q.   Got it.  In any of your discussions with

12   Ms. Barley about, you know, her responding to these

13   accusations of being -- of behaving in a

14   discriminatory manner, did either of you talk about

15   implicit bias?

16        A.   No, I don't -- I don't believe that --

17   that we did.  I think that it was more about

18   understanding, again, how her thought process was and

19   why her decisions were made the way that they were and

20   kind of getting down to the facts of what happened and

21   the specific things that were upsetting Ruby.

22              And I -- I assume those conversations

23   happened at the HR level with Sean and/or Bernée.

24        Q.   Okay.  But you don't know for a fact?

25        A.   I don't.

1          Q.    Okay.  But in your coaching of

2    Ms. Barley, you did not bring up the idea that perhaps

3    implicit bias may be playing a role in the way she's

4    treating her subordinates?

5          A.    I did not.

6                MS. DeFAZIO:  Okay.  Why don't we go off

7    the record and take our 20-minute food break.

8                Does this work for everyone now?

9                (Recess from 1:12 p.m. to 1:41 p.m.)

10         Q.    (By Ms. DeFazio)  So, Ms. Morris, I'm

11   going to go back for a moment to the engagement survey

12   meetings that we were talking about a bit earlier.

13               MS. DEFAZIO:  So I'm going to drop

14   Exhibit 23 into the chat.

15               (Exhibit Number 23 was marked.)

16         Q.    (By Ms. DeFazio)  And just let me know

17   when you've got that open.

18         A.    Got it.

19         Q.    Okay.  So this looks to be a response to

20   an email you sent on Tuesday, July 14, at 2:17 p.m.

21               Do you see that?

22         A.    I do.

23         Q.    Okay.  Tell me, in your message to this

24   group -- and I presume -- is this distribution list

25   all of the employees in the education department or is

1     this the individual contributors?

2          A.    Oh, no, this has -- let's see, the

3     managers and directors, it looks like, are on this.

4          Q.    Got it.  So this is the entire education

5     department under you?

6          A.    Uh-huh.  It is, yes.

7          Q.    Okay.  So tell me what animated your

8     decision to send out this message to everyone?

9          A.    Let me look at the timing.  "Biweekly

10    Education Team Meeting."  This -- oh, that's

11    January 22.

12             So this is July 14, and let me look at

13    what I wrote.

14             So I believe this was sent after the

15    all-hands meeting, Mike Jackson's meeting with the

16    team that I was not present for.  And he was really

17    starting to address some of the things that they had

18    shared in the all-hands that -- how can we

19    collectively get there?  What are your solutions?

20    What do you want to see changed?

21         Q.    Okay.

22         A.    So that's where my head was coming from.

23         Q.    Sure.  So this was after you had -- the

24    all-hands meeting happen, you had that debrief with

25    Stephanie where you mentioned --

```
 1              A.    Yes.

 2              Q.    -- being a bit surprised by the

 3      "unethical" comment, right?

 4              A.    Yes.

 5              Q.    Okay.  So then Ann Godmere in the

 6      message at the top of Exhibit 23 says "That sounds

 7      like a plan."  And then asks that there be a dial-in

 8      number distributed --

 9              A.    Okay.

10              Q.    -- and then maybe -- it looks like

11      volunteers Stephanie Dunmore as the leader.

12              Do you know, does that meeting end up

13      taking place where there's a meeting with all the

14      individual contributors without you present?

15              A.    I believe so, yes.

16              Q.    Okay.  What did you learn as an outcome

17      of that meeting?

18              A.    It's that I believe the meeting took

19      place.  But did anyone come back and communicate to me

20      what happened in that meeting?  I don't remember.  I

21      don't believe that Stephanie came back and said

22      anything.  I do recall that we came back together

23      again after that, where I said, "I know you had your

24      meeting.  What are your solutions?  What do you

25      suggest as a team?"
```

```
 1              I remember -- I don't remember a lot

 2      about this one.  I remember Shawnetta Walker saying

 3      she wanted change.  And I said, "Can you define it for

 4      me?"  And she said, "No, I just want change."

 5              Q.    And she is a woman of color; is that

 6      right?

 7              A.    She is.

 8              I remember that they might have said

 9      that there could be some more training -- more

10      training for their jobs.  It was -- there were so many

11      meetings during this time frame, so I -- to be honest

12      with you.  Because when I saw that meeting request, I

13      didn't remember the managers and the directors being

14      in that meeting, because I remember that -- I thought

15      we had one more meeting where it was just us.

16              So what happened in the collective full

17      department meeting, I just remember some of those

18      comments.  I don't remember -- I remember it was kind

19      of -- I don't even think the meeting at that time was

20      very long because I don't think anyone really had any

21      solutions.  I think everyone was still feeling very

22      bruised from all of the meetings at that point.

23              Q.    Sure.

24              A.    From what I recall.

25              Q.    So you don't recall --
```

1        A.    And that's -- I can't recall if we

2   even -- I really -- honestly, I can't recall if we

3   actually had that meeting or I met with them without

4   everyone else there.

5        Q.    But you --

6        A.    I know --

7        Q.    You met with who without everyone else

8   there?

9        A.    I remember going back to that original

10  IC group and we talked.  And I think that's where

11  Shawnetta suggested change, but she couldn't define

12  what it could be.  She just knew she wanted it.  And

13  they talked a little bit about a little more training

14  for their jobs.

15       Q.    Okay.

16       A.    But I don't remember from the note that

17  you just shared for the greater group if we all met as

18  a -- as one large team at that point, or did we -- or

19  if it got canceled or what happened at that juncture.

20       Q.    Okay.  Did you ever learn from anyone

21  what had been shared amongst the individual

22  contributors in the meeting that followed Exhibit 23?

23       A.    I don't understand that question.

24       Q.    Sure.  So Exhibit 23 goes out, and it

25  sounds like the individual contributors themselves

1    scheduled a time for them all to meet without you

2    present -- or managers, correct.

3           A.    Yes.

4           Q.    Okay.

5           A.    And I -- at that point I think -- there

6    was also -- Stephanie was meeting with her manager,

7    Sara Beth Davis and Liz Lacey at the time about what

8    was coming out of some of these meetings as well.  So

9    I'm -- again, there were so many meetings at this

10   point.  I'm trying to figure out --

11          Q.    Sure.

12          A.    -- who said what to who, and when they

13   were, and all of that.

14                So I don't recall -- after Stephanie and

15   I talked and they -- and if they -- how they went back

16   and met, if anyone came back to me and said, "Here's

17   what happened" or "Here's what we want to do."

18          Q.    Okay.  So you just can't remember.

19          A.    Somewhere in there, I met with them

20   again, because I talked about -- I apologized to say,

21   "If there's something I didn't hear you guys say or

22   you were saying something that I should have heard,

23   then that" -- you know, "that's on me."  But if -- so

24   I wanted to explain why I felt surprised by a comment

25   like "unethical," et cetera.

1                So I think that's when we talked through

2    what could be some solutions, and it was just a

3    very -- nobody really kind of, I think, was in the

4    right mind space to think about what those should be,

5    because a lot going on all around.

6          Q.     Did you offer any possible solutions?

7          A.     I think we talked about meeting cadence

8    and kind of how much more involved I should be kind of

9    in their one-on-one meetings or in their director

10   meetings.  And I -- you know, I think we might have

11   talked about bringing HR into the conversation more,

12   is that something that they wanted.

13               But I really wanted to hear what the

14   solutions were that they suggested that would make

15   them feel better about their day-to-day work life

16   experience rather than me dictating something to them.

17         Q.     Did you ultimately hear from them any

18   suggested solutions?

19         A.     Outside of they wanted to change our

20   meeting cadence and start thinking about how we met as

21   a whole greater team -- we usually had kind of a

22   roundtable meeting.  They wanted to think about -- I

23   think that maybe -- I want to say that Eddice Douglas

24   and someone else might have offered to think about how

25   we could collaborate and communicate more as a team

1    and how we would change our meeting cadence and really

2    make sure that everybody was involved with each other,

3    if that makes sense.

4              Because most of us were remote, so I

5    think that was one of the solutions that came out of

6    it was that different teams started hosting team

7    meetings to make them more informative and interesting

8    and collaborative for the other team members.  I do

9    remember that.  It was one of the solutions.

10         Q.   Do you recall any other solutions that

11   were enacted as a result of all these meetings about

12   the employee engagement survey results?

13         A.   I'm trying to think specifically across

14   the different managers of what happened.  I also think

15   that we -- we talked to people about special projects

16   that they were passionate about, things they wanted to

17   work on rather than being assigned.  That they

18   volunteered more for things that they felt interested

19   in so they could build their strengths in their areas

20   of interest.

21              Those are the two that are standing out

22   for me right now because it was kind of a compact time

23   frame where there were so many meetings and so many

24   discussions.

25              And I'm sure Liz had, you know, with the

1   seminars and the eLearning team reporting up to her

2   and meeting with Mike Jackson, probably had some

3   solutions and things that she built in as well.

4        Q.   Okay.

5        A.   They had meetings and discussions that I

6   was not a part of.

7        Q.   Sure.  It sounds like that the genesis

8   of these meetings were employee survey results that

9   dealt with people's feelings about their managers,

10  right?

11       A.   About their managers.  It could have

12  been -- that's what they indicated it was about at the

13  time.

14       Q.   Okay.

15       A.   So I would assume it was about their

16  specific -- specific managers at that point in time.

17       Q.   Okay.  So what in particular was done

18  following these meetings about those concerns about

19  management in the education department?

20       A.   So we really talked to them and worked

21  with -- I would say Sarah Beth Davis I don't think was

22  an issue.  And I don't think that the eLearning team

23  and Stephanie had issues specific to Sarah Beth.  I

24  think that at that point in time it was around

25  Samantha, and it was around Carolyn.

1          And with Samantha -- I'm trying to

2    think.  It was working more directly with Samantha

3    around her specific job, meaning that they wanted to

4    see their manager perform at a specialist level or a

5    manager level.

6          So Liz kind of had to really go back.

7    Samantha was a return employee.  Liz had to go back

8    with Samantha and kind of really, truly train her down

9    at the ground level -- budgeting, things of that

10   nature.  Kind of instructor management and really

11   walking Samantha back through just some of the more

12   pedestrian duties or things that were being done

13   that -- and ways that she was communicating to her

14   team that were frustrating her team.

15          So Liz put a little more accountability

16   on Samantha to make her own decisions and make

17   decisions for her team at that point in time.

18       Q.    And what about for Ms. Barley?  Were any

19   changes made following these meetings?

20       A.    So for Ms. Barley, I would -- I believe

21   I started attending some of their meetings.  But

22   during this time is also when HR had stepped in with

23   Carolyn, with the workplace investigation -- or with

24   the investigation around racism.

25          And that was at the point where we were

1    letting the investigation -- you know, see what came

2    out of that and see what came out of the mediation,

3    making sure they were going to -- I recall Sean

4    thinking about kind of -- he -- as I said before, kind

5    of for me to stand down.  They wanted to step in, and

6    they wanted to think about kind of what the action

7    plan should be.

8           Q.    But hadn't other employees expressed

9    concern about Ms. Barley's management other than

10   Ms. Mohamed and Ms. Thompson in the context of the

11   survey results?

12          A.    She didn't have anyone else reporting to

13   her.

14          Q.    Ms. Mills or Ms. Godmere?

15          A.    No.

16          Q.    Okay.  So because the concerns in --

17   that were brought up about Ms. Barley's management,

18   because those had come from Ms. Thompson and

19   Ms. Mohamed, they were being kind of isolated in this

20   HR investigation rather than being dealt with in the

21   context of the employment -- employee engagement

22   survey results?

23          A.    Well, there were two -- there were two

24   different issues.  We were working with Carolyn about

25   kind of communication, thinking about how she was

1    managing her team, et cetera.

2              So what I'm saying is, yes, there was

3    ongoing things that we were working with Carolyn on,

4    and I was in there in her day-to-day meetings at times

5    to see kind of what was going on and/or observing her

6    face-to-face in the office.  But during this time,

7    during the employment survey and kind of all the

8    things that happened at one time, there was also that

9    workplace investigation going on as well in the

10   background.

11             So, yes, of course, Nick worked with

12   Carolyn and talked to Carolyn.  I talked to Carolyn.

13   Sean was talking to Carolyn.  We were trying to -- you

14   know, we -- as you know, we had a lot of meetings and

15   we had a lot of talks with Carolyn and just thinking

16   about, you know, I said I would tell her, "Did you

17   ever think about phrasing something this way?" or

18   "Make sure everyone is invited to a meeting.  Make

19   sure they make the decisions of how they want to be.

20   Let them invite you to a conversation if they want you

21   there," things of that nature.

22             So that's kind of how we worked it on

23   our end with Carolyn with her management style.

24        Q.    Okay.  So whereas Ms. Samantha Hawa was

25   kind of referred -- or Liz was helping train -- kind

1    of retrained her from the ground up it sounds like --

2          A.    That's what --

3          Q.    -- with Carolyn it was more -- sorry?

4          A.    Yes.

5          Q.    Okay.  But with Carolyn, it was more of

6    just individual coaching from you and, it sounds like,

7    Mr. Schacht?

8          A.    Correct.  It was -- with Carolyn, it

9    was -- we were really trying to get her to think about

10   the receiving end of why people might be hearing

11   things differently than she was intending or think

12   about kind of how you deliver a message holistically

13   to a team, things of that nature.

14         Q.    And who -- when you say "we," who is

15   that?

16         A.    I would say she -- she got coaching from

17   Bernée Long, she got coaching from Nick, from myself.

18   I think that Carolyn herself was probably -- or was in

19   her own professional development and how she could

20   grow as a people manager.  And I think that she really

21   did want to help and she really did want to ensure

22   that she was growing as a person and a manager, I

23   think.  And we were just trying to help get her out of

24   that set where she was struggling in that respect.

25         Q.    And who is "we" when you say we?

1    A.    I would say collectively, as the people

2    that were involved, Nick, Mike Jackson, Sean, Bernée

3    Long was very much involved, and myself.

4    Q.    Okay.  And is that --

5    A.    And I would say to an extent -- I would

6    say to an extent Liz, as the director of the

7    department, would help coach Carolyn in some areas as

8    well, because Liz had made the move in the

9    organization from manager to director, so she kind of

10   had kind of that mindset that she could talk about

11   kind of where she had struggles and how she overcame

12   them.

13   Q.    And what -- which of those coaching

14   sessions or meetings did you actually witness

15   directly?  So obviously the ones with -- between you

16   and Ms. Barley.

17            Did you sit in on coaching sessions

18   between her and any of these other people you've

19   listed?

20   A.    No, I didn't.  And, you know, we didn't

21   call them coaching sessions.  I think that's just kind

22   of how I look at them in the rearview mirror of what

23   we were doing is really -- we wanted her to have many

24   perspectives of how she might be perceived and how she

25   might approach things differently.

1          Q.    Okay.  And you make it sound like there

2     was a collective approach to this, but I don't know if

3     that's you now kind of looking back and making sense

4     of it all, or was there some sort of plan

5     collaboratively, you know, you, Nick, Sean, Bernée

6     getting together saying, "Hey, we want, you know,

7     Ms. Barley to succeed.  Let's do X, Y, Z."

8               What is it?

9          A.    I would say it was a combination of

10    here's what we're going to do, here's how we need to

11    address it.  I think that also in -- you know, Nick

12    had several meetings with Ruby as I recall.  So Nick

13    would want to talk, you know, directly to Carolyn to

14    offer his advice in his many years of managing and

15    leading people, and how -- you know, what he would

16    suggest she think about.

17         Q.    Okay.  So you're just aware that she

18    talked -- she was being kind of individually

19    approached by these individuals -- Nick, Bernée Long,

20    Sean?

21         A.    And I think she was actively seeking

22    ways to improve.

23         Q.    Okay.  Sure.  I understand that.  But

24    you were aware that she was having conversations with

25    these individuals about Ms. Mohamed's concerns --

1          A.    I was.

2          Q.    -- right?  Okay.

3          A.    Yes.

4          Q.    But you didn't actually witness any of

5     them?  You just knew of them?

6          A.    I just knew of them, yes.

7          Q.    Okay.  Got it.

8                So she was having -- Ms. Barley was

9     having interactions with Mr. Schacht, Mr. Sullivan,

10    Mr. Jackson, Ms. Long.  Anyone else?  And yourself.

11    Oh, Ms. Lacey, you mentioned.

12         A.    What was that last name you mentioned?

13         Q.    Liz Lacey?

14         A.    Yes.  Yes.

15         Q.    Okay.  Anybody else I haven't listed?

16         A.    I don't think so.

17         Q.    Okay.  That's quite a few people to be,

18    you know, either her approaching or approaching her.

19                Did you get the sense that she was

20    getting kind of overwhelmed by, you know, talking

21    about this a lot or, you know, being approached by

22    numerous people about these issues?

23         A.    I think that because it was our work and

24    our -- the operations design development and

25    everything is tightly woven, so it wasn't that it was

192

1    always formal conversations.  It was, you know, Liz

2    was involved in the respect of, "Hey, met with Ruby,

3    and this" -- "and we're working the situation with

4    this SME or Lou Lessig," or things of this nature,

5    "but have you thought about going about things this

6    way, that way?"

7              Do I think Carolyn -- Carolyn at that

8    point in time, I think, generally wanted to be a good

9    people manager.  And I think she just was trying to

10   figure out through her work in the PMQ and working the

11   people manager content and thinking through kind of

12   being a newer people manager of she didn't want to

13   repeat the same mistakes.

14             So she was trying to find -- build her

15   muscle there as a manager, that she wouldn't keep

16   repeating these mistakes over and over, that -- or,

17   you know, I -- she wasn't intending things, but they

18   were happening, so she needed to figure out and course

19   correct --

20        Q.    Did she share with you --

21        A.    -- through team meetings and in her, you

22   know, interactions.

23        Q.    Did she share with you that she thought

24   she had made mistakes in her handling of the situation

25   with Ms. Mohamed?

1      A.   No.  And I -- that was the wrong way to

2  put it.  She -- I think she was frustrated that when

3  she would try to make a change or they would talk -- I

4  recall at one point they had a talk, and Ruby had --

5  she shared or -- Ruby or Carolyn shared with me that

6  they felt that it had -- had a good end to it and that

7  things were starting to change.

8           And then I'm not sure.  After that, I

9  think then something else happened, and then things

10  just did not improve from that point forward.

11      Q.   You said it did not improve from that

12  point forward?

13      A.   I think so.  I -- there was a point

14  where I believe Ruby felt things were changing for the

15  better and they had talked it out.  And then I don't

16  recall what the next thing that happened was,

17  but . . .

18      Q.   Did Ms. Barley ever communicate to you

19  that she felt that Ms. Mohamed was bullying her?

20      A.   I know she communicated to me that Ruby

21  would raise her voice to her a lot in meetings.

22      Q.   Did you actually witness that?

23      A.   The one time that stands out for me was

24  when Ruby -- when we had the meeting in the beginning

25  of June that we spoke about earlier, when Ruby did

1    raise her voice, and she -- when she said, "I have no

2    empathy for you, I have no sympathy for you, and I

3    don't feel bad that you're crying right now."

4              I did witness that at one point in time.

5         Q.    Okay.  And what did you witness exactly?

6    That she raised her voice?

7         A.    She was -- Ruby was very -- was raising

8    her voice.  She said, "I have no sympathy for you, I

9    don't care that you're crying," something along those

10   lines -- "I have no sympathy after the way you've been

11   treating me."

12             That was an occasion where I felt Ruby

13   raised her voice.

14        Q.    Okay.  Have you ever witnessed her raise

15   her voice on another occasion?

16        A.    I have.  I just can't think of a

17   specific example.

18        Q.    Did Ms. Barley ever share with you that

19   she thought that Ms. Mohamed was spreading rumors

20   about her?

21        A.    I can't recall the specific context,

22   but, yes, I think she felt that Ruby was sharing with

23   her peers that Carolyn was a racist.

24        Q.    Okay.  Although you witnessed, at least

25   that meeting with Mike Jackson and the individual

1    contributors, the ISD team, where Ms. Mohamed shared

2    concerns about race discrimination, right?

3        A.    I believe Mike did.  And when they had

4    their one-on-one -- when Ruby and Carolyn had their

5    one-on-one, Mike Jackson also contacted Carolyn first,

6    and then Carolyn and I spoke about it afterwards.

7        Q.    Okay.  Did you perceive Ms. Mohamed

8    bringing up the concern about race discrimination in

9    that meeting as spreading rumors to her peers?

10       A.    No.

11       Q.    Okay.  Do you think that Ms. Mohamed

12   going to Mr. Sullivan with concerns about race

13   discrimination was spreading rumors about Ms. Barley?

14       A.    No.

15       Q.    Do you think that Ms. Mohamed going to

16   Mr. Taylor with concerns of race discrimination was

17   spreading rumors?

18       A.    No.

19       Q.    Do you think that Ms. Mohamed going to

20   Mr. Schacht with concerns about race discrimination

21   was spreading rumors about Ms. Barley?

22       A.    No.

23       Q.    Is it safe to say that Ms. Barley

24   interpreted a lot of those communications as

25   threatening to her?

1           A.    I think Carolyn should answer that

2     question.

3           Q.    That's fair.  Did she ever share with

4     you if she felt that she found it threatening?

5           A.    Not that she found it threatening.  I

6     think she shared concern around -- I think she was

7     just frustrated that the communication between the two

8     of them had gotten to a point where she felt that

9     the -- that Ruby had gone to Nick, had gone to Johnny,

10    had gone to Sean.  I think that was where she was

11    frustrated.  She was frustrated that they -- they

12    couldn't -- they weren't getting there together.

13          Q.    Okay.  But you would agree with me that

14    Ms. Ruby -- or not Ms. Ruby -- Ms. Mohamed had a right

15    to bring her concerns to all those people you just

16    mentioned?

17          A.    Absolutely.

18          Q.    And that doing so was not inappropriate

19    in any way?

20          A.    No, not at all.  In fact, it's

21    encouraged.

22          Q.    Did you emphasize that to Ms. Barley?

23          A.    Yes.  She's aware of the process and the

24    policies at SHRM and the open-door policy.

25          Q.    Okay.  At some point Ms. Thompson was

1    terminated, right?

2            A.    Yes.

3            Q.    Were you privy to that decision?

4            A.    Yes.

5            Q.    Okay.  Were you a part of that decision

6    to terminate her?

7            A.    Yes.

8            Q.    Okay.  And who made that decision?

9            A.    Nick, Carolyn, John, and myself talked

10   through the facts and made the decision to separate.

11           Q.    Okay.  And what was the reason for that

12   termination of Ms. Thompson?

13           A.    The termination was performance-based

14   and that Ebony had not delivered a piece of work since

15   she started in her employment.

16           Q.    She had never completed --

17           A.    Meaning --

18           Q.    -- a piece of work?

19                 Okay.  Sorry.  Go ahead?

20           A.    Yeah.  She was working on a program that

21   she -- it -- it was just not making progress at all.

22           Q.    And had --

23           A.    And Carolyn could provide the specifics

24   of that.

25           Q.    Okay.  Had a deadline come and gone?

1          A.    It was -- yes.  Several times.

2          Q.    Okay.  And what program was that?  Do

3     you recall?

4          A.    I want to say it was succession planning

5     or workforce planning.

6          Q.    Okay.  And you've testified several

7     times that once Mr. Sullivan and Mr. Jackson were

8     involved in the situation, you were told to

9     essentially remove yourself from trying to rectify the

10    situation with Ms. Mohamed and Ms. Barley; is that

11    right?

12         A.    I was not told that by Mr. Jackson, nor

13    was that anything implied associated with Mr. Jackson.

14         Q.    Okay.

15         A.    It was, by the time the complaint had

16    been surfaced to Sean, he wanted to work the process

17    and the investigation process without interference

18    from me at that point.

19         Q.    I see.  And around when was that?

20         A.    It had to have been in that late July,

21    August time frame, I would think.

22         Q.    Okay.

23         A.    Or whenever that initial complaint went

24    to Sean.

25         Q.    Okay.  And that's when Ms. Mohamed

1   actually met with Mr. Sullivan and it was an oral

2   complaint, correct?

3        A.   Yes.  I believe so.

4        Q.   Okay.  All right.

5        A.   It could have been a Zoom.  I don't have

6   that information.

7        Q.   Sure.  Did you ever become aware of the

8   fact that Ms. Mohamed was concerned that you were

9   retaliating against her?

10       A.   Was I ever made aware of that?

11       Q.   Yes.

12       A.   Nobody shared that with me.

13       Q.   Okay.  What about that she thought maybe

14  you were discriminating against her as well?

15       A.   No.

16       Q.   You testified earlier that you did not

17  believe that Ms. Barley was discriminating against

18  Ms. Mohamed; is that right?

19       A.   Correct.  Yes.

20       Q.   Okay.  When did you make that

21  determination that you didn't believe race was at

22  play?

23       A.   I looked at the facts.  And I understood

24  why some decisions were made.  I understood that

25  Carolyn was managing -- managing an employee to their

1    role, to their deadlines, and that it was more of, I

2    would say, an interpersonal conflicts or

3    misunderstandings they had between people manager and

4    employee versus racism.  I had no basis for racism.

5         Q.    Okay.  When did you actually make that

6    determination looking at the facts?

7         A.    I think it was through a process and

8    time.  I didn't just on one day decide it was one way

9    or another.  I kept my mind open, and I continued to

10   watch as things unfold and evaluate again of where

11   they had -- you know, they didn't meet.  What was kind

12   of the root cause of it?

13              And so I would listen to Carolyn

14   explain, I would listen to how Ruby felt on the one

15   side.  But, again, in my viewpoint, as things

16   continued to evolve, it did not seem race-based to me.

17   I had no signs of that.  There was nothing pointing to

18   that.

19        Q.    Okay.  And presumably before Ms. Mohamed

20   was terminated, you came to this conclusion, that her

21   different treatment was not based on race, right?

22        A.    That is what the investigation showed,

23   and I agreed with what came out based on what had

24   evolved during that time frame.

25        Q.    Okay.  And you continue to believe that

1    that's the case?

2        A.    Yes.

3            MS. DEFAZIO:  Okay.  I'm going to share

4    with you what was marked previously as Exhibit 15.

5        A.    Okay.  I'm going to the bottom.  I'll go

6    back up.

7        Q.    (By Ms. DeFazio)  Were you able to get

8    it?

9        A.    Oh, yeah.  I'm reading it.

10       Q.    Oh, okay.

11       A.    My apologies.

12       Q.    Okay.  No problem.  No problem.

13            Before you, you know, get through it

14   all, let me ask you just a few questions.

15            At some point the hard deadline of

16   August 31, 2020, was communicated to Ms. Mohamed for

17   both of the programs that she was working on, right?

18       A.    Correct.

19       Q.    Okay.  Do you know who established those

20   deadlines?

21       A.    Well, originally her deadlines were

22   established for Digital HR in January, and we gave her

23   several --

24       Q.    Wait.  Let me just stop you, Ms. Morris.

25   I'm sorry.

1          Just to keep you focused, who came up

2    with the August 31 deadline for both trainings?

3          A.    Well, I think when the deadlines passed,

4    Carolyn -- I believe Carolyn and Ruby negotiated

5    August 31 as the deadline because --

6          Q.    Okay.  So were you involved in

7    establishing that as a deadline?

8          A.    I don't recall that I was or if it --

9    if -- it might have been a collective conversation we

10   had in more of a group meeting of -- that Liz had

11   these programs on her schedule, and that's kind of the

12   last pass that she needed to get them out there and

13   started circulating them and getting them up and

14   running for the instructors, operational setup,

15   et cetera.

16         Q.    Do you remember that meeting happening

17   with Liz, or are you just speculating that that may

18   have occurred?

19         A.    I'm -- I'm speculating.

20         Q.    Okay.  So you're not aware of --

21         A.    I -- and the reason is because with the

22   digital ones, because we extended it in April to May.

23   Then in May we extended it to July.  In July, then, we

24   extended it again to August.  It had been several

25   times we had extended the deadline for that specific

program.

So I think that sometimes I was involved in them; sometimes I wasn't.

Q.    Okay.

A.    So I can't -- I can't remember specifically again.

Q.    Okay.

A.    It was close to three years ago, so I'm doing my very best here to make sure I give you the right information.

Q.    Sure.  That's fine.  That's fine.  But I only want your recollection.  If you're not sure, that's a perfectly fine answer.  Okay?

A.    Okay.  Thank you.

Q.    Sure.  So you're not sure where that deadline came from?  You think it may have been negotiated between Ms. Barley and Ms. Mohamed?

A.    I believe so.  And Carolyn would have the specific facts --

Q.    Sure.

A.    -- of . . .

Q.    Okay.  Would it surprise you to learn that the first time Ms. Mohamed learned about that -- that the deadline was actually in an email on August 11?

```
 1              A.    That would surprise me.

 2              Q.    Okay.  So I'll have you look then at

 3     Exhibit 23 [sic].  Turn to --

 4              A.    Is that the one I'm in now?

 5              Q.    Yes.  Yes.

 6              A.    I do see that.  Okay.  Let's see.  Let

 7     me go back.  I'm losing it again.

 8              Q.    Sure.  In the lower right-hand corner --

 9              A.    Okay.

10              Q.    -- there is a Bates Number SHRM 0145.

11              A.    Okay.

12              Q.    I'm sorry.  It's --

13              A.    I see where August 11, "Ruby, I

14     appreciate the updates.  Both programs to be finished

15     by the end of the month, August 31."

16              Q.    Okay.  So actually that email --

17              A.    Is that what you're talking about?

18              Q.    That email is dated August 12.

19                    Yes, that is what I'm talking about.

20                    So if I told you that's the first time

21     Ms. Mohamed learned about these deadlines, that would

22     surprise you?

23              A.    Yes.

24              Q.    Okay.  Because wouldn't that have

25     normally been discussed between a designer and their
```

```
 1    manager?

 2            A.    Yes.

 3            Q.    Okay.  And what is your understanding,

 4    if you know, of when Ms. Barley wrote both programs to

 5    be finished?  Is that -- when we talked earlier this

 6    morning about the process, is that the end of the --

 7    it's the implementation phase when there's actually a

 8    product that can be --

 9            A.    Yes.

10            Q.    -- turned into a course?

11            A.    Yes.  That's --

12            Q.    Okay.

13            A.    Yes.  I believe that's what she was

14    communicating here, that she needed the full

15    coursework.

16            Q.    Okay.  But you're not sure?  And

17    Ms. Barley is probably the one to ask about that?

18            A.    She -- repeat the question to me.

19            Q.    Sure.  That you're not sure exactly what

20    Ms. Barley was wanting at -- on August 31, and she

21    would be the one to ask?

22            A.    No.  August 31, the expectation was that

23    the full course programs would be turned over ready to

24    be delivered.

25            Q.    I see.
```

1          A.    That was what was expected on August 31.

2          Q.    Okay.  Had you and Ms. Barley talked

3    about that?  Is that how you know?

4          A.    That's how I know.  And it was just by

5    looking down at the project plans.  And what had been

6    discussed is that the -- both of these courses would

7    be completed by then.

8          Q.    Okay.  And then on August 12 -- so Bates

9    Number SHRM 0144 of that same document, of

10   Exhibit 15 -- Ms. Mohamed responds to that email.

11               Do you see that?

12         A.    And she responds to Nick and I and

13   copies Carolyn?  Or wait.

14         Q.    The --

15         A.    Oh, wait.  I see what you're talking

16   about.  Still on 144.  I see.  Okay.

17         Q.    And she's -- she's says "I have a couple

18   of questions/clarifications to ensure that we are on

19   the same page."

20               Do you see that?

21         A.    Yes.

22               "However the SME" . . .

23               (Deponent reading sotto voce.)

24         Q.    Have you finished reviewing it, her

25   response?

1          A.    I just got there.

2          Q.    Okay.  Great.

3                Do you see anything in this response

4     from Ms. Mohamed on August 12 at 8:50 a.m. as

5     problematic?

6          A.    I do in the sense that she had already

7     been -- had her deadlines extended several times, and

8     she should have, as a senior designer, made greater

9     progress on these programs.  And she got to the point

10    where she asked for the help at the end of the process

11    rather than communicating at the beginning of the

12    process.

13                I don't think it's wrong to ask for

14    help, but when -- when you're managing a project like

15    this, you have to factor in risk and you have to be

16    able to communicate the risk probably earlier on than

17    two weeks out of the -- on the deadline, assuming that

18    she was aware of the August 31 deadline.

19          Q.    Okay.  What if she wasn't aware of the

20    August 31 deadline; would that change your answer?

21          A.    No, because she had already had her

22    deadline extended several times.

23          Q.    Okay.  But you're not -- we talked about

24    this earlier.

25                You don't have any personal knowledge of

1    why that was the case?  You don't recall the details

2    around why they were extended?

3            A.    We would -- because the program wasn't

4    done, so we just had to keep extending it.

5            Q.    That's your --

6            A.    And Carolyn can provide that -- the

7    specifics on that.

8            Q.    Okay.  But your recollection is that

9    they were extended because Ms. Mohamed had not

10   completed the program?

11           A.    She had not completed -- she was not

12   making the -- she was not operating to the project

13   plan that I assume that she had created for herself

14   and gotten ahead of.  So when she did run into risks

15   that were SMEs, she -- she couldn't be as nimble

16   because she was still kind of behind her original plan

17   as well.

18           Q.    But you said you assumed that she

19   created, so this is not based on personal knowledge?

20   You're assuming, correct?

21           A.    My -- I should say my expectation of a

22   senior designer was --

23           Q.    Okay.

24           A.    -- that she -- she created -- she was

25   aware of her initial dates, she created a plan for

1    herself, she managed her work.  And there were some

2    delays that came in, but that would be part on her

3    performance as well as some of these things that we've

4    talked about with Lou.

5         Q.    Uh-huh.  And we talked earlier today

6    about, you know, the four- to six-month period that

7    you'd like to ideally see from the inception of an

8    idea of a program to the time it's launched, right?

9    Do you remember that?

10        A.    It's usually four that most senior

11   designers can turn it around in.

12        Q.    Well, I guess the six-month being if you

13   added -- you tack on the two additional months for an

14   instructor to get familiar with the program before --

15        A.    Before.

16        Q.    -- they actually launch it?

17        A.    And it could vary, yes.

18        Q.    Okay.  And then we talked about there

19   are instances where programs get pushed out because

20   other events occur, correct?

21        A.    Other competing events or --

22        Q.    Okay.

23        A.    -- things where a designer is pulled and

24   the decision's made that we're pulling them.

25        Q.    Okay.  And if you look to -- at the very

210

```
1    last -- or the second-to-last page, so SHRM 0146, do

2    you see that?  There's a table.

3              A.    It's the last page -- oh, yep.  Yep.

4              Q.    Yeah.  The second-to-last page --

5              A.    Yep.

6              Q.    -- of the exhibit, there's a table

7    that --

8              A.    Yep.

9              Q.    -- Ms. Barley includes?

10             A.    Uh-huh.  "Content Dashboard"?

11             Q.    Yes.  And the third column to the right

12   is "Target Completion," correct?

13             A.    Uh-huh.

14             Q.    Okay.  So that's the target for when the

15   course is going to be completed?

16             A.    Uh-huh.

17             Q.    Are there some courses that don't get

18   completed by their target?

19             A.    Yes, for reasons that we stated before

20   of a designer is going to get completely pulled off

21   and we're going to delay design because they're needed

22   elsewhere in the organization or there's a different

23   priority.

24             Q.    And in that case, the -- what happens?

25   Does the date when the program is going to be launched
```

1       just get moved or shifted accordingly?

2              A.    It could get shifted accordingly.  It --

3       or we might just consider outsourcing part of it.  We

4       might -- it will depend if, for example, if there's an

5       enterprise, meaning like a corporate date, and

6       somebody has sold something and promised a delivery

7       on-site at a company or virtually to an organization.

8              Then we kind of think about how we might

9       quickly be able to get that taken care of.  And we

10      might even pull another designer off of their current

11      project into it if that -- you know, it's just kind of

12      like a shuffling deck of cards at times.

13             Q.    So for the projects that Ms. Mohamed was

14      working on, the Digital Transformation:  Cultivating

15      Elastic HR, and Employment and Compliance Law program,

16      they both had launch dates of early October of 2020;

17      is that right?

18             A.    I believe so.

19             Q.    Okay.  And the SME who was working on

20      Employment and Compliance Law was Mr. Lessig, right?

21             A.    Yes.

22             Q.    And he was the one who was going to

23      teach the class, right?

24             A.    Yes.

25             Q.    And who actually continues to teach the

1      class, according to your testimony earlier, right?

2            A.     To my knowledge, yes.

3            Q.     Okay.

4            A.     There could be a second attorney they

5      have teaching now.

6            Q.     Okay.  But he was not going to require

7      the same amount of spin-up that a SME who'd -- or an

8      instructor who had never seen the material before

9      would need?

10           A.     He would still need time to navigate

11     into the Adobe Connect and work through timing, things

12     of that nature --

13           Q.     Okay.

14           A.     -- in delivering the program.

15           Q.     And the Digital Transformation:

16     Cultivating Elastic HR, that had already been offered

17     on SHRM's website, hadn't it?

18           A.     I believe that was up on the website,

19     yes.

20           Q.     Okay.  It was scheduled for July 28 and

21     then no one registered for it, so it was pushed to

22     late October, right?

23           A.     I believe early October.

24           Q.     Okay.

25           A.     First week in October, I want to say.

1          Q.    So I'll have you look in that same

2     exhibit SHRM 0143.  And that's an email from

3     Ms. Mohamed to Ms. Barley, Mr. Schacht, and yourself

4     from August 14.

