IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-01625-GPG-SKC

REHAB MOHAMED,

      Plaintiff,

v.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

      Defendant.

---

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Defendant Society for Human Resource Management ("SHRM"), by and through counsel, respectfully submits this Motion for Summary Judgment, as follows:

### INTRODUCTION

Plaintiff attempts theories of race discrimination and retaliation under 42 U.S.C. § 1981 ("Section 1981") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") against her former employer SHRM. Based on the undisputed facts, Plaintiff simply cannot demonstrate SHRM took any action respecting Plaintiff other than for legitimate business reasons, entitling SHRM to summary judgment on all of Plaintiff's claims.

### STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.**    **Plaintiff's hire at SHRM.**

1.    SHRM hired Plaintiff, an at-will employee, on April 18, 2016. [Ex. A-1, Mohamed Dep., at 118:12-17; Ex. A-2, Offer Letter, at SHRM 0375].

2.      Plaintiff is Egyptian (black). [Complaint, at ¶ 5; Ex. A-1, at 132:24-133:22].

3.      SHRM is a human resources ("HR") membership association providing education, certification, and networking opportunities to its members. [Answer, at ¶ 5].

4.      Plaintiff began as an e-Learning Specialist. [Ex. A-2, at SHRM 0375; Ex. A-1, at 122:17-22].  On July 2, 2018, Plaintiff's position changed to Instructional Designer as a result of SHRM combining the e-Learning and Instructional Design teams. [Ex. A-1, at 127:16-128:16; Ex. A-3, June 22, 2018 Letter, at Mohamed 000354].

**B.      SHRM promotes Plaintiff at Carolyn Barley's recommendation.**

5.      On January 29, 2020, SHRM notified Plaintiff she received promotion to Senior Instructional Designer effective February 10, 2020, which entailed an over twenty (20) percent salary increase. [Ex. A-1, at 130:23-131:8; Ex. A-4, January 29, 2020 Promotion Letter, at Mohamed 000369; Ex. A-5, Personnel File Excerpt, at SHRM 0253].

6.      As a Senior Instructional Designer, Plaintiff was to design, develop, and enhance new and existing education programs.  [Ex. A-1, at 136:20-137:2; Ex. A-6, Job Description, at Mohamed 000373-383].

7.      In this role, Plaintiff reported to Carolyn Barley, Manager Instructional Design. [Ex. A-1, at 131:9-13; Ex. A-4, at Mohamed 000369].

8.      Prior to her promotion, Plaintiff interacted with Ms. Barley in-person and without conflict when the two worked on the same team in SHRM's Virginia office. [Ex. A-1, at 131:14-132:23; Ex. A-7, Barley Dep., at 19:21-20:5]. Ms. Barley believed Plaintiff was creative, technically savvy, and an asset to the team. [Ex. A-7, at 20:6-16].

9.      Plaintiff testified, when she first interacted with Ms. Barley, Ms. Barley saw Plaintiff was black. [Ex. A-1, at 132:24-133:13]. Plaintiff disclosed she was Egyptian.  [*Id*., at

133:14-22]. Plaintiff does not recall Ms. Barley being upset by this disclosure. [*Id*., at 133:23-134:4].  Ms. Barley knows Plaintiff is from Egypt and has brown skin. [Ex. A-7, at 82:16-83:8].

10.     Ms. Barley encouraged Plaintiff to apply for promotion, recommended Plaintiff for promotion, and advocated for Plaintiff to receive the largest raise possible. [*Id*., at 20:17-23; 21:13-18; Ex. A-8, Schacht Dep., at 100:18-19; 164:20-23].

11.     Jeanne Morris, Vice President of Education, Nick Schacht, Chief Global Development Officer, and Ms. Barley decided to promote Plaintiff. [Ex. A-9, Morris Dep., at 106:11-107:3].

12.     Upon Plaintiff's promotion, Ms. Barley congratulated her. [Ex. A-1, at 135:24-136:2].

**C.     Plaintiff performs satisfactorily in certain areas but struggles in others.**

13.     When Plaintiff was promoted, Ms. Barley served as Interim Manager and did not have all managerial responsibilities over Plaintiff. [Ex. A-7, at 21:19-24]. Ms. Morris was heavily involved in Plaintiff's projects and overseeing Plaintiff's duties. [Ex. A-1, at 144:19-145:18].

14.     Although Senior Instructional Designers should operate more independently, Ms. Morris observed Plaintiff substantially relied on Ms. Barley and Plaintiff's teammates. [Ex. A-9, at 107:21-108:16]. Mr. Schact observed that Plaintiff showed promise, but needed development in the new role. [Ex. A-8, at 100:8-21].

15.     Ms. Barley provided Plaintiff with a performance review in May 2020, which evaluated Plaintiff from January to April 2020. [Ex. A-7, at 22:13-15; 31:16-19]. Ms. Barley drafted the review, and Ms. Morris and Mr. Schacht reviewed and approved it. [*Id*., at 33:14-34:1].