5                    Do you see that?

6          A.    Yeah.  I'm reading it right now.

7          Q.    Okay.  And do you see those three --

8     four bullet points that Ms. Mohamed wrote there

9     explaining what the delay had been for the Digital HR

10    program?

11         A.    I'm looking at -- let's see.  I'm -- you

12    said look at 0143.  I was looking at -- Carolyn's

13    response was -- okay.  Now I'm looking at the bullet

14    points.  Okay.

15         Q.    And my question for you after you're

16    done with those four bullet points is are those

17    accurate, to your recollection?

18         A.    Yes.

19         Q.    Okay.

20         A.    To my recollection, this would be --

21         Q.    Okay.

22         A.    -- the chain of events.

23                    MS. DEFAZIO:  All right.  I'm going to

24    share with you Exhibit 24.

25                    (Exhibit Number 24 was marked.)

```
 1          A.    Is this a new one for me to open?

 2          Q.    (By Ms. DeFazio)  Yes.

 3          A.    Okay.

 4          Q.    And just let me know when you've got it

 5    open.

 6          A.    I've got it open.

 7          Q.    Okay.  So turn to the last page, 5 --

 8    SHRM 543.  And you'll see a highlighted portion.

 9          A.    Okay.  Yes.

10          Q.    Okay.  So it -- that looks to be an

11    email from Mr. Schacht to you August 13, 2020, at

12    7:26 a.m.

13                Do you see that?

14          A.    Yes.

15          Q.    Okay.  First of all, I don't know if

16    you'll know the answer to this, but we received it

17    highlighted.

18                Do you have any idea why it's

19    highlighted?

20          A.    I don't.

21          Q.    Okay.  My question -- second question is

22    Mr. Schacht says "I suggest having Carolyn confer with

23    Mike Jackson on a response to Ruby's email.  That

24    email shouldn't go unanswered by Ruby's manager."

25                Do you know what email he's talking
```

 1    about?  Is it an email that's in Exhibit 15?

 2          A.    Is it the same date?  Is it around

 3    August 13, around the same date when he wrote that?

 4          Q.    Some of them are, yeah.

 5          A.    I -- that would be a question for Nick.

 6    I don't recall.

 7          Q.    Okay.  So looking at this -- you don't

 8    have an independent recollection as to what email he

 9    was talking about?

10          A.    I don't.  I would -- you know, I don't.

11    I couldn't say specifically.

12          Q.    Okay.  And then he writes, "But this

13    offers an opportunity to get the right language on the

14    table to correct her quickly or to support an eventual

15    case for termination.  We want the right words in

16    there."

17                Do you know what -- do you have any idea

18    what he was referring to when he said, "correct her

19    quickly"?  Correct her what?

20          A.    I couldn't answer for what he --

21          Q.    Okay.

22          A.    -- exactly meant there.

23          Q.    Okay.

24          A.    I could make inferences or --

25          Q.    I know you --

1      A.     -- assumptions, but I don't want to do

2   that.

3          Q.    No.   Please don't.

4              And then, to the extent you know, what

5   would the eventual case for termination be?  Did you

6   have an idea at that time what he was referring to?

7          A.    Specifically, I couldn't answer for

8   Nick.

9          Q.    Okay.  Do you think at this point -- you

10  know, earlier in the morning, we were talking about

11  how there had been some discussions between you and

12  Mr. Schacht, and you and Mr. Sullivan, and you and

13  Ms. Barley related to potentially terminating

14  Ms. Mohamed if she didn't meet that August 31

15  deadline.

16             Do you think those conversations had

17  begun at this point, by August 13?

18         A.    I don't think so.  This might have been

19  the first -- if it was, I didn't recall that --

20  because that wasn't the goal.

21         Q.    What was the goal?

22         A.    The goal was to get her to understand to

23  complete her programs and meet her deadlines and -- I

24  mean, that's how I would summarize it.

25         Q.    Okay.  And do you think she was doing

1    everything she could to complete her programs that was

2    within her power?

3              A.    On or around in August, with that

4    deadline in mind, she took a two-week vacation.  I

5    don't know the details of it or -- so she -- before

6    that vacation, I recall she confirmed that she would

7    meet those deadlines, so . . .

8              Q.    Do you terminate employees as a matter

9    of course who don't meet a deadline?

10             A.    Could you say that again?

11             Q.    Sure.  Do you terminate all employees

12   once they miss a deadline?

13             A.    No, because employees have missed

14   deadlines.  Ruby missed her deadline further --

15   earlier in the year.  And we had other employees, such

16   as Ebony, that missed all her deadlines and got

17   terminated.

18             Q.    Uh-huh.  Do you think sometimes there's

19   circumstances outside of an employee's control that

20   can keep them from meeting a deadline?

21             A.    Yes.

22             Q.    Okay.  So turning back to Exhibit 15,

23   I'll have you turn to SHRM --

24             A.    Is that the one -- is that the one we're

25   in now, or is that -- are we going to a new one?

```
 1              Q.    That's the one I gave you before this
 2    one.
 3              A.    Okay.
 4              Q.    I think --
 5              A.    Oh, gotcha.
 6              Q.    -- it has Exhibit 15 in the title.
 7    Sadly, it doesn't have that on the actual document.
 8              A.    Okay.  I'm back.  I'm back in that one.
 9              Q.    Great.  So turn to SHRM 0143.
10              And at the bottom of the page Ms. Barley
11    is responding.
12              A.    Okay.  I see that.  Is that the one,
13    "Thank you for outlining your concerns"?
14              Q.    Yes.  Exactly.
15              A.    Yeah.  Okay.
16              Q.    So you would agree with me that this is
17    Ms. Barley responding to Ms. Mohamed's email on
18    SHRM 144 where she was -- she had a couple of
19    questions and clarifications.
20              A.    Yes.
21              Q.    Okay.  And in that email, do you see
22    Ms. -- do you see Ms. Barley offering any advice on
23    how Ms. Mohamed can meet her deadlines?  Any specific
24    advice?
25              A.    No.
```

1        Q.    Okay.  Do you have an understanding as

2   to why the August 31 deadline for both projects was

3   nonnegotiable?  And this is for your understanding.

4        A.    Uh-huh.  Sure.  Because if you think

5   about one of the programs, it had been in design at

6   that point eight months.  She was given twice the

7   amount of time --

8        Q.    Okay.  Ms. Morris, stop.

9        A.    -- to complete.

10       Q.    I'm going to stop you for just a moment.

11  And I understand --

12       A.    Okay.

13       Q.    -- looking back at it, you're making

14  some sense of what occurred.

15            What my question is at the time that

16  Ms. Barley sent this email --

17       A.    Yes.

18       Q.    -- on August 13, 2020, saying the

19  August 31 deadline for both projects is nonnegotiable,

20  did you know why at the time it was nonnegotiable?

21       A.    Because we were getting to the point

22  that we had to get these into editing -- or they

23  should have already been through editing.

24            And so the way it works is we give our

25  editors too kind of a vague -- not vague, but a good

1    idea of when these programs -- because, as you can

2    imagine, they're pretty lengthy -- when they're going

3    to need to go through editing.  So they work things

4    into their schedule as well.

5                So when we keep missing our deadlines,

6    it's kind of, you know, like a game of dominos.  It

7    affects the other areas of the business because then

8    they have a -- they have to stop what they're doing

9    and see what is a priority or isn't to get these in,

10   to get these out the door, to get these to the

11   instructors, et cetera.

12               So we were really starting to really

13   miss our window because we were closing in on

14   September with a fall delivery.

15        Q.    Okay.  How long do editors --

16        A.    So we just couldn't --

17        Q.    -- need to turn around a project?

18        A.    -- we just -- we just couldn't keep --

19   keep pushing this out with the fall scheduling.

20               How long do editors need specifically?

21   I could not tell you, but it's -- if you think about

22   it, just the amount in there that they have to edit.

23   And they go back and they look and make sure that

24   everything is documented, the copyrights are there,

25   that we give proper -- what's -- the word is escaping

1    me right now, but credit --

2          Q.    Attribution, probably?

3          A.    Yeah.  Yeah.  Thank you.  Thank you.

4                So it's not -- it's not just a quick,

5    you know, reviewing an email or something like that.

6          Q.    Sure.  How much time do editors require

7    to turn around a program?

8          A.    I specifically can't think of -- give

9    you a specific number of hours for that right now.

10   I -- off the top of my head.

11         Q.    Okay.  How long do you like to -- you

12   know, how much of a buffer do you like to have to

13   ensure that they have enough time?  A week?  Two or

14   three days?  Understanding that that may depend on the

15   length of the program, obviously, because --

16         A.    Yeah.

17         Q.    -- the more content, the more time they

18   need.

19         A.    Well, it could -- it could vary because

20   they're working on different things.  So it's not

21   like you could -- you might give it to them and they

22   might work on it for an hour a day.  So I think that

23   that would be more of a question for either the folks

24   who are editing these programs or just getting an

25   average collectively from Carolyn and Ann, what

1    they're seeing as far as these editors.

2          Q.    Okay.  But you don't have that knowledge

3    personally?

4          A.    I don't right in front of me, no, I

5    don't.

6          Q.    Okay.  So looking back at SHRM 0143, so

7    Ms. Mohamed's --

8          A.    Are we in 15 or --

9          Q.    15.

10         A.    -- are we on 15 or 14?  15.

11         Q.    We're in 15.

12         A.    Okay.  And where do you want me?  104 --

13         Q.    143.

14         A.    143.  Okay.

15         Q.    And this is Ms. Mohamed's response that

16   has those four bullet points you took a look at

17   already.

18         A.    Uh-huh.

19         Q.    The last few paragraphs, she says, for

20   Digital HR, "Since the program is already in a solid

21   shape for launch, I will use my best judgment to

22   incorporate parts of the book that would add the most

23   value within the time given to complete the revisions.

24   I will submit the final version by August 31.

25              "Is it okay to send questions and bounce

1    ideas about parts that I am having trouble to decide

2    on?  I am happy to refrain from doing so if it would

3    add additional stress on you and other members on the

4    team."

5            Do you think -- was there anything

6    inappropriate about that?

7            A.    I wouldn't say inappropriate, but,

8    again, I would think, you know, just pulling some of

9    the content out or some of the charts or graphs or

10   whatever was tying back to the content, Ruby -- that

11   is something she could have done independently.

12           I don't think it's inappropriate.

13           Q.    Okay.  Do you think there's anything,

14   you know, wrong with her asking if it's okay to send

15   questions and bounce ideas about parts that she's

16   having trouble deciding on?

17           A.    No.

18           Q.    Okay.  And then in the second paragraph

19   under that she gives an update on Compliance in HR.

20   She said, "I will continue to reach out to the SME and

21   ask for the remaining content."

22           Did you understand at that time that

23   Mr. Lessig had not given her content for the remainder

24   of the program?

25           A.    It was my understanding that most of the

1    content had been submitted at this point in time.  So

2    I think this would be a specific question for Carolyn

3    because I thought he had submitted all his content --

4        Q.    Okay.

5        A.    -- by this time.

6        Q.    Okay.  And then she goes on to say, "As

7    a reminder, the SME," Mr. Lessig, "was" --

8        A.    Yes.

9        Q.    -- "supposed to deliver all content for

10    the program by March 2020."

11              Do you see that?

12        A.    Yes.  And I could not verify that

13    specifically that that was the agreement.

14        Q.    Okay.  At the time, did -- at the time

15    when you first read this, did that, you know, surprise

16    you?  Did you have a reaction to seeing that the SME

17    had not given the remaining content?

18        A.    No.  I knew there were issues that were

19    going on, but I thought by this time at this point

20    they had been resolved --

21        Q.    Okay.

22        A.    -- as I recall it, that he was back in

23    communication.

24        Q.    Okay.  But Ms. Mohamed in this email is

25    saying that she still didn't have all the content.

1          So did you just not believe her or

2   didn't -- don't remember reviewing this?

3          A.    I don't recall specifically what my

4   reaction was in this part with March of 2020.  I could

5   have just missed that piece --

6          Q.    Okay.

7          A.    -- there in that email.

8          Q.    At this point in, you know, mid-August,

9   were you basically leaving the day-to-day up to

10  Ms. Barley with respect to Ms. Mohamed and managing

11  her projects?

12         A.    I was -- it wasn't that I was leaving it

13  to Ms. Barley.  I was -- actually, my husband's going

14  to walk in here in two seconds.  I see him coming up,

15  so I don't want to -- hold on one second.  Let me just

16  tell him that I'm still on.

17              (Pause in the proceedings.)

18         A.    So going back to that, I think that the

19  way that I interpreted it, though, that there could

20  have been design and development.  It probably could

21  have still been proceeding outside of whatever content

22  he had contributed.

23              I couldn't tell you that did Ruby have

24  90 percent of the content?  Did -- what percentage of

25  that content that was still not submitted.  Because it

226

1    was my understanding that there was a significant

2    portion that had been submitted by Lou at that point

3    in time.

4         Q.    (By Ms. DeFazio)  Okay.  If he had only

5    delivered three of the modules, would that change your

6    perspective on the August 31 deadline --

7         A.    I'd have --

8         Q.    -- and how reasonable that was?

9         A.    -- to go back and look at the extent

10   of -- what the current -- what he was contributing,

11   what we were contributing, did we source other SMEs,

12   and was it three out of six modules, was it three out

13   of ten.

14              The specifics of that program, right

15   now, I just can't recall, and I wouldn't want to

16   speculate.

17        Q.    I'll have you look at -- same exhibit,

18   SHRM 141.  And there's an email --

19        A.    Are we in Exhibit 15 still?

20        Q.    Uh-huh.  Same exhibit.

21        A.    Okay.  And what number?

22        Q.    0141.

23        A.    Okay.

24        Q.    And there's an email on the second half

25   of the page from Ms. Mohamed on August 19?

```
 1                   Do you see that?

 2          A.     I see the 14th, and then I see Nick

 3     responds on the 14th.

 4          Q.     Look at SHRM 141.

 5          A.     141.  Okay.  Ruby to Nick, Carol, and

 6     Jeanne.  Yes.

 7          Q.     Yes.  So go ahead and read that to

 8     yourself and just let me know when you're done.

 9          A.     Okay.  The "Hi, Nick.  I'm following up

10     on my email from Friday"?

11          Q.     Exactly.  You got it.

12          A.     That one?  Okay.  Okay.  Okay.  I read

13     it.

14          Q.     Sure.  What were your thoughts after you

15     read that the first time when you received it?

16          A.     I was -- well, there were, you know, I

17     thought that she -- the first email, I believe, on

18     that Friday, she -- she said she was going to take

19     some time.  And I -- is that one in here, her email to

20     Nick on the Friday?  Thank you -- okay.  Teachable

21     lesson.  I'm always -- okay.

22                 I'm trying to get to where -- what Nick

23     said to her, too, to get her to that point.

24          Q.     Sure.  If you look at SHRM 142, the

25     email at the bottom third of that page, I believe, is
```

228

the one she's responding to.

A.    Okay.  So I think that Nick is direct.
I kind of --

Q.    Well, my question to you is --

A.    -- what the expectations are of a
designer in bringing solutions to the table.

And then going up to Wednesday,
August 19, when she comes back and says, "Almost
immediately after Jeanne and Carolyn learned" . . . "I
started being subjected to hostility, undeserved
criticism."

You know, my initial reaction would be,
in my viewpoint, I did not view any kind of hostile
behavior.  And, again -- so I can't get into Ruby's
head of what she said when she responded here, but I
did not agree that there was hostility or that anyone
was setting her up to fail.  I thought that, you know,
there still seemed to be some level of accountability
that Ruby wasn't taking, that she had consistently
been given the opportunity to have her deadlines
extended many times.

Q.    Why weren't they extended again?

A.    They were not extended again because,
again, we were moving into the fall programs.  We
needed to start new projects.  We needed to close out

229

1    on these open projects that had been open for eight

2    months or so in the case of one of the programs.  And

3    we just needed to move forward as a business.

4         Q.    Amy Papp had a deadline of October 22,

5    2022, to provide a project.

6              Do you recall that?

7         A.    Amy Papp.  What -- I -- do you recall

8    what specific project this was?

9         Q.    Let's see.  This was the Total Rewards

10   Specialty Credential.

11        A.    Okay.

12        Q.    So the full program was due by

13   October 22, 2022.  Does that ring a bell?

14        A.    Let me go back in my mind.  That could

15   be accurate.  I can't answer yes or no.

16        Q.    Okay.  She missed that deadline, didn't

17   she?

18        A.    She did.  I assume she did, yeah.

19        Q.    And then she was allowed to continue to

20   work on that project afterwards, wasn't she?

21        A.    The Total Work Specialty Credential?

22        Q.    Uh-huh.

23        A.    I can't recall in what capacity she was

24   involved, whether she was designing for the seminar

25   portion or the eLearning portion.  I would have to go

1    back to that.

2        Q.    Okay.  She provided a PowerPoint to

3    Ms. Barley on November 19, so almost a month after it

4    was due.

5            Does that sound familiar?

6        A.    Yes, it sounds familiar.

7        Q.    Okay.  And then she was terminated on

8    December 9.

9            Do you recall that?

10       A.    Yes.

11       Q.    Okay.  If Ms. Mohamed had requested an

12   extension at this time in mid-August when these emails

13   were going back and forth, would that have been an

14   option?

15       A.    I would stand by that at that point

16   there was not an option to extend after a project

17   being in development for eight months.  It -- there's

18   only so many extensions as a business that you can

19   provide.

20       Q.    Do you recall if Ms. Mills ever took

21   longer than eight months to complete a project?

22       A.    I remember Ms. Mills was working on a

23   project, but we had to pull her off a project to

24   reassign her to two things during a program that she

25   was creating.

 1          Ms. Mills came into the company, I

 2    believe it was around February 2020, so there was a

 3    point of onboarding and getting her in place to start

 4    designing.  But then, during her process, she was

 5    selected to work on the Together Forward @Work

 6    campaign for SHRM.  And then we also -- in February

 7    and March of that time, the offices closed down at

 8    SHRM.

 9          So we had over 700 people registered for

10    face-to-face programs.  So both Carrie and Ann and

11    Carolyn were -- had a docket of members to call to

12    convert them from the instructor-led programs to the

13    virtual programs, because that was the critical piece

14    of the business.  So we put Carrie's program on hold.

15          We wanted to allow Ruby to continue

16    focusing at that point on her specific programs.  So

17    Carrie was working on Together Forward @Work.  Carrie

18    was pulled off -- or Together Forward @Work and to

19    call the SHRM members.

20          Q.    Okay.  So it sounds --

21          A.    So that's kind of what -- about her

22    design because she actually had to halt design

23    altogether.

24          Q.    Got it.  So it sounds like the answer is

25    yes?

1          A.     Yes.

2          Q.     Okay.  And was there ever a project that

3    Ms. Godmere worked on that took eight months or longer

4    to complete?

5          A.     I can't think of -- specifically of one.

6    But, again, during that time frame, we had to pull Ann

7    off as well to call not only the member participants.

8    We also had over 5,000 volunteer members who -- their

9    businesses were stopping because of COVID, right?  And

10   they did not have the agility to move their programs,

11   their deliveries, their meetings into the virtual

12   environment.

13          So Ann was pulled off to the greater

14   SHRM need and the captor need of SHRM -- off any

15   project she was working on at that time.  And plans

16   were adjusted because she had to go out and virtually

17   work with the member team to start training all these

18   volunteers of how to successfully deliver volunteer

19   programs.  And at the same time she was also helping

20   to call the members.

21          So those were two things that Ruby was

22   not working on.  Ruby did not have extracurricular

23   projects that we had to pull her off of at that time.

24          Q.     So, again, my question was did

25   Ms. Godmere ever work on a program that took her

1    longer than eight months to complete?

2          A.    I don't recall Ann having one more than

3    eight months.

4          Q.    Okay.

5          MS. DeFAZIO:  Let's go off the record

6    for just a sec.

7               (Recess from 3:12 p.m. to 3:19 p.m.)

8          Q.    (By Ms. DeFazio)  Ms. Morris, I wanted

9    to jump back to something.  It now seems like it was a

10   week ago.  We talked about the June 3, 2020,

11   conversation that you had with Ms. Mohamed --

12         A.    Yes.

13         Q.    -- where she shared her concerns about

14   Ms. Barley.

15               Do you recall your testimony about that?

16         A.    Yes.

17         Q.    Okay.  I made a note that you said that

18   she sounded -- I think you said "disengaged."

19               Can you tell me -- do you remember that?

20         A.    I did.

21         Q.    Can you tell me what you meant --

22         A.    She just --

23         Q.    -- by that?

24         A.    Sure.  She sounded like she was trying

25   to make things work.  You know, if "disengaged" was

1    the right word there -- but Ruby just sounded very

2    frustrated, very kind of not as happy as she usually

3    is feeling.  But that could -- you know, there was a

4    lot going on in the country, in the world.  And I

5    think in general for Ruby, she was just frustrated too

6    because she wanted -- work was -- you know, is

7    important to her, and she was frustrated at the

8    situation she was having with her manager.

9         Q.    Got it.  So less that she was, you know,

10   disengaged with work, but maybe feeling kind of

11   hopeless about the prospects moving forward or

12   something to that effect?

13        A.    I think she just felt -- she wanted to

14   be heard, and she was not as -- she was feeling

15   frustrated that she wasn't making the progress she

16   wanted to in her relationship with Carolyn --

17        Q.    So --

18        A.    -- and as a member of the team.

19        Q.    Did you observe in her from, let's say,

20   that conversation on June 3, 2020, through the time

21   she was terminated, did you observe a change in

22   Ms. Mohamed's affect?

23        A.    In her what?

24        Q.    Her affect, the way she appeared or

25   sounded if it's over the phone.

1          A.    She wasn't always on camera during that

2    time frame, so it was more on the phone.  But I still

3    felt that she was, you know, on calls that I was on

4    with her, she still -- for the most part, what I

5    recall, she was still professional.

6          Q.    Okay.  But would you -- I mean, would

7    you say that she -- before June of 2020, she's a

8    pretty vivacious person, she's got a good amount of

9    energy, she's lively?

10         A.    She is, yes.  Yes.

11         Q.    Okay.  Did you see that lessen over time

12   from June through her termination?

13         A.    I didn't see it lessen in that time, but

14   I also -- I wouldn't have thought that anyone was

15   feeling vivacious during that time considering the

16   turmoil of the country, of what -- things were going

17   on.  She was unhappy.  I think that -- she was --

18   there were also times that she was smiling and happy.

19              And so I can't think of a -- I can't

20   think right now that there was a huge difference.

21              MS. DEFAZIO:  Okay.  Okay.  I'm going to

22   share with you what's going to be Exhibit 25.

23              (Exhibit Number 25 was marked.)

24         A.    Okay.  I'm here.

25         Q.    (By Ms. DeFazio)  Okay.  So if you look

1    at the last page of this exhibit, SHRM 151.

2              A.    Yeah.

3              Q.    Are you -- so that's an email from

4    Ms. Mohamed to Amber Clayton.

5                    Do you see that?

6              A.    Uh-huh.

7              Q.    Okay.  And who is Amber Clayton?

8              A.    Amber Clayton oversees our knowledge

9    center.  So -- and Amber and her team, because they

10   are a group of HR experts, they offer HR -- not legal

11   advice, but practical advice for our members when they

12   call in with different situations.

13                   So they are always willing to jump in to

14   help us navigate service needs for our programs.

15             Q.    Got it.  And is that your understanding

16   of this communication?  I know you weren't included on

17   it in the first instance, but it appears to me that

18   Ms. Mohamed is reaching out to Ms. Clayton looking for

19   a backup SME for her Compliance program.

20                   Do you see that?

21             A.    Uh-huh.  Yep.  I do.

22             Q.    And this is August 26.

23             A.    Okay.

24                   Okay.  I see Amber's response.

25             Q.    Great.  And then subsequently, you know,

```
1     Ms. Mohamed follows up with Ms. Barley letting her
2     know that she's trying to get a backup SME.  And
3     Ms. Barley at the bottom of SHRM 149 says that "The
4     program deadline is unchanged.  It is and remains
5     8/31/2020."
6                 Do you see that?
7           A.    I do.
8           Q.    Okay.  And that's -- she sends that on
9     August 31.  And in the email she says "The program
10    needs to be done as soon as possible using Lou or
11    other SMEs."  That day.  So she's talking about
12    getting it done that day for the deadline that day.
13                Do you see that?
14          A.    Yes.
15          Q.    Okay.  So then on page 148, so the first
16    page of the exhibit, you send an email to Mr. Schacht
17    and Ms. Barley saying "I concur.  She has missed her
18    deadline on both programs."
19                And I understand you may need to read
20    the email below it or so, but what were you concurring
21    to?
22          A.    "See Ruby's response below.  I'm not
23    sure responding is going to add value."
24          Q.    Sorry.  Did you answer the question or
25    are you reading aloud to yourself?
```

1      A.     I'm -- sorry.  I'm reading aloud to

2    myself.

3           Q.     That's fine.

4           A.     "The other day" . . .

5           Q.     If you're reading out loud, by the way,

6    Jenny is having to transcribe what you're saying.  I

7    do that too.

8           A.     So from -- how I read this of -- Nick

9    says, "The day is drawing to a close."  I said, "I

10   concur.  She's missed her deadline on both programs."

11          I think it was let's make the decision.

12   And the decision I -- was to terminate at that point

13   in time.

14          Q.     Okay.  And based on the fact that

15   Ms. Mohamed is reaching out the week before the

16   deadline to get an alternate SME, that she's telling

17   Ms. -- keeping Ms. Barley in the loop about that, is

18   there something else that she could have been doing to

19   complete that program not having the content from

20   Mr. Lessig and trying to get a new SME in place for

21   the Compliance program?

22          A.     I think the time to suggest and recruit

23   a new SME should have come before the week before.

24   And I think, again, she chose to take a vacation

25   during that time knowing that deadlines were looming

1    and what risks to the plan were at that point in time.

2         Q.    Have you ever come to the understanding

3    that Ms. Mohamed took that vacation because she was so

4    anxious, she -- it was debilitating because of the

5    situation at work?

6         A.    That -- I did not -- I was not made

7    aware of that.

8         Q.    If she had disclosed that to you, would

9    you have extended the deadline at some point?

10        A.    If she had disclosed -- can you repeat

11   that question?

12        Q.    Sure.  If she had disclosed to you that

13   she needed to take that vacation because she was

14   suffering from debilitating anxiety because of this

15   work situation, would you have advocated to extend the

16   deadlines on these two programs?

17             MS. SPITTELL:  Objection.  Foundation.

18        A.    I was --

19        Q.    (By Ms. DeFazio)  And go ahead.

20        A.    At that point in time, going back in

21   time, I -- it would have been a -- it would have been

22   a conversation that we went back and had collectively

23   together.

24        Q.    So you would have considered extending

25   the deadline at that point?

1          A.    I can't answer if I would have or I

2     wouldn't have.  I don't know where I would have been

3     at that point in time.

4          Q.    Okay.  Are you aware that -- well, let

5     me ask you this:  Have you seen Ms. Mohamed's

6     termination letter?

7          A.    I don't recall -- I don't recall if I --

8     it was shared with me or not.

9              MS. DEFAZIO:  Okay.  Well, I will share

10    it with you now.  It's Exhibit 17.

11         Q.    (By Ms. DeFazio)  Do you have that open?

12         A.    I do.

13         Q.    Okay.  Do you recall if this was

14    circulated to you before it was provided to

15    Ms. Mohamed?

16         A.    I don't recall.  If I'm not the direct

17    manager, I usually don't see the separation agreement.

18         Q.    Would it surprise you to know that

19    this -- that Mr. Jackson actually started to craft

20    this letter before August 31?

21         A.    Can you repeat that last question?

22         Q.    Sure.  Would it surprise you to know

23    that Mr. Jackson started crafting this letter before

24    August 31?

25              MS. SPITTELL:  Objection.  Foundation.

1      Q.    (By Ms. DeFazio)  You can go ahead and

2   answer.

3      A.    I'm not privy to how -- how they go

4   about types of -- what their specific processes are

5   with creating these or timing.  That would be a

6   question for the HR department.

7      Q.    Well, my question is -- my question is

8   would you be surprised to know that this letter was

9   written before the deadline had come that Ms. Mohamed

10  missed?

11           MS. SPITTELL:  Objection.  Foundation.

12     A.    I can't say if I would be surprised,

13  because, again, I'm not familiar with when they start

14  to prepare letters or get ahead of -- you know, I

15  don't know if they -- how or why they would have

16  started preparing it a couple of days early.

17     Q.    (By Ms. DeFazio)  You don't think

18  there's anything suspect about working on an

19  employee's separation letter before they've actually

20  missed the deadline that they're being terminated for?

21  That doesn't raise any red flags for you?

22           MS. SPITTELL:  Objection.  Form.

23     A.    I can't judge on what -- where their

24  mindset was coming from.

25     Q.    (By Ms. DeFazio)  I'm talking about your

1    personal response to it.

2              Do you think that's a good idea to do?

3         A.    Do I think that's a good idea to do?

4              MS. SPITTELL:  Objection.

5              THE STENOGRAPHER:  Can you please repeat

6    your objection, Ms. Spittell?

7              MS. SPITTELL:  Foundation.

8              THE STENOGRAPHER:  Thank you.

9         Q.    (By Ms. DeFazio)  And go ahead and

10   answer.  I don't believe you have yet.

11        A.    Can you repeat when they started this

12   separation agreement?

13        Q.    Before August 31.

14        A.    I don't -- I can only answer in the fact

15   that I don't know if that's a standard procedure

16   across HR, if that's something they do.  So I -- I

17   couldn't really answer yes or no.

18        Q.    Okay.  So if it was created the morning

19   of August 31 before the deadline had actually kind of

20   come and gone, you don't have any response to that as

21   being preemptory or suspicious?

22        A.    No, unless it was acted upon.

23        Q.    Okay.  Have you -- has it been brought

24   to your attention that anyone else in the education

25   department in the same time frame of the summer into

1    the fall of 2020 raised concerns about race

2    discrimination besides Ms. Thompson and Ms. Mohamed?

3         A.    Can you repeat that?

4         Q.    Sure.  In this -- sorry.  It was a

5    long -- very long question.

6              In August, September of 2020, were you

7    aware of any other individual contributors in the

8    education department besides Ms. Thompson and

9    Ms. Mohamed who brought forward concerns about race

10   discrimination?

11        A.    No, I was not.  That was not

12   communicated to me.

13        Q.    Okay.  Did Ms. Dunmore resign?

14        A.    Yes.

15        Q.    Okay.  Do you know why?

16        A.    She reported to a manager who reported

17   to my director.  So I believe she had another

18   position.

19        Q.    Okay.  But you heard that kind of

20   through the grapevine?

21        A.    That's what I was told by Liz Lacey --

22        Q.    Okay.

23        A.    -- I believe at that time.

24        Q.    Gotcha.  Are you familiar with an

25   employee named Alek Nedelkovski?

1          A.     I am.

2          Q.     Okay.  And he was a senior instructional

3     designer, right?

4          A.     He was.

5          Q.     Okay.  Would you agree that he had some

6     issues with his performance?

7          A.     He -- did he have issues with his

8     performance?

9                 I wasn't as familiar with Alek.  So I

10    would say that there was one project I worked with him

11    on where he did something for Nick, and that was on

12    the more recent side.  And it was just a very basic

13    looking at a slide deck for Nick.

14         Q.     Okay.

15         A.     So I don't have direct close knowledge

16    of Alek.

17         Q.     Okay.  Were you aware of concerns that

18    Ms. Godmere had about Mr. Nedelkovski's work product?

19         A.     Yes.

20         Q.     Okay.

21         A.     I think Ann -- Ann might have helped him

22    with that project with Nick.  I think that we asked

23    her to kind of review it and coach him, and she gave

24    him some coaching on how to elevate the work.

25         Q.     Got it.  Was that part of -- was that

1    part of your concern about Mr. Simms' performance,

2    that he wasn't properly coaching Mr. Nedelkovski?

3         A.    He -- again, Brian was -- he did not

4    have the KSAs -- he did not exhibit the KSAs to

5    successfully perform his role.

6         Q.    That's the knowledge, skills, and

7    abilities?

8         A.    And part of that -- yes.

9         Q.    Okay.  Sorry.  Part of that was what?

10         A.    I was going to say and part of that was

11   that his team was not happy with him.

12         Q.    Sure.  Was Mr. Nedelkovski terminated?

13         A.    He resigned.

14         Q.    He resigned.  Okay.

15              How long has Ms. Barley reported to you?

16         A.    Since she moved over to the education

17   team.  So that must have been 20- -- maybe 2018 at

18   that point.

19         Q.    Other than what we've discussed, have

20   you received other complaints about her supervision?

21         A.    What we've discussed.  I'm thinking

22   about --

23         Q.    Well, maybe we should list out some of

24   them.  So obviously, we have Ms. Mohamed's concerns,

25   we have Ms. Thompson's concerns.  Earlier you

1    testified to Ms. Godmere disagreeing with a review

2    that she -- or rating that she received, and Ms. Mills

3    disagreeing with Ms. Barley's kind of support of the

4    PMQ project or the content of it.

5              Other than those items, who else, if

6    anybody else, has brought you -- concerns to you about

7    Ms. Barley's supervision?

8         A.    The only other person I can think of

9    would be Stephanie Brown.

10         Q.    Okay.  And who is Stephanie Brown?

11         A.    So Stephanie probably started at SHRM

12    almost two years ago, and she just recently resigned.

13    She was an instructional designer.  She -- this was

14    probably last year or in the earlier stages of her and

15    Carolyn's relationship that -- I'm trying to think

16    specifically.

17              I think that she felt that she was --

18    she wanted access to more projects.  She wanted to be

19    more remote, and she wanted to be promoted and asked

20    for a promotion, if I recall, about three months into

21    her role.

22         Q.    And was that --

23         A.    So I think she was a little -- I think

24    she was a little frustrated when she came to me to

25    say, "I feel like I could be a senior" -- "I'm ready

1      to move into a senior designer role," to which -- she

2      just wasn't.  She didn't have the experience to move

3      into a role at that point in time.

4            Q.    Okay.

5            A.    And then I believe her and Carolyn went

6      to coffee and worked out whatever it was they were

7      working out.

8            Q.    Got it.  So you didn't hear anything

9      from her after that?

10           A.    No.

11           Q.    Okay.  What is Ms. Brown's race?

12           A.    White.

13           Q.    During the time that Ms. Barley has

14     reported to you, how many people did she terminate?

15     Or we can just list -- you know, if you could just

16     list for me the people that she did terminate?

17           A.    Ruby, Ebony, Amy Papp, and I believe the

18     rest resigned.

19           Q.    Okay.  And let's talk about who resigned

20     under her.

21           A.    Darren Jones, Carrie Mills.  Alek

22     resigned under Brian Simms.

23           Q.    Okay.

24           A.    Oh, and Obi.

25           Q.    Okay.  And what was the employee Jones?

```
 1          What was their first name?

 2                  A.      Darren, D-a-r-r-e-n.

 3                  Q.      What is Mr. Jones's race?

 4                  A.      African-American.

 5                  Q.      Okay.  Okay.  So that's six people who

 6     were either terminated or resigned under Ms. Barley's

 7     management; is that right?

 8                  A.      Yes.

 9                  Q.      Does that strike you as a high level of

10     turnover?

11                  A.      The resignations don't -- well,

12     actually, no.  In general, no, because of the nature

13     of that role and field.

14                  Q.      Okay.  And four out of six of those

15     people are Black, right?

16                  A.      That resigned and/or were terminated?

17                  Q.      That's right.  Yes.

18                  A.      Yes.

19                  Q.      So we talked a little bit about this

20     earlier today, but Ms. Barley's transition to lead

21     specialist, is that her role now?

22                  A.      Her role now is lead specialist and with

23     a strong focus on acceptability.

24                  Q.      Okay.

25                  A.      She's been working with our general
```

```
1    counsel on acceptability.

2              I'm just going to stand for a second --

3         Q.    Please do.

4         A.    -- but I'm still here.

5              MS. DEFAZIO:  All right.  I'm going to

6    share with you Exhibit 26.

7              (Exhibit Number 26 was marked.)

8         Q.    (By Ms. DeFazio)  And just let me know

9    when you've got that opened.

10        A.    It's open.

11        Q.    Okay.  And these are your reviews of

12   Ms. Barley in 2020, 2021; is that right?

13        A.    It looks like it was 2020.

14        Q.    Okay.

15        A.    There is one more --

16        Q.    Okay.  And as you scroll down, I'll

17   represent to you that there is also a review from 2021

18   that starts on --

19        A.    Okay.

20        Q.    -- page SHRM 874.

21        A.    Okay.

22        Q.    Okay.  So I'll have you go to page 876.

23        A.    876.

24        Q.    And then about the bottom third of the

25   page it says "What were opportunities for development
```

1    for the individual from this review period?"

2              Do you see that?

3         A.    Did you say that's on 874?

4         Q.    876.

5         A.    876.  Oh, gotcha.  And this is 1/1 to

6    12/31/2021.

7         Q.    Yeah.

8         A.    Okay.  "What were key

9    accomplishments" -- "What were opportunities for

10   development?"

11        Q.    Yes.  And then under "Jeanne's Answer,"

12   it says "The second half of the year presented some

13   challenges for you as a people manager."

14             Do you see that?

15        A.    Yes.

16        Q.    Okay.  Tell me what you had in mind

17   when -- presumably, you wrote this, correct?

18        A.    Uh-huh.

19        Q.    That's a yes?

20        A.    I'm reading it.

21        Q.    Okay.

22        A.    Yes.  That's a yes.

23        Q.    Okay.  And when you're done, just let me

24   know if -- what you meant when you wrote that, what

25   the challenges were specifically.