16.     The May 2020 review provided Plaintiff with a mix of positive and constructive feedback. [Ex. A-10, 2020 Review, at SHRM 0054-55; Ex. A-7, at 23:4-32:16]. Ms. Barley viewed

Plaintiff's performance as solid, but believed Plaintiff was maturing into the role and needed to do more and different types of work expected of a senior. [Ex. A-7, at 33:4-12; 35:2-6; 63:8-10].

17.     The May 2020 review identified Plaintiff's need to balance her design experience "**against timelines for improved efficiency and business impact**" as one opportunity for development. [Ex. A-10, at SHRM 0054-55 (emphasis added)]. The May 2020 review further stated Plaintiff should "take more ownership by setting the communication cadence with the vendor[1] and providing updates proactively to leadership." [*Id.*].

18.     In April 2020, leading up to the May 2020 review, Ms. Barley and Ms. Morris discussed concerns regarding Plaintiff's "deadlines slipping for the digital [HR] program," which was initially scheduled for completion in April 2020. [Ex. A-9, at 112:11-113:21].

19.     Plaintiff testified, as of May 2020, she did not believe Ms. Barley was discriminating against her and did not believe SHRM was discriminating against her by issuing the May 2020 review.  [Ex. A-1, at 146:19-147:13; 148:10-13].

       **D.     Plaintiff complains about Ms. Barley, alleging race discrimination.**

20.     On June 3, 2020, Plaintiff orally complained to Ms. Morris regarding Ms. Barley. [Ex. A-1, at 165:9-166:4]. Plaintiff cannot recall specifically what she said.  [*Id.*, at 167:8-10]. Plaintiff recalls generally mentioning specific incidents, telling Ms. Morris how the incidents made her feel, that she believed Ms. Barley treated Plaintiff's white peers differently, and that Plaintiff was having a hard time performing her work because of the situation. [*Id.*, at 75:18-76:8; 167:8-20]. Plaintiff did not request to take leave from work. [*Id.*, at 76:9-11]. Plaintiff's white peers were Anne Godmere and Carrie Mills. [*Id.* at 161:1-3]. Plaintiff testified Ms. Barley treated Ms.

---

[1] Vendors are sometimes referred to as Subject Matter Experts or "SMEs."

Godmere and Ms. Mills with "more freedom and compassion." [*Id.*, at 158:6-16; 160:22-24; 229:11-22]. Ms. Morris testified, during the June 3, 2020 complaint, Plaintiff shared frustration about Ms. Barley "micromanaging her" and allowing Ms. Godmere and Ms. Mills to work more independently without mentioning race. [Ex. A-9, at 116:22-118:11; 144:8-23].

21.    According to Plaintiff, Ms. Morris responded these incidents need to be addressed immediately. [Ex. A-1, at 76:20-77:7; 168:3-6]. Per Plaintiff, Ms. Morris did not show any sign of being upset with Plaintiff for complaining. [*Id.*, at 168:7-23].

22.    According to Plaintiff, after Plaintiff complained, her responsibilities and compensation did not change in any way. [Ex. A-1, at 168:24-169:5].

23.    On June 4, 2020, Ms. Morris held a Zoom meeting with herself, Plaintiff, and Ms. Barley. [Ex. A-9, at 144:19-23]. Plaintiff testified, during this meeting, Plaintiff vocalized her complaint of race discrimination to Ms. Barley. [Ex. A-1, at 172:3-8]. Plaintiff testified Ms. Barley indicated feeling blindsided and was crying. [*Id.*, at 174:11-17]. Plaintiff testified Ms. Barley never threatened Plaintiff's job as a result of the complaint. [*Id.*, at 174:23-175:4]. Ms. Barley testified she did not recall Plaintiff mentioning race, only Ms. Barley's leadership style. [Ex. A-7, at 81:15-24]. Ms. Morris testified race did not come up. [Ex. A-9, at 144:8-23].

24.    Plaintiff and Ms. Barley spoke via phone on June 12, 2020. [Ex. A-1, at 169:23-170:7]. Plaintiff testified Ms. Barley denied Plaintiff's allegations or indicated Plaintiff misunderstood Ms. Barley's statements. [*Id.*, at 170:9-171:23]. Ms. Barley testified, during this call, for the first time, Plaintiff brought up race as part of her complaint. [Ex. A-7, at 81:25-82:13].

25.    After Ms. Barley and Plaintiff's call on June 12, 2020, Ms. Barley consulted Mike Jackson, an HR employee. [*Id.*, at 88:1-89:11]. Mr. Jackson advised Ms. Barley to keep

documentation, which she did from June-August 2020. [*Id*., at 49:2-21; Ex. A-11, Barley Notes, at SHRM 0726-735].

26.     Following Plaintiff and Ms. Barley's conversation on June 12, 2020, Ms. Barley emailed Plaintiff, thanking Plaintiff for voicing her concerns, advising Plaintiff about changes occurring to improve management and communication for the team, and telling Plaintiff she is a great asset to the team and Ms. Barley wishes to position her for success.  [Ex. A-1, at 169:23-25; Ex. A-12, June 12, 2020 Email Chain, at SHRM 0044-45]. Plaintiff did not object to Ms. Barley's proposals. [Ex. A-1, at 175:24-176:13].  Plaintiff responded in part:

> I believe this is a good step towards building a healthy relationship . . . **The changes already made regarding the management of the compliance program have made a big difference (a positive one), which reassured me that we can achieve great things when working together**.