1      A.    So I believe when -- and this might have

2   been around when Darren resigned.  And in looking at

3   the turnover and looking at talent for design as a --

4   instructional design as a profession, we couldn't fill

5   the roles, we couldn't keep the people, we couldn't --

6   they were constantly getting recruited out of SHRM and

7   telling us they were getting paid twice the salary,

8   dream job, remote, all this great stuff.

9          But at the same time, we recognized that

10  there was turnover and that Carolyn was not as

11  effective -- was probably more effective not in people

12  manager and more as a lead specialist.

13         And we -- again, and we also decided we

14  were going to start outsourcing work, which we now

15  have done, and that the designers would report

16  directly to me, and that Carolyn would manage the

17  outsourcing company.

18      Q.    When I asked you a little bit earlier

19  about the number of people who had either been

20  terminated or resigned under Ms. Barley, I think you

21  mentioned that you didn't view that as high turnover.

22         And I just heard you say something about

23  high turnover.  So just wanting -- giving you an

24  opportunity to square that testimony.

25      A.    Sure.  I'm trying to figure a way to say

1    that.  We -- we recognized as a business we were

2    having increasing challenges keeping and retaining

3    people, especially because, again, it's -- there's not

4    a lot of designers out there.  There's not -- they're

5    expensive, et cetera, and it didn't make sense for us

6    to keep recruiting people in and people leaving.

7              And we also sensed Carolyn's frustration

8    to -- for her work-life balance, et cetera, and when

9    she was having this turnover, she was assuming all the

10   workload, et cetera, that we needed a more efficient

11   way of doing the job.

12             But also, just looking at the optics

13   alone, there was -- you know, the turnover, that was

14   there.  Although they didn't complain about Carolyn's

15   management, there still, I would say, was -- we needed

16   to see a little bit more success there of that because

17   of some of the turnover in the shorter periods of

18   time.

19             Q.    Yeah.

20             A.    Does that help?

21             Q.    Yes.

22             A.    Okay.

23             Q.    Did you have concerns that Ms. Barley

24   was just not a very good manager of people?

25             A.    I had concern that -- I -- you know,

253

1    moving her into the lead role was -- I wasn't sure she

2    was at the right place to be a people manager any

3    longer too.

4        Q.    And what makes you say that?

5        A.    Work-life balance, again, because there

6    was open positions.  There was -- you know, I could

7    sense her getting overwhelmed.  I could sense her

8    stress and anxiety.  And I felt that for the

9    organization and if she couldn't successfully manage

10   people based on just, alone, looking at kind of the

11   people that had come through, that she would be better

12   as a lead specialist.

13       Q.    Did she have to compete for that lead

14   specialist position?

15       A.    She did not.

16       Q.    Okay.  So that was created for her?

17       A.    We had lead specialist roles open,

18   meaning that was kind of a new role at the time.  So

19   because of the timing of her working specifically on

20   the -- trying to work on all the accessibility stuff,

21   which was something new, it fit for her role of moving

22   her into a lead role or a senior designer or something

23   of that nature.

24       Q.    But she didn't have to apply for it?

25       A.    She did not.

1          Q.    Given SHRM's, you know, reputation and,

2     obviously, the -- what the company does, do you feel

3     like the company has a -- kind of the obligation to be

4     a model employer?

5          A.    Yes.

6          Q.    Okay.  And so it's important to have

7     really good practices in place for SHRM to ensure that

8     employees are being treated fairly, right?

9          A.    Uh-huh.  Yes.

10         Q.    Okay.  And is it also important to --

11    for the organization to, you know, do what it can to

12    eliminate race discrimination and retaliation from its

13    ranks?

14         A.    Yes.

15         Q.    Okay.  And to take action when concerns

16    are brought forward about race discrimination or

17    retaliation?

18         A.    Yes.

19         Q.    Do you think that given, you know,

20    how -- the work that SHRM does and maybe the awareness

21    of the people who work there about best practices in

22    HR, that the organization is just -- they're less

23    likely to have race discrimination and retaliation?

24         A.    Can you repeat that question?

25         Q.    Sure.  Do you think it's less likely for

1    race discrimination or retaliation to occur at SHRM

2    given the organization's -- you know, what the

3    organization does?

4          A.    That there's a less chance because it's

5    SHRM --

6          Q.    Right.

7          A.    -- of it occurring?

8          Q.    Yes.  That's a better way to put it.

9          A.    I am so sorry.  I know I can't -- my

10   husband's knocking on the door.  He locked himself

11   out.  Can I go --

12         Q.    Sure.

13         A.    -- unlock the door and come right back?

14         Q.    Go ahead.

15         (Pause in the proceedings.)

16         A.    Okay.  So going back, I think what I

17   would say is having the right culture in place, having

18   the right people in place, and it can still happen --

19   right? -- because you don't know who you're hiring,

20   you don't know who walks through the door.

21              So you can have every well-intentioned

22   effort and policy and procedure in place, and I think

23   racism can happen anywhere.

24         Q.    (By Ms. DeFazio)  Okay.  Do you -- do

25   you think it is less likely to have happen at SHRM?

1          A.    Yes, I do.

2          Q.    Okay.  Why is that?

3          A.    I think because everyone is working

4    towards that common mission of better workplaces,

5    better world, that I think that people are more

6    informed.  I think we have a diverse and inclusive

7    environment.  And I think that people know, you know,

8    through -- through kind of the resources that we have,

9    that Together Forward @Work, and/or the Ribbon

10   Commission, et cetera, I think people know there's

11   zero tolerance for it.

12         Q.    But as you testified, it can happen

13   anywhere, so it can also -- it can happen at SHRM,

14   race discrimination or retaliation, right?

15         A.    Absolutely.  You can't control people --

16         Q.    Okay.

17         A.    -- meaning you don't know who walks

18   through the door.

19         Q.    Got it.

20               Have you ever been accused of

21   retaliating or discriminating against anyone other

22   than Ms. Mohamed?

23         A.    No.

24         Q.    No.  And I asked this earlier, although

25   I don't know if I got an answer.

1           When you saw that email from Ms. Mohamed

2     saying that she had been retaliated -- she was being

3     retaliated against by both you and Ms. Barley, did you

4     have a personal response to that?

5           A.    I did.  I didn't want her to feel she

6     was being retaliated against.  But I also think that

7     there were probably -- you know, the communication and

8     kind of -- that when she started communicating

9     directly with Nick and I wasn't as involved, it might

10    have felt -- felt that way to her.

11          So I can't say -- I can say I definitely

12    was not retaliating against her in any way, shape, or

13    form.  But I -- I can't -- I can't change how Ruby

14    might have felt or what optics she was seeing or

15    feeling that was making that happen.  But I felt -- of

16    course, I -- you know, I'm human.  I don't want Ruby

17    to feel that way.  I'm sad to see it there.  And

18    that's -- that's kind of where my reaction was.

19          Q.    Was it upsetting to you to be accused of

20    that?

21          A.    Yes.

22          Q.    And you realize that Ms. Mohamed filed a

23    charge of discrimination with the Colorado Civil

24    Rights Division against you personally?

25          A.    Correct.

258

 1          Q.    Okay.  Were you also upset to see that?

 2          A.    Yes, I was.

 3          Q.    Have you talked to Mr. Sullivan about

 4     this case outside the -- I should say outside of

 5     counsel being present, outside of an attorney?

 6          A.    I haven't talked to Mr. Sullivan since

 7     he left SHRM.

 8          Q.    When did he leave SHRM?  I don't think I

 9     knew that.

10          A.    Now I'm getting so I can't even remember

11     what year we're in now.  20- -- we're in -- he left in

12     2022.

13          Q.    Okay.  Before he left, did you have any

14     conversations with him about this case without an

15     attorney -- without an attorney present?

16          A.    Are you -- are you asking, did -- when

17     we were notified about the CCRB case, did I ever speak

18     directly with Sean Sullivan about it?

19          Q.    Yeah, that or the lawsuit pending.

20          A.    We had no contact about pending

21     lawsuits.

22          Q.    What about the charge?

23          A.    Could you repeat that?

24          Q.    Sure.  What about the charges of

25     discrimination?

1     A.    Did we have any -- Sean met with me, I

2  believe, on one occasion when he first spoke with

3  Ruby, Sean met with me just to get my take.  I believe

4  he met with Ruby, met with Nick, he was going to meet

5  with Carolyn.  He had not met with me, so I believe

6  that I -- I can't recall if I brought it -- I said,

7  "Let's meet," or Nick suggested he speak with me.

8          So he spoke with me about that first --

9  very first conversation he had with Ruby.

10     Q.    Okay.  How about from the time that

11  Ms. Mohamed was terminated in September -- September 1

12  of 2020 through the time that Mr. Sullivan left?

13          Do you recall having any conversations

14  with him about Ms. Mohamed at all?

15     A.    No, we did not discuss her --

16     Q.    Okay.

17     A.    -- ever again.

18     Q.    How about Mr. Taylor during that same

19  time period of September 1 or 2 of 2020 through the

20  present?

21     A.    We -- Johnny and I didn't ever speak

22  one-on-one about it.

23     Q.    With anyone else?

24     A.    I'm sorry.  Could you repeat the

25  question?

1        Q.    Sure.  He -- you said we -- that you

2    never spoke one-on-one about it.

3              So did you speak with him about it with

4    anyone else present?

5        A.    Oh, no.

6        Q.    Okay.

7        A.    No.

8        Q.    All right.  And how about same question

9    with Mr. Jackson; since Ms. Mohamed's termination

10   through the present, have you had any discussions with

11   him about her?

12       A.    No.  I haven't been in touch with Mike

13   Jackson since he left the organization.

14       Q.    Okay.  And same question for Ms. Barley.

15             Have you talked to her since

16   Ms. Mohamed's termination through the present about

17   Ms. Mohamed?

18       A.    About Ms. Mohamed specifically?

19       Q.    Yes.

20       A.    No.  All the -- all that we've talked

21   about was when the lawsuit first came, just talking to

22   her specifically about the lawsuit and the process as

23   we understood it.

24       Q.    Okay.  And who was present for that

25   discussion?

261

1          A.     That would have probably just been in my

2    office or in passing.  And just kind of -- if we spoke

3    about Ruby since then, it might have been clarifying

4    questions of who was working on what and what was

5    moving through the department, or, you know, "I forget

6    who worked on this.  Who worked on this?" type of

7    thing.

8          Q.     And "who worked on," do you mean the

9    response that went --

10         A.     Kind of like if we were looking for

11   files or something like that.  For example, I think

12   recently we were looking for some immigration files

13   and we couldn't find them.  It was for a program and

14   her name came up.

15         Q.     Okay.  Did Ms. Barley share with you her

16   feelings about being named in a charge of

17   discrimination as well?

18         A.     She did.

19         Q.     Okay.  What did she tell you?

20         A.     She -- are you asking me her feelings

21   about being named?

22         Q.     Yeah, or what she shared with you.  What

23   you discussed.

24         A.     She feels -- how could I characterize

25   it?  She's mortified, she's saddened.  She in no way,

1   shape, or form wants -- or considers herself to

2   discriminate or to be a racist.  And she's just been

3   very saddened about -- by the whole thing.

4            Q.    Yeah.  Do you remember -- was that just

5   in one meeting that you had with Ms. Barley?

6            A.    When it first happened -- when we first

7   got notice, she was very, very upset, and, as you can

8   imagine, she got extremely emotional.  And, you know,

9   we, you know, talked about having to trust in, you

10  know, what was going to move forward and trust in

11  actual truth and facts.

12            And then we really didn't talk about any

13  of this probably, I don't know, for a long time.  And

14  then it just came back up recently --

15            Q.    Okay.  What did you --

16            A.    -- in talking about "Did you get the

17  email that just came through?" type of thing.

18            And, you know, we were out in an open

19  environment, and I just said, "I did, and let's not

20  dwell for right now.  Let's" -- you know, we're both

21  very sorry that we're at this point.  And that's kind

22  of been the connection, if we do talk about it.  But

23  it doesn't -- it's been a -- it doesn't come up.

24            Q.    And that recent conversation, was that

25  with respect to being deposed, receiving a notice that

1    you were being deposed?

2          A.    Yes.  Yes.

3          Q.    Okay.

4          A.    Yes.

5          Q.    What did Ms. Barley say about -- her

6    response to being notified that she was going to be

7    deposed?

8          A.    That's when she just said, "Do you

9    know" -- "Did you get the same notice?"  I said, "I

10   got the same notice."

11         Q.    And do you recall her saying anything

12   else about it?

13         A.    I don't, other than that she's just very

14   sad about the whole thing.

15         Q.    Looking back on how the situation with

16   Ms. Mohamed was handled, would you do anything

17   differently if you could?

18                MS. SPITTELL:  Objection.  Form.

19         Q.    (By Ms. DeFazio)  You can go ahead and

20   answer.

21         A.    No.

22         Q.    Okay.

23                MS. DeFAZIO:  All right.  Well, I'm

24   nearly done.  So let's take like ten minutes just for

25   me to kind of look my notes over, and we'll have our

```
 1    last little stretch and let you go, okay?

 2                   THE DEPONENT:  Okay.  Thank you.

 3                   (Recess from 4:11 p.m. to 4:20 p.m.)

 4          Q.    (By Ms. DeFazio)  So, Ms. Morris, I have

 5    just one more question for you, and it involves --

 6          A.    Okay.

 7          Q.    -- an exhibit.

 8                   MS. DEFAZIO:  So I'm going to send you

 9    Exhibit 27.

10                   THE DEPONENT:  Okay.

11                   (Exhibit Number 27 was marked.)

12          Q.    (By Ms. DeFazio)  And when you open

13    it --

14          A.    And can I --

15          Q.    Yeah.

16          A.    At the break I thought of one thing that

17    did happen yesterday that I did not disclose to you --

18          Q.    Oh, yeah.

19          A.    -- in your question earlier.

20          Q.    Please.

21          A.    So you asked me if Carolyn and I had

22    discussed Ruby or the case.  I was on the phone with

23    Carolyn yesterday.  She had to put her cat down, so we

24    were talking.  I was just expressing my condolences.

25          Q.    Sure.
```

1          A.    And I said, "Hey, I'm being deposed

2     tomorrow."  And I did ask her -- I said, "Just refresh

3     my memory on the Digital, that these were the dates

4     where the deadlines were set," and she confirmed for

5     me.

6          Q.    Okay.

7          A.    So we did talk about that yesterday.

8     And I just realized that when we went on break.

9          Q.    And what specifically did you confirm

10    with her about?

11         A.    I wanted to confirm with her when -- I

12    said, "I just wanted to confirm that the project

13    inception started in January, it was end of April, it

14    was end of" -- "and then it's May, and then it was

15    July, and then August."

16              And she just said -- confirmed to the

17    best of her recollection that's what she --

18         Q.    Okay.

19         A.    -- she just confirmed for me.

20         Q.    So you were confirming your recollection

21    of the dates with her --

22         A.    Yes.

23         Q.    -- of the Digital HR project?

24         A.    Yes.

25         Q.    Okay.  All right.  Well, thank you for

1    bringing that to my attention.  I appreciate it.

2          A.    You're welcome.

3          Q.    And really, my primary question with

4    Exhibit 27 is just if you've ever seen it before.  And

5    I'll represent to you that it's a letter from

6    Ms. Mohamed that she wrote on August 13, 2020.  And I

7    believe she provided it to Ms. Long.  But I'm just

8    curious if you've ever seen it.

9          A.    Why isn't this one opening?  Okay.

10          Does it start with "Given"?

11          Q.    Yes.  Uh-huh.

12          A.    Okay.  Let me read this.  This does not

13    look familiar.  I have not seen this document.

14          Q.    Okay.  Got it.

15          MS. DeFAZIO:  Well, I think that's

16    all -- those are all the questions I have.

17          Thank you so much for your time today.

18          THE DEPONENT:  Thank you very much for

19    your time as well.

20          THE STENOGRAPHER:  Do you have any

21    questions, Ms. Spittell?

22          MS. SPITTELL:  I do not have any

23    questions.  I'm good to go off the record.

24          THE STENOGRAPHER:  Could I please get

25    transcript orders?

 1              MS. DeFAZIO:  Sure.  I do not need

 2    exhibits, and I will take an E-Tran and -- yeah.  That

 3    comes with the original depo, too, the hard copy?

 4              THE STENOGRAPHER:  Yes.

 5              MS. SPITTELL:  We will take a PDF

 6    transcript with exhibits, and we'll reserve for

 7    signature.

 8                   *    *    *    *    *    *    *

 9              WHEREUPON, the foregoing deposition was

10    concluded at the hour of 4:24 p.m. on April 26, 2023.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

I, Jennifer Bajwa Melius, a Verbatim
Stenographic Reporter and Registered Professional
Reporter, do hereby certify that previous to the
commencement of the examination, the witness was duly
sworn by me to testify the truth in relation to
matters in controversy between the said parties; that
the said deposition was taken in stenotype by me at
the time and place aforesaid and was thereafter
reduced to typewritten form by me; and that the
foregoing is a true and correct transcript of my
stenotype notes thereof.

That I am not an attorney nor counsel
nor in any way connected with any attorney or counsel
for any of the parties to said action nor otherwise
interested in the outcome of this action.

IN WITNESS WHEREOF, I have hereunto set
my hand on this day, May 8, 2023.


_____
Jennifer Bajwa Melius
Registered Professional Reporter

```
 1                            AMENDMENT SHEET

 2     DEPONENT NAME:                 DATE OF DEPOSITION:
       Jeanne Morris                  April 26, 2023
 3

 4     The deponent wishes to make the following changes in
       the testimony as originally given:
 5

 6     PAGE    LINE    CHANGE                      REASON

 7     _____

 8     _____

 9     _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19     _____

20     Signature of Deponent:_____

21     Subscribed and sworn to before me this _____ day of

22     _____, 2023.

23             Notary's signature_____
               Notary's address_____
24             My commission expires:_____

25
```

DEPONENT'S CERTIFICATE

I do hereby certify that I have read the foregoing deposition and that the same is a true and accurate transcript of my testimony, except for attached amendments, if any.

_____
Jeanne Morris


(  ) No changes          (  ) Amendments Attached


SUBSCRIBED AND SWORN to before me this_____ day of _____, 2023.


Notary Public_____

Address_____

_____

My Commission Expires _____

'
'18 [1] - 93:15
'19 [1] - 112:12
'91 [1] - 10:12

## 0

003147 [1] - 3:13
004359 [1] - 3:10
00623 [1] - 4:4
007172 [1] - 3:18
007173 [1] - 3:18
0141 [1] - 226:22
0143 [4] - 213:2, 213:12, 218:9, 222:6
0144 [1] - 206:9
0145 [1] - 204:10
0146 [1] - 210:1
0148 [1] - 3:24
0151 [1] - 3:24
017110 [2] - 3:15, 152:16
017112 [1] - 3:15
0541 [1] - 3:21
0542 [1] - 3:21
0745 [1] - 3:7
0746 [2] - 3:7, 103:20
0866 [1] - 4:2
0878 [1] - 4:2

## 1

1 [3] - 111:18, 259:11, 259:19
1/1 [1] - 250:5
1/22/2020 [1] - 3:17
1/24/2020 [1] - 3:9
100 [1] - 145:21
1001 [1] - 2:13
101 [1] - 3:6
104 [1] - 222:12
108 [1] - 3:8
11 [2] - 203:25, 204:13
111 [1] - 4:7
11:25 [1] - 116:21
11:41 [1] - 116:21
12 [5] - 4:7, 111:11, 204:18, 206:8, 207:4
12/31/2021 [1] - 250:6
12/7/19 [1] - 102:23
126 [1] - 3:11
12:48 [1] - 160:9
12:50 [1] - 160:9
13 [5] - 214:11, 215:3, 216:17, 219:18,

266:6
14 [4] - 176:20, 177:12, 213:4, 222:10
141 [3] - 226:18, 227:4, 227:5
142 [1] - 227:24
143 [2] - 222:13, 222:14
144 [2] - 206:16, 218:18
148 [1] - 237:15
149 [1] - 237:3
1490 [2] - 2:4, 2:7
14th [2] - 227:2, 227:3
15 [12] - 4:8, 201:4, 206:10, 215:1, 217:22, 218:6, 222:8, 222:9, 222:10, 222:11, 226:19
151 [1] - 236:1
152 [1] - 3:14
17 [4] - 4:8, 48:15, 48:17, 240:10
176 [1] - 3:16
19 [7] - 3:6, 101:9, 101:11, 105:14, 226:25, 228:8, 230:3
1993 [1] - 10:21
1:12 [1] - 176:9
1:22-cv-01625-RM-SKC [1] - 1:2
1:41 [1] - 176:9

## 2

2 [2] - 126:21, 259:19
20 [7] - 3:8, 47:17, 48:21, 108:18, 108:20, 245:17, 258:11
20-minute [1] - 176:7
201 [1] - 4:8
2012 [1] - 9:12
2014 [1] - 59:14
2016 [1] - 91:16
2018 [5] - 36:20, 39:6, 92:11, 93:8, 245:17
2019 [6] - 3:6, 5:21, 59:16, 67:15, 92:11, 102:8
2020 [51] - 4:1, 27:18, 27:24, 29:12, 31:25, 33:8, 33:13, 35:18, 36:7, 37:15, 41:24,

42:10, 44:8, 44:17, 46:13, 46:24, 48:21, 49:3, 51:14, 51:15, 51:16, 82:15, 84:3, 110:8, 111:16, 111:17, 111:21, 113:8, 116:24, 123:20, 126:1, 137:18, 155:20, 158:16, 201:16, 211:16, 214:11, 219:18, 224:10, 225:4, 231:2, 233:10, 234:20, 235:7, 243:1, 243:6, 249:12, 249:13, 259:12, 259:19, 266:6
2021 [10] - 4:1, 47:17, 65:3, 123:20, 124:9, 124:10, 124:25, 125:13, 249:12, 249:17
2022 [9] - 59:17, 59:18, 59:19, 65:4, 65:5, 65:7, 229:5, 229:13, 258:12
2023 [7] - 1:11, 1:18, 267:10, 268:19, 269:2, 269:22, 270:12
21 [3] - 3:11, 126:10, 126:12
213 [1] - 3:19
22 [7] - 3:14, 151:25, 152:2, 153:19, 177:11, 229:4, 229:13
22152 [1] - 5:14
23 [7] - 3:16, 176:14, 176:15, 178:6, 180:22, 180:24, 204:3
235 [1] - 3:22
24 [4] - 3:19, 110:12, 213:24, 213:25
240 [1] - 4:8
249 [1] - 4:1
25 [6] - 3:22, 135:19, 142:11, 155:20, 235:22, 235:23
26 [8] - 1:11, 1:18, 4:1, 236:22, 249:6, 249:7, 267:10, 269:2
264 [1] - 4:3
27 [4] - 4:3, 264:9, 264:11, 266:4

28 [1] - 212:20
2:17 [1] - 176:20

## 3

3 [8] - 116:24, 126:1, 126:18, 126:21, 144:15, 144:20, 233:10, 234:20
30 [2] - 5:24, 8:25
300 [1] - 2:13
303 [1] - 2:7
303)593-2595 [1] - 2:5
303)628-3300 [1] - 2:14
304 [1] - 2:4
31 [37] - 11:24, 13:13, 14:8, 15:8, 16:6, 16:25, 17:2, 17:18, 18:9, 18:15, 19:18, 22:24, 24:9, 26:20, 27:5, 52:25, 53:6, 53:12, 201:16, 202:2, 202:5, 204:15, 205:20, 205:22, 206:1, 207:18, 207:20, 216:14, 219:2, 219:19, 222:24, 226:6, 237:9, 240:20, 240:24, 242:13, 242:19
3:12 [1] - 233:7
3:19 [1] - 233:7

## 4

4 [12] - 3:6, 111:18, 127:20, 130:3, 132:2, 132:3, 133:8, 135:2, 135:8, 144:15, 144:22, 172:11
40 [1] - 78:9
4:11 [1] - 264:3
4:20 [1] - 264:3
4:24 [1] - 267:10

## 5

5 [2] - 3:3, 214:7
5,000 [1] - 232:8
50 [1] - 159:1
543 [1] - 214:8
58 [1] - 159:2

## 6

6/4/2020 [1] - 3:12
627 [1] - 4:4

## 7

7 [1] - 110:8
7/14/2020 [1] - 3:17
700 [1] - 231:9
72 [1] - 159:4
720)815-5281 [1] - 2:8
7726 [1] - 5:14
7:26 [1] - 214:12

## 8

8 [1] - 268:19
8/13/2020 [2] - 3:20, 4:3
8/26/2020 [1] - 3:24
8/31/2020 [2] - 3:24, 237:5
80202 [1] - 2:13
80218 [2] - 2:4, 2:8
874 [2] - 249:20, 250:3
876 [4] - 249:22, 249:23, 250:4, 250:5
8:33 [1] - 1:18
8:50 [2] - 19:10, 207:4
8:53 [1] - 19:10

## 9

9 [1] - 230:8
90 [1] - 225:24
9:38 [1] - 51:23
9:48 [1] - 51:23

## A

a.m [9] - 1:18, 19:10, 51:23, 116:21, 207:4, 214:12
abilities [1] - 245:7
able [12] - 20:16, 20:19, 28:2, 53:16, 72:6, 73:2, 131:5, 166:16, 201:7, 207:16, 211:9
absence [1] - 57:7
absolutely [5] - 58:7, 131:15, 150:1, 196:17, 256:15
academy [2] - 9:6, 9:7
accept [1] - 42:7
acceptability [2] -

248:23, 249:1
**access** [2] - 42:5,
246:18
**accessibility** [1] -
253:20
**accomplishments** [1]
- 250:9
**according** [2] - 73:18,
212:1
**accordingly** [3] - 82:9,
211:1, 211:2
**account** [1] - 46:17
**accountability** [2] -
185:15, 228:18
**accountable** [1] - 61:8
**accounting** [2] - 9:1,
72:6
**accurate** [7] - 25:22,
105:22, 153:16,
173:9, 213:17,
229:15, 270:4
**accurately** [3] - 35:13,
36:21, 45:20
**accusations** [1] -
175:13
**accused** [6] - 171:20,
171:22, 173:5,
174:8, 256:20,
257:19
**accusing** [1] - 172:12
**acquisition** [3] -
77:21, 77:22, 78:9
**acronym** [1] - 69:20
**acted** [1] - 242:22
**action** [5] - 159:10,
186:6, 254:15,
268:16, 268:17
**Action** [1] - 1:2
**actions** [1] - 130:14
**active** [1] - 159:3
**actively** [4] - 37:16,
40:23, 41:1, 190:21
**actual** [7] - 70:12,
70:20, 71:10, 92:18,
101:19, 218:7,
262:11
**ad** [1] - 80:2
**add** [5] - 8:11, 74:25,
222:22, 223:3,
237:23
**add-on** [1] - 74:25
**added** [6] - 48:22,
48:25, 49:1, 50:11,
105:12, 209:13
**ADDIE** [5] - 68:17,
69:20, 69:23, 71:6,

82:14
**additional** [5] - 81:2,
81:3, 170:6, 209:13,
223:3
**address** [4] - 5:12,
177:17, 190:11,
269:23
**Address** [1] - 270:15
**adjust** [1] - 81:10
**adjusted** [1] - 232:16
**adjustments** [2] -
82:9, 88:22
**Adobe** [1] - 212:11
**adult** [1] - 106:6
**advance** [4] - 15:19,
34:4, 67:19, 113:7
**advanced** [1] - 107:22
**advertise** [1] - 28:6
**advertised** [1] - 18:22
**advice** [6] - 166:17,
190:14, 218:22,
218:24, 236:11
**advisors** [1] - 83:5
**advocated** [1] -
239:15
**affect** [2] - 234:22,
234:24
**affects** [1] - 220:7
**aforesaid** [1] - 268:10
**African** [4] - 64:6,
64:7, 149:5, 248:4
**African-American** [4]
- 64:6, 64:7, 149:5,
248:4
**afterwards** [4] -
128:10, 164:18,
195:6, 229:20
**agility** [1] - 232:10
**ago** [7] - 8:25, 62:3,
67:6, 98:16, 203:8,
233:10, 246:12
**agree** [12] - 35:2,
39:13, 44:2, 55:24,
56:15, 57:25, 106:7,
149:1, 196:13,
218:16, 228:16,
244:5
**agreed** [3] - 20:2,
112:10, 200:23
**agreement** [3] -
224:13, 240:17,
242:12
**ahead** [14] - 44:23,
130:1, 130:21,
136:20, 150:22,
197:19, 208:14,

227:7, 239:19,
241:1, 241:14,
242:9, 255:14,
263:19
**Alek** [4] - 243:25,
244:9, 244:16,
247:21
**Alexandria** [1] -
109:10
**all-hands** [18] -
160:21, 161:2,
162:23, 164:9,
164:11, 164:18,
165:11, 165:17,
165:18, 165:24,
166:4, 167:12,
167:17, 168:4,
169:7, 177:15,
177:18, 177:24
**all-staff** [1] - 131:24
**allow** [2] - 57:22,
231:15
**allowed** [3] - 117:8,
130:9, 229:19
**almost** [4] - 80:1,
154:14, 230:3,
246:12
**Almost** [1] - 228:8
**alone** [3] - 92:20,
252:13, 253:10
**aloud** [2] - 237:25,
238:1
**ALSO** [1] - 2:16
**alternate** [1] - 238:16
**altogether** [1] - 231:23
**Amber** [4] - 236:4,
236:7, 236:8, 236:9
**Amber's** [1] - 236:24
**AMENDMENT** [1] -
269:1
**amendments** [1] -
270:5
**Amendments** [1] -
270:9
**American** [4] - 64:6,
64:7, 149:5, 248:4
**amount** [5] - 25:13,
212:7, 219:7,
220:22, 235:8
**Amy** [3] - 229:4,
229:7, 247:17
**analysis** [5] - 30:7,
32:24, 69:6, 69:13,
69:25
**analytics** [2] - 63:19,
74:20
**AND** [1] - 270:11

**animated** [1] - 177:7
**ann** [1] - 139:8
**Ann** [28] - 49:14,
51:15, 63:6, 99:2,
99:22, 117:8,
118:12, 136:12,
138:21, 138:24,
139:16, 139:20,
139:23, 140:9,
142:21, 142:23,
143:5, 148:12,
155:6, 178:5,
221:25, 231:10,
232:6, 232:13,
233:2, 244:21
**annual** [3] - 35:17,
42:12, 98:10
**answer** [29] - 7:18,
30:2, 36:21, 39:7,
45:19, 47:12, 50:12,
68:12, 73:3, 123:11,
150:23, 151:9,
168:15, 196:1,
203:13, 207:20,
214:16, 215:20,
216:7, 229:15,
231:24, 237:24,
240:1, 241:2,
242:10, 242:14,
242:17, 256:25,
263:20
**Answer** [1] - 250:11
**answering** [1] - 50:4
**anticipate** [1] - 127:8
**anticipated** [1] -
110:15
**antiharassment** [1] -
39:10
**anxiety** [3] - 127:17,
239:14, 253:8
**anxious** [1] - 239:4
**anyway** [1] - 159:20
**apart** [1] - 124:22
**apologies** [3] - 83:19,
131:7, 201:11
**apologize** [4] - 55:14,
74:8, 128:14, 171:10
**apologized** [1] -
181:20
**apologizing** [2] -
130:16, 131:10
**APPEARANCES** [1] -
2:1
**appeared** [1] - 234:24
**applied** [2] - 73:15,
106:17
**apply** [1] - 253:24

**appreciate** [4] - 8:21,
169:21, 204:14,
266:1
**approach** [7] - 34:11,
34:14, 34:16, 34:17,
164:6, 189:25, 190:2
**approached** [2] -
190:19, 191:21
**approaching** [2] -
191:18
**appropriate** [4] - 1:15,
83:21, 88:22, 91:1
**April** [10] - 1:11, 1:18,
26:18, 27:3, 113:8,
113:12, 202:22,
265:13, 267:10,
269:2
**arbitrary** [2] - 57:10,
58:12
**area** [4] - 9:13, 74:14,
96:10, 106:9
**areas** [7] - 34:23,
35:10, 168:17,
175:3, 183:19,
189:7, 220:7
**Ariel** [1] - 5:8
**ARIEL** [1] - 2:3
**ariel@lowrey** [1] - 2:5
**ariel@lowrey-parady**
**.com** [1] - 2:5
**article** [1] - 73:12
**Asian** [1] - 148:23
**assessment** [1] -
87:14
**asset** [1] - 107:5
**assigned** [2] - 150:6,
183:17
**assignment** [2] -
65:17
**assignments** [2] -
60:13, 60:18
**assist** [1] - 87:24
**associated** [2] -
133:1, 198:13
**assume** [7] - 57:2,
61:6, 94:22, 175:22,
184:15, 208:13,
229:18
**assumed** [2] - 9:7,
208:18
**assuming** [3] -
207:17, 208:20,
252:9
**assumption** [1] - 21:2
**assumptions** [2] -
148:14, 216:1

**assurance** [1] - 43:17
**attached** [1] - 270:5
**Attached** [1] - 270:9
**attend** [2] - 10:7, 71:22
**attended** [1] - 71:1
**attending** [1] - 185:21
**attention** [2] - 242:24, 266:1
**attorney** [11] - 6:9, 46:1, 46:2, 91:2, 91:6, 212:4, 258:5, 258:15, 268:14, 268:15
**attorneys** [2] - 5:9, 46:19
**attribution** [1] - 221:2
**audio** [5] - 11:8, 31:7, 49:22, 50:16, 73:20
**August** [62] - 5:21, 11:24, 13:13, 14:8, 15:8, 16:6, 16:25, 17:2, 17:18, 18:9, 18:15, 19:18, 22:24, 24:9, 26:20, 27:5, 46:12, 48:21, 51:14, 52:25, 53:6, 53:12, 198:21, 201:16, 202:2, 202:5, 202:24, 203:25, 204:13, 204:15, 204:18, 205:20, 205:22, 206:1, 206:8, 207:4, 207:18, 207:20, 213:4, 214:11, 215:3, 216:14, 216:17, 217:3, 219:2, 219:18, 219:19, 222:24, 225:8, 226:6, 226:25, 228:8, 230:12, 236:22, 237:9, 240:20, 240:24, 242:13, 242:19, 243:6, 265:15, 266:6
**available** [3] - 58:1, 71:21, 92:22
**average** [1] - 221:25
**aware** [21] - 22:15, 33:12, 34:3, 41:6, 41:7, 84:9, 84:18, 88:15, 190:17, 190:24, 196:23, 199:7, 199:10, 202:20, 207:18,

207:19, 208:25, 239:7, 240:4, 243:7, 244:17
**awareness** [1] - 254:20

## B

**background** [2] - 106:5, 187:10
**backup** [2] - 236:19, 237:2
**bad** [3] - 91:12, 150:13, 194:3
**badge** [1] - 37:19
**Bajwa** [1] - 1:19, 268:3, 268:22
**balance** [6] - 32:19, 32:23, 51:10, 82:12, 252:8, 253:5
**Baltimore** [1] - 109:11
**Barley** [127] - 4:1, 11:8, 11:12, 14:7, 14:17, 20:10, 21:3, 22:12, 23:4, 23:11, 23:18, 23:25, 31:4, 32:16, 46:23, 49:14, 49:15, 51:2, 51:17, 51:18, 52:10, 53:16, 56:22, 62:21, 94:24, 96:8, 96:9, 98:23, 99:22, 100:3, 102:4, 102:15, 105:15, 106:23, 110:1, 111:4, 112:13, 112:14, 113:6, 113:19, 113:23, 116:16, 118:20, 120:7, 122:13, 123:4, 124:23, 125:12, 126:3, 127:7, 127:8, 127:17, 127:21, 130:11, 133:8, 133:15, 133:21, 134:6, 135:2, 135:7, 137:4, 138:15, 138:25, 141:2, 141:5, 141:15, 143:8, 143:23, 144:21, 145:1, 145:9, 146:25, 151:4, 151:7, 153:12, 156:20, 162:6, 169:8, 170:11, 172:11, 173:4, 174:7,

175:12, 176:2, 185:18, 185:20, 189:16, 190:7, 191:8, 193:18, 194:18, 195:13, 195:21, 195:23, 196:22, 198:10, 199:17, 203:17, 205:4, 205:17, 205:20, 206:2, 210:9, 213:3, 216:13, 218:10, 218:17, 218:22, 219:16, 225:10, 225:13, 230:3, 233:14, 237:1, 237:3, 237:17, 238:17, 245:15, 247:13, 249:12, 251:20, 252:23, 257:3, 260:14, 261:15, 262:5, 263:5
**Barley's** [23] - 111:2, 114:7, 119:17, 119:24, 120:3, 122:23, 123:1, 123:14, 129:9, 131:7, 131:14, 136:7, 139:24, 140:6, 142:10, 142:20, 143:19, 186:9, 186:17, 246:3, 246:7, 248:6, 248:20
**based** [18] - 65:17, 114:8, 129:20, 138:7, 138:13, 148:14, 151:9, 151:18, 153:12, 167:16, 169:9, 197:13, 200:16, 200:21, 200:23, 208:19, 238:14, 253:10
**basic** [2] - 64:23, 244:12
**basis** [6] - 40:21, 40:22, 73:16, 80:3, 154:14, 200:4
**BASK** [1] - 73:14
**Bates** [3] - 103:19, 204:10, 206:8
**beat** [1] - 153:4
**became** [8] - 9:5, 20:4, 29:21, 67:13, 92:6, 93:9, 93:14, 93:16
**become** [2] - 64:11,