[*Id*., at 177:17-20; Ex. A-12, at SHRM 0044-45 (alterations and emphases added)].

27.     Following this exchange, Plaintiff and Ms. Barley had several biweekly meetings discussing Plaintiff's projects. [Ex. A-1, at 179:19-23; 180:20-25].

28.     Ms. Morris testified the first time she heard Plaintiff complain about differential treatment based on race was in mid or late June 2020 during a meeting in which Ms. Morris, Mr. Jackson, Plaintiff, Ms. Mills, Ms. Godmere, and Ebony Thompson, Senior Instructional Designer, were present. [Ex. A-9, at 136:25-138:7; 144:7-13]. Ms. Morris recalls Plaintiff, or Plaintiff and Ms. Thompson, indicated they felt they were treated differently based on race with regard to Ms. Barley micromanaging them as compared to Ms. Mills and Ms. Godmere. [*Id*., at 138:3-21; Ex. A-1, at 158:6-23; Complaint, at ¶ 53].

29.     Plaintiff testified Ms. Barley requested to review Plaintiff's emails and attend meetings with Plaintiff and vendors/ SMEs to help Plaintiff sound more assertive. [Ex. A-1, at

159:18-23]. Plaintiff testified Ms. Barley discouraged her from attending a People Manager Qualification ("PMQ") meeting Mr. Schacht had invited all team members to attend. [*Id.*, at 183:7-9; 187:6-24]. Plaintiff did not complain to Mr. Schacht about this. [*Id.*, at 187:25-188:2]. Plaintiff cannot recall an incident of Ms. Barley micromanaging Ms. Thompson, only that Ms. Barley talked poorly about Ms. Thompson's work. [*Id.*, at 160:10-13; 230:19-25].

  **E.**  **SHRM investigates and finds no discrimination and no retaliation.**

  30.  Mr. Jackson reached out to Plaintiff to discuss her complaint. [*Id.*, at 217:5-17]. Plaintiff told Mr. Jackson that Ms. Barley was micromanaging her, did not want her to attend a PMQ meeting, and did not allow her autonomy with vendors. [*Id.*, at 217:21-25; Ex. A-13, Jackson, Dep., at 19:4-10; 109:18-110:12]. Mr. Jackson investigated. [Ex. A-13, at 110:21-24; 130:5-16]. Mr. Jackson interviewed Ms. Barley, Ms. Morris, Ms. Godmere, and Ms. Mills. [*Id.*, at 101:12-25; 136:19-25; 138:10-22]. Mr. Jackson reviewed Plaintiff's personnel file, performance reviews, and communications of the individuals involved. [*Id.*, at 113:14-25; 138:23-139:25].

  31.  Plaintiff also contacted Johnny Taylor, Chief Executive Officer ("CEO"), and provided a summary of her concerns. [Ex. A-1, at 77:18-79:6; 78:16-18; 81:2-7; 219:4-19]. According to Plaintiff, Mr. Taylor asked Plaintiff if HR was involved, and Plaintiff answered in the affirmative. [*Id.*, at 78:19-21]. According to Plaintiff, Mr. Taylor told Plaintiff he would connect her with Sean Sullivan, the head of HR. [*Id.*, at 79:3-6]. During her discussion with Mr. Taylor, Plaintiff did not request leave or transfer away from Ms. Barley. [*Id.*, at 80:3-8].

  32.  Plaintiff discussed her concerns with Mr. Sullivan. [*Id.*, at 81:10-82:23; 218:11-14]. Plaintiff testified Mr. Sullivan indicated he would talk to the involved employees and follow up. [*Id.*, at 218:20-219:3]. Mr. Sullivan spoke with Ms. Barley. [Ex. A-7, at 86:3-12; 87:15-20]. Mr. Jackson shared his findings with Mr. Sullivan. [Ex. A-13, at 75:7-12; 106:6-14; 146:17-147:6].

33.     Plaintiff believes Ms. Barley discriminated against her based on her race and does not believe any others discriminated against her. [Ex. A-1, at 239:21-240:4]. Plaintiff cannot recall Ms. Barley ever making any race-based comments. [*Id*., at 158:2-5].

34.     On August 31, 2020, Mr. Sullivan provided to Plaintiff SHRM's Response to Plaintiff's Complaint of Discrimination and Retaliation, finding no race-based discrimination or retaliation. [Ex. A-1, at 227:4-20; Ex. A-14, August 31, 2020 Letter, at SHRM 0042-43]. In the Response, Mr. Sullivan stated in part, "bringing forward a complaint does not shield a person from the routine responsibilities associated with their work tasks or the manager's responsibilities for directing those activities.  In that regard, in what you have described as retaliatory actions, I found to be conventional supervisory communications and actions for managing the tasks of a staff member." [Ex. A-14, at SHRM 0042-43].