199:7
**becomes** [1] - 85:10
**began** [1] - 92:1
**begin** [1] - 65:10
**beginning** [4] - 10:25, 69:9, 193:24, 207:11
**begun** [1] - 216:17
**BEHALF** [2] - 2:2, 2:11
**behalf** [2] - 138:11, 153:12
**behaving** [1] - 175:13
**behavior** [5] - 119:17, 119:24, 120:3, 168:16, 228:14
**behaviors** [3] - 122:21, 162:18, 172:21
**behind** [1] - 208:16
**bell** [1] - 229:13
**bells** [1] - 96:22
**belongs** [1] - 69:7
**below** [2] - 237:20, 237:22
**bench** [2] - 83:2, 87:22
**benefit** [1] - 39:16
**Bernée** [12] - 17:5, 17:15, 21:4, 63:16, 68:5, 99:2, 99:18, 175:23, 188:17, 189:2, 190:5, 190:19
**best** [11] - 16:3, 58:19, 79:12, 94:2, 100:18, 136:14, 140:17, 203:9, 222:21, 254:21, 265:17
**Beth** [4] - 156:18, 181:7, 184:21, 184:23
**better** [10] - 104:25, 105:2, 148:24, 166:15, 182:15, 193:15, 253:11, 255:8, 256:4, 256:5
**between** [27] - 12:2, 16:16, 16:23, 30:11, 42:22, 49:4, 49:19, 50:1, 50:10, 56:9, 56:10, 57:8, 99:19, 108:3, 127:21, 152:5, 153:19, 153:25, 158:6, 189:15, 189:18, 196:7, 200:3, 203:17, 204:25, 216:11, 268:8
**beyond** [2] - 81:23,

142:11
**Bi** [1] - 3:16
**Bi-Weekly** [1] - 3:16
**bias** [5] - 174:23, 174:25, 175:6, 175:15, 176:3
**big** [1] - 84:25
**biggest** [1] - 108:12
**biracial** [5] - 170:14, 170:23, 171:8, 171:18, 172:25
**bit** [15] - 8:11, 9:2, 30:9, 31:20, 31:23, 33:24, 52:2, 57:6, 63:10, 176:12, 178:2, 180:13, 248:19, 251:18, 252:16
**biweekly** [1] - 40:21
**Biweekly** [1] - 177:9
**Black** [4] - 91:23, 110:23, 167:13, 248:15
**blend** [1] - 141:18
**blindsided** [2] - 164:25, 168:10
**blue** [1] - 152:12
**blueprint** [2] - 73:17, 73:18
**board** [2] - 13:20, 75:15
**body** [1] - 73:15
**book** [3] - 32:10, 113:17, 222:22
**borne** [1] - 116:12
**boss** [5] - 11:13, 40:19, 75:15, 145:24, 146:8
**bottom** [9] - 103:18, 152:15, 159:9, 160:18, 201:5, 218:10, 227:25, 237:3, 249:24
**bounce** [2] - 222:25, 223:15
**box** [1] - 100:21
**brave** [2] - 122:4, 135:6
**break** [5] - 8:2, 51:21, 176:7, 264:16, 265:8
**breaking** [1] - 8:3
**Brian** [5] - 49:24, 59:5, 66:8, 245:3, 247:22
**brief** [1] - 6:8
**briefly** [1] - 102:11
**bring** [6] - 64:23,

130:4, 158:11, 164:8, 176:2, 196:15
**bringing** [11] - 117:23, 120:6, 120:19, 142:19, 143:18, 144:11, 158:10, 182:11, 195:8, 228:6, 266:1
**Brodie** [3] - 86:5, 86:12, 88:13
**broken** [2] - 158:18, 158:21
**brought** [13] - 116:23, 122:22, 136:3, 162:22, 163:6, 168:4, 168:24, 186:17, 242:23, 243:9, 246:6, 254:16, 259:6
**Brown** [2] - 246:9, 246:10
**Brown's** [1] - 247:11
**bruised** [1] - 179:22
**budgeting** [1] - 185:9
**budgets** [1] - 79:1
**buffer** [1] - 221:12
**build** [4] - 77:24, 77:25, 183:19, 192:14
**building** [2] - 78:25, 108:10
**built** [2] - 65:20, 184:3
**bullet** [4] - 213:8, 213:13, 213:16, 222:16
**bullying** [1] - 193:19
**business** [31] - 9:4, 9:6, 9:7, 12:10, 16:1, 16:6, 16:25, 18:13, 18:19, 18:21, 19:1, 19:2, 19:6, 19:14, 19:17, 54:5, 54:19, 55:1, 62:10, 64:25, 75:24, 81:14, 82:12, 99:14, 124:4, 124:7, 220:7, 229:3, 230:18, 231:14, 252:1
**businesses** [1] - 232:9
**BY** [1] - 5:6

# C

**cadence** [3] - 182:7, 182:20, 183:1
**calendar** [1] - 76:14

**camera** [1] - 235:1
**campaign** [1] - 231:6
**canceled** [1] - 180:19
**cannot** [1] - 14:9
**capacity** [2] - 62:9, 229:23
**captor** [1] - 232:14
**cards** [1] - 211:12
**care** [6] - 8:6, 25:3, 129:1, 130:24, 194:9, 211:9
**career** [2] - 10:16, 106:4
**Carlos** [2] - 59:5, 155:6
**Carlos's** [1] - 59:7
**Carol** [8] - 49:12, 51:16, 149:5, 149:9, 149:20, 149:22, 155:8, 227:5
**Carolyn** [108] - 4:1, 11:8, 11:12, 12:19, 13:22, 14:16, 14:22, 23:4, 31:4, 32:16, 49:14, 52:19, 56:10, 57:3, 57:4, 58:10, 58:20, 86:8, 99:1, 99:2, 99:22, 102:12, 103:12, 103:22, 104:4, 104:12, 106:23, 110:21, 117:6, 118:1, 119:8, 121:10, 121:12, 122:6, 122:15, 123:10, 124:1, 124:5, 127:24, 128:2, 128:6, 128:8, 128:20, 128:22, 128:23, 128:25, 134:17, 136:1, 138:25, 140:9, 140:11, 140:15, 140:16, 141:21, 141:22, 142:24, 170:22, 171:13, 171:15, 172:8, 172:15, 172:19, 175:2, 184:25, 185:23, 186:24, 187:3, 187:12, 187:13, 187:15, 187:23, 188:3, 188:5, 188:8, 188:18, 189:7, 190:13, 192:7, 193:5, 194:23, 195:4, 195:5, 195:6,

196:1, 197:9, 197:23, 199:25, 200:13, 202:4, 203:18, 206:13, 208:6, 214:22, 221:25, 224:2, 228:9, 231:11, 234:16, 247:5, 251:10, 251:16, 259:5, 264:21, 264:23
**Carolyn's** [7] - 103:20, 139:3, 170:21, 213:12, 246:15, 252:7, 252:14
**Carrie** [17] - 117:8, 118:12, 136:12, 138:21, 138:24, 139:23, 140:14, 140:23, 141:20, 142:2, 148:12, 155:6, 174:16, 231:10, 231:17, 247:21
**Carrie's** [1] - 231:14
**case** [17] - 5:9, 46:3, 55:13, 70:10, 81:18, 90:12, 90:15, 201:1, 208:1, 210:24, 215:15, 216:5, 229:2, 258:4, 258:14, 258:17, 264:22
**cases** [3] - 85:3, 85:17, 88:2
**cat** [1] - 264:23
**categories** [3] - 114:16, 114:18, 115:17
**CCRB** [1] - 258:17
**CCRD** [1] - 45:18
**cell** [3] - 46:22, 47:11, 117:16
**center** [3] - 73:1, 83:5, 236:9
**CEO** [1] - 57:20
**certain** [3] - 127:3, 133:3
**certainly** [3] - 8:22, 57:6, 171:7
**CERTIFICATE** [2] - 268:1, 270:1
**certification** [3] - 73:17, 76:5, 83:8
**certify** [2] - 268:5, 270:2
**cetera** [15] - 22:6,

23:24, 53:9, 74:21, 76:19, 79:1, 124:21, 181:25, 187:1, 202:15, 220:11, 252:5, 252:8, 252:10, 256:10
**Chain** [3] - 3:16, 3:19, 3:22
**chain** [1] - 213:22
**challenged** [1] - 85:20
**challenges** [3] - 250:13, 250:25, 252:2
**chance** [4] - 48:10, 51:21, 106:20, 255:4
**change** [17] - 8:10, 30:4, 30:11, 100:14, 156:9, 166:20, 179:3, 179:4, 180:11, 182:19, 183:1, 193:3, 193:7, 207:20, 226:5, 234:21, 257:13
**CHANGE** [1] - 269:6
**changed** [5] - 47:7, 47:14, 47:15, 48:20, 177:20
**changes** [6] - 8:13, 125:20, 125:22, 185:19, 269:4, 270:9
**changing** [2] - 64:25, 193:14
**chapter** [1] - 84:13
**chapters** [1] - 73:10
**characterize** [1] - 261:24
**charge** [6] - 29:20, 29:22, 84:20, 257:23, 258:22, 261:16
**charges** [1] - 258:24
**charts** [1] - 223:9
**chat** [2] - 100:20, 176:14
**check** [7] - 24:10, 61:20, 63:5, 92:19, 93:11, 101:18, 123:21
**chief** [5] - 11:13, 83:9, 159:11, 159:13
**child** [6] - 170:12, 170:14, 170:23, 171:8, 171:18, 172:25
**choose** [2] - 79:16, 83:13
**chose** [2] - 121:7,

238:24
**Chris** [1] - 149:16
**CHRO** [2] - 9:22, 9:23
**circulated** [1] - 240:14
**circulating** [1] - 202:13
**circumstances** [1] - 217:19
**Civil** [1] - 1:2, 257:23
**civil** [1] - 1:15
**clarifications** [1] - 218:19
**clarify** [2] - 144:8, 147:21
**clarifying** [3] - 52:1, 96:15, 261:3
**class** [3] - 63:19, 211:23, 212:1
**classes** [1] - 78:15
**classify** [1] - 120:18
**Clayton** [5] - 236:4, 236:7, 236:8, 236:18
**clear** [6] - 7:8, 38:14, 55:15, 80:14, 154:6, 154:8
**cleared** [1] - 154:7
**clearly** [1] - 153:24
**close** [8] - 61:22, 83:6, 97:12, 117:21, 203:8, 228:25, 238:9, 244:15
**closed** [1] - 231:7
**closely** [2] - 69:18, 86:9
**closer** [2] - 16:17, 87:22
**closing** [1] - 220:13
**coach** [2] - 189:7, 244:23
**coached** [1] - 39:20
**coaching** [15] - 38:8, 39:14, 43:18, 44:3, 96:24, 107:20, 176:1, 188:6, 188:16, 188:17, 189:13, 189:17, 189:21, 244:24, 245:2
**code** [1] - 39:8
**coffee** [1] - 247:6
**collaborate** [1] - 182:25
**collaboration** [2] - 30:8, 108:15
**collaborative** [5] - 11:7, 12:1, 120:14,

120:19, 183:8
**collaboratively** [1] -
190:5
**colleagues** [1] - 110:7
**collective** [10] - 16:23,
25:7, 54:4, 57:21,
72:22, 74:10, 133:5,
179:16, 190:2, 202:9
**collectively** [11] -
41:19, 52:9, 74:17,
82:25, 110:21,
129:18, 136:4,
177:19, 189:1,
221:25, 239:22
**college** [1] - 10:7
**color** [10] - 141:5,
146:20, 148:15,
150:18, 151:7,
151:10, 167:4,
167:21, 168:17,
179:5
**COLORADO** [1] - 1:1
**Colorado** [4] - 2:4,
2:8, 2:13, 257:23
**column** [1] - 210:11
**combination** [3] -
58:18, 137:12, 190:9
**combined** [1] - 70:20
**comfortable** [2] -
77:3, 80:11
**coming** [9] - 87:6,
121:14, 133:2,
172:8, 174:19,
177:22, 181:8,
225:14, 241:24
**commenced** [1] -
26:17
**commencement** [1] -
268:6
**commencing** [1] -
1:18
**comment** [6] - 42:7,
149:12, 149:18,
151:12, 178:3,
181:24
**comments** [2] - 32:5,
179:18
**commercial** [1] -
11:13
**Commission** [2] -
256:10, 270:17
**commission** [1] -
269:24
**commitment** [1] - 31:1
**committed** [2] - 85:17,
86:24
**common** [1] - 256:4

**communicate** [8] -
20:19, 20:22, 53:17,
115:15, 178:19,
182:25, 193:18,
207:16
**communicated** [7] -
17:15, 21:10, 44:7,
89:22, 193:20,
201:16, 243:12
**communicating** [12] -
17:10, 18:25, 20:3,
22:25, 23:14, 24:11,
24:19, 185:13,
205:14, 207:11,
257:8
**communication** [18] -
14:7, 16:16, 20:23,
20:24, 21:3, 22:13,
23:19, 23:23, 24:1,
25:7, 39:12, 43:17,
57:13, 186:25,
196:7, 224:23,
236:16, 257:7
**communications** [10]
- 25:4, 42:22, 44:12,
45:2, 45:12, 46:3,
47:10, 56:10,
107:14, 195:24
**commute** [2] - 109:13,
109:17
**compact** [1] - 183:22
**company** [7] - 71:24,
143:14, 211:7,
231:1, 251:17,
254:2, 254:3
**compared** [1] - 159:4
**compete** [2] - 76:6,
253:13
**competing** [2] - 32:19,
209:21
**competitor** [1] - 82:2
**competitors** [1] - 69:2
**complain** [1] - 252:14
**complaint** [6] - 45:18,
116:23, 139:15,
198:15, 198:23,
199:2
**complaints** [2] -
62:20, 245:20
**complete** [17] - 20:23,
33:18, 37:17, 52:20,
53:5, 60:19, 61:14,
77:8, 119:25,
216:23, 217:1,
219:9, 222:23,
230:21, 232:4,
233:1, 238:19

**completed** [29] -
18:12, 18:23, 19:22,
27:17, 27:19, 27:20,
27:21, 28:1, 28:7,
28:9, 33:11, 34:2,
61:9, 69:11, 70:20,
72:17, 97:22, 97:24,
102:21, 103:3,
103:10, 197:16,
206:7, 208:10,
208:11, 210:15,
210:18
**completely** [1] -
210:20
**completing** [3] -
60:13, 99:13, 113:7
**completion** [1] - 88:14
**Completion** [1] -
210:12
**Compliance** [19] -
3:23, 26:7, 26:13,
26:22, 26:25, 28:16,
28:25, 29:16, 30:12,
89:6, 89:15, 89:17,
90:23, 114:12,
211:15, 211:20,
223:19, 236:19,
238:21
**compliance** [1] -
26:23
**complying** [1] - 114:8
**components** [1] -
64:24
**computer** [1] - 31:7
**concept** [1] - 166:19
**concern** [17] - 65:19,
65:20, 97:6, 98:4,
114:7, 118:15,
142:18, 144:11,
147:4, 147:9, 186:9,
195:8, 196:6, 245:1,
252:25
**concerned** [5] - 141:4,
147:18, 158:23,
158:25, 199:8
**concerns** [69] - 56:23,
63:3, 63:7, 65:10,
67:5, 93:22, 94:18,
94:23, 95:10, 95:19,
95:22, 95:24, 96:17,
97:9, 98:21, 98:23,
111:1, 111:5,
113:10, 114:4,
116:15, 119:8,
120:6, 120:12,
120:19, 121:8,
122:12, 122:25,

123:3, 123:5,
123:13, 124:23,
125:6, 137:25,
139:3, 139:7, 139:8,
139:24, 140:6,
140:15, 142:9,
142:14, 143:18,
146:20, 146:24,
147:5, 153:8,
156:19, 157:22,
162:22, 167:7,
184:18, 186:16,
190:25, 195:2,
195:12, 195:16,
195:20, 196:15,
218:13, 233:13,
243:1, 243:9,
244:17, 245:24,
245:25, 246:6,
252:23, 254:15
**concluded** [2] -
133:12, 267:10
**conclusion** [4] -
121:24, 122:2,
133:7, 200:20
**concur** [2] - 237:17,
238:10
**concurring** [1] -
237:20
**condolences** [1] -
264:24
**conduct** [3] - 39:8,
122:23, 129:9
**confer** [1] - 214:22
**conference** [4] - 73:8,
77:24, 79:7, 145:17
**conferences** [3] -
73:5, 79:12, 90:21
**confidence** [1] - 108:8
**CONFIDENTIAL** [6] -
3:10, 3:13, 3:18,
3:21, 3:25, 4:2
**confirm** [7] - 13:17,
86:23, 89:16,
111:20, 265:9,
265:11, 265:12
**confirmed** [5] - 14:12,
217:6, 265:4,
265:16, 265:19
**confirming** [1] -
265:20
**conflicts** [3] - 60:13,
63:17, 200:2
**confusion** [1] - 103:25
**conjunction** [2] -
77:23, 79:12
**connect** [1] - 117:18

**Connect** [1] - 212:11
**connected** [5] - 66:1,
66:2, 66:4, 117:17,
268:15
**connection** [1] -
262:22
**conscious** [1] -
147:22
**consider** [4] - 54:14,
55:4, 104:25, 211:3
**consideration** [1] -
53:11
**considered** [8] - 53:4,
53:19, 54:17, 55:7,
169:3, 169:5, 239:24
**considering** [1] -
235:15
**considers** [1] - 262:1
**consistent** [1] -
120:10
**consistently** [1] -
228:19
**constantly** [1] - 251:6
**constructive** [1] -
105:8
**contact** [3] - 85:16,
258:20
**contacted** [1] - 195:5
**contemplating** [1] -
67:20
**Content** [1] - 210:10
**content** [39] - 18:25,
28:21, 29:4, 30:20,
64:15, 69:4, 70:11,
74:15, 74:18, 76:23,
77:2, 85:1, 85:2,
85:7, 90:1, 90:18,
90:23, 104:6,
105:16, 141:23,
143:9, 143:10,
143:16, 192:11,
221:17, 223:9,
223:10, 223:21,
223:23, 224:1,
224:3, 224:9,
224:17, 224:25,
225:21, 225:24,
225:25, 238:19,
246:4
**contents** [1] - 161:6
**context** [16] - 30:12,
91:17, 124:16,
124:17, 141:25,
148:2, 150:8,
163:17, 171:1,
171:12, 171:14,
171:23, 172:3,

186:10, 186:21, 194:21

**continue** [8] - 17:7, 21:7, 106:3, 154:18, 200:25, 223:20, 229:19, 231:15

**continued** [4] - 67:14, 154:19, 200:9, 200:16

**continues** [1] - 211:25

**contract** [1] - 57:8

**contractors** [3] - 10:19, 11:1, 11:3

**contribute** [7] - 66:7, 84:23, 85:7, 92:24, 112:1, 112:7, 123:25

**contributed** [1] - 225:22

**contributing** [7] - 19:5, 20:1, 104:9, 104:15, 124:6, 226:10, 226:11

**contributor** [2] - 61:4, 167:5

**contributors** [21] - 152:22, 155:5, 159:17, 160:12, 162:5, 163:17, 163:24, 164:17, 165:4, 165:6, 166:4, 166:11, 167:4, 167:6, 167:9, 177:1, 178:14, 180:22, 180:25, 195:1, 243:7

**control** [3] - 148:15, 217:19, 256:15

**controversy** [1] - 268:8

**conversation** [21] - 7:1, 37:8, 39:20, 40:21, 117:24, 119:14, 121:16, 133:21, 140:23, 146:10, 170:18, 171:2, 172:10, 182:11, 187:20, 202:9, 233:11, 234:20, 239:22, 259:9, 262:24

**conversations** [25] - 18:7, 38:19, 41:13, 43:22, 52:24, 57:3, 57:5, 58:21, 75:3, 75:6, 136:5, 159:24, 166:21, 170:6, 172:11, 172:24, 173:3, 173:19,

175:22, 190:24, 192:1, 216:16, 258:14, 259:13

**convert** [1] - 231:12

**copies** [2] - 153:21, 206:13

**copy** [2] - 158:15, 267:3

**copyrights** [1] - 220:24

**corner** [4] - 102:25, 103:19, 152:15, 204:8

**corporate** [1] - 211:5

**Correct** [2] - 29:9, 257:25

**correct** [52] - 6:12, 12:23, 26:5, 26:6, 35:8, 49:24, 53:17, 53:18, 56:3, 56:4, 65:7, 71:15, 71:16, 81:20, 90:20, 91:2, 95:7, 95:8, 103:24, 107:5, 109:1, 110:23, 110:24, 111:18, 112:15, 116:13, 116:17, 126:5, 138:15, 139:25, 140:1, 143:9, 147:1, 147:2, 152:9, 167:1, 167:14, 181:2, 188:8, 192:19, 199:2, 199:19, 201:18, 208:20, 209:20, 210:12, 215:14, 215:18, 215:19, 250:17, 268:12

**corrections** [1] - 8:9

**correctly** [3] - 90:8, 117:22, 162:12

**corroborate** [1] - 12:17

**counsel** [5] - 7:15, 249:1, 258:5, 268:14, 268:15

**country** [2] - 234:4, 235:16

**couple** [11] - 11:2, 49:1, 52:1, 62:11, 65:16, 72:7, 109:9, 153:25, 206:17, 218:18, 241:16

**courage** [1] - 131:6

**courageous** [1] - 122:3

**course** [30] - 32:14, 32:24, 38:16, 54:16, 69:11, 70:20, 71:20, 71:21, 71:23, 71:25, 72:13, 76:8, 78:12, 78:13, 80:24, 80:25, 96:23, 100:4, 109:15, 154:10, 156:6, 159:10, 187:11, 192:18, 205:10, 205:23, 210:15, 217:9, 257:16

**courses** [7] - 9:7, 38:8, 63:22, 73:13, 73:14, 206:6, 210:17

**coursework** [2] - 72:11, 205:15

**court** [4] - 6:18, 6:21, 7:3, 8:4

**COURT** [1] - 1:1

**COVID** [2] - 90:15, 232:9

**coworkers** [1] - 130:5

**craft** [1] - 240:19

**crafting** [1] - 240:23

**created** [8] - 71:17, 71:18, 208:13, 208:19, 208:24, 208:25, 242:18, 253:16

**creates** [1] - 80:8

**creating** [4] - 29:3, 68:15, 230:25, 241:5

**creative** [2] - 100:7, 114:1

**creator** [1] - 29:7

**Credential** [2] - 229:10, 229:21

**credential** [3] - 92:17, 92:18, 92:21

**credit** [1] - 221:1

**critical** [1] - 231:13

**criticism** [1] - 228:11

**crying** [6] - 128:23, 129:2, 130:15, 130:24, 194:3, 194:9

**Cs** [1] - 162:2

**cultivate** [1] - 106:3

**cultivating** [1] - 211:14

**Cultivating** [1] - 212:16

**culture** [6] - 120:11, 122:16, 147:10, 175:4, 175:10, 255:17

**curious** [1] - 266:8

**current** [4] - 5:15, 10:4, 211:10, 226:10

**curriculum** [1] - 78:6

**customer** [1] - 9:2

**cut** [1] - 11:10

**cycle** [2] - 55:23, 56:2

**cycles** [1] - 85:4

**D**

**d-a-r-r-e-n** [1] - 248:2

**daily** [1] - 154:14

**Darren** [3] - 247:21, 248:2, 251:2

**Dashboard** [1] - 210:10

**Date** [5] - 3:9, 3:12, 3:17, 3:20, 3:24

**DATE** [1] - 269:2

**date** [15] - 27:7, 34:5, 39:22, 66:17, 67:1, 67:19, 77:25, 78:20, 79:5, 82:9, 102:19, 210:25, 211:5, 215:2, 215:3

**dated** [1] - 204:18

**dates** [9] - 24:21, 76:10, 76:15, 77:17, 93:12, 208:25, 211:16, 265:3, 265:21

**Davis** [5] - 49:11, 156:18, 181:7, 184:21

**day-to-day** [8] - 30:22, 31:3, 43:17, 64:18, 166:16, 182:15, 187:4, 225:9

**Dayforce** [9] - 42:1, 42:4, 42:10, 42:17, 42:25, 56:23, 57:2, 111:20, 111:21

**days** [9] - 16:1, 16:6, 16:25, 23:21, 24:8, 76:18, 145:17, 221:14, 241:16

**dead** [1] - 153:5

**deadline** [50] - 15:8, 15:19, 17:3, 17:18, 17:19, 18:9, 19:19, 22:24, 24:9, 26:16, 52:25, 53:12, 61:23, 61:25, 114:5, 114:9, 197:25, 201:15, 202:2, 202:5, 202:7, 202:25, 203:16,

203:24, 207:17, 207:18, 207:20, 207:22, 216:15, 217:4, 217:9, 217:12, 217:14, 218:20, 219:2, 219:19, 226:6, 229:4, 229:16, 237:4, 237:12, 237:18, 238:10, 238:16, 239:9, 239:25, 241:9, 241:20, 242:19

**deadlines** [39] - 11:24, 12:8, 12:18, 14:3, 15:5, 15:12, 16:8, 18:17, 18:20, 19:23, 19:24, 20:17, 25:21, 26:11, 38:2, 40:20, 53:8, 54:21, 62:11, 63:25, 106:9, 113:10, 114:8, 200:1, 201:20, 201:21, 202:3, 204:21, 207:7, 216:23, 217:7, 217:14, 217:16, 218:23, 220:5, 228:20, 238:25, 239:16, 265:4

**dealing** [1] - 22:3

**dealt** [2] - 184:9, 186:20

**death** [1] - 153:6

**debilitating** [2] - 239:4, 239:14

**Deborah** [1] - 31:12

**debrief** [3] - 145:14, 168:3, 177:24

**December** [2] - 47:15, 230:8

**decide** [10] - 68:19, 68:21, 73:13, 76:8, 77:21, 81:25, 82:1, 121:25, 200:8, 223:1

**decided** [7] - 15:7, 15:10, 18:14, 82:3, 124:4, 169:25, 251:13

**decides** [1] - 82:21

**deciding** [1] - 223:16

**decision** [35] - 11:5, 11:7, 11:21, 11:22, 12:1, 12:3, 12:9, 12:17, 13:8, 19:2, 19:6, 20:7, 50:25, 52:4, 52:9, 52:21,

54:18, 57:21, 57:22, 62:9, 64:3, 99:14, 106:11, 107:1, 110:17, 110:20, 113:19, 174:20, 177:8, 197:3, 197:5, 197:8, 197:10, 238:11, 238:12
**decision's** [1] - 209:24
**decision-making** [1] - 174:20
**decisions** [9] - 58:12, 78:25, 166:18, 172:21, 175:19, 185:16, 185:17, 187:19, 199:24
**deck** [2] - 211:12, 244:13
**declined** [1] - 17:16
**DEFAZIO** [14] - 73:24, 74:6, 101:7, 108:17, 111:9, 126:8, 151:23, 176:13, 201:3, 213:23, 235:21, 240:9, 249:5, 264:8
**deFAZIO** [1] - 50:5
**DeFazio** [55] - 2:3, 3:3, 5:6, 5:8, 11:4, 11:20, 19:8, 19:11, 31:9, 33:10, 33:12, 50:8, 50:20, 50:22, 51:20, 51:24, 66:18, 70:22, 74:9, 88:23, 101:13, 108:21, 111:12, 116:11, 116:19, 116:22, 126:14, 147:4, 150:22, 152:4, 160:7, 160:10, 176:6, 176:10, 176:16, 201:7, 214:2, 226:4, 233:5, 233:8, 235:25, 239:19, 240:11, 241:1, 241:17, 241:25, 242:9, 249:8, 255:24, 263:19, 263:23, 264:4, 264:12, 266:15, 267:1
**defend** [1] - 174:11
**Defendant** [1] - 1:8
**DEFENDANT** [1] - 2:11
**defended** [1] - 130:14
**defense** [2] - 128:9,

130:12
**defensive** [2] - 128:23, 131:16
**define** [2] - 179:3, 180:11
**defined** [1] - 79:5
**definitely** [2] - 153:5, 257:11
**degree** [3] - 24:20, 98:15, 115:22
**delay** [6] - 7:11, 82:4, 88:14, 89:21, 210:21, 213:9
**delayed** [8] - 28:10, 28:12, 81:13, 81:15, 81:23, 81:25, 88:16, 89:22
**delaying** [2] - 87:15, 96:23
**delays** [6] - 30:21, 30:24, 88:22, 130:9, 130:10, 209:2
**delete** [7] - 46:2, 47:7, 47:10, 154:11, 154:15, 154:21
**deliver** [5] - 88:6, 100:5, 188:12, 224:9, 232:18
**delivered** [6] - 70:24, 71:15, 72:13, 197:14, 205:24, 226:5
**deliveries** [1] - 232:11
**delivering** [2] - 18:25, 212:14
**delivery** [9] - 60:17, 68:23, 71:10, 75:23, 76:17, 77:1, 92:18, 211:6, 220:14
**demographic** [1] - 147:5
**Denver** [3] - 2:4, 2:8, 2:13
**department** [15] - 87:13, 123:22, 158:19, 158:22, 161:19, 161:22, 176:25, 177:5, 179:17, 184:19, 189:7, 241:6, 242:25, 243:8, 261:5
**depo** [1] - 267:3
**Deponent** [2] - 206:23, 269:20
**DEPONENT** [12] - 11:2, 50:3, 50:14, 50:18, 66:16, 88:21,

116:6, 152:1, 264:2, 264:10, 266:18, 269:2
**deponent** [1] - 269:4
**DEPONENT'S** [1] - 270:1
**deposed** [5] - 6:5, 262:25, 263:1, 263:7, 265:1
**DEPOSITION** [2] - 1:10, 269:2
**deposition** [9] - 1:16, 6:10, 8:8, 8:12, 55:11, 111:11, 267:9, 268:9, 270:3
**depth** [2] - 74:22, 86:18
**described** [3] - 41:11, 153:2, 160:13
**design** [37] - 34:1, 49:1, 51:1, 51:9, 54:2, 54:4, 54:12, 60:23, 65:15, 69:13, 69:25, 70:6, 70:12, 75:25, 76:21, 78:1, 79:16, 79:18, 80:24, 89:13, 102:6, 107:18, 108:6, 113:14, 114:3, 124:8, 134:10, 134:16, 142:25, 191:24, 210:21, 219:5, 225:20, 231:22, 251:3, 251:4
**designed** [4] - 107:15, 137:4, 137:21, 175:9
**designer** [35] - 28:20, 30:6, 32:23, 54:11, 68:25, 69:10, 71:14, 72:16, 77:7, 83:11, 84:21, 93:15, 95:4, 96:15, 106:3, 106:13, 106:17, 106:19, 107:10, 107:15, 108:3, 108:4, 108:16, 175:2, 204:25, 207:8, 208:22, 209:23, 210:20, 211:10, 228:6, 244:3, 246:13, 247:1, 253:22
**designers** [12] - 51:4, 70:9, 70:15, 70:18, 75:25, 82:25, 83:4, 83:13, 109:20, 209:11, 251:15,

252:4
**designing** [5] - 61:11, 72:3, 81:9, 229:24, 231:4
**designs** [2] - 96:1, 96:21
**desire** [2] - 20:22, 21:2
**detail** [2] - 33:24, 137:5
**details** [5] - 62:5, 88:24, 102:17, 208:1, 217:5
**determination** [3] - 124:15, 199:21, 200:6
**develop** [10] - 34:19, 38:8, 74:16, 78:5, 80:9, 95:20, 96:18, 123:3, 123:13, 124:23
**developed** [3] - 20:6, 64:19, 97:13
**developing** [6] - 75:18, 80:21, 87:12, 92:8, 124:2, 125:4
**development** [26] - 9:4, 11:13, 54:5, 65:15, 69:13, 70:1, 70:7, 70:9, 74:14, 76:4, 76:21, 83:5, 83:8, 89:19, 89:23, 90:23, 105:12, 114:3, 124:8, 125:3, 188:19, 191:24, 225:20, 230:17, 249:25, 250:10
**dial** [1] - 178:7
**dial-in** [1] - 178:7
**dictating** [1] - 182:16
**difference** [3] - 108:2, 163:8, 235:20
**different** [25] - 32:11, 40:17, 42:14, 50:19, 53:20, 54:24, 66:2, 70:4, 79:3, 82:6, 115:2, 115:3, 136:8, 147:12, 153:1, 156:25, 167:16, 174:14, 183:6, 183:14, 186:24, 200:21, 210:22, 221:20, 236:12
**differential** [1] - 153:11
**differently** [21] - 118:3, 118:16,

129:20, 130:5, 138:7, 138:13, 138:14, 138:18, 141:6, 146:21, 151:8, 156:25, 167:22, 168:17, 169:3, 169:9, 172:13, 174:8, 188:11, 189:25, 263:17
**differing** [1] - 87:10
**difficult** [3] - 67:8, 97:2, 119:24
**difficulty** [1] - 124:20
**digest** [3] - 76:23, 77:10, 80:10
**Digital** [15] - 26:4, 26:12, 26:15, 27:15, 28:9, 28:14, 31:10, 114:9, 201:22, 211:14, 212:15, 213:9, 222:20, 265:3, 265:23
**digital** [4] - 26:12, 37:19, 113:10, 202:22
**direct** [15] - 36:2, 49:6, 51:12, 93:9, 93:10, 93:20, 94:7, 94:18, 94:24, 95:13, 156:15, 162:6, 228:2, 240:16, 244:15
**directed** [3] - 45:4, 45:15, 46:1
**direction** [3] - 9:21, 143:13, 143:15
**directions** [1] - 75:2
**directive** [2] - 24:22, 159:16
**directly** [14] - 21:19, 49:16, 54:8, 61:15, 100:3, 102:15, 120:7, 149:20, 185:2, 189:15, 190:13, 251:16, 257:9, 258:18
**director** [11] - 9:13, 34:17, 65:12, 75:21, 78:24, 123:23, 124:5, 182:9, 189:6, 189:9, 243:17
**directors** [4] - 49:8, 165:15, 177:3, 179:13
**directs** [1] - 7:17
**disagree** [1] - 105:20

**disagreed** [1] - 142:25
**disagreeing** [2] - 246:1, 246:3
**discipline** [7] - 36:8, 36:15, 36:25, 37:5, 37:22, 48:3, 57:10
**disciplined** [2] - 58:2, 98:18
**disclose** [2] - 121:8, 264:17
**disclosed** [4] - 151:13, 239:8, 239:10, 239:12
**discount** [1] - 47:22
**discourage** [2] - 40:23, 41:1
**discrepancy** [2] - 59:21, 63:10
**discrete** [1] - 165:25
**discriminate** [1] - 262:2
**discriminating** [3] - 199:14, 199:17, 256:21
**discrimination** [20] - 118:9, 157:22, 157:23, 162:22, 167:8, 195:2, 195:8, 195:13, 195:16, 195:20, 243:2, 243:10, 254:12, 254:16, 254:23, 255:1, 256:14, 257:23, 258:25, 261:17
**discriminatory** [3] - 151:17, 173:6, 175:14
**discuss** [7] - 13:7, 18:10, 105:16, 122:7, 132:10, 137:5, 259:15
**discussed** [14] - 6:14, 13:13, 53:13, 114:13, 145:19, 145:23, 173:7, 175:6, 204:25, 206:6, 245:19, 245:21, 261:23, 264:22
**discussing** [1] - 17:18
**discussion** [9] - 3:12, 15:20, 15:21, 17:1, 39:21, 68:1, 113:6, 161:7, 260:25
**Discussion** [1] - 11:19
**discussions** [15] -

12:2, 17:4, 17:7, 17:8, 17:11, 18:2, 19:13, 58:10, 75:20, 175:11, 183:24, 184:5, 216:11, 260:10
**disengaged** [5] - 119:21, 127:2, 233:18, 233:25, 234:10
**disparate** [1] - 16:13
**disruption** [3] - 11:8, 49:22, 73:17
**disruption)** [1] - 50:16
**distressed** [2] - 174:7, 174:17
**distributed** [1] - 178:8
**distribution** [1] - 176:24
**DISTRICT** [2] - 1:1, 1:1
**diverse** [1] - 256:6
**diversity** [2] - 163:5, 166:23
**Division** [1] - 257:24
**division** [2] - 9:5, 161:23
**docket** [1] - 231:11
**document** [13] - 39:24, 40:3, 40:8, 40:17, 43:14, 101:14, 102:20, 110:4, 111:10, 143:1, 206:9, 218:7, 266:13
**documentation** [4] - 41:2, 41:10, 41:12, 43:1
**documented** [10] - 42:16, 42:17, 42:20, 42:21, 56:8, 56:9, 56:22, 57:2, 57:5, 220:24
**documenting** [3] - 40:11, 41:14, 57:3
**documents** [6] - 41:10, 44:12, 55:12, 55:18, 56:5, 56:8
**dominos** [1] - 220:6
**done** [21] - 27:1, 28:17, 47:11, 67:25, 72:11, 85:5, 97:10, 112:18, 149:17, 159:20, 184:17, 185:12, 208:4, 213:16, 223:11, 227:8, 237:10, 237:12, 250:23,