**F.     SHRM recommends mediation, and Plaintiff withdraws.**

35.     Plaintiff spoke with Bernee Long, Director of Organizational Learning and Talent Development, as part of a mediation process recommended by Mr. Sullivan on August 7, 2020. [Ex. A-1, at 83:22-25; 199:12-19; Ex. A-15, August 7, 2020 Email, at SHRM 0049; Ex. A-16, Sullivan Dep., at 112:14-22]. The purpose of mediation was to determine if Plaintiff and Ms. Barley could work together. [Ex. A-16, at 110:7-10; Ex. A-9, at 20:8-13].

36.     Plaintiff watched a Ted Talks video Ms. Long ultimately sent to Ms. Barley, agreeing the video was a good first step toward Ms. Barley understanding Plaintiff's position.  [Ex. A-1, at 203:8-15; [Ex. A-17, Long Dep., at 92:3-19].

37.      During mediation sessions, Ms. Long and Plaintiff discussed how Plaintiff felt and the expectations for Plaintiff meeting deadlines and deliverables. [*Id*., at 88:20-90:5].

38.     Plaintiff recalls declining, without providing a reason, Ms. Long's request to continue mediation. [Ex. A-1, at 204:7-23]. Plaintiff testified, in the last mediation session with Ms. Long, Plaintiff expressed concern that her performance, tone, and attitude were the subject of the mediation. [*Id*., at 204:25-205:8].

39.     At no time did Plaintiff make a request to Ms. Long or anyone else to be removed from Ms. Barley's supervision or to avoid interaction with Ms. Barley. [*Id*., at 98:4-6; 203:24-204:3; 225:23-226:6]. At no time did Plaintiff make a request to Ms. Long or anyone else to take leave from SHRM or be relieved of her job duties. [*Id*., at 98:7-9; 204:4-6; 225:23-226:2].

**G.     Plaintiff stops working and stops communicating with Ms. Barley prior to two large, project deadlines.**

40.     When Plaintiff declined mediation, it appeared she had "no desire to continue to improve the communication [with Ms. Barley]." [Ex. A-9, at 20:14-25]. Plaintiff "shut down and stopped communicating with her team." [*Id*., at 22:22-23:2, 20-24].   Plaintiff acknowledges avoiding conversations with Ms. Barley because they were very tense. [Ex. A-1, at 188:11-19].

41.     On August 7, 2020, Ms. Barley emailed Mr. Sullivan and Mr. Jackson regarding Plaintiff cancelling meetings, failing to respond to team emails, and recusing herself from a project, indicating Ms. Barley was "growing more and more concerned about the work" and Plaintiff's projects are now "3 weeks behind." [Ex. A-18, August 7, 2020 Email from Barley, at SHRM 0788; Ex. A-7, at 131:2-132:23].

42.     For at least a month prior to this email, Ms. Barley observed Plaintiff unresponsive, canceling meetings, and not working. [Ex. A-7, at 132:4-11; 133:5-9; 142:7-13]. Plaintiff then asked for almost two weeks' off with two days' notice, which Ms. Barley approved, but confirming with Plaintiff that she would meet her deliverables and deadlines. [*Id*., at 132:4-17; 282:6-11].

43.     Plaintiff acknowledges taking vacation at the end of July 2020. [Ex. A-1, at 189:3-
13]. Plaintiff was working on two key projects during this time, the digital HR program and the
compliance HR program, which she was developing from start to finish. [*Id.*, at 189:14-190:9].

44.     Plaintiff acknowledges Ms. Barley communicated to her the digital HR and
compliance HR programs were to be completed by August 31, 2020. [*Id.*, at 192:5-13; 224:18-25].
Plaintiff does not recall the first time Ms. Barley communicated that deadline to her but estimates
August 11, 2020. [*Id.*, at 192:5-13]. Ms. Barley testified this was not a draft deadline, but a fully
finished, ready-to-go-live program deadline. [Ex. A-7, at 235:7-10].

45.     Ms. Barley testified she determined August 31, 2020, as a reasonable deadline
because she evaluated the content, seat hours, the amount of time the program should take to
develop, the extensions that had occurred, how much work was left to be created, and the fact the
programs were to go live in the Fall 2020. [*Id.*, at 283:23-284:11]. Both programs were set to go
live in early October 2020. [Ex. A-9, at 211:13-18].  SHRM puts on programming the spring and
fall of each year to drive revenues. [*Id.*, at 76:12-20; Ex. A-8, at 22:23-23:8].  Programs must be
completed prior to implementation, ideally two months beforehand, so instructors have sufficient
time to teach the program. [Ex. A-9, at 76:21-77:15].

46.     In May 2020, Ms. Barley knew Plaintiff had difficulties obtaining information from
the vendor/ SME for the compliance HR program, which is a common issue faced by Senior
Instructional Designers.  [Ex. A-7, at 120:6-121:16; 128:2-20].  Ms. Barley shared with Plaintiff
how to pivot to do the design and development work herself, but Plaintiff would not make the
adjustment, and as a result, this issue continued through June and weeks prior to Plaintiff's
deadline even though Ms. Barley had expected Plaintiff to complete the necessary work herself.
[*Id.*, at 120:6-121:16; 128:2-20; 212:10-21]. Even when an SME is involved, the responsibility of

managing the SME relationship and the responsibility of designing and determining the contents of the program ultimately falls to the Senior Instructional Designer. [Ex. A-9, at 32:22-24; 70:6-20; 82:21-83:16; 84:19-21].