251:15, 263:24
**door** [11] - 39:12, 57:18, 57:20, 93:25, 160:3, 196:24, 220:10, 255:10, 255:13, 255:20, 256:18
**Douglas** [2] - 155:6, 182:23
**down** [25] - 6:19, 19:5, 22:25, 28:2, 79:21, 101:21, 103:11, 103:18, 105:14, 105:18, 112:13, 115:5, 121:19, 126:21, 145:16, 158:18, 158:21, 172:20, 175:20, 185:8, 186:5, 206:5, 231:7, 249:16, 264:23
**download** [1] - 101:5
**downloaded** [1] - 108:22
**draft** [2] - 32:6, 112:14
**drawing** [1] - 238:9
**dream** [1] - 251:8
**driven** [1] - 60:16
**drop** [1] - 176:13
**dropping** [1] - 7:11
**due** [7] - 26:18, 26:25, 27:2, 34:5, 113:11, 229:12, 230:4
**duly** [2] - 5:3, 268:6
**Dunmore** [17] - 155:8, 160:25, 161:13, 162:13, 164:15, 165:5, 165:8, 166:10, 167:7, 167:13, 167:17, 169:6, 170:11, 171:11, 172:10, 178:11, 243:13
**during** [48] - 17:9, 17:14, 21:23, 23:20, 24:7, 25:1, 33:8, 36:15, 46:24, 56:6, 69:17, 72:8, 89:22, 92:7, 95:3, 117:24, 118:18, 119:13, 120:22, 123:5, 129:18, 132:15, 135:7, 138:23, 138:25, 139:5, 139:17, 139:22, 146:17, 151:13, 158:3, 158:10,

166:12, 167:17, 173:24, 179:11, 185:22, 187:6, 187:7, 200:24, 230:24, 231:4, 232:6, 235:1, 235:15, 238:25, 247:13, 259:18
**duties** [3] - 107:9, 107:13, 185:12
**dwell** [1] - 262:20

**E**

**e-learning** [1] - 80:24
**E-Tran** [1] - 267:2
**early** [5] - 123:20, 124:9, 211:16, 212:23, 241:16
**earned** [1] - 34:20
**ebony** [1] - 118:19
**Ebony** [11] - 118:22, 118:25, 136:12, 138:10, 138:11, 148:12, 155:5, 197:14, 217:16, 247:17
**ed** [1] - 78:24
**Eddice** [2] - 155:6, 182:23
**edit** [1] - 220:22
**edited** [1] - 104:24
**editing** [4] - 219:22, 219:23, 220:3, 221:24
**editors** [5] - 219:25, 220:15, 220:20, 221:6, 222:1
**education** [24] - 5:19, 9:12, 48:12, 48:17, 49:12, 73:4, 73:12, 75:13, 75:20, 75:22, 93:12, 96:10, 137:8, 158:20, 160:23, 161:14, 163:14, 167:1, 176:25, 177:4, 184:19, 242:24, 243:8, 245:16
**Education** [2] - 3:16, 177:10
**educational** [2] - 9:13, 68:15
**effect** [3] - 33:8, 118:10, 234:12
**effective** [5] - 41:24, 85:11, 124:6, 251:11

**effectively** [1] - 64:3
**effectiveness** [3] - 44:3, 44:4, 125:8
**efficiency** [1] - 106:2
**efficient** [1] - 252:10
**effort** [2] - 134:3, 255:22
**efforts** [2] - 63:13, 64:10
**eight** [7] - 219:6, 229:1, 230:17, 230:21, 232:3, 233:1, 233:3
**either** [12] - 43:12, 46:1, 46:19, 51:7, 55:13, 65:6, 153:15, 175:14, 191:18, 221:23, 248:6, 251:19
**Elastic** [2] - 211:15, 212:16
**eLearning** [12] - 49:2, 72:3, 72:4, 92:7, 92:13, 92:20, 92:24, 96:18, 156:17, 184:1, 184:22, 229:25
**elevate** [1] - 244:24
**eliminate** [1] - 254:12
**elsewhere** [1] - 210:22
**email** [42] - 16:13, 16:15, 31:23, 39:19, 42:22, 43:9, 43:24, 44:8, 56:13, 108:25, 110:6, 117:13, 176:20, 203:24, 204:16, 204:18, 206:10, 213:2, 214:11, 214:23, 214:24, 214:25, 215:1, 215:8, 218:17, 218:21, 219:16, 221:5, 224:24, 225:7, 226:18, 226:24, 227:10, 227:17, 227:19, 227:25, 236:3, 237:9, 237:16, 237:20, 257:1, 262:17
**Email** [4] - 3:8, 3:16, 3:19, 3:22
**emailed** [1] - 32:1
**emails** [8] - 24:5, 41:11, 41:15, 45:13, 45:16, 56:14, 120:15, 230:12

**emotional** [6] - 123:8, 130:15, 130:17, 169:15, 173:14, 262:8

**empathetic** [2] - 122:17, 132:23

**empathize** [1] - 38:9

**empathy** [5] - 38:10, 128:25, 130:23, 132:16, 194:2

**emphasize** [1] - 196:22

**employee** [39] - 5:23, 18:24, 19:4, 20:1, 35:13, 35:24, 37:7, 37:25, 38:21, 39:15, 39:16, 40:5, 41:8, 42:15, 42:23, 43:9, 43:19, 48:9, 54:20, 55:20, 57:8, 57:15, 82:16, 93:25, 94:5, 105:1, 109:1, 137:1, 150:4, 152:24, 158:15, 183:12, 184:8, 185:7, 186:21, 199:25, 200:4, 243:25, 247:25

**employee's** [3] - 33:18, 217:19, 241:19

**employees** [23] - 9:16, 17:6, 33:2, 34:15, 35:3, 38:15, 41:6, 42:5, 44:7, 48:4, 48:17, 57:9, 93:24, 151:15, 159:2, 169:2, 176:25, 186:8, 217:8, 217:11, 217:13, 217:15, 254:8

**employer** [2] - 5:15, 254:4

**Employment** [3] - 26:8, 211:15, 211:20

**employment** [10] - 8:24, 36:15, 52:5, 91:5, 93:2, 93:4, 110:18, 186:21, 187:7, 197:15

**enacted** [1] - 183:11

**encompassed** [1] - 71:7

**encompasses** [1] - 72:16

**encourage** [2] - 41:4, 94:13

**encouraged** [5] - 64:14, 64:15, 64:16, 157:3, 196:21

**encouraging** [1] - 43:16

**end** [23] - 26:18, 27:3, 37:15, 50:12, 65:2, 69:9, 72:12, 103:7, 109:18, 110:18, 112:12, 113:12, 121:24, 123:19, 178:12, 187:23, 188:10, 193:6, 204:15, 205:6, 207:10, 265:13, 265:14

**End** [1] - 3:6

**end-of-year** [1] - 112:12

**ended** [3] - 129:3, 129:6, 173:17

**energy** [1] - 235:9

**enforcement** [1] - 133:2

**engagement** [4] - 152:25, 176:11, 183:12, 186:21

**enjoyed** [1] - 61:3

**enroll** [2] - 63:22, 64:16

**ensure** [5] - 57:9, 188:21, 206:18, 221:13, 254:7

**enterprise** [2] - 124:7, 211:5

**entire** [7] - 79:22, 93:4, 161:5, 161:22, 163:13, 177:4

**environment** [3] - 232:12, 256:7, 262:19

**episodes** [1] - 174:24

**escaping** [2] - 42:2, 155:10, 220:25

**especially** [3] - 7:9, 171:17, 252:3

**ESQ** [3] - 2:3, 2:6, 2:12

**essentially** [4] - 72:10, 94:8, 162:15, 198:9

**Essentials** [1] - 64:16

**established** [2] - 201:19, 201:22

**establishing** [1] - 202:7

**estimate** [1] - 10:11

**Estrella** [1] - 155:7

**ET** [1] - 143:15

**et** [15] - 22:6, 23:24, 53:9, 74:21, 76:19, 79:1, 124:21, 181:25, 187:1, 202:15, 220:11, 252:5, 252:8, 252:10, 256:10

**ethics** [1] - 168:12

**evaluate** [1] - 200:10

**evaluated** [1] - 57:16

**evaluating** [1] - 34:16

**evaluation** [7] - 33:1, 33:3, 33:13, 33:23, 69:14, 70:1, 70:25

**evaluations** [4] - 34:15, 35:13, 71:3, 74:21

**Evans** [1] - 2:12

**events** [4] - 145:22, 209:20, 209:21, 213:22

**eventual** [2] - 215:14, 216:5

**eventually** [2] - 90:13, 109:14

**evident** [1] - 65:18

**evolve** [1] - 200:16

**evolved** [1] - 200:24

**exact** [10] - 24:21, 27:6, 27:7, 30:23, 39:7, 46:6, 66:25, 93:12, 123:21, 128:6

**exactly** [11] - 16:10, 118:25, 124:14, 125:18, 167:25, 168:21, 194:5, 205:19, 215:22, 218:14, 227:11

**EXAMINATION** [2] - 3:2, 5:5

**examination** [2] - 1:17, 268:6

**examined** [1] - 5:3

**example** [10] - 38:17, 72:25, 74:19, 76:17, 81:16, 85:21, 114:15, 194:17, 211:4, 261:11

**examples** [1] - 81:21

**except** [2] - 112:19, 270:4

**exchange** [1] - 129:18

**exchanged** [1] - 46:22

**exchanges** [1] - 153:25

**excuse** [2] - 128:16, 148:7

**executive** [1] - 75:16

**executives** [1] - 162:8

**exercising** [1] - 53:8

**Exhibit** [46] - 3:6, 3:8, 3:11, 3:14, 3:16, 3:19, 3:22, 4:1, 4:3, 4:7, 4:8, 4:8, 101:8, 101:9, 101:11, 105:14, 108:18, 108:20, 111:11, 126:10, 126:12, 151:25, 152:2, 153:19, 176:14, 176:15, 178:6, 180:22, 180:24, 201:4, 204:3, 206:10, 213:24, 213:25, 215:1, 217:22, 218:6, 226:19, 235:22, 235:23, 240:10, 249:6, 249:7, 264:9, 264:11, 266:4

**exhibit** [10] - 100:20, 152:15, 210:6, 213:2, 226:17, 226:20, 236:1, 237:16, 245:4, 264:7

**exhibiting** [1] - 42:15

**exhibits** [2] - 267:2, 267:6

**EXHIBITS** [2] - 3:5, 4:6

**exist** [2] - 55:12, 56:6

**existing** [4] - 28:14, 28:20, 79:6, 79:24

**expect** [3] - 6:10, 65:24, 66:1

**expectation** [2] - 205:22, 208:21

**expectations** [1] - 228:5

**expected** [4] - 35:7, 39:17, 115:19, 206:1

**expensive** [1] - 252:5

**experience** [8] - 65:25, 108:5, 108:8, 135:13, 143:22, 157:2, 182:16, 247:2

**experiences** [2] - 147:12, 147:13

**expert** [2] - 28:23, 83:3

**experts** [5] - 69:18, 70:19, 82:19,

156:11, 236:10

**expires** [1] - 269:24

**Expires** [1] - 270:17

**explain** [6] - 128:20, 131:17, 172:22, 174:4, 181:24, 200:14

**explaining** [1] - 213:9

**exploring** [1] - 106:5

**exposed** [1] - 129:23

**exposure** [2] - 92:1, 100:12

**express** [8] - 111:1, 119:8, 138:25, 139:6, 139:24, 140:6, 140:14, 156:19

**expressed** [2] - 66:9, 106:9, 125:13, 139:5, 139:8, 141:21, 162:19, 168:25, 186:8

**expressing** [1] - 264:24

**extend** [2] - 230:16, 239:15

**extended** [22] - 19:24, 25:21, 26:11, 26:13, 26:14, 26:16, 26:18, 26:19, 26:20, 27:3, 202:22, 202:23, 202:24, 202:25, 207:7, 207:22, 208:2, 208:9, 228:21, 228:22, 228:23, 239:9

**extending** [3] - 53:8, 208:4, 239:24

**extension** [1] - 230:12

**extensions** [1] - 230:18

**extent** [7] - 22:11, 96:20, 140:10, 189:5, 189:6, 216:4, 226:9

**external** [1] - 46:1

**extracurricular** [1] - 232:22

**extremely** [1] - 131:2, 262:8

**F**

**face** [4] - 187:6, 231:10

**face-to-face** [2] - 187:6, 231:10

**facilitate** [1] - 99:18
**facilitated** [1] - 99:21
**facing** [1] - 73:11
**fact** [11] - 87:2, 120:2, 126:1, 151:4, 151:7, 163:19, 175:24, 196:20, 199:8, 238:14, 242:14
**factor** [3] - 109:17, 123:8, 207:15
**factors** [1] - 81:1
**facts** [7] - 147:13, 175:20, 197:10, 199:23, 200:6, 203:19, 262:11
**fail** [2] - 61:14, 228:17
**failing** [1] - 102:18
**failure** [2] - 156:12, 166:19
**fair** [5] - 10:15, 20:12, 25:12, 91:25, 196:3
**fairly** [3] - 32:5, 58:13, 254:8
**fall** [7] - 76:13, 79:17, 79:18, 220:14, 220:19, 228:24, 243:1
**familiar** [15] - 28:4, 29:24, 31:2, 31:14, 31:15, 137:6, 159:6, 159:7, 209:14, 230:5, 230:6, 241:13, 243:24, 244:9, 266:13
**families** [2] - 132:21, 132:24
**family** [1] - 132:17
**far** [17] - 15:19, 22:5, 41:12, 41:13, 67:4, 76:21, 89:20, 90:25, 108:6, 114:24, 118:3, 129:10, 130:17, 135:1, 153:16, 153:17, 222:1
**Farewell** [1] - 3:8
**farewell** [1] - 110:7
**fashion** [1] - 89:22
**February** [5] - 26:23, 26:24, 110:8, 231:2, 231:6
**Feedback** [1] - 104:7
**feedback** [13] - 35:3, 57:17, 70:25, 75:8, 95:25, 97:4, 97:8, 97:9, 98:1, 98:5, 104:16, 119:10,

161:19
**feelings** [7] - 100:17, 119:2, 135:7, 149:6, 184:9, 261:16, 261:20
**fellow** [1] - 107:20
**felt** [54] - 19:15, 19:17, 58:2, 66:6, 66:8, 96:23, 97:2, 106:18, 117:8, 118:2, 119:20, 119:21, 121:11, 124:5, 128:11, 128:24, 129:19, 130:4, 130:7, 133:4, 138:9, 138:12, 139:10, 140:10, 149:21, 156:2, 157:4, 157:9, 157:10, 164:25, 168:10, 168:11, 168:16, 168:23, 169:23, 181:24, 183:18, 193:6, 193:14, 193:19, 194:12, 194:22, 196:4, 196:8, 200:14, 234:13, 235:3, 246:17, 253:8, 257:10, 257:14, 257:15
**few** [9] - 9:11, 82:14, 101:8, 145:17, 153:25, 173:22, 191:17, 201:14, 222:19
**field** [2] - 82:2, 248:13
**figure** [9] - 102:7, 102:10, 122:15, 137:21, 147:16, 181:10, 192:10, 192:18, 251:25
**filed** [1] - 257:22
**files** [2] - 261:11, 261:12
**fill** [2] - 78:15, 251:4
**filling** [1] - 73:7
**final** [4] - 71:18, 78:19, 110:14, 222:24
**finalized** [1] - 104:17
**finally** [1] - 30:25
**fine** [6] - 34:13, 104:20, 203:11, 203:13, 238:3
**finish** [3] - 13:5, 83:19, 128:13
**finished** [3] - 204:14, 205:5, 206:24

**finishing** [1] - 148:20
**fir** [1] - 89:7
**first** [44] - 5:3, 14:24, 26:4, 52:8, 63:24, 78:18, 91:12, 91:13, 91:20, 107:14, 107:18, 111:17, 112:14, 118:7, 120:25, 121:20, 121:23, 128:13, 129:23, 134:15, 138:5, 144:10, 152:14, 157:5, 163:10, 172:16, 195:5, 203:23, 204:20, 212:25, 214:15, 216:19, 224:15, 227:15, 227:17, 236:17, 237:15, 248:1, 259:2, 259:8, 259:9, 260:21, 262:6
**fit** [3] - 55:2, 151:11, 253:21
**fitting** [1] - 54:20
**five** [6] - 16:1, 16:5, 16:25, 23:21, 24:8, 51:21
**five-minute** [1] - 51:21
**flags** [1] - 241:21
**flair** [1] - 100:7
**float** [1] - 74:13
**Floyd** [1] - 132:5
**Floyd's** [1] - 132:17
**focus** [3] - 64:17, 248:23
**focused** [2] - 64:20, 202:1
**focusing** [1] - 231:16
**folks** [4] - 85:23, 86:10, 112:22, 221:23
**follow** [4] - 7:5, 21:18, 68:17, 129:13
**follow-up** [1] - 129:13
**followed** [1] - 180:22
**following** [7] - 73:14, 133:21, 172:11, 184:18, 185:19, 227:9, 269:4
**follows** [2] - 5:4, 237:1
**food** [1] - 176:7
**FOR** [2] - 1:1, 1:7
**foregoing** [3] - 267:9, 268:12, 270:3
**foremost** [1] - 128:13

**forget** [1] - 261:5
**form** [6] - 40:7, 241:22, 257:13, 262:1, 263:18, 268:11
**formal** [2] - 6:18, 37:8, 37:10, 39:4, 40:8, 40:12, 41:9, 41:10, 41:12, 57:7, 143:5, 192:1
**formalization** [1] - 41:17
**formalize** [1] - 38:17
**formalized** [5] - 37:14, 38:24, 42:25, 57:12, 114:2
**formalizing** [1] - 43:12
**formally** [2] - 38:5, 38:7
**format** [2] - 115:2, 115:3
**formats** [1] - 76:16
**former** [1] - 108:25
**forth** [2] - 43:9, 230:13
**forward** [20] - 13:18, 14:2, 14:4, 15:23, 15:24, 18:11, 20:5, 20:21, 75:17, 99:15, 140:18, 159:11, 193:10, 193:12, 229:3, 234:11, 243:9, 254:16, 262:10
**Forward** [4] - 231:5, 231:17, 231:18, 256:9
**foundation** [7] - 33:9, 147:3, 150:21, 239:17, 240:25, 241:11, 242:7
**four** [31] - 6:2, 13:2, 13:6, 16:12, 16:20, 16:23, 19:24, 25:22, 26:11, 49:5, 69:12, 71:5, 71:7, 71:12, 72:11, 72:13, 72:15, 76:19, 77:8, 80:9, 81:3, 81:23, 107:1, 148:8, 165:25, 209:6, 209:10, 213:8, 213:16, 222:16, 248:14
**four-month** [3] - 71:5, 72:11, 72:13
**fourth** [2] - 103:5, 103:6
**frame** [25] - 16:18,

17:9, 17:14, 23:10, 23:20, 93:13, 102:10, 102:12, 103:3, 123:5, 123:21, 125:1, 135:21, 139:17, 141:12, 161:11, 164:14, 171:10, 179:11, 183:23, 198:21, 200:24, 232:6, 235:2, 242:25
**framing** [1] - 171:12
**Friday** [3] - 227:10, 227:18, 227:20
**friend** [1] - 84:14
**friendly** [1] - 91:21
**friends** [1] - 160:2
**frightened** [1] - 132:25
**front** [5] - 27:9, 27:13, 73:14, 101:14, 222:4
**frustrated** [14] - 117:11, 119:4, 119:5, 119:15, 119:20, 193:2, 196:7, 196:11, 234:2, 234:5, 234:7, 234:15, 246:24
**frustrating** [1] - 185:14
**frustratingly** [1] - 126:22
**frustration** [6] - 117:25, 142:3, 142:5, 143:8, 143:17, 252:7
**frustrations** [3] - 122:7, 128:2, 141:21
**full** [7] - 5:11, 92:17, 134:21, 179:16, 205:14, 205:23, 229:12
**function** [2] - 55:10, 124:8
**funky** [1] - 7:12

## G

**gain** [1] - 108:8
**game** [1] - 220:6
**gap** [1] - 74:18
**geared** [1] - 35:24
**gears** [1] - 32:25
**general** [14] - 37:6, 62:15, 75:13, 78:4, 96:4, 100:1, 124:20, 132:21, 134:10,

138:1, 155:25, 234:5, 248:12, 248:25

**generally** [7] - 36:25, 37:21, 75:13, 78:18, 84:22, 108:2, 192:8
**generated** [2] - 71:13, 77:7
**generates** [1] - 72:20
**generating** [1] - 74:10
**genesis** [1] - 184:7
**George** [1] - 132:5
**given** [21] - 27:25, 68:10, 71:13, 72:5, 72:16, 77:7, 89:21, 117:9, 117:10, 118:14, 130:7, 130:8, 219:6, 222:23, 223:23, 224:17, 228:20, 254:1, 254:19, 255:2, 269:4
**Given** [1] - 266:10
**global** [1] - 11:13
**goal** [3] - 216:20, 216:21, 216:22
**goals** [8] - 9:20, 38:1, 38:2, 38:14, 40:5, 40:10, 54:21, 106:5
**Godmere** [23] - 49:14, 49:15, 49:19, 50:1, 50:11, 51:3, 63:6, 99:22, 137:14, 139:13, 142:9, 142:14, 142:19, 146:19, 146:24, 151:6, 153:9, 178:5, 186:14, 232:3, 232:25, 244:18, 246:1
**goodness** [1] - 10:10
**gotcha** [13] - 22:21, 80:2, 88:7, 93:14, 94:13, 96:11, 101:2, 113:2, 157:21, 159:15, 218:5, 243:24, 250:5
**government** [2] - 10:19, 11:3
**graduate** [2] - 10:6, 10:9
**graduation** [1] - 10:20
**grapevine** [1] - 243:20
**graphs** [1] - 223:9
**gray** [2] - 116:12, 152:9
**great** [18] - 6:4, 8:19,

25:13, 27:15, 50:8, 59:11, 68:20, 101:5, 101:13, 103:21, 111:16, 152:4, 152:14, 162:2, 207:2, 218:9, 236:25, 251:8
**greater** [5] - 81:5, 180:17, 182:21, 207:8, 232:13
**ground** [2] - 185:9, 188:1
**group** [17] - 51:12, 51:13, 52:20, 109:15, 136:22, 139:23, 155:3, 155:4, 155:14, 157:2, 160:23, 176:24, 180:10, 180:17, 202:10, 236:10
**grow** [2] - 106:2, 188:20
**growing** [3] - 35:1, 66:6, 188:22
**growth** [5] - 34:21, 34:22, 35:1, 106:9, 107:7
**guess** [6] - 43:3, 95:4, 112:14, 126:15, 147:8, 209:12
**guide** [1] - 69:19
**guiding** [2] - 43:18, 159:4
**guys** [2] - 94:12, 181:21

## H

**hair** [2] - 149:7, 149:13
**half** [4] - 8:4, 67:3, 226:24, 250:12
**hall** [5] - 131:24, 132:9, 132:11, 132:15
**Hall** [2] - 2:12, 155:8
**halt** [1] - 231:22
**hand** [5] - 102:24, 103:19, 152:15, 204:8, 268:19
**handled** [1] - 263:16
**handling** [2] - 143:9, 192:24
**hands** [21] - 8:6, 51:22, 64:22, 160:21, 161:2,

162:23, 164:9, 164:11, 164:18, 165:11, 165:17, 165:18, 165:24, 166:4, 167:12, 167:17, 168:4, 169:7, 177:15, 177:18, 177:24
**happy** [5] - 120:8, 223:2, 234:2, 235:18, 245:11
**harassment** [2] - 175:5, 175:7
**hard** [2] - 201:15, 267:3
**Harwood** [1] - 5:14
**Hawa** [4] - 156:2, 156:16, 156:17, 187:24
**head** [6] - 7:5, 86:6, 143:13, 177:22, 221:10, 228:15
**heads** [2] - 7:2, 165:16
**heads-up** [1] - 165:16
**hear** [19] - 23:1, 50:1, 50:13, 66:15, 74:2, 86:20, 94:8, 94:19, 95:9, 95:10, 134:10, 136:4, 148:10, 157:13, 169:17, 181:21, 182:13, 182:17, 247:8
**heard** [21] - 86:20, 98:22, 122:11, 129:19, 131:21, 138:6, 145:15, 146:19, 146:23, 148:7, 148:8, 159:18, 163:11, 163:20, 166:14, 166:22, 172:17, 181:22, 234:14, 243:19, 251:22
**hearing** [9] - 73:10, 94:23, 123:11, 144:18, 153:8, 167:19, 171:15, 173:14, 188:10
**heated** [1] - 170:7
**heavily** [1] - 91:5
**held** [12] - 6:1, 8:23, 10:3, 10:4, 11:19, 18:22, 49:23, 61:8, 66:19, 66:20, 131:24, 134:23
**help** [27] - 20:10, 58:20, 58:23, 62:24,

63:13, 64:11, 67:25, 69:18, 83:18, 83:21, 83:25, 85:1, 94:5, 102:19, 134:3, 150:14, 157:16, 158:7, 173:25, 174:2, 188:21, 188:23, 189:7, 207:10, 207:14, 236:14, 252:20
**helped** [4] - 63:18, 63:21, 84:5, 244:21
**helping** [7] - 22:12, 29:4, 43:18, 62:23, 88:5, 187:25, 232:19
**helps** [1] - 84:2
**hereby** [2] - 268:5, 270:2
**hereunto** [1] - 268:18
**herself** [8] - 61:12, 128:20, 131:17, 174:12, 188:18, 208:13, 209:1, 262:1
**Hi** [1] - 227:9
**high** [4] - 169:14, 248:9, 251:21, 251:23
**higher** [1] - 123:24
**highest** [2] - 115:8, 115:10
**highlighted** [3] - 214:8, 214:17, 214:19
**himself** [4] - 62:25, 66:8, 136:4, 255:10
**hire** [4] - 51:6, 65:10, 66:17, 66:25
**hired** [3] - 65:1, 65:22, 66:11
**hiring** [2] - 51:8, 255:19
**Hispanic** [2] - 60:5, 170:12
**hoc** [1] - 80:2
**hold** [3] - 160:4, 225:15, 231:14
**holidays** [2] - 76:15
**holistically** [1] - 188:12
**home** [1] - 5:12
**honest** [3] - 88:10, 145:21, 179:11
**honestly** [1] - 180:2
**hopeless** [1] - 234:11
**hoping** [2] - 18:17, 152:16

**horse** [1] - 153:5
**hostile** [1] - 228:13
**hostility** [2] - 228:10, 228:16
**hosting** [1] - 183:6
**hour** [6] - 8:4, 117:22, 117:24, 221:22, 267:10
**hour-long** [1] - 117:24
**hours** [1] - 221:9
**house** [2] - 46:2, 46:19
**HR** [56] - 3:23, 9:10, 9:15, 9:16, 11:9, 14:23, 21:23, 22:5, 24:14, 24:15, 24:19, 24:25, 26:4, 26:12, 27:15, 28:9, 31:10, 32:13, 35:22, 39:2, 39:6, 41:14, 52:16, 57:20, 58:9, 58:21, 59:21, 64:15, 64:16, 83:6, 87:13, 114:9, 129:14, 145:17, 147:16, 158:17, 173:8, 173:15, 173:20, 175:23, 182:11, 185:22, 186:20, 201:22, 211:15, 212:16, 213:9, 222:20, 223:19, 236:10, 241:6, 242:16, 254:22, 265:23
**HR's** [1] - 26:16
**huge** [3] - 109:17, 235:20
**human** [1] - 257:16
**HUMAN** [1] - 1:7
**Human** [1] - 5:17
**HUNTER** [1] - 2:6
**Hunter** [1] - 5:10
**hunter@
swainemploymentlaw
.com** [1] - 2:9
**hurt** [2] - 149:6, 149:9
**husband's** [2] - 225:13, 255:10

## I

**IC** [1] - 180:10
**icon** [1] - 37:18
**ICs** [1] - 159:12
**idea** [14] - 69:5, 71:13, 72:16, 78:19, 80:3, 170:5, 176:2, 209:8,

214:18, 215:17, 216:6, 220:1, 242:2, 242:3
**ideal** [3] - 77:9, 77:12, 77:14
**ideally** [1] - 209:7
**ideas** [6] - 31:24, 72:20, 74:10, 156:8, 223:1, 223:15
**identified** [4] - 84:4, 84:19, 98:16, 106:1
**identifies** [1] - 64:6
**identify** [1] - 83:21
**imagine** [3] - 6:9, 220:2, 262:8
**immediately** [2] - 58:8, 228:9
**immense** [1] - 117:25
**immigration** [1] - 261:12
**impacting** [1] - 119:18
**implementation** [7] - 69:14, 70:1, 70:14, 70:22, 71:8, 76:25, 205:7
**implemented** [1] - 72:18
**implementing** [4] - 96:2, 97:7, 98:1, 98:4
**implicit** [4] - 174:23, 175:6, 175:15, 176:3
**implied** [2] - 12:1, 198:13
**important** [9] - 7:10, 35:3, 35:9, 35:12, 38:1, 48:4, 234:7, 254:6, 254:10
**impression** [1] - 100:1
**improve** [13] - 20:22, 21:3, 34:23, 34:24, 35:10, 48:5, 63:14, 119:6, 119:10, 122:16, 190:22, 193:10, 193:11
**improvement** [7] - 36:19, 38:18, 38:22, 39:5, 40:4, 40:24, 43:13
**improving** [1] - 37:5
**IN** [1] - 268:18
**in-house** [2] - 46:2, 46:19
**in-office** [1] - 109:14
**in-person** [2] - 14:16, 77:18

**inappropriate** [5] - 120:5, 196:18, 223:6, 223:7, 223:12
**inception** [3] - 68:25, 209:7, 265:13
**incident** [2] - 125:3, 125:7
**include** [1] - 106:23
**included** [3] - 98:9, 98:11, 236:16
**includes** [1] - 210:9
**inclusive** [3] - 175:3, 175:10, 256:6
**incorporate** [4] - 32:8, 32:10, 82:4, 222:22
**incorporated** [1] - 97:4
**incorporating** [2] - 33:4, 96:22
**increasing** [2] - 73:2, 252:2
**independence** [2] - 130:7, 174:16
**independent** [5] - 54:15, 108:16, 118:4, 160:12, 215:8
**independently** [5] - 108:7, 117:9, 121:10, 135:25, 223:11
**indicate** [1] - 102:20
**indicated** [2] - 101:25, 184:12
**indicates** [1] - 126:23
**indicating)** [1] - 64:21
**indirect** [3] - 93:2, 93:16, 95:6
**indirectly** [1] - 95:1
**individual** [6] - 61:4, 99:24, 152:22, 155:4, 159:17, 160:12, 162:5, 163:17, 163:23, 164:17, 165:3, 165:5, 166:3, 166:11, 167:3, 167:4, 167:6, 167:9, 177:1, 178:14, 180:21, 180:25, 188:6, 194:25, 243:7, 250:1
**individual's** [1] - 10:2
**individually** [2] - 150:5, 190:18
**individuals** [6] - 73:19, 74:11, 75:5, 88:13, 190:19,

190:25
**inferences** [1] - 215:24
**informal** [1] - 39:1
**informality** [1] - 6:17
**information** [2] - 30:15, 31:20, 199:6, 203:10
**informative** [2] - 146:1, 183:7
**informed** [1] - 256:6
**initial** [4] - 69:5, 198:23, 208:25, 228:12
**INITIAL** [2] - 3:4, 4:5
**instance** [3] - 41:11, 105:13, 236:17
**instances** [1] - 209:19
**instructed** [2] - 44:21, 44:25
**instrument** [25] - 34:1, 49:1, 51:1, 51:3, 51:9, 54:2, 54:11, 54:12, 60:23, 71:14, 75:25, 93:15, 95:4, 96:15, 102:5, 106:12, 106:17, 107:10, 108:3, 108:4, 134:10, 134:16, 244:2, 246:13, 251:4
**instructor** [12] - 77:10, 80:10, 83:2, 86:5, 87:22, 87:25, 92:18, 107:18, 185:10, 209:14, 212:8, 231:12
**instructor-led** [3] - 92:18, 107:18, 231:12
**instructors** [8] - 66:2, 71:2, 76:23, 77:1, 87:23, 124:21, 202:14, 220:11
**integrated** [1] - 54:6
**intelligence** [1] - 123:8
**intending** [2] - 188:11, 192:17
**intent** [8] - 58:24, 130:17, 131:9, 131:12, 131:13, 131:15, 135:23
**intentioned** [1] - 255:21
**intents** [1] - 18:16
**interactions** [2] -

191:9, 192:22
**interest** [2] - 88:5, 183:20
**interested** [3] - 159:8, 183:18, 268:17
**interesting** [1] - 183:7
**interfere** [1] - 24:23
**interference** [3] - 22:7, 198:17
**interim** [1] - 102:14
**internal** [1] - 51:10
**internet** [1] - 7:12
**interpersonal** [1] - 200:2
**interpretation** [2] - 131:20, 131:22
**interpreted** [2] - 195:24, 225:19
**interrupt** [2] - 7:13, 10:24
**introduce** [1] - 77:22
**investigate** [1] - 25:2
**investigated** [2] - 58:22, 173:8
**investigation** [9] - 100:4, 147:17, 185:23, 185:24, 186:1, 186:20, 187:9, 198:17, 200:22
**Investigations** [2] - 78:12, 92:12
**investigations** [2] - 92:8, 95:21
**Invitation** [1] - 3:11
**invitation** [1] - 126:24
**invite** [2] - 133:18, 187:20
**invited** [1] - 187:18
**involve** [3] - 24:16, 75:14, 78:24
**involved** [27] - 24:23, 28:25, 30:22, 30:25, 31:11, 33:23, 39:2, 57:23, 58:9, 75:6, 75:20, 82:22, 83:23, 84:3, 92:6, 99:24, 106:11, 182:8, 183:2, 189:2, 189:3, 192:2, 198:8, 202:6, 203:2, 229:24, 257:9
**involvement** [1] - 174:15
**involves** [1] - 264:5
**IP** [1] - 85:3
**ISD** [11] - 66:23, 66:24,

135:17, 137:3, 137:9, 139:23, 144:9, 144:25, 145:8, 152:20, 195:1
**isolated** [1] - 186:19
**issue** [12] - 37:25, 43:1, 43:10, 94:9, 97:25, 98:6, 118:16, 136:8, 144:4, 167:15, 169:11, 184:22
**issues** [29] - 20:11, 22:13, 39:3, 42:16, 55:22, 56:2, 56:6, 60:9, 60:11, 67:20, 73:10, 86:7, 87:12, 96:7, 98:8, 99:3, 99:6, 99:10, 99:11, 109:16, 136:7, 136:14, 138:25, 184:23, 186:24, 191:22, 224:18, 244:6, 244:7
**items** [2] - 92:16, 246:5
**iterations** [1] - 70:4

**J**

**Jackson** [33] - 14:23, 17:14, 25:8, 129:21, 134:16, 135:16, 137:14, 144:9, 144:25, 145:8, 145:13, 146:17, 152:20, 153:15, 155:11, 161:3, 161:4, 162:10, 162:11, 172:18, 184:2, 189:2, 191:10, 194:25, 195:5, 198:7, 198:12, 198:13, 214:23, 240:19, 240:23, 260:9, 260:13
**Jackson's** [1] - 177:15
**January** [5] - 26:17, 110:12, 177:11, 201:22, 265:13
**JEANNE** [2] - 1:10, 5:2
**Jeanne** [7] - 1:16, 5:13, 149:8, 227:6, 228:9, 269:2, 270:7
**Jeanne's** [1] - 250:11
**Jeff** [1] - 10:1
**Jennifer** [3] - 1:19,

268:3, 268:22
**Jenny** [4] - 50:5, 51:21, 101:9, 238:6
**Jim** [1] - 10:4
**job** [15] - 43:20, 85:12, 109:14, 115:19, 116:3, 116:5, 116:9, 148:20, 148:22, 148:24, 156:2, 185:3, 251:8, 252:11
**jobs** [3] - 151:1, 179:10, 180:14
**John** [1] - 197:9
**Johnny** [5] - 142:5, 144:1, 146:11, 196:9, 259:21
**joined** [2] - 134:9, 134:14
**Jones** [2] - 247:21, 247:25
**Jones's** [1] - 248:3
**Juan** [1] - 155:6
**judge** [1] - 241:23
**judgment** [1] - 222:21
**July** [13] - 26:19, 29:14, 29:16, 141:13, 161:11, 164:12, 176:20, 177:12, 198:20, 202:23, 212:20, 265:15
**jump** [4] - 13:3, 13:6, 233:9, 236:13
**juncture** [2] - 116:17, 180:19
**June** [29] - 27:5, 29:14, 29:15, 116:24, 126:1, 126:18, 127:20, 129:25, 130:3, 132:2, 132:3, 133:8, 135:2, 135:8, 135:19, 137:18, 139:22, 141:13, 142:11, 144:15, 144:20, 144:22, 155:20, 172:11, 193:25, 233:10, 234:20, 235:7, 235:12
**justice** [1] - 175:1
**justified** [1] - 128:18

## K

**KAITLIN** [1] - 2:12
**Kaitlin** [1] - 74:1

**keep** [14] - 19:1, 64:20, 89:23, 154:9, 160:2, 192:15, 202:1, 208:4, 217:20, 220:5, 220:18, 220:19, 251:5, 252:6
**keeping** [3] - 20:20, 238:17, 252:2
**kept** [3] - 89:25, 130:15, 200:9
**Kevin** [1] - 155:7
**key** [1] - 250:8
**Kim** [23] - 59:5, 63:18, 66:21, 66:23, 67:7, 67:25, 68:4, 95:19, 95:21, 95:25, 96:23, 97:2, 97:7, 97:15, 97:19, 98:16, 98:25, 99:1, 99:22, 102:8, 102:10
**Kim's** [1] - 66:17
**kind** [131] - 6:16, 9:3, 9:21, 12:17, 16:12, 18:11, 30:9, 32:12, 34:1, 43:16, 51:9, 54:25, 64:17, 64:21, 67:14, 67:24, 68:25, 69:4, 72:5, 72:7, 72:10, 72:23, 74:23, 75:3, 76:20, 77:24, 78:2, 78:4, 78:20, 79:25, 84:24, 97:3, 103:25, 104:22, 108:7, 108:8, 108:9, 112:25, 113:16, 114:2, 121:12, 121:13, 123:24, 124:1, 124:3, 124:19, 125:8, 125:20, 128:1, 129:14, 132:18, 133:5, 134:11, 138:19, 145:23, 146:12, 147:10, 147:12, 148:2, 149:23, 153:11, 156:4, 158:19, 159:16, 161:13, 163:18, 164:6, 164:20, 165:16, 165:25, 169:15, 169:25, 172:7, 172:22, 174:14, 175:20, 179:18, 182:3, 182:8, 182:21, 183:22,