47.     In a July 16, 2020 email from Ms. Barley to Plaintiff and others, Ms. Barley outlined Plaintiff's target completion date for the digital HR program as July 2020, and Plaintiff's target completion date for the compliance HR program as August 2020. [Ex. A-19, Collection of Emails from July 16, 2020 to August 28, 2020, at SHRM 0139-147]. Ms. Barley and Mr. Schacht testified, prior to the July 16, 2020 report, these projects had earlier deadlines, which kept getting pushed. [Ex. A-7, at 287:24-288:8; Ex. A-8, at 101:22-102:3].

48.     Ms. Morris testified, the digital HR program commenced in January 2020, and was first due at the end of April 2020. SHRM first extended the digital HR program to May 2020; second extended it to July 2020; and third extended it to August 31, 2020. [Ex. A-9, at 15:7-13]. Ms. Morris testified, similarly, the compliance HR program was assigned to Plaintiff in February 2020 with a deadline of April or May 2020; SHRM second extended it to June 2020; and third extended it to August 31, 2020.  [*Id*., at 26:23-27:5; 202:1-25].

49.     Between August 10, 2020 and August 13, 2020, Ms. Barley and Plaintiff exchanged emails regarding the deadlines for Plaintiff's projects.  [Ex. A-19, at SHRM 0139-147].  Plaintiff asked Ms. Barley to account for Plaintiff's vacation in setting deadlines.  [*Id*.].  On August 13, 2020, Ms. Barley emailed Plaintiff stating, "As a reminder, the original deadline for this program [digital HR program] was the end of April with an approved extension until the end of May. With regards to the Compliance program, your assurance that the program was on track for completion as scheduled formed the basis for my approval of your request for leave. Accordingly, the August 31 deadline for both projects is non-negotiable." [*Id*.]. Per Ms. Morris, the August 31, 2020

deadline was non-negotiable because the programs needed editing before going live in the Fall 2020. [Ex. A-9, at 219:18-220:14; 228:22-229:3]. Mr. Schacht testified, by August 13, 2020, there was growing concern as to whether Plaintiff would finish her work. [Ex. A-8, at 128:19-129:11].

50.     On August 14, 2020, Plaintiff emailed Ms. Barley, Mr. Schacht, and Ms. Morris, indicating she would submit the "final version" of the digital HR program by August 31, 2020. [Ex. A-19, at SHRM 0139-147].   Email exchanges then occurred between Plaintiff and Mr. Schacht regarding the program deadlines.   [*Id*.]. Plaintiff stated, "just weeks after I made my discrimination complaints, SHRM is setting me up to fail by imposing an inflexible and unrealistic deadline on me . . . ." [*Id*.]. Mr. Schacht responded, "the deadlines that have been set for your current projects are neither unfair nor unrealistic. The deadline for the Digital HR course has been extended multiple times based on your conversations with your manager, and the deadline for the Compliance course has been set for a long time. Neither of these deadlines has been changed without your knowledge or input, **and they reflect the current financial and operational plans of the business**. We take the issues you raise about discrimination and retaliation very seriously, and our level of attention is demonstrated through the involvement of Sean [Sullivan] and the HR team in reviewing those issues." [*Id*. (emphasis added)].

51.     On August 25, Ms. Barley summarized to Mr. Schacht, Ms. Morris, Ms. Long, and Mr. Jackson a discussion with Plaintiff in which Plaintiff asked whether the deadline for her projects was still August 31, 2020, and Ms. Barley confirmed August 31 as the deadline. [Ex. A-20, August 25, 2020 Email, at SHRM 0714-715; Ex. A-7, at 201:7-202:16; 205:7-17].

**H.     Plaintiff misses the project deadlines, and SHRM terminates her.**

52.     Plaintiff testified she submitted her work with regard to the digital HR program and the compliance HR program to Ms. Barley on August 28, 2020. [Ex. A-1, at 226:7-13]. Ms. Barley

testified one of Plaintiff's submissions came on August 31, 2020, the other submission may have come in prior to August 31, 2020. [Ex. A-7, at 125:21-24].

53.     Ms. Barley reviewed Plaintiff's work product and found it uncompleted. [*Id.*, at 115:1-10].

54.     The morning of September 1, 2020, Ms. Barley contacted Ms. Morris, shared Plaintiff's work product and how much work was left to complete, recommended termination of Plaintiff's employment, and Ms. Morris agreed. [Ex. A-7, at 114:15-25]. Ms. Barley and Ms. Morris also called Mr. Sullivan, who had questions regarding the degree of incompleteness, and after Ms. Barley confirmed there was a lot of work remaining, Mr. Sullivan agreed SHRM should proceed with termination. [*Id.*, at 115:1-10].  Mr. Schacht was also involved in confirming the decision to terminate Plaintiff's employment.  [Ex. A-8, at 161:3-162:12; Ex. A-9, at 14:14-18; Ex. A-7, at 17:1-7].