185:6, 185:8, 185:10, 186:4, 186:6, 186:19, 186:25, 187:5, 187:7, 187:22, 187:25, 188:12, 188:9, 189:10, 189:11, 189:21, 190:3, 190:18, 191:20, 192:11, 200:11, 202:11, 208:16, 211:8, 211:11, 219:25, 220:6, 228:3, 228:13, 231:21, 234:2, 234:10, 242:19, 243:19, 244:23, 246:3, 253:10, 253:18, 254:3, 256:8, 257:8, 257:18, 261:2, 261:10, 262:21, 263:25
**knocking** [1] - 255:10
**knowing** [2] - 127:17, 238:25
**knowledge** [20] - 38:24, 45:25, 53:20, 73:1, 73:15, 74:14, 76:4, 83:4, 83:5, 83:8, 92:15, 106:5, 114:2, 207:25, 208:19, 212:2, 222:2, 236:8, 244:15, 245:6
**known** [2] - 5:18, 25:9
**KSAs** [2] - 245:4

## L

**Lacey** [12] - 49:11, 75:21, 84:2, 84:4, 87:2, 106:24, 156:18, 162:6, 181:7, 191:11, 191:13, 243:21
**Lacey's** [1] - 161:5
**lack** [3] - 20:23, 97:3, 168:11
**ladies** [2] - 118:2, 128:4
**lady** [1] - 31:12
**Lafayette** [2] - 2:4, 2:7
**Lang** [15] - 59:5, 59:15, 60:6, 63:12, 63:15, 66:11, 95:19, 96:9, 96:19, 98:1,

98:3, 99:5, 99:9, 99:16, 99:19
**Lang's** [2] - 64:5, 96:16
**language** [1] - 215:13
**large** [4] - 48:14, 50:25, 57:13, 180:18
**larger** [2] - 137:8, 155:3
**last** [28] - 23:19, 36:17, 36:20, 37:2, 37:9, 47:13, 49:23, 59:7, 66:15, 66:19, 82:14, 89:18, 110:9, 111:1, 143:25, 161:25, 191:12, 202:12, 210:1, 210:3, 210:4, 214:7, 222:19, 236:1, 240:21, 246:14, 264:1
**late** [6] - 124:10, 125:13, 137:18, 139:22, 198:20, 212:22
**launch** [14] - 77:23, 78:20, 79:3, 79:5, 79:11, 79:13, 79:23, 80:4, 80:18, 80:19, 82:9, 209:16, 211:16, 222:21
**launched** [5] - 37:15, 77:18, 81:13, 209:8, 210:25
**launching** [1] - 78:2
**law** [1] - 133:2
**Law** [3] - 2:7, 211:15, 211:20
**laws** [1] - 91:5
**lawsuit** [7] - 44:12, 45:2, 45:6, 45:16, 258:19, 260:21, 260:22
**lawsuits** [1] - 258:21
**layered** [1] - 164:6
**layering** [1] - 164:21
**lead** [12] - 124:6, 125:23, 146:12, 175:2, 248:20, 248:22, 251:12, 253:1, 253:12, 253:13, 253:17, 253:22
**leader** [2] - 124:2, 178:11
**leaders** [2] - 163:10, 166:16

**leadership** [8] - 37:5, 95:6, 141:23, 163:1, 163:5, 163:14, 165:1, 167:19
**leading** [4] - 15:17, 22:23, 108:7, 190:15
**leaning** [1] - 107:19
**learn** [4] - 64:23, 178:16, 180:20, 203:22
**learned** [6] - 96:7, 164:16, 166:6, 203:23, 204:21, 228:9
**learning** [4] - 80:24, 106:6, 128:19
**least** [3] - 153:24, 173:22, 194:24
**leave** [3] - 109:18, 110:8, 258:8
**leaving** [4] - 143:24, 225:9, 225:12, 252:6
**Lebsack** [1] - 2:3
**led** [4] - 92:18, 107:18, 125:3, 231:12
**leeway** [1] - 117:10
**left** [11] - 83:10, 102:10, 102:24, 105:11, 109:7, 152:8, 258:7, 258:11, 258:13, 259:12, 260:13
**left-hand** [1] - 102:24
**legal** [1] - 236:10
**length** [3] - 95:20, 96:17, 221:15
**lengthy** [1] - 220:2
**lens** [1] - 32:13
**Leslie** [1] - 5:13
**less** [11] - 27:1, 28:17, 80:17, 86:3, 99:12, 168:13, 234:9, 254:22, 254:25, 255:4, 255:25
**lessen** [2] - 235:11, 235:13
**Lessig** [14] - 28:24, 29:8, 29:19, 30:11, 30:14, 84:5, 84:16, 85:22, 89:1, 192:4, 211:20, 223:23, 224:7, 238:20
**lesson** [1] - 227:21
**letter** [7] - 47:10, 240:6, 240:20, 240:23, 241:8, 241:19, 266:5

**Letter** [1] - 4:3
**letters** [1] - 241:14
**letting** [4] - 22:4,
150:5, 186:1, 237:1
**level** [23] - 34:17,
35:24, 37:11, 51:9,
65:12, 65:13, 65:25,
104:12, 108:6,
115:11, 120:12,
123:24, 123:25,
125:10, 138:20,
151:1, 174:15,
175:23, 185:4,
185:5, 185:9,
228:18, 248:9
**levels** [1] - 115:23
**Lewis** [1] - 155:8
**life** [3] - 182:15, 252:8,
253:5
**light** [1] - 173:8
**likely** [5] - 42:21,
77:23, 254:23,
254:25, 255:25
**limited** [1] - 56:7
**line** [1] - 92:25
**LINE** [1] - 269:6
**lines** [13] - 39:23,
48:2, 86:21, 148:19,
160:1, 166:14,
167:23, 168:21,
170:14, 170:25,
173:2, 174:17,
194:10
**Link** [1] - 10:5
**list** [8] - 11:11, 31:18,
52:20, 63:3, 176:24,
245:23, 247:15,
247:16
**listed** [4] - 51:13,
155:15, 189:19,
191:15
**listen** [6] - 93:22,
121:1, 157:13,
157:19, 200:13,
200:14
**Listen** [1] - 140:11
**listened** [1] - 122:19
**listening** [1] - 123:7
**live** [5] - 68:23, 70:23,
71:1, 72:1, 80:25
**lived** [2] - 109:9,
109:10
**lively** [1] - 235:9
**Liz** [26] - 49:11, 51:16,
75:21, 84:2, 84:4,
87:2, 87:6, 88:8,
106:24, 156:18,

161:5, 165:15,
168:25, 181:7,
183:25, 185:6,
185:7, 185:15,
187:25, 189:6,
189:8, 191:13,
192:1, 202:10,
202:17, 243:21
**LLC** [3] - 2:3, 2:7, 2:12
**located** [1] - 109:10
**locked** [1] - 255:10
**long-term** [1] - 106:4
**look** [48] - 32:12, 38:5,
44:11, 45:8, 45:9,
46:14, 47:16, 51:7,
61:18, 68:16, 69:1,
69:3, 69:5, 70:12,
72:22, 72:25, 73:5,
73:9, 74:22, 75:3,
76:14, 76:16,
103:11, 105:18,
105:21, 108:15,
112:3, 114:21,
115:1, 124:1,
124:14, 150:25,
177:9, 177:12,
189:22, 204:2,
209:25, 213:1,
213:12, 220:23,
222:16, 226:9,
226:17, 227:4,
227:24, 235:25,
263:25, 266:13
**looked** [4] - 76:12,
115:3, 143:1, 199:23
**looking** [28] - 27:8,
74:21, 102:25,
103:25, 105:20,
107:11, 124:3,
125:8, 125:10,
153:19, 190:3,
200:6, 206:5,
213:11, 213:12,
213:13, 215:7,
219:13, 222:6,
236:18, 244:13,
251:2, 251:3,
252:12, 253:10,
261:10, 261:12,
263:15
**looks** [8] - 103:12,
111:19, 176:19,
177:3, 178:10,
214:10, 249:13
**looming** [1] - 238:25
**loop** [1] - 238:17
**losing** [1] - 204:7

**loss** [1] - 109:16
**Lou** [12] - 28:24, 30:5,
84:5, 84:16, 85:13,
87:8, 88:8, 192:4,
209:4, 226:2, 237:10
**loud** [1] - 238:5
**low** [3] - 159:9,
160:18, 160:19
**lower** [5] - 51:9,
115:11, 139:10,
142:15, 204:8
**lower-level** [2] - 51:9,
115:11
**Lowrey** [1] - 2:3

# M

**m-a-r-r-o-q-u-i-n** [1] -
59:8
**mail** [1] - 47:21
**majority** [2] - 10:16,
173:18
**malicious** [2] -
131:13, 131:15
**manage** [8] - 42:11,
108:10, 125:14,
125:18, 156:4,
251:16, 253:9
**managed** [2] - 64:1,
209:1
**MANAGEMENT** [1] -
1:7
**management** [41] -
9:7, 33:6, 37:11,
40:10, 41:18, 41:20,
42:6, 42:9, 42:18,
56:24, 65:14, 67:13,
72:4, 93:21, 95:22,
97:17, 98:12,
105:25, 111:2,
111:21, 123:14,
125:10, 139:3,
139:7, 139:24,
140:6, 142:10,
142:20, 143:19,
151:2, 166:16,
166:24, 174:20,
174:25, 184:19,
185:10, 186:9,
186:17, 187:23,
248:7, 252:15
**Management** [1] -
5:17
**Manager** [2] - 37:13,
104:7
**manager** [64] - 9:1,
9:4, 9:5, 11:12,

20:19, 33:18, 33:23,
34:3, 36:1, 36:25,
42:22, 44:4, 54:22,
54:24, 57:9, 57:19,
57:22, 60:22, 60:25,
61:7, 66:23, 66:24,
75:24, 94:4, 101:19,
102:1, 102:5,
102:16, 104:16,
105:9, 107:19,
107:25, 110:1,
115:16, 118:1,
123:1, 123:4,
124:24, 127:2,
150:13, 150:15,
150:17, 156:1,
156:17, 181:6,
185:4, 185:5,
188:20, 188:22,
189:9, 192:9,
192:11, 192:12,
192:15, 200:3,
205:1, 214:24,
234:8, 240:17,
243:16, 250:13,
251:12, 252:24,
253:2
**manager's** [1] - 57:19
**managers** [21] - 33:25,
37:12, 37:16, 40:23,
42:5, 57:19, 140:17,
155:25, 156:10,
157:20, 162:17,
166:15, 166:25,
174:23, 177:3,
179:13, 181:2,
183:14, 184:9,
184:11, 184:16
**manages** [1] - 87:21
**managing** [11] - 61:4,
84:20, 151:10,
156:3, 156:7, 187:1,
190:14, 199:25,
207:14, 225:10
**mandatory** [1] - 175:5
**manner** [4] - 105:2,
171:25, 173:5,
175:14
**March** [4] - 78:9,
224:10, 225:4, 231:7
**mark** [1] - 101:7
**MARKED** [1] - 4:6
**marked** [13] - 101:11,
108:20, 111:10,
126:9, 126:12,
151:24, 152:2,
176:15, 201:4,

213:25, 235:23,
249:7, 264:11
**married** [1] - 84:14
**Marroquin** [5] - 59:5,
59:12, 59:20, 60:4,
63:9
**marshaling** [1] - 29:20
**material** [1] - 212:8
**math** [1] - 148:24
**matter** [11] - 6:22,
28:23, 38:16, 69:18,
70:19, 82:19,
154:10, 156:11,
163:18, 173:6, 217:8
**matters** [1] - 268:8
**mean** [7] - 28:18,
71:25, 76:10, 78:20,
216:24, 235:6, 261:8
**meaning** [6] - 7:24,
185:3, 197:17,
211:5, 253:18,
256:17
**means** [3] - 12:13,
115:18, 116:3
**meant** [6] - 82:8,
149:21, 167:20,
215:22, 233:21,
250:24
**mediation** [17] - 17:5,
17:16, 19:5, 20:2,
20:8, 20:16, 21:5,
21:20, 22:6, 22:14,
25:4, 58:22, 99:1,
99:19, 99:21, 99:24,
186:2
**mediator** [1] - 68:6
**meet** [29] - 15:5, 15:8,
15:11, 17:19, 18:8,
18:16, 19:18, 20:17,
30:25, 37:25, 38:2,
53:12, 93:19, 105:9,
122:6, 133:14,
134:2, 150:5,
159:12, 164:15,
181:1, 200:11,
216:14, 216:23,
217:7, 217:9,
218:23, 259:4, 259:7
**meeting** [136] - 12:3,
12:5, 12:11, 13:7,
14:16, 16:20, 16:23,
17:24, 19:25, 68:3,
91:13, 91:15, 91:18,
91:22, 106:9, 114:5,
120:22, 126:2,
126:23, 127:11,
127:13, 127:20,

129:5, 129:13, 129:15, 129:21, 129:25, 130:3, 133:7, 133:10, 133:13, 133:16, 133:19, 133:25, 134:14, 134:15, 134:20, 134:23, 135:1, 135:3, 135:8, 135:15, 135:23, 137:3, 137:7, 137:13, 138:4, 138:5, 138:23, 139:1, 139:5, 139:22, 142:11, 144:9, 144:17, 144:25, 145:7, 145:10, 145:14, 146:17, 148:6, 153:1, 155:1, 155:13, 155:23, 155:24, 156:22, 157:7, 157:10, 158:10, 158:11, 160:11, 160:14, 160:16, 160:20, 160:21, 161:2, 161:16, 161:21, 162:20, 162:23, 163:7, 163:21, 163:23, 164:6, 164:9, 164:12, 164:16, 164:18, 164:23, 165:3, 165:9, 165:11, 166:2, 166:4, 166:9, 166:12, 166:14, 167:8, 167:12, 167:17, 168:3, 168:8, 168:20, 169:7, 169:8, 177:15, 177:24, 178:12, 178:13, 178:17, 178:18, 178:20, 178:24, 179:12, 179:14, 179:15, 179:17, 179:19, 180:3, 180:22, 181:6, 182:7, 182:20, 182:22, 183:1, 184:2, 187:18, 193:24, 194:25, 195:9, 202:10, 202:16, 217:20, 262:5

**Meeting** [2] - 3:11,

177:10

**meetings** [34] - 16:13, 23:24, 24:5, 40:9, 40:19, 94:10, 134:10, 136:23, 141:17, 160:24, 165:19, 166:1, 176:12, 179:11, 179:22, 181:8, 181:9, 182:9, 182:10, 183:7, 183:11, 183:23, 184:5, 184:8, 184:18, 185:19, 185:21, 187:4, 187:14, 189:14, 190:12, 192:21, 193:21, 232:11

**Meetings** [1] - 3:17

**Melius** [3] - 1:19, 268:3, 268:22

**member** [2] - 232:7, 232:17, 234:18

**members** [8] - 132:10, 183:8, 223:3, 231:11, 231:19, 232:8, 232:20, 236:11

**memory** [1] - 265:3

**mention** [4] - 13:21, 118:19, 157:22, 157:23

**mentioned** [22] - 11:25, 22:22, 44:6, 52:9, 58:16, 71:6, 82:18, 86:11, 88:7, 98:3, 119:3, 135:5, 135:16, 142:8, 144:8, 150:3, 161:12, 177:25, 191:11, 191:12, 196:16, 251:21

**mentioning** [1] - 118:5

**message** [7] - 46:16, 155:2, 158:6, 176:23, 177:8, 178:6, 188:12

**messages** [18] - 44:11, 45:1, 45:5, 46:22, 47:2, 47:5, 47:8, 56:14, 56:16, 56:17, 152:5, 153:19, 153:21, 154:2, 154:6, 154:9, 154:15

**Messages** [1] - 3:14

**met** [32] - 5:7, 6:8,

18:20, 19:23, 67:24, 91:20, 134:8, 160:22, 161:1, 161:4, 163:25, 164:3, 164:19, 165:5, 165:8, 165:14, 165:24, 166:3, 166:10, 180:3, 180:7, 180:17, 181:16, 181:19, 182:20, 192:2, 199:1, 259:1, 259:3, 259:4, 259:5

**microaggressions** [2] - 147:23, 148:13, 150:3

**micromanage** [1] - 156:23

**micromanaged** [6] - 118:3, 128:3, 130:8, 140:11, 146:25, 158:8

**micromanagement** [2] - 138:20, 156:23

**micromanaging** [9] - 117:7, 150:4, 150:11, 150:12, 150:14, 150:17, 150:18, 151:4, 151:5

**mid** [4] - 137:18, 139:22, 225:8, 230:12

**mid-August** [2] - 225:8, 230:12

**middle** [1] - 169:24

**might** [73] - 16:1, 41:14, 43:24, 43:25, 55:12, 63:4, 67:23, 69:11, 70:10, 70:11, 72:25, 73:12, 74:19, 74:24, 76:4, 76:17, 76:18, 76:24, 79:16, 79:18, 81:4, 81:9, 81:17, 81:24, 81:25, 82:1, 83:3, 84:12, 104:25, 105:1, 105:8, 105:9, 106:18, 108:12, 117:21, 122:18, 132:13, 134:9, 134:19, 134:23, 139:20, 142:21, 147:24, 148:9, 149:16, 159:24, 163:25, 165:12, 165:14, 167:22, 168:19, 171:2,

179:8, 182:10, 182:24, 188:10, 189:24, 189:25, 202:9, 211:3, 211:4, 211:8, 211:10, 216:18, 221:21, 221:22, 244:21, 251:1, 257:9, 257:14, 261:3

**Mike** [27] - 14:23, 17:13, 25:7, 129:21, 134:15, 134:20, 135:16, 135:24, 144:9, 144:25, 145:7, 146:17, 152:20, 155:11, 161:3, 161:4, 162:10, 162:11, 172:18, 177:15, 184:2, 189:2, 194:25, 195:3, 195:5, 214:23, 260:12

**Mills** [14] - 137:14, 140:14, 142:10, 143:7, 143:18, 146:18, 146:24, 151:5, 153:10, 186:14, 230:20, 230:22, 231:1, 246:2

**mills** [5] - 140:19, 140:20, 141:1, 142:6, 247:21

**Milton** [2] - 86:5, 86:11

**mind** [12] - 31:7, 85:25, 87:6, 102:8, 116:8, 153:10, 173:1, 182:4, 200:9, 217:4, 229:14, 250:16

**minds** [1] - 93:23

**mindset** [3] - 173:1, 189:10, 241:24

**minute** [1] - 51:21

**minutes** [1] - 263:24

**mirror** [1] - 189:22

**misrepresented** [1] - 59:23

**miss** [3] - 169:17, 217:12, 220:13

**missed** [18] - 11:10, 11:23, 12:8, 12:18, 14:3, 16:8, 17:2, 62:11, 63:24, 217:13, 217:14, 217:16, 225:5,

229:16, 237:17, 238:10, 241:10, 241:20

**missing** [3] - 61:23, 155:9, 220:5

**mission** [1] - 256:4

**misspeaking** [1] - 45:9

**mistakes** [3] - 192:13, 192:16, 192:24

**mistranscriptions** [1] - 8:9

**misunderstandings** [1] - 200:3

**mode** [2] - 128:9, 130:12

**model** [7] - 68:17, 114:17, 114:18, 114:22, 115:8, 115:10, 254:4

**models** [1] - 159:3

**modules** [2] - 226:5, 226:12

**Mohamed** [135] - 2:17, 4:3, 11:6, 15:1, 17:2, 17:19, 18:8, 19:18, 20:10, 20:15, 21:2, 21:10, 21:15, 21:19, 22:3, 22:13, 22:17, 22:24, 23:12, 24:9, 25:10, 25:25, 27:25, 29:6, 29:21, 30:11, 32:18, 46:23, 53:5, 53:16, 53:20, 54:7, 55:21, 58:1, 82:16, 91:14, 96:17, 97:7, 98:4, 98:19, 99:20, 99:23, 100:9, 106:12, 113:7, 113:23, 114:8, 114:15, 116:23, 118:18, 119:4, 119:9, 119:16, 120:6, 120:18, 121:25, 126:1, 126:3, 127:7, 127:21, 129:7, 130:3, 133:8, 133:17, 133:23, 134:7, 135:2, 135:6, 136:6, 137:14, 144:10, 144:20, 144:21, 146:18, 146:20, 151:5, 152:6, 153:9, 153:20, 154:1, 157:1, 157:21,

159:21, 172:12,
186:10, 186:19,
192:25, 193:19,
194:19, 195:1,
195:7, 195:11,
195:15, 195:19,
196:14, 198:10,
198:25, 199:8,
199:18, 200:19,
201:16, 203:17,
203:23, 204:21,
206:10, 207:4,
208:9, 211:13,
213:3, 213:8,
216:14, 218:23,
224:24, 225:10,
226:25, 230:11,
233:11, 236:4,
236:18, 237:1,
238:15, 239:3,
240:15, 241:9,
243:2, 243:9,
256:22, 257:1,
257:22, 259:11,
259:14, 260:17,
260:18, 263:16,
266:6
**MOHAMED** [7] - 1:4,
3:10, 3:13, 3:15,
3:18, 4:4, 152:16
**Mohamed's** [28] - 5:9,
23:18, 46:12, 52:5,
56:1, 56:23, 93:1,
94:25, 96:7, 98:9,
98:23, 100:2,
111:16, 112:12,
113:19, 116:16,
118:15, 137:23,
152:11, 190:25,
218:17, 222:7,
222:15, 234:22,
240:5, 245:24,
260:9, 260:16
**moment** [7] - 11:18,
101:1, 101:6, 160:4,
170:7, 176:11,
219:10
**moments** [1] - 82:15
**money** [1] - 72:6
**month** [9] - 65:16,
65:21, 71:5, 72:11,
72:13, 204:15,
209:6, 209:12, 230:3
**months** [30] - 65:20,
69:12, 71:7, 71:12,
72:15, 77:2, 77:4,
77:5, 77:8, 77:10,

77:13, 77:14, 77:15,
80:4, 80:9, 80:10,
80:18, 81:3, 81:23,
109:9, 209:13,
219:6, 229:2,
230:17, 230:21,
232:3, 233:1, 233:3,
246:20
**morning** [4] - 5:7,
205:6, 216:10,
242:18
**MORRIS** [2] - 1:10, 5:2
**Morris** [17] - 1:16, 5:7,
5:13, 11:5, 19:12,
50:2, 51:25, 66:15,
116:22, 160:10,
176:10, 201:24,
219:8, 233:8, 264:4,
269:2, 270:7
**Morris's** [1] - 74:7
**Morrison** [1] - 149:16
**mortified** [1] - 261:25
**most** [15] - 18:2,
43:22, 73:7, 83:12,
85:3, 85:17, 89:3,
92:16, 148:4,
162:15, 183:4,
209:10, 222:22,
223:25, 235:4
**mostly** [1] - 56:13
**mouth** [1] - 144:7
**move** [21] - 13:18,
15:23, 15:24, 20:5,
20:10, 54:4, 54:21,
54:24, 61:1, 64:2,
75:17, 80:15, 85:19,
99:15, 124:4, 189:8,
229:3, 232:10,
247:1, 247:2, 262:10
**moved** [9] - 9:2, 9:3,
9:9, 9:12, 93:12,
143:16, 146:11,
211:1, 245:16
**moving** [15] - 13:18,
14:2, 14:3, 14:4,
18:11, 20:21, 29:21,
53:20, 64:24,
140:17, 228:24,
234:11, 253:1,
253:21, 261:5
**MS** [43] - 5:6, 19:8,
31:8, 33:9, 33:10,
50:5, 50:8, 50:20,
51:20, 73:24, 74:2,
74:4, 74:6, 101:7,
108:17, 111:9,
116:19, 126:8,

147:3, 150:21,
151:23, 160:7,
176:6, 176:13,
201:3, 213:23,
233:5, 235:21,
239:17, 240:9,
240:25, 241:11,
241:22, 242:4,
242:7, 249:5,
263:18, 263:23,
264:8, 266:15,
266:22, 267:1, 267:5
**multiple** [1] - 12:2
**murdered** [1] - 132:6
**muscle** [1] - 192:15
**must** [1] - 245:17
**muted** [1] - 74:1
**muting** [1] - 31:7

### N

**NAME** [1] - 269:2
**name** [13] - 5:8, 5:11,
42:2, 59:7, 101:19,
103:14, 103:21,
104:3, 109:3,
161:25, 191:12,
248:1, 261:14
**named** [5] - 28:24,
31:12, 243:25,
261:16, 261:21
**names** [3] - 49:10,
86:1, 156:5
**nappy** [2] - 149:7,
149:13
**narrative** [2] - 113:1,
116:12
**natural** [1] - 106:3
**nature** [14] - 24:6,
44:1, 80:6, 118:4,
130:10, 143:5,
147:24, 185:10,
187:21, 188:13,
192:4, 212:12,
248:12, 253:23
**navigate** [2] - 212:10,
236:14
**nearing** [1] - 153:5
**nearly** [1] - 263:24
**necessarily** [1] - 57:2
**Nedelkovski** [3] -
243:25, 245:2,
245:12
**Nedelkovski's** [1] -
244:18
**need** [37] - 7:18, 8:2,
10:23, 18:19, 18:21,

25:16, 34:23, 35:10,
38:4, 38:6, 38:14,
39:22, 41:16, 43:19,
55:18, 73:4, 81:2,
81:5, 81:9, 81:10,
81:14, 81:18, 82:12,
124:3, 148:10,
170:9, 190:10,
212:9, 212:10,
220:3, 220:17,
220:20, 221:18,
232:14, 237:19,
267:1
**needed** [17] - 18:23,
63:24, 64:1, 124:4,
125:9, 133:13,
151:2, 192:18,
202:12, 205:14,
210:21, 228:25,
229:3, 239:13,
252:10, 252:15
**needing** [1] - 158:7
**needs** [8] - 8:6, 18:25,
51:11, 81:15, 83:25,
93:24, 236:14,
237:10
**negative** [1] - 94:14
**negotiated** [2] - 202:4,
203:17
**neighborhood** [2] -
59:14, 92:10
**network** [1] - 84:13
**never** [9] - 44:20,
44:25, 98:17,
125:17, 143:4,
153:20, 197:16,
212:8, 260:2
**new** [14] - 33:4, 33:5,
41:22, 77:22, 82:3,
124:20, 156:8,
214:1, 217:25,
228:25, 238:20,
238:23, 253:18,
253:21
**newer** [1] - 192:12
**next** [15] - 65:20,
79:22, 105:12,
122:1, 122:5, 126:5,
126:6, 126:13,
129:14, 133:9,
133:13, 146:2,
160:17, 193:16
**nice** [1] - 154:16
**niche** [1] - 54:3
**Nick** [53] - 11:14,
13:12, 13:22, 13:25,
14:15, 16:16, 17:21,

18:2, 18:7, 19:13,
21:24, 24:20, 46:25,
47:4, 52:14, 52:19,
67:22, 67:24, 75:15,
106:24, 110:21,
146:9, 146:10,
146:14, 159:14,
159:15, 160:22,
187:11, 188:17,
189:2, 190:5,
190:11, 190:12,
190:19, 196:9,
197:9, 206:12,
215:5, 216:8, 227:2,
227:5, 227:9,
227:20, 227:22,
228:2, 238:8,
244:11, 244:13,
244:22, 257:9,
259:4, 259:7
**Nick's** [2] - 160:21,
161:22
**Nicole** [1] - 155:8
**nimble** [2] - 82:8,
208:15
**nobody** [2] - 182:3,
199:12
**noes** [1] - 7:1
**nonnegotiable** [3] -
219:3, 219:19,
219:20
**nonresponsive** [2] -
85:11, 85:21
**nonretaliation** [1] -
39:11
**normal** [1] - 55:23
**normally** [4] - 54:25,
80:12, 126:25,
204:25
**Notary** [1] - 270:14
**Notary's** [2] - 269:23,
269:23
**note** [2] - 180:16,
233:17
**notes** [10] - 27:8,
27:13, 41:13,
120:22, 121:2,
121:16, 121:17,
121:22, 263:25,
268:13
**nothing** [4] - 106:8,
131:3, 139:5, 200:17
**notice** [5] - 74:17,
262:7, 262:25,
263:9, 263:10
**NOTICE** [1] - 1:14
**notified** [2] - 258:17,

263:6
**November** [10] - 5:24,
9:12, 10:21, 59:16,
59:18, 59:19, 65:7,
67:15, 102:9, 230:3
**nuance** [1] - 116:12
**number** [9] - 17:1,
25:10, 103:19,
159:9, 173:9, 178:8,
221:9, 226:21,
251:19
**Number** [11] - 101:11,
108:20, 126:12,
152:2, 176:15,
204:10, 206:9,
213:25, 235:23,
249:7, 264:11
**numerous** [1] - 191:22

## O

**oath** [2] - 6:16, 6:20
**Obi** [7] - 109:8,
109:10, 109:12,
109:20, 110:23,
111:5, 247:24
**Obi's** [1] - 109:15
**Obianuju** [1] - 109:3
**object** [1] - 7:15
**objected** [1] - 73:25
**objecting** [1] - 74:5
**Objection** [1] - 242:4
**objection** [10] - 33:9,
73:23, 147:3,
150:21, 239:17,
240:25, 241:11,
241:22, 242:6,
263:18
**obligation** [1] - 254:3
**observe** [3] - 100:3,
234:19, 234:21
**observed** [1] - 122:21
**observing** [1] - 187:5
**obvious** [1] - 91:22
**obviously** [6] - 76:15,
98:17, 189:15,
221:15, 245:24,
254:2
**occasion** [3] - 194:12,
194:15, 259:2
**occasions** [1] - 66:10
**occur** [7] - 71:20,
81:4, 82:6, 118:14,
135:19, 209:20,
255:1
**occurred** [9] - 29:13,
81:22, 102:14,

123:16, 139:9,
155:19, 165:13,
202:18, 219:14
**occurring** [3] - 55:22,
151:14, 255:7
**October** [9] - 59:19,
65:7, 102:9, 211:16,
212:22, 212:23,
212:25, 229:4,
229:13
**OF** [5] - 1:1, 1:10, 2:2,
2:11, 269:2
**offer** [4] - 78:16,
78:17, 166:17,
182:6, 190:14,
236:10
**offered** [7] - 20:9,
27:17, 72:1, 76:9,
78:6, 182:24, 212:16
**offering** [9] - 28:10,
38:7, 38:8, 69:3,
78:9, 78:13, 78:14,
96:24, 218:22
**offers** [1] - 215:13
**office** [14] - 13:13,
14:1, 14:10, 14:15,
18:3, 67:9, 67:10,
109:14, 109:21,
112:17, 173:14,
173:23, 187:6, 261:2
**officer** [1] - 11:14
**offices** [1] - 231:7
**official** [2] - 110:9
**often** [4] - 7:2, 44:14,
78:16, 154:13
**old** [2] - 47:18, 47:25
**ON** [2] - 2:2, 2:11
**on-site** [1] - 211:7
**onboard** [1] - 62:23
**onboarding** [1] -
231:3
**once** [7] - 27:21,
71:23, 72:3, 76:25,
84:19, 198:7, 217:12
**one** [128] - 5:9, 6:1,
12:3, 12:5, 17:23,
26:10, 26:14, 27:2,
27:6, 29:2, 29:19,
29:22, 32:2, 36:2,
36:22, 40:9, 40:18,
45:17, 50:4, 55:7,
57:22, 61:19, 67:3,
76:18, 81:16, 83:14,
83:25, 84:9, 87:13,
89:18, 92:15, 92:16,
93:9, 93:16, 94:10,
94:18, 94:24, 97:19,

99:5, 101:21,
108:12, 112:20,
114:5, 114:9,
114:18, 114:22,
115:1, 115:11,
115:12, 115:16,
120:15, 121:23,
129:14, 133:20,
136:5, 136:7,
137:20, 140:17,
141:18, 143:13,
144:3, 148:3,
148:11, 148:12,
149:4, 153:2,
155:17, 159:23,
160:4, 166:21,
171:21, 172:17,
173:24, 179:2,
179:15, 180:18,
182:9, 183:5, 183:9,
187:8, 193:4,
193:23, 194:4,
195:4, 195:5, 200:8,
200:14, 204:4,
205:17, 205:21,
211:22, 212:21,
214:1, 217:24,
217:25, 218:1,
218:2, 218:8,
218:12, 219:5,
225:15, 227:12,
227:19, 228:1,
229:2, 232:5, 233:2,
244:10, 249:15,
259:2, 259:22,
260:2, 262:5, 264:5,
264:16, 266:9
**one-off** [1] - 136:5
**one-on-one** [10] -
40:9, 40:18, 94:10,
133:20, 173:24,
182:9, 195:4, 195:5,
259:22, 260:2
**one-on-ones** [2] -
112:20, 172:17
**ones** [8] - 38:25, 39:1,
46:25, 112:20,
154:23, 172:17,
189:15, 202:22
**ongoing** [2] - 37:4,
187:3
**open** [38] - 19:21,
35:25, 39:12, 48:18,
50:23, 50:24, 57:18,
57:20, 93:25,
100:23, 101:5,
101:14, 106:16,

111:15, 119:9,
121:4, 122:19,
123:7, 125:21,
147:16, 156:8,
157:5, 166:20,
176:17, 196:24,
200:9, 214:1, 214:5,
214:6, 229:1,
240:11, 249:10,
253:6, 253:17,
262:18, 264:12
**open-door** [5] - 39:12,
57:18, 57:20, 93:25,
196:24
**opened** [3] - 108:22,
111:13, 249:9
**opening** [4] - 107:2,
111:14, 166:20,
266:9
**openness** [2] -
120:15, 120:20
**operate** [1] - 172:25
**operating** [2] - 108:16,
208:12
**operational** [1] -
202:14
**operations** [4] - 18:11,
75:23, 87:20, 191:24
**opinion** [1] - 131:14
**opinions** [1] - 87:10
**opportunities** [3] -
166:22, 249:25,
250:9
**opportunity** [10] -
7:15, 8:5, 8:7, 8:17,
42:7, 48:5, 106:2,
215:13, 228:20,
251:24
**opposite** [1] - 141:9
**opted** [2] - 21:19,
22:17
**optics** [2] - 252:12,
257:14
**option** [9] - 15:13,
16:8, 17:2, 17:20,
20:10, 54:10, 68:11,
230:14, 230:16
**options** [8] - 53:3,
53:7, 53:10, 114:19,
114:20, 114:24,
115:4, 115:5
**Orakwue** [1] - 109:3
**oral** [1] - 199:1
**order** [2] - 13:15, 20:5
**orders** [1] - 266:25
**organization** [23] -
9:20, 20:3, 20:25,

38:15, 54:3, 66:3,
66:5, 75:4, 75:8,
76:3, 76:7, 100:12,
136:24, 143:25,
174:19, 189:9,
210:22, 211:7,
253:9, 254:11,
254:22, 255:3,
260:13
**organization's** [1] -
255:2
**organized** [1] - 54:19
**orientation** [1] - 6:8
**original** [5] - 32:24,
42:2, 180:9, 208:16,
267:3
**originally** [3] - 29:2,
201:21, 269:4
**otherwise** [2] - 8:3,
268:16
**outcome** [2] - 178:16,
268:17
**outlier** [4] - 63:10,
81:12, 90:7, 90:9
**outliers** [1] - 80:16
**outline** [2] - 34:18,
90:6
**outlining** [1] - 218:13
**outside** [12] - 22:7,
55:22, 56:2, 85:13,
142:10, 172:9,
182:19, 217:19,
225:21, 258:4, 258:5
**outsource** [1] - 50:25
**outsourcing** [4] -
51:11, 211:3,
251:14, 251:17
**Overall** [1] - 3:6
**overall** [5] - 92:25,
113:22, 125:9,
147:9, 159:5
**overcame** [1] - 189:11
**oversees** [1] - 236:8
**oversight** [2] - 20:20,
75:22
**overt** [3] - 147:14,
147:19, 147:21
**overview** [1] - 8:20
**overwhelmed** [2] -
191:20, 253:7
**own** [6] - 27:10, 27:11,
107:15, 122:10,
185:16, 188:19

## P

**p.m** [10] - 160:9,

176:9, 176:20,
233:7, 264:3, 267:10
**paced** [1] - 80:24
**page** [17] - 103:18,
103:20, 152:14,
206:19, 210:1,
210:3, 210:4, 214:7,
218:10, 226:25,
227:25, 236:1,
237:15, 237:16,
249:20, 249:22,
249:25
**PAGE** [2] - 3:2, 269:6
**paid** [1] - 251:7
**palatable** [1] - 130:9
**Papp** [3] - 229:4,
229:7, 247:17
**par** [1] - 41:9
**Parady** [1] - 2:3
**parady.com** [1] - 2:5
**paragraph** [1] - 223:18
**paragraphs** [1] -
222:19
**parent** [1] - 109:16
**part** [25] - 14:23, 51:1,
55:10, 56:21, 74:9,
83:12, 89:13, 90:3,
90:17, 99:9, 99:11,
106:24, 119:1,
170:12, 184:6,
197:5, 209:2, 211:3,
225:4, 235:4,
244:25, 245:1,
245:8, 245:9, 245:10
**participants** [2] - 71:4,
232:7
**participate** [1] - 20:15
**particular** [7] - 45:17,
63:13, 91:4, 105:13,
125:2, 160:16,
184:17
**parties** [2] - 268:8,
268:16
**partner** [1] - 82:3
**parts** [5] - 71:6, 75:8,
222:22, 223:1,
223:15
**pass** [1] - 202:12
**passed** [1] - 202:3
**passing** [3] - 17:12,
173:23, 261:2
**passionate** [1] -
183:16
**past** [1] - 109:11
**path** [1] - 79:15
**Pause** [2] - 225:17,