55.     Mr. Jackson testified he was not involved in the discussions where the decision was made to terminate Plaintiff's employment as he was on medical leave. [Ex. A-13, at 35:7-13; 189:12-20]. Beginning August 21, 2020, Mr. Jackson prepared termination documents for Plaintiff prior to his medical leave in case such documents were needed even though he was not asked to do so. [*Id.*, at 35:14- 36:18; 42:1-3; 44:16- 45:4; 72:23-73:9; 156:13-17; 290:9-14; 291:2-13].

56.     Ms. Barley testified she made the decision to recommend Plaintiff for termination on September 1, 2020. [Ex. A-7, at 18:8-10].  Ms. Barley testified the individuals involved did not decide to terminate Plaintiff until September 1, 2020, the date of Plaintiff's termination. [*Id.*, at 17:19-18:7; 111:17-112:25]. Termination of Plaintiff's employment was one of many possibilities SHRM considered prior to that time. [*Id.*, at 117:3-24; Ex. A-9, at 15:7-13; 17:17-21; 18:2-19:7].

57.     The sole reason for the termination was Plaintiff "failed to complete two projects on their deadlines." [Ex. A-7, at 18:23-19:8].

58.     On September 1, 2020, SHRM notified Plaintiff her employment was terminated effective September 2, 2020. [Ex. A-1, at 228:8-22; Ex. A-21, September 1, 2020 Letter, at SHRM 0087]. Ms. Barley notified Plaintiff of the termination, stating Plaintiff was "being terminated for missing deadlines." [Ex. A-1, at 228:21-229:1].

59.     Ms. Barley testified extending the deadlines for Plaintiff's projects was not an option because Plaintiff had more than a reasonable time to finish both projects, and Plaintiff already had many extensions. [Ex. A-7, at 127:2-11]. Ms. Morris agreed. [Ex. A-9, at 26:23-27:5; 202:1-25].

## ARGUMENT

### I.     Plaintiff's Title VII and Section 1981 race discrimination claims fail.

#### A.     Plaintiff cannot establish causation.

Both Title VII and Section 1981 require plaintiff to establish a causal connection between plaintiff's race and the adverse action.   Title VII requires the plaintiff to show race was a motivating factor in the adverse action. 42 U.S.C. §2000e-2(m).   Section 1981 imposes a heightened standard in that plaintiff must show her race was the but-for cause of injury. *Comcast Corp. v. Nat'l Ass'n of African American Owned Media*, 140 S. Ct. 1009, 1014-15 (2020).

Here Plaintiff cannot meet the causation requirements under the Title VII or the heightened Section 1981 standard, requiring dismissal of her race discrimination claims for this reason alone. To begin, Plaintiff contends Ms. Barley was the only person at SHRM who discriminated against

her based on race. [¶ 33][2].  Plaintiff appears to allege the discrimination consisted of Ms. Barley micromanaging her, excluding her from a PMQ meeting, preventing her from having autonomy with vendors, holding her to unrealistic project deadlines, and ultimately terminating her employment for missing her project deadlines. [¶¶ 29-30; *see also* Complaint at ¶¶ 135, 153]. None of these actions are discriminatory on their face.  Further, Plaintiff concedes Ms. Barley has never made any race-based comments to Plaintiff, in relation to these actions or otherwise. [¶ 33]. At most, Plaintiff seemingly contends Ms. Barley similarly subjected her non-white coworker Ms. Thompson to micromanaging, but Plaintiff concedes Ms. Barley never made any race-based comments regarding Ms. Thompson, only a reference to Ms. Thompson's poor quality of work. [¶ 29]. There are no facts allowing Plaintiff to meet her Title VII burden or heightened Section 1981 burden establishing any of this conduct by Ms. Barley has any connection whatsoever to Plaintiff's race. *Compare, e.g., **Rea v. Martin Marietta Corp.,*** 29 F.3d 1450, 1457 (10th Cir. 1994) (plaintiff must demonstrate a nexus between the adverse action and any alleged discriminatory statements).

### B.      Plaintiff cannot establish pretext.

Plaintiff's Title VII and Section 1981 race discrimination claims fail for the independent reason that Plaintiff cannot demonstrate pretext. SHRM terminated Plaintiff for a legitimate, non-discriminatory reason wholly unrelated to her race. Specifically, Plaintiff submitted two incomplete projects, missing her deadlines. [¶¶ 53, 56]. *See **Metzler v. Fed. Home Loan Bank of Topeka***, 464 F.3d 1164, 1172 (10th Cir. 2006) (poor job performance is a legitimate reason for termination). If the employer articulates a nondiscriminatory reason for the adverse action, the plaintiff may attempt to demonstrate the proffered reason is pretextual and therefore unworthy

---

[2] Whenever possible, factual references are made to the paragraph numbers of the above Defendant's Statement of Undisputed Material Facts.

of belief. *Sanders v. Southwestern Bell Telephone, L.P.,* 544 F.3d 1101, 1105 (10th Cir. 2008); *Hinds v. Sprint/United Management Co.,* 523 F.3d 1187, 1195 (10th Cir. 2008).   After the employer offers a legitimate nondiscriminatory reason for the termination, the burden returns to the plaintiff.   At this point, the plaintiff must prove "the employment decision was the result of intentional discrimination based on an impermissible motive." *Martin v. Nannie & Newborns, Inc.,* 3 F.3d 1410, 1417 (10th Cir. 1993).