255:15
**PDF** [1] - 267:5
**pedestrian** [1] -
185:12
**peers** [3] - 18:5,
194:23, 195:9
**pending** [2] - 258:19,
258:20
**people** [92] - 7:2, 7:11,
27:17, 28:1, 28:3,
28:11, 28:12, 35:25,
36:25, 57:18, 59:2,
59:4, 60:25, 61:5,
67:13, 70:10, 71:1,
73:4, 74:21, 75:12,
76:3, 76:4, 78:4,
86:3, 87:3, 93:21,
120:13, 123:14,
124:24, 125:14,
125:18, 128:19,
132:18, 132:19,
132:24, 133:1,
133:2, 133:6, 141:5,
145:24, 146:5,
147:11, 147:24,
148:8, 151:2, 151:7,
155:14, 156:25,
157:11, 159:25,
167:4, 168:16,
169:9, 174:8,
174:21, 174:22,
174:24, 183:15,
188:10, 188:20,
189:1, 189:18,
190:15, 191:17,
191:22, 192:9,
192:11, 192:12,
196:15, 200:3,
231:9, 247:14,
247:16, 248:5,
248:15, 250:13,
251:5, 251:11,
251:19, 252:3,
252:6, 252:24,
253:2, 253:10,
253:11, 254:21,
255:18, 256:5,
256:7, 256:10,
256:15
**People** [2] - 37:13,
167:21
**people's** [1] - 184:9
**Per** [1] - 39:21
**perceive** [1] - 195:7
**perceived** [2] -
128:12, 189:24
**percent** [4] - 145:21,

159:2, 159:4, 225:24
**percentage** [1] -
225:24
**perfect** [3] - 128:18,
171:25
**perfectly** [1] - 203:13
**perform** [6] - 41:16,
62:8, 62:16, 64:12,
185:4, 245:5
**performance** [57] -
33:6, 35:4, 35:20,
36:19, 38:18, 38:20,
38:21, 38:22, 39:5,
40:3, 40:24, 41:3,
41:17, 41:20, 42:6,
42:8, 42:9, 42:16,
42:18, 43:1, 43:10,
43:13, 48:5, 55:22,
56:2, 56:6, 56:23,
56:24, 57:12, 60:8,
60:11, 60:16, 62:21,
62:22, 63:3, 63:7,
63:14, 65:11, 67:5,
67:12, 67:14, 67:20,
94:25, 95:11, 96:6,
98:24, 101:17,
111:21, 116:16,
139:9, 142:15,
143:6, 197:13,
209:3, 244:6, 244:8,
245:1
**Performance** [2] - 3:6,
4:1
**performance-based**
[1] - 197:13
**performance-driven**
[1] - 60:16
**performed** [1] - 151:1
**performer** [8] -
114:16, 114:17,
115:9, 115:12,
115:15, 115:18,
115:25, 116:8
**performing** [7] - 41:9,
54:21, 64:4, 74:23,
74:24, 104:23,
113:23
**perhaps** [8] - 16:14,
17:15, 24:20, 30:7,
39:14, 51:8, 84:15,
176:2
**period** [15] - 7:22,
46:24, 47:3, 47:5,
70:7, 71:5, 72:12,
97:2, 102:14,
111:18, 134:4,
161:8, 209:6, 250:1,

259:19
**periodically** [1] - 40:4
**periods** [1] - 252:17
**Perkins** [3] - 86:5,
86:11, 88:13
**person** [16] - 14:10,
14:16, 16:13, 17:12,
25:17, 62:24, 77:18,
83:21, 86:24,
148:20, 148:21,
149:11, 188:22,
235:8, 246:8
**personal** [6] - 84:7,
109:16, 207:25,
208:19, 242:1, 257:4
**personally** [7] - 25:13,
64:13, 68:12,
151:21, 151:22,
222:3, 257:24
**perspective** [7] -
38:10, 91:6, 105:7,
105:8, 122:18,
171:24, 226:6
**perspectives** [2] -
93:24, 189:24
**phase** [2] - 69:6, 205:7
**phone** [16] - 12:14,
12:21, 13:7, 16:11,
17:13, 43:25, 46:22,
47:11, 47:14, 47:15,
56:18, 121:25,
125:25, 234:25,
235:2, 264:22
**phones** [4] - 47:7,
47:18, 47:25, 117:16
**phrasing** [1] - 187:17
**picked** [3] - 26:23,
26:24, 114:12
**picture** [1] - 84:25
**pie** [1] - 76:20
**piece** [5] - 168:5,
197:14, 197:18,
225:5, 231:13
**pieces** [1] - 80:15
**PIP** [1] - 57:8
**PIPs** [1] - 40:24
**place** [29] - 5:14,
12:12, 33:13, 36:18,
36:20, 36:22, 39:7,
40:11, 42:10, 42:24,
78:3, 82:15, 95:23,
114:15, 131:18,
131:19, 132:23,
161:9, 171:24,
178:13, 178:19,
231:3, 238:20,
253:2, 254:7,

255:17, 255:18,
255:22, 268:10
**places** [1] - 70:10
**Plaintiff** [2] - 1:5, 1:17
**PLAINTIFF** [1] - 2:2
**plan** [19] - 22:12,
36:19, 38:18, 39:5,
40:4, 40:12, 43:13,
51:6, 78:1, 79:22,
80:4, 108:11, 178:7,
186:7, 190:4,
208:13, 208:16,
208:25, 239:1
**planned** [1] - 110:8
**planning** [5] - 9:10,
9:15, 9:20, 198:4,
198:5
**plans** [4] - 38:22,
40:24, 206:5, 232:15
**play** [1] - 199:22
**played** [1] - 145:22
**playing** [3] - 118:6,
123:8, 176:3
**PMQ** [5] - 141:20,
141:24, 143:9,
192:10, 246:4
**point** [102] - 6:9,
16:15, 18:24, 19:2,
19:23, 20:1, 20:25,
22:1, 24:18, 24:20,
25:9, 27:24, 28:13,
29:6, 29:18, 32:2,
36:9, 36:23, 43:22,
46:12, 52:15, 53:14,
54:13, 63:20, 64:1,
67:23, 68:4, 85:15,
89:9, 100:14,
107:17, 110:19,
113:24, 119:21,
121:16, 123:1,
123:2, 123:3,
123:10, 123:14,
129:4, 129:14,
131:3, 135:24,
136:2, 136:22,
139:15, 140:5,
140:24, 143:19,
146:7, 147:15,
149:4, 151:11,
154:5, 156:1,
156:12, 165:5,
165:15, 166:19,
171:6, 173:20,
179:22, 180:18,
181:5, 181:10,
184:16, 184:24,
185:17, 185:25,

192:8, 193:4,
193:10, 193:12,
193:13, 194:4,
196:8, 196:25,
198:18, 201:15,
207:9, 216:9,
216:17, 219:6,
219:21, 224:1,
224:19, 225:8,
226:2, 227:23,
230:15, 231:3,
231:16, 238:12,
239:1, 239:9,
239:20, 239:25,
240:3, 245:18,
247:3, 262:21
**pointing** [2] - 157:20,
200:17
**points** [5] - 69:3,
213:8, 213:14,
213:16, 222:16
**policies** [3] - 39:9,
39:10, 196:24
**policy** [8] - 36:8,
36:15, 39:12, 57:18,
57:20, 93:25,
196:24, 255:22
**Pon** [1] - 10:1
**poorly** [1] - 146:25
**popping** [2] - 18:3,
173:23
**pops** [1] - 13:25
**popular** [6] - 73:7,
78:13, 92:16, 92:19,
92:22, 92:23
**portion** [7] - 103:9,
104:16, 116:13,
214:8, 226:2, 229:25
**posed** [1] - 168:13
**position** [13] - 5:16,
9:14, 9:16, 32:18,
49:23, 50:23, 50:24,
66:19, 106:16,
106:18, 243:18,
253:14
**positions** [9] - 5:25,
6:3, 8:23, 48:15,
48:18, 48:22, 49:1,
49:2, 253:6
**positive** [3] - 94:14,
105:7, 105:8
**possibilities** [1] -
34:22
**possibility** [3] - 18:7,
34:21, 172:5
**possible** [4] - 77:2,
102:13, 182:6,

237:10
**post** [1] - 129:5
**potential** [2] - 100:9,
107:7
**potentially** [2] - 34:24,
216:13
**power** [1] - 217:2
**PowerPoint** [1] -
230:2
**practical** [1] - 236:11
**practice** [1] - 32:22
**practices** [3] - 83:3,
254:7, 254:21
**pre** [1] - 96:12
**predictable** [1] - 67:9
**preemptory** [1] -
242:21
**prefer** [1] - 68:18
**prepare** [1] - 241:14
**preparing** [1] - 241:16
**presence** [1] - 67:10
**PRESENT** [1] - 2:16
**present** [23] - 10:3,
69:4, 70:20, 88:1,
137:4, 137:13,
140:5, 140:8, 145:1,
145:9, 154:20,
161:3, 161:21,
177:16, 178:14,
181:2, 258:5,
258:15, 259:20,
260:4, 260:10,
260:16, 260:24
**presentation** [2] -
32:6, 72:17
**presented** [2] - 33:5,
250:12
**presenting** [1] -
163:16
**presently** [1] - 48:11
**presents** [1] - 90:20
**president** [1] - 5:18
**pressing** [2] - 142:24,
157:1
**presumably** [3] -
42:11, 200:19,
250:17
**presume** [1] - 176:24
**pretty** [3] - 127:3,
220:2, 235:8
**previous** [2] - 41:17,
268:5
**previously** [1] - 201:4
**PREVIOUSLY** [1] - 4:6
**price** [1] - 69:3
**primary** [2] - 44:7,

266:3
**principles** [2] -
120:16, 159:4
**priority** [2] - 210:23,
220:9
**private** [1] - 164:5
**privy** [3] - 111:5,
197:3, 241:3
**problem** [5] - 53:17,
83:20, 85:14, 201:12
**problematic** [1] -
207:5
**problems** [1] - 108:12
**procedure** [4] - 1:15,
33:13, 242:15,
255:22
**proceeding** [4] - 6:18,
31:3, 153:22, 225:21
**proceedings** [2] -
225:17, 255:15
**proceeds** [1] - 6:22
**process** [47] - 21:23,
21:24, 21:25, 22:1,
22:2, 22:4, 24:24,
33:1, 33:3, 33:4,
33:6, 33:24, 34:9,
35:17, 56:22, 57:7,
57:12, 57:14, 58:11,
58:15, 58:16, 58:17,
58:22, 68:14, 69:1,
71:6, 72:5, 72:9,
82:7, 82:13, 89:19,
106:25, 113:4,
113:14, 132:10,
137:5, 174:5,
175:18, 196:23,
198:16, 198:17,
200:7, 205:6,
207:10, 207:12,
231:4, 260:22
**processes** [2] - 33:17,
241:4
**produce** [2] - 68:22,
69:10
**product** [10] - 69:1,
77:9, 80:9, 92:2,
92:7, 92:13, 100:2,
100:6, 205:8, 244:18
**profession** [3] - 72:24,
73:18, 251:4
**Professional** [3] -
1:20, 268:4, 268:23
**professional** [3] - 9:4,
188:19, 235:5
**professionally** [2] -
25:14, 35:1
**Program** [1] - 3:23

**program** [84] - 27:16,
27:20, 28:14, 28:17,
28:21, 29:3, 30:2,
30:12, 30:16, 31:10,
31:11, 31:21, 32:12,
37:12, 37:14, 48:23,
64:16, 68:15, 69:3,
69:8, 70:13, 71:11,
71:18, 72:7, 73:12,
74:20, 76:25, 77:22,
78:5, 79:2, 81:13,
84:25, 85:8, 87:12,
87:25, 88:17, 89:6,
89:15, 89:17, 89:23,
90:2, 90:19, 90:24,
91:4, 92:7, 92:19,
92:20, 95:21, 96:18,
97:10, 97:12, 98:5,
107:14, 107:18,
113:11, 114:5,
175:4, 197:20,
198:2, 203:1, 208:3,
208:10, 209:8,
209:14, 210:25,
211:15, 212:14,
213:10, 221:7,
221:15, 222:20,
223:24, 224:10,
226:14, 229:12,
230:24, 231:14,
232:25, 236:19,
237:4, 237:9,
238:19, 238:21,
261:13
**programming** [2] -
76:13, 79:21
**programs** [53] - 9:13,
15:6, 18:22, 19:20,
19:21, 20:6, 20:20,
28:5, 60:21, 61:11,
61:13, 63:23, 64:19,
69:19, 72:21, 74:23,
75:22, 77:17, 78:24,
79:22, 79:25, 80:17,
81:22, 84:23, 85:3,
88:14, 92:24, 97:5,
175:9, 201:17,
202:11, 204:14,
205:4, 205:23,
207:9, 209:19,
216:23, 217:1,
219:5, 220:1,
221:24, 228:24,
229:2, 231:10,
231:12, 231:13,
231:16, 232:10,
232:19, 236:14,

237:18, 238:10,
239:16
**progress** [8] - 20:3,
40:12, 68:4, 68:5,
121:11, 197:21,
207:9, 234:15
**progressing** [1] - 40:6
**progressive** [5] - 36:7,
36:14, 36:25, 37:22,
48:3
**project** [49] - 26:17,
27:25, 28:25, 29:7,
29:15, 29:20, 29:22,
30:22, 31:3, 40:10,
81:5, 81:6, 81:17,
81:24, 82:1, 82:4,
82:22, 83:15, 87:15,
89:3, 95:22, 97:17,
97:21, 97:22, 98:12,
105:24, 108:7,
108:11, 141:20,
150:6, 206:5,
207:14, 208:12,
211:11, 220:17,
229:5, 229:8,
229:20, 230:16,
230:21, 230:23,
232:2, 232:15,
244:10, 244:22,
246:4, 265:12,
265:23
**projects** [15] - 25:24,
53:5, 61:8, 62:12,
86:19, 151:11,
183:15, 211:13,
219:2, 219:19,
225:11, 228:25,
229:1, 232:23,
246:18
**promise** [1] - 7:24
**promised** [1] - 211:6
**promote** [2] - 106:12,
106:20
**promoted** [4] - 102:5,
102:12, 107:8,
246:19
**promoting** [1] -
106:21
**promotion** [2] -
106:25, 246:20
**proper** [1] - 220:25
**properly** [1] - 245:2
**prospects** [1] - 234:11
**proud** [1] - 131:4
**provide** [7] - 31:18,
35:16, 41:5, 197:23,
208:6, 229:5, 230:19

**provided** [5] - 46:18, 90:18, 230:2, 240:14, 266:7
**provides** [1] - 35:19
**providing** [6] - 30:15, 34:14, 35:17, 90:4, 90:22, 113:13
**provoked** [1] - 127:16
**Public** [1] - 270:14
**pull** [6] - 76:2, 76:4, 211:10, 230:23, 232:6, 232:23
**pulled** [5] - 21:5, 209:23, 210:20, 231:18, 232:13
**pulling** [3] - 30:20, 209:24, 223:8
**purported** [1] - 56:1
**purportedly** [2] - 53:12, 55:21
**purpose** [1] - 68:1
**purposes** [1] - 18:16
**PURSUANT** [1] - 1:14
**pushed** [2] - 209:19, 212:21
**pushing** [1] - 220:19
**put** [19] - 28:1, 28:5, 32:18, 37:12, 37:18, 72:4, 100:20, 122:17, 144:7, 148:23, 159:11, 169:23, 171:24, 173:9, 185:15, 193:2, 231:14, 255:8, 264:23
**putting** [4] - 43:11, 80:1, 125:22, 171:14
**puzzle** [1] - 80:1

### Q

**Q1** [2] - 29:11, 113:20
**Qualifications** [1] - 37:13
**Quarter** [1] - 3:6
**quarter** [4] - 103:5, 103:6, 103:22, 111:17
**quarterly** [7] - 33:17, 33:21, 34:5, 35:17, 40:17, 42:12, 98:10
**questions** [14] - 8:13, 8:16, 52:1, 52:4, 73:3, 87:14, 201:14, 218:19, 222:25, 223:15, 261:4, 266:16, 266:21,

266:23
**questions/ clarifications** [1] - 206:18
**quick** [1] - 221:4
**quickly** [4] - 112:3, 211:9, 215:14, 215:19
**QUIN** [1] - 59:9
**quite** [9] - 8:11, 31:20, 31:23, 61:1, 92:22, 97:11, 135:6, 174:7, 191:17

### R

**race** [44] - 60:3, 64:5, 118:6, 118:9, 118:16, 129:20, 138:7, 138:13, 144:11, 144:22, 151:18, 153:12, 157:22, 157:23, 158:10, 162:22, 167:8, 167:15, 167:16, 169:3, 169:9, 169:11, 172:13, 172:16, 172:21, 173:4, 174:9, 195:2, 195:8, 195:12, 195:16, 195:20, 199:21, 200:16, 200:21, 243:1, 243:9, 247:11, 248:3, 254:12, 254:16, 254:23, 255:1, 256:14
**race-based** [1] - 200:16
**racial** [1] - 173:1
**racially** [1] - 173:6
**racism** [22] - 147:15, 147:19, 147:22, 147:23, 148:1, 148:9, 148:17, 148:25, 149:8, 150:7, 150:12, 150:20, 150:24, 151:14, 164:8, 185:24, 200:4, 255:23
**racist** [10] - 141:2, 149:21, 170:12, 171:8, 171:16, 172:4, 172:6, 173:5, 194:23, 262:2

**radar** [1] - 65:22
**raise** [5] - 153:10, 193:21, 194:1, 194:14, 241:21
**raised** [4] - 153:14, 194:6, 194:13, 243:1
**raising** [1] - 194:7
**range** [1] - 48:16
**ranks** [1] - 254:13
**rare** [1] - 44:18
**rated** [2] - 114:16, 159:2
**rather** [8] - 68:11, 120:6, 127:12, 136:4, 182:16, 183:17, 186:20, 207:11
**rating** [4] - 112:22, 114:15, 142:15, 246:2
**ratings** [2] - 139:10, 160:19
**reach** [7] - 24:9, 25:17, 38:14, 86:23, 87:9, 117:13, 223:20
**reach-out** [1] - 86:23
**reaching** [3] - 117:1, 236:18, 238:15
**reacting** [1] - 171:15
**reaction** [4] - 224:16, 225:4, 228:12, 257:18
**read** [11] - 50:5, 101:21, 112:9, 224:15, 227:7, 227:12, 227:15, 237:19, 238:8, 266:12, 270:2
**reading** [9] - 104:18, 113:25, 201:9, 206:23, 213:6, 237:25, 238:1, 238:5, 250:20
**ready** [7] - 71:19, 71:23, 71:24, 72:3, 76:25, 205:23, 246:25
**realize** [4] - 141:17, 147:24, 171:21, 257:22
**realized** [1] - 265:8
**really** [56] - 15:23, 30:6, 37:6, 44:3, 44:13, 55:2, 55:15, 57:24, 62:23, 62:24, 64:15, 64:17, 64:25, 65:14, 67:11, 69:6,

72:15, 77:2, 90:16, 108:10, 108:14, 114:2, 115:24, 121:1, 125:9, 125:13, 141:19, 144:17, 146:11, 147:10, 156:3, 166:15, 170:2, 170:22, 173:14, 177:16, 179:20, 180:2, 182:3, 182:13, 183:1, 184:20, 185:6, 185:8, 185:10, 188:9, 188:20, 188:21, 189:23, 220:12, 242:17, 254:7, 262:12, 266:3
**rearview** [1] - 189:22
**REASON** [1] - 269:6
**reason** [7] - 19:14, 19:17, 60:15, 115:6, 136:12, 197:11, 202:21
**reasonable** [1] - 226:8
**reasons** [3] - 81:8, 99:5, 210:19
**reassign** [1] - 230:24
**recalled** [2] - 95:25, 121:19
**receive** [2] - 35:3, 75:8
**received** [6] - 36:24, 62:20, 214:16, 227:15, 245:20, 246:2
**receiving** [5] - 47:9, 57:17, 138:20, 188:10, 262:25
**recent** [4] - 89:3, 139:15, 244:12, 262:24
**recently** [5] - 142:17, 142:18, 246:12, 261:12, 262:14
**Recess** [7] - 19:10, 51:23, 116:21, 160:9, 176:9, 233:7, 264:3
**recognition** [1] - 34:19
**recognize** [2] - 74:19, 135:12
**recognized** [3] - 169:13, 251:9, 252:1
**recollection** [21] - 15:18, 16:4, 19:12, 27:10, 27:11, 27:22,

28:19, 52:22, 86:15, 96:4, 121:15, 125:17, 136:15, 137:17, 203:12, 208:8, 213:17, 213:20, 215:8, 265:17, 265:20
**recommend** [1] - 83:7
**recommendations** [1] - 83:9
**record** [14] - 5:8, 5:12, 7:8, 11:18, 11:19, 19:8, 40:1, 51:22, 51:25, 116:20, 160:7, 176:7, 233:5, 266:23
**recruit** [2] - 84:5, 238:22
**recruited** [1] - 251:6
**recruiting** [2] - 124:20, 252:6
**rectify** [1] - 198:9
**red** [1] - 241:21
**reduced** [1] - 268:11
**reducing** [1] - 121:15
**redundant** [1] - 55:14
**refer** [1] - 28:23
**REFERENCE** [2] - 3:5, 4:6
**referred** [1] - 187:25
**referring** [7] - 40:13, 40:16, 52:18, 152:20, 155:2, 215:18, 216:6
**reflect** [1] - 35:13
**reflected** [1] - 114:3
**reflections** [1] - 31:24
**refrain** [1] - 223:2
**refresh** [1] - 265:2
**regard** [1] - 30:19
**regarding** [3] - 56:6, 105:24, 142:9
**regardless** [2] - 54:23, 55:4
**Registered** [3] - 1:20, 268:4, 268:23
**registered** [3] - 28:3, 212:21, 231:9
**regular** [1] - 67:9, 94:6, 95:4
**regularly** [1] - 38:20
**Rehab** [1] - 4:3
**REHAB** [1] - 1:4
**reiterated** [1] - 156:21
**related** [3] - 45:12, 154:23, 216:13

**relation** [5] - 40:20,
63:1, 68:8, 138:21,
268:7
**relationship** [10] -
20:11, 21:8, 56:20,
84:8, 84:20, 87:22,
91:21, 234:16,
246:15
**release** [2] - 79:17,
79:19
**relevance** [1] - 20:14
**relevant** [12] - 19:15,
20:16, 20:18, 44:12,
45:1, 45:5, 45:16,
46:24, 55:12, 72:23,
79:7
**reliance** [2] - 43:4,
43:8
**relied** [4] - 22:16,
22:19, 62:24, 91:5
**relies** [1] - 44:3
**religious** [1] - 76:15
**remainder** [1] - 223:23
**remaining** [3] - 51:3,
223:21, 224:17
**remains** [1] - 237:4
**remarked** [1] - 149:7
**remarks** [1] - 148:16
**remember** [72] -
16:10, 16:19, 31:10,
37:3, 47:9, 61:25,
91:19, 94:23, 95:24,
105:14, 113:18,
113:22, 117:1,
117:23, 118:8,
119:1, 129:7, 132:8,
132:14, 132:16,
132:17, 133:15,
133:24, 138:8,
138:9, 140:22,
140:23, 141:14,
141:19, 141:25,
142:2, 143:7,
143:20, 144:10,
155:1, 155:22,
155:24, 157:1,
158:2, 158:9, 163:4,
163:6, 167:20,
167:25, 168:6,
168:13, 169:18,
170:10, 171:1,
178:20, 179:1,
179:2, 179:8,
179:13, 179:14,
179:17, 179:18,
180:9, 180:16,
181:18, 183:9,

202:16, 203:5,
209:9, 225:2,
230:22, 233:19,
258:10, 262:4
**remembered** [2] -
104:1, 162:25
**remembering** [1] -
27:9
**reminder** [1] - 224:7
**remote** [6] - 14:11,
43:23, 110:16,
183:4, 246:19, 251:8
**remotely** [2] - 1:17,
112:19
**remove** [2] - 21:25,
198:9
**removed** [2] - 81:5,
81:17
**reopen** [1] - 8:12
**repeat** [22] - 19:16,
42:13, 50:3, 55:25,
70:16, 73:22, 95:9,
98:2, 99:8, 112:5,
145:4, 166:7,
192:13, 205:18,
239:10, 240:21,
242:5, 242:11,
243:3, 254:24,
258:23, 259:24
**repeatedly** [1] - 97:16
**repeating** [1] - 192:16
**report** [13] - 36:2,
49:16, 51:15, 54:7,
54:11, 93:2, 93:9,
95:13, 160:21,
161:1, 162:14,
168:25, 251:15
**report-out** [2] -
162:14, 168:25
**reported** [10] - 98:25,
102:11, 102:14,
161:17, 163:8,
164:5, 243:16,
245:15, 247:14
**reporter** [3] - 6:18,
7:3, 8:5
**Reporter** [5] - 1:19,
1:20, 268:4, 268:5,
268:23
**REPORTER'S** [1] -
268:1
**reporting** [9] - 9:21,
49:9, 57:14, 95:1,
95:2, 96:10, 163:22,
184:1, 186:12
**reports** [10] - 49:6,
51:13, 93:10, 93:16,

93:20, 94:7, 94:18,
94:24, 156:15, 162:6
**represent** [3] - 46:15,
249:17, 266:5
**represented** [1] -
166:23
**reputation** [1] - 254:1
**request** [3] - 45:18,
133:22, 179:12
**requested** [2] -
133:16, 230:11
**require** [3] - 91:5,
212:6, 221:6
**research** [1] - 69:7
**reserve** [2] - 8:12,
267:6
**resign** [2] - 68:11,
243:13
**resignations** [1] -
248:11
**resigned** [15] - 109:24,
109:25, 110:25,
140:16, 143:21,
245:13, 245:14,
246:12, 247:18,
247:19, 247:22,
248:6, 248:16,
251:2, 251:20
**resistant** [3] - 43:11,
43:15, 156:9
**resolve** [1] - 98:6
**resolved** [4] - 97:25,
99:3, 131:3, 224:20
**RESOURCE** [1] - 1:7
**Resource** [1] - 5:17
**resource** [1] - 75:17
**resources** [5] - 38:4,
58:1, 63:22, 113:13,
256:8
**respect** [14] - 20:8,
25:13, 31:9, 97:3,
98:1, 130:6, 130:13,
136:6, 137:22,
149:18, 188:24,
192:2, 225:10,
262:25
**respectful** [2] -
127:15, 133:6
**respond** [6] - 7:17,
30:25, 85:18, 85:24,
90:13, 105:1
**responded** [7] - 58:6,
58:8, 128:25,
130:12, 130:20,
130:23, 228:15
**responding** [6] - 90:7,
175:12, 218:11,

218:17, 228:1,
237:23
**responds** [3] - 206:10,
206:12, 227:3
**response** [17] - 74:7,
88:12, 122:12,
147:6, 176:19,
206:25, 207:3,
213:13, 214:23,
222:15, 236:24,
237:22, 242:1,
242:20, 257:4,
261:9, 263:6
**responses** [1] -
131:14
**rest** [2] - 51:22, 247:18
**restructure** [3] -
124:16, 124:17,
124:22
**restructuring** [1] -
123:22
**result** [1] - 183:11
**results** [12] - 137:2,
137:8, 152:24,
158:15, 158:20,
158:24, 158:25,
161:6, 183:12,
184:8, 186:11,
186:22
**resume** [2] - 59:22,
63:11
**retaining** [1] - 252:2
**retaliated** [3] - 257:2,
257:3, 257:6
**retaliating** [3] - 199:9,
256:21, 257:12
**retaliation** [5] -
254:12, 254:17,
254:23, 255:1,
256:14
**retire** [1] - 75:1
**retrained** [1] - 188:1
**return** [1] - 185:7
**returned** [1] - 40:4
**returning** [1] - 19:12
**revenue** [2] - 79:2,
92:25
**reverted** [1] - 128:8
**review** [39] - 8:8,
33:17, 33:18, 38:21,
42:8, 42:20, 42:21,
45:1, 55:23, 56:3,
57:12, 85:4, 101:17,
102:13, 103:12,
104:1, 104:4,
104:11, 104:13,
105:14, 105:24,

111:17, 112:1,
112:7, 112:12,
113:7, 113:17,
113:20, 113:25,
116:13, 139:9,
142:15, 143:6,
244:23, 246:1,
249:17, 250:1
**Review** [1] - 3:6
**reviewed** [2] - 33:24,
112:13
**reviewer** [5] - 101:20,
102:1, 104:3,
104:12, 112:2
**reviewing** [3] -
206:24, 221:5, 225:2
**reviews** [11] - 33:21,
34:5, 35:18, 35:20,
40:17, 42:12, 98:10,
100:6, 112:21,
249:11
**Reviews** [1] - 4:1
**revisions** [1] - 222:23
**revisit** [1] - 40:5
**Rewards** [1] - 229:9
**Ribbon** [1] - 256:9
**right-hand** [1] -
103:19, 152:15,
204:8
**Rights** [1] - 257:24
**ring** [1] - 229:13
**risk** [2] - 207:15,
207:16
**risks** [2] - 208:14,
239:1
**road** [1] - 172:20
**robust** [1] - 32:5
**Role** [1] - 115:10
**role** [46] - 5:20, 9:3,
9:9, 9:10, 10:2, 10:4,
29:18, 41:16, 54:2,
54:3, 61:1, 62:8,
62:16, 64:2, 64:4,
64:24, 66:6, 66:10,
67:2, 83:18, 83:20,
85:12, 99:13,
114:17, 114:18,
114:22, 115:8,
118:6, 124:5, 124:6,
125:11, 125:23,
159:3, 176:3, 200:1,
245:5, 246:21,
247:1, 247:3,
248:13, 248:21,
248:22, 253:1,
253:18, 253:21,
253:22

**roles** [6] - 30:11, 54:6,
84:12, 167:5, 251:5,
253:17
**room** [2] - 6:20,
145:17
**root** [1] - 200:12
**rose** [1] - 98:17
**roundtable** [1] -
182:22
**row** [1] - 76:18
**Ruby** [103] - 2:17,
11:22, 13:19, 17:8,
17:15, 18:16, 23:23,
24:18, 27:19, 43:23,
56:11, 58:10, 58:20,
58:23, 95:20, 96:1,
96:10, 96:20, 96:21,
97:16, 99:2, 99:22,
100:19, 104:22,
106:17, 106:18,
106:25, 113:14,
117:6, 117:7, 119:2,
121:1, 121:9, 122:6,
122:7, 123:11,
127:15, 127:25,
128:1, 128:10,
128:24, 129:19,
130:16, 130:22,
131:5, 131:17,
131:18, 136:1,
136:9, 138:6,
138:11, 146:8,
148:11, 155:6,
156:21, 157:4,
159:19, 172:17,
174:15, 174:18,
175:21, 190:12,
192:2, 193:4, 193:5,
193:14, 193:20,
193:24, 193:25,
194:7, 194:12,
194:22, 195:4,
196:9, 196:14,
200:14, 202:4,
204:13, 217:14,
223:10, 225:23,
227:5, 228:19,
231:15, 232:21,
232:22, 234:1,
234:5, 247:17,
257:13, 257:16,
259:3, 259:4, 259:9,
261:3, 264:22
**Ruby's** [7] - 92:6,
101:17, 168:19,
214:23, 214:24,
228:14, 237:22

**rude** [1] - 7:7
**rules** [1] - 1:15
**rumors** [5] - 194:19,
195:9, 195:13,
195:17, 195:21
**run** [1] - 208:14
**running** [1] - 202:14

**S**

**S-M-E** [1] - 28:23
**Sackett** [3] - 86:6,
86:12, 88:14
**sad** [2] - 257:17,
263:14
**saddened** [2] -
261:25, 262:3
**sadly** [1] - 218:7
**safe** [5] - 32:17, 94:17,
100:8, 174:6, 195:23
**salary** [1] - 251:7
**sales** [1] - 92:20
**Samantha** [2] - 156:1,
184:25, 185:1,
185:2, 185:7, 185:8,
185:11, 185:16,
187:24
**Sara** [2] - 156:18,
181:7
**Sarah** [2] - 184:21,
184:23
**sat** [1] - 112:13
**saw** [5] - 107:4,
151:11, 157:4,
179:12, 257:1
**scale** [1] - 114:14
**scenario** [1] - 106:22
**Schacht** [21] - 11:14,
46:23, 52:10, 52:24,
75:15, 106:24,
146:9, 159:14,
161:24, 162:1,
162:2, 162:4, 162:9,
188:7, 191:9,
195:20, 213:3,
214:11, 214:22,
216:12, 237:16
**schedule** [6] - 76:24,
78:5, 78:7, 79:6,
81:10, 117:13,
126:2, 202:11, 220:4
**scheduled** [6] - 19:20,
19:22, 126:7, 127:5,
181:1, 212:20
**scheduling** [2] -
127:4, 220:19
**scores** [1] - 157:20

**scroll** [1] - 249:16
**scrutinized** [1] - 58:3
**Sean** [36] - 10:3,
11:15, 12:16, 12:21,
13:14, 13:15, 13:17,
13:25, 14:13, 14:15,
16:16, 17:21, 18:3,
22:19, 25:7, 47:1,
47:4, 52:18, 52:19,
67:24, 68:3, 145:24,
146:11, 173:15,
175:23, 186:3,
187:13, 189:2,
190:5, 190:20,
196:10, 198:16,
198:24, 258:18,
259:1, 259:3
**search** [2] - 45:4,
45:15
**sec** [2] - 19:9, 233:6
**second** [24] - 26:7,
50:15, 50:18,
103:18, 104:12,
120:12, 145:3,
160:8, 210:1, 210:4,
212:4, 214:21,
223:18, 225:15,
226:24, 249:2,
250:12
**second-level** [2] -
104:12, 120:12
**second-to-last** [2] -
210:1, 210:4
**seconds** [1] - 225:14
**See** [1] - 237:22
**see** [82] - 6:2, 15:5,
18:6, 18:15, 22:11,
24:10, 34:19, 51:2,
55:1, 61:13, 64:22,
66:1, 71:9, 99:4,
99:23, 100:18,
100:25, 101:3,
102:23, 102:24,
103:23, 104:19,
105:19, 105:23,
106:1, 113:16,
114:1, 114:15,
137:10, 143:7,
143:15, 147:14,
164:2, 164:7,
166:22, 176:21,
177:2, 177:20,
185:4, 186:1, 186:2,
187:5, 198:19,
204:6, 204:13,
205:25, 206:11,
206:15, 206:16,

206:20, 207:3,
209:7, 210:2, 213:5,
213:7, 213:11,
214:8, 214:13,
218:12, 218:21,
218:22, 220:9,
224:11, 225:14,
227:1, 227:2, 229:9,
235:11, 235:13,
236:5, 236:20,
236:24, 237:6,
237:13, 240:17,
250:2, 250:14,
252:16, 257:17,
258:1
**seeing** [3] - 222:1,
224:16, 257:14
**seeking** [1] - 190:21
**seem** [4] - 119:9,
119:13, 139:2,
200:16
**select** [1] - 107:2
**selected** [2] - 161:13,
231:5
**selects** [1] - 115:16
**self** [4] - 33:23, 80:24,
128:9, 130:12
**self-defense** [2] -
128:9, 130:12
**self-evaluation** [1] -
33:23
**self-paced** [1] - 80:24
**semblance** [1] - 6:16
**seminar** [4] - 68:22,
71:25, 107:18,
229:24
**seminars** [3] - 9:8,
155:25, 184:1
**send** [6] - 63:6, 177:8,
222:25, 223:14,
237:16, 264:8
**sending** [1] - 63:2
**sends** [1] - 237:8
**senior** [21] - 32:23,
51:8, 61:1, 64:2,
69:10, 83:12, 95:5,
106:12, 106:16,
106:19, 107:9,
107:15, 108:3,
207:8, 208:22,
209:10, 244:2,
246:25, 247:1,
253:22
**sense** [18] - 7:19,
8:14, 54:5, 67:10,
76:1, 76:6, 76:20,
79:17, 92:23, 148:4,

183:3, 190:3,
191:19, 207:6,
219:14, 252:5, 253:7
**sensed** [1] - 252:7
**sent** [5] - 126:17,
126:24, 176:20,
177:14, 219:16
**separate** [3] - 12:10,
20:5, 197:10
**separated** [1] - 62:10
**separating** [1] - 13:19
**separation** [6] - 14:4,
15:12, 15:25,
240:17, 241:19,
242:12
**September** [5] -
220:14, 243:6,
259:11, 259:19
**sequence** [3] -
145:21, 171:17,
172:15
**series** [1] - 52:4
**serious** [1] - 98:8
**serve** [1] - 83:6
**served** [1] - 89:18
**service** [2] - 9:2,
236:14
**serving** [3] - 89:9,
89:10, 89:12
**sessions** [6] - 22:18,
73:6, 73:8, 189:14,
189:17, 189:21
**set** [7] - 37:7, 39:3,
48:10, 58:22,
188:24, 265:4,
268:18
**sets** [1] - 38:9
**setting** [1] - 228:17
**setup** [1] - 202:14
**seven** [1] - 76:19
**Seventeenth** [1] - 2:13
**several** [17] - 26:13,
58:21, 62:3, 66:10,
77:1, 77:4, 77:5,
77:10, 77:13,
173:18, 190:12,
198:1, 198:6,
201:23, 202:24,
207:7, 207:22
**severity** [1] - 98:18
**shade** [1] - 116:2
**shades** [2] - 116:1,
116:11
**shake** [1] - 7:2
**shape** [3] - 222:21,
257:12, 262:1