Plaintiff may satisfy her burden of proof either directly by demonstrating the employer acted with a discriminatory motive or indirectly by showing the stated reason for the adverse employment action was a pretext. *York v. American Tel. & Tel. Co.,* 95 F.3d 948, 954 (10th Cir. 1996); *Randle v. City of Aurora,* 69 F.3d 441, 451-53 & n. 17 (10th Cir. 1995).  Plaintiff must present sufficient actual evidence to survive summary judgment.  It is insufficient for Plaintiff to merely speculate her employer "must have" acted in a discriminatory fashion. *Panis v. Mission Hills Bank, N.A.,* 60 F.3d 1486, 1490 (10th Cir. 1995), *cert. denied,* 516 U.S. 1160 (1996). Plaintiff's bare personal belief that her employer's decisions were motivated by intentional discrimination is insufficient. *Faulkner v. Super Valu Stores, Inc.,* 3 F.3d 1419, 1426 n. 4 (10th Cir. 1993).  "A plaintiff's mere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir. 1988).  Whether an employer's decision is a pretext for discrimination must be judged based on the employer's perspective. "The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs." *Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1318 (10th Cir. 1999). "In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear to the person

making the decision." ***Watts v. Norman,*** 270 F.3d 1288, 1295 (10th Cir. 2001), *cert. denied,* 535 U.S. 1055 (2002).

Here, Plaintiff cannot create a triable issue by disputing whether her projects deadlines should have been extended as she alleges.   [¶ 49]. Instead, to establish pretext, Plaintiff must challenge the decision to terminate her employment based on the perceptions of Ms. Barley, who recommended the decision, and Ms. Morris, Mr. Schacht, and Mr. Sullivan who approved the recommendation. [¶ 53]. Unless Plaintiff can establish facts that did not justify her termination, taken from the perspective of these SHRM's decision-makers, she cannot establish pretext under applicable precedent. Ms. Barley recommended Plaintiff for termination, and Ms. Morris, Mr. Schacht, and Mr. Sullivan approved the recommendation, based on Plaintiff's uncompleted work, receipt of multiple extensions for her projects previously, and the operational and revenue needs of the business, which required Plaintiff's projects to launch in October 2020. [¶¶ 45, 49, 52-53, 56, 58-59]. No basis exists to suggest SHRM's rationale for terminating Plaintiff's employment is so unworthy of belief to be considered pretext. *Compare* ***McKnight v. Kimberly Clark Corp.***, 149 F.3d 1125, 1129 (10th Cir. 1998) ("Summary judgment is not ordinarily appropriate for settling issues of intent or motivation.  However, in this case, McKnight has not shown that at the time of his termination there was any dispute or genuine issue concerning the sincerity of defendants' proffered reasons for his termination.  In this case the totality of McKnight's proffered evidence is insufficient to raise a genuine doubt about KCC's motivation at the time of termination"). Further, the fact the same individuals involved in terminating Plaintiff had months earlier recommended Plaintiff for promotion (knowing her race) belies any indicia of pretext.  [¶¶ 11, 53; ***Antonio v. Sygma Network, Inc.***, 458 F.3d 1177, 1183 (10th Cir. 2006) (where "the employee was hired and fired by the same person within a relatively short time span", there is "a strong inference

that the employer's stated reason for acting against the employee is not pretextual"). Even if Plaintiff disagrees about the decision to impose the August 31, 2020, project deadline, believing the deadline to be unfair, this is not sufficient to meet her burden. *See supra*; *see also*, ***Jones v. Barnhart***, 349 F.3d 1260, 1267 (10th Cir. 2003). There is no pretext.

II.     **Plaintiff's Title VII and Section 1981 retaliation claims fail.**

Retaliation claims under both Title VII and Section 1981 require but-for causation. ***Univ. of Tex. Sw. Med. Ctr. v. Nassar***, 570 U.S. 338, 360 & 363 (2013); ***Aman v. Dillon Cos.***, 645 Fed. Appx. 719, n.5 (10th Cir. 2016). Plaintiff cannot establish the requisite causation for her retaliation claims, namely she cannot establish her complaint was the but-for cause of her termination.

Here, the undisputed facts undermine the presence of any retaliatory animus. In total, Plaintiff raised her complaint with seven individuals, including Ms. Barley, the alleged discriminator, and SHRM's CEO Mr. Taylor. [¶¶ 20, 23-24, 28, 30-32, 35, 49]. Plaintiff concedes none of the individuals to whom Plaintiff raised her complaint ever expressed or implied they were frustrated with Plaintiff for raising concerns. [¶¶ 21, 23, 26, 30-32, 35, 49]. Following each report, no adverse employment action was taken regarding Plaintiff's employment—Plaintiff's job duties remained the same; she was not demoted or subject to a decrease in pay. [¶ 22]. SHRM never separated Plaintiff and Ms. Barley because Plaintiff never asked for a transfer, leave from work, or to be relieved from any of her duties. [¶¶ 20, 31, 39]. To the extent SHRM, on its own accord, attempted to determine whether Plaintiff and Ms. Barley could work together by having them participate in mediation, Plaintiff withdrew from that process without explanation. [¶ 38]. Following Plaintiff's report to Mr. Taylor, he connected her with the head of HR. [¶ 31]. Plaintiff's allegations were thoroughly investigated by neutral HR employees, with no involvement in the

underlying allegations or connection to the involved employees. [¶¶ 30, 32]. The HR investigation concluded there was no evidence of discrimination or retaliation. [¶ 34].