**share** [30] - 23:6,
31:20, 85:1, 94:13,
100:21, 108:17,
111:10, 126:9,
142:4, 146:20,
146:24, 149:23,
151:24, 157:2,
157:12, 159:21,
162:13, 164:22,
166:5, 166:12,
192:20, 192:23,
194:18, 196:3,
201:3, 213:24,
235:22, 240:9,
249:6, 261:15
**shared** [22] - 132:15,
132:16, 135:7,
145:10, 151:12,
157:21, 160:14,
162:15, 163:21,
164:20, 166:18,
177:18, 180:17,
180:21, 193:5,
195:1, 196:6,
199:12, 233:13,
240:8, 261:22
**sharing** [7] - 19:13,
128:1, 129:7, 158:2,
158:4, 164:20,
194:22
**Shawnetta** [3] - 155:7,
179:2, 180:11
**SHEET** [1] - 269:1
**shifted** [3] - 129:11,
211:1, 211:2
**shocked** [1] - 169:15
**shorter** [1] - 252:17
**shortly** [3] - 13:13,
126:7, 146:8
**show** [1] - 34:19
**showed** [1] - 200:22
**showing** [3] - 23:23,
38:10, 115:19
**SHRM** [101] - 3:7,
3:21, 3:24, 4:2, 5:18,
5:22, 6:3, 6:9, 8:24,
9:8, 9:16, 10:16,
10:20, 11:3, 28:10,
32:13, 33:1, 33:3,
35:16, 35:19, 36:7,
36:12, 36:14, 37:16,
38:17, 38:19, 38:23,
40:23, 43:11, 43:15,
43:16, 44:7, 55:7,
58:5, 58:7, 58:25,
66:20, 68:11, 68:13,
68:15, 72:21, 73:18,

81:5, 85:16, 86:23,
88:15, 89:1, 89:23,
90:18, 93:5, 100:9,
103:20, 109:1,
109:7, 109:8, 109:9,
109:15, 111:1,
120:11, 131:23,
133:1, 151:13,
151:20, 151:22,
159:3, 159:4,
163:14, 174:22,
175:1, 175:4,
196:24, 204:10,
206:9, 210:1, 213:2,
214:8, 217:23,
218:9, 218:18,
222:6, 226:18,
227:4, 227:24,
231:6, 231:8,
231:19, 232:14,
236:1, 237:3,
246:11, 249:20,
251:6, 254:7,
254:20, 255:1,
255:5, 255:25,
256:13, 258:7, 258:8
**SHRM's** [8] - 41:20,
56:21, 56:24, 73:16,
92:13, 120:16,
212:17, 254:1
**shuffling** [1] - 211:12
**shut** [2] - 19:5, 22:24
**sic]** [1] - 204:3
**side** [7] - 11:3, 48:23,
75:23, 76:5, 124:7,
200:15, 244:12
**sign** [13] - 27:17, 28:2,
104:13, 147:14,
147:19, 148:1,
148:25, 150:6,
150:12, 150:13,
150:19, 150:24,
150:25
**signature** [3] - 37:18,
267:7, 269:23
**Signature** [1] - 269:20
**signed** [3] - 5:10,
28:11, 28:13
**significant** [3] - 8:10,
142:22, 226:1
**significantly** [1] -
64:25
**signing** [3] - 103:21,
112:2, 112:7
**signs** [2] - 147:22,
200:17
**Simms** [13] - 49:24,

50:22, 59:6, 59:17,
62:6, 62:8, 62:13,
63:12, 64:8, 64:11,
64:14, 65:1, 247:22
**Simms'** [1] - 245:1
**single** [3] - 46:16,
156:12, 166:19
**single-point-of-**
**failure** [1] - 166:19
**sit** [3] - 79:21, 105:18,
189:17
**site** [1] - 211:7
**sitting** [2] - 47:25,
105:14
**situation** [14] - 24:17,
55:3, 82:11, 119:11,
148:6, 153:7, 192:3,
192:24, 198:8,
198:10, 234:8,
239:5, 239:15,
263:15
**situations** [6] - 81:12,
86:22, 87:4, 87:6,
87:9, 236:12
**six** [11] - 65:20, 80:4,
80:17, 80:18, 81:3,
81:23, 209:6,
209:12, 226:12,
248:5, 248:14
**six-month** [2] - 209:6,
209:12
**skill** [1] - 38:9
**skills** [3] - 73:15,
123:1, 245:6
**skin** [2] - 148:15,
151:10
**Slack** [8] - 43:25, 44:6,
44:11, 44:13, 45:1,
46:16, 56:14, 56:16
**slide** [1] - 244:13
**slipping** [1] - 113:10
**slow** [1] - 85:24
**slower** [1] - 88:12
**SME** [40] - 28:22,
28:23, 28:24, 29:8,
29:23, 30:6, 31:10,
32:23, 82:21, 83:11,
83:13, 83:25, 84:5,
84:6, 84:19, 85:7,
85:10, 85:16, 85:19,
85:21, 87:13, 89:1,
89:11, 89:18, 89:24,
90:1, 90:18, 150:5,
192:4, 206:22,
211:19, 212:7,
223:20, 224:7,
224:16, 236:19,

237:2, 238:16,
238:20, 238:23
**SMEs** [15] - 31:17,
66:2, 70:17, 82:18,
83:1, 83:6, 83:7,
83:9, 84:22, 87:10,
87:24, 108:11,
208:15, 226:11,
237:11
**smiling** [1] - 235:18
**social** [1] - 174:25
**Society** [1] - 5:17
**SOCIETY** [1] - 1:7
**software** [5] - 40:10,
42:2, 56:24, 105:25,
111:21
**sold** [1] - 211:6
**solid** [10] - 114:16,
114:17, 115:8,
115:12, 115:15,
115:18, 115:25,
116:3, 116:8, 222:20
**solution** [2] - 54:20,
55:2
**solutions** [14] - 170:8,
170:9, 177:19,
178:24, 179:21,
182:2, 182:6,
182:14, 182:18,
183:5, 183:9,
183:10, 184:3, 228:6
**solved** [1] - 54:10
**someone** [26] - 30:1,
39:3, 39:21, 49:19,
50:10, 65:25, 68:10,
71:17, 71:21, 76:7,
81:4, 81:17, 115:24,
122:8, 122:10,
123:23, 127:1,
149:15, 150:13,
155:9, 160:3, 171:7,
171:21, 173:5,
174:1, 182:24
**sometime** [1] - 137:18
**sometimes** [9] -
74:13, 80:17, 83:1,
85:18, 104:24,
105:5, 203:2, 203:3,
217:18
**Sometimes** [1] - 39:19
**somewhere** [9] -
26:24, 47:17, 59:14,
92:10, 93:13, 102:9,
161:11, 164:13,
181:19
**soon** [4] - 65:9, 71:20,
154:7, 237:10

**Sorry** [2] - 74:4,
197:19
**sorry** [42] - 13:5,
13:10, 23:8, 23:16,
31:8, 34:12, 36:14,
40:14, 43:6, 43:7,
49:25, 51:22, 61:19,
66:14, 67:6, 83:19,
88:25, 103:4,
103:17, 104:18,
110:3, 114:17,
128:24, 129:1,
130:1, 130:21,
131:8, 136:20,
139:20, 153:4,
160:3, 166:7, 188:3,
201:25, 204:12,
237:24, 238:1,
243:4, 245:9, 255:9,
259:24, 262:21
**sort** [6] - 14:6, 41:2,
43:10, 141:16,
168:2, 190:4
**sotto** [1] - 206:23
**sound** [9] - 28:4,
29:24, 31:15, 79:8,
137:6, 159:1, 159:6,
190:1, 230:5
**sounded** [4] - 233:18,
233:24, 234:1,
234:25
**sounds** [29] - 12:20,
31:14, 61:9, 63:9,
75:7, 79:4, 80:3,
82:7, 83:17, 124:11,
127:20, 131:8,
134:22, 134:25,
139:21, 142:16,
146:19, 155:21,
159:7, 168:4,
173:21, 178:6,
180:25, 184:7,
188:1, 188:6, 230:6,
231:20, 231:24
**source** [5] - 55:18,
83:1, 83:25, 97:19,
226:11
**space** [1] - 182:4
**spaced** [1] - 78:8
**span** [1] - 173:16
**Spears** [5] - 49:12,
51:16, 149:5,
151:13, 155:8
**special** [1] - 183:15
**specialist** [10] - 49:12,
124:6, 125:23,
185:4, 248:21,

248:22, 251:12, 253:12, 253:14, 253:17
**Specialty** [2] - 229:10, 229:21
**specialty** [1] - 83:3
**specific** [25] - 46:25, 75:5, 86:1, 90:11, 92:20, 125:7, 138:25, 143:10, 156:5, 160:1, 175:21, 184:16, 184:23, 185:3, 194:17, 194:21, 202:25, 203:19, 218:23, 221:9, 224:2, 229:8, 231:16, 241:4
**specifically** [32] - 13:24, 25:5, 28:9, 57:4, 60:10, 60:20, 105:3, 106:8, 106:10, 113:21, 129:8, 132:12, 134:8, 139:14, 144:11, 156:16, 175:8, 183:13, 203:6, 215:11, 216:7, 220:20, 221:8, 224:13, 225:3, 232:5, 246:16, 250:25, 253:19, 260:18, 260:22, 265:9
**specifics** [8] - 27:6, 30:13, 32:15, 61:21, 128:7, 197:23, 208:7, 226:14
**speculate** [1] - 226:16
**speculating** [2] - 202:17, 202:19
**spell** [1] - 59:7
**spend** [1] - 66:3
**spent** [3] - 10:15, 64:13, 67:1
**spin** [1] - 212:7
**spin-up** [1] - 212:7
**SPITTELL** [16] - 2:12, 31:8, 33:9, 74:2, 74:4, 147:3, 150:21, 239:17, 240:25, 241:11, 241:22, 242:4, 242:7, 263:18, 266:22, 267:5
**Spittell** [5] - 7:15, 31:6, 73:23, 242:6,

266:21
**spittellk@hallevans. com** [1] - 2:14
**split** [1] - 76:20
**spokesperson** [4] - 160:22, 160:25, 161:13, 169:24
**sponsor** [1] - 75:16
**spreading** [6] - 78:10, 194:19, 195:9, 195:13, 195:17, 195:21
**spreads** [1] - 79:2
**spring** [4] - 76:13, 79:17, 79:18, 79:21
**Springfield** [1] - 5:14
**square** [1] - 251:24
**staff** [2] - 131:24, 132:10
**stage** [1] - 69:13
**stages** [2] - 106:19, 246:14
**stance** [1] - 141:23
**stand** [4] - 92:20, 186:5, 230:15, 249:2
**stand-alone** [1] - 92:20
**standard** [2] - 32:22, 242:15
**standing** [1] - 183:21
**standpoint** [1] - 87:20
**stands** [2] - 69:25, 193:23
**start** [15] - 58:9, 68:18, 68:25, 69:1, 69:6, 93:8, 124:23, 170:5, 182:20, 228:25, 231:3, 232:17, 241:13, 251:14, 266:10
**started** [30] - 8:17, 8:24, 9:1, 28:20, 66:23, 91:16, 99:13, 102:15, 107:12, 107:13, 109:8, 116:7, 123:21, 128:1, 128:6, 128:22, 130:15, 173:17, 183:6, 185:21, 197:15, 202:13, 228:10, 240:19, 240:23, 241:16, 242:11, 246:11, 257:8, 265:13
**starting** [6] - 107:21, 113:9, 120:25,

177:17, 193:7, 220:12
**starts** [1] - 249:18
**state** [6] - 5:11, 71:18, 163:18, 169:15, 172:6
**STATES** [1] - 1:1
**stating** [1] - 172:7
**STENOGRAPHER** [21] - 10:23, 11:17, 31:6, 49:25, 50:7, 50:9, 50:17, 66:14, 70:16, 70:21, 73:22, 74:3, 74:8, 88:20, 116:4, 116:10, 242:5, 242:8, 266:20, 266:24, 267:4
**Stenographic** [2] - 1:19, 268:4
**stenotype** [2] - 268:9, 268:13
**step** [9] - 87:7, 87:16, 99:12, 133:9, 160:17, 169:20, 170:1, 170:8, 186:5
**Stephanie** [21] - 155:8, 160:25, 161:12, 164:1, 164:4, 164:19, 165:14, 165:24, 166:3, 166:10, 168:23, 171:3, 177:25, 178:11, 178:21, 181:6, 181:14, 184:23, 246:9, 246:10, 246:11
**stepped** [7] - 58:9, 58:21, 87:2, 87:11, 88:8, 96:19, 185:22
**steps** [7] - 67:25, 87:21, 105:12, 108:9, 122:1, 122:6, 146:2
**stick** [1] - 50:20
**still** [33] - 6:18, 7:18, 14:11, 46:21, 47:18, 88:18, 89:1, 89:5, 92:13, 100:17, 103:13, 107:17, 107:19, 107:22, 120:15, 154:21, 158:14, 179:21, 208:16, 212:10, 224:25, 225:16, 225:21, 225:25, 226:19, 228:18,

235:2, 235:4, 235:5, 249:4, 252:15, 255:18
**Still** [1] - 206:16
**stop** [5] - 81:9, 201:24, 219:8, 219:10, 220:8
**stopped** [2] - 22:25, 154:18
**stopping** [1] - 232:9
**strategic** [5] - 9:10, 9:15, 9:20, 9:21, 123:25
**strategies** [1] - 106:6
**Street** [3] - 2:4, 2:7, 2:13
**strengths** [1] - 183:19
**stress** [2] - 223:3, 253:8
**stretch** [2] - 8:5, 264:1
**strike** [2] - 103:2, 248:9
**strong** [6] - 67:11, 82:2, 115:24, 142:5, 148:25, 248:23
**stronger** [2] - 113:14, 141:23
**strongly** [2] - 106:25, 119:1
**structuring** [1] - 123:18
**struggled** [3] - 64:14, 67:9, 109:12
**struggles** [1] - 189:11
**struggling** [4] - 16:10, 43:10, 87:14, 188:24
**stuff** [2] - 251:8, 253:20
**style** [2] - 139:24, 187:23
**Subject** [5] - 3:8, 3:12, 3:16, 3:20, 3:23
**subject** [5] - 28:22, 69:18, 70:19, 82:19, 156:10
**subjected** [2] - 57:10, 228:10
**submit** [2] - 34:1, 222:24
**submitted** [4] - 224:1, 224:3, 225:25, 226:2
**subordinate** [1] - 94:19
**subordinates** [5] - 94:7, 94:15, 150:18, 150:19, 176:4

**Subscribed** [1] - 269:21
**SUBSCRIBED** [1] - 270:11
**subsequent** [6] - 133:16, 134:13, 135:1, 161:2, 161:4, 172:18
**subsequently** [1] - 236:25
**subtle** [1] - 150:2
**succeed** [1] - 190:7
**succeeding** [1] - 66:9
**success** [4] - 37:7, 39:4, 48:10, 252:16
**successes** [2] - 34:2, 34:18
**successful** [1] - 76:16
**successfully** [4] - 43:19, 232:18, 245:5, 253:9
**succession** [1] - 198:4
**suffering** [1] - 239:14
**suggest** [4] - 178:25, 190:16, 214:22, 238:22
**suggested** [6] - 54:13, 160:23, 180:11, 182:14, 182:18, 259:7
**suggestion** [1] - 3:20
**Suite** [3] - 2:4, 2:7, 2:13
**Sullivan** [17] - 10:3, 11:15, 22:19, 25:7, 46:23, 52:10, 68:3, 146:12, 191:9, 195:12, 198:7, 199:1, 216:12, 258:3, 258:6, 258:18, 259:12
**summarize** [2] - 22:10, 216:24
**summer** [3] - 27:4, 31:25, 242:25
**sunset** [1] - 74:25
**supervising** [1] - 128:11
**supervision** [2] - 245:20, 246:7
**supervisor** [3] - 53:21, 95:15, 120:12
**supervisors** [2] - 96:8, 98:22
**supervisors/**

**managers** [1] - 159:3
**support** [8] - 14:5,
29:21, 70:17, 70:18,
93:20, 107:22,
215:14, 246:3
**supported** [5] - 12:17,
12:19, 13:22, 106:25
**supporting** [1] - 9:16
**supports** [2] - 75:16,
151:6
**supposed** [1] - 224:9
**supposedly** [1] -
24:10
**surfaced** [1] - 198:16
**surprise** [6] - 203:22,
204:1, 204:22,
224:15, 240:18,
240:22
**surprised** [9] - 38:21,
162:20, 163:1,
164:24, 169:16,
178:2, 181:24,
241:8, 241:12
**surprising** [1] -
162:18
**survey** [10] - 137:2,
152:25, 158:15,
161:6, 176:11,
183:12, 184:8,
186:11, 186:22,
187:7
**Susie** [5] - 49:11,
51:16, 156:18,
165:15, 168:25
**suspect** [1] - 241:18
**suspects** [1] - 75:11
**suspicion** [2] -
153:10, 153:15
**suspicious** [1] -
242:21
**SWAIN** [1] - 2:6
**Swain** [2] - 2:7, 5:10
**SweetRush** [1] -
143:14
**switched** [1] - 29:19
**switching** [1] - 32:25
**sworn** [3] - 6:15,
268:7, 269:21
**SWORN** [1] - 270:11
**sworn/affirmed** [1] -
5:3
**sympathy** [4] -
132:17, 194:2,
194:8, 194:10
**system** [10] - 41:18,
41:21, 41:23, 42:6,

42:10, 42:18, 72:5,
97:17, 98:12, 103:14

## T

**table** [4] - 210:2,
210:6, 215:14, 228:6
**tack** [1] - 209:13
**talent** [7] - 77:21,
77:22, 77:24, 78:9,
86:7, 106:4, 251:3
**talks** [1] - 187:15
**Target** [1] - 210:12
**target** [2] - 210:14,
210:18
**taught** [1] - 32:13
**Taylor** [4] - 131:24,
132:9, 195:16,
259:18
**teach** [4] - 89:14, 90:2,
211:23, 211:25
**teachable** [1] - 227:20
**teaches** [1] - 89:5
**teaching** [4] - 76:24,
77:3, 77:11, 212:5
**team** [85] - 11:9,
14:23, 17:10, 20:25,
22:25, 23:19, 23:23,
24:11, 24:25, 34:1,
52:16, 54:5, 54:12,
60:14, 60:23, 62:17,
63:16, 63:17, 64:1,
64:17, 64:18, 65:14,
68:5, 75:13, 75:20,
83:8, 93:13, 94:11,
94:12, 99:7, 99:10,
99:20, 102:6,
102:11, 102:14,
107:5, 109:21,
124:19, 125:9,
128:5, 134:11,
134:16, 134:21,
135:17, 136:11,
137:3, 137:8, 137:9,
137:22, 138:1,
144:10, 144:25,
145:8, 149:5,
152:17, 152:20,
156:1, 161:5,
163:15, 166:17,
166:24, 170:2,
177:16, 178:25,
180:18, 182:21,
182:25, 183:6,
183:8, 184:1,
184:22, 185:14,
185:17, 187:1,

188:13, 192:21,
195:1, 223:4,
232:17, 234:18,
236:9, 245:11,
245:17
**Team** [2] - 3:16,
177:10
**teammates** [2] -
107:20, 107:23
**teams** [3] - 54:19,
136:23, 183:6
**technical** [1] - 148:24
**technology** [2] -
43:24, 149:15
**temperature** [2] -
130:18, 159:17
**ten** [2] - 226:13,
263:24
**tenor** [1] - 131:8
**tenure** [1] - 67:4
**term** [3] - 106:4,
118:9, 120:14
**terminate** [13] - 11:5,
11:22, 18:20, 19:18,
52:5, 59:11, 59:20,
197:6, 217:8,
217:11, 238:12,
247:14, 247:16
**terminated** [33] - 15:9,
48:6, 50:23, 58:25,
60:1, 60:7, 60:8,
60:12, 61:22, 62:7,
63:14, 64:11, 65:6,
66:24, 67:2, 67:15,
68:8, 68:11, 98:18,
99:5, 99:9, 100:16,
197:1, 200:20,
217:17, 230:7,
234:21, 241:20,
245:12, 248:6,
248:16, 251:20,
259:11
**terminating** [6] -
14:21, 14:25, 18:8,
19:4, 67:20, 216:13
**termination** [17] -
13:7, 14:22, 15:12,
17:1, 17:19, 46:12,
53:4, 53:11, 67:19,
197:12, 197:13,
215:15, 216:5,
235:12, 240:6,
260:9, 260:16
**terribly** [1] - 30:15
**testified** [8] - 5:4,
53:15, 99:4, 112:11,
198:6, 199:16,

246:1, 256:12
**testify** [2] - 6:21, 268:7
**testimony** [11] - 52:2,
52:6, 58:5, 82:14,
144:19, 151:3,
212:1, 233:15,
251:24, 269:4, 270:4
**Text** [1] - 3:14
**text** [17] - 8:11, 45:5,
46:16, 46:21, 47:2,
47:5, 47:8, 56:17,
56:20, 152:5,
153:19, 153:21,
154:2, 154:9,
154:15, 155:1
**texts** [2] - 152:8, 157:3
**thanked** [1] - 122:2
**THE** [35] - 1:1, 2:2,
2:11, 10:23, 11:2,
11:17, 31:6, 49:25,
50:3, 50:7, 50:9,
50:14, 50:17, 50:18,
66:14, 66:16, 70:16,
70:21, 73:22, 74:3,
74:8, 88:20, 88:21,
116:4, 116:6,
116:10, 152:1,
242:5, 242:8, 264:2,
264:10, 266:18,
266:20, 266:24,
267:4
**themselves** [2] - 76:1,
180:25
**theoretical** [1] - 55:21
**theory** [2] - 72:14,
106:6
**thereafter** [3] - 126:7,
146:8, 268:10
**thereof** [1] - 268:13
**they've** [3] - 84:11,
85:2, 241:19
**thinking** [22] - 32:11,
45:17, 51:10, 78:4,
86:5, 86:19, 108:15,
112:21, 123:18,
123:22, 141:19,
141:22, 148:21,
170:20, 170:21,
173:16, 182:20,
186:4, 186:25,
187:15, 192:11,
245:21
**thinks** [1] - 150:13
**third** [4] - 129:18,
210:11, 227:25,
249:24
**Thompson** [14] -

118:19, 137:15,
146:18, 146:20,
151:4, 153:8, 158:2,
158:9, 186:10,
186:18, 196:25,
197:12, 243:2, 243:8
**Thompson's** [2] -
158:5, 245:25
**thoughts** [5] - 31:21,
31:24, 32:2, 121:12,
227:14
**threatening** [3] -
195:25, 196:4, 196:5
**three** [25] - 6:2, 16:1,
16:5, 16:25, 19:24,
23:21, 24:8, 25:21,
26:11, 49:4, 59:3,
76:18, 114:18,
114:24, 115:7,
126:2, 134:5, 134:9,
203:8, 213:7,
221:14, 226:5,
226:12, 246:20
**throughout** [3] - 93:1,
93:4, 100:12
**tighter** [1] - 86:9
**tightly** [1] - 191:25
**Tim** [2] - 86:6, 86:12
**timeline** [1] - 33:19
**timeliness** [4] - 97:10,
98:13, 105:24, 106:8
**timely** [1] - 30:15
**timing** [9] - 42:19,
76:16, 108:9,
129:10, 165:3,
177:9, 212:11,
241:5, 253:19
**title** [2] - 11:14, 218:6
**TO** [1] - 1:14
**today** [6] - 39:21,
110:9, 152:17,
209:5, 248:20,
266:17
**Todd** [2] - 86:5, 86:11
**Together** [4] - 231:5,
231:17, 231:18,
256:9
**together** [10] - 15:24,
70:7, 84:12, 105:18,
127:22, 136:3,
178:22, 190:6,
196:12, 239:23
**tolerance** [1] - 256:11
**tomorrow** [1] - 265:2
**took** [14] - 29:15,
63:18, 97:11,
107:17, 121:22,

131:6, 146:12, 178:18, 217:4, 222:16, 230:20, 232:3, 232:25, 239:3
**tool** [1] - 95:23
**toolbox** [1] - 113:15
**tools** [4] - 38:3, 38:6, 63:23, 113:14
**top** [5] - 78:19, 86:6, 126:22, 178:6, 221:10
**topic** [8] - 68:19, 68:22, 73:2, 75:17, 75:18, 77:7, 77:20, 89:13
**topics** [2] - 78:8, 79:11
**Total** [2] - 229:9, 229:21
**touch** [1] - 260:12
**towards** [4] - 35:24, 37:15, 157:20, 256:4
**town** [5] - 131:24, 132:9, 132:11, 132:15
**train** [2] - 185:8, 187:25
**training** [16] - 35:16, 35:19, 36:24, 37:3, 37:5, 37:8, 37:10, 37:14, 174:25, 175:1, 175:5, 175:7, 179:9, 179:10, 180:13, 232:17
**Training** [1] - 3:23
**trainings** [2] - 174:22, 202:2
**Tran** [1] - 267:2
**transcribe** [1] - 238:6
**transcript** [5] - 8:8, 266:25, 267:6, 268:12, 270:4
**transcription** [1] - 7:4
**Transformation** [3] - 28:15, 211:14, 212:15
**transition** [1] - 248:20
**translate** [1] - 7:3
**transpired** [1] - 170:3
**traveled** [1] - 6:3
**treat** [1] - 141:5
**treated** [17] - 58:13, 118:2, 118:15, 118:20, 129:19, 130:5, 138:6, 138:10, 138:12, 138:14, 138:18,

146:21, 146:25, 156:25, 167:22, 168:17, 254:8
**treating** [8] - 151:7, 169:2, 169:9, 172:13, 173:5, 174:8, 176:4, 194:11
**treatment** [4] - 151:18, 153:11, 167:16, 200:21
**tremendous** [1] - 107:5
**trial** [1] - 6:22
**trouble** [2] - 223:1, 223:16
**true** [2] - 268:12, 270:3
**truly** [1] - 185:8
**trust** [2] - 262:9, 262:10
**truth** [3] - 97:20, 262:11, 268:7
**try** [7] - 7:12, 32:18, 66:5, 76:14, 79:6, 93:23, 134:3, 137:21, 193:3
**trying** [54] - 7:6, 7:7, 17:5, 25:1, 25:2, 32:7, 34:8, 58:19, 64:20, 64:23, 67:7, 85:13, 87:11, 102:7, 102:9, 102:10, 103:4, 121:9, 123:17, 125:15, 136:10, 136:11, 139:16, 140:15, 140:22, 140:24, 141:16, 142:3, 142:21, 150:14, 157:11, 168:12, 168:18, 171:24, 172:14, 173:9, 174:11, 174:13, 181:10, 183:13, 185:1, 187:13, 188:9, 188:23, 192:9, 192:14, 198:9, 227:22, 233:24, 237:2, 238:20, 246:15, 251:25, 253:20
**Tuesday** [1] - 176:20
**turmoil** [1] - 235:16
**turn** [7] - 204:3, 209:11, 214:7, 217:23, 218:9, 220:17, 221:7

**turned** [2] - 205:10, 205:23
**turning** [1] - 217:22
**turnkey** [1] - 72:11
**turnover** [8] - 248:10, 251:3, 251:10, 251:21, 251:23, 252:9, 252:13, 252:17
**twice** [2] - 219:6, 251:7
**two** [37] - 17:6, 17:23, 20:21, 23:19, 24:8, 25:24, 49:3, 49:8, 68:22, 77:15, 80:10, 97:12, 110:14, 110:17, 114:16, 118:2, 128:4, 129:5, 130:5, 134:2, 146:19, 146:23, 174:24, 183:21, 186:23, 196:7, 207:17, 209:13, 217:4, 221:13, 225:14, 230:24, 232:21, 239:16, 246:12
**two-day** [1] - 68:22
**two-week** [1] - 217:4
**tying** [1] - 223:10
**type** [5] - 74:17, 146:4, 173:1, 261:6, 262:17
**types** [3] - 136:22, 150:2, 241:4
**typewritten** [1] - 268:11
**typical** [4] - 75:9, 75:12, 80:5, 80:7
**typically** [3] - 49:19, 50:10, 68:24

## U

**Ubering** [1] - 109:13
**ultimately** [4] - 97:23, 97:24, 99:6, 182:17
**unanswered** [1] - 214:24
**unaware** [1] - 41:22
**unchanged** [1] - 237:4
**unconscious** [1] - 147:23
**under** [1] - 6:15, 37:18, 53:11, 62:17, 95:6, 98:22, 100:2, 104:6, 115:16, 162:5, 177:5,

223:19, 247:20, 247:22, 248:6, 250:11, 251:20
**underneath** [1] - 115:13
**underperform** [1] - 114:23
**understood** [9] - 14:19, 24:19, 97:20, 121:13, 149:25, 174:19, 199:23, 199:24, 260:23
**undeserved** [1] - 228:10
**unethical** [14] - 162:17, 162:19, 163:1, 163:10, 163:15, 164:25, 167:19, 168:5, 168:15, 169:4, 169:5, 178:3, 181:25
**unfairly** [1] - 57:16
**unfold** [1] - 200:10
**unhappy** [5] - 62:17, 67:13, 158:5, 159:19, 235:17
**unique** [1] - 82:11
**UNITED** [1] - 1:1
**universe** [2] - 55:12, 56:5
**unjustly** [1] - 58:2
**unless** [2] - 7:16, 242:22
**unlock** [1] - 255:13
**unusual** [1] - 85:6
**up** [88] - 7:5, 15:17, 21:18, 22:23, 23:23, 24:8, 26:23, 26:24, 27:17, 27:18, 28:1, 28:2, 28:6, 28:11, 28:13, 29:17, 37:7, 39:4, 39:6, 41:9, 41:16, 48:10, 58:22, 65:22, 71:8, 73:7, 74:14, 76:20, 77:8, 77:17, 79:5, 80:3, 82:3, 83:10, 108:25, 114:13, 115:19, 117:24, 122:22, 129:13, 130:4, 138:11, 140:5, 140:8, 142:19, 143:18, 144:11, 144:15, 144:16, 144:22, 148:5, 156:4, 156:7, 157:5, 158:10, 158:11,

162:22, 163:6, 164:8, 164:10, 165:16, 166:19, 167:8, 167:16, 168:4, 168:24, 172:15, 173:17, 176:2, 178:12, 184:1, 186:17, 188:1, 195:8, 201:6, 202:1, 202:13, 212:7, 212:18, 225:9, 225:14, 227:9, 228:7, 228:17, 237:1, 261:14, 262:14, 262:23
**update** [2] - 97:16, 223:19
**updates** [3] - 94:6, 94:14, 204:14
**uploaded** [3] - 71:19, 71:23, 72:4
**upper** [1] - 102:24
**upset** [16] - 119:13, 127:1, 130:25, 131:2, 157:6, 168:19, 170:22, 170:24, 171:13, 171:15, 171:17, 171:19, 172:12, 174:18, 258:1, 262:7
**upsetting** [6] - 120:3, 120:4, 129:8, 135:13, 175:21, 257:19
**utilize** [1] - 83:11, 83:14
**utilized** [2] - 38:23, 71:19

## V

**vacation** [5] - 217:4, 217:6, 238:24, 239:3, 239:13
**vacillate** [1] - 158:6
**vacillated** [1] - 60:24
**vague** [2] - 219:25
**value** [6] - 19:5, 40:3, 90:3, 90:17, 222:23, 237:23
**various** [1] - 76:3
**vary** [3] - 74:12, 209:17, 221:19
**vein** [1] - 21:13
**verbal** [1] - 39:14
**Verbatim** [2] - 1:19,

268:3
**verify** [1] - 224:12
**version** [1] - 222:24
**versus** [5] - 32:12,
32:13, 121:1,
123:11, 200:4
**vested** [1] - 88:4
**vets** [1] - 66:4
**vibe** [1] - 157:10
**vice** [1] - 5:18
**video** [2] - 127:25
**VIDEOCONFERENC
E** [1] - 1:10
**videoconference** [1] -
1:16
**view** [2] - 228:13,
251:21
**viewed** [2] - 53:25,
100:8
**viewpoint** [2] -
200:15, 228:13
**Virginia** [2] - 5:14,
109:10
**virtual** [4] - 76:17,
77:19, 231:13,
232:11
**virtually** [2] - 211:7,
232:16
**vision** [1] - 32:11
**visions** [1] - 32:19
**vivacious** [2] - 235:8,
235:15
**voce** [1] - 206:23
**voice** [7] - 157:13,
193:21, 194:1,
194:6, 194:8,
194:13, 194:15
**voicing** [1] - 105:10
**volunteer** [2] - 232:8,
232:18
**volunteered** [2] - 29:7,
183:18
**volunteers** [2] -
178:11, 232:18
**VP** [1] - 48:11
**VPs** [1] - 159:11
**vs** [1] - 1:6

## W

**Waddill** [2] - 31:13,
31:19
**wait** [4] - 13:5, 18:14,
206:13, 206:15
**Wait** [1] - 201:24
**waiting** [3] - 15:4,

15:5, 86:20
**walk** [2] - 67:24,
225:14
**Walker** [2] - 155:7,
179:2
**walking** [1] - 185:11
**walks** [2] - 255:20,
256:17
**wane** [1] - 67:14
**wants** [4] - 32:23,
38:19, 94:1, 262:1
**warning** [1] - 43:12
**warnings** [1] - 41:5
**watch** [1] - 200:10
**ways** [5] - 79:3,
108:13, 156:8,
185:13, 190:22
**website** [6] - 19:21,
28:1, 28:6, 92:13,
212:17, 212:18
**Wednesday** [1] -
228:7
**week** [10] - 22:23,
23:19, 132:6,
133:21, 212:25,
217:4, 221:13,
233:10, 238:15,
238:23
**weekly** [1] - 40:21
**Weekly** [1] - 3:16
**weeks** [8] - 15:17,
24:8, 72:8, 76:19,
110:14, 110:17,
207:17
**weigh** [1] - 85:5
**weighing** [1] - 89:14
**weird** [2] - 149:24,
154:15
**welcome** [1] - 266:2
**well-intentioned** [1] -
255:21
**whatsoever** [1] - 24:1
**whereas** [1] - 187:24
**WHEREOF** [1] -
268:18
**WHEREUPON** [1] -
267:9
**whistles** [1] - 96:22
**white** [6] - 64:9,
118:12, 146:23,
150:19, 167:1,
247:12
**who'd** [1] - 212:7
**whole** [7] - 78:6,
81:25, 125:9,
157:10, 182:21,

262:3, 263:14
**willing** [3] - 20:15,
159:25, 236:13
**window** [1] - 220:13
**wishes** [1] - 269:4
**wishing** [1] - 156:10
**witness** [6] - 189:14,
191:4, 193:22,
194:4, 194:5, 268:6
**WITNESS** [1] - 268:18
**witnessed** [3] -
151:14, 194:14,
194:24
**witnessing** [1] - 141:5
**woman** [3] - 110:23,
149:5, 179:5
**women** [2] - 146:19,
146:23
**wondering** [1] -
136:13
**word** [4] - 7:23,
163:11, 220:25,
234:1
**words** [5] - 46:7,
143:25, 144:7,
162:19, 215:15
**wordsmith** [1] - 105:6
**work-life** [2] - 252:8,
253:5
**work-related** [1] -
154:23
**workforce** [1] - 198:5
**workload** [1] - 252:10
**Workplace** [2] - 78:12,
92:12
**workplace** [9] - 92:8,
100:4, 107:14,
151:18, 174:25,
175:3, 175:10,
185:23, 187:9
**workplaces** [1] -
256:4
**works** [1] - 219:24
**world** [4] - 77:9,
77:12, 234:4, 256:5
**worst** [2] - 171:20,
171:21
**woven** [1] - 191:25
**wow** [1] - 5:25
**write** [5] - 29:4, 85:1,
104:6, 105:17,
152:16
**writes** [2] - 110:7,
215:12
**writing** [2] - 30:2,
87:14

**written** [13] - 34:15,
39:6, 39:17, 41:2,
43:13, 55:23, 85:2,
85:7, 90:23, 104:13,
105:7, 112:14, 241:9
**WRITTEN** [1] - 1:14
**wrote** [12] - 103:12,
104:4, 105:15,
110:12, 121:18,
177:13, 205:4,
213:8, 215:3,
250:17, 250:24,
266:6

## Y

**year** [11] - 78:11,
79:22, 97:12, 103:7,
103:22, 112:12,
115:2, 217:15,
246:14, 250:12,
258:11
**Year** [1] - 3:6
**year-end** [1] - 103:7
**Year-End** [1] - 3:6
**years** [15] - 5:24, 8:25,
9:11, 25:10, 62:3,
67:3, 67:6, 83:23,
92:1, 97:12, 108:5,
142:22, 190:14,
203:8, 246:12
**yeses** [1] - 7:1
**yesterday** [5] - 101:8,
111:11, 264:17,
264:23, 265:7
**yourself** [10] - 24:16,
127:7, 145:8,
153:20, 155:15,
191:10, 198:9,
213:3, 227:8, 237:25

## Z

**zero** [1] - 256:11
**Zoom** [13] - 6:17, 7:9,
11:8, 24:5, 44:1,
49:22, 50:15, 73:20,
117:15, 127:22,
127:23, 144:21,
199:5