Notably, SHRM did not attempt to stick its head in the proverbial sand, instead aptly recognizing the working relationship between Plaintiff and Ms. Barley was strained. [¶ 35]. Accordingly, SHRM recommended Plaintiff and Ms. Barley participate in mediation. [*Id.*]. SHRM did not place any limitations on the amount of time needed for Plaintiff and Ms. Barley to work on their relationship through mediation. [*Id.*]. Yet, during the last six weeks of Plaintiff's employment, she largely stopped communicating with Ms. Barley, took an almost two-week vacation with project deadlines pending, and withdrew from mediation after a few sessions with no reason given. [¶¶ 38, 40-43]. SHRM took Plaintiff's complaint seriously and made efforts to meet with her to understand her concerns, to investigate her allegations of misconduct, and to offer services to improve her relationship with Ms. Barley. *See supra*. No retaliation occurred.

As outlined above, SHRM had legitimate, non-retaliatory reasons to terminate Plaintiff. Plaintiff's action of bringing forward a complaint did not shield her from routine responsibilities associated with her work. *See **Booker v. Brown & Williamson Tobacco Co.**,* 879 F.2d 1304, 1312 (6th Cir. 1989) ("[T]he fact an employee files a complaint or charge does not create any right on the part of the employee to miss work, fail to perform assigned work, or leave work without notice"). Plaintiff was still required to perform her work in a timely manner, and as Plaintiff's supervisor, Ms. Barley was still responsible for directing those activities. For the same reasons outlined above regarding Plaintiff's discrimination claims, she is, likewise, unable to establish her complaint was the but-for cause of her termination. Thus, her retaliation claims fail.

### III.     Plaintiff Cannot Establish Entitlement to Punitive Damages.

Plaintiff is not entitled to punitive damages against SHRM for want of the requisite intent. Title VII and Section 1981 limit the recovery of punitive damages to situations where "the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *McInnis v. Fairfield Cmty, Inc.*, 458 F.3d 1129, 1136-37 (10th Cir. 2006), citing 42 U.S.C. § 1981a(b)(1). "Before a company is held liable for punitive damages for acts of harassment by low-level employees, there [must] be some culpability beyond mere negligence at the management level." *Danco, Inc. v. Wal-Mart Stores, Inc.*, 178 F.3d 8, 18 (10th Cir. 1999). Plaintiff offers no evidence showing SHRM engaged in a discriminatory practice with malice or reckless indifference to her rights, thus foreclosing her punitive damages claim.

## <u>CONCLUSION</u>

In conclusion, for the foregoing reasons, Defendant SHRM respectfully requests this Court grant it summary judgment on all of Plaintiff's claims, dismiss all of Plaintiff's claims with prejudice in their entirety, and for all further relief as this Court deems just and appropriate.

Dated and respectfully submitted this 4th day of August, 2023.

> *s/ Kendra K. Smith*
> Kendra K. Smith, Esq.
> Katherine N. Hoffman, Esq.
> Kaitlin I. Spittell, Esq.
> HALL & EVANS, L.L.C.
> 1001 Seventeenth Street, Suite 300
> Denver, CO 80202
> Phone: (303) 628-3300
> Fax: (303) 628-3368
> smithk@hallevans.com
> hoffmank@hallevans.com
> spittellk@hallevans.com

**ATTORNEYS FOR DEFENDANT SOCIETY FOR HUMAN RESOURCE MANAGEMENT**

**<u>CERTIFICATE OF SERVICE (CM/ECF)</u>**

I HEREBY CERTIFY that on the 4th day of August, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Hunter A. Swain, Esq.
SWAIN LAW, LLC
1490 North Lafayette Street, Suite 303
Denver, CO 80218
Tel: (720) 815-5281
hunter@swainemploymentlaw.com

Ariel DeFazio, Esq.
LOWREY PARADY LEBSACK, LLC
1490 North Lafayette Street, Suite 304
Denver, CO 80218
Tel: (303) 593-2595
ariel@lowrey-parady.com

***Attorneys for Plaintiff***

s/ Rebecca Walker, Legal Assistant to
Kendra K. Smith, Esq.
Katherine N. Hoffman, Esq.
Kaitlin I. Spittell, Esq.
Hall & Evans, L.L.C.
1001 Seventeenth Street, Suite 300
Denver, CO 80202
Phone: (303) 628-3300
Fax:  (303) 628-3368
smithk@hallevans.com
hoffmank@hallevans.com
spittellk@hallevans.com

**ATTORNEYS FOR DEFENDANT SOCIETY FOR HUMAN RESOURCE MANAGEMENT**