Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2

        Civil Action Number 1:22-cv-01625-RM-SKC
 3

        REHAB MOHAMED,
 4
               Plaintiff,
 5

        vs.
 6

        SOCIETY FOR HUMAN RESOURCE MANAGEMENT,
 7
               Defendant.
 8

        ------------------------------------------------------
 9              VIDEO DEPOSITION OF REHAB MOHAMED
                        April 25, 2023
10      ------------------------------------------------------
11      APPEARANCES:
12      ON BEHALF OF THE PLAINTIFF:
                        HUNTER A. SWAIN, ESQ.
13                      Swain Law, LLC
                        1490 North Lafayette Street, Suite 303
14                      Denver, Colorado 80218
                        Phone: 720-815-5281
15                      Email: hunter@swainemploymentlaw.com
16                      ARIEL DEFAZIO, ESQ.
                        Lowrey Parady Lebsack, LLC
17                      1490 North Lafayette Street, Suite 304
                        Denver, Colorado 80218
18                      Phone: 303-593-2595
                        Email: ariel@lowrey-parady.com
19
        ON BEHALF OF THE DEFENDANT:
20                      KENDRA K. SMITH, ESQ.
                        KATHERINE N. HOFFMAN, ESQ.
21                      Hall & Evans, L.L.C.
                        1001 Seventeenth Street, Suite 300
22                      Denver, Colorado 80202
                        Phone: 303-628-3338
23                      Email: smithk@hallevans.com
                        Email: hoffmank@hallevans.com
24
        Also Present:  Davis Baumunk, Videographer
25
```

**EXHIBIT A-1**

**Page 2**

1   PURSUANT TO WRITTEN NOTICE and the
2   appropriate rules of civil procedure, the video
3   deposition of REHAB MOHAMED, called for examination by
4   the Defendant, was taken at the offices of Hall & Evans,
5   L.L.C., 1001 Seventeenth Street, Suite 300, Denver,
6   Colorado, commencing at 9:04 a.m. on April 25, 2023,
7   before Kimberly Smith, Registered Professional Reporter
8   and Notary Public in and for the State of Colorado.
9
10   I N D E X
11

EXAMINATION:                          PAGE

12
By Ms. Smith                          5
13
14
15   EXHIBITS:                          PAGE
16   Exhibit 1   Plaintiff's Initial Disclosures      8
17   Exhibit 2   Plaintiff's First Supplemental      68
              Responses to Defendant's First
18            Set of Written Discovery Requests
              to Plaintiff
19
      Exhibit 3   Offer Letter to Mohamed from      118
20            Deynes, 4/4/16
21   Exhibit 4   Resume of Rehab Mohamed      123
22   Exhibit 5   SHRM Job Description      125
23   Exhibit 6   SHRM Employee Code of Conduct      126
24   Exhibit 7   Society for Human Resourse      127
              Management Equal Employment
25            Opportunity Policy

**Page 3**

1   Exhibit 8   Letter to Mohamed from Dickens,      127
              6/22/18
2
      Exhibit 9   Job Description, Job Title:      129
3            Instructional Designer
4   Exhibit 10   Letter to Mohamed from Sullivan,      130
              1/29/2020
5
      Exhibit 11   Job Description, Job Title:      136
6            Senior Instructional Designer
7   Exhibit 12   2020 SHRM Review #1      141
8   Exhibit 13   Email to Barley from Mohamed,      169
              Subject: RE: Follow up,
9            6/12/2020, with attached emails
10   Exhibit 14   Email to Mohamed from Sullivan,      196
              Subject: Next Week, 8/7/2020
11
      Exhibit 15   Email to Schacht and others from      205
12            Mohamed, Subject: RE: Follow
              up - RE: ISD Operations Report,
13            8/28/2020
14   Exhibit 16   Email to James-Rouse from Barley,      227
              Subject: FW: Response to
15            Complaint, 12/9/2020, with attached
              email, with attachment
16
      Exhibit 17   Memo to Mohamed from Maldonado,      228
17            Subject: Separation Agreement,
              9/1/2020
18
      Exhibit 18   Complaint and Jury Demand      229
19
20
21
22
23
24
25

**Page 4**

1   P R O C E E D I N G S
2   (At this time Ms. Hoffman is not present.)
3   THE VIDEOGRAPHER:  Good morning.  We're
4   going on the record at 9:04 on April 25, 2023.
5   Audio and video recording will continue to
6   take place unless all parties agree to go off the
7   record.
8   This is Media Unit 1 of the video-recorded
9   deposition of Rehab Mohamed taken by counsel for
10   Defendant in the matter of Rehab Mohamed versus
11   Society for Human Resource Management -- excuse me --
12   Society for Human Resource Management, filed in the
13   United States District Court, for the District of
14   Colorado, Case No. 1:22-cv-01625-RM-SKC.
15   The location of this deposition is 1001
16   Seventeenth Street, Denver, Colorado.
17   My name is Davis Baumunk, representing
18   Veritext Legal Solutions, and I am the videographer.
19   The court reporter is Kim Smith from the firm Veritext
20   Legal Solutions.
21   I'm not related any party in this action,
22   nor am I financially interested in the outcome.
23   Counsel will now state their appearances
24   and affiliations for the record, beginning with the
25   noticing attorney.

**Page 5**

1   MS. SMITH:  Kendra Smith, counsel for
2   Society for Human Resource Management.
3   MR. SWAIN:  And this is Hunter Swain on
4   behalf of Ms. Mohamed.
5   REHAB MOHAMED
6   having been first duly sworn, was examined and
7   testified as follows:
8   EXAMINATION
9   BY MS. SMITH:
10   Q   Good morning, Ms. Mohamed.
11   A   Good morning.
12   Q   My name is Kendra Smith, and I represent
13   Society for Human Resource Management in the lawsuit
14   you brought in the United States District Court, for
15   the District of Colorado.
16   Do you understand that?
17   A   Yes.
18   Q   For simplicity, I'm going to refer to
19   Society for Human Resource Management as S-H-R-M or
20   SHRM.  Is that clear?
21   A   Yes.
22   Q   Can you please state your full name for the
23   record.
24   A   Rehab Mohamed.
25   Q   And do you also go by Ruby?

2 (Pages 2 - 5)

1     A   Uh-huh.
2     Q   And we'll go over this as well.  But there
3  are some rules to the deposition, including giving
4  verbal responses.
5         And so even though in conversation there is
6  a temptation to just nod or shake your head or answer
7  uh-huh or huh-uh, we'll need you to provide yes or no
8  responses.
9         If you fail to do so, I may ask you to
10 clarify.  Please don't be offended by that.  That's
11 just to ensure we get a clear record.
12        Do you understand?
13    A   Yes.
14    Q   Have you ever been deposed before?
15    A   No.
16    Q   This is your first time?
17    A   Yes.
18    Q   So there's a court reporter here
19 transcribing what's being said.  It's also important
20 to kind of speak up and to her where possible, so she
21 can get a clear record.
22        If you don't understand a question, please
23 tell me, and I will try to rephrase or clarify the
24 question.
25        Do you understand?

1     A   Yes.
2     Q   If you need a break, just ask for one.
3  However, if there's a question pending, you're going
4  to need to answer the question pending before we
5  break.
6         Is that clear?
7     A   Yes.
8     Q   You have your attorneys present here today.
9  Your attorneys may object to a question being asked.
10 You still need to answer the question even if there's
11 an objection.  The only caveat to that is if your
12 attorneys instruct you not to answer a question.
13        Do you understand that?
14    A   Yes.
15    Q   We also need to speak one at a time without
16 interrupting each other, which you're doing a good job
17 of right now.  And that's just for the ease of the
18 court reporter, so that she can get a clear record.
19        Even if you think you know where I'm going
20 with a question, I'm going to ask that you refrain
21 from answering until I've finished asking the
22 question, just so that we get a clear record.
23        Is that okay?
24    A   Yes.
25    Q   Are you on any medication today that would

1  impact your ability to understand or truthfully answer
2  any of my questions?
3     A   No.
4     Q   Do you know of any reason why you cannot
5  understand or truthfully answer my questions today?
6     A   No.
7     Q   All right.  So I want to begin with the
8  damages you claim in this lawsuit.  And we'll start
9  with Exhibit 1.
10        If I represented to you that this document
11 was prepared on your behalf by your attorneys, would
12 that make sense to you?
13    A   Yes.
14        MR. SWAIN:  Object to form.
15    Q   (By Ms. Smith)  You can still answer.
16    A   Can you repeat the question, please.
17    Q   Sure.  If I represented to you that this
18 document was prepared on your behalf by your
19 attorneys, would that make sense to you?
20        MR. SWAIN:  Same objection.
21    A   Yes.
22    Q   (By Ms. Smith)  All right.  Let's look at
23 page 7 of Exhibit 1.  On page 7 of Exhibit 1, there's
24 a Section C, where it says, "Damages."
25        Do you see that?

1     A   Yes.
2     Q   And let's go to the second paragraph under
3  Section C, under "Backpay/Lost Wages & Benefits."  Are
4  you following me?
5     A   Yes.
6     Q   In the third sentence of that paragraph, it
7  states, "Following her" -- "Following her September
8  2020 termination, Plaintiff was unemployed for
9  approximately 3 months before she partially mitigated
10 her economic damages by becoming re-employed in late
11 November 2020."
12        Do you see that reference?
13    A   I do.
14    Q   Did you have any source of income during
15 that three-month period of unemployment?
16    A   I did --
17        MR. SWAIN:  Object to form.
18    A   I did not.
19    Q   (By Ms. Smith)  You didn't have any
20 unemployment benefits?
21    A   I did not.
22    Q   Did you have any disability benefits?
23        MR. SWAIN:  Object to form.
24    A   I did not.
25    Q   (By Ms. Smith)  During that three-month

Page 10

1   period of unemployment, did you apply for any jobs?
2       A   I did.
3       Q   Which jobs did you apply for?
4           MR. SWAIN:  Object to form.
5       A   There are a number of openings I applied
6   for.  I can't recall all of them at this moment.  But
7   I -- for example, I applied for Amazon, an opportunity
8   for a senior instructional designer there.
9           I applied for several openings for senior
10  and instructional designer positions.
11      Q   (By Ms. Smith)  And do you still have
12  copies of those applications?
13      A   I do.
14      Q   Would you be able to provide them to your
15  attorneys?
16      A   They were provided, I believe.
17      Q   What happened with the position for Amazon,
18  senior instructional designer?
19      A   I received a notification that they decided
20  to move -- with another candidate.
21      Q   Did you receive any interviews with that
22  job?
23      A   No.
24      Q   And you said you applied for several other
25  senior instructional designer positions?

Page 11

1       A   Uh-huh.  Yes.
2       Q   Do you recall the names of the companies
3   you applied?
4       A   I don't recall it at this moment.
5       Q   Would those be reflected in the records of
6   applications you provided to your attorneys?
7       A   They are.
8       Q   Did you receive any interviews?
9           MR. SWAIN:  Object to form.
10      A   I did.
11      Q   (By Ms. Smith)  Do you recall where you
12  received interviews?
13      A   I do.  I think the company name was Hugo,
14  but I'm not really sure.  I can't recollect the exact
15  name.
16      Q   Would you be able to spell Hugo for us?
17      A   H-u-g-o.
18      Q   Do you recall what type of company Hugo
19  was?
20      A   Yes.  It was an HR software company,
21  basically a company that sells software for HR
22  professionals and --
23      Q   Okay.
24      A   -- departments.
25      Q   And that was for a senior instructional

Page 12

1   designer position?
2       A   As far as I recall.
3       Q   And you did not -- you did receive an
4   interview with Hugo?
5       A   I did.
6       Q   And what happened as a result of that
7   interview?
8       A   I did not receive the position.
9       Q   Were you informed that you were not
10  receiving the position?
11      A   I did.
12      Q   Do you remember who you interviewed with?
13      A   I do not recall at this moment.
14      Q   Do you recall the salary range for the
15  position?
16          MR. SWAIN:  Object to form.
17      A   I do not recall at this moment.
18      Q   (By Ms. Smith)  Do you recall generally
19  what salary ranges for jobs you were applying for?
20      A   Uh-huh.  I was aiming for 80,000 -- 75,000,
21  80,000, and plus.
22      Q   And the position for Hugo, was that a
23  remote position, or was that an in-person position?
24      A   It was a remote position.
25      Q   Were all the jobs you were looking at

Page 13

1   remote positions?
2       A   They were.
3           MR. SWAIN:  Object to form.
4       A   They were.
5       Q   (By Ms. Smith)  Was there a reason why you
6   were looking for remote positions?
7       A   This is -- I'd been working remotely before
8   this time for almost three years, and I wanted to
9   continue -- and, you know, to continue work remotely,
10  even after being fired by SHRM.
11      Q   It was convenient for you?
12      A   It was convenient.  It's -- I work better
13  remotely as well.  So . . .
14      Q   And do you have any geographic limitations
15  to your job searches?
16          MR. SWAIN:  Object to form.
17      Q   (By Ms. Smith)  Were you looking
18  nationally?
19          MR. SWAIN:  Same objection.
20      A   I was.
21      Q   (By Ms. Smith)  You were looking
22  nationally?
23      A   Uh-huh.
24      Q   And tell me about the job search websites
25  that you may have looked at during your search

4 (Pages 10 - 13)

Page 14

1 efforts. Did you --
2    MR. SWAIN: Object to form.
3    Q    (By Ms. Smith) Did you look online at any
4 job postings or positions?
5    A    Yes, I did.
6    Q    Do you recall which job sites you looked
7 at?
8    A    The ones I recall right now is Indeed,
9 Glassdoor. That's all I can recall at this moment.
10    Q    Do you have any records of those job
11 searches?
12    A    Job --
13    MR. SWAIN: Object to form. Which time
14 period are we talking about?
15    Q    (By Ms. Smith) The three-month time period
16 following your termination from SHRM.
17    A    Okay. And can you clarify record of job
18 searches?
19    Q    Sure. Like, did you track in handwritten
20 notes or a diary entry, for instance, what jobs you
21 were looking at and when?
22    A    I did not.
23    Q    Did you save any printouts of any jobs that
24 you were interested in?
25    MR. SWAIN: Object to form.

Page 15

1    A    Can you clarify that.
2    Q    (By Ms. Smith) Sure. For instance, if you
3 were looking at the job with Hugo, did you say, Okay,
4 this job looks like it might be a possible contender;
5 I'm going to save a printout of the job posting for my
6 reference?
7    A    I do not recall doing that.
8    Q    Okay. Did you search for any jobs in
9 Colorado?
10    A    I did.
11    Q    Do you recall which ones?
12    A    I do not recall.
13    Q    Did you limit your job searches to the
14 position of instructional designer, senior
15 instructional designer?
16    A    I did not.
17    Q    What other jobs did you look for?
18    A    I looked for talent management, learning
19 and development, eLearning specialist, curriculum
20 developer, content manager.
21    That's as far as I recall right now.
22    Q    And did you get any traction with any of
23 those areas?
24    MR. SWAIN: Object to form.
25    A    Can you clarify.

Page 16

1    Q    (By Ms. Smith) Sure. Did any one of those
2 areas lead to more job leads than others?
3    MR. SWAIN: Object to form.
4    A    The position that led to something is the
5 one I took.
6    Q    (By Ms. Smith) And which one was that?
7    A    That was at HackerU.
8    Q    That was HackerU?
9    A    Yep.
10    Q    And can you spell that for us.
11    A    H-a-c-k-e-r and U.
12    Q    In what sort of field was the job with
13 HackerU?
14    A    It was training and development.
15    Q    Was that a remote position?
16    A    It was.
17    Q    Was the position with HackerU the first job
18 offer you had received following your termination from
19 SHRM?
20    A    It was.
21    Q    Did you work with a recruiter, a
22 headhunter, or consultant as part of your job search
23 efforts?
24    A    I did not.
25    Q    Why not?

Page 17

1    A    A, I wasn't aware that this was an option
2 or tool that I can use. I had recruiters reach out to
3 me on LinkedIn, and I responded to them. But I wasn't
4 aware that this is a service that I can -- I can use.
5    Q    Describe for me the job offer with HackerU.
6 What was the specific position?
7    Q    Do you mean job duties?
8    Q    Your role.
9    A    My role. My role, as described by HackerU,
10 would be working on curriculum for certification
11 programs that the company is -- was building and
12 offering to students.
13    And my job would be taking a look at the
14 curriculum, making sure it aligns with instructional
15 design best practices and aligns also with the
16 learner's needs that we're targeting.
17    Q    And what was your specific title at
18 HackerU?
19    A    Instructional designer.
20    Q    Was it senior instructional designer or
21 just instructional designer?
22    A    Just instructional designer.
23    Q    And do you recall the compensation for the
24 position?
25    A    I want to say it was 80,000, but I am not

5 (Pages 14 - 17)

1  sure.
2  Q  Where is HackerU based?
3  A  I am not aware.
4  Q  Did you ever visit their corporate office?
5  A  I had not.
6  Q  Your position was completely remote?
7  A  It was.
8  Q  Do you recall who your supervisor was?
9  A  Uh-huh.  Shawn.  Shawn Hanagee (phonetic),
10  I think is the last name.  And I cannot spell that.
11  Q  Do you recall Shawn's title?
12  A  I believe he was a director of -- I want to
13  say training and development department.  I'm also
14  unsure of that.
15  Q  Have you received any professional or
16  education credentials since your time working at SHRM?
17  A  Until now?
18  Q  Yes.
19  A  I have not.
20  Q  Have you undertaken any job retraining
21  since your time working at SHRM?
22  MR. SWAIN:  Object to form.
23  A  Job retraining?
24  Q  (By Ms. Smith)  Yes.
25  A  Can you clarify that.

1  Q  Sure.  Any sort of training that would
2  allow you to move outside of your industry.
3  A  I have not.
4  Q  Let's look at page 8 of the disclosures in
5  Exhibit 1.  In the next sentence, it says that you
6  became reemployed in late November 2020.
7  Do you see where I'm referencing?
8  A  I do.
9  Q  Where did you become reemployed?  Was that
10  at Hacker?
11  A  Yes.  HackerU.
12  Q  Do you recall the specific dates of your
13  employment at Hacker?
14  A  I do not.
15  Q  Did Shawn Hanagee hire you for the position
16  at HackerU?
17  A  He did.
18  Q  Do you recall receiving any other
19  compensation other than your salary at HackerU, such
20  as benefits?
21  A  I received benefits.
22  Q  Do you recall what those benefits were?
23  A  The ones I can recall is health insurance,
24  dental, vision.  That's as far as I can recall.
25  Q  Were you eligible for a bonus?

1  MR. SWAIN:  Object to form.
2  A  I don't recall having a bonus system --
3  HackerU having one.
4  Q  (By Ms. Smith)  Did you have a 401(k)?
5  A  I cannot recall that.
6  Q  Do you still have your offer letter from
7  HackerU?
8  A  I do.
9  Q  Was that provided to your attorneys?
10  A  It was.
11  Q  And tell me about your separation from
12  HackerU.  Was that a voluntary separation?
13  A  It was.
14  Q  You resigned?
15  A  I did.
16  Q  What was the reason for your resignation?
17  A  Mainly, it became apparent that the tasks
18  and the role that I was in did not really reflect the
19  vision or the description that I was told during the
20  interview, when I accepted the job.
21  There were a lot of inconsistencies when it
22  comes to expectations of my role and a lot of
23  unclarity of what is expected of me.
24  This -- basically, it was more of an
25  organizational I would call it dilemma.  They're

1  figuring things out within the organization.
2  And soon after I resigned, my entire team,
3  including my role, was eliminated.
4  Q  Okay.  When you say that there were
5  discrepancies between the expectations and what you
6  were told the role would be, can you give us some
7  examples of what those discrepancies were?
8  A  Uh-huh.  As an instructional designer, I
9  was told that I would be -- basically take information
10  available at the organization and build a curriculum
11  that can help -- help individuals, adults, to advance
12  their career in fields like digital marketing, data
13  science, fintech, and things like that.
14  So the expectations were for me to go and
15  interview subject matter experts on the topics and
16  then take this information and develop a curriculum
17  that can adhere to the audience that we're targeting.
18  However, the reality was a bit different.
19  It seemed that the organization hired two positions
20  for the same role, which often collided, meaning that
21  there were positions called curriculum engineers, who
22  were also developing curriculum for the same programs.
23  And it was almost like we were both
24  developing curriculum for the same program, but
25  everyone's doing it separately.

6 (Pages 18 - 21)

|   | Page 22 |
|---|---|
| 1 | And there were a lot of confusion on which |
| 2 | curriculum stays, or Why were you hired again if we |
| 3 | are already developing the curriculum for that |
| 4 | program? A lot of people were not really |
| 5 | understanding why I was there. |
| 6 | Q So did you get the sense from individuals |
| 7 | at Hacker that your role was duplicative of the |
| 8 | curriculum engineers? |
| 9 | A It was. |
| 10 | Q Did you ever complain to anyone at HackerU |
| 11 | that the role did not meet the expectations for which |
| 12 | you were hired? |
| 13 | A I did bring it up in a sense of, We need a |
| 14 | more efficient process in place in order to not |
| 15 | duplicate the efforts of individuals, you know, that |
| 16 | are hired to do the same thing. |
| 17 | So I did bring it up, that maybe we need to |
| 18 | clarify a little bit to everyone involved on who is |
| 19 | doing what, so we can work efficiently. |
| 20 | Q And who did you raise that concern to? |
| 21 | A To Shawn and other stakeholders as well. |
| 22 | Q Do you remember Shawn's response, if any, |
| 23 | when you raised the concern? |
| 24 | A Shawn admitted that this is an issue -- you |
| 25 | know, this was a startup. He admitted that, as a |

|   | Page 23 |
|---|---|
| 1 | startup, a lot of changes happen very quickly and that |
| 2 | they were struggling to keep up with the changes that |
| 3 | were taking place. |
| 4 | Q About how many employees did HackerU have? |
| 5 | A I cannot recall. |
| 6 | Q Do you recall if it was less than a |
| 7 | hundred? |
| 8 | A I don't really know. I can't recall. |
| 9 | Q Can you recall if it was more than five? |
| 10 | A It was more than five. |
| 11 | Q Can you recall if it was more than ten? |
| 12 | A It was more than ten. |
| 13 | Q Can you recall if it was more than 20? |
| 14 | A It was more than 20. |
| 15 | Q Okay. Did you assert any claims of |
| 16 | discrimination against Hacker following your |
| 17 | separation of employment there? |
| 18 | A I did not. |
| 19 | Q Did you receive a severance or settlement |
| 20 | from Hacker following your separation? |
| 21 | A I did not. |
| 22 | Q When you provided notice of your |
| 23 | resignation, what did you tell Hacker? |
| 24 | A I told HackerU that I am no longer -- this |
| 25 | is my two weeks' notice, and I would be moving on |

|   | Page 24 |
|---|---|
| 1 | after that. |
| 2 | Q Did you provide a reason for the |
| 3 | resignation at that time? |
| 4 | A I did. |
| 5 | Q And what did you tell them? |
| 6 | A The same reasons I mentioned previously, |
| 7 | which is unclarity on the role, expectations, |
| 8 | duplicates of efforts. |
| 9 | Q Have you completed your response? |
| 10 | A Yes. |
| 11 | Q At the time you resigned from HackerU, had |
| 12 | you been looking for any other jobs? |
| 13 | A I started looking around the time that I |
| 14 | decided to resign. |
| 15 | Q And what sorts of jobs were you looking at? |
| 16 | A The same jobs I was looking for previously |
| 17 | as well. |
| 18 | Q Did you receive any offers or requests for |
| 19 | interview during that time? |
| 20 | A I received the request for interview for |
| 21 | the position that I currently hold. |
| 22 | Q Was that immediately following your |
| 23 | resignation from Hacker? |
| 24 | MR. SWAIN: Object to form. |
| 25 | A I can't really recall the exact date of |

|   | Page 25 |
|---|---|
| 1 | when I received the request for interview. |
| 2 | Q (By Ms. Smith) Let's go back to Exhibit 1, |
| 3 | page 8. In the second sentence, it states, "Plaintiff |
| 4 | was unemployed again for approximately 37 weeks |
| 5 | between August 6, 2021 and April 25, 2022, at which |
| 6 | time she became re-employed." |
| 7 | Do you see that? |
| 8 | A I do. |
| 9 | Q Is that the period of reemployment that |
| 10 | you're referencing? |
| 11 | A As far as I remember. |
| 12 | Q During your 37-week period of unemployment |
| 13 | between August 6, 2021, and April 25, 2022, did you |
| 14 | have any source of income? |
| 15 | A I did not. |
| 16 | MR. SWAIN: Object to form. |
| 17 | Q (By Ms. Smith) Did you have any |
| 18 | unemployment benefits? |
| 19 | A I -- |
| 20 | MR. SWAIN: Object to form. |
| 21 | A I did not. |
| 22 | Q (By Ms. Smith) Any disability benefits? |
| 23 | MR. SWAIN: Same objection. |
| 24 | A I did not. |
| 25 | Q (By Ms. Smith) Did you have any sort of |

7 (Pages 22 - 25)

Page 26

1  part-time work?
2      A  I did not.
3      Q  Do you recall the names of the companies
4  which you applied during that 37-week period of
5  unemployment?
6      A  I do not recall.
7      Q  Did you save records of any of those
8  applications?
9      A  I have records of application receipts.  So
10  after applying for a position, they usually send you a
11  notification that, We received your application.
12      Q  Were those receipts for the applications
13  which were submitted provided to your attorneys?
14      A  They were.
15      Q  Do you recall what the salary ranges were
16  for the positions you were applying during that
17  37-week period of unemployment?
18      A  Seventy-five, 80-plus -- 80,000-plus.
19      Q  And were you looking at remote positions
20  during that time?
21      A  I was.
22      Q  Were you looking at positions in Colorado?
23      A  I was.
24      Q  Were you looking at positions nationally?
25      A  I was.

Page 27

1      Q  Did you reject any offers of employment
2  during that time?
3      A  I did not.
4      Q  Going back to page 8 of Exhibit 1, in the
5  second sentence, is it correct that you became
6  reemployed on April 25, 2022?
7      A  I can't recall the exact date.
8      Q  Do you have any reason to doubt that that
9  date is correct?
10      A  I don't.
11      Q  Where did you become reemployed at this
12  time?
13      A  A company called TTI Global.
14      Q  And where is TTI Global located?
15      A  They're remote.  I don't know where their
16  headquarters are -- or is.
17      Q  Are you still working at TTI Global?
18      A  I am.
19      Q  In what position were you hired?
20      A  Senior instructional designer.
21      Q  Were you hired as a senior instructional
22  designer, or did you move into the senior
23  instructional designer role after your hire?
24      A  I was hired as a senior instructional
25  designer.

Page 28

1      Q  Is that your current position?
2      A  It is.
3      Q  And what are your duties and
4  responsibilities with respect to that role?
5      A  My duties and responsibilities is to
6  develop sales enablement training, to help sales teams
7  with Microsoft, to hold conversations with their
8  potential clients.
9      Q  And do you recall the individual who hired
10  you?
11      A  Ian, I-a-n, his name.  I do not recall his
12  last name.
13      Q  Do you recall his title?
14      A  I do not.  I do know that he was part of
15  the recruitment team.
16      Q  And to whom do you report?
17      A  Rachel.  I do not recall the last name
18  either.
19      Q  Rachel is your current supervisor?
20      A  Uh-huh.
21      Q  Do you know how large of an organization
22  TTI Global is?
23      A  I do not.
24      Q  Do you know if they have more than five
25  employees?

Page 29

1      A  They do.
2      Q  Do you know if they have more than 50
3  employees?
4      A  They do.
5      Q  Do you know if they have more than 100
6  employees?
7      A  I am not aware.
8      Q  At what compensation were you hired?
9      A  95,000, if I can recall correctly.
10      Q  Is that your salary?
11      A  Yes.
12      Q  Do you have any benefits as well?
13      A  I do have benefits:  health benefits.
14      Q  Do you have any other benefits other than
15  health?
16      A  I have a 401(k).
17      Q  And can you explain the 401(k)?  Do you
18  have a matching contribution?
19      A  I don't.
20      Q  Do you still have your offer letter from
21  that job?
22      A  I do.
23      Q  Was that provided to your attorneys?
24      A  It was.
25      Q  Have you ever asserted any claims of

8 (Pages 26 - 29)

Page 30

1  discrimination against TTI Global?
2      A   I have not.
3      Q   Going back to page 8 of Exhibit 1, the
4  third sentence states, Plaintiff intends to seek lost
5  wages and benefits for her periods of unemployment in
6  addition to the differential in her earnings and
7  benefits from the amount she would have earned by
8  continuing to work for Defendant (including raises).
9          Do you see that?  It's the third sentence
10  on page 8.
11      A   Yep, I see it.
12      Q   How much did you earn in salary at SHRM at
13  the time of your termination of employment?
14      A   I believe it was 80,000 a year.
15      Q   Did you receive a bonus at SHRM?
16      A   I did.
17      Q   Do you recall what that was?
18      A   It was different every year.
19      Q   Do you recall what the bonus was during the
20  year of your termination?
21      A   I do not recall.
22      Q   Do you recall any of the ranges of the
23  bonus during your employment?
24          MR. SWAIN:  Object to form.
25      A   I believe it was within 5K.

Page 31

1      Q   (By Ms. Smith)  Do you ever recall the
2  bonus exceeding $5,000?
3      A   I don't recall that.
4      Q   What's your understanding of how the bonus
5  was paid?  Was it a performance-based bonus?
6      A   It was a performance-based bonus.
7      Q   Was it based on your individual
8  performance?
9      A   It was.
10      Q   Do you have record of the bonuses you
11  received at SHRM?
12      A   Records as . . .
13      Q   Reflected on your wage information, pay
14  stubs, W-2.
15          MR. SWAIN:  Object to form.
16      A   I don't recall.
17      Q   (By Ms. Smith)  Did you have health
18  insurance at SHRM?
19      A   I did.
20      Q   Did you have to pay any out-of-pocket
21  premiums for COBRA following your termination from
22  SHRM?
23      A   I can't recall.
24      Q   Do you have any records reflecting payment
25  of premiums for COBRA?

Page 32

1      A   I can't recall.
2      Q   If you had those records, would you have
3  provided them to your attorneys?
4          MR. SWAIN:  Object to form.
5      A   Would I provide them?
6      Q   (By Ms. Smith)  (Nodded head up and down.)
7      A   If necessary.
8      Q   So if you had those records, would you
9  provide them to your attorneys?
10          MR. SWAIN:  Object to form.
11      A   If necessary.
12      Q   (By Ms. Smith)  Would you be able to locate
13  whether you have those records or not currently?
14      A   I'm not really sure if I can or not.  I
15  have to look into it.
16      Q   What would you -- what steps would you take
17  to look into that?
18      A   I believe look at health records and see if
19  I paid with any of those doctor visits.
20      Q   Did you receive a 401(k) matching
21  contribution from SHRM?
22      A   I did.
23      Q   Do you recall the amount of the matching
24  contribution?
25      A   I do not recall.

Page 33

1      Q   Do you recall if it was a certain
2  percentage of your salary?
3          MR. SWAIN:  Object to form.  She just
4  testified she doesn't recall.
5      A   Uh-huh.  I do not recall.
6      Q   (By Ms. Smith)  Do you recall if the
7  matching contribution was something like 3 percent?
8          MR. SWAIN:  Object to form.  She already
9  testified she doesn't recall.
10      A   I do not recall.
11      Q   (By Ms. Smith)  Do you recall if the
12  matching contribution was something along the lines of
13  5 percent?
14          MR. SWAIN:  Same objection.
15      A   I do not recall.
16      Q   (By Ms. Smith)  Did you receive a company
17  reimbursement for your cell phone bill?
18      A   I did not.
19      Q   Is there any other category of benefit that
20  we have not discussed that you were provided at SHRM?
21      A   I do remember there were pension -- a
22  pension plan.
23      Q   And explain to me the pension plan.
24      A   I do not recall the details.  All I
25  remember is that there was a pension plan.

Page 34

1    Q   Were you a participant in the pension plan?
2    A   My understanding, that if my employment had
3  reached the five-year mark, then I would have received
4  a pension from SHRM.
5    Q   And how did you understand that if your
6  employment reached the five-year mark, you would have
7  received eligibility for the pension?
8    A   I believe --
9        MR. SWAIN:  Object to form.
10   A   I believe it was part of the onboarding.
11   Q   (By Ms. Smith)  What raises do you believe
12 you qualified for at SHRM?
13       MR. SWAIN:  Object to form.
14   A   Can you clarify.
15   Q   (By Ms. Smith)  Sure.  Were you eligible
16 for salary increases during your time at SHRM?
17   A   I do not understand the question.
18   Q   Did you ever receive an increase in pay
19 when you worked at SHRM?
20   A   I did.
21   Q   Do you believe that if your employment had
22 continued with SHRM, you would have been qualified for
23 further salary increases?
24   A   I do believe so.
25   Q   And what do you believe the amount of those

Page 35

1  salary increases would be?
2    A   I do not know.
3    Q   Did you receive a standard annual increase?
4    A   Yes.
5    Q   Do you recall what that amount was?
6    A   I do not.
7    Q   Was that a certain percentage of your
8  salary?
9        MR. SWAIN:  Object to form.
10   A   I cannot recall.
11   Q   (By Ms. Smith)  Let's go to the bottom of
12 page 8 on Exhibit 1.  Under Reinstatement/Front Pay,
13 this states, Ms. Mohamed sinks -- seeks reinstatement
14 or front pay in an amount to be determined by the
15 Court.
16       Are you seeking reinstatement to SHRM as
17 part of this lawsuit?
18   A   Yes.
19   Q   Do you intend to keep your employment at
20 TTI Global?
21       MR. SWAIN:  Object to form.
22   A   So if the reinstatement is received, or
23 just in general?
24   Q   (By Ms. Smith)  Well, you tell me.  It says
25 that you're seeking reinstatement as part of this

Page 36

1  lawsuit.  So I'm wondering what that would look like
2  as far as your kind of professional career.
3        MR. SWAIN:  Object to form.
4    Q   (By Ms. Smith)  Would you return to SHRM as
5  an employee and give up your job at TTI Global?
6    A   I mean, I am seeking reinstatement.  So if
7  that comes down to this, and we agree on terms or we
8  come to terms that I do agree on, I am willing to
9  explore that possibility.
10   Q   And you're seeking compensatory damages in
11 this lawsuit as well, correct?
12   A   I am.
13   Q   What evidence do you have that you're
14 entitled to compensatory damages?
15       MR. SWAIN:  Object to form.
16   A   I do not understand the question.
17   Q   (By Ms. Smith)  You believe you're entitled
18 to compensatory damages, correct?
19   A   Uh-huh.
20   Q   Why?
21   A   Why?  Because I was fired unjustly, and
22 that has caused economic damage because of the salary
23 that was basically cut off.  My income was cut off.
24       And if I was not fired unjustly by SHRM,
25 I -- that income would have continued -- would have

Page 37

1  continued, and I would have still, you know, had that
2  compensation.  So . . .
3    Q   Have you sought treatment by any healthcare
4  provider as a result of your termination of employment
5  from SHRM?
6    A   As a result of the termination?
7    Q   Yes.
8    A   No.
9    Q   Have you sought treatment by any healthcare
10 provider as a result of your employment at SHRM?
11   A   I have.
12   Q   And who did you seek treatment with?
13   A   A counseling center here, a therapist
14 center here in Colorado.
15   Q   Do you recall the name of that center?
16   A   Creative Counseling.  That's not the exact
17 name, but that's as far as I recall.
18   Q   Do you remember the name of the counselor
19 who you saw?
20   A   I can't recall her name.
21   Q   It was a woman?
22   A   Yes.
23   Q   And when did you seek counseling at
24 Creative Counseling?
25       MR. SWAIN:  Object to form.

10 (Pages 34 - 37)

1    A   I seeked (sic) counseling twice.  I can't
2  recall the exact dates where I seeked out, but I
3  seeked -- there was a period of years between the
4  first time I seeked out and the second time I seeked
5  out.
6        What I do recall is that the second time I
7  reached out for counseling was in August, the same
8  month that I was unjustly fired by SHRM.
9    Q   (By Ms. Smith)  And do you recall what the
10  second time was that you sought out counseling?
11    A   That was the second time.
12    Q   Do you recall the first time you sought out
13  counseling?
14    A   I can't exact- -- I can't remember the
15  exact year, but I would say a couple years before
16  2020, so maybe 2018.
17    Q   Are you still seeing a counselor from that
18  Creative Counseling Center?
19    A   I am not.
20    Q   What prompted you to stop seeing a
21  counselor?
22    A   Initially, we have developed a routine and
23  a -- yeah, a routine that really helped me with
24  whatever I was going through at that time.
25        My conditions kept --

1        (Sneeze.)
2        THE DEPONENT:  Bless you.
3        MS. SMITH:  Bless you.
4        MR. SWAIN:  Thank you.
5    A   My conditions were getting better session
6  after session.  Things were just getting better
7  overall.
8        Sessions initially slowed down, the
9  frequency of the sessions, until we decided that it
10  was a good place for us to not continue the regular
11  sessions.  And her door is open if I ever feel like I
12  need to reach back to her.
13    Q   (By Ms. Smith)  So when you say,
14  "sessions," are you referring to the two times you
15  went to counseling; or were there other times?
16    A   Yeah.  So I think there was a
17  misunderstanding.  When I say two times, it doesn't
18  mean two visits; it means like two periods that I was
19  seeking counseling.
20        The first period, multiple sessions took
21  place during that period.
22    Q   And what about during the second period?
23    A   The second period was only one session.
24    Q   Why was the second period only one session?
25    A   I needed to -- I needed a voice on -- or a

1  reminder on how I handled those triggers and trauma
2  that I was suffering from.
3        And since we established a very strong
4  foundational work during the first period that I was
5  seeking therapy, we didn't really need as much work
6  the second time.  I just needed to touch base and just
7  touch on those core routines, habits, things that
8  really helped me out.
9        And so that session, it was just more of a
10  reminder of me of what had helped me, why I am
11  experiencing negative, you know, thoughts.  And I felt
12  it was sufficient afterwards.
13    Q   Are you claiming that you suffered trauma
14  as a result of your termination of employment from
15  SHRM?
16    A   I am.
17    Q   And what trauma are you claiming you
18  suffered?
19    A   What trauma?  The systematic harassment
20  structure, racism, intense bullying that SHRM has put
21  me through has triggered a lot of -- a lot of negative
22  thoughts and a lot of negative feelings that impacted
23  me and left a burden on me that I am stealing -- I am
24  still dealing with today.
25    Q   What impacts are you still dealing with

1  today?
2    A   One of the things that -- that was a clear
3  outcome of what happened at SHRM is the fact that it
4  is not safe to speak up, even though when wrongdoings
5  are taking place -- even though when you speak up, you
6  come across as trying to find the solution that would
7  facilitate me doing my job correctly.
8        It was -- it was very apparent and evident
9  that there is no safe space for me to speak up, as a
10  black woman.  And until today -- I'm a different
11  person in the workplace.  You know, sit by the
12  wall, do the minimum, don't speak up.
13        I don't feel safe.  I don't feel that --
14  even if a wrongdoing is taking place, that I have
15  something to protect me.
16    Q   Do you feel less assertive in your current
17  work environment because of what you claim happened at
18  SHRM?
19    A   Can you explain "less assertive."
20    Q   Sure.  You said that you don't feel
21  comfortable speaking up.  What don't you feel
22  comfortable speaking up about?
23    A   I don't feel comfortable speaking up about
24  policies that -- that the organization is putting out.
25  I don't comfortable -- I don't feel comfortable

11 (Pages 38 - 41)

Page 42

1 speaking up about diversity and inclusion initiatives
2 and being part of those because of what happened at
3 SHRM.
4 Yes. So that's just an example of one of
5 the things that I don't feel comfortable speaking
6 about.
7 Q Are there any other examples that you can
8 provide to us about the purported trauma that you
9 suffered as a result of your termination of employment
10 from SHRM?
11 A Yes. Yes. So besides being a completely
12 different employee, as a person, during -- during that
13 period, I have found myself having zero energy. I was
14 emotionally drained all the time, under -- feeling
15 intense anxiety and stress.
16 Again, there was a lack of safe -- safety
17 that I just felt during that period. I didn't feel
18 safe to say anything, to be myself.
19 I -- as a result, I was always just lacking
20 energy, sleeping a lot. I did not want to be awake,
21 because my reality back then was too much for me to
22 deal with.
23 Q And can you elaborate on the time frame
24 when you were experiencing this intense anxiety and
25 stress and sleeping a lot?

Page 43

1 MR. SWAIN: Ms. Smith, I'm not sure if she
2 was finished with her answer.
3 MS. SMITH: Sure.
4 Q (By Ms. Smith) Go ahead.
5 A Uh-huh. So again, the intense -- the
6 intensity that was taking place in the workplace at
7 SHRM has left me under severe anxiety, a lot of
8 stress, feeling unsafe, feeling that I need to be less
9 of myself, feeling not safe to be myself or even speak
10 about my own work, even if it's not a contro- --
11 controversial topic. Just regular day-to-day meetings
12 just felt very stressful.
13 Again, as a result, I suffered severe
14 anxiety on and off work, which led to a lack of
15 energy, withdrawn from social activities and from my
16 social circles.
17 I didn't have energy to be me, as a person.
18 I felt that I had -- I was carrying a big burden that
19 SHRM has put on me, as a black woman, not only to
20 prove that my immediate supervisor was discriminating
21 against me, harassing me, and -- and bullying me, but
22 also to come up with solutions for SHRM to fix or make
23 sure that the supervisors were capable of dealing with
24 a diverse team, capable with checking their
25 subconscious bias.

Page 44

1 It was -- all that was put on me. And I
2 just wanted to set a reminder that this time was also
3 during COVID-19. It was during the brutal murdle --
4 murder of George Floyd.
5 And as -- during that time, workplace
6 worked as an outlet for many people, because we were
7 living in isolation, in an intense environment as a
8 country.
9 And usually workplaces were a place for
10 people to vent and a safe space for them to just talk
11 about what was going on and how the conditions were
12 impacting them.
13 For me, workplace was an additional source
14 of stress, it was an additional source of anxiety, was
15 an additional reality of what was going on in the
16 country, that I had to live through.
17 Q Have you completed your response?
18 A I have.
19 Q And so going back to my question: What
20 time frame were you experiencing the symptoms of
21 intense anxiety and stress?
22 Was this during your employment with SHRM
23 or following your termination?
24 A It was --
25 MR. SWAIN: Object to form.

Page 45

1 A Uh-huh. It was both: during and
2 following.
3 Q (By Ms. Smith) Can you place an
4 approximate time frame on when you were experiencing
5 these symptoms during your employment? You mentioned
6 COVID-19.
7 A I can't put an exact date of when the
8 intensity it started, but I do know for sure it was
9 after I came forward with a complaint to Jeanne Morris
10 about the discrimination behavior that I was
11 experiencing from Carolyn.
12 It became more intense after that date. It
13 did surely exist before then, but it became more
14 intense after that.
15 Q Have you ever suffered from these symptoms
16 prior to your employment with SHRM?
17 A Prior to the employment with SHRM. Not to
18 that intensity.
19 Q Have you ever suffered from these sorts of
20 symptoms of a lesser intensity prior to your
21 employment with SHRM?
22 A Not to this intensity, again. So . . .
23 Q Had you ever experienced stress prior to
24 your employment with SHRM?
25 A I have experienced stress before my

12 (Pages 42 - 45)

Page 46

1 employment with SHRM.
2 Q Have you ever experienced anxiety prior to
3 your employment with SHRM?
4 A I have experienced anxiety.
5 Q Are you diagnosed with anxiety or
6 generalized anxiety or anything like that?
7 A Diagnosed . . .
8 Q By a doctor. To your knowledge.
9 A Yeah, I don't -- I don't really know. So I
10 know my therapist in the beginning of our work did
11 point out that I had anxiety and stress, but I don't
12 know if diagnosed means that I was taking medicine or
13 it was, you know, like an official kind of diagnosis.
14 I don't know that.
15 Q Okay. Were you prescribed any medication
16 for the anxiety?
17 A I was --
18 MR. SWAIN: Object to form.
19 THE REPORTER: Can you repeat your answer.
20 THE VIDEOGRAPHER: I didn't get an answer.
21 A I was not.
22 Q (By Ms. Smith) You're seeking punitive
23 damages as part of this lawsuit, correct?
24 A Correct.
25 Q What evidence do you have that you should

Page 47

1 receive punitive damages?
2 A I don't really recall specific evidence for
3 punitive damages. Uh-huh.
4 MS. SMITH: I think this is a good time to
5 take a brief break, if that suits you-all.
6 THE VIDEOGRAPHER: Going off the record at
7 10:02.
8 (Recess taken.)
9 THE VIDEOGRAPHER: Back on the record at
10 10:15.
11 Q (By Ms. Smith) Ms. Mohamed, looking at
12 Exhibit 1, and turning your attention to Section A of
13 Exhibit 1, which is contained on pages 1 through 6,
14 there's a list of a number of individuals here.
15 And you can take your time and review this
16 list. Let me know when you're -- when you're ready.
17 A (The deponent perused the exhibit.)
18 Okay. I reviewed it.
19 Q Have you been in contact with any of the
20 individuals identified in this exhibit since your
21 filing of this lawsuit?
22 A I have.
23 Q Can you please tell us who you've been in
24 contact with.
25 A Taylon Terrell.

Page 48

1 MR. SWAIN: Can you repeat that. I'm
2 sorry.
3 THE DEPONENT: Taylon Terrell; ff, page 3.
4 Q (By Ms. Smith) Is there anyone else?
5 A No.
6 Q When have you been in contact with Taylon
7 Terrell?
8 A I cannot recall the exact date.
9 Q Was it one occasion or multiple occasions?
10 A Multiple occasions.
11 Q Can you recall generally how many occasions
12 you've been in contact with Taylon Terrell?
13 A I cannot recall.
14 Q Is it more than two occasions?
15 A It is more than two occasions.
16 Q Is it more than five occasions?
17 A I can't recall.
18 Q And is -- Taylon Terrell, is that a male or
19 female?
20 A It's a female.
21 Q And how do you know Taylon Terrell?
22 A We worked together.
23 Q Did you work with Ms. Terrell at SHRM?
24 A Yes.
25 Q Is Ms. Terrell still working at SHRM?

Page 49

1 A Yes.
2 Q And how did your communications with Ms.
3 Terrell occur? Was it in person, by phone, by text,
4 by email, or some other method?
5 A Several ways of communication.
6 Q Can you describe for me what those ways of
7 communication were?
8 A In person, text. Yeah.
9 Q Do you still have copies of those text
10 messages?
11 A Not all of them.
12 Q Why not?
13 A My messages were erased, so there's a big
14 chunk of history missing.
15 Q And these are messages that you had with
16 Ms. Terrell after your filing of this lawsuit?
17 A Yes.
18 Q Do you recall when the messages were
19 erased?
20 A I do not recall.
21 Q How were they erased? Did you delete them?
22 A No. I lost my phone. My messages were not
23 backed up, so -- it wasn't just her message. It's
24 just all records of text messages were erased.
25 Q And what kind of phone did you lose?

13 (Pages 46 - 49)

|  | Page 50 |
|---|---|
| 1 | A   An iPhone. |
| 2 | Q   And do you recall when you lost the phone? |
| 3 | A   I do not recall. |
| 4 | Q   Was it this year? |
| 5 | A   I do not recall. |
| 6 | Q   What kind of phone do you have currently? |
| 7 | A   IPhone. |
| 8 | Q   Do you remember the content of your |
| 9 | discussions with Ms. Terrell? |
| 10 | A   I do. |
| 11 | Q   What did you discuss with her generally? |
| 12 | A   Her wedding.  I was a bridesmaid at her |
| 13 | wedding. |
| 14 | Q   Did you have any discussions with her |
| 15 | regarding this lawsuit? |
| 16 | A   Nope. |
| 17 | Q   Did you have any discussions with her |
| 18 | regarding your allegations against SHRM? |
| 19 | A   No. |
| 20 | MR. SWAIN:  Object to form.  Are we still |
| 21 | talking about since her termination? |
| 22 | MS. SMITH:  Since the filing of this |
| 23 | lawsuit. |
| 24 | MR. SWAIN:  Since the filing of the |
| 25 | lawsuit. |

|  | Page 51 |
|---|---|
| 1 | A   Yes.  No. |
| 2 | Q   (By Ms. Smith)  Turning your attention to |
| 3 | Section A, Part 3, which is on page 4 of Exhibit 1, |
| 4 | there are four individuals listed here. |
| 5 | Do you see that? |
| 6 | A   I do. |
| 7 | Q   I'd like to go through each of these |
| 8 | people.  Who is Louis Lessig? |
| 9 | A   Louis is one of the subject matter experts |
| 10 | that I was working with in -- for one of my projects |
| 11 | at SHRM. |
| 12 | Q   Do you remember what division or department |
| 13 | Louis worked in? |
| 14 | A   Louis is a vendor; so he's actually an |
| 15 | outside contractor, vendor, however you would like to |
| 16 | call it.  So he was not employed by SHRM. |
| 17 | Q   Are you still in touch with Louis? |
| 18 | A   No. |
| 19 | Q   Why do you believe he has information about |
| 20 | your job duties, work projects, and job performance? |
| 21 | A   Because of the nature of our work and |
| 22 | collaboration. |
| 23 | Q   And during what time frame did he observe |
| 24 | your work? |
| 25 | A   I cannot recall the exact time frame, but I |

|  | Page 52 |
|---|---|
| 1 | would say between May -- was it May?  No.  It was |
| 2 | before May.  Just early in the year of 2020 until my |
| 3 | time of termination. |
| 4 | Q   And who is Deborah Waddill? |
| 5 | A   Another subject matter expert that I |
| 6 | collaborated with on one of my projects at SHRM. |
| 7 | Q   Was Ms. Waddill also a vendor or outside |
| 8 | contractor? |
| 9 | A   She was. |
| 10 | Q   And when did you work with Ms. Waddill? |
| 11 | A   I can't recall the exact period, but it's |
| 12 | also during the 2020 year prior to my termination. |
| 13 | Q   And who is JoDee Curtis? |
| 14 | A   JoDee Curtis is also another subject matter |
| 15 | expert.  I believe she was the editor for one of my |
| 16 | projects. |
| 17 | Q   Do you remember which project? |
| 18 | A   I don't. |
| 19 | Q   And when did you overlap with Ms. Curtis? |
| 20 | A   Same period as Deborah and Louis:  just |
| 21 | 2020. |
| 22 | Q   And how about Rosalie Lacor- -- Lacorazza? |
| 23 | A   Uh-huh.  It's also an expert -- subject |
| 24 | matter expert that was part of the projects that I was |
| 25 | working with -- on at SHRM. |

|  | Page 53 |
|---|---|
| 1 | Q   Are you currently unaware of Ms. |
| 2 | Lacorazza's address? |
| 3 | A   I am not aware. |
| 4 | Q   And when did you overlap with Ms. |
| 5 | Lacorazza?  Same time period? |
| 6 | A   Same time period. |
| 7 | Q   Do any of these individuals -- do you |
| 8 | believe any of these individuals have knowledge of |
| 9 | your work interactions with Carolyn Barley? |
| 10 | A   Yes. |
| 11 | Q   Which ones? |
| 12 | A   At least Deborah and Louis. |
| 13 | Q   And how do you know that they observed your |
| 14 | interactions with Ms. Barley? |
| 15 | A   They were attendees at meetings where |
| 16 | Barley was an attendee. |
| 17 | Q   Did you ever complain to any of these |
| 18 | individuals that you felt discriminated against? |
| 19 | A   I have not. |
| 20 | Q   Are any of these individuals aware of your |
| 21 | lawsuit? |
| 22 | MR. SWAIN:  Object to form. |
| 23 | A   Not that I know of. |
| 24 | Q   (By Ms. Smith)  Let's look at Section A, |
| 25 | Part 5, which is on pages 5 and 6 of Exhibit 1.  There |

14 (Pages 50 - 53)

Page 54

are three individuals listed here.
Do you see that?
A What page again?
Q Pages 5 and 6. And it's Section A, Part 5.
A Section A, Part 5. Yes. Are you referring to Stephanie, Angela, and Ebony?
Q Yes.
A Yes.
Q Who is Stephanie Dunmore?
A Stephanie Dunmore is a former employee of SHRM.
Q And what was her role?
A As far as I recall, her role was an LMS: learning management system administrator.
Q How did you have occasion to interact with her?
A We've worked -- our nature of work has put us into collaborating on many projects together. Basically, the courses that I built, Stephanie launches on the -- on the platform. So there are a lot of back-and-forwards in order to get the task complete.
Q And why do you believe Ms. Dunmore has information regarding discrimination and retaliation against other employees?

Page 55

A She was informed of those discrimination incidents.
Q By whom?
A Almost every black person on the education team.
Q Can you provide names of those specific people?
A So just to clarify: You want names of . . .
Q You said that Ms. Dunmore was informed by every black person on the education team of discrimination and retaliation.
So I'm looking for the names of those black individuals on the education team.
A Yeah, like -- just to clarify: Every -- every black specialist? Because that's where I would say all minorities on the education team were: in the specialist role. There were no black or minority people in the managerial or leadership roles.
So all the black people in the specialist role have informed Stephanie Dunmore of racial incidents and discriminatory behavior since she was assigned as the spokesperson to discuss the engagement survey results, which basically scored low on managerial trust.

Page 56

And she -- we were told by leadership to hold discussions to specialists, hold discussions to talk about that score -- particular score in the engagement survey, and her role was the spokesperson.
So she attended those discussion meetings among the specialists where several of them had brought up incidents where they felt discriminated against.
Q And so just going back to my original question: Are you able to provide the names of those individuals in the specialist role who you contend informed Ms. Dunmore of discrimination and retaliation?
A I recall myself as a first person. Ebony is also another person. Shawnetta Walker. Eddice Douglas.
Q I'm sorry. What was Douglas' first name?
A Eddice, E-d-d-i-c-e.
Those are the ones that I can recall at this moment.
Q Did Ms. Dunmore ever talk to you about the results of this engagement survey?
A Talk to me personally, yes.
Q What did she say?
A So do you mean did we discuss the results of the engagement survey?

Page 57

Q Yes.
A Yes, we did.
Q And what did you discuss with respect to the results?
A Basically, the engagement survey results came out. We scored low in managerial trust. Jeanne Morris has assigned -- or tasked us with meeting and discussing those engagement survey results.
So those results were discussed among all specialists. And they discu- -- they were discussed in the form of, Why do you think we scored low in the managerial trust? What do you think had led into -- to that result?
And that's when individuals who are part of the minority group came forward and disclosed occasions, specific examples of discriminatory behavior or where they felt that the culture at SHRM was not safe enough for them to be them, you know, as black people.
Q Did you have these discussions as a group --
A Yes.
Q -- or were they individual?
A Both.

| | Page 58 | | Page 60 |
|---|---|---|---|
| 1 | Q  And so tell me about the discussions you | 1 | that report.  That was one of the incidents that came |
| 2 | were involved with.  Did -- | 2 | up during this discussion. |
| 3 | A  I discussed -- | 3 | Q  And was Ms. Dunmore present for this |
| 4 | Q  Sorry.  So just to clarify:  Did you have | 4 | discussion or just Ms. Morris? |
| 5 | discussions with Ms. Dunmore regarding these results, | 5 | A  We had several discussions that I know Ms. |
| 6 | or was it with Ms. Morris, or was it with both? | 6 | Dunmore was -- for sure attended all of them.  I |
| 7 | A  With both. | 7 | cannot say the same for Jeanne Morris.  I know she |
| 8 | Q  With both. | 8 | attended multiple of them. |
| 9 | A  Yes. | 9 | Q  Okay. |
| 10 | Q  Together? | 10 | A  And I just want to go back and complete my |
| 11 | A  Together and separate. | 11 | answer regarding the incidents that came up during |
| 12 | Q  Okay.  Can you tell me what you recall | 12 | these discussions or topics that came up during these |
| 13 | about those discussions. | 13 | discussions. |
| 14 | A  Okay.  So do you want me to just mention, | 14 | Other black employees also brought up the |
| 15 | like, specific topics that came up? | 15 | fact that they've been at the organization for almost |
| 16 | Q  Sure.  If you recall what was said during | 16 | 13 years, applied to move up within that role or |
| 17 | those discussions, that's what I would like to know. | 17 | within that team, and it was always brought -- like, |
| 18 | A  Okay.  So prior to that meeting where -- | 18 | shot down, and then a white manager would be hired |
| 19 | that was held for all the specialists to talk about | 19 | from the outside to supervise them, where they have to |
| 20 | the engagement survey, I received a text message from | 20 | teach them their job.  So that was another pattern |
| 21 | Jeanne Morris informing me that I need to speak up and | 21 | that came up. |
| 22 | let others know of what's going on with my manager. | 22 | It was also very -- brought up several |
| 23 | At this -- at this time, Jeanne Morris was | 23 | times that people were at unease speaking about these |
| 24 | aware of the complaint that I brought forward, the | 24 | things for fear of -- for fear of losing their jobs. |
| 25 | discrimination complaint against Carolyn. | 25 | So for example, it was mentioned, I'm not |

| | Page 59 | | Page 61 |
|---|---|---|---|
| 1 | And she encouraged me to bring up and share | 1 | really sure if we should have this discussion because |
| 2 | my situation with Carolyn with the rest of the group, | 2 | we might lose our jobs if these things come up. |
| 3 | so I can encourage them to also open up and talk about | 3 | Q  Do you recall who said that they were |
| 4 | issues that's going on within their teams. | 4 | fearful about speaking up? |
| 5 | She said that she's going -- she's aware of | 5 | A  I do not recall the exact person. |
| 6 | what's going on in my team, but she wants to know | 6 | Q  Did you ever say you were fearful about |
| 7 | what's going on in other teams as well. | 7 | speaking up because you may lose your job? |
| 8 | And so as far as topics that came up, I | 8 | A  I did mention that I was fearful of |
| 9 | brought up exactly what went down with my own manager | 9 | bringing up these incidents, even though Jeanne was |
| 10 | at that time, Carolyn Barely, and -- or Barley, and | 10 | the one who asked me to do so, because I was afraid it |
| 11 | mentioned the situation -- gave a couple of examples | 11 | would complicate my relat- -- furthermore my |
| 12 | of -- retaliation examples that took place before -- | 12 | relationship with Carolyn. |
| 13 | from Carolyn, after submitting my discrimination | 13 | What if she finds out that I'm telling |
| 14 | complaint.  So that's -- that was one topic. | 14 | these incidents to other people, even though I was |
| 15 | Another topic was other black specialists | 15 | asked by her manager to do so.  I had -- I had fears |
| 16 | bringing up that -- when they submit work for their | 16 | that that might complicate the relationship with her. |
| 17 | white managers, it's not taken as seriously as their | 17 | Q  Did Ms. Morris tell you that the |
| 18 | black -- their white peers. | 18 | information you shared would be shared with Ms. |
| 19 | So say, for example, someone was tasked | 19 | Barley? |
| 20 | with coming up -- or putting together a report for a | 20 | A  She did not mention that. |
| 21 | certain product performance and that report is | 21 | Q  So let's turn back to Exhibit 1.  Who is |
| 22 | submitted to a manager, and then almost the same | 22 | Angela Elder? |
| 23 | report is submitted by a peer, and these two reports | 23 | A  Angela Elder.  I believe she was -- I don't |
| 24 | are being treated completely different based on the | 24 | know the exact title, but she was responsible for one |
| 25 | race that was -- you know, the person who submitted | 25 | of the teams under the education department.  I |

16 (Pages 58 - 61)

Page 62

1 believe it was the events and conferences team. And
2 she was the head of that team.
3 Q And why do you believe Ms. Elder has
4 information regarding discrimination and retaliation
5 against other employees?
6 A Ms. Elder submitted an open letter to Nick
7 Schacht -- I think I'm saying his last name --
8 Q Schacht (pronouncing)?
9 A Schacht (pronouncing). She submitted an
10 open letter to Nick disclosing the racial disparities
11 at SHRM, that she and her team believed that SHRM
12 needs to embody what diversity means besides just
13 black numbers: I have ten employees that are black,
14 now I'm diverse.
15 So she brought up and she submitted a
16 letter disclosing these racial disparities and what
17 SHRM needs to do to address the lack of diversity
18 within the company.
19 Q Did you ever see a copy of this open
20 letter?
21 A I did.
22 Q Did Ms. Elder share it with you?
23 A She did.
24 Q Did you offer input into the open letter?
25 A Meaning did I help craft the letter?

Page 63

1 Q Correct.
2 A The letter was shared with me after it was
3 submitted to Nick.
4 Q And what was your reaction upon seeing the
5 letter? Did you believe it was accurate or did you
6 agree with it?
7 A I did.
8 Q Do you have any knowledge about the result
9 of the letter?
10 A Yeah. The -- she was let go, and her
11 entire team was dismantled.
12 Q Do you know the reason why Ms. Elder was
13 let go?
14 A All I know is that it happened right after
15 that letter was submitted.
16 Q But you don't have any personal knowledge
17 of the reason why she was terminated?
18 A I do not.
19 Q Who is Ebony Thompson?
20 A Ebony Thompson is a former employee of SHRM
21 as well.
22 Q And how do you know Ms. Thompson?
23 A She was on the same team that I was on.
24 Q Did Ms. Thompson also report to Ms. Barley?
25 A She did.

Page 64

1 Q And why do you believe Ms. Thompson has
2 information regarding discrimination and retaliation
3 against other employees?
4 A Not only was she a witness of those
5 incidents, discrimination incidents, but she also was
6 subjected to them.
7 Q What knowledge do you have that Ms.
8 Thompson was subjected to incidents of discrimination
9 or retaliation?
10 A Can you clarify.
11 Q Sure. You said that Ms. Thompson was also
12 subjected to incidents of discrimination or
13 retaliation, correct?
14 A Uh-huh. Yes.
15 Q How do you know she was?
16 A She told me.
17 Q When did she tell you?
18 A I don't recall the name -- the exact date.
19 Q Do you remember the general time frame?
20 A No. She also -- I don't -- I don't recall
21 the general time frame. She also told HR. She told
22 Carolyn herself. She called -- she told Jeanne.
23 And I'm aware of that because I was in the
24 meetings where she spoke up about those behaviors.
25 Q And what behaviors did she speak up about?

Page 65

1 A Uh-huh. She spoke up that she felt that
2 Carolyn was treating her differently than her white
3 peers within the same team.
4 She thought -- she spoke up and mentioned
5 that she was treated with less respect. She was
6 undervalued and undermined. Don't -- this is not
7 quote for quote, but that's basically what I recall.
8 Q Do you recall if she provided any examples
9 as to how she was treated differently than her white
10 peers?
11 A I do not recall.
12 Q Do you recall Ms. Morris' response upon
13 hearing these concerns or complaints?
14 A I do not recall.
15 Q Let's go to page 6 of Exhibit 1, Section 8,
16 Part 6. Who is Ryan Sweeney?
17 A Ryan Sweeney is my ex-partner.
18 Q Is that your domestic -- ex-domestic
19 partner?
20 A Domestic?
21 Q Sure. Was he a business partner?
22 A Oh. No. Like life partner.
23 Q Life partner, domestic partner?
24 A Uh-huh. Yeah, life partner.
25 Q Are you currently unaware of Mr. Sweeney's

17 (Pages 62 - 65)

Page 66

1  address?
2      A   I can't recall it, no.
3      Q   Would you be able to obtain Mr. Sweeney's
4  address?
5      A   I would be able to.
6      Q   Why do you believe Mr. Sweeney has
7  information regarding your damages?
8      A   During the period that SHRM was putting me
9  under structure -- bullying, retaliation,
10 discrimination, Ryan was aware of that.  We were
11 talking about it.
12     He was a witness of the emotional damage
13 that I suffered because of SHRM's actions.  Our
14 relationship was actually impacted because of SHRM's
15 actions.
16     So she was -- he was very aware of what's
17 going on and how it impacted me emotionally and
18 physically.
19     Q   And what did you discuss with Mr. Sweeney
20 about how SHRM impacted you emotionally?
21     A   Uh-huh.  It wasn't a one-time discussion of
22 like, Hey, listen, this is what -- how I am
23 emotionally damaged.  It was more of, Here's what
24 happened.  Here's what keeps happening.  Here's what I
25 did.  Am I sounding crazy?  Is this really happening?

Page 67

1      I needed validation.  I was not getting it
2  from within the organization despite me reaching out
3  and asking for help.  I needed to -- for someone to be
4  that safe person for me.
5      And so I would bring up situations that
6  would take place and share it with him.
7      Q   Do you recall a time period when you were
8  sharing information with Mr. Sweeney?
9      A   I do not recall the exact time period, no.
10     Q   Do you recall generally?
11     A   I do recall that happened -- that was
12 shared definitely from the complaint until the time of
13 termination.
14     Q   Did you share any information with him
15 following your termination of employment with SHRM?
16     A   Like what?
17     Q   How you were impacted emotionally by the
18 termination.
19     A   Uh-huh.  I did.
20     Q   And what did you discuss?
21     A   How I was impacted, the emotion --
22 emotionally by the -- by the termination.
23     Q   Do you recall what you told Mr. Sweeney
24 about how you were impacted emotionally by the
25 termination?

Page 68

1      A   I don't recall the exact dates, but I -- I
2  did recall -- I do recall that I -- I mentioned that I
3  don't have energy to do anything, including activities
4  with him.
5      I am spending most of my days sleeping a
6  lot, having a hard time getting out of bed, putting on
7  weight because of unhealthy eating habits.
8      I do recall that I felt that I was carrying
9  a burden that is unbearable and that I couldn't -- I
10 couldn't believe that I was going through what I was
11 going through.
12     Q   And did the discussions with Mr. Sweeney
13 usually occur in person?
14     A   In person usually, yes, or on the phone.
15     Q   Did you ever text with Mr. Sweeney about
16 the emotional impact?
17     A   Not that I recall.
18     Q   We're done with Exhibit 1.  You can turn to
19 Exhibit 2.  I'm showing you what's been marked as
20 Exhibit 2, Ms. Mohamed.  You can take a moment to look
21 at it.
22     Have you seen this document before?
23     A   (The deponent perused the exhibit.)
24     Uh-huh, I have.
25     Q   Do you recall signing a verification

Page 69

1  attesting that these responses are true?
2      A   I don't recall.
3      Q   Do you have any reason to doubt the
4  truthfulness of these responses?
5      A   I -- unless it's with something I
6  misremembered or -- you know, this happened a really
7  long time ago, but nothing intentionally not true.
8      Q   Did anyone assist you in drafting the
9  responses, other than your attorneys?
10     A   No.
11     Q   Let's turn to pages 6 and 7 of Exhibit 2,
12 which is Interrogatory 5 and answer.  Let me know when
13 you're there.
14     A   I am here.
15     Q   Okay.  In this response, you list your
16 prior and current employers, correct?
17     A   Correct.
18     Q   With respect to your job at Hacker USA, you
19 state your immediate supervisor was Abby Dewelt,
20 correct?
21     A   Uh-huh.
22     Q   I'm sorry.  For purposes of the court
23 reporter and the record, was that a yes?
24     A   It's stated here that it was a yes.
25     Q   Is that correct?

18 (Pages 66 - 69)

|  | Page 70 |
|---|---|
| 1 | A  That she was my immediate supervisor when I |
| 2 | left? |
| 3 | Q  Yes. |
| 4 | A  Yes, she was.  She wasn't when I was hired. |
| 5 | Shawn was. |
| 6 | Q  What is Ms. Dewelt's race? |
| 7 | A  She's white. |
| 8 | Q  How did you get along with Ms. Dewelt? |
| 9 | A  We got along well. |
| 10 | Q  Did you have any issues with her? |
| 11 | MR. SWAIN:  Object to form. |
| 12 | A  No.  Not that I can recall. |
| 13 | Q  (By Ms. Smith)  Did you suffer any |
| 14 | discrimination or retaliation while working at Hacker |
| 15 | USA? |
| 16 | A  I did not. |
| 17 | Q  Just for clarification of the record -- |
| 18 | because I know you were referring to Hacker as |
| 19 | HackerU -- is that the same as Hacker USA? |
| 20 | A  It is. |
| 21 | Q  Have you ever received any performance |
| 22 | reprimands while working at Hacker USA? |
| 23 | A  Performance reviews? |
| 24 | Q  Reprimands. |
| 25 | A  Can you clarify what that is. |

|  | Page 71 |
|---|---|
| 1 | Q  Sure.  Discipline or counseling. |
| 2 | A  Oh.  No, I did not. |
| 3 | Q  On page 7, under Hacker USA, you state, |
| 4 | "Reason for departure: Left to seek further career |
| 5 | growth." |
| 6 | A  Uh-huh. |
| 7 | Q  Do you see that? |
| 8 | A  I see. |
| 9 | Q  Can you explain that in more detail? |
| 10 | A  Yeah.  I -- as you can see, that my title |
| 11 | was instructional designer.  My title at SHRM was |
| 12 | senior instructional designer.  I was seeking to grow |
| 13 | my career and at least go back to the senior level of |
| 14 | a specialist. |
| 15 | I did not see that taking place at HackerU |
| 16 | given the reasons that I mentioned previously.  And so |
| 17 | that was definitely one of the reasons. |
| 18 | Q  Were there any other reasons? |
| 19 | A  I did mention those earlier. |
| 20 | Q  And can you clarify what reasons you're |
| 21 | referring to now? |
| 22 | A  So clarify all the reasons I left Hacker |
| 23 | USA? |
| 24 | Q  (Nodded head up and down.) |
| 25 | A  So as I mentioned, there was a clarity -- |

|  | Page 72 |
|---|---|
| 1 | like a lack of clarity on my role and expectations of |
| 2 | what -- what am I supposed to deliver from my -- from |
| 3 | my role. |
| 4 | And there was a duplication of efforts, |
| 5 | multiple person was hired for -- to do the same job. |
| 6 | And so the organization was going through a lot of |
| 7 | figuring out how things should work. |
| 8 | And I felt -- I sensed that -- you know, |
| 9 | that there was this confusion and -- and -- and my |
| 10 | role and my entire team was eliminated, you know, |
| 11 | maybe a couple weeks after I resigned because, again, |
| 12 | the duplication of hiring two people to do the same |
| 13 | job. |
| 14 | Q  At the time of your resignation, did you |
| 15 | know that your team was going to be eliminated? |
| 16 | A  I did not.  I did see signs of in and outs |
| 17 | or -- again, of lack of organization, if I can put it |
| 18 | that way. |
| 19 | Q  Okay. |
| 20 | A  Uh-huh. |
| 21 | Q  And with respect to your job at TTI Global, |
| 22 | you state your immediate supervisor is Rachel |
| 23 | Grossman, correct? |
| 24 | A  Correct. |
| 25 | Q  What is Ms. Grossman's race? |

|  | Page 73 |
|---|---|
| 1 | A  I don't know actually. |
| 2 | Q  Have you ever met Ms. Grossman? |
| 3 | A  Not, like, face to face, no. |
| 4 | Q  Have you ever seen Ms. Grossman on, for |
| 5 | instance, videoconference? |
| 6 | A  I have not. |
| 7 | Q  Have you ever seen a picture of Ms. |
| 8 | Grossman? |
| 9 | A  I have not. |
| 10 | Q  Do you get along with Ms. Grossman? |
| 11 | A  I do. |
| 12 | Q  Do you have any issues with Ms. Grossman? |
| 13 | A  I do -- |
| 14 | MR. SWAIN:  Object to form. |
| 15 | A  I do not. |
| 16 | Q  (By Ms. Smith)  Have you suffered any |
| 17 | discrimination or retaliation while working at TTI |
| 18 | Global? |
| 19 | A  I did not. |
| 20 | Q  Have you ever received any discipline at |
| 21 | TTI Global? |
| 22 | A  I did not. |
| 23 | Q  And you state here that your rate of pay is |
| 24 | $53 per hour, correct? |
| 25 | A  Correct. |

19 (Pages 70 - 73)

| | Page 74 |
|---|---|
| 1 | Q About how many hours per week do you work, |
| 2 | on average? |
| 3 | A Forty. |
| 4 | Q Does that ever fluctuate? |
| 5 | A Not really. |
| 6 | Q Let's go to Interrogatory 8 and answer, |
| 7 | which is on page 9 of Exhibit 2. You can take a |
| 8 | moment to familiarize yourself with this answer. |
| 9 | A (The deponent perused the exhibit.) |
| 10 | Okay. |
| 11 | Q You state you saw Danielle Polifroni once |
| 12 | in August 2020, correct? |
| 13 | A Correct. |
| 14 | Q Is Danielle Polifroni the counselor who you |
| 15 | were referring to earlier in your deposition? |
| 16 | A It is. |
| 17 | Q Is Creative Counseling Center the |
| 18 | counseling center you were referring to earlier? |
| 19 | A It is. |
| 20 | Q As of today, have you seen any other |
| 21 | healthcare providers regarding emotional distress that |
| 22 | you contend was caused by SHRM? |
| 23 | A I have not. |
| 24 | Q And to your knowledge, Ms. Polifroni has |
| 25 | not provided you with a diagnosis, correct, of anxiety |

| | Page 75 |
|---|---|
| 1 | or any other condition? |
| 2 | A Not that I know of. |
| 3 | Q Ms. Polifroni has not prescribed any |
| 4 | medication to you? |
| 5 | A She has not. |
| 6 | Q Did you ever disclose to anyone at SHRM |
| 7 | that you were experiencing emotional distress? |
| 8 | A Within a given time frame or a period? |
| 9 | Q Anytime that you were experiencing |
| 10 | emotional distress at SHRM. |
| 11 | A I have. |
| 12 | Q And who did you disclose that to? |
| 13 | A Jeanne Morris, Johnny Taylor, Sean |
| 14 | Sullivan, Bernee Long, Carolyn Barley, to name a few. |
| 15 | Q All right. So let's go through each of |
| 16 | those. What did you tell Ms. Morris regarding the |
| 17 | emotional distress you were experiencing? |
| 18 | A Uh-huh. I reached out to Jeanne Morris -- |
| 19 | or in the multiple occasions that we have met |
| 20 | regarding this issue, I disclosed to her that I'm |
| 21 | having a hard time doing my job because of what's |
| 22 | going on. What's happening from Carolyn is impacting |
| 23 | me professionally and personally. |
| 24 | I explained to her that she was my safe |
| 25 | person; and I didn't feel safe to bring this up to |

| | Page 76 |
|---|---|
| 1 | Carolyn directly, thinking that she might get |
| 2 | defensive or take it the wrong way. So I seeked her |
| 3 | out for advice. I always did. |
| 4 | I have mentioned to Jeanne Morris that I |
| 5 | wouldn't even bring it up if it wasn't as severe -- as |
| 6 | severe as in getting in the way of me completing my |
| 7 | tasks successfully and if it wasn't that the situation |
| 8 | keeps getting worse because it's not being addressed. |
| 9 | Q During that conversation with Ms. Morris, |
| 10 | did you ever ask to take any sort of leave from work? |
| 11 | A No. |
| 12 | Q Why not? |
| 13 | A I had projects to work on and deliver. I |
| 14 | didn't really think that was an option for me: to |
| 15 | just take leave. |
| 16 | Q Do you remember when the conversation |
| 17 | occurred with Ms. Morris when you told her you were |
| 18 | having a hard time doing your work? |
| 19 | A I believe it was June 3. |
| 20 | Q And do you recall what Ms. Morris said in |
| 21 | response? |
| 22 | A Ms. Morris apologized that I was feeling |
| 23 | that way. In this specific conversation, it was when |
| 24 | I brought up to Ms. Morris that Carolyn has accused me |
| 25 | of being less assertive; and -- basically that was |

| | Page 77 |
|---|---|
| 1 | one of the reasons she basically said that I cannot |
| 2 | have any meetings alone: because she doesn't think |
| 3 | that I am assertive enough. |
| 4 | I mentioned that comment to Jeanne Morris, |
| 5 | and she was very shocked. She said, I don't think of |
| 6 | you as a less of an assertive person. And she said |
| 7 | that these incidents need to be addressed immediately. |
| 8 | Q Was anyone else present during this |
| 9 | conversation? |
| 10 | A Not during the first conversation with her. |
| 11 | Q And did that conversation occur in person? |
| 12 | A No. |
| 13 | Q How did it occur? |
| 14 | A On the phone. |
| 15 | Q Do you have any recordings of that |
| 16 | conversation? |
| 17 | A I don't. |
| 18 | Q Tell me about the conversation you had with |
| 19 | Johnny Taylor regarding emotional distress you were |
| 20 | experiencing as a result of SHRM. |
| 21 | A I reached out to Johnny Taylor for two |
| 22 | reasons: one, because Johnny always broadcasts his |
| 23 | open door policy, that he's an open door and anyone is |
| 24 | welcome to go ahead and talk to him. |
| 25 | Actually, it was encouraged by him for |

20 (Pages 74 - 77)

1 people to go and disclose incidents to him, because
2 that's how he knows what's really going on on the
3 ground.
4          The second reason I reached out to Johnny,
5 it's when things started to become more of -- I
6 basically suffered a couple of entrapment meetings
7 from HR and from Jeanne and from Carolyn.
8          I felt that I couldn't attend a meeting
9 without having that fear of yet another entrapment is
10 about to take place.
11          I wasn't sure if we're ever going to talk
12 about my work and actually delivering and completing
13 these projects, or are we -- or is -- something is
14 going to be brought up with regards to that: to the
15 issues with my manager.
16          I reached out to Johnny.  He told me to
17 call him.  I called him.  He asked me what was going
18 on.  I gave him a brief of what was going on.
19          He -- he then asked if HR is aware of -- of
20 this incident.  And I told him, yes, that Mike Jackson
21 was part of the discussion -- some of the discussions.
22          Then Johnny basically -- his response was,
23 I know we have a managerial problem at SHRM.  I know
24 we have a diversity problem at SHRM.  We're working on
25 it.  We have lots of initiatives in the work to

1 address these issues.  He was not at shock at all that
2 I was experiencing such behavior from my manager.
3          And the conversation ended with him saying
4 that he will put me touch with Sean Sullivan, who was
5 the head of HR at that time, for him to be aware of
6 the situation as well.
7     Q   Did you share anything specifically with
8 Mr. Taylor at this -- during this phone conversation
9 about emotional distress you were suffering?
10    A   Yes.
11    Q   What did you share with Mr. Taylor?
12        MR. SWAIN:  Object to form.
13    A   It's basically the same thing that I keep
14 mentioning:  the fact that I was -- that I was under
15 severe stress.
16          I felt that that was a huge burden that was put
17 on me, as a black woman, who would have to accommodate
18 the feelings of her white peers when talking about
19 discriminatory behaviors or -- I told him that this
20 intense, systematic, structural, discriminatory
21 behavior was not only putting my health and my
22 personal life at risk, but it was also getting in the
23 way of me completing my tasks successfully.
24    Q   (By Ms. Smith)  Did Mr. Taylor offer any
25 solutions to you with respect to those concerns, other

1 than putting you in touch with Mr. Sullivan?
2    A   No, he did not.
3    Q   Did you request leave at that time, during
4 your discussion with Mr. Taylor?
5    A   I did not.
6    Q   Did you request a transfer away from Ms.
7 Barley?
8    A   I did not.
9    Q   Was anyone else present for this
10 conversation with Mr. Taylor?
11    A   No.
12    Q   How did you know to reach Mr. Taylor?  Was
13 his information published somewhere?
14        MR. SWAIN:  Object to form.
15    Q   (By Ms. Smith)  His contact information.
16    A   He shared it with me.
17    Q   When did he share it with you?
18    A   Like, what date?
19    Q   Or generally, how did he share the
20 information with you?  How did you know how you could
21 get in touch with Mr. Taylor?
22        MR. SWAIN:  Object to form.
23    A   He shared his contact information with me
24 via email.
25    Q   (By Ms. Smith)  And how did you have Mr.

1 Taylor's email?
2    A   He's the CEO of SHRM, so everybody has
3 Johnny's email.
4    Q   His email was published to the employees at
5 SHRM?
6    A   If you just type "Johnny" in the "To"
7 section, his email pops out.
8    Q   Okay.
9    A   Yeah.
10    Q   And what about Sean Sullivan?  You said
11 that you discussed the emotional distress with Mr.
12 Sullivan as well?
13    A   That's correct.
14    Q   Was that during a single discussion or
15 multiple discussions?
16    A   At least multiple.
17    Q   And can you tell me generally when those
18 discussions occurred?
19    A   It was right after I talked to Johnny.
20    Q   Was anyone else present during those
21 discussions?
22    A   No.
23    Q   And did those discussions occur by phone?
24    A   By phone.
25    Q   Do you have any recordings of those

21 (Pages 78 - 81)

Page 82

1  conversations?
2  　　A　No.
3  　　Q　What was generally discussed with Mr.
4  Sullivan as it related to your emotional distress?
5  　　A　This was part of, you know, the burden that
6  I had to carry during my time at SHRM:  is that I kept
7  having to repeat the same story over and over and over
8  again to several stakeholders.
9  　　　　Recounting those incidents was not easy for
10  me.  It was not easy to talk about how I felt
11  belittled, undervalued, not seen equally as my white
12  peers on the same team.
13  　　　　I recounted those same incidents with Sean.
14  I brought up specific examples, specific dates, showed
15  him messages that was from Carolyn to show -- give him
16  an example of what am I dealing with.
17  　　　　Under each bucket of almost -- under each
18  bucket that I've mentioned, I tried to bring forward
19  an example of, for example, the different treatment
20  between me and white peers, for example, being strict
21  with deadlines and so forth.
22  　　　　So all of that was brought forward to Sean
23  during these discussions.
24  　　Q　Did you bring forward to Sean that you were
25  under severe stress?

Page 83

1  　　A　Yes.
2  　　Q　Did you bring forward to Sean that you were
3  having difficulty completing your tasks?
4  　　A　Yes.
5  　　Q　What did Sean say in response to those
6  things?
7  　　A　Sean's initial reaction was, It seems that
8  Carolyn is not the right person for that role.  He was
9  surprised that she was put in a managerial role,
10  period.
11  　　　　He said that she needed some training.  She
12  needed to put under -- some plan to work with her on
13  to -- how to manage a team and specifically a diverse
14  team.
15  　　Q　Did he say anything else?
16  　　A　He said he would be in touch.
17  　　Q　And you said you also spoke with Ms.
18  Long --
19  　　A　Yes.
20  　　Q　-- regarding your emotional distress?
21  　　A　Yes.
22  　　Q　What did you speak with Ms. Long about?
23  　　A　My interaction with Ms. -- Ms. Long with
24  Bernee happened over several mediation sessions that
25  was coordinated by her, by request from Sean.

Page 84

1  　　　　During these media- -- mediation sessions,
2  the first one, I brought up the issues again,
3  encountered (sic) in details what happened, what is
4  taking place, how did we arrive here, and how these
5  actions are impacting me personally and
6  professionally, and that I'm here asking for help.
7  　　　　Just to put that on the record as well:
8  that with every stakeholder that I had spoken with
9  about this issue, my approach was always, I'm open for
10  advice.  What am I doing wrong?  What can I do better?
11  How can I help the situation?
12  　　　　I do not want to get anyone in trouble.  I
13  simply just want to have a safe environment for me to
14  complete my job tasks successfully, just like what my
15  white peers are experiencing.
16  　　　　So the same thing was brought up to Bernee,
17  the fact that I am here looking for solutions.  I hate
18  to keep dwelling and keep talking about what happened
19  and not come up with any solution; because at that
20  time, I've spoken with Jeanne, I've spoken with
21  Carolyn, I've spoken with Mike Jackson from HR, spoken
22  with Johnny, Sean, Bernee.
23  　　　　Not a single solution was afforded after
24  all these discussions with these -- people in
25  leadership, you know, none of these are specialists.

Page 85

1  These people are in charge of my job in one way or
2  another.
3  　　　　So I kept bringing up the fact that we need
4  to come up with solutions to address what's going on.
5  　　Q　Did you tell Ms. Long anything specific
6  regarding the stress you were suffering?
7  　　A　Yeah.
8  　　Q　What did you tell her?
9  　　A　Yes, I did.  I -- I told her that going to
10  work every single day felt like I was entering a war
11  zone.  Every meeting I entered in, I felt unsafe.
12  　　　　Not a single discussion that I was having
13  felt that it was held in confidence, for example.  It
14  was me constantly being on the lookout on who's doing
15  what?  What's going to happen next?  What is the next
16  retaliation action that is going to take place?
17  　　　　And it felt -- as a black person, it felt
18  that it was one against a million.  It was a fight I,
19  every single day, had to take on by myself to further
20  explain how these actions make a black woman feel, how
21  subconscious bias can impact a black woman in a
22  workplace, how -- what is the appropriate way to
23  manage a diverse team as a white manager?
24  　　　　All that has put me under severe anxiety
25  and stress.  And I disclosed that.  At the same time,

22 (Pages 82 - 85)

Case No. 1:22-cv-01425-PAB-KAS Document 40-13 filed 06/09/25 USDC Colorado pg 23
pg 28 of 128

Page 86

1  I had to complete my job tasks and deliver on -- on my
2  work and maintain my excellent performance that SHRM
3  was used to.
4       And on the top of all of that, my personal
5  situation with Carolyn, Jeanne, and so forth, the
6  entire department was having those discussions about
7  the engagement survey results.
8       So with those discussions to discuss my
9  situation with Carolyn, here we are also as a
10  department talking about racial disparities and
11  discriminatory behavior from managers to other black
12  members of the education team.
13      It was overwhelming. It felt that it's
14  never ending. And I felt unheard, that no matter how
15  many times I speak at this point, it was to speak with
16  people several times. It was almost like no one
17  believed me. They kept asking the same questions,
18  hoping I would change my answer.
19      I was not -- it was very evident that I was
20  not giving them the answers that they were looking
21  for.
22      Q   Specifically with regard to Ms. Long, did
23  she respond in any way when you disclosed you were
24  under severe stress?
25      A   Yes.

Page 87

1      Q   What did she say?
2      A   Long's initial response was -- she's an
3  African American woman as well. She completely -- she
4  said, I completely understand. It is hard to be a
5  black woman in the workforce. We cannot bring our
6  blackness to the workforce. We need to know exactly
7  how much of our blackness we can bring to the table in
8  order not to offend others.
9       She told me that she could relate to the
10  issues that I'm dealing with since she lived
11  segregation herself.
12      She -- she told me that the best thing we
13  can do is make sure Carolyn understands these black
14  issues that apparently she had no idea of.
15      She said that she probably was brought up a
16  different way. She was not exposed to a lot of
17  diversity that gave her exposure into these black
18  issues that usually a black woman has to face in the
19  workplace.
20      Q   And what black issues was Ms. Long
21  referring to?
22      MR. SWAIN: Ms. Smith, I'm not sure if Ms.
23  Mohamed was finished with her answer.
24      THE DEPONENT: I was not complete.
25      A   And she said what we can do is work with

Page 88

1  Carolyn to bridge that gap, to help her understand
2  what it means for a black woman to experience those
3  discriminatory behaviors; even if they were
4  unintended, to explain to her what is the impact of
5  that on a black person in the workplace.
6       So that was her reaction. She followed
7  that by sending multiple TED Talks, links to TED Talks
8  about racial bias, discriminatory behavior in the
9  workplace, colorblindnesses. That was my favorite.
10      And she asked me which one of those do I
11  think would be appropriate to share with Carolyn to
12  help her understand the black experience.
13      And I told her one of them. I picked one
14  of them. And she said that she was going to share it
15  with her.
16      Q   (By Ms. Smith) Have you completed your
17  response?
18      A   I have.
19      Q   So going back to my other question: What
20  black issues were you discussing with Ms. Long?
21      A   What black issues?
22      Q   Yeah. You said that you were discussing
23  black issues.
24      A   Uh-huh. So when I mentioned black issues,
25  I -- I am referring to the fact that my manager was

Page 89

1  treating me differently than white peers on the team,
2  even though we all held senior positions within that
3  team. There was a different treatment -- treatment,
4  with less credibility.
5       And then anytime you have -- as a black
6  woman, you bring up that issue and -- and you say,
7  Hey, you know what? I noticed X, Y, and Z, the
8  reaction is usually, Well, that was not my intention.
9  Maybe you misinterpreted it. Maybe there was a
10  misunderstanding that took place.
11      And now it's up to the black person whether
12  to push back and say, No, it was not a
13  misunderstanding, because this is a pattern of
14  behavior, or just worry for their job and not say
15  anything and continue to suffer discriminatory
16  behaviors under the -- under the white manager.
17      Also, among the black issues that we are
18  faced in the workplace is the fact that it's usually
19  put on us to come up with solutions. It's -- the
20  burden of change was put on me.
21      The fact that I had to come up with a
22  solution in order to correct the wrongdoing that was
23  taking place while you are advocating for solutions,
24  you have to be very careful to not put -- to not be
25  put in that category of aggressive, negative, toxic,

23 (Pages 86 - 89)

Page 90

1 bullier just because you're being assertive and
2 speaking up for your rights.
3        And among other things, as well, is being
4 treated as the black expert. When an incident that
5 has to do with race comes up, it's usually -- the room
6 turns into the black person in the room and asks
7 for -- well, what do you think about that, completely
8 disregarding the mental stress that this person might
9 be going through or even their willingness to talk
10 about these intense issues.
11        These are black issues that I didn't really
12 have to explain much for Bernee Long, as a black woman
13 as well. We got it immediately.
14        It was the first person that I didn't have
15 to go further and further and explain these black
16 issues to, because she was very aware of it as a black
17 woman as well.
18    Q   You also said that you had conversations
19 with Ms. Barley regarding your emotional distress,
20 correct?
21    A   Yes.
22    Q   Were those multiple conversations, or was
23 there a specific conversation you're referencing?
24    A   I'd have to say it's at least multiple
25 conversations.

Page 91

1    Q   Was anyone else present during those
2 conversations?
3    A   Sometimes.
4    Q   Do you recall who?
5    A   Mike Jackson, Jeanne Morris, Carrie Mills
6 or Mill -- I can't remember her last name exactly --
7 and Godmere. Yep.
8    Q   Did those conversations occur by phone? In
9 person?
10    A   Not in person. I was remote 100 percent
11 during this time.
12    Q   Did they occur by videoconference? How did
13 they occur?
14    A   Zoom meetings. Not video, just audio.
15    Q   And you could see the other attendees
16 during the conversations?
17    A   It was all audio.
18    Q   How do you know these other individuals
19 were present for the discussions?
20    A   They were on the attendees list.
21    Q   What did you tell Ms. Barley regarding your
22 emotional distress?
23    A   The initial conversation, you know,
24 happened when Jeanne was there, when -- after I told
25 Jeanne about the wrongdoing.

Page 92

1        And then she scheduled a meeting between
2 me, her, and Carolyn to discuss. And she asked me in
3 the meeting, Ruby, can you disclose to Carolyn what
4 you told me?
5        And I -- I recited the incidents and
6 described how it made me feel and their impact on me
7 professionally and personally.
8        I also opened up to Carolyn with regard to
9 previous experiences, giving examples of how such
10 behaviors could make -- what -- and how it did make me
11 feel.
12        And I disclosed to Carolyn that her
13 behavior is getting in the way of me completing my job
14 successfully.
15    Q   And how did Ms. Barley respond to that, as
16 far as you recall?
17    A   Ms. Barley? The response was denial,
18 complete dismissiveness of what's being said under the
19 category of misinterpretation -- "I don't recall
20 saying that." That's her saying this -- and
21 feeling -- getting defensive because she felt
22 blindsided.
23        I believe at some point, Carolyn mentioned
24 that she felt that I was out there to get her. And
25 she -- even after going in extensive details of what

Page 93

1 happened and how it impacted me, she said she would
2 not change a word -- a single word that she would have
3 said that made me feel that way.
4    Q   How would you describe how you're doing
5 currently as far as your emotional distress?
6    A   It's up and down. Like I mentioned, I'm a
7 different employee now. I am -- I don't really speak
8 up or -- I don't seek to participate in any kind of
9 policy initiatives with regard to diversity,
10 inclusion.
11        But overall, I feel that something was
12 broken inside of me because of what happened. I'm a
13 very passionate person, especially if I believe in
14 something. I usually stand by it.
15        SHRM has definitely took (sic) that away
16 from me, took hope away from me, that even when a
17 person means well and really tries to be that
18 collaborative, open, positive -- that the system is
19 still hard to crack. That change is just hard to come
20 with.
21        And if it does come and it's -- it happens,
22 I have to pay for it. So I'm very careful. I'm very,
23 very careful what to say and what not to say. I try
24 to keep it to myself.
25        Because we are in this lawsuit, I often

24 (Pages 90 - 93)

|  | Page 94 |
| --- | --- |

1  have to respond to questions you have and recite these
2  memories and incidents, look back to emails where
3  Carolyn was so dismissive of me, where she
4  disrespected me.
5       Going back to these records definitely
6  brings up emotions. I'm human, at the end; and I
7  can't just sit here and pretend that everything is
8  okay.
9       Q   Okay. Let's look at Interrogatory 10 and
10  answer, which is on Exhibit 2. You state here, "I am
11  not claiming that I am entitled to any medical or
12  health care expenses in this lawsuit."
13       Is that true?
14       A   That's true.
15       Q   You believe you're not entitled to any
16  medical expenses incurred in relation to your session
17  with Ms. Polifroni?
18       A   Yes.
19       Q   Why do you believe that?
20       A   I have had only one session with Daniella.
21  Even though it was related to what SHRM had put me
22  through, I just didn't think -- since I wasn't on
23  medication or hospitalti- -- hospitalized, that it was
24  necessary to claim that expense.
25       Q   Looking at Interrogatory 16 and answer,

|  | Page 95 |
| --- | --- |

1  which is on page 15 of Exhibit 2, other than your
2  attorneys, who have you discussed this lawsuit with?
3       MR. SWAIN: Object to form.
4       A   So lawsuit or discriminatory behavior?
5       Q   (By Ms. Smith) The lawsuit.
6       A   I have spoken with my brother about this.
7       Q   And what's your brother's name?
8       A   Tamer Mahmoud.
9       Q   Would you be able to provide Mr. Mahmoud's
10  contact information?
11       A   Yes.
12       Q   What discussions have you had with your
13  brother regarding this lawsuit?
14       A   It was mostly emotional venting. It was --
15  it was mostly describing what I'm going through
16  because of SHRM's actions.
17       Again, I'm seeking validation, seeking a
18  safe person to disclose this with; and he was that for
19  me.
20       Q   Did these conversations occur by phone?
21  Email? Text? Some other method?
22       A   Mostly by phone.
23       Q   Any other method, other than phone?
24       A   Face to face.
25       Q   And was anyone else present during these

|  | Page 96 |
| --- | --- |

1  conversations?
2       A   No. Not that I can recall.
3       Q   Let's look at Interrogatory 18 and answer.
4  Why do you believe that Carolyn Barley witnessed
5  instances of discrimination and retaliation?
6       A   Because she was a witness of retaliation.
7  That's why I believe so.
8       Q   Are there any specific instances you're
9  referring to here?
10       MR. SWAIN: Object to form.
11       A   I can recall one specific incident. It was
12  the day after Jeanne Morris had put together a meeting
13  with Mike Jackson from HR.
14       The attendees -- the people who were
15  invited to the meeting was the instructional design
16  team, without Carolyn. She was not invited to that
17  meeting.
18       And during that meeting, me and Ebony were
19  pressured into yet again disclosing the wrongdoing
20  that was taking place.
21       It was a very intense meeting, one where I
22  had a panic attack because of the stress that Jeanne
23  and Mike Jackson were putting on me to speak, after
24  resisting to speak and then finally breaking down and
25  talking again about the wrongdoing that's being --

|  | Page 97 |
| --- | --- |

1  that's taking place and what is -- Carolyn is doing
2  within retaliating -- with regards to retaliating
3  against me. And I mentioned a couple of examples.
4       The next day, there was a meeting between
5  me, Jeanne, Carolyn, and Liz Jackson to discuss a
6  digital HR course that I was working on.
7       However -- that was the title of the
8  meeting invitation. That did not take place. That
9  was not what happened during that meeting.
10       During that meeting, Jeanne recited the
11  incidents and the information that I disclosed with
12  confidence during that meeting with HR the previous
13  day and forced me to face Carolyn with these
14  accusations.
15       Keep in mind, I had no idea that this is
16  what we were going to talk about. I thought we were
17  going to talk about copyrights and digital HR and
18  software and technology.
19       However, the incidents that I brought up
20  were recited by Jeanne in front of Liz Jackson, who
21  wasn't even a part of that meeting, and also in front
22  of Carolyn.
23       I described this as entrapment meetings,
24  which is a form of retaliation. And Carolyn was
25  there, and she witnessed it.

25 (Pages 94 - 97)

| | |
|---|---|
| Page 98 | Page 100 |

**Page 98**

1    Q    (By Ms. Smith) Have you completed your
2    response?
3        A    Yes.
4        Q    Did you ever ask to not interact with Ms.
5    Barley?
6        A    I have not.
7        Q    Did you ever ask to be relieved of your job
8    duties?
9        A    I have not.
10       Q    All right. Let's look back at
11   Interrogatory 18 and answer. What is your -- the
12   basis for your belief that Sarah Black witnessed
13   instances of discrimination and retaliation?
14       A    (The deponent perused the exhibit.)
15       So I believe that these were members of the
16   survey results discussions that we were told to have
17   by Jeanne Morris. And Sarah was one of those
18   attendees.
19       And she definitely -- I recited all -- or
20   what was going on with my manager back then. And she
21   was there, witnessed, you know, me saying that; and
22   not only me saying that, but also other people on my
23   team, members, acknowledging that they have themselves
24   witnessed those wrongdoings as well.
25       Q    To your knowledge, did Ms. Black ever

**Page 99**

1    complain to anyone at SHRM about discrimination or
2    retaliation?
3        A    Not that I know of.
4        Q    Looking back at Interrogatory 18, why do
5    you believe that Susie Davis witnessed instances of
6    discrimination and retaliation?
7        A    Susie Davis was one of the attendees where
8    the survey engagement results discussions were --
9    results were discussed.
10       And during that meeting, I brought up
11   that -- again, the wrongdoing that was taking place.
12   And she was there to witness that. So . . .
13       Q    To your knowledge, did Ms. Davis ever
14   complain to anyone at SHRM about discrimination and
15   retaliation?
16       A    Not that I know of.
17       Q    Did Ms. Davis ever tell you she complained?
18       A    Not that I know of.
19       Q    Why do you believe that Eddice Douglas
20   witnessed instances of discrimination and retaliation?
21       A    Eddice was part of the group who were in
22   the engagement survey results discussions, and she was
23   there when I disclosed the wrongdoing that was taking
24   place from Carolyn.
25       Q    To your knowledge, has Ms. Douglas ever

**Page 100**

1    complained to anyone at SHRM about discrimination and
2    retaliation?
3        A    Eddice did bring up during that discrim- --
4    survey results discussions that she herself felt that
5    she's being treated differently because of her race.
6        Q    And who did she raise that concern to you?
7        A    As far as I know, it was raised only during
8    these discussions. I don't know if she brought it up
9    again.
10       Q    And so my question was: Do you know the
11   specific individuals who she raised the concern to,
12   the names of those people?
13       A    Everyone that was in that engagement survey
14   results discussion.
15       Q    And who were those individuals?
16       A    They are listed. I can't recall all of
17   them, but I can say it's Ann, Carrie, Ebony, Taylon,
18   Shawnetta, Juan Carlos, Stephanie, Kevin, Carol,
19   Nicole. That's as far as I can recall.
20       Q    Were any of those individuals in human
21   resources?
22       A    No.
23       Q    Why do you believe that Stephanie Dunmore
24   witnessed incidents of discrimination and retaliation?
25       A    So Stephanie Dunmore is the -- was the

**Page 101**

1    spokesperson, right, that Jeanne assigned -- or Nick
2    assigned to basically attend the survey results
3    discussions and report back to Nick and upper
4    leadership.
5        I believe that Stephanie witnessed this
6    because she was in those meetings where we
7    specifically brought up those incidents and disclosed
8    it to her, so she can go and -- go ahead and tell it
9    to Jeanne and Nick.
10       She basically relayed those messages to
11   Jeanne and to Nick with -- specifically her discussion
12   with Jeanne -- so just to give context here: that
13   Stephanie would attend those discussions with the
14   specialists, but then disclose the outcomes of those
15   discussions with Nick in a meeting with -- everyone
16   attended. Not only the ISD team. It was the
17   conference and events team. Everybody was there.
18       And every spokesperson -- every team had a
19   spokesperson, and she was one of them. And so she
20   brought up those incidents in this big meeting.
21       Right after the meeting, she and Jeanne
22   were -- met. And that's when Jeanne disclosed how she
23   felt blindsided by the message that was relayed by
24   Stephanie.
25       That's when Jeanne disclosed that Carolyn

26 (Pages 98 - 101)

| Page 102 | Page 104 |
|---|---|

**Page 102**

1 cannot be -- can't possibly be racist because she has
2 a Hispanic kid.
3     That's when Jeanne disclosed that she's --
4 she has a fear of losing her job because of the
5 messages that Stephanie disclosed with Nick and the
6 upper leadership.
7     Q  So you were present for Ms. Dunmore's
8 disclosure to Ms. Morris?
9     A  I was not.
10     Q  How do you know all of this was conveyed?
11     A  It was disclosed to me by Stephanie.
12     Q  When?
13     A  I don't recall the exact date.
14     Q  Was anyone else present when Ms. Dunmore
15 told you this information?
16     A  I can't recall.
17     Q  What's the basis for your belief that Juan
18 Carlos Estrella witnessed instances of discrimination
19 and retaliation?
20     A  Juan Carlos was an attendee in those
21 engagement survey results discussions.
22     Q  To your knowledge, has Mr. Estrella ever
23 complained to anyone at SHRM about discrimination and
24 retaliation?
25     A  Not to my knowledge.

**Page 103**

1     Q  Why do you believe Ann Godmere witnessed
2 incidents of discrimination and retaliation?
3     A  Well, Ann is a member of the instructional
4 design team. She was an attendee in meetings, like
5 weekly team meetings held by Carolyn, where certain
6 comments and incidents that were taking place that she
7 had witnessed.
8     Q  Are there any specific instances that
9 you're recalling you believe that Ms. Godmere
10 witnessed?
11     A  There are two incidents that I can recall.
12 The first one was the incident that we talked about:
13 Juneteenth.
14     This came up during a team meeting, where I
15 think Ebony asked Carolyn if June 16th (sic) will be a
16 holiday to honor blackness, basically, in America.
17     And the answer was: No. SHRM is not
18 giving people a holiday or a day off for Juneteenth.
19 Just keep in mind, this was a big deal. It was
20 definitely a way that companies make statements during
21 that time, whether they are behind Black Lives Matter
22 or not, basically.
23     And so there were -- a lot of companies
24 were under -- under -- under the eye of, Are they
25 giving Juneteenth off or not as a part of a solidarity

**Page 104**

1 with what was going on and the African Americans are
2 suffering during that time.
3     So that was asked. And Carolyn said, No.
4 Both Ebony and I disclosed that it was disappointing
5 that SHRM, as an HR company, doesn't set the example
6 by giving Juneteenth off, specifically if SHRM
7 continues to broadcast themselves as the leader in
8 diversity and inclusion and putting out reports and
9 statics of how African Americans are not being treated
10 equally at work.
11     So there's definitely a front that the
12 company is trying to portray. However, when it comes
13 to reality, they couldn't honor that day.
14     And we both -- Ebony and I both said that
15 we hope in the future that SHRM arrives at a place
16 where they feel comfortable enough to give Juneteenth
17 off.
18     This discussion unfortunately felt a bit
19 tense. Carolyn -- Carolyn after that meeting sent a
20 message or an email -- I can't remember -- saying that
21 if me and Ebony have anything to say about this, then
22 we should talk to HR instead of our team.
23     It's a very -- I was surprised by that
24 message, because this is not the first time that we
25 bring up or criticize SHRM actions when it comes to

**Page 105**

1 situations, not necessarily that has to do with race,
2 just another stance that SHRM has published.
3     This was not the first time also to discuss
4 something politically in the team. That was normal.
5 For example, Carrie brought up -- or Anna -- I can't
6 remember --
7     Q  I think you're getting away from the
8 original question. So I just want to make sure that
9 you're responding to the question, which was --
10     MR. SWAIN: Can she finish her answer
11 before you re-ask the question?
12     MS. SMITH: Well -- I mean, we've got
13 limited time on the record, right? So she's been
14 going on, some narrative responses, and I haven't said
15 anything.
16     Q  (By Ms. Smith) But if you don't kind of
17 tailor your responses to be a bit more responsive,
18 then we may have to stay here longer than we would
19 otherwise, or I may have to recall you for a
20 deposition. And I don't want to have to do that.
21     So I'm just making sure that, you know, you
22 are answering the question of what the instances were
23 that Ms. Godmere witnessed discrimination or
24 retaliation.
25     A  That was the incident --

27 (Pages 102 - 105)

Case No. 1:22-cv-01625-PAB-KAS Document 40-3 filed 06/09/25 USDC Colorado pg 28
of 128

Page 106

1    Q   Okay.
2    A   -- that I was just telling right now.
3    Q   Okay.
4    A   Was that -- if it's not clear, I'm happy to
5  clarify that.
6    Q   So it was a -- it was a meeting where
7  Juneteenth was discussed?
8    A   Yes.  And we were met with rather strict
9  reaction from Carolyn for talking about that.
10   Q   You said there was a second incident,
11 correct?
12   A   Correct.
13   Q   What was the second incident?
14   A   Yep.  So -- and also, she was an attendee
15 of a meeting when Carolyn tried to exclude me from
16 attending a meeting, which is the PMQ meeting.
17       During that meeting, Carolyn mentioned to
18 me that this meeting -- big decisions will be made and
19 that I don't need to attend it.  And if I do attend
20 it, then I need to be quiet and not speak.
21       And it's just another example of treating
22 me with less credibility, and undervalued; and Ann was
23 there to witness that as well.
24   Q   Did Ms. Godmere ever complain to anyone at
25 SHRM about discrimination and retaliation?

Page 107

1    A   Not that I know of.
2    Q   Did she ever tell you you complained?
3    A   Not that I can recall.
4    Q   Why do you believe that Nicole Hall
5  witnessed incidents of discrimination and retaliation?
6    A   She was one of the individuals who attended
7  the engagement survey discussions results or results
8  discussions.
9    Q   To your knowledge, did Ms. Hall ever
10 complain to anyone at SHRM about discrimination and
11 retaliation?
12   A   Not that I know of.
13   Q   Did Ms. Hall ever tell you you complained?
14   A   No.
15   Q   Why do you believe that Samantha Hawa
16 witnessed incidents of discrimination and retaliation?
17   A   She was one of the attendees of the
18 engagement survey results discussions?
19   Q   To your knowledge, did Ms. Hawa ever
20 complain to anyone at SHRM about discrimination and
21 retaliation?
22   A   Not that I know of.
23   Q   Did Ms. Hawa ever tell you you complained?
24   A   No, she did not.
25   Q   Why do you believe that Elizabeth Lacey

Page 108

1  witnessed incidents of discrimination and retaliation?
2    A   So do I need to go into details or . . . I
3  am trying to be mindful of time.  Because, yes, she
4  was a witness.  She attended a couple of meetings
5  where discriminatory and retaliatory behaviors were
6  taking place.
7    Q   Tell me about those meetings.
8    A   So one of the meetings was the meeting that
9  I was telling -- I was reciting, where Jeanne Morris
10 brought up things that I disclosed with HR in
11 confidence the day before.  She was -- she was an
12 attendee.
13       She was also an attendee of the engagement
14 survey discussion -- the results discussions.  And
15 Ms. Lacey was considered one of the upper management,
16 you know, on our team.
17       So with regards to the compliance -- HR
18 compliance project that I was working on, she was the
19 overall person to report to.
20       So one of the things that Carolyn did is
21 basically takes my work and talks about it to others.
22 She was definitely one of those people that -- Carolyn
23 would attend meetings that I would have, and she would
24 go and relay the results without basically disclosing
25 or giving any credit to me or without giving me the

Page 109

1  liberty to talk about my work and represent my work
2  while others, like Ann and Carrie, were free to do so.
3    Q   To your knowledge, did Ms. Lacey ever
4  complain to anyone at SHRM about discrimination and
5  retaliation?
6    A   Not that I know of.
7    Q   Did she ever tell you you complained?
8    A   No.
9    Q   Why do you believe that Kevin Lewis
10 witnessed incidents of discrimination and retaliation?
11   A   He was one of the individuals who attended
12 the engagement survey results discussions.
13   Q   To your knowledge, did Mr. Lewis ever
14 complain to anyone at SHRM about discrimination and
15 retaliation?
16   A   Not that I know of.
17   Q   Did he ever tell you he complained?
18   A   No.
19   Q   Why do you believe that Carrie Mills
20 witnessed instances of discrimination and retaliation?
21   A   Because she reported incidents of
22 discrimination and retaliation to Nick.
23   Q   Were you present for that discussion?
24   A   No.  But she told me about it.
25   Q   When did she tell you about it?

28 (Pages 106 - 109)

Page 110

1    A   I can't recall the exact date.
2    Q   What did she tell you?
3    A   She said that she has been witnessing the
4  difference of treatment from Carolyn for me and Ebony
5  and her and Ann.
6       She's been witnessing how Carolyn is
7  bad-talking or bad-mouthing about my work in the
8  office. Because she wasn't in person. She actually
9  went to the office while I was working remote. And
10 she felt that she needed to disclose that to upper
11 management as well.
12      She came to me and asked me how I felt
13 about that before she reported the incident. I told
14 her that she should do whatever she feels best for her
15 and put herself first.
16      At this time, anyone who speaks up, it was
17 kind of risky for them to do so; so I definitely
18 didn't act to influence her decision. And she did
19 speak up to Nick and reported that incident to him.
20 And she came back and told me that she did.
21      She told him of several incidents where she
22 witnessed the difference of treatment from Carolyn
23 to -- between black and white peers.
24      And he responded with acknowledging that he
25 knows that this is taking place and that they are

Page 111

1  working on a solution.
2    Q   Why do you believe Carol Spears witnessed
3  instances of discrimination and retaliation?
4    A   She was one of the attendees of the
5  engagement survey discussions. Yeah.
6    Q   To your knowledge, did Ms. Spears ever
7  complain to anyone at SHRM about discrimination or
8  retaliation?
9    A   Not that I know of.
10   Q   Did she ever tell you she complained?
11   A   No.
12   Q   Why do you believe that Taylon Terrell
13 witnessed instances of discrimination and retaliation?
14   A   She was one of the attendees of the
15 engagement survey results discussion.
16   Q   To your knowledge, did Ms. Terrell ever
17 complain to anybody at SHRM about discrimination and
18 retaliation?
19   A   Not to my knowledge.
20   Q   Did Ms. Terrell ever tell you she
21 complained?
22   A   No.
23   Q   Why do you believe Shawnetta Walker
24 witnessed instances of discrimination and retaliation?
25   A   Shawnetta was one of the attendees of the

Page 112

1  engagement survey results. And she was also subjected
2  to retaliation herself by -- so after, you know, those
3  individuals disclosed that wrongdoing has been taking
4  place, is happening, HR scheduled meetings with
5  individual teams to further discuss these incidents
6  that was -- that were brought up. Those meetings were
7  really intense.
8       And I do recall Shawnetta mentioning the
9  emotional toll, that these meetings were having an
10 impact on her. She literally, quote, unquote, said
11 that she felt sick to her stomach going into these
12 meetings.
13   Q   To your knowledge, did Ms. Walker ever
14 complain to anyone at SHRM about discrimination or
15 retaliation?
16   A   Not that I know of.
17   Q   Did Ms. Walker ever tell you she
18 complained?
19   A   No.
20      MS. SMITH: Let's go ahead and take a
21 break. I think now is a good time for lunch.
22      THE VIDEOGRAPHER: Going off the record at
23 11:59. This marks the end of Media 2 of the video
24 deposition of Rehab Mohamed.
25      (Lunch recess taken.)

Page 113

1       THE VIDEOGRAPHER: This marks the start of
2  Media 3 of the video deposition of Rehab Mohamed.
3  We're back on the record. The time is 12:50.
4    Q   (By Ms. Smith) Ms. Mohamed, have you filed
5  taxes since your termination of employment from SHRM?
6    A   Yes.
7    Q   Do you have records of your tax returns?
8    A   Yes.
9    Q   Who is your tax preparer?
10      MR. SWAIN: Object to form.
11   A   TurboTax.
12   Q   (By Ms. Smith) You don't have an
13 accountant?
14   A   No.
15   Q   Do you have any written or recorded
16 statements from any witnesses you intend to use in
17 this matter?
18      MR. SWAIN: Object to form.
19   A   In which matter?
20   Q   (By Ms. Smith) This lawsuit.
21   A   I'm not really sure. I know we identified
22 a couple of witnesses.
23   Q   Do you have any written statements from
24 those witnesses?
25      MR. SWAIN: Same objection.

29 (Pages 110 - 113)

| | Page 114 |
|---|---|
| 1 | A  I'm not really sure.  I'm not sure. |
| 2 | Q  (By Ms. Smith)  Do you maintain a diary or |
| 3 | a journal? |
| 4 | A  No. |
| 5 | Q  Did you ever maintain one? |
| 6 | A  No. |
| 7 | Q  Have you ever maintained any notes, |
| 8 | handwritten or electronic, regarding your interactions |
| 9 | with SHRM employees? |
| 10 | MR. SWAIN:  Object to form. |
| 11 | A  It's really hard to recall if that has |
| 12 | taken place.  It's a long period of time.  So . . . |
| 13 | MR. SWAIN:  Just to clarify:  Are you |
| 14 | talking about anything she's written down, like |
| 15 | emails, or something other than that? |
| 16 | MS. SMITH:  Handwritten notes, emails, |
| 17 | recorded recollections. |
| 18 | A  Of the incidents and what was going on in |
| 19 | my work at SHRM, period? |
| 20 | Q  (By Ms. Smith)  Of your interactions with |
| 21 | SHRM employees. |
| 22 | A  I'm sure there was emails between us. |
| 23 | Q  Anything that you specifically took down to |
| 24 | jog your memory or make a recording of those |
| 25 | interactions? |

| | Page 115 |
|---|---|
| 1 | MR. SWAIN:  Object to form. |
| 2 | A  Yeah, it's -- it's really vague.  There are |
| 3 | a lot of incidents that went on.  Most of the emails, |
| 4 | for example, that -- I remembered emails from me to |
| 5 | Bernee Long, for example, explaining what happened, |
| 6 | detailing the incidents. |
| 7 | I remember, you know, disclosing a letter |
| 8 | detailing those incidents for both of us, recollection |
| 9 | purposes. |
| 10 | But I can't remember something |
| 11 | specifically, you know, that I can recall at this |
| 12 | moment. |
| 13 | Q  (By Ms. Smith)  Can you remember any |
| 14 | handwritten notes you've taken? |
| 15 | A  I can't recall. |
| 16 | Q  At the time of your employment at SHRM, did |
| 17 | you maintain copies of any company emails or documents |
| 18 | on your personal electronic devices? |
| 19 | A  No, not on my devices. |
| 20 | Q  Did you have a company-issued laptop? |
| 21 | A  Yes. |
| 22 | Q  Did you have a company-issued phone? |
| 23 | A  No. |
| 24 | Q  What efforts have you taken to search for |
| 25 | documents related to this lawsuit? |

| | Page 116 |
|---|---|
| 1 | MR. SWAIN:  Object to form. |
| 2 | A  What efforts -- can you repeat the |
| 3 | question. |
| 4 | Q  (By Ms. Smith)  Sure.  What efforts have |
| 5 | you taken to search for documents related to this |
| 6 | lawsuit? |
| 7 | MR. SWAIN:  Same objection. |
| 8 | A  During my employment or after -- |
| 9 | Q  (By Ms. Smith)  Both. |
| 10 | A  -- the termination? |
| 11 | I have searched for emails of interactions |
| 12 | between me and Carolyn, between me and Jeanne Morris, |
| 13 | mostly things that I have written to them with regards |
| 14 | to the incidents that this situation is about. |
| 15 | So I would just search. |
| 16 | Q  Did you download or print off copies of |
| 17 | those emails at any time? |
| 18 | A  I did not print off, but I did download. |
| 19 | Q  And where did you download those emails? |
| 20 | A  To the company's laptop. |
| 21 | Q  Have you since returned those documents to |
| 22 | the company following your separation of employment? |
| 23 | A  I have not. |
| 24 | Q  Have you returned your company laptop? |
| 25 | A  Yes. |

| | Page 117 |
|---|---|
| 1 | Q  Do you have any documents belonging to the |
| 2 | company in your personal possession currently? |
| 3 | MR. SWAIN:  Object to form. |
| 4 | A  The documents that I have are related to |
| 5 | interactions that are related to this case, so -- and |
| 6 | they are -- they were submitted as evidence in this |
| 7 | case as well. |
| 8 | So those are the emails that I have.  It's |
| 9 | with regards of communication between me -- either |
| 10 | with Carolyn, Nick, Sean, Jeanne.  So -- yeah.  So |
| 11 | those emails, I still have. |
| 12 | Q  (By Ms. Smith)  And where are those |
| 13 | maintained? |
| 14 | A  On the software. |
| 15 | Q  On your personal -- |
| 16 | A  On a cloud. |
| 17 | Q  -- computer? |
| 18 | A  On a cloud. |
| 19 | Q  Which cloud? |
| 20 | A  Gmail.  It's Google Drive. |
| 21 | Q  Do you currently have any text message |
| 22 | communications discussing or relating to Ms. Barley? |
| 23 | MR. SWAIN:  Object to form. |
| 24 | A  Can you clarify, please. |
| 25 | Q  (By Ms. Smith)  Sure.  Do you have any text |

30 (Pages 114 - 117)

Page 118

1  message communications currently in your possession
2  that reference Carolyn Barley?
3       MR. SWAIN: Object to form.
4    A   Like any message?
5    Q   (By Ms. Smith) Text messages specifically.
6    A   That Carolyn is brought up?
7    Q   Yes.
8    A   Not that I can recall.
9    Q   Did you ever have any such text messages,
10  including on the phone that was lost?
11   A   I cannot recall.
12   Q   Okay. If I told you you were employed with
13  SHRM from April 18, 2016, until September 2, 2020,
14  would those dates sound correct to you?
15       MR. SWAIN: Object to form.
16   A   As far as I recall, yeah. It sounds pretty
17  accurate.
18   Q   (By Ms. Smith) Let's take a look at
19  Exhibit 3. Do you recognize this document?
20   A   Are we referring to . . .
21   Q   It should have a designation that says,
22  SHRM 0375 on the bottom.
23   A   0375. Yes, I do recognize.
24   Q   What is this?
25   A   It's the offer letter, SHRM's offer letter.

Page 119

1    Q   To you?
2    A   Yes.
3    Q   According to this offer letter, SHRM
4  offered you the position of specialist, e-Learning
5  products, correct?
6    A   Uh-huh. Yes, correct.
7    Q   And this offer letter says you were to --
8  you were to report to "Jen Walsh" --
9    A   Yeah.
10   Q   -- "manager, e-Learning Products," right?
11   A   That's correct.
12   Q   Upon your hire with SHRM, did Ms. Walsh
13  serve as your direct supervisor?
14   A   She did.
15   Q   And what race is Ms. Walsh, if you know?
16   A   She's white.
17   Q   Did you have any issues with Ms. Walsh?
18       MR. SWAIN: Object to form.
19   A   Can you clarify.
20   Q   (By Ms. Smith) Sure. Did you get along
21  with Ms. Walsh?
22   A   I did.
23   Q   Did you have any concerns regarding her
24  management of you?
25   A   I did not.

Page 120

1    Q   Did you believe Ms. Walsh treated you
2  fairly?
3    A   As far as I remember, yes.
4    Q   Did you ever make any complaints about Ms.
5  Walsh to SHRM?
6    A   I did not.
7    Q   And when you were hired with SHRM, did you
8  work remotely?
9    A   I did not.
10   Q   Where did you work?
11   A   Alexandria, Virginia.
12   Q   When did you move to a remote position?
13   A   I can't recall the exact date.
14   Q   Do you remember if it was before COVID?
15   A   It was before COVID.
16   Q   Do you remember if you were still reporting
17  to Ms. Walsh at that time?
18   A   I was not.
19   Q   Did Ms. Walsh work out of Alexandria,
20  Virginia, as well?
21   A   She did.
22   Q   And how did you and Ms. Walsh communicate?
23  Was it by phone? Email? In person?
24   A   All of the above.
25   Q   How often would you interact with her?

Page 121

1       MR. SWAIN: Object to form.
2    A   With my manager back then?
3    Q   (By Ms. Smith) Yes.
4    A   I can't recall the -- how often. But
5  often, as a manager, you know, and an employee.
6    Q   Would it be daily?
7    A   He can't really recall that. Maybe there
8  were some days that we didn't communicate.
9    Q   Would it be several times a week?
10   A   Yep. Yes.
11   Q   Did Ms. Walsh have any other direct reports
12  other than you?
13   A   She did.
14   Q   Do you recall who those individuals are?
15   A   Minh Chaw.
16   Q   Can you spell that for us?
17   A   M-i-n-h. And then Chaw, C-h-a-w. But I
18  could -- I could be wrong with the spelling.
19   Q   And is Minh Chaw a woman? Man?
20   A   She's a woman.
21   Q   And what did you observe with regard to Ms.
22  Walsh's treatment of Minh Chaw?
23   A   In -- with regards to what did I observe in
24  what way?
25   Q   Do you believe that Ms. Walsh treated Minh

31 (Pages 118 - 121)

Page 122

1 Chaw fairly?
2     A   I don't really have an opinion on how Ms.
3 Walsh was treating other employees.
4     Q   Okay.  You didn't have an opportunity to
5 observe that?
6         MR. SWAIN:  Object to form.
7     A   I observed regular, you know, team
8 interactions; but I don't have a specific opinion
9 whether this was a fairly (sic) interaction or a
10 fair -- fairly behavior from Jen.
11    Q   (By Ms. Smith)  Was there anything that
12 concerned you about the interactions from Ms. Walsh?
13    A   Not that I can recall.
14    Q   Did anyone else report to Ms. Walsh?
15        MR. SWAIN:  Object to form.
16    A   Not that I can recall.
17    Q   (By Ms. Smith)  As a specialist, e-Learning
18 products, you worked in the educational products
19 department, correct?
20    A   I don't know the exact title.  I know it's
21 in the education department.  I don't know the other
22 titles.  I can't recall the other titles.
23    Q   How large is the department?
24    A   The education department?  When I was there
25 at SHRM?

Page 123

1     Q   Yes.
2     A   The beginning or the end?
3     Q   When you first started.
4     A   Yeah, I -- I don't know the exact number.
5     Q   Can you give us a range?
6     A   No, not really.  I know my team, there's
7 me, Minh Chaw, and Jen.
8     Q   Do you know how the department was
9 organized?
10        MR. SWAIN:  Object to form.
11    A   There was an e-Learning team, which is my
12 team; and there was the instructional design team,
13 which was responsible for face-to-face and virtual
14 events.
15    Q   (By Ms. Smith)  And what was the e-Learning
16 team responsible for?
17    A   Building e-Learning courses.
18    Q   Was that what you did?
19    A   Yes.
20    Q   Let's turn to Exhibit 4.  Is this a copy of
21 your resume?
22    A   I assume this is one version of it.
23    Q   Is this the resume you submitted to SHRM
24 during the application process?
25    A   I can't recall if it's the exact one, but

Page 124

1 it looks like it.
2     Q   Does this resume accurately state your
3 skills, education, and employment experience?
4         MR. SWAIN:  Object to form.  Are you
5 talking about at the time that she applied to SHRM or
6 now?
7         MS. SMITH:  I'm talking about the resume
8 included in Exhibit 4.
9     A   Yeah.  But at the time that I applied or
10 right now?
11    Q   (By Ms. Smith)  Well, I'm asking about the
12 document.
13    A   This is an old document.  So we want to
14 just make sure that -- I want to make sure I
15 understand your question, whether the skills and --
16 the skills that are mentioned in this resume, are you
17 saying that they are reflective of my current skills
18 or my skills when I applied to SHRM?
19    Q   Your skills when you applied to SHRM.
20    A   Yes.
21    Q   Why did you accept the job with SHRM?
22    A   It was a -- financially, it was a move.  It
23 was definitely more than what I was making prior to
24 SHRM.
25        And my meetings with Jen were very

Page 125

1 pleasant.  I did like her as a manager, and I thought
2 we -- I would learn a lot from her, and we would do
3 great things together.
4     Q   Were you specifically interested in
5 e-Learning when you applied?
6     A   Not really.
7     Q   Did you have any background or experience
8 in e-Learning?
9     A   Yes.
10    Q   And did you enjoy that?
11    A   Yes.
12    Q   Let's look at Exhibit 5.  You can take a
13 few moments and familiarize yourself with this
14 document.
15    A   (The deponent perused the exhibit.)
16        Uh-huh.  Okay.
17    Q   This is a job description for the position
18 of specialist, e-Learning products, correct?
19    A   Correct.
20    Q   Does this job description accurately
21 describe your duties and responsibilities as a
22 specialist, e-Learning products when you were hired by
23 SHRM?
24    A   For the most part.
25    Q   Do you notice any inaccuracies?

32 (Pages 122 - 125)

Page 126

1    A    (The deponent perused the exhibit.)
2    No.
3    Q    In your own words, how would you describe
4  your duties and responsibilities as an e-Learning
5  specialist?
6    A    As an e-Learning specialist, I was hired to
7  basically create e-Learning programs from conception
8  to launch. SHRM at this time did not have any
9  in-house developed online or e-Learning courses.
10        Most of the e-Learning courses they had
11  were from partners -- outside partners, so we would
12  host them on our platform.
13        So my job was in between, A, making sure
14  that the courses that we are acquiring from third
15  parties to align with our mission statements -- and
16  the second part was to start a process for in-house
17  development, as we can create our own online courses
18  or e-Learning courses.
19    Q    Let's look at Exhibit 6. This is SHRM's
20  employee code of conduct, correct?
21    A    That's the title.
22        MR. SWAIN: Object to form.
23    Q    (By Ms. Smith) Have you ever seen this
24  document before?
25    A    No.

Page 127

1    Q    Was this code of conduct available to you
2  as an employee of SHRM?
3        MR. SWAIN: Object to form.
4    A    I cannot recall.
5    Q    (By Ms. Smith) Do you understand that
6  SHRM's policies are contained in this document?
7    A    I understand that.
8    Q    Did you read the code of conduct at any
9  time during your employment?
10    A    I did not.
11    Q    Let's go to Exhibit 7. This is SHRM's
12  equal employment opportunity policy, correct?
13    A    That's the title.
14    Q    Have you ever seen this document before?
15    A    I have not.
16    Q    Let's go to Exhibit 8. You can take a
17  moment to read this.
18    A    (The deponent perused the exhibit.)
19        Okay.
20    Q    This is a letter dated June 22, 2018, from
21  SHRM to you, correct?
22    A    Correct.
23    Q    And this letter notified you your position
24  with SHRM was changing to instructional designer
25  effective July 2, 2018, correct?

Page 128

1    A    Correct.
2    Q    What prompted the change in position, to
3  your knowledge?
4    A    To my knowledge, for the education -- the
5  education department was going through some changes.
6  It did not make sense for the leadership at this time,
7  that the e-Learning courses and instructional design
8  or the face-to-face and virtual events to be separate
9  entities. It made sense for them to be one.
10        And so they combined basically the
11  e-Learning part to the instructional design team,
12  which was responsible for the face-to-face and
13  virtually events.
14    Q    So there was basically a structural
15  reorganization?
16    A    I believe so.
17    Q    And in this letter, in the first paragraph,
18  in the last sentence, this states, "You will continue
19  to report to Kim Lang, Manager, Instructional Design."
20        Do you see that?
21    A    I see that.
22    Q    When did you start reporting to Ms. Lang?
23    A    I can't recall the exact date.
24    Q    Do you know generally?
25    A    No.

Page 129

1    Q    Were you working remotely at the time you
2  started reporting to ?
3    A    No.
4    Q    You were still in Alexandria?
5    A    Uh-huh. Yes, yes. Uh-huh.
6    Q    Do you know if Ms. Lang had any other
7  direct reports?
8    A    From what I recall, basically the
9  e-Learning specialists and the instructional designers
10  merged to report to Kim Lang.
11    Q    Do you know how many direct reports she
12  had?
13    A    I can't recall.
14    Q    What's Ms. Lang's race, if you know?
15    A    She's not white.
16    Q    Did you have any issues working under Ms.
17  Lang?
18    A    I did not.
19    Q    Did you get along with Ms. Lang?
20    A    I did.
21    Q    Did you ever complain to anyone at SHRM
22  about Ms. Lang's supervision of you?
23    A    I did not.
24    Q    Let's take a look at Exhibit 9. This is a
25  job description for the position of instructional

33 (Pages 126 - 129)

1  designer, correct?
2      A   It appears so.
3      Q   And you could take a look at this document.
4  My question for you is:  Does this job description
5  accurately describe your duties and responsibilities
6  as an instructional designer?
7      A   (The deponent perused the exhibit.)
8      Yes.
9      Q   Do you note any inaccuracies with this job
10 description?
11     A   Not that I can recall for right now.
12     Q   And how would you describe your job duties
13 and responsibilities as an instructional designer?
14     MR. SWAIN:  Object to form.
15     A   As an instructional designer, I -- instead
16 of focusing on just building e-Learning courses and
17 expanding the e-Learning portfolio at SHRM, I also
18 focused on face-to-face and virtual events.
19     So basically, I started working on
20 different modality of -- of launching educational
21 courses from just e-Learning to virtual and face to
22 face.
23     Q   (By Ms. Smith)  Okay.  Let's look at
24 Exhibit 10.  This is a letter dated January 29, 2020,
25 from SHRM to you, correct?

1      A   Correct.
2      Q   And this letter notified you you were being
3  promoted to the position of senior instructional
4  designer, correct?
5      A   Correct.
6      Q   With this promotion, you received a salary
7  increase to $80,000 per year; is that right?
8      A   Yes.
9      Q   And in this letter -- in the first
10 paragraph, second sentence, this letter states, "you
11 will report to Carolyn Barley, Manager Instructional
12 Design," correct?
13     A   Correct.
14     Q   Prior to your promotion to senior
15 instructional designer, did you have any interactions
16 with Ms. Barley?
17     A   I did, because we worked on the same team.
18 However, you know, the ISD team works -- or the
19 structure of it and the fact that each of us have
20 individual courses or each -- individual projects that
21 we work on, so there isn't a lot of like -- there
22 aren't (sic) a lot of heavy collaboration when it
23 comes to -- among ISD team members.
24     So that's why, again, it wasn't very heavy
25 interactions between me and Carolyn at that point.

1      Q   How frequently would you say you interacted
2  with her at the time?
3      A   I can't really put a number for that.
4      Q   Was it daily?
5      A   No.
6      Q   Weekly?
7      A   Maybe.
8      Q   And can you approximate for us when you
9  first interacted with Ms. Barley?
10     A   I cannot.
11     Q   Were you working remotely?
12     A   No.  I was in the office.
13     Q   So this was in Alexandria, Virginia?
14     A   Correct.
15     Q   Was Ms. Barley working out of Alexandria,
16 Virginia?
17     A   That's correct.
18     Q   Did you get along with Ms. Barley when you
19 first started interacting with her?
20     A   Again, because -- there weren't a lot of,
21 like, interactions between us.  So for the
22 interactions that we had, I didn't really have many
23 conflicts.
24     Q   Did you disclose to Ms. Barley your race at
25 that time, when you first interacted with her?

1      A   Like, Hello, I'm black, or how . . .
2      Q   You tell me.
3      A   I mean, my race is on my face.  You can see
4  it.  So --
5      Q   And you interacted with Ms. Barley in
6  person?
7      A   Yes.  We were both in the Alexandria
8  office.
9      Q   So when you first interacted with Ms.
10 Barley, she could see that you were black?
11     A   Can you see that I'm black?
12     Q   Yes.
13     A   Yes.  So then yes.
14     Q   Did you ever make a disclosure of your race
15 to Ms. Barley?
16     A   I can't recall a specific, like, incident,
17 where I said, Hey, my name is Ruby, and I'm black, by
18 the way.  But it was brought up, you know, that I was
19 Egyptian.  My niece was brought up, that my family
20 were in Egypt.
21     It was definitely well established that I
22 was not a white American and that I was different.
23     Q   Do you recall Ms. Barley's responses or how
24 she responded when you told her you were Egyptian?
25     A   I do not recall that.

34 (Pages 130 - 133)

|  | Page 134 |
|---|---|
| 1 | Q   Do you recall her being upset? |
| 2 | A   For the fact that I'm Egyptian? |
| 3 | Q   Yes. |
| 4 | A   I cannot recall that. |
| 5 | Q   When you were promoted to the position of |
| 6 | senior instructional designer, Ms. Barley was working |
| 7 | in Virginia the whole time? |
| 8 | A   You mean, like, in the office, like was she |
| 9 | coming to the office? |
| 10 | Q   Yes. |
| 11 | A   Yeah.  Yes. |
| 12 | Q   And you were as well? |
| 13 | A   Yes. |
| 14 | Q   How would you communicate with Ms. Barley? |
| 15 | MR. SWAIN:  Object to form. |
| 16 | Q   (By Ms. Smith)  By phone?  Email?  Text? |
| 17 | In person? |
| 18 | A   All of the above. |
| 19 | Q   And describe kind of the breakdown of those |
| 20 | communications.  How often would you have in-person |
| 21 | interactions with Ms. Barley? |
| 22 | MR. SWAIN:  Object to form. |
| 23 | A   I cannot recall how often that happened. |
| 24 | Q   (By Ms. Smith)  Were the majority of your |
| 25 | interactions in person? |

|  | Page 135 |
|---|---|
| 1 | MR. SWAIN:  Object to form.  During which |
| 2 | time period are you asking about? |
| 3 | MS. SMITH:  During the time period when Ms. |
| 4 | Mohamed was in the position of senior instructional |
| 5 | designer. |
| 6 | A   So the entire time that I was a senior |
| 7 | instructional designer? |
| 8 | Q   (By Ms. Smith)  When you first began |
| 9 | interacting with Ms. Barley. |
| 10 | A   When I first -- when I was first promoted |
| 11 | to the senior instructional designer position, I was |
| 12 | still in the office.  The setup for our office is |
| 13 | cubical, so it's open space.  She sat behind me. |
| 14 | So . . . |
| 15 | Q   Would you exchange niceties with her when |
| 16 | you came in in the morning or left for the day or |
| 17 | anything like that? |
| 18 | A   I can't recall specific exchanges, but I |
| 19 | would say "good morning" to her, just like to any |
| 20 | others. |
| 21 | Q   And were your interactions with her tense |
| 22 | at that time? |
| 23 | A   No, not that I can remember. |
| 24 | Q   When you were promoted to the position of |
| 25 | senior instructional designer, did Ms. Barley |

|  | Page 136 |
|---|---|
| 1 | congratulate you on your promotion? |
| 2 | A   She did. |
| 3 | Q   What did she say? |
| 4 | A   I can't recall the exact words. |
| 5 | Q   Did she seem in any way upset with your |
| 6 | promotion? |
| 7 | A   Not that I can recall. |
| 8 | Q   Do you remember if anyone else was present |
| 9 | when Ms. Barley congratulated you on your promotion? |
| 10 | A   I -- she sent a congratulation email thread |
| 11 | announcing my new position, and I think members of the |
| 12 | education department were recipients of that thread. |
| 13 | Q   Do you recall her saying anything else |
| 14 | other than in the email thread? |
| 15 | A   I do not. |
| 16 | Q   Do you have any knowledge as to whether or |
| 17 | not Ms. Barley advocated for your promotion to the |
| 18 | position of senior instructional designer? |
| 19 | A   I do not know. |
| 20 | Q   Let's take a look at Exhibit 11.  This is a |
| 21 | job description for the position of senior |
| 22 | instructional designer, correct? |
| 23 | A   Correct. |
| 24 | Q   Does this job description accurately |
| 25 | describe your duties and responsibilities as a senior |

|  | Page 137 |
|---|---|
| 1 | instructional designer? |
| 2 | A   It does. |
| 3 | Q   And how would you describe your duties and |
| 4 | responsibilities as a senior instructional designer, |
| 5 | in your own words? |
| 6 | A   My job duties didn't really change much |
| 7 | from an instructional designer to senior instructional |
| 8 | designer, as I was already doing the senior |
| 9 | instructional designer duties as an instructional |
| 10 | designer. |
| 11 | And so the move from an instructional to a |
| 12 | senior instructional designer was basically a catch-up |
| 13 | to the duties that I was already doing. |
| 14 | Q   And -- go ahead. |
| 15 | A   So including managing the development and |
| 16 | the launch of education products from conception to |
| 17 | launch, reporting on the performance of these |
| 18 | products, going through the phases -- the |
| 19 | instructional design phases when developing these |
| 20 | products and making sure these key milestones were |
| 21 | met. |
| 22 | Again, all of these that I was already |
| 23 | doing as an instructional designer, and so having that |
| 24 | promotion was only a catch-up. |
| 25 | Q   Do you believe you were qualified for the |

35 (Pages 134 - 137)

| Page 138 | Page 140 |

Page 138

1 role of senior instructional designer?
2    A  I do.
3    Q  Did you find any challenges with the role
4 upon your promotion?
5    A  I did not.
6    Q  There was no learning curve with the
7 position?
8    A  As I mentioned, I was already doing most of
9 these tasks and duties as an instructional designer.
10 I don't recall anything new that was added to my task
11 list.
12      I was already working on -- I think two
13 projects were already in the works, and I just
14 continued to work on those products to reach the
15 limit, like the -- launch them basically, complete
16 them and launch them.
17    Q  Were there any aspects of the role that you
18 believed you needed help with or that you needed to
19 learn?
20    A  The only aspect that I thought I needed
21 help with was my interactions with Carolyn once things
22 got ugly. That's when I spoke up.
23    Q  But as far as the job duties and
24 responsibilities themselves, you felt comfortable?
25    A  Not only that I felt comfortable, I was

Page 139

1 continuously getting positive feedback and stellar
2 performance review validating that my performance as a
3 senior specialist was stellar.
4    Q  Prior to taking the role of senior
5 instructional designer, your job performance was rated
6 as satisfactory, correct?
7    A  I can't really recall.
8    Q  Would you say your job performance was
9 satisfactory?
10    A  I can't recall, because I'm not the one who
11 rates my job performance. So . . .
12    Q  What would you think of your job
13 performance? How would you rate it?
14    A  I met all expectations or managerial
15 expectations that were communicated clearly to me. On
16 top of that, my products were -- were being sold at
17 high rates. I can't -- performing very well in the
18 market. There you do.
19      They were performing very well in the
20 market. One of the -- the first online course --
21 e-Learning course SHRM ever launched and sold was
22 created by me, and it's a best seller until now.
23    Q  And which course was that?
24    A  Leading Internal Investigations.
25    Q  And you did that course as an e-Learning

Page 140

1 specialist?
2    A  I did that as -- I think it was e-Learning
3 specialist, slash, instructional designer, within the
4 two -- within the transition, I think; but I can't
5 really recall, to be honest. Uh-huh.
6    Q  You received regular performance reviews
7 with SHRM, correct?
8    A  Yes.
9    Q  When you took the role of senior
10 instructional designer, Carolyn Barley was charged
11 with reviewing your job performance, correct?
12    A  No, not really. I know for a fact that at
13 least the first performance review that she gave out
14 as a manager or for me as a senior instructional
15 designer was mostly written by Jeanne Morris.
16      That's what Carolyn told us: that Jeanne
17 wanted to make sure that she's the one writing those
18 (sic) performance review, at least to help Carolyn out
19 at the very beginning, you know, as a manager.
20    Q  So you were told Jeanne Morris was
21 responsible for writing your performance reviews?
22    A  She heavily aided in the process.
23    Q  How did she heavily aid?
24    A  So I know, for example, that Carolyn and
25 her had meetings about it. I know that these

Page 141

1 performance reviews were not released without Jeanne's
2 approval as well.
3    Q  Do you know if Carolyn Barley contributed
4 input into the performance reviews?
5    A  I do not know.
6    Q  Let's look at Exhibit 12. You can take a
7 minute to look at this document. I know the writing
8 is a little small. Unfortunately, I think this is as
9 big as we could get the font.
10    A  (The deponent perused the exhibit.)
11      Okay.
12    Q  Have you seen this document before?
13    A  Yes.
14    Q  Is this your performance review for the
15 first quarter of 2020?
16    A  I can't recall exactly what quarter, but it
17 was in -- for 2020.
18    Q  Did you get reviews on a quarterly basis?
19    A  I believe so. Actually, I take that back,
20 because there were changes in the -- how often these
21 performance reviews should be given out.
22      So there were a lot of backward ways --
23 we're going to do it once a year, a quarter a year;
24 and I can't really recall when is when.
25    Q  Okay.

36 (Pages 138 - 141)

Page 142

1     A   Uh-huh.
2     Q   During the time of this review, you held
3   the role of senior instructional designer, correct?
4     A   Correct.
5     Q   And Ms. Barley was your supervisor at that
6   time?
7     A   Yes.
8     Q   Did Ms. Barley present this performance
9   review to you?
10    A   We received our performance review via
11  platform. So we just downloaded it once it's
12  available.
13    Q   So you didn't know who completed the
14  review?
15    A   I'm not really sure, or -- all I knew, that
16  once it's ready, we can download it from that
17  platform.
18    Q   Did you discuss the review with anyone?
19    A   Yes.
20    Q   Who?
21    A   Carolyn.
22    Q   And when did that discussion occur?
23    A   I cannot recall.
24    Q   Was anyone else present?
25    A   No.

Page 143

1     Q   Do you recall what was discussed during the
2   meeting with Carolyn?
3     A   I think SHRM had a -- a structure for
4   performance review meetings, where basically we go
5   over the bullet points.
6         And it's literally the manager usually
7   reading from the performance review, from the report
8   itself, and reiterating what's already written.
9     Q   Is that what happened with your meeting
10  with Carolyn?
11    A   I can't remember everything that went down,
12  but yes.
13    Q   So looking specifically at this review,
14  when asked how effective this individual is in
15  performing their assigned tasks, duties, and
16  responsibilities, which is the first point on the
17  first page, it indicates with respect to you:  solid
18  performer.
19        Do you see that?
20    A   I see.
21    Q   And it says, "Manager's Answer" --
22    A   Uh-huh.
23    Q   -- correct?
24    A   Correct.
25    Q   So who was your manager? It's not a trick

Page 144

1   question.
2     A   So you're asking who was my manager during
3   that time?
4     Q   Where it says, "Manager's Answer, solid
5   performer," who was your manager?
6     A   At that time, it was Carolyn.
7     Q   Do you have any reason to believe that Ms.
8   Barley didn't rate you as a solid performer?
9     A   As I mentioned, it was disclosed by Carolyn
10  that her and Jeanne Morris collaborated heavily to
11  come up with these performance reviews.
12        And for that reason, I can't really
13  pinpoint and say for sure this answer was my manager's
14  answer or this answer was Jeanne's answer.
15        It's really hard for me to come up with
16  that, because it was clearly communicated to us that
17  Jeanne's very involved in writing those performance
18  reviews.
19    Q   Was Ms. Morris involved in overseeing your
20  performance?
21    A   I have -- can you -- can you clarify.
22    Q   Sure.  Did she supervise you in your
23  day-to-day responsibilities?
24    A   Meaning . . .
25    Q   Was she included on your projects, did she

Page 145

1   answer questions regarding your assignments, that sort
2   of thing?
3     A   Yeah.  So at the very beginning of my
4   position as a senior instructional designer, Jeanne
5   was pretty involved, not only that we had a good
6   relationship back then and -- but also, the way that
7   these projects work is that we regularly have to go
8   back to Jeanne and Ms. Lacey at each phase of the
9   development to make sure things -- things are aligned.
10        That's one of the things that she was
11  involved for, naming, for example, who in the
12  committee is going to review the course and who are
13  the reviewers -- that's Jeanne -- identifying the SMEs
14  and -- the subject matter experts that I can
15  collaborate with.  That's Jeanne.
16        So I can say that she was pretty heavily
17  involved in seeing and -- in my day-to-day duties for
18  sure.
19    Q   Okay.  Going back to this document:  When
20  asked how effective this individual is in living
21  SHRM's mission, vision, and organizational objectives,
22  this states that the manager's answer indicates "Solid
23  Performer."
24        Do you see that?
25    A   I see that.

37 (Pages 142 - 145)

Page 146

1    Q   When asked how effective the individual is
2  in living SHRM's guiding principles, this indicates
3  the manager's answer was "Role Model."
4        Do you see that?
5    A   I see that.
6    Q   Do you have any idea if this was Ms.
7  Barley, Ms. Morris, or some combination of both of
8  them who thought you were a role model?
9    A   I can't pinpoint again who -- whether it
10 was Jeanne or Carolyn who specified my performance
11 pointers or rate -- my performance rate, because it
12 was stated at the beginning that Jeanne was heavily
13 involved in writing this report.
14   Q   And when asked how effective the individual
15 is contributing above and beyond their assigned roles
16 and responsibilities, the manager's answer states
17 "Solid Performer," correct?
18   A   Correct.
19   Q   At the time of this performance review, do
20 you believe Ms. Barley was discriminating against you
21 because of your race?
22   A   At the time of this specific performance
23 review, I -- you know, there weren't a lot of
24 interactions between me and Carolyn.
25       I know she is stated here, as she is my

Page 147

1  manager. However, the position was really new to her,
2  and she was very well occupied with the PMQ project,
3  which is a big project that SHRM was working on.
4        So during that period, I can say that --
5  that Carolyn was almost acting as a senior
6  instructional designer, because she was leading
7  projects of her own and developing content rather than
8  really overseeing the projects that we were working on
9  as instructional designers.
10       So at that point, I hadn't really -- there
11 weren't a lot of managerial interactions that had
12 taken place for me to clearly see discriminatory
13 behaviors.
14   Q   So is your answer to that question no?
15       MR. SWAIN: Object to form. She's already
16 answered the question.
17   A   The answer is what I just said.
18   Q   (By Ms. Smith) And I'm asking: Is that a
19 no?
20       MR. SWAIN: Same objection.
21   A   So at this time, there weren't a lot of
22 interactions -- managerial interactions between me and
23 Carolyn.
24       And so I couldn't clearly see any
25 discriminatory behavior during that time, because she

Page 148

1  wasn't really overseeing me.  She was more involved in
2  creating another course.
3    Q   (By Ms. Smith) So you could not see any
4  discriminatory behavior from Ms. Barley at this time?
5    A   Due to the lack of interaction between me
6  and her, yeah.
7    Q   Do you believe this performance review was
8  discriminatory?
9    A   Can you clarify that, please.
10   Q   Sure.  Do you think that by issuing this
11 performance review, SHRM was discriminating against
12 you?
13   A   No.
14   Q   On the first page of Exhibit 12, there are
15 four points listed about notable contributions you
16 made during the first half of 2020.
17       Do you see that?
18   A   Wait.  Where again?
19   Q   It's the first page of Exhibit 12.
20   A   Okay.
21   Q   There are four points listed about notable
22 contributions you made during the first half of 2020.
23 And again, I know the font is kind of small.
24       Let me know when you've found the --
25   A   Notable contributions.  Yes, I see it.

Page 149

1    Q   Do you see where I'm -- where I'm looking?
2    A   I do.
3    Q   Do you agree you made those contributions?
4  And you can take a moment to read those.
5    A   (The deponent perused the exhibit.)
6        Uh-huh.  I agree.
7    Q   You agree.  Under Point 4, there's a note
8  stating, "The extra time spent keeping up with the
9  pace to meet deadlines is greatly appreciated."
10       Do you see that?
11   A   I see that.
12   Q   Do you know who wrote that note?
13   A   Again, I can't really point who wrote what,
14 because it was communicated to us that Jeanne and
15 Carolyn collaborated to write this report.
16   Q   Did you meet deadlines at the time of this
17 performance review?
18   A   I can't recall specific deadlines during
19 that entire quarter, so -- I can't really recall all
20 the deadlines I had, but I believe that I did meet
21 them.
22   Q   You believe you did?
23   A   Uh-huh.  Yes.  Sorry.  Uh-huh.
24   Q   Did you spend extra time to keep up the
25 pace to meet deadlines?

38 (Pages 146 - 149)

Page 150

1    A   With regards to the PMQ course, which is
2 the course that, by the way, Carolyn was charged of
3 creating -- because there were red flags that she
4 couldn't meet the deadline to launch that course in
5 time, we all had to drop what we were doing and jump
6 in to help her, so we can make sure that we're meeting
7 the deadline that -- at this time, SHRM has already
8 announced to the public that we are -- they're about
9 to offer that product, so we had an announced deadline
10 that we had to reach.
11    And Carolyn couldn't reach that on her own,
12 so we were asked to chip in to help her reach that.
13    Q   Were there any other projects in which you
14 chipped in to help meet deadlines?
15    A   The -- the -- yeah, so it's -- I don't want
16 to say really it was more of a deadline; it was more
17 of stepping in to save the day more.
18    So things would come up, whether in
19 projects that were already launched and up and running
20 on the platform or projects that are still in the
21 work.  And I was often asked if I can step in and
22 assist.  And then I did, gladly.
23    Q   And who would ask you to step in and
24 assist?
25    A   Whether Jeanne, whether Carolyn, whether

Page 151

1 the person who's actually on the project.  There's a
2 number of people who would ask me to step in.
3    Q   Who other than Jeanne and Carolyn may ask
4 you to assist?
5    A   I can't recall everyone.
6    Q   Can you recall any of them?
7    A   Ms. Lacey is one of them as well.
8    Q   And under notable contributions, Section
9 Point 3, in the last sentence, there's a note stating,
10 "In projects like these, I'd like you to continue to
11 take more ownership by setting the communication
12 cadence with the vendor and providing updates
13 proactively to leadership."
14    Do you see where I'm referencing?
15    A   I do.
16    Q   What do you interpret that statement to
17 mean?
18    A   I've asked Carolyn the same question
19 when -- during the performance review meeting, because
20 I couldn't really understand.  And she said not to
21 worry about it.  It's just something that -- it was
22 written down.
23    Q   Did you construe this statement to be
24 discriminatory?
25    A   At that time, I didn't really think it was

Page 152

1 discriminatory.  I thought it was confusing, because
2 it was delivering to -- I was being delivered two
3 separate messages.
4    A, I was asked to not make any meetings
5 without her presence, not send emails without running
6 it by her.
7    I -- the names of the reviewers or
8 stakeholders were being withheld from me until -- I
9 had to bug her to give it to me, so I could send them
10 communication.
11    And that -- my communication with the upper
12 leadership was winding down.  It was definitely me --
13 she was the sole channel of communication.
14    And so it was very confusing when it says,
15 We'd like you to continue to take more ownership and
16 setting communication candice (sic) with the vendors
17 and updates to leadership; because I wasn't allowed to
18 do these things on my own.
19    I was asked by Carolyn for her to be
20 involved very heavily within those tasks.  And that's
21 why I brought it up to her that -- it's written here
22 that -- I told her that I'm up for taking more candice
23 and taking more leadership; but at the same time, I'm
24 instructed that I cannot take almost any action
25 without her interference.

Page 153

1    So it's very conflicting messages, that I
2 didn't understand.
3    Q   How did Ms. Barley give you the message
4 that you weren't to communicate directly with vendors?
5    A   I mean, she would tell me, if there's a
6 meeting, then she has to be on there.  She said make
7 sure that I'm attending all the meetings that you're
8 attending with the vendor.
9    She said make sure that -- send me that
10 email that you're about to send to reviewers before
11 you send it out to the reviewers -- actually, send me
12 the email so I can review it, and then I will give you
13 the names of the reviewers that you should send it to.
14    And when I asked, Why do you see it
15 necessary for you to attend every single meeting that
16 I have, that's when she said, You don't sound
17 assertive enough.  I need to be there to help you
18 sound assertive.
19    Q   Did you ever complain to Jeanne Morris or
20 anyone else that Ms. Barley was preventing you from
21 communicating directly with vendors?
22    A   On June 3rd, that was one of the things I
23 brought up.
24    Q   Did you at the time of this performance
25 review?

39 (Pages 150 - 153)

Page 154

```
1       A   No.
2       Q   Why not?
3       A   I am the kind of person who really don't
4   (sic) like to stir the pot.  If things are just going,
5   let's just go.
6           And from my understanding, I took that as,
7   This is Carolyn's managerial style.  Maybe she doesn't
8   feel comfortable enough for me -- or IDS, period -- to
9   lead those instructional design projects.
10          Although, as you saw in the
11  responsibilities and job duties in the position
12  itself, that is part of my position that I was
13  assigned for or tasks that I was assigned for:  is to
14  take the leadership of those projects.
15          I assume that that's what Carolyn does, and
16  I don't want to be problematic.  I want to keep the
17  ship going.  And she's my manager at the end.
18          You have to understand that when your
19  manager comes and tells you to do something, I didn't
20  really question that, I just did it, until a pattern
21  started to appear.  And that's when I started
22  questioning things.
23      Q   Okay.  Let's look at Exhibit 12, under
24  opportunities for development.  Do you see that
25  section?
```

Page 155

```
1       A   I do.
2       Q   Under Point 1, it says, "As a Senior
3   Instructional Designer and having experience at SHRM,
4   the organization greatly benefits from your creatively
5   and institutional knowledge.  As you continue to grow
6   in your design experience, you'll be able to balance
7   those pieces against timelines for improved efficiency
8   and business impact."
9       A   Uh-huh.
10      Q   Do you see where I'm referencing?
11      A   I do.
12      Q   At the time of this performance review, did
13  you have any difficulties balancing your instructional
14  design work against timelines?
15      A   I did not.  Not to my knowledge.
16      Q   Why do you think this statement was
17  included in this performance review?
18      A   Again, I asked Carolyn about this, and she
19  said this -- these are just things that we have to put
20  in there.
21          We have to come -- not, quote, unquote, but
22  what I was told is, We have to come up with things
23  that you have to improve on even if you don't have,
24  and this is the thing that we just wrote in there.
25          Because, you know, it's -- I take pride in
```

Page 156

```
1   my work.  I -- the work that I produce is really
2   important to me.  And when I get feedback, it's really
3   important for me to understand, How can I get better,
4   and how can I be better if there is -- any problems
5   are in the way?
6           And I took this as an opportunity not to
7   nit-pick of like, Oh, you said this.  Why did you say
8   that?  But, no, it was to -- honestly to -- if I'm
9   lacking behind in leadership or deadlines, I need you
10  to communicate that to me, not only at the performance
11  review, but also as these things are happening, so I
12  can continuously better myself.
13          But none of these things -- none of that
14  feedback was given to me of, Here's a specific
15  incident where you lacked -- or where you were behind
16  a deadline, and here's what I need you to do to not do
17  that again.
18          That was never given to me to even improve
19  on if that was an issue back then.
20      Q   Did you ask for specific examples?
21      A   I did.
22      Q   And what was Ms. Barley's response?
23      A   It was the answer of, Don't worry about it.
24  You're doing great.  You're a solid performer.  Just
25  keep doing what you're doing.  No issues at all.  We
```

Page 157

```
1   just have to come up with things.
2           Everybody has that.  That's written in
3   everyone's performance review.  That was -- that's
4   what I was told.  It's not something specifically
5   directed at you.
6       Q   Do you believe this statement in this
7   performance review is discriminatory?
8       A   So when you say it's discriminatory, do you
9   mean that the person who wrote it wrote it with intent
10  of discrimination?
11      Q   Yes.
12      A   I can't know the intent, so I can't really
13  answer that question.
14      Q   So you don't know?
15      A   I don't know.
16          MS. SMITH:  I think this is a good time for
17  a quick break.
18          MS. DEFAZIO:  Sure.
19          THE VIDEOGRAPHER:  Going off the record at
20  1:50.  This marks the end of Media 3.
21          (Recess taken.)
22          (At this time Ms. Hoffman entered the
23  room.)
24          THE VIDEOGRAPHER:  This marks the start of
25  Media 4 of the video deposition of Rehab Mohamed.
```

40 (Pages 154 - 157)

Page 158

1  We're back on the record. The time is 2:02.
2      Q   (By Ms. Smith) Ms. Mohamed, during your
3  employment with SHRM, did Ms. Barley ever make any
4  comments to you regarding your race?
5      A   Not that I can recall.
6      Q   How would you describe Ms. Barley's
7  management style?
8      A   It really depends on who she's managing.
9  If it's a minority group, then it's micromanaging,
10 very involved, very restrictive treatment with less
11 credibility, assuming the worst kind of approach.
12      If the -- if she's managing someone outside
13 of the minority group, then it's compassion, it's
14 absolute freedom to get in touch with vendors, upper
15 management, without her knowledge, and empowerment for
16 them to be successful.
17      Q   And when you say that with respect to a
18 minority group, are you referring to her management of
19 you?
20      A   Of me and Ebony. That's the two I've seen.
21      Q   Anyone else?
22      A   I haven't seen --
23      Q   In the minority group.
24      A   -- her manage other minority groups.
25      Q   And can you give us some examples of how

Page 159

1  her management style was micromanaging?
2      A   I've already mentioned those, but I'm happy
3  to reiterate again. The micromanaging came with her
4  involvement in almost every step in the way.
5      Now, as an instructional designer, there
6  are key milestones that you check in with your
7  management throughout the project.
8      So a long project usually takes six months.
9  That's a long period. So there are check-ins at
10 certain phases as you're developing the content and
11 the product.
12      The norm is when those check-ins happened,
13 that's when Carolyn is pulled in, the manager; or if
14 there is a blockage or a hurdle that gets in front of
15 the instructional designer that is preventing them
16 from reaching a certain phase, that's when the
17 manager's also pulled in.
18      In my case, it was completely different.
19 It was, I need to be on every meeting that you're
20 conducting with your stakeholders.
21      It was, I need to review emails before you
22 send them out to the stakeholders. It was, I need to
23 be in the meetings to help you sound more assertive.
24      It was withholding information from me to
25 make sure that I'm moving within her pace and under

Page 160

1  her mercy rather than empowering me with all the
2  resources I need to complete my job successfully.
3      That's where the micromanaging really
4  happens: When she felt that she needs to be there
5  when she didn't. And that got in the way of me
6  delivering on my deliverables. So . . .
7      Q   Did you observe the same micromanagement
8  toward Ebony?
9      A   I did.
10      Q   Can you provide us with any examples of how
11 Ms. Barley micromanaged Ebony specifically?
12      A   I can't remember a specific incident or an
13 example of micromanaging Ebony. It was -- Ebony was
14 also isolated, same as I was, with -- meaning that any
15 communication going in or out goes through Carolyn.
16      This communication, whether to the vendors,
17 upper management -- the only people I could talk to
18 freely is my peers; because I can chat with those,
19 with the people in the ISD team.
20      However, outside of that, Carolyn
21 definitely played as the middleman.
22      Q   And you said that Ms. Barley treated your
23 white counterparts with more freedom and compassion --
24      A   Yes.
25      Q   -- correct?

Page 161

1      Who were your white counterparts?
2      A   Anne Godmere and Carrie Mill. Mill or
3  Mills. I'm sorry. I can't recall the last name.
4      Q   How long were you in the role of senior
5  instructional designer when Ms. Barley was
6  micromanaging you?
7      A   I can't put an exact date or period -- time
8  frame on that, but it was the minute she became free
9  from the PMQ occupation.
10      As I mentioned, she was very occupied in
11 the beginning of my senior position with another
12 project that we didn't really have a lot of managerial
13 interactions.
14      But it was after her leave of that project,
15 that's when the micromanaging started to happen.
16      Q   And do you know how long Ann Godmere was a
17 senior instructional designer when Ms. Barley started
18 managing her?
19      A   I know that Ann was a senior instructional
20 designer from the beginning of the time that Carolyn
21 was a manager. So like from -- like, once Carolyn
22 became a manager, she was managing Ann, as a senior
23 instructional designer.
24      Q   Do you know how long Ms. Godmere was in the
25 role of senior instructional designer?

41 (Pages 158 - 161)

Page 162

1  A  I do not know.
2  Q  Do you know how long Ms. Mills was in the
3  role of senior instructional designer?
4  A  I cannot recall.
5  Q  And when you say that Ms. Barley was --
6  treated you and Ebony with less credibility, what do
7  you mean by that?
8  A  With less credibility with regards -- for
9  example, if you -- one of the basic things that we do
10  as an instructional designer is lear- -- is identify
11  learning objectives for the courses that we're
12  building.  This is 101 ISD.  Like, this is very basic.
13  Any instructional designer should know how to do this.
14     And I remember, for example, one incident
15  where Ebony was presenting her learning objectives.
16  And we don't have to agree on the learning objectives.
17  It's a discussion.  That's why we review them before
18  we start on the content.
19     But the response was, Do you even know how
20  to write learning objectives, or do you need a
21  training on that as well?
22     At some point, Carolyn reached out to me
23  and Jeanne reached out to me to help Ebony do her job
24  better, even though -- I don't know why I was picked,
25  but you can guess.

Page 163

1     And I -- the description that was given to
2  me, it was the fact that she is -- she doesn't even
3  know the basics of instructional design.  She needs
4  help learning learning objectives.
5     She missed a meeting because her
6  electricity was out, and Carolyn thought she was lying
7  about that.
8     It was all accusations that really had
9  taken a stab at Ebony's character rather than the work
10  that she was producing from the report that Jeanne and
11  Carolyn gave to me when they asked me to help her out.
12  Q  Did you have an opportunity to observe
13  Ebony's performance personally?
14  A  Again, each instructional designer has
15  their own project, so we don't really collaborate
16  within that one project.
17     But there are check-ins, where if I reach
18  the alpha draft, for example, then I can share it with
19  the fellow instructional designers for them to review.
20  That's where I observed Ebony's work.
21  Q  How often would you observe Ebony's work?
22  A  Not very often, but I can't really tell how
23  often.
24  Q  How did Ms. Barley compare to your prior
25  managers at SHRM?

Page 164

1     MR. SWAIN:  Object to form.
2  A  With regards to her management style?
3  Q  (By Ms. Smith)  Sure.
4  A  So prior to Carolyn, I had Kim and Jen as
5  my managers.  I had a wonderful relation or -- yeah,
6  relationship with Jen.  She empowered me to do what I
7  needed to do.
8     Her -- I remember her specifically saying,
9  I'm here for you to be successful.  So that's when you
10  can pull me in.  Other than that, go and do your
11  thing.  I trust you.  You've proven your worth,
12  basically, because of the products that you designed.
13     Kim also was very trust- -- trusting and
14  very empowering.  I never really experienced that
15  level of scrutiny that I experienced with Carolyn with
16  other managers, which was -- again, you know, it's
17  almost four or five years that I've been at SHRM by
18  then.
19     And I have a proven record.  I'm not a new
20  employee.  This is -- they're not still finding out
21  whether Ruby is a good employee or not or whether she
22  can deliver or not.  I have four years of proof that I
23  can.
24     And it was -- that's why it was quite
25  shocking that I'm being put under such scrutiny from

Page 165

1  my new manager.
2  Q  So Ms. Walsh and Ms. Lang didn't treat you
3  with the same micromanaging style as Ms. Barley?
4  A  No, they didn't.
5  Q  Did you immediately construe Ms. Barley's
6  management style to be discriminatory?
7     MR. SWAIN:  Object to form.
8  A  No.  Not immediately.
9  Q  (By Ms. Smith)  It's my understanding that
10  on June 1st, 2020, you complained to Jeanne Morris,
11  who it's my understanding is the vice president of
12  education, regarding Ms. Barley.
13     Is that correct?
14     MR. SWAIN:  Object to form.
15  A  I believe it was June 3rd.  But . . .
16  Q  (By Ms. Smith)  June 3rd?
17  A  Yeah.
18  Q  Why does June 3rd stand out in your mind?
19  A  That was the beginning of it all.
20  Q  Do you have any reason as to why you recall
21  that specific date?
22  A  That was the beginning of it all.
23  Q  Did you make the complaint to Ms. Morris
24  orally or in writing?
25  A  Orally.

42 (Pages 162 - 165)

Case No. 1:22-cv-01525-SBP-KAS Document 40-13 filed 06/09/25 USDC Colorado pg 43 of 128
Case No. 1:22-cv-01525-BNB-KAS Document 40-13 filed 06/09/25 USDC Colorado pg 43 of 128

| Page 166 | | Page 168 | |
|---|---|---|---|
| 1 | Q And where did you make the complaint? | 1 | A I recall saying, I am discriminated against |
| 2 | A Where? | 2 | by Carolyn. |
| 3 | Q (Nodded head up and down.) | 3 | Q How did Ms. Morris respond? |
| 4 | A On the phone. | 4 | A She said that, We immediately need to |
| 5 | Q Were you still working remotely? | 5 | address -- to bring Carolyn to the table and address |
| 6 | A Yes. | 6 | these issues. |
| 7 | Q And Ms. Morris was also working remotely, | 7 | Q Did Ms. Morris say or do anything to lead |
| 8 | or was she in Virginia? | 8 | you to believe that she was upset with you that had |
| 9 | A I can't really recall where she was | 9 | you complained? |
| 10 | exactly. | 10 | MR. SWAIN: Object to form. Are you |
| 11 | Q Why did you complain to Ms. Morris? | 11 | talking about during that meeting or just in general? |
| 12 | A Jeanne and I had, what I thought back then, | 12 | MS. SMITH: During that meeting or |
| 13 | good candice. She was my safe person. She's always | 13 | otherwise. |
| 14 | encouraged me to speak up. She always has given me | 14 | That she was mad at me for complaining? |
| 15 | positive feedback on my performance. We joked a lot. | 15 | Q (By Ms. Smith) Yes. |
| 16 | It wasn't just professional. We had a good | 16 | A At that time, there -- she did not show any |
| 17 | relationship. | 17 | signs of being upset. |
| 18 | At the same time, I believe Jeanne -- this | 18 | Q Did Ms. Morris tell you you were in trouble |
| 19 | is -- this was time where the brutal murder of George | 19 | for complaining? |
| 20 | Floyd was -- it just happened, and there was a turmoil | 20 | MR. SWAIN: Same objection. Can we talk |
| 21 | in the country. | 21 | about the time period that you're asking about. |
| 22 | And Jeanne basically was reaching out to | 22 | MS. SMITH: During that meeting. |
| 23 | black and members of minority groups in the | 23 | A She did not. |
| 24 | department, in the education team, telling them that | 24 | Q (By Ms. Smith) Did your day-to-day |
| 25 | she -- you know, just showing compassion that, Sorry | 25 | responsibilities as a senior instructional designer |

| Page 167 | | Page 169 | |
|---|---|---|---|
| 1 | all these things are happening to you. | 1 | change in any way after you complained to Ms. Morris? |
| 2 | So it felt safe for me to reach out to her. | 2 | A No. |
| 3 | She's Carolyn's boss as well, so I thought she can | 3 | Q Did your compensation change in any way |
| 4 | help me relay that message to Carolyn in a | 4 | after you complained to Ms. Morris? |
| 5 | constructive way that won't make her defensive and | 5 | A No. |
| 6 | would create a space for us to work on solutions | 6 | Q Let's take a look at Exhibit 13. Can you |
| 7 | rather. | 7 | take a moment to review this exhibit. |
| 8 | Q Do you recall what you told Ms. Morris | 8 | A (The deponent perused the exhibit.) |
| 9 | specifically when you complained about Ms. Barley? | 9 | Yes. |
| 10 | A I can't recall specifically. | 10 | Q Have you finished looking at the -- |
| 11 | Q Do you recall generally? | 11 | A Yes. |
| 12 | A I really generally, yes. | 12 | Q -- document? |
| 13 | Q What do you recall? | 13 | These are emails dated June 12, 2020, |
| 14 | A I recall that -- me mentioning specific | 14 | between you and Ms. Barley, correct? |
| 15 | incidents, that I've already mentioned, during this | 15 | A That's correct. |
| 16 | meeting to Jeanne Morris and telling her how these | 16 | Q Looking at the second page -- it should be |
| 17 | incidents made me feel and how Carolyn treats my -- | 17 | labeled SHRM 0045 -- |
| 18 | the white peers on the ISD team differently than the | 18 | A Uh-huh. |
| 19 | black peers and that I believe that I am being | 19 | Q -- Ms. Barley says, "Hi Ruby - Thank you |
| 20 | discriminated against by Carolyn. | 20 | for taking the time to talk with me this morning." Do |
| 21 | Q Did you specifically tell Ms. Morris that | 21 | you see that? |
| 22 | you believed Ms. Barley was discriminating against you | 22 | A I see that. |
| 23 | based on your race? | 23 | Q Did you and Ms. Barley talk on June 12, |
| 24 | A Yes. | 24 | 2020, prior to this email string? |
| 25 | Q You recall those exact words? | 25 | A I believe so. |

43 (Pages 166 - 169)

Page 170

1    Q   Do you remember how that discussion
2  occurred?  Was it by phone?
3    A   By phone.
4    Q   Was anyone else present for the discussion?
5    A   No.
6    Q   Do you have any recordings of this
7  discussion?
8    A   No.
9    Q   What do you recall was discussed during
10 this meeting?
11   A   During this meeting, what I recall was --
12 it was basically the opportunity for Carolyn and I to
13 get on the same page of where are things are not
14 aligned.
15      I brought up incidents that were -- that
16 took place by Barolyn -- by Carolyn and explained to
17 her the impact of those incidents on me as a black
18 woman and how they made me feel as a black woman and
19 how they got in the way of me performing my duties as
20 a senior instructional designer.
21      I opened up about previous incidents with
22 other managers that may have to show -- to show
23 examples of how -- how certain incidents can impact
24 people of color differently.
25      And Carolyn's response was mostly, as far

Page 171

1  as I recall, either denying these incidents took place
2  to begin with -- if I show proof that these incidents
3  did take place and remind her, then she would say, Oh,
4  that's not really what I meant.  You misunderstood, or
5  that wasn't really my intentions.
6       And if I explained that even with good
7  intentions, we, as people of color, has still to live
8  with the consequences of those actions regardless of
9  the person's intent.
10      It was -- it was still -- the approach was
11 basically like, There's nothing I can do -- sorry.
12 There's nothing I can do.  Like, what do you -- you
13 know, I'm not discriminating against you.  I have good
14 intentions.  What -- what do you want me to do,
15 basically?
16      And it -- the conversation I believe that
17 ended that:  This cannot be resolved in one
18 discussion, that this is something that we both have
19 to -- going to work on:  Her -- on her side, of
20 learning how to lead a diverse team, and on my side is
21 to communicate to her when the wrongdoing is taking
22 place.
23      That's all I can recall.
24   Q   Was this the first time you told Ms. Barley
25 that you believed she was discriminating against you

Page 172

1  because of your race?
2    A   No.
3    Q   When did you tell her previously?
4    A   During that meeting that Jeanne put
5  together for me, her, and Jeanne.  I cannot recall the
6  date -- the exact dates for that.  I did mention that
7  I believe that she was discriminating against me
8  because I'm black.
9    Q   And you mentioned that you raised certain
10 incidents that you felt were examples of the disparate
11 treatment during this discussion with Ms. Barley --
12   A   Uh-huh.
13   Q   -- prior to the email on June 12, correct?
14   A   Uh-huh.  Correct.
15   Q   What were some of the examples of those
16 incidents you raised to Ms. Barley?
17   A   I -- I can't really recall the exact
18 incidents.  All I know, that I was trying to show her
19 examples in ways that she doesn't feel like it's
20 personal.
21      And so I was trying to show her how these
22 random incidents as well can be, you know -- how can
23 they be discriminatory and what kind of impact they
24 can have on a person of color.
25   Q   Looking back at Exhibit 13, page 2, Ms.

Page 173

1  Barley states in her email to you, I appreciate your
2  raising concerns with me about your experience both
3  with me and previous managers.  While I can't be
4  responsible for previous situations, it helps to have
5  that context in your experience.
6       Do you see that?
7    A   Yes.
8    Q   When you received this email from Ms.
9  Barley on June 12, 2020, did you construe Ms. Barley
10 to be upset with you for raising concerns?
11   A   I -- so your question is:  Did I think
12 Carolyn was mad that I brought that up?
13   Q   Yes.
14   A   I did think that she wasn't happy, that it
15 wasn't a pleasant discussion for her.
16   Q   Why did you think that she wasn't happy?
17   A   I mean, who would be happy with their
18 reporter telling them that, You're discriminating
19 against me?
20   Q   Did you observe anything with regard to her
21 reaction or response to you that would lead you to
22 believe she was upset?
23   A   Uh-huh.  Well, her inability to
24 take accountable -- to be accountable -- to be held
25 accountable for any of the incidents that happened,

44 (Pages 170 - 173)

Case No. 1:22-cv-01525-PAB-KAS Document 40-13 filed 06/09/25 USDC Colorado pg 45 of 128

Page 174

1 regardless of her intent, for me it really showed that
2 she took this very personally. And --
3 (Sneeze.)
4 THE DEPONENT: Bless you.
5 MR. SWAIN: Excuse me.
6 MS. SMITH: Bless you.
7 A And she took it very personally. The fact
8 that she would deny the things that actually
9 happened -- things did happen, that she would deny
10 that they would happen and flip-flop on that.
11 During the meeting, when Jeanne put us
12 together, Carolyn was very upset. Her reaction when I
13 disclosed -- because Jeanne asked me, Tell her what
14 you told me. And I said, Okay.
15 And I told her exactly what I told Jeanne.
16 And her reaction -- she was very upset. She felt
17 blindsided, she said. She was crying. She basically
18 implied that, I'm a good person, why are you doing
19 that to me, kind of message.
20 So all these reasons had led me to believe
21 that she wasn't really happy with the complaint that I
22 brought forward.
23 Q (By Ms. Smith) Did Ms. Barley ever
24 threaten your job?
25 A Threaten my job in what way?

Page 175

1 Q I'm not happy you complained; I'm going to
2 fire you?
3 A I wish it was that easy. But, no, she
4 didn't do that.
5 Q Did she do anything more subtle to lead you
6 to believe that she was going to take action against
7 you?
8 A The retaliation actions that took place
9 after me bringing forward the complaint, they were all
10 done to lead to the result of me being fired.
11 Q Let's go back to Exhibit 13, page 2.
12 Ms. Barley states in her email to you, We've already
13 made some changes in projects, such as the Compliance
14 and Employment Law program. We are also looking at
15 different approaches across the team, such as clarity
16 on what to include in the weekly ID team report. I'm
17 confident that we can continue to work together and
18 trust that we both do want the same goals. As we
19 discussed, I'm going to schedule biweekly meetings for
20 you -- for you and I to check in. I think this will
21 help with our communication.
22 Do you see that?
23 A I see that.
24 Q Did you object to any of these changes that
25 Ms. Barley references here?

Page 176

1 MR. SWAIN: Object to form.
2 A With regards to the biweekly meetings, I
3 did not object to that, no.
4 Q (By Ms. Smith) What about any of the other
5 changes?
6 A Which is?
7 Q Changes in the project, such as the
8 Compliance and Employment Law program.
9 A So at this point, the only changes that
10 took place is her releasing important information that
11 she was holding from me with regard to that program
12 and her telling me -- giving me the permission to meet
13 with the vendor without her presence.
14 I did not object to either of those.
15 Q And what about looking at different
16 approaches across the team, such as clarity on what to
17 include in the weekly ID team report?
18 A I have no idea what she's referring to.
19 Q Did you ask her for clarification?
20 A I did not.
21 Q Why not?
22 A Communication was very sensitive at this
23 time. Less is better for sure. And I wanted to focus
24 on the positive changes that were taking place. I
25 wanted to be positively reinforcing any positive

Page 177

1 change.
2 So I didn't really want to pick on
3 something that honestly I didn't think it would be
4 important.
5 The ID reports, she writes that based on
6 things we give her -- ID team gives her. So it's
7 really more of her task. It doesn't really involve me
8 much. So I didn't think it would impact me doing my
9 job.
10 Q You didn't believe the ID report fell
11 within your performance expectations?
12 A The ID report reported milestones within --
13 with each of the projects that we were working on.
14 And so I didn't know really what she was talking
15 about, different approaches. So I didn't care to ask
16 about that.
17 Q Okay. Let's look at page 1 of Exhibit 13.
18 This contains your response to Ms. Barley's email,
19 correct?
20 A Yes.
21 Q Looking at the last sentence of the first
22 full paragraph in this email, you state, "The changes
23 already made regarding the management of the
24 compliance program have made a big difference (a
25 positive one), which reassured me that we can achieve

45 (Pages 174 - 177)

Page 178

1 great things when working together."
2      Do you see that?
3    A  I see that.
4    Q  What changes to the management of the
5 compliance program were you referring to?
6    A  I just mentioned, but I'll mention them
7 again.  She shared with me information that she was
8 holding -- she was withholding with regards to the
9 compliance program.
10      And she give me the liberty to interact
11 with the vendor without her involvement at every step
12 in the way.
13    Q  And which information was she withholding
14 from you?
15    A  So things like, for example -- when an ID
16 person is being assigned a course, there are already
17 some discussions that are happening on upper level
18 management of why this course or why this topic was
19 chosen, right?
20      So this context, we are not involved in.
21 But when we are assigned the course, we are usually
22 given that context of, We want to -- you know, SHRM
23 wants to create a HR compliance online learning
24 program because X, Y, and Z.  Here are the
25 expectations.  Here's some materials that you can

Page 179

1 start with to give you a little bit more of an idea of
2 what are we trying to achieve here.
3      Keep in mind, I asked for this information
4 when I first received this project.  And Carolyn said,
5 I don't have any information to give you.
6      And so it was all of a sudden, I have all
7 this information, and I have permission to talk to
8 Lou -- Louis, Louis (pronouncing), without her
9 permission on every interaction.
10      I perceived this as a positive step, and I
11 wanted to make sure that I let her know -- because I
12 wanted to arrive at a solution.
13      I wanted to let her know that, Yes, I
14 really wish you have done this early on without me
15 asking you, because it would have allowed me to do my
16 job better.
17      But I told her that was a positive change
18 and -- hoping that she would continue doing so.
19    Q  Following this email exchange on June 12 of
20 2020, did you have the biweekly meetings with Ms.
21 Barley?
22    A  I believe we had a couple of biweekly
23 meetings.
24    Q  Approximately how many meetings?
25    A  I cannot recall.

Page 180

1    Q  Was it more than two?
2    A  I cannot recall.
3    Q  Can you recall if it was more than five?
4    A  I cannot recall.
5    Q  Do you recall if anyone else was present
6 for those meetings?
7    A  No.
8    Q  It was just you and Ms. Barley?
9    A  Yes.
10    Q  And how did they occur?
11    Q  How did they occur?
12    Q  Yeah.  Was it by phone?
13    A  Phone.
14    Q  Do you recall what was discussed at those
15 meetings?
16    A  I can't recall specific details, no.
17    Q  What about generally?
18    A  I -- all I can recall, it was general
19 status updates on my projects.
20    Q  Were the meetings strictly related to your
21 projects?
22    A  I -- as far as I recall, that they were
23 strictly with regards to my projects.  We did not talk
24 about the complaint.  We did not talk about her
25 discriminatory behavior.

Page 181

1 It was, Where are you at with compliance?
2 Where are you at with -- it was more of a check --
3 status check, rather.
4    Q  Okay.  Did you raise any other concerns to
5 Ms. Barley during these meetings?
6    A  I cannot recall.
7    Q  It's my understanding there was some issue
8 related to Ms. Barley's handling of what you've
9 referred to as the PMQ meeting --
10    A  Yes.
11      MR. SWAIN:  Object to form.
12      MS. SMITH:  I'm not finished with my
13 question, but sure.
14    Q  (By Ms. Smith)  -- on or around June 25,
15 2020.  Does that sound familiar to you?
16      MR. SWAIN:  Same objection.
17    A  Can you clarify, please.
18    Q  (By Ms. Smith)  Well, firstly, what's the
19 people manager's qualification?
20    A  You're asking me what is that?
21    Q  Yeah.  Yeah.
22    A  It's a course.
23    Q  Is it a course?  And there was a meeting
24 regarding that PMQ?
25    A  Uh-huh.  Yes.

46 (Pages 178 - 181)

Page 182

1     Q   Did the meeting occur on or around June 25,
2 2020?
3     A   Are you looking at a certain record?
4     Q   No. I'm just asking for your present
5 recollection.
6     A   Yeah, I can't recall the exact date.
7     Q   Can you recall approximately when it
8 occurred?
9     A   I cannot recall.
10     Q   Do you recall what the issue was with
11 Ms. Barley's handling of the PMQ meeting?
12         MR. SWAIN: Object to form.
13     A   So if we're talking about the meeting where
14 Carolyn discouraged me from attending -- is that the
15 meeting that we're talking about? Because there were
16 a lot of PMQ meetings.
17     Q   (By Ms. Smith) You tell me. Was there a
18 specific meeting that you recall having an issue with
19 Ms. Barley's handling of the meeting?
20         MR. SWAIN: Object to form.
21     A   "Handling of the meeting." Can you
22 clarify. What do you mean by that?
23     Q   (By Ms. Smith) The PMQ meeting.
24     A   No. What do you mean by an issue handling
25 the meeting?

Page 183

1     Q   You were upset with the way in which Ms.
2 Barley handled the PMQ meeting, correct?
3         MR. SWAIN: Object to form.
4     Q   (By Ms. Smith) And I'm talking about the
5 meeting that occurred on or around June 25, 2020. But
6 I know you can't recall specifically.
7     A   So there was one meeting with regards to
8 the PMQ project that Carolyn has discouraged me from
9 attending.
10     Q   Have you completed your response?
11     A   Can you repeat your question.
12     Q   I think you've answered it.
13         But when did Ms. Barley discourage you from
14 attending a PMQ meeting?
15     A   Before the meeting.
16     Q   And do you remember the approximate time
17 frame?
18     A   No.
19     Q   What did she tell you that led you to
20 believe she didn't want you to attend the meeting?
21     A   I believe it was during an ISD team
22 meeting, where all the ISD team members were present.
23 We usually go around and give project status updates.
24 And it was time for the PMQ project status update, and
25 Carolyn was giving that.

Page 184

1         And there was a meeting coming up that was
2 put together by Nick and -- that I was invited to, for
3 us to review the reviewers' responses after the course
4 was completed.
5         So we have a committee every course. You
6 finish it; we have a committee. Take a look at this
7 course; tell us what you think, an outsider kind of
8 point of view.
9         So this stage already happened, and now we
10 want to take a look at the outsider's point of views
11 of what they think of the project.
12         So this meeting was coming up. Nick has
13 invited me already. And her speech was, I know that a
14 PMQ meeting review is coming up, and I know you're not
15 going to be in the office, so you're not going to be
16 able to attend this meeting.
17         Ruby, there are big decisions that are
18 about to happen in this meeting, so don't feel
19 pressured to attend that, or feel free to skip the
20 meeting. And if you do, please don't speak.
21     Q   When do you recall Ms. Barley having this
22 conversation with you?
23     A   This was during ISD team weekly or
24 biweekly meeting, where we all meet and give status
25 updates.

Page 185

1     Q   And you say that the entire ISD team was
2 present?
3     A   Yes.
4     Q   And that would include Ebony and Carrie?
5     A   Correct.
6     Q   Anyone else?
7     A   Carolyn.
8     Q   And did you object to Ms. Barley telling
9 you this at the time?
10         MR. SWAIN: Object to form.
11     A   I did not.
12     Q   (By Ms. Smith) Why not?
13     A   Our relationship was already strained. I
14 did not -- previously, when I called her out on
15 things, her reaction usually is defensive, crying,
16 sad, tense. I didn't want to make the situation
17 worse.
18     Q   Do you believe that Ms. Barley telling you
19 you didn't have to attend the PMQ meeting review was
20 discriminatory or retaliatory?
21     A   Yes and yes.
22     Q   To both?
23     A   Yes.
24     Q   Why do you believe it was discriminatory?
25     A   So the feedback that we received from

47 (Pages 182 - 185)

---

Page 186

1 this -- from these committees usually includes things
2 such as there are -- why are you portraying the black
3 woman as aggressive in your course? Why are all the
4 managers in this course are (sic) white males? You're
5 reinforcing a stereotype that we're not trying to keep
6 going.
7     There -- there were comments that -- in the
8 feedback from this committee with relation to race,
9 that I believe that Carolyn did not want to hear what
10 I have to say about -- about it.
11   Q  And why do you believe that her
12 discouragement of you attending the meeting was
13 retaliatory?
14   A  I bring up a complaint about race. Now
15 there is a meeting that we possibly could discuss
16 race. She knows very much my views on it.
17     And on top of all of that, many times,
18 whether by Nick or Jeanne, it was brought up that --
19 how valuable my contribution has been to the PMQ
20 project.
21     I believe it's a collection of all of that,
22 that, A, she didn't want me to be present in a place
23 where race is going to be brought up; and at the same
24 time, it's more of the isolation of, Why don't you
25 just focus on these two projects. And because

Page 187

1 we're -- we're making big decisions in this meeting,
2 then you're not needed, basically, which shows that --
3 again, that she doesn't value my opinion or my input
4 on things. Hence, that -- since big decisions are
5 made, then your input is not even . . .
6   Q  You said that Nick invited you to the
7 meeting, correct?
8   A  That's correct.
9   Q  Is that Nick Schacht?
10   A  Yes.
11   Q  And how did Nick Schacht invite you to the
12 meeting?
13   A  I was in the previous meeting, where that
14 meeting was -- the idea of that meeting was talked
15 about.
16     And he said, Let's meet again. By this
17 time, we'll have the review back or the feedback from
18 the committee. And let's go through the feedback they
19 shared with us.
20   Q  Did Mr. Schacht personally invite you to
21 the meeting?
22   A  He invited everyone in that meeting. And
23 also, there was a meeting invitation that went out,
24 that I was copied on it.
25   Q  Did you complain to Mr. Schacht about Ms.

Page 188

1 Barley telling you not to attend the meeting?
2   A  I did not.
3   Q  Why not?
4   A  He's the director of -- or the VP,
5 actually. I just didn't feel like he was the
6 appropriate person for me to say that to.
7   Q  After the PMQ meeting review, did you stop
8 responding to Ms. Barley's email communications
9 relating to work?
10   A  Not that I can recall.
11   Q  After the PMQ meeting review, did you
12 cancel any meetings with Ms. Barley or team members
13 with little or no advance notice?
14   A  I can't recall specific meetings that I
15 canceled. I can't recall specific meetings that were
16 canceled.
17     But I do recall me avoiding to have more
18 one-on-one conversations with Carolyn alone, because
19 the conversations were very tense.
20   Q  Following the PMQ meeting review, how would
21 you describe your working relationship with Ms.
22 Barley?
23   A  I can't say it got better.
24   Q  Did it get worse?
25   A  I can't really say if it had gotten worse

Page 189

1 or better. What I can say for sure: that we were on
2 the way of finding a resolution.
3   Q  Do you recall taking vacation from July 29,
4 2020, to August 7, 2020?
5   A  I can't remember the exact dates, but I do
6 remember calling to take time off.
7   Q  Do you have any reason to question the
8 accuracy of the dates I'm giving to you now?
9   A  I have no idea. Maybe you copied them
10 wrong. I'm not sure.
11   Q  Did you take vacation at the end of July
12 2020?
13   A  Yes.
14   Q  It's my understanding that you were working
15 on two key projects during this time frame. And maybe
16 I'm referring to them incorrectly, so correct me if
17 I'm wrong.
18     But one was the digital human resources
19 program and the other was a compliance and human
20 resources program.
21     Does that ring a bell?
22   A  That's correct.
23     MR. SWAIN: Object to form.
24   Q  (By Ms. Smith) And with respect to human
25 resources, I'll call it HR. Does that make sense to

48 (Pages 186 - 189)

|  | Page 190 |
|---|---|
| 1 | you? |
| 2 | A  That makes sense. |
| 3 | Q  What was the scope of these projects? |
| 4 | A  Can you clarify, please. |
| 5 | Q  Sure.  What were you working on with |
| 6 | respect to these projects? |
| 7 | A  I was developing these projects. |
| 8 | Q  From start to finish? |
| 9 | A  Yes. |
| 10 | Q  And what did the projects entail? |
| 11 | A  So the projects basically entail again -- I |
| 12 | mean, it's different from one project to another; |
| 13 | because the compliance -- the HR compliance one, I was |
| 14 | initially brought in to that project for support, not |
| 15 | as a lead. |
| 16 | And Louis -- or Louis (pronouncing) -- I |
| 17 | can't remember his name -- the vendor that we |
| 18 | contracted with, he was the one who was actually |
| 19 | tasked with creating the actual course. |
| 20 | Initially, when Carolyn brought me on to |
| 21 | that course, she told me that I can download pictures, |
| 22 | as a senior instructional designer, which is another |
| 23 | example of undermining the value that I bring in. |
| 24 | Literally all I had to do is just go in and download |
| 25 | pictures. |

|  | Page 191 |
|---|---|
| 1 | So that's how I was brought in to the |
| 2 | compliance HR project.  The vendor kept missing |
| 3 | deadlines and kept not delivering the deliverables |
| 4 | that he promised, and it became more of a habit, one |
| 5 | after another, incident after another. |
| 6 | And we were getting close to the deadline |
| 7 | that we were supposed to launch this course by, and we |
| 8 | didn't have nearly even an eighth of what we needed to |
| 9 | have in order to reach the -- or complete that course. |
| 10 | At the time, I volunteered.  I brought it |
| 11 | up to Jeanne and Carolyn and Liz Lacey that I would be |
| 12 | happy to take the lead on this course and use Louis |
| 13 | as -- as a subject matter expert. |
| 14 | He's a lawyer, so he can supply me with the |
| 15 | legal terminologies and laws that revolve around HR |
| 16 | and employment law while I can mold this information |
| 17 | into content and a learning -- learning content. |
| 18 | And once that switch happened, my duties |
| 19 | was to lead the project, meaning that -- getting the |
| 20 | information from subject matter expert, using that |
| 21 | information to develop lessons, learning objectives, |
| 22 | media, job aids, resources, you name it, and basically |
| 23 | going -- so there are, like, about four (sic) phases |
| 24 | within the structural design process:  analysis, |
| 25 | design, development, launch, evaluation; so going |

|  | Page 192 |
|---|---|
| 1 | through all of these phases and completing the course. |
| 2 | Same duties apply to digital HR, but I was |
| 3 | the initial -- I was the -- initially the leader of |
| 4 | that project, from the beginning. |
| 5 | Q  Okay.  Was it ever communicated to you that |
| 6 | the digital HR program and the compliance in HR |
| 7 | program were to be completed by August 31, 2020? |
| 8 | A  The first time I recall that deadline is |
| 9 | when Carolyn sent that email.  I want to say it was |
| 10 | August 11, but please don't quote me on that. |
| 11 | That's when that firm deadline of |
| 12 | August 31, I believe -- that was the first time I hear |
| 13 | about that. |
| 14 | Q  Prior to Ms. Barley communicating that to |
| 15 | you, what was your understanding of when these |
| 16 | projects were to be completed? |
| 17 | A  Uh-huh.  So the digital HR course was |
| 18 | already completed and given to management and reviewed |
| 19 | by management; and also, launched on SHRM website for |
| 20 | registers to enroll in, for people to enroll in.  So |
| 21 | this course was already completed. |
| 22 | However, due to low enrollment in the |
| 23 | course, the organization decided to take it down; |
| 24 | because it's a face-to-face course, so we have to have |
| 25 | a minimum amount of registers for us to actually |

|  | Page 193 |
|---|---|
| 1 | launch it -- for SHRM to launch it. |
| 2 | We didn't reach that minimum threshold, so |
| 3 | they decided to delay the launch of that course to the |
| 4 | next cycle. |
| 5 | What is the next cycle?  I have no idea. |
| 6 | That was not really communicated to me.  This is |
| 7 | usually more managerial, which is Nicole's duties. |
| 8 | The ISD team are not really responsible for any of |
| 9 | this information. |
| 10 | Q  So was it typical that the ISD team worked |
| 11 | without deadlines? |
| 12 | A  Again, the deadline for that was reached |
| 13 | already, and the course was already completed and |
| 14 | delivered. |
| 15 | It was the management decision to make |
| 16 | changes after the course was completed, because we |
| 17 | didn't have enough people enrolled in it. |
| 18 | So we had a period of time.  They said, |
| 19 | Well, since we have that period of time, why don't we |
| 20 | incorporate this book. |
| 21 | Q  And did you have any understanding of when |
| 22 | those changes were to be implemented by? |
| 23 | A  I did not. |
| 24 | Q  That was never communicated to you? |
| 25 | A  That was never communicated to me. |

49 (Pages 190 - 193)

Page 194

1   Q   Was that typical of your experience on the
2   ISD team?
3       MR. SWAIN:  Object to form.
4   A   I don't know.  I can't really -- I don't
5   know what's typical and what's not.  All I know is
6   that we have launch date, completion dates.
7       Once we reach that, I'm not really sure --
8   it's really up to upper management what happens after
9   that.
10  Q   (By Ms. Smith)  If upper management were to
11  provide a date for completion of the changes, would
12  you take that as an expectation of your performance?
13  A   Yes.
14  Q   With respect to the other program, was it
15  your understanding that the completion date was August
16  31, 2020?
17      MR. SWAIN:  Object to form.
18  A   It was not.
19  Q   (By Ms. Smith)  What was your
20  understanding?
21  A   Usually it takes six months to create a
22  course.  At this point, with the late start on this
23  course, due to the vendor's inability to deliver
24  content on time, we've already -- we were already
25  behind -- way behind.

Page 195

1       And Carolyn was getting almost weekly
2   updates on exactly where that course is -- where it
3   stands with regard to development.
4       My understanding, that towards August, if
5   the vendor complies and continues to provide me with
6   the legal terminologies that I need to complete these
7   tasks, then we might have an alpha draft, which is the
8   first draft of the course, by August.
9       That's not even the end of the development
10  stage that I was referring to earlier.
11  Q   So what's an alpha draft?
12  A   Alpha draft.  It's a draft of, Here's what
13  the course could possibly look like after the subject
14  matter expert has given me all the information that I
15  needed.
16  Q   Did you have any expectation of when the
17  alpha draft was to be completed?
18      MR. SWAIN:  Object to form.  What time
19  period are you asking her about?
20      MS. SMITH:  Well, I'm asking Ms. Mohamed
21  that question.  I don't know.  That's why I'm asking.
22  A   Yeah.  I mean, my understanding, that by
23  sometime in August -- again, if Lou delivers and gives
24  me the information that I need, I would definitely be
25  able to deliver an alpha draft for the team to review,

Page 196

1   for legal to review, and for us to go on and go to the
2   next phase.
3   Q   (By Ms. Smith)  And is the alpha draft a
4   complete draft of the course?
5   A   Yes.
6   Q   Let's go to Exhibit 14.
7   A   May I actually -- I want to point something
8   out in Exhibit 13.
9   Q   Well --
10  A   No?
11  Q   I mean, it's not one of my questions,
12  unless you're correcting some of your prior testimony.
13  A   It's correcting.
14  Q   Okay.
15  A   I want to correct the fact that -- it says
16  here, I appreciate you raising concern with me about
17  your previous experiences both with the previous
18  managers.
19      The experiences with the previous managers
20  refer to Liz -- Liz Jackson -- it was Jackson -- which
21  is a previous -- which is a manager that were (sic) in
22  place very briefly after Kim Lang has -- was fired.
23  They hired Liz Jackson.  She was there for a very
24  brief time.
25      And under her, that's where I experienced

Page 197

1   the negative experiences that I shared with Carolyn.
2   Q   And what race was Liz Jackson?
3   A   She was white.
4   Q   And do you recall the time frames when you
5   were reporting to her?
6   A   I do not.
7   Q   Do you recall for about how long you
8   reported to Ms. Jackson?
9   A   I do not.
10  Q   What were the issues while you were
11  reporting under Ms. Jackson?
12  A   I can't really recall the exact incidents,
13  but it was more of the isolation, the withholding of
14  information, the discouragement of attending meetings,
15  the -- being the sole person of communicating things
16  on behalf of you, and not empowering you to be a
17  successful employee.
18      For me, that's, you know, what a manager's
19  job is:  is to empower me to do better and be
20  successful.  And I mentioned these examples to Carolyn
21  to just showcase how these issues can impact -- impact
22  me as a senior instructional designer.
23  Q   Did you complain to anyone about Ms.
24  Jackson's treatment?
25  A   I did.

50 (Pages 194 - 197)

Page 198

```
1        Q   Who?
2        A   I believe to my manager -- or her manager
3    back then, which was Christine.  And I can't remember
4    the last name.
5        Q   And do you remember what happened as a
6    result of that complaint?
7        A   I don't remember what happened as a result
8    of that complaint.  I do know that Liz didn't stay in
9    that position for a really long time.
10           And that's when also there was a
11   restruction of the department and the merging of the
12   e-Learning and the face-to-face and virtual events
13   happened.
14       Q   So you reported to Ms. Jackson at the time
15   you were an e-Learning product specialist?
16       A   Part -- I can't really recall whether at
17   the time I was an instructional designer or an
18   e-Learning specialist.
19       Q   But it was around the time of the
20   structural transition?
21       A   Correct.
22           MS. SMITH:  All right.  Why don't we take a
23   brief break.
24           THE VIDEOGRAPHER:  Going off the record at
25   2:59.
```

Page 199

```
1            (Recess taken.)
2            (At this time Ms. Hoffman is not present.)
3            THE VIDEOGRAPHER:  Back on the record at
4    3:16.
5        Q   (By Ms. Smith)  Ms. Mohamed, I'm showing
6    you what's been marked as Exhibit 14.  It should be
7    SHRM 0049.
8            Do you see that?
9        A   Yes.
10       Q   Do you recognize this email?
11       A   Yes.
12       Q   As of August 2020, SHRM referred you and
13   Ms. Barley to a mediation with Bernee Long, correct?
14       A   Correct.
15       Q   And it's my understanding, Ms. Long is the
16   director of organizational learning and talent
17   development.
18           Is that correct?
19       A   Correct.
20       Q   Did you have any interactions with Ms. Long
21   previously?
22       A   Prior to the mediation sessions?
23       Q   Correct.
24       A   I remember encountering her maybe once or
25   twice, nothing heavy.
```

Page 200

```
1        Q   Do you know where she worked?
2        A   Can you clarify, please.
3        Q   Was she in Virginia?
4        A   Oh, I have no idea.
5        Q   During the one or two times that you
6    interacted with her previously, did those interactions
7    occur by phone?
8        A   This was when I was still in the office, so
9    it's usually just running into her.  I remember Jeanne
10   when she was first hired, Jeanne brought her over to
11   the team and introduced her, something like that.
12       Q   And was this your first time participating
13   in a SHRM mediation process?
14       A   Yes.
15       Q   How many mediation sessions did you
16   participate in with Ms. Long?
17       A   I cannot recall.
18       Q   Do you have any approximation you might be
19   able to provide?
20       A   I don't.  I don't.
21       Q   Was it more than one?
22       A   Yes.
23       Q   Was it more than five?
24       A   I do not recall.
25       Q   What occurred during the mediation
```

Page 201

```
1    sessions?
2        A   The mediation sessions basically started
3    with her explaining what's about to unfold and -- for
4    me and Carolyn, and then telling us that she would
5    meet with us separately in order to discuss what's
6    going on, the events that are taking place.
7            I think I already described the first
8    session with the Bernee, very extensively earlier in
9    this meeting, where she acknowledged and basically
10   told me that it is hard to bring -- for a black woman
11   to bring her blackness to the workplace; that it is
12   hard for Carolyn, as a white woman, to understand
13   certain things that a black woman might experience in
14   the workplace; and that she's going to send the TED
15   Talk link to the -- a video -- the TED Talk video to
16   Carolyn about color -- it was either about
17   colorblindnesses or about racial bias.
18           She was going to send that to Carolyn to
19   understand -- for her to understand the underlying
20   meanings of these issues -- these are complex issues.
21   These are things that the entire country was dealing
22   with -- is dealing with until today -- and she thought
23   sending a couple of resources to help her gain a
24   better understanding of the black experience in the
25   workplace.
```

51 (Pages 198 - 201)

Page 202

1  That was the first session. We exchanged a
2  couple of emails after that. The second session, the
3  tone was completely different.
4      I believe I was told that Carolyn is
5  really, really, really upset with your behavior. She,
6  quote, unquote, is crying rivers. She believes that
7  you are bullying her.
8      She said that I am causing issues with team
9  members -- my behavior is causing issues among the
10  team and that I would regret those behaviors; and if I
11  really want to have a job by the end of the month, I'd
12  better deliver those two courses.
13     Q   Which two courses was Ms. Long referring
14  to?
15     A   Yeah, I had no idea really. She basically
16  said, Deliver your projects if you want to have a job
17  by the end of the month.
18     Q   Did you have any projects you were working
19  on during the time of that mediation discussion?
20     A   I was working on the compliance and the
21  digital HR.
22     Q   And when did the second session you're
23  speaking of occur with Ms. Long?
24     A   I cannot recall. It did occur after she
25  met with Carolyn at least once.

Page 203

1      Q   Do you remember if it was several weeks
2  after you were referred to mediation with Ms. Long
3  or --
4      A   It's not several weeks, but I can't
5  remember exactly when.
6      Q   Do you remember if it was days after?
7      A   I cannot recall.
8      Q   What was the video -- with respect to the
9  video you reference with the TED Talk that Ms. Long
10  sent to Ms. Barley, did you watch that video?
11     A   I did. I did.
12     Q   Did you agree that the video was a good
13  first step toward Ms. Barley understanding your
14  position?
15     A   I did.
16     Q   Did you have any other suggestions for Ms.
17  Long with respect to allowing Ms. Barley to understand
18  your position?
19         MR. SWAIN: Object to form.
20     A   I can't recall suggesting any other thing.
21  All I can remember is reinstating that I'm open to
22  whatever solution and whatever can help us move
23  forward.
24     Q   (By Ms. Smith) Did you ever request of Ms.
25  Long to be removed from Ms. Barley's supervision?

Page 204

1      A   For me to be removed?
2      Q   (Nodded head up and down.)
3      A   I did not.
4      Q   Did you ever request to take leave from
5  SHRM to Ms. Long?
6      A   I do not recall requesting that.
7      Q   Did you at some point communicate to Ms.
8  Long that you were no longer interested in pursuing
9  mediation?
10     A   I remember towards the end where there was
11  an email from Bernee saying -- because the mediations
12  were put on hold.
13         And she sent an email saying, We can -- you
14  know, let's have another mediation sessions --
15  session. And that's when I expressed my lack of
16  interest in participating in one.
17     Q   And what did you tell Ms. Long at that
18  time?
19     A   I believe I wrote her back that I
20  respectfully decline to participate in the mediation
21  sessions.
22     Q   Did you provide a reason for declining?
23     A   I did not.
24     Q   Why not?
25     A   At this point, I -- in the last mediation

Page 205

1  session, I expressed to Bernee my concern that the
2  mediation sessions are becoming more about my
3  performance.
4      All of a sudden my performance is the
5  subject, my tone is the subject, my attitude is the
6  subject rather than the initial subject of the
7  mediation, which is Carolyn's discriminatory behavior
8  and how can we deal with that.
9      Q   So you had raised that with Ms. Long before
10  you declined to continue the mediations?
11     A   Yes. As a matter of fact, I wrote an open
12  letter to Ms. Long for her to share with -- the
13  leadership with a timeline outlining exactly the
14  ongoing issues; because I think felt that the
15  mediation sessions were completely off topic.
16     So I thought maybe if I can outline the
17  actual issues in writing, that can help Ms. Long
18  mediate better.
19     Q   Let's look at Exhibit 15. You may take a
20  moment to review this exhibit. It's several pages.
21  And let me know when you're ready.
22     A   (The deponent perused the exhibit.)
23     Okay.
24     Q   Okay. Let's look first at SHRM 0141. It's
25  on the third page of Exhibit 15.

52 (Pages 202 - 205)

| | |
|---|---|
| Page 206 | Page 208 |

Page 206

1    A   Okay.

2    Q   And turning your attention to the email

3 dated August 19, 2020.

4    A   Okay.

5    Q   Are you following me?

6    A   Yes.

7    Q   This is an email from you to Nick Schacht,

8 Carolyn Barley, and Jeanne Morris, correct?

9    A   That's correct.

10    Q   Why did you direct this email to those

11 three individuals in particular?

12    A   At this point, those three individuals were

13 well aware -- I felt like they were well aware of

14 what's going on between me and Carolyn; and also, they

15 were well aware of the projects that I was working on.

16    Q   And how were they well aware of what was

17 going on between you and Ms. Barley?

18    A   Well, as for Jeanne, I directly told her of

19 what's going on between me and Carolyn.  And for Nick,

20 I had spoken to him multiple times about the ongoing

21 issues.

22    Q   Mr. Schacht held the position of chief

23 global development officer at the time of this email,

24 correct?

25    A   I am not aware.  I can't recall.

Page 207

1    Q   Okay.  Do you know if he was in kind of a

2 higher-level managerial position at SHRM?

3    A   He was.

4    Q   In your August 19 email to Mr. Schacht,

5 Ms. Barley, and Ms. Morris, in the second paragraph

6 and second sentence, you state, "As you know, I made a

7 complaint of race discrimination about my manager's

8 treatment of me in early June."

9    Do you see that reference?

10    A   I see it.

11    Q   What complaint are you referencing here?

12    A   The complaint that I brought forward to

13 Jeanne Morris about Carolyn's discriminatory behavior.

14    Q   And in that complaint to Ms. Morris, you

15 specifically cited race discrimination?

16    A   Yes.

17    Q   In your August 19 email to Mr. Schacht,

18 Ms. Barley, and Ms. Morris, in the second paragraph,

19 third sentence, you state, I have elaborated on my

20 discrimination complaint and repeated them several

21 times since, including in conversations with you,

22 Jeanne, and Carolyn (not to mention with HR and SHRM's

23 CEO and CHRO).

24    Do you see that?

25    A   I see that.

Page 208

1    Q   When did you have conversations with Mr.

2 Schacht repeating your complaints of discrimination?

3    A   I can't recall the exact date.

4    Q   Can you recall generally the time frame?

5    A   I can't.

6    Q   Do you recall if those conversations

7 occurred by phone?  Email?  In person?

8    MR. SWAIN:  Object to form.  Are you

9 talking about the conversation with Mr. Schacht or the

10 other ones referenced?

11    MS. SMITH:  The conversation with Mr.

12 Schacht -- or conversations with Mr. Schacht.

13    A   There's an email exchange, and there's also

14 phone communication.

15    Q   (By Ms. Smith)  What do you recall telling

16 Mr. Schacht during these conversations?

17    A   Okay.  So one incident that I talked to

18 Nick about with regard to my situation is when I

19 was -- there was a new course that was being talked

20 about for social justice in the workplace.

21    Carolyn was assigned as a lead for this --

22 for this course.  I voiced my concern that Carolyn

23 would do a fair job teaching social justice in the

24 workplace to others given the situation.

25    When I voiced that concern, I was put -- I

Page 209

1 was added to the project like, Well, you're black, you

2 do it then, since you know all about social justice.

3    That's when I talked to Nick about recusing

4 myself from working on this project with Carolyn in

5 fear of retaliation since this project was literally

6 crafting scenarios where racial discrimination,

7 subconscious bias, unfair treatment to minorities, all

8 of that that takes place in the workplace, we -- the

9 point was for us to draft scenarios and talk about how

10 to handle them correctly.

11    And I told him that I'm concerned that if I

12 voice my true expert opinion as an instructional

13 designer on how to address these sensitive topics with

14 Carolyn in the room, it would restrain our

15 relationship further and I would -- I would deal with

16 further retaliation.

17    So that's -- that's what I told him.

18    Q   How did Mr. Schacht respond?

19    A   Mr. Schacht said that he understands my

20 position.  He said that my experience as a black woman

21 in the workplace is exactly what needs to be embodied

22 in that course, and that's why it's really important

23 for me to work on it; so SHRM can take my own

24 experience of being discriminated against and put it

25 in a product to sell, basically.

53 (Pages 206 - 209)

Page 210

1   Q   Mr. Schacht told you that SHRM wanted to
2   take your experience of being discriminated against
3   and put it into a product to sell?
4   A   Nick said that, Your experience as a black
5   woman is exactly the experience that we need to embody
6   in that course, and that's why it's really important
7   for you to be part of it.
8   Q   Did Mr. Schacht reference anything with
9   respect to discrimination you believed you were
10  experiencing?
11  A   He said, I know what's going on between you
12  and Carolyn, and I do not want to get involved in that
13  since the mediation is taking place and HR is involved
14  and Jeanne is involved.
15      Let's just -- that happened.  And I
16  respected that.  Hence, that's why I never really
17  included Nick from the beginning, because I wanted
18  whoever is involved to take care of business.
19      He acknowledged that he's aware of what's
20  going on between Nick -- between me and Carolyn.  And
21  with regard -- regardless of that, that I still need
22  to think about joining that project, so we can make
23  sure that my experience makes it in there.
24  Q   Did Mr. Schacht ever acknowledge that you
25  were being discriminated against based on your race

Page 211

1   during this conversation?
2   A   As, Oh, I know Carolyn is being racist
3   against you?
4   Q   Yes.
5   A   He's in -- he's in leadership -- upper
6   leadership in an HR company.  There's no way I can see
7   anyone in his position admitting of racial
8   discrimination, putting the organization at risk.
9       But he did acknowledge that my experience
10  as a black woman, specifically as a black woman, needs
11  to be documented in a course about teaching HR
12  professionals how to deal with racial justice in the
13  workplace.
14  Q   When did you have conversations with Jeanne
15  Morris repeating your complaints of discrimination?
16  A   When?
17  Q   (Nodded head up and down.)
18  A   I can't recall the exact dates.
19  Q   Do you recall generally?
20  A   I recall that it started on June 3, and
21  multiple meetings happened after that.
22  Q   Did the meetings occur in person?  By
23  phone?  By video?
24  A   At this time, I was working 100 percent
25  remotely, so everything is by phone.

Page 212

1   Q   And can you tell me, to the extent you
2   haven't already, what was said in your conversations
3   with Ms. Morris?
4   A   I believe that I covered all I can think
5   of, of what was being talked about during these
6   conversations.
7   Q   There's nothing else you can think of at
8   this time?
9   A   At this time, I can't think of anything
10  else.  But if there's a specific question about a
11  specific topic, I'm happy to elaborate on . . .
12  Q   Was anyone else present for your
13  conversations with Ms. Morris?
14  A   Yes.
15  Q   Who else?
16  A   Carolyn, Mike Jackson, Ann Godmere -- Ann
17  Godmere is one name -- Carrie Mill (sic), all the
18  specialists in the education department.
19      I don't really recall all the names, but
20  those names were brought up previously as well.
21  Q   So is it your testimony that each of these
22  individuals were present when you made specific
23  complaints of race discrimination?
24  A   Yes.
25  Q   And how did they respond when you

Page 213

1   complained of race discrimination?
2   A   How -- each individual?
3   Q   Yes.  You said Mike Jackson was present
4   when you made a complaint of race discrimination.
5   A   Yes.
6   Q   How did Mr. Jackson respond?
7   A   Mr. Jackson didn't say much.  He said,
8   We'll be in touch, which he never did.
9   Q   And you said Ms. Godmere was present as
10  well?
11  A   Yes.
12  Q   How did she respond?
13  A   The one incident that -- when it was the HR
14  meeting with Mike Jackson, Jeanne, Ann, Carrie,
15  myself, and Ebony -- so all the ISD team without
16  Carolyn in attendance -- that's when both Mike and
17  Jeanne kept pressuring us into disclosing what was
18  going on, even though we have disclosed it plenty of
19  time up to that point.
20      I kept saying I didn't want to disclose
21  anything.  She pressured.  She pressured.  She said,
22  You need to talk about this.  And I disclosed it.
23      Ann's reaction was, A, I'm sure she didn't
24  mean any of this, Ruby.  I'm sure that there's a lot
25  of miscommunication that is taking place.  And not to

54 (Pages 210 - 213)

Page 214

1  make light of your situation, but the information that
2  Carolyn failed to disclose to you as a manager can be
3  easily found in one of the Excel sheets that we have.
4      And maybe what would help them, referring
5  to me and Ebony, is to bring another black person to
6  speak to them about what's going on.
7      Q   And so it's your testimony -- who made
8  these statements?  Was that Ms. Godmere?
9      A   Yes.
10     Q   And what happened after Ms. Godmere made
11 those statements?  Did anyone else respond to those
12 statements?
13         MR. SWAIN:  Object to form.
14     A   Awkward silence.  What do you respond with
15 that -- to that?
16     Q   (By Ms. Smith)  What about Carrie Mill
17 (sic)?  You said that she was present when you made
18 complaints of race discrimination?
19     A   Yes.  Not only that she was present; she
20 brought forward her own complaint about witnessing
21 discriminatory behavior from Carolyn to me and Ebony.
22     Q   And that was the conversation you referred
23 to earlier in which Ms. Mill told you she was going to
24 report to Nick Schacht?
25     A   Yes.

Page 215

1      Q   Did Ms. Mill respond in any way when you
2  made the complaint of race discrimination, other than
3  what you've already testified?
4      A   She was very apologetic.  She said -- she
5  was very sorry that I'm going through what I'm going
6  through and that she's there if she needs me -- if I
7  need her.
8      Q   And you said there were other specialists
9  in education who were also present?
10     A   Yes.
11     Q   Who were those individuals?
12     A   I don't know the exact page number that
13 they're listed.  So Eddice, Douglas, Juan Carlos,
14 Taylon Terrell, Carol Spears, Ebony Thompson,
15 Stephanie Dunmore -- Dunsmore (sic).
16         That's as far as I can remember.
17     Q   So did Eddice Douglas say anything in
18 response, when you complained of race discrimination?
19     A   So when I brought this up during Jeanne's
20 presence -- there's a culture fear in SHRM.  No one
21 responded to that.
22         Once Jeanne left, that's when almost each
23 of those specialists shared similar experiences to
24 mine.
25     Q   And what about specifically with respect to

Page 216

1  Eddice Douglas?  How did he respond?  Or she.  I'm
2  sorry.
3      A   How did she respond to what?
4      Q   When you shared complaints of race
5  discrimination.
6      A   While Jeanne was present, she didn't
7  respond.
8      Q   And what about -- you said it's Juan
9  Carlos?
10     A   Yes.
11     Q   Did he respond in any way?
12     A   No.
13     Q   What about Taylon Terrell?
14     A   No.
15     Q   And how about Ebony Thompson?
16     A   I can't recall.
17     Q   What about Stephanie Dunsmore (sic)?
18     A   I don't remember.  I can't recall.
19         However, Ann and Carrie, they -- because
20 this specific incident, when I brought forward how
21 Carolyn tried to exclude me from attending the PMQ
22 meeting, saying that big decisions will be made and my
23 opinion is not needed -- when I mentioned that
24 specific situation, both Carrie and Ann were present,
25 and they both confirmed that that did take place.

Page 217

1          Ann mentioned that she thought it was
2  really odd how Carolyn kept going on and on how she
3  values my opinion, but please don't attend.  And if
4  you do attend, please don't speak.
5      Q   When did you have conversations with SHRM's
6  human resources representative repeating your
7  complaints of discrimination?
8      A   At some point, I received a meeting
9  invitation from Mike Jackson for me and Carolyn to
10 discuss the issues.  So that's the first time I
11 remember HR involvement.
12     Q   And so the HR representative who you're
13 referring to in this email dated August 19, 2020, is
14 Mike Jackson?
15     A   Yes.
16     Q   And did you speak with Mike Jackson?
17     A   I spoke with Mike Jackson.
18     Q   Do you recall when that conversation
19 occurred?
20     A   I do not.
21     Q   And that conversation occurred by phone?
22     A   Yes.
23     Q   Do you recall generally what was said
24 during that conversation?
25     A   I repeated the incidents that took place.

55 (Pages 214 - 217)

Page 218

1    Q   Did Mr. Jackson respond in any way at that
2    time?
3    A   Mr. Jackson, as far as I remember, was
4    pretty reserved with the words; and all I remember
5    was, We will be in touch.
6    Q   Was he in touch at some point?
7    A   No.
8    Q   Was anyone else from SHRM in touch with
9    you?
10   A   What do you mean?
11   Q   Did anyone follow up with you after your
12   conversation with Mike Jackson?
13   A   Yes.  Actually, it wasn't a follow-up.  It
14   was me reaching out to Sean.
15   Q   And that's Sean Sullivan?
16   A   Yes.  So the HR did not follow up with me.
17   It was me reaching out to them.
18   Q   Do you recall when you reached out?
19   A   I do not recall.
20   Q   And what did Mr. Sullivan say in response?
21   A   I believe we covered that.
22   Q   Can you remind me.
23   A   I -- Sean Sullivan's response was that
24   Carolyn is not capable of being in her managerial
25   position; that she needs training to be able to

Page 219

1    conduct her duties successfully; that he will talk to
2    the people identified and to Carolyn to get more
3    information and will be in touch with me.
4    Q   When did you have conversations with SHRM's
5    CEO repeating your complaints of discrimination?
6    A   I can't recall the exact date.
7    Q   Do you recall generally?
8    A   No.
9    Q   Were these the conversations you had with
10   Johnny Taylor?
11   A   Yes.
12   Q   And that was by phone?
13   A   Yes.
14   Q   Is there anything else you'd like to add to
15   your testimony, other than what you've told us
16   already --
17   A   Not that I --
18   Q   -- about those conversations?
19   A   Not that I can think of.
20   Q   When did you have conversations with SHRM's
21   CHRO repeating your complaints of discrimination?
22   A   That's Sean Sullivan.
23   Q   Okay.
24   A   And I can't recall the exact date.
25   Q   Okay.  In your August 19 email to Mr.

Page 220

1    Schacht, Ms. Barley, and Ms. Morris, contained on SHRM
2    0141, in the second paragraph, fourth sentence, you
3    state, "Almost immediately after Jeanne and Carolyn
4    learned that my discrimination claims had been
5    reported to you and the rest of the division, I
6    started being subjected to hostility, undeserved
7    criticism, increased scrutiny and other forms of
8    retaliation."
9        Do you see that?
10   A   I see that.
11   Q   Can you explain this statement a little
12   further to me.  What sorts of hostility, undeserved
13   criticism, increased scrutiny, and other retaliation
14   were you experiencing?
15   A   Yes.  So right after Stephanie, the
16   spokesperson for the specialists in the ID- -- in the
17   education team, relayed the outcomes of the engagement
18   survey results to Nick, there was a complete change of
19   events.
20       So when it comes to subjected to hostility,
21   I'm referring to, for example, the meeting that I was
22   forced into speaking to the point that I had a panic
23   attack and I couldn't speak because I was crying.
24       Keep in mind, this is the meeting that I
25   was forced to repeat the incidents of discriminatory

Page 221

1    behavior after I have repeated it plenty of times
2    prior to that meeting.
3    Q   And who forced you to speak during this
4    meeting?
5    A   Jeanne.
6    Q   How did she force you?
7    A   She said, How are you dealing with your
8    managers?  How -- with your manager?  Ann responds.
9    Carrie responds.  Or maybe the question was more of,
10   Are you facing any problems with your managers?
11       And when it came to me, I said that
12   everything -- every problem that I'm -- I am
13   experiencing, I have disclosed at this point.
14       And she said, You need to speak about
15   those.  I stayed quiet.  She repeats again, I
16   understand it's hard to talk about these things, but I
17   really need you to talk about these -- I really need
18   you to share your experience.  I stayed quiet.  And I
19   think Mike at that point intervened as well and said
20   that, We really need to hear from you.
21       At this point, I just broke down and
22   started crying hysterically.  I just felt that my
23   hardship was making -- was being a joke, was not being
24   taken seriously.
25       It was almost like a button, Repeat what

56 (Pages 218 - 221)

Page 222

1 you said, repeat what you said, even though completely
2 disregarding to how re-inciting those behaviors makes
3 me feel, completely ignoring the fact that I am still
4 dealing with those behaviors as we speak at that time,
5 during that meeting.
6     Yet, I was still being asked to further
7 explain, What kind of discriminatory behavior?
8     Q  Did you articulate that you were
9 uncomfortable speaking about these things to anyone at
10 this meeting?
11     A  I did say, I disclosed everything that I
12 can disclose at this moment. I don't have anything
13 else to say.
14     Q  Did you ever articulate to anyone that you
15 were uncomfortable disclosing anything at this
16 meeting?
17     A  Well, the fact is -- it's not the fact that
18 I'm uncomfortable disclosing things. I have disclosed
19 these things. It's the fact that I am being asked
20 repeatedly to repeat incidents. It's almost like they
21 were hoping for a different answer.
22     Q  And I'm not trying to argue with you, Ms.
23 Mohamed. I'm just trying to elicit an answer to my
24 question.
25     So my question is: Did you ever tell

Page 223

1 anyone at this meeting that you were uncomfortable
2 speaking about these things?
3     A  I never verbally said, I am uncomfortable
4 speaking or repeating those incidents. However, I
5 believed that the panic attack that was witnessed by
6 the entire team has really displayed the amount of
7 discomfort that I was going through.
8     Q  And when you say, "panic attack," and you
9 say you were hysterically crying, were there any other
10 symptoms that you experienced physically during this
11 meeting?
12     A  Crying, unable to breath regularly,
13 literally crumbling on the ground. I mean, Ebony was
14 texting me, telling me, You do not have to speak.
15 Don't worry about it.
16     Q  And this meeting occurred by phone?
17     A  Yes.
18     Q  Could anybody see your physical response?
19     A  No. It was audio.
20     Q  So you didn't say that you were
21 uncomfortable, and no one could see you, correct?
22     A  They could definitely hear my crying and my
23 silence as well.
24     Q  So you were crying over the phone?
25     A  Yes.

Page 224

1     Q  Did you seek any treatment for the panic
2 attack?
3     A  I did not.
4     Q  Why not?
5     A  You know, seeking -- or making the choice
6 to seek treatment requires an amount of strength that
7 I did not have back then.
8     Q  In your August 19 email to Mr. Schacht, Ms.
9 Barley, and Ms. Morris contained on SHRM 0141, in the
10 second paragraph, second-to-last sentence, you state,
11 "Now, just weeks after I made my discrimination
12 complaints, SHRM is setting me up to fail by imposing
13 an inflexible and unrealistic deadline on me while
14 denying me the support I need to successfully complete
15 the project before the deadline."
16     Do you see that?
17     A  I see that.
18     Q  What project were you referring to here?
19     A  Both digital HR and compliance.
20     Q  What deadline were you referring to?
21     A  I believe at this point, SHRM -- Carolyn
22 has shared the August 31 deadline.
23     Q  Was the August 31 deadline for both
24 projects?
25     A  Yes.

Page 225

1     Q  At the time you wrote this email to Mr.
2 Schacht, Ms. Barley, and Ms. Morris on August 19,
3 2020, did you believe you could not complete the
4 digital HR and the compliance projects by the
5 deadline?
6     A  With regards to the HR compliance course, I
7 did believe that I could not finish or deliver that on
8 time because the information that I needed to complete
9 that course was being withheld.
10     Q  And is it your testimony that information
11 was being withheld by Ms. Barley?
12     A  It's by the subject matter expert.
13     Q  And who was that?
14     A  Louis -- Lou.
15     Q  I think we have his name somewhere.
16     A  Yeah. So I don't know -- where is that
17 page with all the names? But . . .
18     Q  That was Louis?
19     A  Yes.
20     Q  Okay.
21     A  I don't know where -- what's the page
22 number where his name is listed.
23     Q  And we likely went over this before, but
24 just so I'm clear: At any time in your role as senior
25 instructional designer, did you ask for a transfer to

57 (Pages 222 - 225)

Page 226

1  a different position?
2      A  No.
3      Q  At any time in your role as a senior
4  instructional designer, did you ask for a transfer to
5  a different supervisor?
6      A  No.
7      Q  Ultimately you submitted your work with
8  regard to the digital HR program and the compliance in
9  HR program to Ms. Barley, correct?
10     A  Correct.
11     Q  Do you recall the dates when those programs
12  were submitted?
13     A  I believe August 28.
14     Q  And were you satisfied with your work on
15  these projects?
16     A  Explain "satisfied."
17     Q  Were you happy with what you submitted?
18     A  I was told to do the best I can with what I
19  have.  And according to those standards, I was
20  satisfied.
21     Q  Did you believe your work product with
22  respect to these programs was adequate?
23     A  Please elaborate.
24     Q  Do you believe you met expectations with
25  respect to the work product you turned in?

Page 227

1      A  I was told to deliver with what I have.
2  And so, according to that standard, I do think it's
3  adequate.
4      Q  Okay.  Let's look at Exhibit 16.  And, Ms.
5  Mohamed, looking at the first page of the exhibit,
6  there's an email dated August 31, 2020, from Sean
7  Sullivan to you, copying Mr. Schacht, Ms. Morris, and
8  Ms. Barley, correct?
9      A  Correct.
10     Q  Do you recognize this August 31 email?
11     A  I do.
12     Q  On the second page of this exhibit, there's
13  a letter dated August 31, 2020, from Sean Sullivan to
14  you, correct?
15     A  Correct.
16     Q  Do you recognize this letter?
17     A  I do.
18     Q  Did you receive this letter during your
19  employment with SHRM?
20     A  This happened a day before I was fired.  I
21  can't remember if I received this while my employment
22  or after I was terminated.
23     Q  Were you still receiving correspondence
24  from SHRM following your termination?
25     A  No.

Page 228

1      MR. SWAIN:  Object to form.
2      Q  (By Ms. Smith)  Did you respond to this
3  letter in any way after receiving it?
4      A  I did not.
5      Q  Your employment was SHRM was ultimately
6  terminated, correct?
7      A  Correct.
8      Q  Let's take a look at Exhibit 17.  Do you
9  recognize this document?
10     A  Yes.
11     Q  Was there a meeting with anyone regarding
12  your termination before you received this letter?
13     A  I believe there was a meeting, yes.
14     Q  Did that meeting occur by phone?
15     A  Yes.
16     Q  Who was in attendance at that meeting?
17     A  Carolyn.
18     Q  Anyone else?
19     A  I can't -- someone from HR.  I guess it's
20  Keren, but I can't remember.
21     Q  Who notified you of the termination?
22     A  I was notified by Carolyn.
23     Q  And what did Ms. Barley say?
24     A  I can't recall the exact words, but what I
25  do remember, that -- she said that I was being

Page 229

1  terminated for missing deadlines.
2      Q  Did she say anything else?
3      A  I can't recall.
4      Q  Do you recall if she told you you were
5  being terminated for complaining?
6      A  I can't recall.
7      Q  I'm showing you Exhibit 18.  This is your
8  complaint filed in the U.S. District Court for the
9  District of Colorado, correct?
10     A  Correct.
11     Q  And I'd like to go through some of the
12  allegations with you, beginning on page 7, paragraph
13  37.
14        This states, "Soon after she began
15  reporting directly to Ms. Barley, Ms. Mohamed observed
16  that Barley treated her and other non-white employees
17  differently than their white peers."
18        Do you see that?
19     A  Uh-huh.  Yes, I do.
20     Q  Which white employees are you referring to
21  here?
22     A  Ann Godmere and Carrie Mills.
23     Q  And which nonwhite employees are you
24  referring to?
25     A  Ebony Thompson.

58 (Pages 226 - 229)

Page 230

1    Q   Is there anything else you'd like to add to
2   your testimony other than what you've already offered
3   about the differential treatment?
4    A   At this moment, this is all I can recall.
5    Q   Turning to page 9, paragraph 47, this
6   states, "Barley had one other non-white subordinate,
7   Senior Instructional Designer Ebony Thompson (who is
8   Black), who Barley treated poorly."
9        Do you see that statement?
10   A   Yes.
11   Q   What did you observe with respect to Ms.
12  Barley's poor treatment of Ebony Thompson?
13   A   I believe she was treated with less
14  credibility.  She was questioned whether she's able to
15  do basic things as a senior instructional designer.
16       If she took a day off or couldn't attend a
17  meeting because of an incident that's out of her
18  control, that was also questioned.
19       Her work was just talked about poorly by
20  Carolyn in general.
21   Q   Do you recall anything specific about her
22  discussing Ms. Thompson's work?
23   A   As I mentioned, how -- how Carolyn
24  questioned whether Ms. Thompson can even write a
25  learning objective.

Page 231

1    Q   Is there anything else you can recall?
2    A   I can't recall at this moment.
3    Q   Okay.  Let's look at page 11, paragraph 58.
4   This states, "Promptly after Ms. Mohamed raised
5   concerns about race/color discrimination, Barley began
6   retaliating against Ms. Mohamed by attempting to
7   exclude her from meetings and opportunities for
8   professional advancement within SHRM."
9        Do you see that?
10   A   I see that.
11   Q   What are you referring to here?
12   A   The PMQ meeting.
13   Q   Is there anything else?
14   A   Not that I can think of.
15   Q   Let's look at page 14, paragraph 79.  In
16  the second sentence here, this states, Meanwhile,
17  Barley's discriminatory behavior had worsened, and she
18  became increasingly aggressive in her interactions
19  with Ms. Mohamed.
20       Do you see that?
21   A   I see that.
22   Q   How did the discriminatory behavior worsen?
23   A   I recall this meeting that was held by
24  Carolyn for the ISD team members to establish team
25  norms, establishing rules on how we should behave, how

Page 232

1   we should communicate, who can we copy on our emails.
2        During that meeting, Carolyn said that we
3   need to come up with norms to establish these rules.
4   My response was, These rules will basically determine
5   how we interact on a day-to-day basis; and I would
6   really appreciate it if we had a third person come in
7   and help us come up with these rules, so we can make
8   sure that they are inclusive.
9        Her response was, Not everything is about
10  inclusion, Ruby.  Some of us just want to have the job
11  to get done.
12   Q   Was there anything else that you recall
13  regarding how the discriminatory behavior worsened?
14   A   I was taken off one of the projects that I
15  was told was going to be mine.  So this specific
16  project, if you recall, I -- I mentioned that I built
17  an e-Learning course about internal investigations,
18  that's a best seller.
19       They wanted to take that course and make a
20  face-to-face and a virtual version of it and attach
21  credentials, call it microcredentials, to it.
22  Ultimately, the same content would be used on those
23  other modalities, just with small adjustments.
24       Since I built the initial course, I was
25  assigned to build the other modalities as well.

Page 233

1   Carolyn kept canceling meetings for -- that were
2   scheduled to talk about this project.
3        And when we met, she had several questions
4   about the project itself; for example, who are -- who
5   are the subject matter experts that I used in the
6   first course that I built?  What resources did you
7   rely on?  What topics do you think is really
8   important?  How should we address these topics?
9        It's literally an analysis question.  The
10  first phase in the ISD, it's the analysis.  She put me
11  through all of this; I give her all the information
12  that she needed; and then I was informed that I'm no
13  longer on that project.
14       This is just another example of Carolyn
15  meeting on the side with me to take the information
16  and my expertise and to use it for her own without
17  giving any credibility to the person that she took
18  this information from.
19   Q   Do you recall when Ms. Barley removed you
20  from this project?
21   A   I cannot recall.
22   Q   Do you recall if it was before or after
23  your complaint to Ms. Morris?
24   A   It was definitely after.
25   Q   Okay.

59 (Pages 230 - 233)

Page 234

1    A   Uh-huh.
2    Q   Can you explain how Ms. Barley became
3  increasingly more aggressive in her interactions with
4  you?
5    A   One of the biweekly meetings that she has
6  set for us to work on our relationship, I was speaking
7  with her.  And all of a sudden, I started -- she
8  started to criticize my tone that I'm speaking with.
9        She said that she didn't appreciate my
10  tone.  And I said, I'm sorry.  I didn't know that I
11  was coming across -- I didn't recognize I have a tone,
12  period.
13       And she basically continued to say that in
14  order for us to have any discussion, I need to have a
15  different tone.  When I asked about what a different
16  tone is, I didn't really receive a clear answer around
17  that.
18       And then I couldn't -- I couldn't really --
19  I felt like if I say anything, I would be criticized
20  for my tone; so I couldn't really speak freely, since
21  I'm being heavily criticized.
22    Q   Do you remember when this criticism of your
23  tone occurred, if it was before or after your
24  conversation with Jeanne Morris?
25    A   It was after my conversation with Jeanne --

Page 235

1    Q   Okay.
2    A   -- with Jeanne.  Uh-huh.
3    Q   Let's look at page 19.
4        THE VIDEOGRAPHER:  We need to go off the
5  record for a second to start a new media sometime in
6  the next five minutes.
7        MS. SMITH:  That's fine.  You want to do
8  it now?
9        THE VIDEOGRAPHER:  Going off the record at
10  4:11.  This marks the end of Media 4.
11       (Recess taken.)
12       (At this time Ms. DeFazio is not present.)
13       THE VIDEOGRAPHER:  This marks the start of
14  Media 5 of the video deposition of Rehab Mohamed.
15  We're back on the record.  The time is 4:13.
16    Q   (By Ms. Smith)  Ms. Mohamed, looking at
17  page 19, paragraph 108 of the complaint, this states,
18  "Barley's preferential treatment of her white
19  subordinates also extended to deadlines:  she was lax
20  about enforcing deadlines with the white employees she
21  supervised, allowing them to miss deadlines multiple
22  times, and by several weeks."
23       Do you see that?
24    A   I see that.
25    Q   Who did Ms. Barley allow to miss deadlines?

Page 236

1    A   Carrie -- Carrie Mills and Ann Godmere.
2    Q   And when did this happen?
3    A   I can't give an exact date of when did that
4  happen.
5    Q   Can you give any sort of understanding of
6  what projects those related to?
7    A   They were all ISD projects.  So they were
8  courses that we were building, just like the
9  compliance and digital HR.
10    Q   Do you remember any specific projects by
11  name?
12    A   I do not.
13    Q   Do you know by how much deadlines were
14  missed?
15    A   I do not.  I do not, no.
16    Q   And how do you know Carrie and Ann missed
17  deadlines?
18    A   For example, in the email that Carolyn
19  initially sent to us to talk about asking for a status
20  update on the projects that we were working on and
21  mentioned that she would not -- in that email, Carolyn
22  attached an older report where the deadlines for the
23  prospective projects were listed, including Ann's
24  projects.
25       So Ann mentioned that she will not be able

Page 237

1  to reach those deadlines because her vendor wasn't
2  being in touch and not being communicative.  So she
3  couldn't get the information she needed to complete
4  the course, which might impact her ability to complete
5  the course within the deadline that was mentioned.
6        At the same time, Carrie's course -- single
7  course -- keep in mind that I was working on two
8  courses while Carrie, for example, was working on one.
9  I can't remember what Ann was -- how many courses Ann
10  was working on.
11       But I was working on two major courses
12  while others were working on one and being granted to
13  miss deadlines.
14       So Carrie, the project that she was working
15  on, that, A, didn't initially start from scratch.  She
16  started with content that already existed from Obi,
17  the previous instructional designer.
18       And she -- her deadline was pushed multiple
19  times.  I know that because of Slack messages.  She
20  would say, for example, I know I was supposed to
21  deliver this on X, but I'm going to need a couple more
22  weeks.
23       Those couple more weeks will come.  The
24  same thing:  Oh, I am adding this and that.  I'm going
25  to need more time to finalize this and that.

60 (Pages 234 - 237)

| Page 238 | Page 240 |
|---|---|

**Page 238**

1　　　And then when the -- when the final, final
2　deadline that -- was given, I reached out to Carrie
3　that exact date to ask her, to see a sample of her
4　workbook, which should be completed, since that is the
5　deadline for her to complete everything; and she said
6　she hasn't completed that yet.
7　　Q　Do you think that the fact that you were
8　working on two courses, whereas Ann and Carrie were
9　working on one, was discriminatory?
10　　A　I don't recall that Ann was working just on
11　one. I know Carrie was.
12　　Q　Okay.
13　　A　I don't recall -- it's really hard to
14　pinpoint whether this behavior was discriminatory or
15　not because discrimination comes in very -- many
16　forms.
17　　　　It doesn't -- you know, you can have a
18　hoodie on or you can say a racial slur or you can have
19　microaggressions. So there are many different forms
20　of discrimination that can come across.
21　　　　What I do believe, that Carolyn extended a
22　hand of compassion to her white peers that did not --
23　that was not extended to her black peers, to the black
24　peers on the team.
25　　Q　Did Ms. Barley delegate the assignments to

**Page 240**

1　　Q　(By Ms. Smith) Do you believe anyone else
2　at SHRM discriminated against you based on your race?
3　　A　I can't really say that. Not to my
4　knowledge.
5　　Q　You also claim retaliation in this lawsuit,
6　correct?
7　　A　Yes.
8　　Q　You believe Ms. Barley retaliated against
9　you, correct?
10　　　MR. SWAIN: Object to form.
11　　A　Correct.
12　　Q　(By Ms. Smith) Do you believe anyone else
13　at SHRM retaliated against you?
14　　　MR. SWAIN: Same objection.
15　　A　I believe anyone who aided into firing me
16　and setting me up for failure has retaliated against
17　me.
18　　Q　(By Ms. Smith) Do you use any social
19　media?
20　　A　Not really.
21　　Q　Are you on any platforms, such as Facebook,
22　Instagram, Twitter, TikTok?
23　　A　I am on Facebook.
24　　Q　Any other platforms?
25　　A　LinkedIn.

| Page 239 | Page 241 |
|---|---|

**Page 239**

1　all of you --
2　　A　Yes.
3　　Q　-- on the ISD team?
4　　A　Yes.
5　　Q　You testified earlier that you volunteered
6　to work on the digital HR project, correct?
7　　A　That's not correct.
8　　Q　You didn't?
9　　A　No. I was given to work on the digital HR
10　course.
11　　Q　Were you also given to work on the
12　compliance HR course?
13　　A　Initially, I was given the role of support,
14　of downloading pictures for that. And when I saw they
15　were really lacking behind, I did step up and
16　suggested that I can take the lead on that and -- so
17　we can move forward.
18　　Q　In this complaint, you claim race
19　discrimination, correct?
20　　A　Correct.
21　　Q　You believe Ms. Barley discriminated
22　against you based on your race, correct?
23　　A　I believe so.
24　　　MR. SWAIN: Object to form.
25　　A　I believe so.

**Page 241**

1　　Q　Is your Facebook profile public?
2　　A　No.
3　　Q　Can anyone other than you post on your
4　Facebook account?
5　　A　No.
6　　Q　Have you ever had any of your social media
7　accounts hacked?
8　　A　No. Not that I know of.
9　　　MS. SMITH: All right. Those are all my
10　questions.
11　　　MR. SWAIN: By my count, SHRM only used
12　about five hours and 45 minutes of its seven hours of
13　time. And the reason that I bring that up is earlier
14　in the day, Ms. Smith mentioned the notion of maybe
15　extending the deposition or recalling Ms. Mohamed on
16　another date.
17　　　We would object to an attempt to do either.
18　So I would like to invite you to use the rest of your
19　time, which is about an hour and 15 minutes, today.
20　　　MS. SMITH: What I said during the
21　deposition was that Ms. Mohamed's answers were
22　becoming narrative and unresponsive, and I didn't want
23　to have to recall her, extend -- or extend the
24　deposition.
25　　　And I think we addressed that by being able

**61 (Pages 238 - 241)**

Page 242

1  to get through material.  So there's no need to recall
2  her at this point.
3       MR. SWAIN:  Okay.  I have no questions.
4       MS. SMITH:  Okay.
5       THE VIDEOGRAPHER:  Going off the record at
6  4:21.  This marks the end of Media 5 of 5.
7       (The following colloquy is not on the video
8  record.)
9       THE REPORTER:  I just need to get
10  transcript orders on the record.
11       MS. SMITH:  We'll order.  Just PDF with
12  exhibits.
13       MR. SWAIN:  And she'll have to read, so
14  yeah.
15       THE REPORTER:  Do you want a copy?
16       MR. SWAIN:  Yes.
17       THE REPORTER:  Do you want exhibits as
18  well?
19       MR. SWAIN:  Yes.
20       (Deposition Exhibits 1 through 18 were
21  marked.)
22           *  *  *  *  *  *  *
23       WHEREUPON, the foregoing deposition was
24  concluded at 4:21 p.m.  Total time on the record was
25  5 hours and 46 minutes.

Page 243

1           I, REHAB MOHAMED, the deponent in the above
2  deposition, do hereby acknowledge that I have read the
3  foregoing transcript of my testimony, and state under
4  oath that it, together with any attached Amendment to
5  Deposition pages, constitutes my sworn testimony.
6
7  _____ I have made changes to my deposition
8  _____ I have NOT made any changes to my deposition
9
10  _____
   REHAB MOHAMED
11
12
13       Subscribed and sworn to before me this
14  _____ day of _____, 20____.
15       My commission expires:
16  _____.
17
18  _____
   NOTARY PUBLIC
19
20
21
22
23
24
25

Page 244

1       CERTIFICATE OF DEPOSITION OFFICER
2  STATE OF COLORADO          )
3  CITY AND COUNTY OF DENVER   )
4       I, Kimberly Smith, a Registered
5  Professional Reporter and Notary Public within and for
6  the State of Colorado, commissioned to administer oaths,
7  do hereby certify that previous to the commencement of
8  the examination, the witness was duly sworn by me to
9  testify the truth in relation to matters in controversy
10  between the said parties; that the said deposition was
11  taken in stenotype by me at the time and place aforesaid
12  and was thereafter reduced to typewritten form by me; and
13  that the foregoing is a true and correct transcript of my
14  stenotype notes thereof; that I am not an attorney nor
15  counsel nor in any way connected with any attorney or
16  counsel for any of the parties to said action nor
17                        outcome of this action.
18                        xpires June 21, 2025.
19
20
   KIMBERLY SMITH
21  Registered Professional Reporter
   Notary Public, State of Colorado
22
23
24
25

Page 245

1  Hunter A. Swain, Esq.
2  hunter@swainemploymentlaw.com
3       May 10th, 2023
4  RE:Mohamed, Rehab v. Society For Human Resource Management
5  4/25/2023, Rehab Mohamed (#5801132)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  (erratas-cs@veritext.com).
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22       Yours,
23       Veritext Legal Solutions
24
25

62 (Pages 242 - 245)

```
                                                    Page 246
 1  Mohamed, Rehab v. Society For Human Resource Management
 2  Rehab Mohamed (#5801132)
 3          E R R A T A  S H E E T
 4  PAGE_____ LINE_____ CHANGE_____
 5  _____
 6  REASON_____
 7  PAGE_____ LINE_____ CHANGE_____
 8  _____
 9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Rehab Mohamed                Date
25
```

Veritext Legal Solutions

800-567-8658                                    973-410-4098

Case No. 1:22-cv-01525-PAB-KAS Document 140-33 filed 06/09/25 USDC Colorado pg 64 of 128

| & | | | |
|---|---|---|---|

**&**   1:21 2:4 9:3

**0**

**0045**   169:17
**0049**   199:7
**0141**   205:24
  220:2 224:9
**01625**   1:2 4:14
**0375**   118:22,23

**1**

**1**   2:16 3:7 4:8
  8:9,23,23 19:5
  25:2 27:4 30:3
  35:12 47:12,13
  47:13 51:3
  53:25 61:21
  65:15 68:18
  155:2 177:17
  242:20
**1/29/2020**   3:4
**10**   3:4 94:9
  130:24
**100**   29:5 91:10
  211:24
**1001**   1:21 2:5
  4:15
**101**   162:12
**108**   235:17
**10:02**   47:7
**10:15**   47:10
**10th**   245:3
**11**   3:5 136:20
  192:10 231:3

**118**   2:19
**11:59**   112:23
**12**   3:7 141:6
  148:14,19
  154:23 169:13
  169:23 172:13
  173:9 179:19
**12/9/2020**   3:15
**123**   2:21
**125**   2:22
**126**   2:23
**127**   2:24 3:1
**129**   3:2
**12:50**   113:3
**13**   3:8 60:16
  169:6 172:25
  175:11 177:17
  196:8
**130**   3:4
**136**   3:5
**14**   3:10 196:6
  199:6 231:15
**141**   3:7
**1490**   1:13,17
**15**   3:11 95:1
  205:19,25
  241:19
**16**   3:14 94:25
  227:4
**169**   3:8
**16th**   103:15
**17**   3:16 228:8
**18**   3:18 96:3
  98:11 99:4
  118:13 229:7

242:20
**19**   44:3 45:6
  206:3 207:4,17
  217:13 219:25
  224:8 225:2
  235:3,17
**196**   3:10
**1:22**   1:2 4:14
**1:50**   157:20
**1st**   165:10

**2**

**2**   2:17 31:14
  68:19,20 69:11
  74:7 94:10
  95:1 112:23
  118:13 127:25
  172:25 175:11
**20**   23:13,14
  243:14
**2016**   118:13
**2018**   38:16
  127:20,25
**2020**   3:7 9:8,11
  19:6 38:16
  52:2,12,21
  74:12 118:13
  130:24 141:15
  141:17 148:16
  148:22 165:10
  169:13,24
  173:9 179:20
  181:15 182:2
  183:5 189:4,4
  189:12 192:7
  194:16 199:12

206:3 217:13
  225:3 227:6,13
**2021**   25:5,13
**2022**   25:5,13
  27:6
**2023**   1:9 2:6
  4:4 245:3
**2025**   244:18
**205**   3:11
**21**   244:18
**22**   127:20
**22401**   244:20
**227**   3:14
**228**   3:16
**229**   3:18
**25**   1:9 2:6 4:4
  25:5,13 27:6
  181:14 182:1
  183:5
**28**   226:13
**29**   130:24
  189:3
**2:02**   158:1
**2:59**   198:25

**3**

**3**   2:19 9:9 33:7
  48:3 51:3
  76:19 113:2
  118:19 151:9
  157:20 211:20
**30**   245:17
**300**   1:21 2:5
**303**   1:13
**303-593-2595**
  1:18

Case No. 1:22-cv-01032-PAB-KAS Document 40-3 filed 06/09/25 USDC Colorado pg 65 of 128

**303-628-3338** 1:22
**304** 1:17
**31** 192:7,12 194:16 224:22 224:23 227:6 227:10,13
**37** 25:4,12 26:4 26:17 229:13
**3:16** 199:4
**3rd** 153:22 165:15,16,18

**4**

**4** 2:21 51:3 123:20 124:8 149:7 157:25 235:10
**4/25/2023** 245:5
**4/4/16** 2:20
**401** 20:4 29:16 29:17 32:20
**45** 241:12
**46** 242:25
**47** 230:5
**4:11** 235:10
**4:13** 235:15
**4:21** 242:6,24

**5**

**5** 2:12,22 33:13 53:25,25 54:4 54:4,5 69:12 125:12 235:14 242:6,6,25

**5,000** 31:2
**50** 29:2
**53** 73:24
**58** 231:3
**5801132** 245:5 246:2
**5k** 30:25

**6**

**6** 2:23 25:5,13 47:13 53:25 54:4 65:15,16 69:11 126:19
**6/12/2020** 3:9
**6/22/18** 3:1
**68** 2:17

**7**

**7** 2:24 8:23,23 69:11 71:3 127:11 189:4 229:12
**720-815-5281** 1:14
**75,000** 12:20
**79** 231:15

**8**

**8** 2:16 3:1 19:4 25:3 27:4 30:3 30:10 35:12 65:15 74:6 127:16
**8/28/2020** 3:13
**8/7/2020** 3:10
**80** 26:18

**80,000** 12:20,21 17:25 26:18 30:14 131:7
**80202** 1:22
**80218** 1:14,17

**9**

**9** 3:2 74:7 129:24 230:5
**9/1/2020** 3:17
**95,000** 29:9
**9:04** 2:6 4:4

**a**

**a.m.** 2:6
**abby** 69:19
**ability** 8:1 237:4
**able** 10:14 11:16 32:12 56:10 66:3,5 95:9 155:6 184:16 195:25 200:19 218:25 230:14 236:25 241:25
**above** 120:24 134:18 146:15 243:1 245:6
**absolute** 158:14
**accept** 124:21
**accepted** 20:20
**accommodate** 79:17

**account** 241:4
**accountable** 173:24,24,25
**accountant** 113:13
**accounts** 241:7
**accuracy** 189:8 245:9
**accurate** 63:5 118:17
**accurately** 124:2 125:20 130:5 136:24
**accusations** 97:14 163:8
**accused** 76:24
**achieve** 177:25 179:2
**acknowledge** 210:24 211:9 243:2
**acknowledged** 201:9 210:19
**acknowledging** 98:23 110:24
**acknowledg...** 245:12
**acquiring** 126:14
**acting** 147:5
**action** 1:2 4:21 85:16 152:24 175:6 244:16 244:17

Case No. 1:22-cv-01615-PAB-KAS Document 40-33 filed 06/09/26 USDC Colorado pg 66 of 128

| | | | |
|---|---|---|---|
| **actions** 66:13 66:15 84:5 85:20 95:16 104:25 171:8 175:8 | **adhere** 21:17 **adjustments** 232:23 **administer** 244:6 | **agree** 4:6 36:7 36:8 63:6 149:3,6,7 162:16 203:12 | **amendment** 243:4 **america** 103:16 **american** 87:3 133:22 |
| **activities** 43:15 68:3 | **administrator** 54:14 | **agreement** 3:17 **ahead** 43:4 | **americans** 104:1,9 |
| **actual** 190:19 205:17 | **admitted** 22:24 22:25 | 77:24 101:8 112:20 137:14 | **amount** 30:7 32:23 34:25 |
| **actually** 51:14 66:14 73:1 77:25 78:12 110:8 141:19 151:1 153:11 174:8 188:5 190:18 192:25 196:7 218:13 | **admitting** 211:7 **adults** 21:11 **advance** 21:11 188:13 **advancement** 231:8 **advice** 76:3 84:10 | **aid** 140:23 **aided** 140:22 240:15 **aids** 191:22 **aiming** 12:20 **alexandria** 120:11,19 129:4 132:13 132:15 133:7 | 35:5,14 192:25 223:6 224:6 **analysis** 191:24 233:9,10 **angela** 54:6 61:22,23 **ann** 100:17 103:1,3 106:22 |
| **add** 219:14 230:1 | **advocated** 136:17 | **align** 126:15 **aligned** 145:9 | 109:2 110:5 161:16,19,22 |
| **added** 138:10 209:1 | **advocating** 89:23 | 170:14 **aligns** 17:14,15 | 212:16,16 213:14 216:19 |
| **adding** 237:24 **addition** 30:6 | **affiliations** 4:24 | **allegations** 50:18 229:12 | 216:24 217:1 221:8 229:22 |
| **additional** 44:13,14,15 | **afforded** 84:23 **aforesaid** 244:11 | **allotted** 245:20 **allow** 19:2 | 236:1,16,25 237:9,9 238:8 |
| **address** 53:2 62:17 66:1,4 79:1 85:4 168:5,5 209:13 233:8 | **afraid** 61:10 **african** 87:3 104:1,9 **aggressive** 89:25 186:3 | 235:25 **allowed** 152:17 179:15 **allowing** 203:17 235:21 | 238:10 **ann's** 213:23 236:23 **anna** 105:5 **anne** 161:2 |
| **addressed** 76:8 77:7 241:25 | 231:18 234:3 **ago** 69:7 | **alpha** 163:18 195:7,11,12,17 | **announced** 150:8,9 |
| **adequate** 226:22 227:3 | | 195:25 196:3 **amazon** 10:7 10:17 | **announcing** 136:11 |

Case No. 1:22-cv-01565-PAB-KAS Document 40-3 filed 06/09/06/24 USDC Colorado pg 67 pg 67 of 128

| | | | |
|---|---|---|---|
| **annual** 35:3 | **apologized** | 177:15 | 163:11 174:13 |
| **answer** 6:6 7:4 | 76:22 | **appropriate** | 179:3 222:6,19 |
| 7:10,12 8:1,5 | **apparent** 20:17 | 2:2 85:22 | 234:15 |
| 8:15 43:2 | 41:8 | 88:11 188:6 | **asking** 7:21 |
| 46:19,20 60:11 | **apparently** | **approval** 141:2 | 67:3 84:6 |
| 69:12 74:6,8 | 87:14 | **approximate** | 86:17 124:11 |
| 86:18 87:23 | **appear** 154:21 | 45:4 132:8 | 135:2 144:2 |
| 94:10,25 96:3 | **appearances** | 183:16 | 147:18 168:21 |
| 98:11 103:17 | 1:11 4:23 | **approximately** | 179:15 181:20 |
| 105:10 143:21 | **appears** 130:2 | 9:9 25:4 | 182:4 195:19 |
| 144:4,13,14,14 | **applicable** | 179:24 182:7 | 195:20,21 |
| 144:14 145:1 | 245:8 | **approximation** | 236:19 |
| 145:22 146:3 | **application** | 200:18 | **asks** 90:6 |
| 146:16 147:14 | 26:9,11 123:24 | **april** 1:9 2:6 | **aspect** 138:20 |
| 147:17 156:23 | **applications** | 4:4 25:5,13 | **aspects** 138:17 |
| 157:13 222:21 | 10:12 11:6 | 27:6 118:13 | **assert** 23:15 |
| 222:23 234:16 | 26:8,12 | **areas** 15:23 | **asserted** 29:25 |
| **answered** | **applied** 10:5,7 | 16:2 | **assertive** 41:16 |
| 147:16 183:12 | 10:9,24 11:3 | **argue** 222:22 | 41:19 76:25 |
| **answering** 7:21 | 26:4 60:16 | **ariel** 1:16,18 | 77:3,6 90:1 |
| 105:22 | 124:5,9,18,19 | **arrive** 84:4 | 153:17,18 |
| **answers** 86:20 | 125:5 | 179:12 | 159:23 |
| 241:21 | **apply** 10:1,3 | **arrives** 104:15 | **assigned** 55:23 |
| **anxiety** 42:15 | 192:2 | **articulate** | 57:8 101:1,2 |
| 42:24 43:7,14 | **applying** 12:19 | 222:8,14 | 143:15 146:15 |
| 44:14,21 46:2 | 26:10,16 | **asked** 7:9 61:10 | 154:13,13 |
| 46:4,5,6,11,16 | **appreciate** | 61:15 78:17,19 | 178:16,21 |
| 74:25 85:24 | 173:1 196:16 | 88:10 92:2 | 208:21 232:25 |
| **anybody** | 232:6 234:9 | 103:15 104:3 | **assignments** |
| 111:17 223:18 | **appreciated** | 110:12 143:14 | 145:1 238:25 |
| **anytime** 75:9 | 149:9 | 145:20 146:1 | **assist** 69:8 |
| 89:5 | **approach** 84:9 | 146:14 150:12 | 150:22,24 |
| **apologetic** | 158:11 171:10 | 150:21 151:18 | 151:4 |
| 215:4 | **approaches** | 152:4,19 | **assume** 123:22 |
| | 175:15 176:16 | 153:14 155:18 | 154:15 |

Case No. 1:22-cv-01032-PKC-AS Document 40-3 Filed 06/04/24 USDC Colorado pg 68 of 128

| | | | |
|---|---|---|---|
| **assuming** 158:11 | 107:17 111:4 111:14,25 | **available** 21:10 127:1 142:12 245:6 | 199:3 204:19 224:7 235:15 |
| **attach** 232:20 | **attending** | **average** 74:2 | **backed** 49:23 |
| **attached** 3:9,15 236:22 243:4 245:11 | 106:16 153:7,8 182:14 183:9 183:14 186:12 | **avoiding** 188:17 | **background** 125:7 |
| **attachment** 3:15 | 197:14 216:21 | **awake** 42:20 | **backpay** 9:3 |
| **attack** 96:22 220:23 223:5,8 224:2 | **attention** 47:12 51:2 206:2 | **aware** 17:1,4 18:3 29:7 53:3 53:20 58:24 | **backward** 141:22 |
| **attempt** 241:17 | **attesting** 69:1 | 59:5 64:23 66:10,16 78:19 | **bad** 110:7,7 |
| **attempting** 231:6 | **attitude** 205:5 | 79:5 90:16 206:13,13,15 | **balance** 155:6 |
| **attend** 78:8 101:2,13 106:19,19 108:23 153:15 183:20 184:16 184:19 185:19 188:1 217:3,4 230:16 | **attorney** 4:25 244:14,15 245:13 | 206:16,25 210:19 | **balancing** 155:13 |
| | **attorneys** 7:8,9 7:12 8:11,19 10:15 11:6 20:9 26:13 29:23 32:3,9 69:9 95:2 | **awkward** 214:14 | **barely** 59:10 |
| | | **b** | **barley** 3:8,14 53:9,14,16 59:10 61:19 63:24 75:14 80:7 90:19 91:21 92:15,17 96:4 98:5 117:22 118:2 131:11,16 132:9,15,18,24 133:5,10,15 134:6,14,21 135:9,25 136:9 136:17 140:10 141:3 142:5,8 144:8 146:7,20 148:4 153:3,20 158:3 160:11 160:22 161:5 161:17 162:5 163:24 165:3 165:12 167:9 |
| **attendance** 213:16 228:16 | | **back** 25:2 27:4 30:3 39:12 42:21 44:19 47:9 54:21 56:9 60:10 61:21 71:13 88:19 89:12 94:2,5 98:10 98:20 99:4 101:3 110:20 113:3 121:2 141:19 145:6,8 145:19 156:19 158:1 166:12 172:25 175:11 187:17 198:3 | |
| **attended** 56:5 60:6,8 101:16 107:6 108:4 109:11 | **audience** 21:17 | | |
| | **audio** 4:5 91:14 91:17 223:19 | | |
| **attendee** 53:16 102:20 103:4 106:14 108:12 108:13 | **august** 25:5,13 38:7 74:12 189:4 192:7,10 192:12 194:15 195:4,8,23 199:12 206:3 207:4,17 217:13 219:25 224:8,22,23 225:2 226:13 227:6,10,13 | | |
| **attendees** 53:15 91:15,20 96:14 98:18 99:7 | | | |

Case No. 1:22-cv-01052-PGG-KAS Document 40-3 filed 06/09/25 USDC Colorado pg 69 of 128

167:22 169:14
169:19,23
171:24 172:11
172:16 173:1,9
173:9 174:23
175:12,25
179:21 180:8
181:5 183:2,13
184:21 185:8
185:18 188:1
188:12,22
192:14 199:13
203:10,13,17
206:8,17 207:5
207:18 220:1
224:9 225:2,11
226:9 227:8
228:23 229:15
229:16 230:6,8
231:5 233:19
234:2 235:25
238:25 239:21
240:8
**barley's** 133:23
156:22 158:6
165:5 177:18
181:8 182:11
182:19 188:8
203:25 230:12
231:17 235:18
**barolyn** 170:16
**base** 40:6
**based** 18:2 31:5
31:6,7 59:24
167:23 177:5

210:25 239:22
240:2
**basic** 162:9,12
230:15
**basically** 11:21
20:24 21:9
36:23 54:19
55:24 57:6
65:7 76:25
77:1 78:6,22
79:13 101:2,10
103:16,22
108:21,24
126:7 128:10
128:14 129:8
130:19 137:12
138:15 143:4
164:12 166:22
170:12 171:11
171:15 174:17
187:2 190:11
191:22 201:2,9
202:15 209:25
232:4 234:13
**basics** 163:3
**basis** 98:12
102:17 141:18
232:5
**baumunk** 1:24
4:17
**becoming** 9:10
205:2 241:22
**bed** 68:6
**began** 135:8
229:14 231:5

**beginning** 4:24
46:10 123:2
140:19 145:3
146:12 161:11
161:20 165:19
165:22 192:4
210:17 229:12
**behalf** 1:12,19
5:4 8:11,18
197:16
**behave** 231:25
**behavior** 45:10
55:22 57:18
79:2,21 86:11
88:8 89:14
92:13 95:4
122:10 147:25
148:4 180:25
202:5,9 205:7
207:13 214:21
221:1 222:7
231:17,22
232:13 238:14
**behaviors**
64:24,25 79:19
88:3 89:16
92:10 108:5
147:13 202:10
222:2,4
**belief** 98:12
102:17
**believe** 10:16
18:12 30:14,25
32:18 34:8,10
34:11,21,24,25

36:17 51:19
52:15 53:8
54:23 61:23
62:1,3 63:5
64:1 66:6
68:10 76:19
92:23 93:13
94:15,19 96:4
96:7 98:15
99:5,19 100:23
101:5 103:1,9
107:4,15,25
109:9,19 111:2
111:12,23
120:1 121:25
128:16 137:25
141:19 144:7
146:20 148:7
149:20,22
157:6 165:15
166:18 167:19
168:8 169:25
171:16 172:7
173:22 174:20
175:6 177:10
179:22 183:20
183:21 185:18
185:24 186:9
186:11,21
192:12 198:2
202:4 204:19
212:4 218:21
224:21 225:3,7
226:13,21,24
228:13 230:13

Case No. 1:22-cv-01616-PBG-KAS Document 40-3 filed 06/09/26 USDC Colorado pg 70 of 128

| | | | |
|---|---|---|---|
| 238:21 239:21 | **beyond** 146:15 | 170:17,18 | **bridge** 88:1 |
| 239:23,25 | **bias** 43:25 | 172:8 186:2 | **brief** 47:5 |
| 240:1,8,12,15 | 85:21 88:8 | 201:10,13,24 | 78:18 196:24 |
| **believed** 62:11 | 201:17 209:7 | 209:1,20 210:4 | 198:23 |
| 86:17 138:18 | **big** 43:18 49:13 | 211:10,10 | **briefly** 196:22 |
| 167:22 171:25 | 101:20 103:19 | 214:5 230:8 | **bring** 22:13,17 |
| 210:9 223:5 | 106:18 141:9 | 238:23,23 | 59:1 67:5 |
| **believes** 202:6 | 147:3 177:24 | **blackness** 87:6 | 75:25 76:5 |
| **belittled** 82:11 | 184:17 187:1,4 | 87:7 103:16 | 82:18,24 83:2 |
| **bell** 189:21 | 216:22 | 201:11 | 87:5,7 89:6 |
| **belonging** | **bill** 33:17 | **bless** 39:2,3 | 100:3 104:25 |
| 117:1 | **bit** 21:18 22:18 | 174:4,6 | 168:5 186:14 |
| **benefit** 33:19 | 104:18 105:17 | **blindsided** | 190:23 201:10 |
| **benefits** 9:3,20 | 179:1 | 92:22 101:23 | 201:11 214:5 |
| 9:22 19:20,21 | **biweekly** | 174:17 | 241:13 |
| 19:22 25:18,22 | 175:19 176:2 | **blockage** | **bringing** 59:16 |
| 29:12,13,13,14 | 179:20,22 | 159:14 | 61:9 85:3 |
| 30:5,7 155:4 | 184:24 234:5 | **bonus** 19:25 | 175:9 |
| **bernee** 75:14 | **black** 41:10 | 20:2 30:15,19 | **brings** 94:6 |
| 83:24 84:16,22 | 43:19 55:4,11 | 30:23 31:2,4,5 | **broadcast** |
| 90:12 115:5 | 55:13,16,18,20 | 31:6 | 104:7 |
| 199:13 201:8 | 57:20 59:15,18 | **bonuses** 31:10 | **broadcasts** |
| 204:11 205:1 | 60:14 62:13,13 | **book** 193:20 | 77:22 |
| **best** 17:15 | 79:17 85:17,20 | **boss** 167:3 | **broke** 221:21 |
| 87:12 110:14 | 85:21 86:11 | **bottom** 35:11 | **broken** 93:12 |
| 139:22 226:18 | 87:5,13,17,18 | 118:22 | **brother** 95:6,13 |
| 232:18 | 87:20 88:2,5 | **break** 7:2,5 | **brother's** 95:7 |
| **better** 13:12 | 88:12,20,21,23 | 47:5 112:21 | **brought** 5:14 |
| 39:5,6 84:10 | 88:24 89:5,11 | 157:17 198:23 | 56:7 58:24 |
| 156:3,4,12 | 89:17 90:4,6 | **breakdown** | 59:9 60:14,17 |
| 162:24 176:23 | 90:11,12,15,16 | 134:19 | 60:22 62:15 |
| 179:16 188:23 | 98:12,25 | **breaking** 96:24 | 76:24 78:14 |
| 189:1 197:19 | 103:21 110:23 | **breath** 223:12 | 82:14,22 84:2 |
| 201:24 202:12 | 133:1,10,11,17 | **bridesmaid** | 84:16 87:15 |
| 205:18 | 166:23 167:19 | 50:12 | 97:19 99:10 |

Case No. 1:22-cv-01525-PAB-KAS Document 40-3 filed 06/09/25 USDC Colorado pg 71 of 128

100:8 101:7,20
105:5 108:10
112:6 118:6
133:18,19
152:21 153:23
170:15 173:12
174:22 186:18
186:23 190:14
190:20 191:1
191:10 200:10
207:12 212:20
214:20 215:19
216:20
**brutal** 44:3
166:19
**bucket** 82:17
82:18
**bug** 152:9
**build** 21:10
232:25
**building** 17:11
123:17 130:16
162:12 236:8
**built** 54:19
232:16,24
233:6
**bullet** 143:5
**bullier** 90:1
**bullying** 40:20
43:21 66:9
202:7
**burden** 40:23
43:18 68:9
79:16 82:5
89:20

**business** 65:21
155:8 210:18
**button** 221:25

**c**

**c** 4:1 8:24 9:3
16:11 56:18
121:17
**cadence** 151:12
**call** 20:25
51:16 78:17
189:25 232:21
**called** 2:3 21:21
27:13 64:22
78:17 185:14
**calling** 189:6
**cancel** 188:12
**canceled**
188:15,16
**canceling** 233:1
**candice** 152:16
152:22 166:13
**candidate**
10:20
**capable** 43:23
43:24 218:24
**care** 94:12
177:15 210:18
**career** 21:12
36:2 71:4,13
**careful** 89:24
93:22,23
**carlos** 100:18
102:18,20
215:13 216:9

**carol** 100:18
111:2 215:14
**carolyn** 45:11
53:9 58:25
59:2,10,13
61:12 64:22
65:2 75:14,22
76:1,24 78:7
82:15 83:8
84:21 86:5,9
87:13 88:1,11
92:2,3,8,12,23
94:3 96:4,16
97:1,5,13,22,24
99:24 101:25
103:5,15 104:3
104:19,19
106:9,15,17
108:20,22
110:4,6,22
116:12 117:10
118:2,6 131:11
131:25 138:21
140:10,16,18
140:24 141:3
142:21 143:2
143:10 144:6,9
146:10,24
147:5,23
149:15 150:2
150:11,25
151:3,18
152:19 154:15
155:18 159:13
160:15,20

161:20,21
162:22 163:6
163:11 164:4
164:15 167:4
167:17,20
168:2,5 170:12
170:16 173:12
174:12 179:4
182:14 183:8
183:25 185:7
186:9 188:18
190:20 191:11
192:9 195:1
197:1,20 201:4
201:12,16,18
202:4,25 206:8
206:14,19
207:22 208:21
208:22 209:4
209:14 210:12
210:20 211:2
212:16 213:16
214:2,21
216:21 217:2,9
218:24 219:2
220:3 224:21
228:17,22
230:20,23
231:24 232:2
233:1,14
236:18,21
238:21
**carolyn's** 154:7
167:3 170:25
205:7 207:13

| | | | |
|---|---|---|---|
| **carrie** 91:5 | **certificate** | **check** 159:6,9 | 181:17 182:22 |
| 100:17 105:5 | 244:1 | 159:12 163:17 | 190:4 200:2 |
| 109:2,19 161:2 | **certification** | 175:20 181:2,3 | **clarity** 71:25 |
| 185:4 212:17 | 17:10 | **checking** 43:24 | 72:1 175:15 |
| 213:14 214:16 | **certify** 244:7 | **chief** 206:22 | 176:16 |
| 216:19,24 | **challenges** | **chip** 150:12 | **clear** 5:20 6:11 |
| 221:9 229:22 | 138:3 | **chipped** 150:14 | 6:21 7:6,18,22 |
| 236:1,1,16 | **change** 86:18 | **choice** 224:5 | 41:2 106:4 |
| 237:8,14 238:2 | 89:20 93:2,19 | **chosen** 178:19 | 225:24 234:16 |
| 238:8,11 | 128:2 137:6 | **christine** 198:3 | **clearly** 139:15 |
| **carrie's** 237:6 | 169:1,3 177:1 | **chro** 207:23 | 144:16 147:12 |
| **carry** 82:6 | 179:17 220:18 | 219:21 | 147:24 |
| **carrying** 43:18 | 246:4,7,10,13 | **chunk** 49:14 | **clients** 28:8 |
| 68:8 | 246:16,19 | **circles** 43:16 | **close** 191:6 |
| **case** 4:14 117:5 | **changes** 23:1,2 | **cited** 207:15 | **cloud** 117:16 |
| 117:7 159:18 | 128:5 141:20 | **city** 244:3 | 117:18,19 |
| **catch** 137:12,24 | 175:13,24 | **civil** 1:2 2:2 | **cobra** 31:21,25 |
| **category** 33:19 | 176:5,7,9,24 | **claim** 8:8 41:17 | **code** 2:23 |
| 89:25 92:19 | 177:22 178:4 | 94:24 239:18 | 126:20 127:1,8 |
| **caused** 36:22 | 193:16,22 | 240:5 | **collaborate** |
| 74:22 | 194:11 243:7,8 | **claiming** 40:13 | 145:15 163:15 |
| **causing** 202:8,9 | 245:10 | 40:17 94:11 | **collaborated** |
| **caveat** 7:11 | **changing** | **claims** 23:15 | 52:6 144:10 |
| **cell** 33:17 | 127:24 | 29:25 220:4 | 149:15 |
| **center** 37:13,14 | **channel** 152:13 | **clarification** | **collaborating** |
| 37:15 38:18 | **character** | 70:17 176:19 | 54:18 |
| 74:17,18 | 163:9 | **clarify** 6:10,23 | **collaboration** |
| **ceo** 81:2 207:23 | **charge** 85:1 | 14:17 15:1,25 | 51:22 131:22 |
| 219:5 | **charged** 140:10 | 18:25 22:18 | **collaborative** |
| **certain** 33:1 | 150:2 | 34:14 55:8,15 | 93:18 |
| 35:7 59:21 | **chat** 160:18 | 58:4 64:10 | **collection** |
| 103:5 159:10 | **chaw** 121:15,17 | 70:25 71:20,22 | 186:21 |
| 159:16 170:23 | 121:19,22 | 106:5 114:13 | **collided** 21:20 |
| 172:9 182:3 | 122:1 123:7 | 117:24 119:19 | **colloquy** 242:7 |
| 201:13 | | 144:21 148:9 | |

Case No. 1:22-cv-01512-PAB-KAS Document 40-3 filed 06/09/25 USDC Colorado pg 73 of 128

| | | | |
|---|---|---|---|
| **color** 170:24 | **coming** 59:20 | 152:11,13,16 | 106:24 107:10 |
| 171:7 172:24 | 134:9 184:1,12 | 160:15,16 | 107:20 109:4 |
| 201:16 231:5 | 184:14 234:11 | 175:21 176:22 | 109:14 111:7 |
| **colorado** 1:1,14 | **commencem...** | 208:14 | 111:17 112:14 |
| 1:17,22 2:6,8 | 244:7 | **communicati...** | 129:21 153:19 |
| 4:14,16 5:15 | **commencing** | 49:2 117:22 | 166:11 187:25 |
| 15:9 26:22 | 2:6 | 118:1 134:20 | 197:23 |
| 37:14 229:9 | **comment** 77:4 | 188:8 | **complained** |
| 244:2,6,21 | **comments** | **communicative** | 99:17 100:1 |
| **colorblindnes...** | 103:6 158:4 | 237:2 | 102:23 107:2 |
| 88:9 201:17 | 186:7 | **companies** 11:2 | 107:13,23 |
| **combination** | **commission** | 26:3 103:20,23 | 109:7,17 |
| 146:7 | 243:15 244:18 | **company** 11:13 | 111:10,21 |
| **combined** | **commissioned** | 11:18,20,21 | 112:18 165:10 |
| 128:10 | 244:6 | 17:11 27:13 | 167:9 168:9 |
| **come** 36:8 41:6 | **committee** | 33:16 62:18 | 169:1,4 175:1 |
| 43:22 61:2 | 145:12 184:5,6 | 104:5,12 | 213:1 215:18 |
| 84:19 85:4 | 186:8 187:18 | 115:17,20,22 | **complaining** |
| 89:19,21 93:19 | **committees** | 116:22,24 | 168:14,19 |
| 93:21 144:11 | 186:1 | 117:2 211:6 | 229:5 |
| 144:15 150:18 | **communicate** | **company's** | **complaint** 3:15 |
| 155:21,22 | 120:22 121:8 | 116:20 | 3:18 45:9 |
| 157:1 232:3,6 | 134:14 153:4 | **compare** | 58:24,25 59:14 |
| 232:7 237:23 | 156:10 171:21 | 163:24 | 67:12 165:23 |
| 238:20 | 204:7 232:1 | **compassion** | 166:1 174:21 |
| **comes** 20:22 | **communicated** | 158:13 160:23 | 175:9 180:24 |
| 36:7 90:5 | 139:15 144:16 | 166:25 238:22 | 186:14 198:6,8 |
| 104:12,25 | 149:14 192:5 | **compensation** | 207:7,11,12,14 |
| 131:23 154:19 | 193:6,24,25 | 17:23 19:19 | 207:20 213:4 |
| 220:20 238:15 | **communicating** | 29:8 37:2 | 214:20 215:2 |
| **comfortable** | 153:21 192:14 | 169:3 | 229:8 233:23 |
| 41:21,22,23,25 | 197:15 | **compensatory** | 235:17 239:18 |
| 41:25 42:5 | **communication** | 36:10,14,18 | **complaints** |
| 104:16 138:24 | 49:5,7 117:9 | **complain** 22:10 | 65:13 120:4 |
| 138:25 154:8 | 151:11 152:10 | 53:17 99:1,14 | 208:2 211:15 |

Case No. 1:22-cv-01625-PGG-KAS Document 40-3 filed 06/09/25 USDC Colorado pg 74 of 128

| | | | |
|---|---|---|---|
| 212:23 214:18 | **compliance** | **conduct** 2:23 | **considered** |
| 216:4 217:7 | 108:17,18 | 126:20 127:1,8 | 108:15 |
| 219:5,21 | 175:13 176:8 | 219:1 | **constantly** |
| 224:12 | 177:24 178:5,9 | **conducting** | 85:14 |
| **complete** 54:22 | 178:23 181:1 | 159:20 | **constitutes** |
| 60:10 84:14 | 189:19 190:13 | **conference** | 243:5 |
| 86:1 87:24 | 190:13 191:2 | 101:17 | **constructive** |
| 92:18 138:15 | 192:6 202:20 | **conferences** | 167:5 |
| 160:2 191:9 | 224:19 225:4,6 | 62:1 | **construe** |
| 195:6 196:4 | 226:8 236:9 | **confidence** | 151:23 165:5 |
| 220:18 224:14 | 239:12 | 85:13 97:12 | 173:9 |
| 225:3,8 237:3 | **complicate** | 108:11 | **consultant** |
| 237:4 238:5 | 61:11,16 | **confident** | 16:22 |
| **completed** 24:9 | **complies** 195:5 | 175:17 | **contact** 47:19 |
| 44:17 88:16 | **computer** | **confirmed** | 47:24 48:6,12 |
| 98:1 142:13 | 117:17 | 216:25 | 80:15,23 95:10 |
| 183:10 184:4 | **conception** | **conflicting** | **contained** |
| 192:7,16,18,21 | 126:7 137:16 | 153:1 | 47:13 127:6 |
| 193:13,16 | **concern** 22:20 | **conflicts** | 220:1 224:9 |
| 195:17 238:4,6 | 22:23 100:6,11 | 132:23 | **contains** |
| 245:17 | 196:16 205:1 | **confusing** | 177:18 |
| **completely** | 208:22,25 | 152:1,14 | **contend** 56:11 |
| 18:6 42:11 | **concerned** | **confusion** 22:1 | 74:22 |
| 59:24 87:3,4 | 122:12 209:11 | 72:9 | **contender** 15:4 |
| 90:7 159:18 | **concerns** 65:13 | **congratulate** | **content** 15:20 |
| 202:3 205:15 | 79:25 119:23 | 136:1 | 50:8 147:7 |
| 222:1,3 | 173:2,10 181:4 | **congratulated** | 159:10 162:18 |
| **completing** | 231:5 | 136:9 | 191:17,17 |
| 76:6,18 78:12 | **concluded** | **congratulation** | 194:24 232:22 |
| 79:23 83:3 | 242:24 | 136:10 | 237:16 |
| 92:13 192:1 | **condition** 75:1 | **connected** | **context** 101:12 |
| **completion** | **conditions** | 244:15 | 173:5 178:20 |
| 194:6,11,15 | 38:25 39:5 | **consequences** | 178:22 |
| **complex** | 44:11 | 171:8 | **continue** 4:5 |
| 201:20 | | | 13:9,9 39:10 |

Case No. 1:22-cv-01512-PAB-KAS Document 40-3 filed 06/09/25 USDC Colorado pg 75 of 128

89:15 128:18
151:10 152:15
155:5 175:17
179:18 205:10
**continued**
34:22 36:25
37:1 138:14
234:13
**continues**
104:7 195:5
**continuing**
30:8
**continuously**
139:1 156:12
**contracted**
190:18
**contractor**
51:15 52:8
**contributed**
141:3
**contributing**
146:15
**contribution**
29:18 32:21,24
33:7,12 186:19
**contributions**
148:15,22,25
149:3 151:8
**contro** 43:10
**control** 230:18
**controversial**
43:11
**controversy**
244:9

**convenient**
13:11,12
**conversation**
6:5 76:9,16,23
77:9,10,11,16
77:18 79:3,8
80:10 90:23
91:23 171:16
184:22 208:9
208:11 211:1
214:22 217:18
217:21,24
218:12 234:24
234:25
**conversations**
28:7 82:1
90:18,22,25
91:2,8,16
95:20 96:1
188:18,19
207:21 208:1,6
208:12,16
211:14 212:2,6
212:13 217:5
219:4,9,18,20
**conveyed**
102:10
**coordinated**
83:25
**copied** 187:24
189:9
**copies** 10:12
49:9 115:17
116:16 245:14

**copy** 62:19
123:20 232:1
242:15
**copying** 227:7
**copyrights**
97:17
**core** 40:7
**corporate** 18:4
**correct** 27:5,9
36:11,18 46:23
46:24 63:1
64:13 69:16,17
69:20,25 72:23
72:24 73:24,25
74:12,13,25
81:13 89:22
90:20 106:11
106:12 118:14
119:5,6,11
122:19 125:18
125:19 126:20
127:12,21,22
127:25 128:1
130:1,25 131:1
131:4,5,12,13
132:14,17
136:22,23
139:6 140:7,11
142:3,4 143:23
143:24 146:17
146:18 160:25
165:13 169:14
169:15 172:13
172:14 177:19
183:2 185:5

187:7,8 189:16
189:22 196:15
198:21 199:13
199:14,18,19
199:23 206:8,9
206:24 223:21
226:9,10 227:8
227:9,14,15
228:6,7 229:9
229:10 239:6,7
239:19,20,22
240:6,9,11
244:13
**correcting**
196:12,13
**correctly** 29:9
41:7 209:10
**corresponden...**
227:23
**counsel** 4:9,23
5:1 244:15,16
245:14
**counseling**
37:13,16,23,24
38:1,7,10,13,18
39:15,19 71:1
74:17,18
**counselor**
37:18 38:17,21
74:14
**count** 241:11
**counterparts**
160:23 161:1
**country** 44:8
44:16 166:21

Case No. 1:22-cv-01525-PGC-KAS Document 40-3 filed 06/09/25 USDC Colorado pg 76 of 128

201:21
**county** 244:3
**couple** 38:15
59:11 72:11
78:6 97:3
108:4 113:22
179:22 201:23
202:2 237:21
237:23
**course** 97:6
139:20,21,23
139:25 145:12
148:2 150:1,2
150:4 178:16
178:18,21
181:22,23
184:3,5,7
186:3,4 190:19
190:21 191:7,9
191:12 192:1
192:17,21,23
192:24 193:3
193:13,16
194:22,23
195:2,8,13
196:4 208:19
208:22 209:22
210:6 211:11
225:6,9 232:17
232:19,24
233:6 237:4,5
237:6,7 239:10
239:12
**courses** 54:19
123:17 126:9

126:10,14,17
126:18 128:7
130:16,21
131:20 162:11
202:12,13
236:8 237:8,9
237:11 238:8
**court** 1:1 4:13
4:19 5:14 6:18
7:18 35:15
69:22 229:8
**covered** 212:4
218:21
**covid** 44:3 45:6
120:14,15
**crack** 93:19
**craft** 62:25
**crafting** 209:6
**crazy** 66:25
**create** 126:7,17
167:6 178:23
194:21
**created** 139:22
**creating** 148:2
150:3 190:19
**creative** 37:16
37:24 38:18
74:17
**creatively**
155:4
**credentials**
18:16 232:21
**credibility** 89:4
106:22 158:11
162:6,8 230:14

233:17
**credit** 108:25
**criticism** 220:7
220:13 234:22
**criticize** 104:25
234:8
**criticized**
234:19,21
**crumbling**
223:13
**crying** 174:17
185:15 202:6
220:23 221:22
223:9,12,22,24
**cs** 245:15
**cubical** 135:13
**culture** 57:18
215:20
**current** 28:1,19
41:16 69:16
124:17
**currently** 24:21
32:13 50:6
53:1 65:25
93:5 117:2,21
118:1
**curriculum**
15:19 17:10,14
21:10,16,21,22
21:24 22:2,3,8
**curtis** 52:13,14
52:19
**curve** 138:6
**cut** 36:23,23

**cv** 1:2 4:14
**cycle** 193:4,5

**d**

**d** 2:10 4:1
56:18,18
**daily** 121:6
132:4
**damage** 36:22
66:12
**damaged** 66:23
**damages** 8:8,24
9:10 36:10,14
36:18 46:23
47:1,3 66:7
**daniella** 94:20
**danielle** 74:11
74:14
**data** 21:12
**date** 24:25 27:7
27:9 45:7,12
48:8 64:18
80:18 102:13
110:1 120:13
128:23 161:7
165:21 172:6
182:6 194:6,11
194:15 208:3
219:6,24 236:3
238:3 241:16
246:24
**dated** 127:20
130:24 169:13
206:3 217:13
227:6,13

Case No. 1:22-cv-01602-PAB-KAS Document 40-3 filed 06/09/26 USDC Colorado pg 77 of 128

| | | | |
|---|---|---|---|
| **dates** 19:12 | 235:19,20,21 | **defensive** 76:2 | **deny** 174:8,9 |
| 38:2 68:1 | 235:25 236:13 | 92:21 167:5 | **denying** 171:1 |
| 82:14 118:14 | 236:17,22 | 185:15 | 224:14 |
| 172:6 189:5,8 | 237:1,13 | **definitely** 67:12 | **department** |
| 194:6 211:18 | **deal** 42:22 | 71:17 93:15 | 18:13 51:12 |
| 226:11 | 103:19 205:8 | 94:5 98:19 | 61:25 86:6,10 |
| **davis** 1:24 4:17 | 209:15 211:12 | 103:20 104:11 | 122:19,21,23 |
| 99:5,7,13,17 | **dealing** 40:24 | 108:22 110:17 | 122:24 123:8 |
| **day** 43:11,11 | 40:25 43:23 | 124:23 133:21 | 128:5 136:12 |
| 85:10,19 96:12 | 82:16 87:10 | 152:12 160:21 | 166:24 198:11 |
| 97:4,13 103:18 | 201:21,22 | 195:24 223:22 | 212:18 |
| 104:13 108:11 | 221:7 222:4 | 233:24 | **departments** |
| 135:16 144:23 | **deborah** 52:4 | **delay** 193:3 | 11:24 |
| 144:23 145:17 | 52:20 53:12 | **delegate** 238:25 | **departure** 71:4 |
| 145:17 150:17 | **decided** 10:19 | **delete** 49:21 | **depends** 158:8 |
| 168:24,24 | 24:14 39:9 | **deliver** 72:2 | **deponent** 39:2 |
| 227:20 230:16 | 192:23 193:3 | 76:13 86:1 | 47:17 48:3 |
| 232:5,5 241:14 | **decision** 110:18 | 164:22 194:23 | 68:23 74:9 |
| 243:14 | 193:15 | 195:25 202:12 | 87:24 98:14 |
| **days** 68:5 121:8 | **decisions** | 202:16 225:7 | 125:15 126:1 |
| 203:6 245:17 | 106:18 184:17 | 227:1 237:21 | 127:18 130:7 |
| **deadline** 150:4 | 187:1,4 216:22 | **deliverables** | 141:10 149:5 |
| 150:7,9,16 | **decline** 204:20 | 160:6 191:3 | 169:8 174:4 |
| 156:16 191:6 | **declined** | **delivered** 152:2 | 205:22 243:1 |
| 192:8,11 | 205:10 | 193:14 | 245:13 |
| 193:12 224:13 | **declining** | **delivering** | **deposed** 6:14 |
| 224:15,20,22 | 204:22 | 78:12 152:2 | **deposing** |
| 224:23 225:5 | **defazio** 1:16 | 160:6 191:3 | 245:13 |
| 237:5,18 238:2 | 157:18 235:12 | **delivers** 195:23 | **deposition** 1:9 |
| 238:5 | **defendant** 1:7 | **demand** 3:18 | 2:3 4:9,15 6:3 |
| **deadlines** 82:21 | 1:19 2:4 4:10 | **denial** 92:17 | 74:15 105:20 |
| 149:9,16,18,20 | 30:8 | **dental** 19:24 | 112:24 113:2 |
| 149:25 150:14 | **defendant's** | **denver** 1:14,17 | 157:25 235:14 |
| 156:9 191:3 | 2:17 | 1:22 2:5 4:16 | 241:15,21,24 |
| 193:11 229:1 | | 244:3 | 242:20,23 |

Case No. 1:22-cv-01525-PGG-KAS Document 40-3 Filed 06/02/25 USDC Colorado pg 78 of 128

| | | | |
|---|---|---|---|
| 243:2,5,7,8 | 12:1 15:14,15 | **determine** | **difference** |
| 244:1,10 | 17:19,20,21,22 | 232:4 | 110:4,22 |
| **describe** 17:5 | 21:8 27:20,22 | **determined** | 177:24 |
| 49:6 93:4 | 27:23,25 71:11 | 35:14 | **different** 21:18 |
| 125:21 126:3 | 71:12 127:24 | **develop** 21:16 | 30:18 41:10 |
| 130:5,12 | 130:1,6,13,15 | 28:6 191:21 | 42:12 59:24 |
| 134:19 136:25 | 131:4,15 134:6 | **developed** | 82:19 87:16 |
| 137:3 158:6 | 135:5,7,11,25 | 38:22 126:9 | 89:3 93:7 |
| 188:21 | 136:18,22 | **developer** | 130:20 133:22 |
| **described** 17:9 | 137:1,4,7,8,9 | 15:20 | 159:18 175:15 |
| 92:6 97:23 | 137:10,12,23 | **developing** | 176:15 177:15 |
| 201:7 | 138:1,9 139:5 | 21:22,24 22:3 | 190:12 202:3 |
| **describing** | 140:3,10,15 | 137:19 147:7 | 222:21 226:1,5 |
| 95:15 | 142:3 145:4 | 159:10 190:7 | 234:15,15 |
| **description** | 147:6 155:3 | **development** | 238:19 |
| 2:22 3:2,5 | 159:5,15 161:5 | 15:19 16:14 | **differential** |
| 20:19 125:17 | 161:17,20,23 | 18:13 126:17 | 30:6 230:3 |
| 125:20 129:25 | 161:25 162:3 | 137:15 145:9 | **differently** 65:2 |
| 130:4,10 | 162:10,13 | 154:24 191:25 | 65:9 89:1 |
| 136:21,24 | 163:14 168:25 | 195:3,9 199:17 | 100:5 167:18 |
| 163:1 | 170:20 190:22 | 206:23 | 170:24 229:17 |
| **design** 17:15 | 197:22 198:17 | **devices** 115:18 | **difficulties** |
| 96:15 103:4 | 209:13 225:25 | 115:19 | 155:13 |
| 123:12 128:7 | 226:4 230:7,15 | **dewelt** 69:19 | **difficulty** 83:3 |
| 128:11,19 | 237:17 | 70:8 | **digital** 21:12 |
| 131:12 137:19 | **designers** 129:9 | **dewelt's** 70:6 | 97:6,17 189:18 |
| 154:9 155:6,14 | 147:9 163:19 | **deynes** 2:20 | 192:2,6,17 |
| 163:3 191:24 | **despite** 67:2 | **diagnosed** 46:5 | 202:21 224:19 |
| 191:25 | **detail** 71:9 | 46:7,12 | 225:4 226:8 |
| **designation** | **detailing** 115:6 | **diagnosis** 46:13 | 236:9 239:6,9 |
| 118:21 | 115:8 | 74:25 | **dilemma** 20:25 |
| **designed** | **details** 33:24 | **diary** 14:20 | **direct** 119:13 |
| 164:12 | 84:3 92:25 | 114:2 | 121:11 129:7 |
| **designer** 3:3,6 | 108:2 180:16 | **dickens** 3:1 | 129:11 206:10 |
| 10:8,10,18,25 | | | |

Case No. 1:22-cv-01525-SBP-KAS Document 40-3 filed 06/09/25 USDC Colorado pg 79 of 128

| | | | |
|---|---|---|---|
| **directed**   157:5 | **disclosure** | 96:5 98:13 | 231:17,22 |
| **directly**   76:1 | 102:8 133:14 | 99:1,6,14,20 | 232:13 238:9 |
| 153:4,21 | **disclosures** | 100:1,24 | 238:14 |
| 206:18 229:15 | 2:16 19:4 | 102:18,23 | **discu**   57:11 |
| **director**   18:12 | **discomfort** | 103:2 105:23 | **discuss**   50:11 |
| 188:4 199:16 | 223:7 | 106:25 107:5 | 55:23 56:25 |
| **disability**   9:22 | **discourage** | 107:10,16,20 | 57:4 66:19 |
| 25:22 | 183:13 | 108:1 109:4,10 | 67:20 86:8 |
| **disappointing** | **discouraged** | 109:14,20,22 | 92:2 97:5 |
| 104:4 | 182:14 183:8 | 111:3,7,13,17 | 105:3 112:5 |
| **discipline**   71:1 | **discouragem...** | 111:24 112:14 | 142:18 186:15 |
| 73:20 | 186:12 197:14 | 157:10 207:7 | 201:5 217:10 |
| **disclose**   75:6,12 | **discovery**   2:18 | 207:15,20 | **discussed**   33:20 |
| 78:1 92:3 | **discrepancies** | 208:2 209:6 | 57:10,11 58:3 |
| 95:18 101:14 | 21:5,7 | 210:9 211:8,15 | 81:11 82:3 |
| 110:10 132:24 | **discrim**   100:3 | 212:23 213:1,4 | 95:2 99:9 |
| 213:20 214:2 | **discriminated** | 214:18 215:2 | 106:7 143:1 |
| 222:12 | 53:18 56:7 | 215:18 216:5 | 170:9 175:19 |
| **disclosed**   57:16 | 167:20 168:1 | 217:7 219:5,21 | 180:14 |
| 75:20 85:25 | 209:24 210:2 | 220:4 224:11 | **discussing**   57:9 |
| 86:23 92:12 | 210:25 239:21 | 231:5 238:15 | 88:20,22 |
| 97:11 99:23 | 240:2 | 238:20 239:19 | 117:22 230:22 |
| 101:7,22,25 | **discriminating** | **discriminatory** | **discussion**   56:5 |
| 102:3,5,11 | 43:20 146:20 | 55:22 57:17 | 60:2,4 61:1 |
| 104:4 108:10 | 148:11 167:22 | 79:19,20 86:11 | 66:21 78:21 |
| 112:3 144:9 | 171:13,25 | 88:3,8 89:15 | 80:4 81:14 |
| 174:13 213:18 | 172:7 173:18 | 95:4 108:5 | 85:12 100:14 |
| 213:22 221:13 | **discrimination** | 147:12,25 | 101:11 104:18 |
| 222:11,18 | 23:16 30:1 | 148:4,8 151:24 | 108:14 109:23 |
| **disclosing** | 45:10 54:24 | 152:1 157:7,8 | 111:15 142:22 |
| 62:10,16 96:19 | 55:1,12 56:12 | 165:6 172:23 | 162:17 170:1,4 |
| 108:24 115:7 | 58:25 59:13 | 180:25 185:20 | 170:7 171:18 |
| 213:17 222:15 | 62:4 64:2,5,8 | 185:24 205:7 | 172:11 173:15 |
| 222:18 | 64:12 66:10 | 207:13 214:21 | 202:19 234:14 |
| | 70:14 73:17 | 220:25 222:7 | |

Case No. 1:22-cv-01652-PAB-KAS Document 40-33 filed 06/09/26 USDC Colorado pg 80 of 128

| | | | |
|---|---|---|---|
| **discussions** 50:9,14,17 56:2,2 57:21 58:1,5,13,17 60:5,12,13 68:12 78:21 81:15,18,21,23 82:23 84:24 86:6,8 91:19 95:12 98:16 99:8,22 100:4 100:8 101:3,13 101:15 102:21 107:7,8,18 108:14 109:12 111:5 178:17 **dismantled** 63:11 **dismissive** 94:3 **dismissiveness** 92:18 **disparate** 172:10 **disparities** 62:10,16 86:10 **displayed** 223:6 **disregarding** 90:8 222:2 **disrespected** 94:4 **distress** 74:21 75:7,10,17 77:19 79:9 81:11 82:4 | 83:20 90:19 91:22 93:5 **district** 1:1,1 4:13,13 5:14 5:15 229:8,9 **diverse** 43:24 62:14 83:13 85:23 171:20 **diversity** 42:1 62:12,17 78:24 87:17 93:9 104:8 **division** 51:12 220:5 **doctor** 32:19 46:8 **document** 8:10 8:18 68:22 118:19 124:12 124:13 125:14 126:24 127:6 127:14 130:3 141:7,12 145:19 169:12 228:9 **documented** 211:11 **documents** 115:17,25 116:5,21 117:1 117:4 **doing** 7:16 15:7 21:25 22:19 41:7 75:21 84:10 85:14 | 93:4 97:1 137:8,13,23 138:8 150:5 156:24,25,25 174:18 177:8 179:18 **domestic** 65:18 65:18,20,23 **door** 39:11 77:23,23 **doubt** 27:8 69:3 **douglas** 56:16 56:17 99:19,25 215:13,17 216:1 **download** 116:16,18,19 142:16 190:21 190:24 **downloaded** 142:11 **downloading** 239:14 **draft** 163:18 195:7,8,11,12 195:12,17,25 196:3,4 209:9 **drafting** 69:8 **drained** 42:14 **drive** 117:20 **drop** 150:5 **due** 148:5 192:22 194:23 | **duly** 5:6 244:8 **dunmore** 54:9 54:10,23 55:10 55:21 56:12,21 58:5 60:3,6 100:23,25 102:14 215:15 **dunmore's** 102:7 **dunsmore** 215:15 216:17 **duplicate** 22:15 **duplicates** 24:8 **duplication** 72:4,12 **duplicative** 22:7 **duties** 17:7 28:3,5 51:20 98:8 125:21 126:4 130:5,12 136:25 137:3,6 137:9,13 138:9 138:23 143:15 145:17 154:11 170:19 191:18 192:2 193:7 219:1 **dwelling** 84:18 |
| | | | **e** |
| | | | **e** 2:10 4:1,1 16:11 56:18,18 119:4,10 122:17 123:11 123:15,17 |

Case No. 1:22-cv-01525-PGG-KAS Document 40-3 filed 06/09/26 USDC Colorado pg 81 of 128

125:5,8,18,22
126:4,6,7,9,10
126:18 128:7
128:11 129:9
130:16,17,21
139:21,25
140:2 198:12
198:15,18
232:17 246:3,3
246:3
**earlier** 71:19
74:15,18
195:10 201:8
214:23 239:5
241:13
**early** 52:2
179:14 207:8
**earn** 30:12
**earned** 30:7
**earnings** 30:6
**ease** 7:17
**easily** 214:3
**easy** 82:9,10
175:3
**eating** 68:7
**ebony** 54:6
56:14 63:19,20
96:18 100:17
103:15 104:4
104:14,21
110:4 158:20
160:8,11,13,13
162:6,15,23
185:4 213:15
214:5,21

215:14 216:15
223:13 229:25
230:7,12
**ebony's** 163:9
163:13,20,21
**economic** 9:10
36:22
**eddice** 56:15,18
99:19,21 100:3
215:13,17
216:1
**editor** 52:15
**education**
18:16 55:4,11
55:14,17 61:25
86:12 122:21
122:24 124:3
128:4,5 136:12
137:16 165:12
166:24 212:18
215:9 220:17
**educational**
122:18 130:20
**effective**
127:25 143:14
145:20 146:1
146:14
**efficiency**
155:7
**efficient** 22:14
**efficiently**
22:19
**efforts** 14:1
16:23 22:15
24:8 72:4

115:24 116:2,4
**egypt** 133:20
**egyptian**
133:19,24
134:2
**eighth** 191:8
**either** 28:18
117:9 171:1
176:14 201:16
241:17
**elaborate** 42:23
212:11 226:23
**elaborated**
207:19
**elder** 61:22,23
62:3,6,22
63:12
**elearning** 15:19
**electricity**
163:6
**electronic**
114:8 115:18
**elicit** 222:23
**eligibility** 34:7
**eligible** 19:25
34:15
**eliminated** 21:3
72:10,15
**elizabeth**
107:25
**email** 1:15,18
1:23,23 3:8,10
3:11,14,15
49:4 80:24
81:1,3,4,7

95:21 104:20
120:23 134:16
136:10,14
153:10,12
169:24 172:13
173:1,8 175:12
177:18,22
179:19 188:8
192:9 199:10
204:11,13
206:2,7,10,23
207:4,17 208:7
208:13 217:13
219:25 224:8
225:1 227:6,10
236:18,21
**emails** 3:9 94:2
114:15,16,22
115:3,4,17
116:11,17,19
117:8,11 152:5
159:21 169:13
202:2 232:1
**embodied**
209:21
**embody** 62:12
210:5
**emotion** 67:21
**emotional**
66:12 68:16
74:21 75:7,10
75:17 77:19
79:9 81:11
82:4 83:20
90:19 91:22

Case No. 1:22-cv-01525-PAB-KAS Document 40-83 filed 06/09/25 USDC Colorado pg 82
pg of 128

93:5 95:14
112:9
**emotionally**
42:14 66:17,20
66:23 67:17,22
67:24
**emotions** 94:6
**employed** 9:10
25:6 51:16
118:12
**employee** 2:23
36:5 42:12
54:10 63:20
93:7 121:5
126:20 127:2
164:20,21
197:17
**employees** 23:4
28:25 29:3,6
54:25 60:14
62:5,13 64:3
81:4 114:9,21
122:3 229:16
229:20,23
235:20
**employers**
69:16
**employment**
2:24 19:13
23:17 27:1
30:13,23 34:2
34:6,21 35:19
37:4,10 40:14
42:9 44:22
45:5,16,17,21

45:24 46:1,3
67:15 113:5
115:16 116:8
116:22 124:3
127:9,12 158:3
175:14 176:8
191:16 227:19
227:21 228:5
**empower**
197:19
**empowered**
164:6
**empowering**
160:1 164:14
197:16
**empowerment**
158:15
**enablement**
28:6
**encountered**
84:3
**encountering**
199:24
**encourage** 59:3
**encouraged**
59:1 77:25
166:14
**ended** 79:3
171:17
**energy** 42:13
42:20 43:15,17
68:3
**enforcing**
235:20

**engagement**
55:23 56:4,22
57:1,6,9 58:20
86:7 99:8,22
100:13 102:21
107:7,18
108:13 109:12
111:5,15 112:1
220:17
**engineers**
21:21 22:8
**enjoy** 125:10
**enroll** 192:20
192:20
**enrolled** 193:17
**enrollment**
192:22
**ensure** 6:11
**entail** 190:10
190:11
**entered** 85:11
157:22
**entering** 85:10
**entire** 21:2
63:11 72:10
86:6 135:6
149:19 185:1
201:21 223:6
**entities** 128:9
**entitled** 36:14
36:17 94:11,15
**entrapment**
78:6,9 97:23
**entry** 14:20

**environment**
41:17 44:7
84:13
**equal** 2:24
127:12
**equally** 82:11
104:10
**erased** 49:13,19
49:21,24
**errata** 245:11
245:13,17
**erratas** 245:15
**especially**
93:13
**esq** 1:12,16,20
1:20 245:1
**establish**
231:24 232:3
**established**
40:3 133:21
**establishing**
231:25
**estrella** 102:18
102:22
**evaluation**
191:25
**evans** 1:21 2:4
**events** 62:1
101:17 123:14
128:8,13
130:18 198:12
201:6 220:19
**everybody** 81:2
101:17 157:2

Case No. 1:22-cv-01525-PGG-KAS Document 40-33 Filed 06/09/26 USDC Colorado pg 83
pg 83 of 128

| everyone's | 244:8 | exclude 106:15 | exhibits 2:15 |
| 21:25 157:3 | examined 5:6 | 216:21 231:7 | 242:12,17,20 |
| evidence 36:13 | example 10:7 | excuse 4:11 | exist 45:13 |
| 46:25 47:2 | 42:4 59:19 | 174:5 | existed 237:16 |
| 117:6 | 60:25 82:16,19 | exhibit 2:16,17 | expanding |
| evident 41:8 | 82:19,20 85:13 | 2:19,21,22,23 | 130:17 |
| 86:19 | 104:5 105:5 | 2:24 3:1,2,4,5,7 | expectation |
| ex 65:17,18 | 106:21 115:4,5 | 3:8,10,11,14,16 | 194:12 195:16 |
| exact 11:14 | 140:24 145:11 | 3:18 8:9,23,23 | expectations |
| 24:25 27:7 | 160:13 162:9 | 19:5 25:2 27:4 | 20:22 21:5,14 |
| 37:16 38:2,14 | 162:14 163:18 | 30:3 35:12 | 22:11 24:7 |
| 38:15 45:7 | 178:15 190:23 | 47:12,13,17,20 | 72:1 139:14,15 |
| 48:8 51:25 | 220:21 233:4 | 51:3 53:25 | 177:11 178:25 |
| 52:11 61:5,24 | 233:14 236:18 | 61:21 65:15 | 226:24 |
| 64:18 67:9 | 237:8,20 | 68:18,19,20,23 | expected 20:23 |
| 68:1 102:13 | examples 21:7 | 69:11 74:7,9 | expense 94:24 |
| 110:1 120:13 | 42:7 57:17 | 94:10 95:1 | expenses 94:12 |
| 122:20 123:4 | 59:11,12 65:8 | 98:14 118:19 | 94:16 |
| 123:25 128:23 | 82:14 92:9 | 123:20 124:8 | experience 88:2 |
| 136:4 161:7 | 97:3 156:20 | 125:12,15 | 88:12 124:3 |
| 167:25 172:6 | 158:25 160:10 | 126:1,19 | 125:7 155:3,6 |
| 172:17 182:6 | 170:23 172:10 | 127:11,16,18 | 173:2,5 194:1 |
| 189:5 197:12 | 172:15,19 | 129:24 130:7 | 201:13,24 |
| 208:3 211:18 | 197:20 | 130:24 136:20 | 209:20,24 |
| 215:12 219:6 | exceeding 31:2 | 141:6,10 | 210:2,4,5,23 |
| 219:24 228:24 | excel 214:3 | 148:14,19 | 211:9 221:18 |
| 236:3 238:3 | excellent 86:2 | 149:5 154:23 | experienced |
| exactly 59:9 | exchange | 169:6,7,8 | 45:23,25 46:2 |
| 87:6 91:6 | 135:15 179:19 | 172:25 175:11 | 46:4 164:14,15 |
| 141:16 166:10 | 208:13 | 177:17 196:6,8 | 196:25 223:10 |
| 174:15 195:2 | exchanged | 199:6 205:19 | experiences |
| 203:5 205:13 | 202:1 | 205:20,22,25 | 92:9 196:17,19 |
| 209:21 210:5 | exchanges | 227:4,5,12 | 197:1 215:23 |
| examination | 135:18 | 228:8 229:7 | experiencing |
| 2:3,11 5:8 | | | 40:11 42:24 |

Case No. 1:22-cv-01616-GPG-KAS Document 40-3 filed 06/09/25 USDC Colorado pg 84 of 128

44:20 45:4,11
75:7,9,17
77:20 79:2
84:15 210:10
220:14 221:13
**expert** 52:5,15
52:23,24 90:4
191:13,20
195:14 209:12
225:12
**expertise**
233:16
**experts** 21:15
51:9 145:14
233:5
**expires** 243:15
244:18
**explain** 29:17
33:23 41:19
71:9 85:20
88:4 90:12,15
220:11 222:7
226:16 234:2
**explained**
75:24 170:16
171:6
**explaining**
115:5 201:3
**explore** 36:9
**exposed** 87:16
**exposure** 87:17
**expressed**
204:15 205:1
**extend** 241:23
241:23

**extended**
235:19 238:21
238:23
**extending**
241:15
**extensive** 92:25
**extensively**
201:8
**extent** 212:1
**extra** 149:8,24
**eye** 103:24

**f**

**face** 73:3,3
87:18 95:24,24
97:13 123:13
123:13 128:8,8
128:12,12
130:18,18,21
130:22 133:3
192:24,24
198:12,12
232:20,20
**facebook**
240:21,23
241:1,4
**faced** 89:18
**facilitate** 41:7
**facing** 221:10
**fact** 41:3 60:15
79:14 84:17
85:3 88:25
89:18,21
131:19 134:2
140:12 163:2
174:7 196:15

205:11 222:3
222:17,17,19
238:7
**fail** 6:9 224:12
**failed** 214:2
**fails** 245:19
**failure** 240:16
**fair** 122:10
208:23
**fairly** 120:2
122:1,9,10
**familiar** 181:15
**familiarize**
74:8 125:13
**family** 133:19
**far** 12:2 15:21
19:24 25:11
36:2 37:17
54:13 59:8
92:16 93:5
100:7,19
118:16 120:3
138:23 170:25
180:22 215:16
218:3
**favorite** 88:9
**fear** 60:24,24
78:9 102:4
209:5 215:20
**fearful** 61:4,6,8
**fears** 61:15
**feedback** 139:1
156:2,14
166:15 185:25
186:8 187:17

187:18
**feel** 39:11 41:13
41:13,16,20,21
41:23,25 42:5
42:17 75:25
85:20 92:6,11
93:3,11 104:16
154:8 167:17
170:18 172:19
184:18,19
188:5 222:3
**feeling** 42:14
43:8,8,9 76:22
92:21
**feelings** 40:22
79:18
**feels** 110:14
**fell** 177:10
**fellow** 163:19
**felt** 40:11 42:17
43:12,18 53:18
56:7 57:18
65:1 68:8 72:8
78:8 79:16
82:10 85:10,11
85:13,17,17
86:13,14 92:21
92:24 100:4
101:23 104:18
110:10,12
112:11 138:24
138:25 160:4
167:2 172:10
174:16 205:14
206:13 221:22

| | | | |
|---|---|---|---|
| 234:19 | **firing** 240:15 | **flags** 150:3 | 12:16 13:3,16 |
| **female** 48:19 | **firm** 4:19 | **flip** 174:10 | 14:2,13,25 |
| 48:20 | 192:11 | **flop** 174:10 | 15:24 16:3 |
| **ff** 48:3 | **first** 2:17,17 | **floyd** 44:4 | 18:22 20:1 |
| **field** 16:12 | 5:6 6:16 16:17 | 166:20 | 24:24 25:16,20 |
| **fields** 21:12 | 38:4,12 39:20 | **fluctuate** 74:4 | 30:24 31:15 |
| **fight** 85:18 | 40:4 56:14,17 | **focus** 176:23 | 32:4,10 33:3,8 |
| **figuring** 21:1 | 77:10 84:2 | 186:25 | 34:9,13 35:9 |
| 72:7 | 90:14 103:12 | **focused** 130:18 | 35:21 36:3,15 |
| **filed** 4:12 113:4 | 104:24 105:3 | **focusing** | 37:25 44:25 |
| 229:8 | 110:15 123:3 | 130:16 | 46:18 50:20 |
| **filing** 47:21 | 128:17 131:9 | **follow** 3:8,12 | 53:22 57:12 |
| 49:16 50:22,24 | 132:9,19,25 | 218:11,13,16 | 70:11 73:14 |
| **final** 238:1,1 | 133:9 135:8,10 | **followed** 88:6 | 79:12 80:14,22 |
| **finalize** 237:25 | 135:10 139:20 | **following** 9:4,7 | 95:3 96:10 |
| **finally** 96:24 | 140:13 141:15 | 9:7 14:16 | 97:24 113:10 |
| **financially** 4:22 | 143:16,17 | 16:18 23:16,20 | 113:18 114:10 |
| 124:22 | 148:14,16,19 | 24:22 31:21 | 115:1 116:1 |
| **find** 41:6 138:3 | 148:22 171:24 | 44:23 45:2 | 117:3,23 118:3 |
| **finding** 164:20 | 177:21 179:4 | 67:15 116:22 | 118:15 119:18 |
| 189:2 | 192:8,12 195:8 | 179:19 188:20 | 121:1 122:6,15 |
| **finds** 61:13 | 200:10,12 | 206:5 227:24 | 123:10 124:4 |
| **fine** 235:7 | 201:7 202:1 | 242:7 | 126:22 127:3 |
| **finish** 105:10 | 203:13 205:24 | **follows** 5:7 | 130:14 134:15 |
| 184:6 190:8 | 217:10 227:5 | **font** 141:9 | 134:22 135:1 |
| 225:7 | 233:6,10 | 148:23 | 147:15 164:1 |
| **finished** 7:21 | **firstly** 181:18 | **force** 221:6 | 165:7,14 |
| 43:2 87:23 | **five** 23:9,10 | **forced** 97:13 | 168:10 176:1 |
| 169:10 181:12 | 26:18 28:24 | 220:22,25 | 181:11 182:12 |
| **fintech** 21:13 | 34:3,6 48:16 | 221:3 | 182:20 183:3 |
| **fire** 175:2 | 164:17 180:3 | **foregoing** | 185:10 189:23 |
| **fired** 13:10 | 200:23 235:6 | 242:23 243:3 | 194:3,17 |
| 36:21,24 38:8 | 241:12 | 244:13 | 195:18 203:19 |
| 175:10 196:22 | **fix** 43:22 | **form** 8:14 9:17 | 208:8 214:13 |
| 227:20 | | 9:23 10:4 11:9 | 228:1 239:24 |

Case No. 1:22-cv-01525-PAB-KAS Document 40-13 filed 06/09/25 USDC Colorado pg 86 pg 86 of 128

| | | | |
|---|---|---|---|
| 240:10 244:12 | **freedom** 158:14 | 167:12 180:17 | 108:25 176:12 |
| **former** 54:10 | 160:23 | 208:4 211:19 | 183:25 189:8 |
| 63:20 | **freely** 160:18 | 217:23 219:7 | 233:17 |
| **forms** 220:7 | 234:20 | **geographic** | **gladly** 150:22 |
| 238:16,19 | **frequency** 39:9 | 13:14 | **glassdoor** 14:9 |
| **forth** 82:21 | **frequently** | **george** 44:4 | **global** 27:13,14 |
| 86:5 | 132:1 | 166:19 | 27:17 28:22 |
| **forty** 74:3 | **front** 35:12,14 | **getting** 39:5,6 | 30:1 35:20 |
| **forward** 45:9 | 97:20,21 | 67:1 68:6 76:6 | 36:5 72:21 |
| 57:16 58:24 | 104:11 159:14 | 76:8 79:22 | 73:18,21 |
| 82:18,22,24 | **full** 5:22 177:22 | 92:13,21 105:7 | 206:23 |
| 83:2 174:22 | **further** 34:23 | 139:1 191:6,19 | **gmail** 117:20 |
| 175:9 203:23 | 71:4 85:19 | 195:1 | **go** 4:6 5:25 6:2 |
| 207:12 214:20 | 90:15,15 112:5 | **give** 21:6 36:5 | 9:2 21:14 25:2 |
| 216:20 239:17 | 209:15,16 | 82:15 101:12 | 35:11 43:4 |
| **forwards** 54:21 | 220:12 222:6 | 104:16 123:5 | 51:7 60:10 |
| **found** 42:13 | **furthermore** | 152:9 153:3,12 | 63:10,13 65:15 |
| 148:24 214:3 | 61:11 | 158:25 177:6 | 71:13 74:6 |
| **foundational** | **future** 104:15 | 178:10 179:1,5 | 75:15 77:24 |
| 40:4 | **fw** 3:14 | 183:23 184:24 | 78:1 90:15 |
| **four** 51:4 | | 233:11 236:3,5 | 101:8,8 108:2 |
| 148:15,21 | **g** | **given** 71:16 | 108:24 112:20 |
| 164:17,22 | **g** 4:1 11:17 | 75:8 141:21 | 127:11,16 |
| 191:23 | **gain** 201:23 | 156:14,18 | 137:14 143:4 |
| **fourth** 220:2 | **gap** 88:1 | 163:1 166:14 | 145:7 154:5 |
| **frame** 42:23 | **general** 35:23 | 178:22 192:18 | 164:10 175:11 |
| 44:20 45:4 | 64:19,21 | 195:14 208:24 | 183:23 187:18 |
| 51:23,25 64:19 | 168:11 180:18 | 238:2 239:9,11 | 190:24 196:1,1 |
| 64:21 75:8 | 230:20 | 239:13 | 196:6 229:11 |
| 161:8 183:17 | **generalized** | **gives** 177:6 | 235:4 |
| 189:15 208:4 | 46:6 | 195:23 | **goals** 175:18 |
| **frames** 197:4 | **generally** 12:18 | **giving** 6:3 | **godmere** 91:7 |
| **free** 109:2 | 48:11 50:11 | 86:20 92:9 | 103:1,9 105:23 |
| 161:8 184:19 | 67:10 80:19 | 103:18,25 | 106:24 161:2 |
| | 81:17 82:3 | 104:6 108:25 | 161:16,24 |
| | 128:24 167:11 | | |

Case No. 1:22-cv-01616-GPG-KAS Document 40-3 filed 06/09/26 USDC Colorado pg 87 of 128

212:16,17
213:9 214:8,10
229:22 236:1
**goes** 160:15
**going** 4:4 5:18
7:3,19,20 15:5
27:4 30:3
38:24 44:11,15
44:19 47:6
56:9 58:22
59:4,5,6,7
66:17 68:10,11
72:6,15 75:22
78:2,11,14,17
78:18 85:4,9
85:15,16 88:14
88:19 90:9
92:25 94:5
95:15 97:16,17
98:20 104:1
105:14 112:11
112:22 114:18
128:5 137:18
141:23 145:12
145:19 154:4
154:17 157:19
160:15 171:19
175:1,6,19
184:15,15
186:6,23
191:23,25
198:24 201:6
201:14,18
206:14,17,19
210:11,20

213:18 214:6
214:23 215:5,5
217:2 223:7
232:15 235:9
237:21,24
242:5
**good** 4:3 5:10
5:11 7:16
39:10 47:4
112:21 135:19
145:5 157:16
164:21 166:13
166:16 171:6
171:13 174:18
203:12
**google** 117:20
**gotten** 188:25
**granted** 237:12
**great** 125:3
156:24 178:1
**greatly** 149:9
155:4
**grossman**
72:23 73:2,4,8
73:10,12
**grossman's**
72:25
**ground** 78:3
223:13
**group** 57:16,22
59:2 99:21
158:9,13,18,23
**groups** 158:24
166:23

**grow** 71:12
155:5
**growth** 71:5
**guess** 162:25
228:19
**guiding** 146:2

**h**

**h** 5:19 11:17
16:11 121:17
121:17 246:3
**habit** 191:4
**habits** 40:7
68:7
**hacked** 241:7
**hacker** 19:10
19:13 22:7
23:16,20,23
24:23 69:18
70:14,18,19,22
71:3,22
**hackeru** 16:7,8
16:13,17 17:5
17:9,18 18:2
19:11,16,19
20:3,7,12
22:10 23:4,24
24:11 70:19
71:15
**half** 148:16,22
**hall** 1:21 2:4
107:4,9,13
**hallevans.com**
1:23,23
**hanagee** 18:9
19:15

**hand** 238:22
**handle** 209:10
**handled** 40:1
183:2
**handling** 181:8
182:11,19,21
182:24
**handwritten**
14:19 114:8,16
115:14
**happen** 23:1
85:15 161:15
174:9,10
184:18 236:2,4
**happened**
10:17 12:6
41:3,17 42:2
63:14 66:24
67:11 69:6
83:24 84:3,18
91:24 93:1,12
97:9 115:5
134:23 143:9
159:12 166:20
173:25 174:9
184:9 191:18
198:5,7,13
210:15 211:21
214:10 227:20
**happening**
66:24,25 75:22
112:4 156:11
167:1 178:17
**happens** 93:21
160:4 194:8

Case No. 1:22-cv-01616-GPG-KAS Document 40-3 filed 06/09/26 USDC Colorado pg 88 of 128

| | | | |
|---|---|---|---|
| **happy** 106:4 | **hear** 186:9 | **high** 139:17 | **hospitalized** |
| 159:2 173:14 | 192:12 221:20 | **higher** 207:2 | 94:23 |
| 173:16,17 | 223:22 | **hire** 19:15 | **hospitalti** 94:23 |
| 174:21 175:1 | **hearing** 65:13 | 27:23 119:12 | **host** 126:12 |
| 191:12 212:11 | **heavily** 140:22 | **hired** 21:19 | **hostility** 220:6 |
| 226:17 | 140:23 144:10 | 22:2,12,16 | 220:12,20 |
| **harassing** | 145:16 146:12 | 27:19,21,24 | **hour** 73:24 |
| 43:21 | 152:20 234:21 | 28:9 29:8 | 241:19 |
| **harassment** | **heavy** 131:22 | 60:18 70:4 | **hours** 74:1 |
| 40:19 | 131:24 199:25 | 72:5 120:7 | 241:12,12 |
| **hard** 68:6 | **held** 58:19 | 125:22 126:6 | 242:25 |
| 75:21 76:18 | 85:13 89:2 | 196:23 200:10 | **house** 126:9,16 |
| 87:4 93:19,19 | 103:5 142:2 | **hiring** 72:12 | **hr** 11:20,21 |
| 114:11 144:15 | 173:24 206:22 | **hispanic** 102:2 | 64:21 78:7,19 |
| 201:10,12 | 231:23 | **history** 49:14 | 79:5 84:21 |
| 221:16 238:13 | **hello** 133:1 | **hoffman** 1:20 | 96:13 97:6,12 |
| **hardship** | **help** 21:11,11 | 4:2 157:22 | 97:17 104:5,22 |
| 221:23 | 28:6 62:25 | 199:2 | 108:10,17 |
| **hate** 84:17 | 67:3 84:6,11 | **hoffmank** 1:23 | 112:4 178:23 |
| **hawa** 107:15 | 88:1,12 138:18 | **hold** 24:21 28:7 | 189:25 190:13 |
| 107:19,23 | 138:21 140:18 | 56:2,2 204:12 | 191:2,15 192:2 |
| **head** 6:6 32:6 | 150:6,12,14 | **holding** 176:11 | 192:6,6,17 |
| 62:2 71:24 | 153:17 159:23 | 178:8 | 202:21 207:22 |
| 79:5 166:3 | 162:23 163:4 | **holiday** 103:16 | 210:13 211:6 |
| 204:2 211:17 | 163:11 167:4 | 103:18 | 211:11 213:13 |
| **headhunter** | 175:21 201:23 | **honest** 140:5 | 217:11,12 |
| 16:22 | 203:22 205:17 | **honestly** 156:8 | 218:16 224:19 |
| **headquarters** | 214:4 232:7 | 177:3 | 225:4,6 226:8 |
| 27:16 | **helped** 38:23 | **honor** 103:16 | 226:9 228:19 |
| **health** 19:23 | 40:8,10 | 104:13 | 236:9 239:6,9 |
| 29:13,15 31:17 | **helps** 173:4 | **hoodie** 238:18 | 239:12 |
| 32:18 79:21 | **hey** 66:22 89:7 | **hope** 93:16 | **huge** 79:16 |
| 94:12 | 133:17 | 104:15 | **hugo** 11:13,16 |
| **healthcare** 37:3 | **hi** 169:19 | **hoping** 86:18 | 11:18 12:4,22 |
| 37:9 74:21 | | 179:18 222:21 | 15:3 |

Case No. 1:22-cv-01129-NYW-SBP Document 40-13 filed 06/09/23 USDC Colorado pg 89 of 128

| huh 6:1,7,7 | i | impacting | 64:12 77:7 |
|---|---|---|---|
| 11:1 12:20 | | 44:12 75:22 | 78:1 82:9,13 |
| 13:23 18:9 | ian 28:11 | 84:5 | 92:5 94:2 |
| 21:8 28:20 | idea 87:14 | impacts 40:25 | 97:11,19 |
| 33:5 36:19 | 97:15 146:6 | implemented | 100:24 101:7 |
| 43:5 45:1 47:3 | 176:18 179:1 | 193:22 | 101:20 103:2,6 |
| 52:23 64:14 | 187:14 189:9 | implied 174:18 | 103:11 107:5 |
| 65:1,24 66:21 | 193:5 200:4 | important 6:19 | 107:16 108:1 |
| 67:19 68:24 | 202:15 | 156:2,3 176:10 | 109:10,21 |
| 69:21 71:6 | identified | 177:4 209:22 | 110:21 112:5 |
| 72:20 75:18 | 47:20 113:21 | 210:6 233:8 | 114:18 115:3,6 |
| 88:24 119:6 | 219:2 | imposing | 115:8 116:14 |
| 125:16 129:5,5 | identify 162:10 | 224:12 | 167:15,17 |
| 140:5 142:1 | identifying | improve | 170:15,17,21 |
| 143:22 149:6 | 145:13 | 155:23 156:18 | 170:23 171:1,2 |
| 149:23,23 | ids 154:8 | improved | 172:10,16,18 |
| 155:9 169:18 | ignoring 222:3 | 155:7 | 172:22 173:25 |
| 172:12,14 | immediate | inability | 197:12 217:25 |
| 173:23 181:25 | 43:20 69:19 | 173:23 194:23 | 220:25 222:20 |
| 192:17 229:19 | 70:1 72:22 | inaccuracies | 223:4 |
| 234:1 235:2 | immediately | 125:25 130:9 | inciting 222:2 |
| human 1:6 2:24 | 24:22 77:7 | incident 78:20 | include 175:16 |
| 4:11,12 5:2,13 | 90:13 165:5,8 | 90:4 96:11 | 176:17 185:4 |
| 5:19 94:6 | 168:4 220:3 | 103:12 105:25 | included 124:8 |
| 100:20 189:18 | impact 8:1 | 106:10,13 | 144:25 155:17 |
| 189:19,24 | 68:16 85:21 | 110:13,19 | 210:17 |
| 217:6 245:4 | 88:4 92:6 | 133:16 156:15 | includes 186:1 |
| 246:1 | 112:10 155:8 | 160:12 162:14 | including 6:3 |
| hundred 23:7 | 170:17,23 | 191:5 208:17 | 21:3 30:8 68:3 |
| hunter 1:12,15 | 172:23 177:8 | 213:13 216:20 | 118:10 137:15 |
| 5:3 245:1,2 | 197:21,21 | 230:17 | 207:21 236:23 |
| hurdle 159:14 | 237:4 | incidents 55:2 | inclusion 42:1 |
| hysterically | impacted 40:22 | 55:22 56:7 | 93:10 104:8 |
| 221:22 223:9 | 66:14,17,20 | 60:1,11 61:9 | 232:10 |
| | 67:17,21,24 | 61:14 64:5,5,8 | |
| | 93:1 | | |

Case No. 1:22-cv-01151-PAB-KAS Document 40-3 filed 06/02/25 USDC Colorado pg 90 of 128

| | | | |
|---|---|---|---|
| **inclusive** 232:8 | 107:6 109:11 | 205:6 232:24 | 103:3 123:12 |
| **income** 9:14 | 112:3 121:14 | **initially** 38:22 | 127:24 128:7 |
| 25:14 36:23,25 | 206:11,12 | 39:8 190:14,20 | 128:11,19 |
| **inconsistencies** | 212:22 215:11 | 192:3 236:19 | 129:9,25 130:6 |
| 20:21 | **industry** 19:2 | 237:15 239:13 | 130:13,15 |
| **incorporate** | **inflexible** | **initiatives** 42:1 | 131:3,11,15 |
| 193:20 | 224:13 | 78:25 93:9 | 134:6 135:4,7 |
| **incorrectly** | **influence** | **input** 62:24 | 135:11,25 |
| 189:16 | 110:18 | 141:4 187:3,5 | 136:18,22 |
| **increase** 34:18 | **information** | **ins** 159:9,12 | 137:1,4,7,7,9,9 |
| 35:3 131:7 | 21:9,16 31:13 | 163:17 | 137:11,12,19 |
| **increased** | 51:19 54:24 | **inside** 93:12 | 137:23 138:1,9 |
| 220:7,13 | 61:18 62:4 | **instagram** | 139:5 140:3,10 |
| **increases** 34:16 | 64:2 66:7 67:8 | 240:22 | 140:14 142:3 |
| 34:23 35:1 | 67:14 80:13,15 | **instance** 14:20 | 145:4 147:6,9 |
| **increasingly** | 80:20,23 95:10 | 15:2 73:5 | 154:9 155:3,13 |
| 231:18 234:3 | 97:11 102:15 | **instances** 96:5 | 159:5,15 161:5 |
| **incurred** 94:16 | 159:24 176:10 | 96:8 98:13 | 161:17,19,23 |
| **indicates** | 178:7,13 179:3 | 99:5,20 102:18 | 161:25 162:3 |
| 143:17 145:22 | 179:5,7 191:16 | 103:8 105:22 | 162:10,13 |
| 146:2 | 191:20,21 | 109:20 111:3 | 163:3,14,19 |
| **individual** 28:9 | 193:9 195:14 | 111:13,24 | 168:25 170:20 |
| 31:7 57:24 | 195:24 197:14 | **institutional** | 190:22 197:22 |
| 112:5 131:20 | 214:1 219:3 | 155:5 | 198:17 209:12 |
| 131:20 143:14 | 225:8,10 | **instruct** 7:12 | 225:25 226:4 |
| 145:20 146:1 | 233:11,15,18 | **instructed** | 230:7,15 |
| 146:14 213:2 | 237:3 | 152:24 | 237:17 |
| **individuals** | **informed** 12:9 | **instructional** | **insurance** |
| 21:11 22:6,15 | 55:1,10,21 | 3:3,6 10:8,10 | 19:23 31:18 |
| 47:14,20 51:4 | 56:12 233:12 | 10:18,25 11:25 | **intend** 35:19 |
| 53:7,8,18,20 | **informing** | 15:14,15 17:14 | 113:16 |
| 54:1 55:14 | 58:21 | 17:19,20,21,22 | **intends** 30:4 |
| 56:11 57:15 | **initial** 2:16 | 21:8 27:20,21 | **intense** 40:20 |
| 91:18 100:11 | 83:7 87:2 | 27:23,24 71:11 | 42:15,24 43:5 |
| 100:15,20 | 91:23 192:3 | 71:12 96:15 | 44:7,21 45:12 |

Case No. 1:22-cv-01525-PAB-KAS Document 40-13 filed 06/09/26 USDC Colorado pg 91 of 128

45:14 79:20
90:10 96:21
112:7
**intensity** 43:6
45:8,18,20,22
**intent** 157:9,12
171:9 174:1
**intention** 89:8
**intentionally**
69:7
**intentions**
171:5,7,14
**interact** 54:15
98:4 120:25
178:10 232:5
**interacted**
132:1,9,25
133:5,9 200:6
**interacting**
132:19 135:9
**interaction**
83:23 122:9
148:5 179:9
**interactions**
53:9,14 114:8
114:20,25
116:11 117:5
122:8,12
131:15,25
132:21,22
134:21,25
135:21 138:21
146:24 147:11
147:22,22
161:13 199:20

200:6 231:18
234:3
**interest** 204:16
**interested** 4:22
14:24 125:4
204:8 244:17
**interference**
152:25
**internal** 139:24
232:17
**interpret**
151:16
**interrogatory**
69:12 74:6
94:9,25 96:3
98:11 99:4
**interrupting**
7:16
**intervened**
221:19
**interview** 12:4
12:7 20:20
21:15 24:19,20
25:1
**interviewed**
12:12
**interviews**
10:21 11:8,12
**introduced**
200:11
**investigations**
139:24 232:17
**invitation** 97:8
187:23 217:9

**invite** 187:11
187:20 241:18
**invited** 96:15
96:16 184:2,13
187:6,22
**involve** 177:7
**involved** 22:18
58:2 144:17,19
145:5,11,17
146:13 148:1
152:20 158:10
178:20 210:12
210:13,14,18
**involvement**
159:4 178:11
217:11
**iphone** 50:1,7
**isd** 3:12 101:16
131:18,23
160:19 162:12
167:18 183:21
183:22 184:23
185:1 193:8,10
194:2 213:15
231:24 233:10
236:7 239:3
**isolated** 160:14
**isolation** 44:7
186:24 197:13
**issue** 22:24
75:20 84:9
89:6 156:19
181:7 182:10
182:18,24

**issued** 115:20
115:22
**issues** 59:4
70:10 73:12
78:15 79:1
84:2 87:10,14
87:18,20 88:20
88:21,23,24
89:17 90:10,11
90:16 119:17
129:16 156:25
168:6 197:10
197:21 201:20
201:20 202:8,9
205:14,17
206:21 217:10
**issuing** 148:10

**j**

**jackson** 78:20
84:21 91:5
96:13,23 97:5
97:20 196:20
196:20,23
197:2,8,11
198:14 212:16
213:3,6,7,14
217:9,14,16,17
218:1,3,12
**jackson's**
197:24
**james** 3:14
**january** 130:24
**jeanne** 45:9
57:7 58:21,23
60:7 61:9

Case No. 1:22-cv-01925-PAB-KAS Document 40-3 filed 06/09/25 USDC Colorado pg 92 of 128

| | | | |
|---|---|---|---|
| 64:22 75:13,18 | 124:25 164:4,6 | 60:24 61:2 | 211:12 |
| 76:4 77:4 78:7 | **job** 2:22 3:2,2,5 | **jodee** 52:13,14 | **k** |
| 84:20 86:5 | 3:5 7:16 10:22 | **jog** 114:24 | **k** 1:20 16:11 |
| 91:5,24,25 | 13:15,24 14:4 | **johnny** 75:13 | 20:4 29:16,17 |
| 96:12,22 97:5 | 14:6,10,12,17 | 77:19,21,22 | 32:20 |
| 97:10,20 98:17 | 15:3,4,5,13 | 78:4,16,22 | **katherine** 1:20 |
| 101:1,9,11,12 | 16:2,12,17,22 | 81:6,19 84:22 | **keep** 23:2 35:19 |
| 101:21,22,25 | 17:5,7,13 | 219:10 | 79:13 84:18,18 |
| 102:3 108:9 | 18:20,23 20:20 | **johnny's** 81:3 | 93:24 97:15 |
| 116:12 117:10 | 29:21 36:5 | **joining** 210:22 | 103:19 149:24 |
| 140:15,16,20 | 41:7 51:20,20 | **joke** 221:23 | 154:16 156:25 |
| 144:10 145:4,8 | 60:20 61:7 | **joked** 166:15 | 179:3 186:5 |
| 145:13,15 | 69:18 72:5,13 | **journal** 114:3 | 220:24 237:7 |
| 146:10,12 | 72:21 75:21 | **juan** 100:18 | **keeping** 149:8 |
| 149:14 150:25 | 84:14 85:1 | 102:17,20 | **keeps** 66:24 |
| 151:3 153:19 | 86:1 89:14 | 215:13 216:8 | 76:8 |
| 162:23 163:10 | 92:13 98:7 | **july** 127:25 | **kendra** 1:20 |
| 165:10 166:12 | 102:4 124:21 | 189:3,11 | 5:1,12 |
| 166:18,22 | 125:17,20 | **jump** 150:5 | **kept** 38:25 82:6 |
| 167:16 172:4,5 | 126:13 129:25 | **june** 76:19 | 85:3 86:17 |
| 174:11,13,15 | 130:4,9,12 | 103:15 127:20 | 191:2,3 213:17 |
| 186:18 191:11 | 136:21,24 | 153:22 165:10 | 213:20 217:2 |
| 200:9,10 206:8 | 137:6 138:23 | 165:15,16,18 | 233:1 |
| 206:18 207:13 | 139:5,8,11,12 | 169:13,23 | **keren** 228:20 |
| 207:22 210:14 | 140:11 154:11 | 172:13 173:9 | **kevin** 100:18 |
| 211:14 213:14 | 160:2 162:23 | 179:19 181:14 | 109:9 |
| 213:17 215:22 | 174:24,25 | 182:1 183:5 | **key** 137:20 |
| 216:6 220:3 | 177:9 179:16 | 207:8 211:20 | 159:6 189:15 |
| 221:5 234:24 | 191:22 197:19 | 244:18 | **kid** 102:2 |
| 234:25 235:2 | 202:11,16 | **juneteenth** | **kim** 4:19 |
| **jeanne's** 141:1 | 208:23 232:10 | 103:13,18,25 | 128:19 129:10 |
| 144:14,17 | **jobs** 10:1,3 | 104:6,16 106:7 | 164:4,13 |
| 215:19 | 12:19,25 14:20 | **jury** 3:18 | 196:22 |
| **jen** 119:8 | 14:23 15:8,17 | **justice** 208:20 | **kimberly** 2:7 |
| 122:10 123:7 | 24:12,15,16 | 208:23 209:2 | 244:4,20 |

Case No. 1:22-cv-01525-PAB-KAS Document 40-3 filed 06/09/25 USDC Colorado pg 93 of 128

| | | | |
|---|---|---|---|
| **kind** 6:20 36:2 | 107:12,22 | 215:12 224:5 | **lacor** 52:22 |
| 46:13 49:25 | 108:16 109:6 | 225:16,21 | **lacorazza** |
| 50:6 93:8 | 109:16 111:9 | 234:10 236:13 | 52:22 53:5 |
| 105:16 110:17 | 112:2,16 | 236:16 237:19 | **lacorazza's** |
| 134:19 148:23 | 113:21 115:7 | 237:20 238:11 | 53:2 |
| 154:3 158:11 | 115:11 119:15 | 238:17 241:8 | **lafayette** 1:13 |
| 172:23 174:19 | 121:5 122:7,20 | **knowledge** | 1:17 |
| 184:7 207:1 | 122:20,21 | 46:8 53:8 63:8 | **lang** 128:19,22 |
| 222:7 | 123:4,6,8 | 63:16 64:7 | 129:6,10,17,19 |
| **knew** 142:15 | 128:24 129:6 | 74:24 98:25 | 165:2 196:22 |
| **know** 7:19 8:4 | 129:11,14 | 99:13,25 | **lang's** 129:14 |
| 13:9 22:15,25 | 131:18 133:18 | 102:22,25 | 129:22 |
| 23:8 27:15 | 136:19 140:12 | 107:9,19 109:3 | **laptop** 115:20 |
| 28:14,21,24 | 140:19,24,25 | 109:13 111:6 | 116:20,24 |
| 29:2,5 35:2 | 141:3,5,7 | 111:16,19 | **large** 28:21 |
| 37:1 40:11 | 142:13 146:23 | 112:13 128:3,4 | 122:23 |
| 41:11 45:8 | 146:25 148:23 | 136:16 155:5 | **late** 9:10 19:6 |
| 46:9,10,12,13 | 148:24 149:12 | 155:15 158:15 | 194:22 |
| 46:14 47:16 | 155:25 157:12 | 240:4 | **launch** 126:8 |
| 48:21 53:13,23 | 157:14,15 | **knows** 78:2 | 137:16,17 |
| 57:19 58:17,22 | 161:16,19,24 | 110:25 186:16 | 138:15,16 |
| 59:6,25 60:5,7 | 162:1,2,13,19 | | 150:4 191:7,25 |
| 61:24 63:12,14 | 162:24 163:3 | **l** | 193:1,1,3 |
| 63:22 64:15 | 164:16 166:25 | **l.l.c.** 1:21 2:5 | 194:6 |
| 69:6,12 70:18 | 171:13 172:18 | **labeled** 169:17 | **launched** |
| 72:8,10,15 | 172:22 177:14 | **lacey** 107:25 | 139:21 150:19 |
| 73:1 75:2 | 178:22 179:11 | 108:15 109:3 | 192:19 |
| 78:23,23 80:12 | 179:13 183:6 | 145:8 151:7 | **launches** 54:20 |
| 80:20 82:5 | 184:13,14 | 191:11 | **launching** |
| 84:25 87:6 | 194:4,5,5 | **lack** 42:16 | 130:20 |
| 89:7 91:18,23 | 195:21 197:18 | 43:14 62:17 | **law** 1:13 |
| 98:21 99:3,16 | 198:8 200:1 | 72:1,17 148:5 | 175:14 176:8 |
| 99:18 100:7,8 | 204:14 205:21 | 204:15 | 191:16 |
| 100:10 102:10 | 207:1,6 209:2 | **lacked** 156:15 | **laws** 191:15 |
| 105:21 107:1 | 210:11 211:2 | **lacking** 42:19 | |
| | | 156:9 239:15 | |

Case No. 1:22-cv-01426-PAB-KAS Document 40-3 filed 06/09/26 USDC Colorado pg 94 of 128

| | | | |
|---|---|---|---|
| **lawsuit** 5:13 8:8 35:17 36:1 36:11 46:23 47:21 49:16 50:15,23,25 53:21 93:25 94:12 95:2,4,5 95:13 113:20 115:25 116:6 240:5 | **learned** 220:4 **learner's** 17:16 **learning** 15:18 54:14 119:4,10 122:17 123:11 123:15,17 125:5,8,18,22 126:4,6,7,9,10 126:18 128:7 128:11 129:9 130:16,17,21 | **lessig** 51:8 **lessons** 191:21 **letter** 2:19 3:1 3:4 20:6 29:20 62:6,10,16,20 62:24,25 63:2 63:5,9,15 115:7 118:25 118:25 119:3,7 127:20,23 128:17 130:24 | **linkedin** 17:3 240:25 **links** 88:7 **list** 47:14,16 69:15 91:20 138:11 **listed** 51:4 54:1 100:16 148:15 148:21 215:13 225:22 236:23 |
| **lawyer** 191:14 **lax** 235:19 **lead** 16:2 154:9 168:7 171:20 173:21 175:5 175:10 190:15 191:12,19 208:21 239:16 | 138:6 139:21 139:25 140:2 162:11,15,16 162:20 163:4,4 171:20 178:23 191:17,17,21 198:12,15,18 199:16 230:25 232:17 | 131:2,9,10 205:12 227:13 227:16,18 228:3,12 **level** 71:13 164:15 178:17 207:2 **lewis** 109:9,13 | **listen** 66:22 **literally** 112:10 143:6 190:24 209:5 223:13 233:9 **little** 22:18 141:8 179:1 188:13 220:11 **live** 44:16 |
| **leader** 104:7 192:3 **leadership** 55:19 56:1 84:25 101:4 102:6 128:6 151:13 152:12 152:17,23 154:14 156:9 205:13 211:5,6 | **leave** 76:10,15 80:3 161:14 204:4 **lebsack** 1:16 **led** 16:4 43:14 57:13 174:20 183:19 **left** 40:23 43:7 | **liberty** 109:1 178:10 **life** 65:22,23,24 79:22 **light** 214:1 **likely** 225:23 **limit** 15:13 138:15 **limitations** | 171:7 **lived** 87:10 **lives** 103:21 **living** 44:7 145:20 146:2 **liz** 97:5,20 191:11 196:20 196:20,23 197:2 198:8 |
| **leading** 139:24 147:6 **leads** 16:2 **lear** 162:10 **learn** 125:2 138:19 | 70:2 71:4,22 135:16 215:22 **legal** 4:18,20 191:15 195:6 196:1 245:23 **lesser** 45:20 | 13:14 **limited** 105:13 **line** 246:4,7,10 246:13,16,19 **lines** 33:12 **link** 201:15 | **llc** 1:13,16 **lms** 54:13 **locate** 32:12 **located** 27:14 **location** 4:15 **long** 69:7 75:14 83:18,22,23 |

Case No. 1:22-cv-01525-PGG-KAS Document 40-3 Filed 06/09/26 USDC Colorado pg 95 of 128

85:5 86:22 87:20 88:20 90:12 114:12 115:5 159:8,9 161:4,16,24 162:2 197:7 198:9 199:13 199:15,20 200:16 202:13 202:23 203:2,9 203:17,25 204:5,8,17 205:9,12,17

**long's** 87:2

**longer** 23:24 105:18 204:8 233:13

**look** 8:22 14:3 15:17 17:13 19:4 32:15,17 32:18 36:1 53:24 68:20 94:2,9 96:3 98:10 118:18 125:12 126:19 129:24 130:3 130:23 136:20 141:6,7 154:23 169:6 177:17 184:6,10 195:13 205:19 205:24 227:4 228:8 231:3,15 235:3

**looked** 13:25 14:6 15:18

**looking** 12:25 13:6,17,21 14:21 15:3 24:12,13,15,16 26:19,22,24 47:11 55:13 84:17 86:20 94:25 99:4 143:13 149:1 169:10,16 172:25 175:14 176:15 177:21 182:3 227:5 235:16

**lookout** 85:14

**looks** 15:4 124:1

**lose** 49:25 61:2 61:7

**losing** 60:24 102:4

**lost** 9:3 30:4 49:22 50:2 118:10

**lot** 20:21,22 22:1,4 23:1 40:21,21,22 42:20,25 43:7 54:21 68:6 72:6 87:16 103:23 115:3 125:2 131:21 131:22 132:20

141:22 146:23 147:11,21 161:12 166:15 182:16 213:24

**lots** 78:25

**lou** 179:8 195:23 225:14

**louis** 51:8,9,13 51:14,17 52:20 53:12 179:8,8 190:16,16 191:12 225:14 225:18

**low** 55:24 57:7 57:12 192:22

**lowrey** 1:16,18

**lunch** 112:21 112:25

**lying** 163:6

**m**

**m** 5:19 121:17

**mad** 168:14 173:12

**made** 92:6 93:3 106:18 128:9 148:16,22 149:3 167:17 170:18 175:13 177:23,24 187:5 207:6 212:22 213:4 214:7,10,17 215:2 216:22 224:11 243:7,8

**mahmoud** 95:8

**mahmoud's** 95:9

**maintain** 86:2 114:2,5 115:17

**maintained** 114:7 117:13

**major** 237:11

**majority** 134:24

**make** 8:12,19 43:22 85:20 87:13 92:10,10 103:20 105:8 114:24 120:4 124:14,14 128:6 133:14 140:17 145:9 150:6 152:4 153:6,9 158:3 159:25 165:23 166:1 167:5 179:11 185:16 189:25 193:15 210:22 214:1 232:7,19

**makes** 190:2 210:23 222:2

**making** 17:14 105:21 124:23 126:13 137:20 187:1 221:23 224:5

**maldonado** 3:16

Case No. 1:22-cv-01525-RBG-KAS Document 40-3 filed 06/09/26 USDC Colorado pg 96 of 128

| | | | |
|---|---|---|---|
| **male** 48:18 | 221:8 | 157:24 235:10 | 88:2 93:17 |
| **males** 186:4 | **manager's** | 235:13 242:6 | **meant** 171:4 |
| **man** 121:19 | 143:21 144:4 | **matching** 29:18 | **media** 4:8 84:1 |
| **manage** 83:13 | 144:13 145:22 | 32:20,23 33:7 | 112:23 113:2 |
| 85:23 158:24 | 146:3,16 | 33:12 | 157:20,25 |
| **management** | 159:17 181:19 | **material** 242:1 | 191:22 235:5 |
| 1:6 2:24 4:11 | 197:18 207:7 | **materials** | 235:10,14 |
| 4:12 5:2,13,19 | **managerial** | 178:25 | 240:19 241:6 |
| 15:18 54:14 | 55:19,25 57:7 | **matter** 4:10 | 242:6 |
| 108:15 110:11 | 57:13 78:23 | 21:15 51:9 | **mediate** 205:18 |
| 119:24 158:7 | 83:9 139:14 | 52:5,14,24 | **mediation** |
| 158:15,18 | 147:11,22 | 86:14 103:21 | 83:24 84:1 |
| 159:1,7 160:17 | 154:7 161:12 | 113:17,19 | 199:13,22 |
| 164:2 165:6 | 193:7 207:2 | 145:14 191:13 | 200:13,15,25 |
| 177:23 178:4 | 218:24 | 191:20 195:14 | 201:2 202:19 |
| 178:18 192:18 | **managers** | 205:11 225:12 | 203:2 204:9,14 |
| 192:19 193:15 | 59:17 86:11 | 233:5 | 204:20,25 |
| 194:8,10 245:4 | 163:25 164:5 | **matters** 244:9 | 205:2,7,15 |
| 246:1 | 164:16 170:22 | **mean** 17:7 36:6 | 210:13 |
| **manager** 15:20 | 173:3 186:4 | 39:18 56:25 | **mediations** |
| 58:22 59:9,22 | 196:18,19 | 105:12 133:3 | 204:11 205:10 |
| 60:18 61:15 | 221:8,10 | 134:8 151:17 | **medical** 94:11 |
| 78:15 79:2 | **managing** | 153:5 157:9 | 94:16 |
| 85:23 88:25 | 137:15 158:8 | 162:7 173:17 | **medication** |
| 89:16 98:20 | 158:12 161:18 | 182:22,24 | 7:25 46:15 |
| 119:10 121:2,5 | 161:22 | 190:12 195:22 | 75:4 94:23 |
| 125:1 128:19 | **mark** 34:3,6 | 196:11 213:24 | **medicine** 46:12 |
| 131:11 140:14 | **marked** 68:19 | 218:10 223:13 | **meet** 22:11 |
| 140:19 143:6 | 199:6 242:21 | **meaning** 21:20 | 149:9,16,20,25 |
| 143:25 144:2,5 | **market** 139:18 | 62:25 144:24 | 150:4,14 |
| 147:1 154:17 | 139:20 | 160:14 191:19 | 176:12 184:24 |
| 154:19 159:13 | **marketing** | **meanings** | 187:16 201:5 |
| 161:21,22 | 21:12 | 201:20 | **meeting** 57:8 |
| 165:1 196:21 | **marks** 112:23 | **means** 39:18 | 58:18 78:8 |
| 198:2,2 214:2 | 113:1 157:20 | 46:12 62:12 | 85:11 92:1,3 |

| | | | |
|---|---|---|---|
| 96:12,15,17,18 | 223:1,11,16 | **mental** 90:8 | **messages** 49:10 |
| 96:21 97:4,8,9 | 228:11,13,14 | **mention** 58:14 | 49:13,15,18,22 |
| 97:10,12,21 | 228:16 230:17 | 61:8,20 71:19 | 49:24 82:15 |
| 99:10 101:15 | 231:12,23 | 172:6 178:6 | 101:10 102:5 |
| 101:20,21 | 232:2 233:15 | 207:22 | 118:5,9 152:3 |
| 103:14 104:19 | **meetings** 43:11 | **mentioned** 24:6 | 153:1 237:19 |
| 106:6,15,16,16 | 53:15 56:5 | 45:5 59:11 | **met** 73:2 75:19 |
| 106:17,18 | 64:24 77:2 | 60:25 65:4 | 101:22 106:8 |
| 108:8 143:2,9 | 78:6 91:14 | 68:2 71:16,25 | 137:21 139:14 |
| 150:6 151:19 | 97:23 101:6 | 76:4 77:4 | 202:25 226:24 |
| 153:6,15 | 103:4,5 108:4 | 82:18 88:24 | 233:3 |
| 159:19 163:5 | 108:7,8,23 | 92:23 93:6 | **method** 49:4 |
| 167:16 168:11 | 112:4,6,9,12 | 97:3 106:17 | 95:21,23 |
| 168:12,22 | 124:25 140:25 | 124:16 138:8 | **microaggress...** |
| 170:10,11 | 143:4 152:4 | 144:9 159:2 | 238:19 |
| 172:4 174:11 | 153:7 159:23 | 161:10 167:15 | **microcredent...** |
| 181:9,23 182:1 | 175:19 176:2 | 172:9 178:6 | 232:21 |
| 182:11,13,15 | 179:20,23,24 | 197:20 216:23 | **micromanaged** |
| 182:18,19,21 | 180:6,15,20 | 217:1 230:23 | 160:11 |
| 182:23,25 | 181:5 182:16 | 232:16 236:21 | **micromanage...** |
| 183:2,5,7,14,15 | 188:12,14,15 | 236:25 237:5 | 160:7 |
| 183:20,22 | 197:14 211:21 | 241:14 | **micromanagi...** |
| 184:1,12,14,16 | 211:22 231:7 | **mentioning** | 158:9 159:1,3 |
| 184:18,20,24 | 233:1 234:5 | 79:14 112:8 | 160:3,13 161:6 |
| 185:19 186:12 | **member** 103:3 | 167:14 | 161:15 165:3 |
| 186:15 187:1,7 | **members** 86:12 | **mercy** 160:1 | **microsoft** 28:7 |
| 187:12,13,14 | 98:15,23 | **merged** 129:10 | **middleman** |
| 187:14,21,22 | 131:23 136:11 | **merging** | 160:21 |
| 187:23 188:1,7 | 166:23 183:22 | 198:11 | **mike** 78:20 |
| 188:11,20 | 188:12 202:9 | **message** 49:23 | 84:21 91:5 |
| 201:9 213:14 | 231:24 | 58:20 101:23 | 96:13,23 |
| 216:22 217:8 | **memo** 3:16 | 104:20,24 | 212:16 213:3 |
| 220:21,24 | **memories** 94:2 | 117:21 118:1,4 | 213:14,16 |
| 221:2,4 222:5 | **memory** 114:24 | 153:3 167:4 | 217:9,14,16,17 |
| 222:10,16 | | 174:19 | 218:12 221:19 |

Case No. 1:22-cv-01626-PAB-KAS Document 40-3 filed 06/09/25 USDC Colorado pg 98 of 128

**milestones**
137:20 159:6
177:12
**mill** 91:6 161:2
161:2 212:17
214:16,23
215:1
**million** 85:18
**mills** 91:5
109:19 161:3
162:2 229:22
236:1
**mind** 97:15
103:19 165:18
179:3 220:24
237:7
**mindful** 108:3
**mine** 215:24
232:15
**minh** 121:15,19
121:22,25
123:7
**minimum**
41:12 192:25
193:2
**minorities**
55:17 209:7
**minority** 55:18
57:16 158:9,13
158:18,23,24
166:23
**minute** 141:7
161:8
**minutes** 235:6
241:12,19

242:25
**miscommuni...**
213:25
**misinterpreta...**
92:19
**misinterpreted**
89:9
**misremember...**
69:6
**missed** 163:5
236:14,16
**missing** 49:14
191:2 229:1
**mission** 126:15
145:21
**misunderstan...**
39:17 89:10,13
**misunderstood**
171:4
**mitigated** 9:9
**modalities**
232:23,25
**modality**
130:20
**model** 146:3,8
**mohamed** 1:3,9
2:3,19,21 3:1,4
3:8,10,12,16
4:9,10 5:4,5,10
5:24 35:13
47:11 68:20
87:23 112:24
113:2,4 135:4
157:25 158:2
195:20 199:5

222:23 227:5
229:15 231:4,6
231:19 235:14
235:16 241:15
243:1,10 245:4
245:5 246:1,2
246:24
**mohamed's**
241:21
**mold** 191:16
**moment** 10:6
11:4 12:13,17
14:9 56:20
68:20 74:8
115:12 127:17
149:4 169:7
205:20 222:12
230:4 231:2
**moments**
125:13
**month** 9:15,25
14:15 38:8
202:11,17
**months** 9:9
159:8 194:21
**morning** 4:3
5:10,11 135:16
135:19 169:20
**morris** 45:9
57:8 58:6,21
58:23 60:4,7
61:17 65:12
75:13,16,18
76:4,9,17,20,22
76:24 77:4

91:5 96:12
98:17 102:8
108:9 116:12
140:15,20
144:10,19
146:7 153:19
165:10,23
166:7,11 167:8
167:16,21
168:3,7,18
169:1,4 206:8
207:5,13,14,18
211:15 212:3
212:13 220:1
224:9 225:2
227:7 233:23
234:24
**mouthing**
110:7
**move** 10:20
19:2 27:22
60:16 120:12
124:22 137:11
203:22 239:17
**moving** 23:25
159:25
**multiple** 39:20
48:9,10 60:8
72:5 75:19
81:15,16 88:7
90:22,24
206:20 211:21
235:21 237:18
**murder** 44:4
166:19

Case No. 1:22-cv-01032-PAB-SKC Document 40-3 filed 06/09/06/24 USDC Colorado pg 99 pg 99 of 128

| | | | |
|---|---|---|---|
| **murdle** 44:3 | **need** 6:7 7:2,4 | 197:1 | **nonwhite** |
| **n** | 7:10,15 22:13 | **never** 86:14 | 229:23 |
| **n** 1:20 2:10 4:1 | 22:17 39:12 | 156:18 164:14 | **nope** 50:16 |
| 28:11 121:17 | 40:5 43:8 | 193:24,25 | **norm** 159:12 |
| **name** 4:17 5:12 | 58:21 77:7 | 210:16 213:8 | **normal** 105:4 |
| 5:22 11:13,15 | 85:3 87:6 | 223:3 | **norms** 231:25 |
| 18:10 28:11,12 | 106:19,20 | **new** 136:11 | 232:3 |
| 28:17 37:15,17 | 108:2 153:17 | 138:10 147:1 | **north** 1:13,17 |
| 37:18,20 56:17 | 156:9,16 | 164:19 165:1 | **notable** 148:15 |
| 62:7 64:18 | 159:19,21,22 | 208:19 235:5 | 148:21,25 |
| 75:14 91:6 | 160:2 162:20 | **niceties** 135:15 | 151:8 |
| 95:7 133:17 | 168:4 195:6,24 | **nick** 62:6,10 | **notary** 2:8 |
| 161:3 190:17 | 210:5,21 | 63:3 101:1,3,9 | 243:18 244:5 |
| 191:22 198:4 | 213:22 215:7 | 101:11,15 | 244:21 |
| 212:17 225:15 | 221:14,17,17 | 102:5 109:22 | **note** 130:9 |
| 225:22 236:11 | 221:20 224:14 | 110:19 117:10 | 149:7,12 151:9 |
| **names** 11:2 | 232:3 234:14 | 184:2,12 | 245:10 |
| 26:3 55:6,8,13 | 235:4 237:21 | 186:18 187:6,9 | **notes** 14:20 |
| 56:10 100:12 | 237:25 242:1,9 | 187:11 206:7 | 114:7,16 |
| 152:7 153:13 | **needed** 39:25 | 206:19 208:18 | 115:14 244:14 |
| 212:19,20 | 39:25 40:6 | 209:3 210:4,17 | **notice** 2:1 |
| 225:17 | 67:1,3 83:11 | 210:20 214:24 | 23:22,25 |
| **naming** 145:11 | 83:12 110:10 | 220:18 | 125:25 188:13 |
| **narrative** | 138:18,18,20 | **nicole** 100:19 | **noticed** 89:7 |
| 105:14 241:22 | 164:7 187:2 | 107:4 | **noticing** 4:25 |
| **nationally** | 191:8 195:15 | **nicole's** 193:7 | **notification** |
| 13:18,22 26:24 | 216:23 225:8 | **niece** 133:19 | 10:19 26:11 |
| **nature** 51:21 | 233:12 237:3 | **nit** 156:7 | **notified** 127:23 |
| 54:17 | **needs** 17:16 | **nod** 6:6 | 131:2 228:21 |
| **nearly** 191:8 | 62:12,17 160:4 | **nodded** 32:6 | 228:22 |
| **necessarily** | 163:3 209:21 | 71:24 166:3 | **notion** 241:14 |
| 105:1 | 211:10 215:6 | 204:2 211:17 | **november** 9:11 |
| **necessary** 32:7 | 218:25 | **non** 229:16 | 19:6 |
| 32:11 94:24 | **negative** 40:11 | 230:6 | **number** 1:2 |
| 153:15 | 40:21,22 89:25 | | 10:5 47:14 |

Case No. 2:23-cv-01625-SPG-KAS Document 40-13 Filed 08/09/25 DC USDC Colorado pg 100 of 128
pg 100 of 128

| | | | |
|---|---|---|---|
| 123:4 132:3 | 134:22 135:1 | **obtain** 66:3 | **offered** 119:4 |
| 151:2 215:12 | 147:15 164:1 | **occasion** 48:9 | 230:2 |
| 225:22 | 165:7,14 | 54:15 | **offering** 17:12 |
| **numbers** 62:13 | 168:10 175:24 | **occasions** 48:9 | **offers** 24:18 |

**o**

**o** 4:1 11:17
**oath** 243:4
**oaths** 244:6
**obi** 237:16
**object** 7:9 8:14
9:17,23 10:4
11:9 12:16
13:3,16 14:2
14:13,25 15:24
16:3 18:22
20:1 24:24
25:16,20 30:24
31:15 32:4,10
33:3,8 34:9,13
35:9,21 36:3
36:15 37:25
44:25 46:18
50:20 53:22
70:11 73:14
79:12 80:14,22
95:3 96:10
113:10,18
114:10 115:1
116:1 117:3,23
118:3,15
119:18 121:1
122:6,15
123:10 124:4
126:22 127:3
130:14 134:15

176:1,3,14
181:11 182:12
182:20 183:3
185:8,10
189:23 194:3
194:17 195:18
203:19 208:8
214:13 228:1
239:24 240:10
241:17
**objection** 7:11
8:20 13:19
25:23 33:14
113:25 116:7
147:20 168:20
181:16 240:14
**objective**
230:25
**objectives**
145:21 162:11
162:15,16,20
163:4 191:21
**observe** 51:23
121:21,23
122:5 160:7
163:12,21
173:20 230:11
**observed** 53:13
122:7 163:20
229:15

48:10,11,14,15
48:16 57:17
75:19
**occupation**
161:9
**occupied** 147:2
161:10
**occur** 49:3
68:13 77:11,13
81:23 91:8,12
91:13 95:20
142:22 180:10
180:11 182:1
200:7 202:23
202:24 211:22
228:14
**occurred** 76:17
81:18 170:2
182:8 183:5
200:25 208:7
217:19,21
223:16 234:23
**odd** 217:2
**offend** 87:8
**offended** 6:10
**offer** 2:19
16:18 17:5
20:6 29:20
62:24 79:24
118:25,25
119:3,7 150:9

27:1
**office** 18:4
110:8,9 132:12
133:8 134:8,9
135:12,12
184:15 200:8
**officer** 206:23
244:1
**offices** 2:4
**official** 46:13
**oh** 65:22 71:2
156:7 171:3
200:4 211:2
237:24
**okay** 7:23
11:23 14:17
15:3,8 21:4
23:15 46:15
47:18 58:12,14
58:18 60:9
69:15 72:19
74:10 81:8
94:8,9 106:1,3
118:12 122:4
125:16 127:19
130:23 141:11
141:25 145:19
148:20 154:23
174:14 177:17
181:4 192:5
196:14 205:23

Case No. 1:23-cv-01625-SKC-KAS Document 40-13 filed 08/04/25 USDC Colorado pg 101 of 128

| | | | |
|---|---|---|---|
| 205:24 206:1,4 207:1 208:17 219:23,25 225:20 227:4 231:3 233:25 235:1 238:12 242:3,4 | **operations** 3:12 **opinion** 122:2,8 187:3 209:12 216:23 217:3 **opportunities** 154:24 231:7 **opportunity** 2:25 10:7 | **outcome** 4:22 41:3 244:17 **outcomes** 101:14 220:17 **outlet** 44:6 **outline** 205:16 **outlining** 205:13 | **p** |
| **old** 124:13 **older** 236:22 **onboarding** 34:10 | 122:4 127:12 156:6 163:12 170:12 **option** 17:1 | **outs** 72:16 **outside** 19:2 51:15 52:7 60:19 126:11 | **p** 4:1 **p.m.** 242:24 **pace** 149:9,25 159:25 **page** 2:11,15 8:23,23 19:4 |
| **once** 74:11 138:21 141:23 142:11,16 161:21 191:18 194:7 199:24 202:25 215:22 | 76:14 **orally** 165:24 165:25 **order** 22:14 54:21 87:8 89:22 191:9 201:5 234:14 | 158:12 160:20 **outsider** 184:7 **outsider's** 184:10 **overall** 39:7 93:11 108:19 **overlap** 52:19 | 25:3 27:4 30:3 30:10 35:12 48:3 51:3 54:3 65:15 71:3 74:7 95:1 143:17 148:14 |
| **ones** 14:8 15:11 19:23 53:11 56:19 208:10 **ongoing** 205:14 206:20 | 242:11 **orders** 242:10 **organization** 21:1,10,19 28:21 41:24 | 53:4 **overseeing** 144:19 147:8 148:1 **overwhelming** | 148:19 169:16 170:13 172:25 175:11 177:17 205:25 215:12 225:17,21 |
| **online** 14:3 126:9,17 139:20 178:23 **open** 39:11 59:3 62:6,10 | 60:15 67:2 72:6,17 155:4 192:23 211:8 **organizational** 20:25 145:21 | 86:13 **own** 43:10 59:9 126:3,17 137:5 147:7 150:11 152:18 163:15 | 227:5,12 229:12 230:5 231:3,15 235:3 235:17 246:4,7 246:10,13,16 246:19 |
| 62:19,24 77:23 77:23 84:9 93:18 135:13 203:21 205:11 | 199:16 **organized** 123:9 **original** 56:9 105:8 | 209:23 214:20 233:16 **ownership** 151:11 152:15 | **pages** 47:13 53:25 54:4 69:11 205:20 243:5 |
| **opened** 92:8 170:21 **openings** 10:5 10:9 | | | **paid** 31:5 32:19 **panic** 96:22 220:22 223:5,8 224:1 **parady** 1:16 **parady.com** 1:18 |

Case No. 1:23-cv-01625-SKC-KAS Document 40-13 filed 08/04/25 USDC Colorado pg 102 of 128

**paragraph** 9:2 9:6 128:17 131:10 177:22 207:5,18 220:2 224:10 229:12 230:5 231:3,15 235:17

**part** 16:22 26:1 28:14 34:10 35:17,25 42:2 46:23 51:3 52:24 53:25 54:4,5 57:15 65:16 78:21 82:5 97:21 99:21 103:25 125:24 126:16 128:11 154:12 198:16 210:7

**partially** 9:9

**participant** 34:1

**participate** 93:8 200:16 204:20

**participating** 200:12 204:16

**particular** 56:3 206:11

**parties** 4:6 126:15 244:10 244:16

**partner** 65:17 65:19,21,22,23 65:23,24

**partners** 126:11,11

**party** 4:21

**passionate** 93:13

**pattern** 60:20 89:13 154:20

**pay** 31:13,20 34:18 35:12,14 73:23 93:22

**payment** 31:24

**pdf** 242:11

**peer** 59:23

**peers** 59:18 65:3,10 79:18 82:12,20 84:15 89:1 110:23 160:18 167:18 167:19 229:17 238:22,23,24

**pending** 7:3,4

**pension** 33:21 33:22,23,25 34:1,4,7

**people** 22:4 44:6,10 51:8 55:7,19,20 57:20 60:23 61:14 72:12 78:1 84:24 85:1 86:16 96:14 98:22 100:12 103:18 108:22 151:2 160:17,19

170:24 171:7 181:19 192:20 193:17 219:2

**perceived** 179:10

**percent** 33:7,13 91:10 211:24

**percentage** 33:2 35:7

**performance** 31:5,6,8 51:20 59:21 70:21,23 86:2 137:17 139:2,2,5,8,11 139:13 140:6 140:11,13,18 140:21 141:1,4 141:14,21 142:8,10 143:4 143:7 144:11 144:17,20 146:10,11,19 146:22 148:7 148:11 149:17 151:19 153:24 155:12,17 156:10 157:3,7 163:13 166:15 177:11 194:12 205:3,4

**performer** 143:18 144:5,8 145:23 146:17 156:24

**performing** 139:17,19 143:15 170:19

**period** 9:15 10:1 14:14,15 25:9,12 26:4 26:17 38:3 39:20,21,22,23 39:24 40:4 42:13,17 52:11 52:20 53:5,6 66:8 67:7,9 75:8 83:10 114:12,19 135:2,3 147:4 154:8 159:9 161:7 168:21 193:18,19 195:19 234:12

**periods** 30:5 39:18

**permission** 176:12 179:7,9

**person** 12:23 41:11 42:12 43:17 49:3,8 55:4,11 56:14 56:15 59:25 61:5 67:4 68:13,14 72:5 75:25 77:6,11 83:8 85:17 88:5 89:11 90:6,8,14 91:9 91:10 93:13,17

Case No. 22-cv-01625-PGK-AOS Document 40-13 filed 08/04/23 USDC Colorado pg 103
pg 103 of 128

95:18 108:19
110:8 120:23
133:6 134:17
134:20,25
151:1 154:3
157:9 166:13
172:24 174:18
178:16 188:6
197:15 208:7
211:22 214:5
232:6 233:17
**person's** 171:9
**personal** 63:16
79:22 86:4
115:18 117:2
117:15 172:20
**personally**
56:23 75:23
84:5 92:7
163:13 174:2,7
187:20
**perused** 47:17
68:23 74:9
98:14 125:15
126:1 127:18
130:7 141:10
149:5 169:8
205:22
**phase** 145:8
159:16 196:2
233:10
**phases** 137:18
137:19 159:10
191:23 192:1

**phone** 1:14,18
1:22 33:17
49:3,22,25
50:2,6 68:14
77:14 79:8
81:23,24 91:8
95:20,22,23
115:22 118:10
120:23 134:16
166:4 170:2,3
180:12,13
200:7 208:7,14
211:23,25
217:21 219:12
223:16,24
228:14
**phonetic** 18:9
**physical** 223:18
**physically**
66:18 223:10
**pick** 156:7
177:2
**picked** 88:13
162:24
**picture** 73:7
**pictures** 190:21
190:25 239:14
**pieces** 155:7
**pinpoint**
144:13 146:9
238:14
**place** 4:6 22:14
23:3 39:10,21
41:5,14 43:6
44:9 45:3

59:12 67:6
71:15 78:10
84:4 85:16
89:10,23 96:20
97:1,8 99:11
99:24 103:6
104:15 108:6
110:25 112:4
114:12 147:12
170:16 171:1,3
171:22 175:8
176:10,24
186:22 196:22
201:6 209:8
210:13 213:25
216:25 217:25
244:11
**plaintiff** 1:4,12
2:18 9:8 25:3
30:4
**plaintiff's** 2:16
2:17
**plan** 33:22,23
33:25 34:1
83:12
**platform** 54:20
126:12 142:11
142:17 150:20
**platforms**
240:21,24
**played** 160:21
**pleasant** 125:1
173:15
**please** 5:22
6:10,22 8:16

47:23 117:24
148:9 181:17
184:20 190:4
192:10 200:2
217:3,4 226:23
**plenty** 213:18
221:1
**plus** 12:21
26:18,18
**pmq** 106:16
147:2 150:1
161:9 181:9,24
182:11,16,23
183:2,8,14,24
184:14 185:19
186:19 188:7
188:11,20
216:21 231:12
**pocket** 31:20
**point** 46:11
86:15 92:23
131:25 143:16
147:10 149:7
149:13 151:9
155:2 162:22
176:9 184:8,10
194:22 196:7
204:7,25
206:12 209:9
213:19 217:8
218:6 220:22
221:13,19,21
224:21 242:2
**pointers** 146:11

Case No. 1:23-cv-01625-SKC-KAS Document 40-13 filed 08/04/25 USDC Colorado pg 104 of 128
pg 104 of 128

| | | | |
|---|---|---|---|
| **points** 143:5 | 138:7 145:4 | **premiums** | **pretty** 118:16 |
| 148:15,21 | 147:1 154:11 | 31:21,25 | 145:5,16 218:4 |
| **policies** 41:24 | 154:12 161:11 | **prepared** 8:11 | **preventing** |
| 127:6 | 198:9 203:14 | 8:18 | 153:20 159:15 |
| **policy** 2:25 | 203:18 206:22 | **preparer** 113:9 | **previous** 92:9 |
| 77:23 93:9 | 207:2 209:20 | **prescribed** | 97:12 170:21 |
| 127:12 | 211:7 218:25 | 46:15 75:3 | 173:3,4 187:13 |
| **polifroni** 74:11 | 226:1 | **presence** 152:5 | 196:17,17,19 |
| 74:14,24 75:3 | **positions** 10:10 | 176:13 215:20 | 196:21 237:17 |
| 94:17 | 10:25 13:1,6 | **present** 1:24 | 244:7 |
| **politically** | 14:4 21:19,21 | 4:2 7:8 60:3 | **previously** 24:6 |
| 105:4 | 26:16,19,22,24 | 77:8 80:9 | 24:16 71:16 |
| **poor** 230:12 | 89:2 | 81:20 91:1,19 | 172:3 185:14 |
| **poorly** 230:8 | **positive** 93:18 | 95:25 102:7,14 | 199:21 200:6 |
| 230:19 | 139:1 166:15 | 109:23 136:8 | 212:20 |
| **pops** 81:7 | 176:24,25 | 142:8,24 170:4 | **pride** 155:25 |
| **portfolio** | 177:25 179:10 | 180:5 182:4 | **principles** |
| 130:17 | 179:17 | 183:22 185:2 | 146:2 |
| **portray** 104:12 | **positively** | 186:22 199:2 | **print** 116:16,18 |
| **portraying** | 176:25 | 212:12,22 | **printout** 15:5 |
| 186:2 | **possession** | 213:3,9 214:17 | **printouts** 14:23 |
| **position** 10:17 | 117:2 118:1 | 214:19 215:9 | **prior** 45:16,17 |
| 12:1,8,10,15,22 | **possibility** 36:9 | 216:6,24 | 45:20,23 46:2 |
| 12:23,23,24 | **possible** 6:20 | 235:12 | 52:12 58:18 |
| 15:14 16:4,15 | 15:4 | **presenting** | 69:16 124:23 |
| 16:17 17:6,24 | **possibly** 102:1 | 162:15 | 131:14 139:4 |
| 18:6 19:15 | 186:15 195:13 | **president** | 163:24 164:4 |
| 24:21 26:10 | **post** 241:3 | 165:11 | 169:24 172:13 |
| 27:19 28:1 | **posting** 15:5 | **pressured** | 192:14 196:12 |
| 119:4 120:12 | **postings** 14:4 | 96:19 184:19 | 199:22 221:2 |
| 125:17 127:23 | **pot** 154:4 | 213:21,21 | **proactively** |
| 128:2 129:25 | **potential** 28:8 | **pressuring** | 151:13 |
| 131:3 134:5 | **practices** 17:15 | 213:17 | **probably** 87:15 |
| 135:4,11,24 | **preferential** | **pretend** 94:7 | **problem** 78:23 |
| 136:11,18,21 | 235:18 | | 78:24 221:12 |

**problematic** 154:16

**problems** 156:4 221:10

**procedure** 2:2

**process** 22:14 123:24 126:16 140:22 191:24 200:13

**produce** 156:1

**producing** 163:10

**product** 59:21 150:9 159:11 198:15 209:25 210:3 226:21 226:25

**products** 119:5 119:10 122:18 122:18 125:18 125:22 137:16 137:18,20 138:14 139:16 164:12

**professional** 2:7 18:15 36:2 166:16 231:8 244:5,21

**professionally** 75:23 84:6 92:7

**professionals** 11:22 211:12

**profile** 241:1

**program** 21:24 22:4 175:14 176:8,11 177:24 178:5,9 178:24 189:19 189:20 192:6,7 194:14 226:8,9

**programs** 17:11 21:22 126:7 226:11 226:22

**project** 52:17 108:18 147:2,3 151:1 159:7,8 161:12,14 163:15,16 176:7 179:4 183:8,23,24 184:11 186:20 190:12,14 191:2,19 192:4 209:1,4,5 210:22 224:15 224:18 232:16 233:2,4,13,20 237:14 239:6

**projects** 51:10 51:20 52:6,16 52:24 54:18 76:13 78:13 131:20 138:13 144:25 145:7 147:7,8 150:13 150:19,20 151:10 154:9

154:14 175:13 177:13 180:19 180:21,23 186:25 189:15 190:3,6,7,10,11 192:16 202:16 202:18 206:15 224:24 225:4 226:15 232:14 236:6,7,10,20 236:23,24

**promised** 191:4

**promoted** 131:3 134:5 135:10,24

**promotion** 131:6,14 136:1 136:6,9,17 137:24 138:4

**prompted** 38:20 128:2

**promptly** 231:4

**pronouncing** 62:8,9 179:8 190:16

**proof** 164:22 171:2

**prospective** 236:23

**protect** 41:15

**prove** 43:20

**proven** 164:11 164:19

**provide** 6:7 10:14 24:2

32:5,9 42:8 55:6 56:10 95:9 160:10 194:11 195:5 200:19 204:22

**provided** 10:16 11:6 20:9 23:22 26:13 29:23 32:3 33:20 65:8 74:25

**provider** 37:4 37:10

**providers** 74:21

**providing** 151:12

**public** 2:8 150:8 241:1 243:18 244:5 244:21

**published** 80:13 81:4 105:2

**pull** 164:10

**pulled** 159:13 159:17

**punitive** 46:22 47:1,3

**purported** 42:8

**purposes** 69:22 115:9

**pursuant** 2:1

**pursuing** 204:8

Case No. 1:23-cv-01625-SKC-KAS Document 40-3 filed 08/02/25 USDC Colorado pg 106 of 128

| | | | |
|---|---|---|---|
| **push** 89:12 | 36:16 44:19 | **race** 59:25 70:6 | **random** 172:22 |
| **pushed** 237:18 | 56:10 88:19 | 72:25 90:5 | **range** 12:14 |
| **put** 40:20 43:19 | 100:10 105:8,9 | 100:5 105:1 | 123:5 |
| 44:1 45:7 | 105:11,22 | 119:15 129:14 | **ranges** 12:19 |
| 54:17 72:17 | 116:3 124:15 | 132:24 133:3 | 26:15 30:22 |
| 79:4,16 83:9 | 130:4 144:1 | 133:14 146:21 | **rate** 73:23 |
| 83:12 84:7 | 147:14,16 | 158:4 167:23 | 139:13 144:8 |
| 85:24 89:19,20 | 151:18 154:20 | 172:1 186:8,14 | 146:11,11 |
| 89:24,25 94:21 | 157:13 173:11 | 186:16,23 | **rated** 139:5 |
| 96:12 110:15 | 181:13 183:11 | 197:2 207:7,15 | **rates** 139:11,17 |
| 132:3 155:19 | 189:7 195:21 | 210:25 212:23 | **rather** 106:8 |
| 161:7 164:25 | 212:10 221:9 | 213:1,4 214:18 | 147:7 160:1 |
| 172:4 174:11 | 222:24,25 | 215:2,18 216:4 | 163:9 167:7 |
| 184:2 204:12 | 233:9 | 231:5 239:18 | 181:3 205:6 |
| 208:25 209:24 | **questioned** | 239:22 240:2 | **reach** 17:2 |
| 210:3 233:10 | 230:14,18,24 | **rachel** 28:17,19 | 39:12 80:12 |
| **putting** 41:24 | **questioning** | 72:22 | 138:14 150:10 |
| 59:20 66:8 | 154:22 | **racial** 55:21 | 150:11,12 |
| 68:6 79:21 | **questions** 8:2,5 | 62:10,16 86:10 | 163:17 167:2 |
| 80:1 96:23 | 86:17 94:1 | 88:8 201:17 | 191:9 193:2 |
| 104:8 211:8 | 145:1 196:11 | 209:6 211:7,12 | 194:7 237:1 |
| | 233:3 241:10 | 238:18 | **reached** 34:3,6 |
| **q** | 242:3 | **racism** 40:20 | 38:7 75:18 |
| **qualification** | **quick** 157:17 | **racist** 102:1 | 77:21 78:4,16 |
| 181:19 | **quickly** 23:1 | 211:2 | 162:22,23 |
| **qualified** 34:12 | **quiet** 106:20 | **raise** 22:20 | 193:12 218:18 |
| 34:22 137:25 | 221:15,18 | 100:6 181:4 | 238:2 |
| **quarter** 141:15 | **quite** 164:24 | **raised** 22:23 | **reaching** 67:2 |
| 141:16,23 | **quote** 65:7,7 | 100:7,11 172:9 | 159:16 166:22 |
| 149:19 | 112:10 155:21 | 172:16 205:9 | 218:14,17 |
| **quarterly** | 192:10 202:6 | 231:4 | **reaction** 63:4 |
| 141:18 | **r** | **raises** 30:8 | 83:7 88:6 89:8 |
| **question** 6:22 | **r** 4:1 5:19 16:11 | 34:11 | 106:9 173:21 |
| 6:24 7:3,4,9,10 | 246:3,3 | **raising** 173:2 | 174:12,16 |
| 7:12,20,22 | | 173:10 196:16 | 185:15 213:23 |
| 8:16 34:17 | | | |

Case No. 1:23-cv-01625-SKC-KAS Document 40-13 filed 08/04/25 USDC Colorado pg 107
pg 107 of 128

| | | | |
|---|---|---|---|
| **read**  127:8,17 | 163:15,22 | **reassured** | 76:20 91:4 |
| 149:4 242:13 | 164:14 166:9 | 177:25 | 92:16,19 96:2 |
| 243:2 245:9 | 167:12 171:4,5 | **recall**  10:6 11:2 | 96:11 100:16 |
| **reading**  143:7 | 172:17 174:1 | 11:4,11,18 | 100:19 102:13 |
| **ready**  47:16 | 174:21 177:2,7 | 12:2,13,14,17 | 102:16 103:11 |
| 142:16 205:21 | 177:7,14 | 12:18 14:6,8,9 | 105:19 107:3 |
| **reality**  21:18 | 179:14 188:25 | 15:7,11,12,21 | 110:1 112:8 |
| 42:21 44:15 | 193:6,8 194:4 | 17:23 18:8,11 | 114:11 115:11 |
| 104:13 | 194:7,8 197:12 | 19:12,18,22,23 | 115:15 118:8 |
| **really**  11:14 | 198:9,16 202:5 | 19:24 20:2,5 | 118:11,16 |
| 20:18 22:4 | 202:5,5,11,15 | 23:5,6,8,9,11 | 120:13 121:4,7 |
| 23:8 24:25 | 209:22 210:6 | 23:13 24:25 | 121:14 122:13 |
| 32:14 38:23 | 210:16 212:19 | 26:3,6,15 27:7 | 122:16,22 |
| 40:5,8 46:9 | 217:2 221:17 | 28:9,11,13,17 | 123:25 127:4 |
| 47:2 61:1 | 221:17,20 | 29:9 30:17,19 | 128:23 129:8 |
| 66:25 69:6 | 223:6 232:6 | 30:21,22 31:1 | 129:13 130:11 |
| 74:5 76:14 | 233:7 234:16 | 31:3,16,23 | 133:16,23,25 |
| 78:2 90:11 | 234:18,20 | 32:1,23,25 | 134:1,4,23 |
| 93:7,17 112:7 | 238:13 239:15 | 33:1,4,5,6,9,10 | 135:18 136:4,7 |
| 113:21 114:1 | 240:3,20 | 33:11,15,24 | 136:13 138:10 |
| 114:11 115:2 | **reason**  8:4 13:5 | 35:5,10 37:15 | 139:7,10 140:5 |
| 121:7 122:2 | 20:16 24:2 | 37:17,20 38:2 | 141:16,24 |
| 123:6 125:6 | 27:8 63:12,17 | 38:6,9,12 47:2 | 142:23 143:1 |
| 132:3,22 137:6 | 69:3 71:4 78:4 | 48:8,11,13,17 | 149:18,19 |
| 139:7 140:5,12 | 144:7,12 | 49:18,20 50:2 | 151:5,6 158:5 |
| 141:24 142:15 | 165:20 189:7 | 50:3,5 51:25 | 161:3 162:4 |
| 144:12,15 | 204:22 241:13 | 52:11 54:13 | 165:20 166:9 |
| 147:1,8,10 | 245:11 246:6,9 | 56:14,19 58:12 | 167:8,10,11,13 |
| 148:1 149:13 | 246:12,15,18 | 58:16 61:3,5 | 167:14,25 |
| 149:19 150:16 | 246:21 | 64:18,20 65:7 | 168:1 170:9,11 |
| 151:20,25 | **reasons**  24:6 | 65:8,11,12,14 | 171:1,23 172:5 |
| 154:3,20 156:1 | 71:16,17,18,20 | 66:2 67:7,9,10 | 172:17 179:25 |
| 156:2 157:12 | 71:22 77:1,22 | 67:11,23 68:1 | 180:2,3,4,5,14 |
| 158:8 160:3 | 174:20 | 68:2,2,8,17,25 | 180:16,18,22 |
| 161:12 163:8 | | 69:2 70:12 | 181:6 182:6,7 |

Case No. 1:23-cv-01625-SKC-KAS Document 40-13 filed 08/04/25 USDC Colorado pg 108 of 128
pg 108 of 128

| | | | |
|---|---|---|---|
| 182:9,10,18 | 227:18 234:16 | **record** 4:4,7,24 | **red** 150:3 |
| 183:6 184:21 | **received** 10:19 | 5:23 6:11,21 | **reduced** 244:12 |
| 188:10,14,15 | 11:12 16:18 | 7:18,22 14:17 | **reemployed** |
| 188:17 189:3 | 18:15 19:21 | 31:10 47:6,9 | 19:6,9 27:6,11 |
| 192:8 197:4,7 | 24:20 25:1 | 69:23 70:17 | **reemployment** |
| 197:12 198:16 | 26:11 31:11 | 84:7 105:13 | 25:9 |
| 200:17,24 | 34:3,7 35:22 | 112:22 113:3 | **refer** 5:18 |
| 202:24 203:7 | 58:20 70:21 | 157:19 158:1 | 196:20 |
| 203:20 204:6 | 73:20 131:6 | 164:19 182:3 | **reference** 9:12 |
| 206:25 208:3,4 | 140:6 142:10 | 198:24 199:3 | 15:6 118:2 |
| 208:6,15 | 173:8 179:4 | 235:5,9,15 | 203:9 207:9 |
| 211:18,19,20 | 185:25 217:8 | 242:5,8,10,24 | 210:8 |
| 212:19 216:16 | 227:21 228:12 | **recorded** 4:8 | **referenced** |
| 216:18 217:18 | **receiving** 12:10 | 113:15 114:17 | 208:10 245:6 |
| 217:23 218:18 | 19:18 227:23 | **recording** 4:5 | **references** |
| 218:19 219:6,7 | 228:3 | 114:24 | 175:25 |
| 219:24 226:11 | **recess** 47:8 | **recordings** | **referencing** |
| 228:24 229:3,4 | 112:25 157:21 | 77:15 81:25 | 19:7 25:10 |
| 229:6 230:4,21 | 199:1 235:11 | 170:6 | 90:23 151:14 |
| 231:1,2,23 | **recipients** | **records** 11:5 | 155:10 207:11 |
| 232:12,16 | 136:12 | 14:10 26:7,9 | **referred** 181:9 |
| 233:19,21,22 | **recite** 94:1 | 31:12,24 32:2 | 199:12 203:2 |
| 238:10,13 | **recited** 92:5 | 32:8,13,18 | 214:22 |
| 241:23 242:1 | 97:10,20 98:19 | 49:24 94:5 | **referring** 39:14 |
| **recalling** 103:9 | **reciting** 108:9 | 113:7 | 54:5 70:18 |
| 241:15 | **recognize** | **recounted** | 71:21 74:15,18 |
| **receipt** 245:18 | 118:19,23 | 82:13 | 87:21 88:25 |
| **receipts** 26:9 | 199:10 227:10 | **recounting** | 96:9 118:20 |
| 26:12 | 227:16 228:9 | 82:9 | 158:18 176:18 |
| **receive** 10:21 | 234:11 | **recruiter** 16:21 | 178:5 189:16 |
| 11:8 12:3,8 | **recollect** 11:14 | **recruiters** 17:2 | 195:10 202:13 |
| 23:19 24:18 | **recollection** | **recruitment** | 214:4 217:13 |
| 30:15 32:20 | 115:8 182:5 | 28:15 | 220:21 224:18 |
| 33:16 34:18 | **recollections** | **recusing** 209:3 | 224:20 229:20 |
| 35:3 47:1 | 114:17 | | 229:24 231:11 |

Case No. 22-cv-01252-SPG-KAS Document 40-13 Filed 08/09/06/29 DC USDC Colorado pg 109 pg 109 of 128

| | | | |
|---|---|---|---|
| **reflect** 20:18 | 176:2 178:8 | **relate** 87:9 | 120:3,14,16 |
| **reflected** 11:5 | 180:23 183:7 | **related** 4:21 | 135:23 136:8 |
| 31:13 | 225:6 | 82:4 94:21 | 143:11 160:12 |
| **reflecting** | **registered** 2:7 | 115:25 116:5 | 162:14 164:8 |
| 31:24 | 244:4,21 | 117:4,5 180:20 | 170:1 183:16 |
| **reflective** | **registers** | 181:8 236:6 | 189:5,6 190:17 |
| 124:17 | 192:20,25 | **relating** 117:22 | 198:3,5,7 |
| **refrain** 7:20 | **regret** 202:10 | 188:9 | 199:24 200:9 |
| **regard** 86:22 | **regular** 39:10 | **relation** 94:16 | 203:1,5,6,21 |
| 92:8 93:9 | 43:11 122:7 | 164:5 186:8 | 204:10 215:16 |
| 121:21 173:20 | 140:6 | 244:9 | 216:18 217:11 |
| 176:11 195:3 | **regularly** 145:7 | **relationship** | 218:3,4 227:21 |
| 208:18 210:21 | 223:12 | 61:12,16 66:14 | 228:20,25 |
| 226:8 | **rehab** 1:3,9 2:3 | 145:6 164:6 | 234:22 236:10 |
| **regarding** | 2:21 4:9,10 5:5 | 166:17 185:13 | 237:9 |
| 50:15,18 54:24 | 5:24 112:24 | 188:21 209:15 | **remembered** |
| 58:5 60:11 | 113:2 157:25 | 234:6 | 115:4 |
| 62:4 64:2 66:7 | 235:14 243:1 | **relay** 108:24 | **remind** 171:3 |
| 74:21 75:16,20 | 243:10 245:4,5 | 167:4 | 218:22 |
| 77:19 83:20 | 246:1,2,24 | **relayed** 101:10 | **reminder** 40:1 |
| 85:6 90:19 | **reimbursement** | 101:23 220:17 | 40:10 44:2 |
| 91:21 95:13 | 33:17 | **released** 141:1 | **remote** 12:23 |
| 114:8 119:23 | **reinforcing** | **releasing** | 12:24 13:1,6 |
| 145:1 158:4 | 176:25 186:5 | 176:10 | 16:15 18:6 |
| 165:12 177:23 | **reinstatement** | **relieved** 98:7 | 26:19 27:15 |
| 181:24 228:11 | 35:12,13,16,22 | **rely** 233:7 | 91:10 110:9 |
| 232:13 | 35:25 36:6 | **remember** | 120:12 |
| **regardless** | **reinstating** | 12:12 22:22 | **remotely** 13:7,9 |
| 171:8 174:1 | 203:21 | 25:11 33:21,25 | 13:13 120:8 |
| 210:21 | **reiterate** 159:3 | 37:18 38:14 | 129:1 132:11 |
| **regards** 78:14 | **reiterating** | 50:8 51:12 | 166:5,7 211:25 |
| 97:2 108:17 | 143:8 | 52:17 64:19 | **removed** |
| 116:13 117:9 | **reject** 27:1 | 76:16 91:6 | 203:25 204:1 |
| 121:23 150:1 | **relat** 61:11 | 104:20 105:6 | 233:19 |
| 162:8 164:2 | | 115:7,10,13 | |

Case No. 22-01625-SPG KAS Document 40-13 Filed 08/04/23 06:23 DC USDC Colorado pg 10 pg 1 of 128 of 128

| | | | |
|---|---|---|---|
| reorganization 128:15 | 220:5 | reserved 218:4 | respectfully 204:20 |
| repeat 8:16 46:19 48:1 82:7 116:2 183:11 220:25 221:25 222:1 222:20 | reporter 2:7 4:19 6:18 7:18 46:19 69:23 173:18 242:9 242:15,17 244:5,21 | resign 24:14 resignation 20:16 23:23 24:3,23 72:14 | respond 86:23 92:15 94:1 168:3 209:18 212:25 213:6 213:12 214:11 214:14 215:1 216:1,3,7,11 218:1 228:2 |
| repeated 207:20 217:25 221:1 | reporting 120:16 128:22 129:2 137:17 197:5,11 229:15 | resigned 20:14 21:2 24:11 72:11 resisting 96:24 resolution 189:2 | responded 17:3 110:24 133:24 215:21 |
| repeatedly 222:20 | | resolved 171:17 | responding 105:9 188:8 |
| repeating 208:2 211:15 217:6 219:5,21 223:4 | reports 59:23 104:8 121:11 129:7,11 177:5 represent 5:12 109:1 | resource 1:6 4:11,12 5:2,13 5:19 245:4 246:1 | responds 221:8 221:9 response 3:14 22:22 24:9 |
| repeats 221:15 | representative | resources 100:21 160:2 | 44:17 65:12 69:15 76:21 |
| rephrase 6:23 | 217:6,12 | 189:18,20,25 | 78:22 83:5 |
| report 3:12 28:16 59:20,21 59:23 60:1 63:24 101:3 108:19 119:8 122:14 128:19 129:10 131:11 143:7 146:13 149:15 163:10 175:16 176:17 177:10,12 214:24 236:22 | represented 8:10,17 representing 4:17 reprimands 70:22,24 request 24:20 25:1 80:3,6 83:25 203:24 204:4 requesting 204:6 | 191:22 201:23 217:6 233:6 resourse 2:24 respect 28:4 57:4 65:5 69:18 72:21 79:25 143:17 158:17 189:24 190:6 194:14 203:8,17 210:9 215:25 226:22 226:25 230:11 | 87:2 88:17 92:17 98:2 156:22 162:19 170:25 173:21 177:18 183:10 215:18 218:20 218:23 223:18 232:4,9 responses 2:17 6:4,8 69:1,4,9 105:14,17 |
| reported 109:21 110:13 110:19 177:12 197:8 198:14 | requests 2:18 24:18 requires 224:6 | respected 210:16 | 133:23 184:3 |

Case No. 1:23-cv-01625-PGG-KAS Document 40-13 Filed 08/04/23 USDC Colorado pg 111 of 128

| | | | |
|---|---|---|---|
| **responsibilities** | 108:24 109:12 | **return** 36:4 | 144:11,18 |
| 28:4,5 125:21 | 111:15 112:1 | 245:13,17 | **revolve** 191:15 |
| 126:4 130:5,13 | 220:18 | **returned** | **right** 7:17 8:7 |
| 136:25 137:4 | **resume** 2:21 | 116:21,24 | 8:22 14:8 |
| 138:24 143:16 | 123:21,23 | **returns** 113:7 | 15:21 63:14 |
| 144:23 146:16 | 124:2,7,16 | **review** 3:7 | 75:15 81:19 |
| 154:11 168:25 | **retaliated** | 47:15 139:2 | 83:8 98:10 |
| **responsible** | 240:8,13,16 | 140:13,18 | 101:1,21 |
| 61:24 123:13 | **retaliating** 97:2 | 141:14 142:2,9 | 105:13 106:2 |
| 123:16 128:12 | 97:2 231:6 | 142:10,14,18 | 119:10 124:10 |
| 140:21 173:4 | **retaliation** | 143:4,7,13 | 130:11 131:7 |
| 193:8 | 54:24 55:12 | 145:12 146:19 | 178:19 198:22 |
| **responsive** | 56:13 59:12 | 146:23 148:7 | 220:15 241:9 |
| 105:17 | 62:4 64:2,9,13 | 148:11 149:17 | **rights** 90:2 |
| **rest** 59:2 220:5 | 66:9 70:14 | 151:19 153:12 | **ring** 189:21 |
| 241:18 | 73:17 85:16 | 153:25 155:12 | **risk** 79:22 |
| **restrain** 209:14 | 96:5,6 97:24 | 155:17 156:11 | 211:8 |
| **restrictive** | 98:13 99:2,6 | 157:3,7 159:21 | **risky** 110:17 |
| 158:10 | 99:15,20 100:2 | 162:17 163:19 | **rivers** 202:6 |
| **restruction** | 100:24 102:19 | 169:7 184:3,14 | **rm** 1:2 4:14 |
| 198:11 | 102:24 103:2 | 185:19 187:17 | **role** 17:8,9,9 |
| **result** 12:6 37:4 | 105:24 106:25 | 188:7,11,20 | 20:18,22 21:3 |
| 37:6,10 40:14 | 107:5,11,16,21 | 195:25 196:1 | 21:6,20 22:7 |
| 42:9,19 43:13 | 108:1 109:5,10 | 205:20 245:7 | 22:11 24:7 |
| 57:14 63:8 | 109:15,20,22 | **reviewed** 47:18 | 27:23 28:4 |
| 77:20 175:10 | 111:3,8,13,18 | 192:18 | 54:12,13 55:18 |
| 198:6,7 | 111:24 112:2 | **reviewers** | 55:21 56:4,11 |
| **results** 55:24 | 112:15 175:8 | 145:13 152:7 | 60:16 72:1,3 |
| 56:22,25 57:5 | 209:5,16 220:8 | 153:10,11,13 | 72:10 83:8,9 |
| 57:6,9,10 58:5 | 220:13 240:5 | 184:3 | 138:1,3,17 |
| 86:7 98:16 | **retaliatory** | **reviewing** | 139:4 140:9 |
| 99:8,9,22 | 108:5 185:20 | 140:11 | 142:3 146:3,8 |
| 100:4,14 101:2 | 186:13 | **reviews** 70:23 | 161:4,25 162:3 |
| 102:21 107:7,7 | **retraining** | 140:6,21 141:1 | 225:24 226:3 |
| 107:18 108:14 | 18:20,23 | 141:4,18,21 | 239:13 |

800-567-8658          973-410-4098

Case No. 1:23-cv-01652-PAB-SKC Document 40-33 filed 08/04/23 USDC Colorado pg 112 of 128

| | | | |
|---|---|---|---|
| **roles** 55:19 | 131:6 | 206:7,22 207:4 | **searched** |
| 146:15 | **sales** 28:6,6 | 207:17 208:2,9 | 116:11 |
| **room** 90:5,6 | **samantha** | 208:12,12,16 | **searches** 13:15 |
| 157:23 209:14 | 107:15 | 209:18,19 | 14:11,18 15:13 |
| **rosalie** 52:22 | **sample** 238:3 | 210:1,8,24 | **second** 9:2 25:3 |
| **rouse** 3:14 | **sarah** 98:12,17 | 214:24 220:1 | 27:5 38:4,6,10 |
| **routine** 38:22 | **sat** 135:13 | 224:8 225:2 | 38:11 39:22,23 |
| 38:23 | **satisfactory** | 227:7 | 39:24 40:6 |
| **routines** 40:7 | 139:6,9 | **schedule** | 78:4 106:10,13 |
| **ruby** 5:25 92:3 | **satisfied** 226:14 | 175:19 | 126:16 131:10 |
| 133:17 164:21 | 226:16,20 | **scheduled** 92:1 | 169:16 202:2 |
| 169:19 184:17 | **save** 14:23 15:5 | 112:4 233:2 | 202:22 207:5,6 |
| 213:24 232:10 | 26:7 150:17 | **science** 21:13 | 207:18 220:2 |
| **rules** 2:2 6:3 | **saw** 37:19 | **scope** 190:3 | 224:10,10 |
| 231:25 232:3,4 | 74:11 154:10 | **score** 56:3,3 | 227:12 231:16 |
| 232:7 | 239:14 | **scored** 55:24 | 235:5 |
| **running** 150:19 | **saying** 62:7 | 57:7,12 | **section** 8:24 9:3 |
| 152:5 200:9 | 79:3 92:20,20 | **scratch** 237:15 | 47:12 51:3 |
| **ryan** 65:16,17 | 98:21,22 | **scrutiny** 164:15 | 53:24 54:4,5 |
| 66:10 | 104:20 124:17 | 164:25 220:7 | 65:15 81:7 |
| | 136:13 164:8 | 220:13 | 151:8 154:25 |
| **s** | 168:1 204:11 | **sean** 75:13 79:4 | **see** 8:25 9:12 |
| **s** 4:1 5:19 246:3 | 204:13 213:20 | 81:10 82:13,22 | 19:7 25:7 30:9 |
| **sad** 185:16 | 216:22 | 82:24 83:2,5 | 30:11 32:18 |
| **safe** 41:4,9,13 | **says** 8:24 19:5 | 83:25 84:22 | 51:5 54:2 |
| 42:16,18 43:9 | 35:24 118:21 | 117:10 218:14 | 62:19 71:7,8 |
| 44:10 57:19 | 119:7 143:21 | 218:15,23 | 71:10,15 72:16 |
| 67:4 75:24,25 | 144:4 152:14 | 219:22 227:6 | 91:15 128:20 |
| 84:13 95:18 | 155:2 169:19 | 227:13 | 128:21 133:3 |
| 166:13 167:2 | 196:15 | **sean's** 83:7 | 133:10,11 |
| **safety** 42:16 | **scenarios** 209:6 | **search** 13:24,25 | 143:19,20 |
| **salary** 12:14,19 | 209:9 | 15:8 16:22 | 145:24,25 |
| 19:19 26:15 | **schacht** 3:11 | 115:24 116:5 | 146:4,5 147:12 |
| 29:10 30:12 | 62:7,8,9 187:9 | 116:15 | 147:24 148:3 |
| 33:2 34:16,23 | 187:11,20,25 | | 148:17,25 |
| 35:1,8 36:22 | | | |

Case No. 1:23-cv-01625-SKC-KAS Document 40-13 filed 08/04/25 USDC Colorado pg 113
pg 1 of 128

| | | | |
|---|---|---|---|
| 149:1,10,11 | 158:20,22 | **sense** 8:12,19 | 204:15 205:1 |
| 151:14 153:14 | **segregation** | 22:6,13 128:6 | **sessions** 39:8,9 |
| 154:24 155:10 | 87:11 | 128:9 189:25 | 39:11,14,20 |
| 169:21,22 | **sell** 209:25 | 190:2 | 83:24 84:1 |
| 173:6 175:22 | 210:3 | **sensed** 72:8 | 199:22 200:15 |
| 175:23 178:2,3 | **seller** 139:22 | **sensitive** | 201:1,2 204:14 |
| 199:8 207:9,10 | 232:18 | 176:22 209:13 | 204:21 205:2 |
| 207:24,25 | **sells** 11:21 | **sent** 104:19 | 205:15 |
| 211:6 220:9,10 | **send** 26:10 | 136:10 192:9 | **set** 2:18 44:2 |
| 223:18,21 | 152:5,9 153:9 | 203:10 204:13 | 104:5 234:6 |
| 224:16,17 | 153:10,11,11 | 236:19 245:14 | **setting** 151:11 |
| 229:18 230:9 | 153:13 159:22 | **sentence** 9:6 | 152:16 224:12 |
| 231:9,10,20,21 | 201:14,18 | 19:5 25:3 27:5 | 240:16 |
| 235:23,24 | **sending** 88:7 | 30:4,9 128:18 | **settlement** |
| 238:3 | 201:23 | 131:10 151:9 | 23:19 |
| **seeing** 38:17,20 | **senior** 3:6 10:8 | 177:21 207:6 | **setup** 135:12 |
| 63:4 145:17 | 10:9,18,25 | 207:19 220:2 | **seven** 241:12 |
| **seek** 30:4 37:12 | 11:25 15:14 | 224:10 231:16 | **seventeenth** |
| 37:23 71:4 | 17:20 27:20,21 | **separate** 58:11 | 1:21 2:5 4:16 |
| 93:8 224:1,6 | 27:22,24 71:12 | 128:8 152:3 | **seventy** 26:18 |
| **seeked** 38:1,2,3 | 71:13 89:2 | **separately** | **several** 10:9,24 |
| 38:4,4 76:2 | 131:3,14 134:6 | 21:25 201:5 | 49:5 56:6 60:5 |
| **seeking** 35:16 | 135:4,6,11,25 | **separation** 3:17 | 60:22 82:8 |
| 35:25 36:6,10 | 136:18,21,25 | 20:11,12 23:17 | 83:24 86:16 |
| 39:19 40:5 | 137:4,7,8,12 | 23:20 116:22 | 110:21 121:9 |
| 46:22 71:12 | 138:1 139:3,4 | **september** 9:7 | 203:1,4 205:20 |
| 95:17,17 224:5 | 140:9,14 142:3 | 118:13 | 207:20 233:3 |
| **seeks** 35:13 | 145:4 147:5 | **seriously** 59:17 | 235:22 |
| **seem** 136:5 | 155:2 161:4,11 | 221:24 | **severance** |
| **seemed** 21:19 | 161:17,19,22 | **serve** 119:13 | 23:19 |
| **seems** 83:7 | 161:25 162:3 | **service** 17:4 | **severe** 43:7,13 |
| **seen** 68:22 73:4 | 168:25 170:20 | **session** 39:5,6 | 76:5,6 79:15 |
| 73:7 74:20 | 190:22 197:22 | 39:23,24 40:9 | 82:25 85:24 |
| 82:11 126:23 | 225:24 226:3 | 94:16,20 201:8 | 86:24 |
| 127:14 141:12 | 230:7,15 | 202:1,2,22 | |

Case No. 1:23-cv-01625-SKC-KAS   Document 40-13   filed 06/04/25   USDC Colorado   pg 114
pg 114 of 128

shake  6:6
share  59:1
  62:22 67:6,14
  79:7,11 80:17
  80:19 88:11,14
  163:18 205:12
  221:18
shared  61:18
  61:18 63:2
  67:12 80:16,23
  178:7 187:19
  197:1 215:23
  216:4 224:22
sharing  67:8
shawn  18:9,9
  19:15 22:21,24
  70:5
shawn's  18:11
  22:22
shawnetta
  56:15 100:18
  111:23,25
  112:8
she'll  242:13
sheet  245:11
sheets  214:3
ship  154:17
shock  79:1
shocked  77:5
shocking
  164:25
shot  60:18
show  82:15
  168:16 170:22
  170:22 171:2

172:18,21
showcase
  197:21
showed  82:14
  174:1
showing  68:19
  166:25 199:5
  229:7
shows  187:2
shrm  2:22,23
  3:7 5:20 13:10
  14:16 16:19
  18:16,21 30:12
  30:15 31:11,18
  31:22 32:21
  33:20 34:4,12
  34:16,19,22
  35:16 36:4,24
  37:5,10 38:8
  40:15,20 41:3
  41:18 42:3,10
  43:7,19,22
  44:22 45:16,17
  45:21,24 46:1
  46:3 48:23,25
  50:18 51:11,16
  52:6,25 54:11
  57:18 62:11,11
  62:17 63:20
  66:8,20 67:15
  71:11 74:22
  75:6,10 77:20
  78:23,24 81:2
  81:5 82:6 86:2
  93:15 94:21

99:1,14 100:1
  102:23 103:17
  104:5,6,15,25
  105:2 106:25
  107:10,20
  109:4,14 111:7
  111:17 112:14
  113:5 114:9,19
  114:21 115:16
  118:13,22
  119:3,12 120:5
  120:7 122:25
  123:23 124:5
  124:18,19,21
  124:24 125:23
  126:8 127:2,21
  127:24 129:21
  130:17,25
  139:21 140:7
  143:3 147:3
  148:11 150:7
  155:3 158:3
  163:25 164:17
  169:17 178:22
  192:19 193:1
  199:7,12
  200:13 204:5
  205:24 207:2
  209:23 210:1
  215:20 218:8
  220:1 224:9,12
  224:21 227:19
  227:24 228:5
  231:8 240:2,13
  241:11

shrm's  66:13
  66:14 95:16
  118:25 126:19
  127:6,11
  145:21 146:2
  207:22 217:5
  219:4,20
sic  38:1 84:3
  93:15 103:15
  122:9 131:22
  140:18 152:16
  154:4 186:4
  191:23 196:21
  212:17 214:17
  215:15 216:17
sick  112:11
side  171:19,20
  233:15
sign  245:12
signature
  244:20
signed  245:20
signing  68:25
signs  72:16
  168:17
silence  214:14
  223:23
similar  215:23
simplicity  5:18
simply  84:13
single  81:14
  84:23 85:10,12
  85:19 93:2
  153:15 237:6

Case No. 1:23-cv-01652-PGG-SAS Document 40-3 Filed 08/04/25 USDC Colorado pg 115 of 128

| | | | |
|---|---|---|---|
| **sinks** 35:13 | 16:1,6 18:24 | 174:23 176:4 | **solidarity** |
| **sit** 41:11 94:7 | 20:4 25:2,17 | 181:12,14,18 | 103:25 |
| **sites** 14:6 | 25:22,25 31:1 | 182:17,23 | **solution** 41:6 |
| **situation** 59:2 | 31:17 32:6,12 | 183:4 185:12 | 84:19,23 89:22 |
| 59:11 76:7 | 33:6,11,16 | 189:24 194:10 | 111:1 179:12 |
| 79:6 84:11 | 34:11,15 35:11 | 194:19 195:20 | 203:22 |
| 86:5,9 116:14 | 35:24 36:4,17 | 196:3 198:22 | **solutions** 4:18 |
| 185:16 208:18 | 38:9 39:3,13 | 199:5 203:24 | 4:20 43:22 |
| 208:24 214:1 | 43:1,3,4 45:3 | 208:11,15 | 79:25 84:17 |
| 216:24 | 46:22 47:4,11 | 214:16 228:2 | 85:4 89:19,23 |
| **situations** 67:5 | 48:4 50:22 | 235:7,16 240:1 | 167:6 245:23 |
| 105:1 173:4 | 51:2 53:24 | 240:12,18 | **soon** 21:2 |
| **six** 159:8 | 70:13 73:16 | 241:9,14,20 | 229:14 |
| 194:21 | 79:24 80:15,25 | 242:4,11 244:4 | **sorry** 48:2 |
| **skc** 1:2 4:14 | 87:22 88:16 | 244:20 | 56:17 58:4 |
| **skills** 124:3,15 | 95:5 98:1 | **smithk** 1:23 | 69:22 149:23 |
| 124:16,17,18 | 105:12,16 | **sneeze** 39:1 | 161:3 166:25 |
| 124:19 | 112:20 113:4 | 174:3 | 171:11 215:5 |
| **skip** 184:19 | 113:12,20 | **social** 43:15,16 | 216:2 234:10 |
| **slack** 237:19 | 114:2,16,20 | 208:20,23 | **sort** 16:12 19:1 |
| **slash** 140:3 | 115:13 116:4,9 | 209:2 240:18 | 25:25 76:10 |
| **sleeping** 42:20 | 117:12,25 | 241:6 | 145:1 236:5 |
| 42:25 68:5 | 118:5,18 | **society** 1:6 2:24 | **sorts** 24:15 |
| **slowed** 39:8 | 119:20 121:3 | 4:11,12 5:2,13 | 45:19 220:12 |
| **slur** 238:18 | 122:11,17 | 5:19 245:4 | **sought** 37:3,9 |
| **small** 141:8 | 123:15 124:7 | 246:1 | 38:10,12 |
| 148:23 232:23 | 124:11 126:23 | **software** 11:20 | **sound** 118:14 |
| **smes** 145:13 | 127:5 130:23 | 11:21 97:18 | 153:16,18 |
| **smith** 1:20 2:7 | 134:16,24 | 117:14 | 159:23 181:15 |
| 2:12 4:19 5:1,1 | 135:3,8 147:18 | **sold** 139:16,21 | **sounding** 66:25 |
| 5:9,12 8:15,22 | 148:3 157:16 | **sole** 152:13 | **sounds** 118:16 |
| 9:19,25 10:11 | 158:2 164:3 | 197:15 | **source** 9:14 |
| 11:11 12:18 | 165:9,16 | **solid** 143:17 | 25:14 44:13,14 |
| 13:5,17,21 | 168:12,15,22 | 144:4,8 145:22 | **space** 41:9 |
| 14:3,15 15:2 | 168:24 174:6 | 146:17 156:24 | 44:10 135:13 |

Case No. 1:23-cv-01625-SKC-CYC Document 40-13 filed 08/04/25 USDC Colorado pg 116 of 128

167:6
**speak** 6:20 7:15
41:4,5,9,12
43:9 58:21
64:25 83:22
86:15,15 93:7
96:23,24
106:20 110:19
166:14 184:20
214:6 217:4,16
220:23 221:3
221:14 222:4
223:14 234:20
**speaking** 41:21
41:22,23 42:1
42:5 60:23
61:4,7 90:2
202:23 220:22
222:9 223:2,4
234:6,8
**speaks** 110:16
**spears** 111:2,6
215:14
**specialist** 15:19
55:16,18,20
56:11 71:14
119:4 122:17
125:18,22
126:5,6 139:3
140:1,3 198:15
198:18
**specialists** 56:2
56:6 57:11
58:19 59:15
84:25 101:14

129:9 212:18
215:8,23
220:16
**specific** 17:6,17
19:12 47:2
55:6 57:17
58:15 76:23
82:14,14 85:5
90:23 96:8,11
100:11 103:8
122:8 133:16
135:18 146:22
149:18 156:14
156:20 160:12
165:21 167:14
180:16 182:18
188:14,15
212:10,11,22
216:20,24
230:21 232:15
236:10
**specifically**
79:7 83:13
86:22 101:7,11
104:6 114:23
115:11 118:5
125:4 143:13
157:4 160:11
164:8 167:9,10
167:21 183:6
207:15 211:10
215:25
**specified**
146:10

**speech** 184:13
**spell** 11:16
16:10 18:10
121:16
**spelling** 121:18
**spend** 149:24
**spending** 68:5
**spent** 149:8
**spoke** 64:24
65:1,4 83:17
138:22 217:17
**spoken** 84:8,20
84:20,21,21
95:6 206:20
**spokesperson**
55:23 56:4
101:1,18,19
220:16
**stab** 163:9
**stage** 184:9
195:10
**stakeholder**
84:8
**stakeholders**
22:21 82:8
152:8 159:20
159:22
**stance** 105:2
**stand** 93:14
165:18
**standard** 35:3
227:2
**standards**
226:19

**stands** 195:3
**start** 8:8 113:1
126:16 128:22
157:24 162:18
179:1 190:8
194:22 235:5
235:13 237:15
**started** 24:13
45:8 78:5
123:3 129:2
130:19 132:19
154:21,21
161:15,17
201:2 211:20
220:6 221:22
234:7,8 237:16
**startup** 22:25
23:1
**state** 2:8 4:23
5:22 69:19
71:3 72:22
73:23 74:11
94:10 124:2
177:22 207:6
207:19 220:3
224:10 243:3
244:2,6,21
**stated** 69:24
146:12,25
**statement**
151:16,23
155:16 157:6
220:11 230:9
**statements**
103:20 113:16

Case No. 1:23-cv-01625-PGG-SAS Document 40-3 Filed 08/04/23 USDC Colorado pg 117 of 128

| | | | |
|---|---|---|---|
| 113:23 126:15 | 101:5,13,24 | **structure** 40:20 | **subordinates** |
| 214:8,11,12 | 102:5,11 | 66:9 131:19 | 235:19 |
| **states** 1:1 4:13 | 215:15 216:17 | 143:3 | **subscribed** |
| 5:14 9:7 25:3 | 220:15 | **struggling** 23:2 | 243:13 |
| 30:4 35:13 | **stepping** | **stubs** 31:14 | **subtle** 175:5 |
| 128:18 131:10 | 150:17 | **students** 17:12 | **successful** |
| 145:22 146:16 | **steps** 32:16 | **style** 154:7 | 158:16 164:9 |
| 173:1 175:12 | **stereotype** | 158:7 159:1 | 197:17,20 |
| 229:14 230:6 | 186:5 | 164:2 165:3,6 | **successfully** |
| 231:4,16 | **stir** 154:4 | **subconscious** | 76:7 79:23 |
| 235:17 | **stomach** | 43:25 85:21 | 84:14 92:14 |
| **statics** 104:9 | 112:11 | 209:7 | 160:2 219:1 |
| **stating** 149:8 | **stop** 38:20 | **subject** 3:8,10 | 224:14 |
| 151:9 | 188:7 | 3:12,14,17 | **sudden** 179:6 |
| **status** 180:19 | **story** 82:7 | 21:15 51:9 | 205:4 234:7 |
| 181:3 183:23 | **strained** 185:13 | 52:5,14,23 | **suffer** 70:13 |
| 183:24 184:24 | **street** 1:13,17 | 145:14 191:13 | 89:15 |
| 236:19 | 1:21 2:5 4:16 | 191:20 195:13 | **suffered** 40:13 |
| **stay** 105:18 | **strength** 224:6 | 205:5,5,6,6 | 40:18 42:9 |
| 198:8 | **stress** 42:15,25 | 225:12 233:5 | 43:13 45:15,19 |
| **stayed** 221:15 | 43:8 44:14,21 | **subjected** 64:6 | 66:13 73:16 |
| 221:18 | 45:23,25 46:11 | 64:8,12 112:1 | 78:6 |
| **stays** 22:2 | 79:15 82:25 | 220:6,20 | **suffering** 40:2 |
| **stealing** 40:23 | 85:6,25 86:24 | **submit** 59:16 | 79:9 85:6 |
| **stellar** 139:1,3 | 90:8 96:22 | **submitted** | 104:2 |
| **stenotype** | **stressful** 43:12 | 26:13 59:22,23 | **sufficient** 40:12 |
| 244:11,14 | **strict** 82:20 | 59:25 62:6,9 | **suggested** |
| **step** 150:21,23 | 106:8 | 62:15 63:3,15 | 239:16 |
| 151:2 159:4 | **strictly** 180:20 | 117:6 123:23 | **suggesting** |
| 178:11 179:10 | 180:23 | 226:7,12,17 | 203:20 |
| 203:13 239:15 | **string** 169:24 | **submitting** | **suggestions** |
| **stephanie** 54:6 | **strong** 40:3 | 59:13 | 203:16 |
| 54:9,10,19 | **structural** | **subordinate** | **suite** 1:13,17,21 |
| 55:21 100:18 | 79:20 128:14 | 230:6 | 2:5 |
| 100:23,25 | 191:24 198:20 | | |

Case No. 1:23-cv-01626-SKC-KAS Document 40-13 filed 08/04/25 USDC Colorado pg 118
of 128

| | | | |
|---|---|---|---|
| **suits** 47:5 | 43:23 45:8 | 111:15 112:1 | 147:15,20 |
| **sullivan** 3:4,10 | 58:16 60:6 | 220:18 | 164:1 165:7,14 |
| 75:14 79:4 | 61:1 64:11 | **susie** 99:5,7 | 168:10,20 |
| 80:1 81:10,12 | 65:21 71:1 | **swain** 1:12,13 | 174:5 176:1 |
| 82:4 218:15,20 | 78:11 87:13,22 | 5:3,3 8:14,20 | 181:11,16 |
| 219:22 227:7 | 105:8,21 | 9:17,23 10:4 | 182:12,20 |
| 227:13 | 113:21 114:1,1 | 11:9 12:16 | 183:3 185:10 |
| **sullivan's** | 114:22 116:4 | 13:3,16,19 | 189:23 194:3 |
| 218:23 | 117:25 119:20 | 14:2,13,25 | 194:17 195:18 |
| **supervise** 60:19 | 124:14,14 | 15:24 16:3 | 203:19 208:8 |
| 144:22 | 126:13 137:20 | 18:22 20:1 | 214:13 228:1 |
| **supervised** | 140:17 142:15 | 24:24 25:16,20 | 239:24 240:10 |
| 235:21 | 144:13,22 | 25:23 30:24 | 240:14 241:11 |
| **supervision** | 145:9,18 | 31:15 32:4,10 | 242:3,13,16,19 |
| 129:22 203:25 | 148:10 150:6 | 33:3,8,14 34:9 | 245:1 |
| **supervisor** 18:8 | 153:7,9 157:18 | 34:13 35:9,21 | **swainemploy...** |
| 28:19 43:20 | 159:25 164:3 | 36:3,15 37:25 | 1:15 245:2 |
| 69:19 70:1 | 176:23 179:11 | 39:4 43:1 | **sweeney** 65:16 |
| 72:22 119:13 | 181:13 189:1 | 44:25 46:18 | 65:17 66:6,19 |
| 142:5 226:5 | 189:10 190:5 | 48:1 50:20,24 | 67:8,23 68:12 |
| **supervisors** | 194:7 210:23 | 53:22 70:11 | 68:15 |
| 43:23 | 213:23,24 | 73:14 79:12 | **sweeney's** |
| **supplemental** | 232:8 | 80:14,22 87:22 | 65:25 66:3 |
| 2:17 | **surely** 45:13 | 95:3 96:10 | **switch** 191:18 |
| **supply** 191:14 | **surprised** 83:9 | 105:10 113:10 | **sworn** 5:6 |
| **support** 190:14 | 104:23 | 113:18,25 | 243:5,13 244:8 |
| 224:14 239:13 | **survey** 55:24 | 114:10,13 | **symptoms** |
| **supposed** 72:2 | 56:4,22 57:1,6 | 115:1 116:1,7 | 44:20 45:5,15 |
| 191:7 237:20 | 57:9 58:20 | 117:3,23 118:3 | 45:20 223:10 |
| **sure** 8:17 11:14 | 86:7 98:16 | 118:15 119:18 | **system** 20:2 |
| 14:19 15:2 | 99:8,22 100:4 | 121:1 122:6,15 | 54:14 93:18 |
| 16:1 17:14 | 100:13 101:2 | 123:10 124:4 | **systematic** |
| 18:1 19:1 | 102:21 107:7 | 126:22 127:3 | 40:19 79:20 |
| 32:14 34:15 | 107:18 108:14 | 130:14 134:15 | |
| 41:20 43:1,3 | 109:12 111:5 | 134:22 135:1 | |

CaSeseNo:22:23-04-0262535PGPKASASDocumemt40tB3Filed 08/04/295606/29DCUStDCaColopagd019
pg 1of9108128

| t | | | |
|---|---|---|---|
| **t** 246:3,3 | 199:1 221:24 | 182:13,15 | 59:6 60:17 |
| **table** 87:7 | 232:14 235:11 | 183:4 208:9 | 62:1,2,11 |
| 168:5 | 244:11 | **talks** 88:7,7 | 63:11,23 65:3 |
| **tailor** 105:17 | **takes** 108:21 | 108:21 | 72:10,15 82:12 |
| **take** 4:6 21:9 | 159:8 194:21 | **tamer** 95:8 | 83:13,14 85:23 |
| 21:16 32:16 | 209:8 | **targeting** 17:16 | 86:12 89:1,3 |
| 47:5,15 67:6 | **talent** 15:18 | 21:17 | 96:16 98:23 |
| 68:20 74:7 | 199:16 | **task** 54:21 | 101:16,17,18 |
| 76:2,10,15 | **talk** 44:10 56:3 | 138:10 177:7 | 103:4,5,14 |
| 78:10 85:16,19 | 56:21,23 58:19 | **tasked** 57:8 | 104:22 105:4 |
| 97:8 112:20 | 59:3 77:24 | 59:19 190:19 | 108:16 122:7 |
| 118:18 125:12 | 78:11 82:10 | **tasks** 20:17 | 123:6,11,12,12 |
| 127:16 129:24 | 90:9 97:16,17 | 76:7 79:23 | 123:16 128:11 |
| 130:3 136:20 | 104:22 109:1 | 83:3 84:14 | 131:17,18,23 |
| 141:6,19 149:4 | 160:17 168:20 | 86:1 138:9 | 160:19 166:24 |
| 151:11 152:15 | 169:20,23 | 143:15 152:20 | 167:18 171:20 |
| 152:24 154:14 | 179:7 180:23 | 154:13 195:7 | 175:15,16 |
| 155:25 169:6,7 | 180:24 201:15 | **tax** 113:7,9 | 176:16,17 |
| 171:3 173:24 | 201:15 203:9 | **taxes** 113:5 | 177:6 183:21 |
| 175:6 184:6,10 | 209:9 213:22 | **taylon** 47:25 | 183:22 184:23 |
| 189:6,11 | 219:1 221:16 | 48:3,6,12,18,21 | 185:1 188:12 |
| 191:12 192:23 | 221:17 233:2 | 100:17 111:12 | 193:8,10 194:2 |
| 194:12 198:22 | 236:19 | 215:14 216:13 | 195:25 200:11 |
| 204:4 205:19 | **talked** 81:19 | **taylor** 75:13 | 202:8,10 |
| 209:23 210:2 | 103:12 187:14 | 77:19,21 79:8 | 213:15 220:17 |
| 210:18 216:25 | 208:17,19 | 79:11,24 80:4 | 223:6 231:24 |
| 228:8 232:19 | 209:3 212:5 | 80:10,12,21 | 231:24 238:24 |
| 233:15 239:16 | 230:19 | 219:10 | 239:3 |
| **taken** 2:4 4:9 | **talking** 14:14 | **taylor's** 81:1 | **teams** 28:6 59:4 |
| 47:8 59:17 | 50:21 66:11 | **teach** 60:20 | 59:7 61:25 |
| 112:25 114:12 | 79:18 84:18 | **teaching** | 112:5 |
| 115:14,24 | 86:10 96:25 | 208:23 211:11 | **technology** |
| 116:5 147:12 | 106:9 110:7 | **team** 21:2 | 97:18 |
| 157:21 163:9 | 114:14 124:5,7 | 28:15 43:24 | **ted** 88:7,7 |
| | 168:11 177:14 | 55:5,11,14,17 | 201:14,15 |

Case No. 1:23-cv-01625-SKC-KAS Document 40-13 filed 08/04/25 USDC Colorado pg 120 pg 107 of 128

| | | | |
|---|---|---|---|
| 203:9 | **terminated** | 95:21 117:21 | 221:16 222:9 |
| **tell** 6:23 13:24 | 63:17 227:22 | 117:25 118:5,9 | 222:18,19 |
| 20:11 23:23 | 228:6 229:1,5 | 134:16 | 223:2 230:15 |
| 24:5 35:24 | **termination** | **texting** 223:14 | **think** 7:19 |
| 47:23 58:1,12 | 9:8 14:16 | **thank** 39:4 | 11:13 18:10 |
| 61:17 64:17 | 16:18 30:13,20 | 169:19 | 39:16 47:4 |
| 75:16 77:18 | 31:21 37:4,6 | **therapist** 37:13 | 57:12,13 62:7 |
| 81:17 85:5,8 | 40:14 42:9 | 46:10 | 76:14 77:2,5 |
| 91:21 99:17 | 44:23 50:21 | **therapy** 40:5 | 88:11 90:7 |
| 101:8 107:2,13 | 52:3,12 67:13 | **thereof** 244:14 | 94:22 103:15 |
| 107:23 108:7 | 67:15,18,22,25 | **thing** 22:16 | 105:7 112:21 |
| 109:7,17,25 | 113:5 116:10 | 79:13 84:16 | 136:11 138:12 |
| 110:2 111:10 | 227:24 228:12 | 87:12 145:2 | 139:12 140:2,4 |
| 111:20 112:17 | 228:21 | 155:24 164:11 | 141:8 143:3 |
| 133:2 153:5 | **terminologies** | 203:20 237:24 | 148:10 151:25 |
| 163:22 167:21 | 191:15 195:6 | **things** 21:1,13 | 155:16 157:16 |
| 168:18 172:3 | **terms** 36:7,8 | 39:6 40:7 41:2 | 173:11,14,16 |
| 174:13 182:17 | **terrell** 47:25 | 42:5 60:24 | 175:20 177:3,8 |
| 183:19 184:7 | 48:3,7,12,18,21 | 61:2 72:7 78:5 | 183:12 184:7 |
| 204:17 212:1 | 48:23,25 49:3 | 83:6 90:3 | 184:11 201:7 |
| 222:25 | 49:16 50:9 | 108:10,20 | 205:14 210:22 |
| **telling** 61:13 | 111:12,16,20 | 116:13 125:3 | 212:4,7,9 |
| 106:2 108:9 | 215:14 216:13 | 138:21 145:9,9 | 219:19 221:19 |
| 166:24 167:16 | **testified** 5:7 | 145:10 150:18 | 225:15 227:2 |
| 173:18 176:12 | 33:4,9 215:3 | 152:18 153:22 | 231:14 233:7 |
| 185:8,18 188:1 | 239:5 | 154:4,22 | 238:7 241:25 |
| 201:4 208:15 | **testify** 244:9 | 155:19,22 | **thinking** 76:1 |
| 223:14 | **testimony** | 156:11,13 | **third** 9:6 30:4,9 |
| **tells** 154:19 | 196:12 212:21 | 157:1 162:9 | 126:14 205:25 |
| **temptation** 6:6 | 214:7 219:15 | 167:1 170:13 | 207:19 232:6 |
| **ten** 23:11,12 | 225:10 230:2 | 174:8,9 177:6 | **thompson** |
| 62:13 | 243:3,5 245:9 | 178:1,15 | 63:19,20,22,24 |
| **tense** 104:19 | 245:18 | 185:15 186:1 | 64:1,8,11 |
| 135:21 185:16 | **text** 49:3,8,9,24 | 187:4 197:15 | 215:14 216:15 |
| 188:19 | 58:20 68:15 | 201:13,21 | 229:25 230:7 |

Case No. 1:23-cv-01610-SKC-KAS Document 40-13 filed 08/04/25 USDC Colorado pg 121 of 128

| | | | |
|---|---|---|---|
| 230:12,24 | 53:5,6 58:23 | 189:6,15 | 126:21 127:13 |
| **thompson's** | 59:10 64:19,21 | 191:10 192:8 | **titles**   122:22,22 |
| 230:22 | 66:21 67:7,9 | 192:12 193:18 | **today**   7:8,25 |
| **thought**   65:4 | 67:12 68:6 | 193:19 194:24 | 8:5 40:24 41:1 |
| 97:16 125:1 | 69:7 72:14 | 195:18 196:24 | 41:10 74:20 |
| 138:20 146:8 | 75:8,21 76:18 | 197:4 198:9,14 | 201:22 241:19 |
| 152:1 163:6 | 79:5 80:3 82:6 | 198:17,19 | **together**   48:22 |
| 166:12 167:3 | 84:20 85:25 | 199:2 200:12 | 54:18 58:10,11 |
| 201:22 205:16 | 91:11 103:21 | 202:19 204:18 | 59:20 96:12 |
| 217:1 | 104:2,24 105:3 | 206:23 208:4 | 125:3 172:5 |
| **thoughts**   40:11 | 105:13 108:3 | 211:24 212:8,9 | 174:12 175:17 |
| 40:22 | 110:16 112:21 | 213:19 217:10 | 178:1 184:2 |
| **thread**   136:10 | 113:3 114:12 | 218:2 222:4 | 243:4 |
| 136:12,14 | 115:16 116:17 | 225:1,8,24 | **told**   20:19 21:6 |
| **threaten** | 120:17 124:5,9 | 226:3 235:12 | 21:9 23:24 |
| 174:24,25 | 126:8 127:9 | 235:15 237:6 | 56:1 64:16,21 |
| **three**   9:15,25 | 128:6 129:1 | 237:25 241:13 | 64:21,22 67:23 |
| 13:8 14:15 | 132:2,25 134:7 | 241:19 242:24 | 76:17 78:16,20 |
| 54:1 206:11,12 | 135:2,3,6,22 | 244:11 245:19 | 79:19 85:9 |
| **threshold** | 142:2,6 144:3 | **timeframe** | 87:9,12 88:13 |
| 193:2 | 144:6 146:19 | 245:8 | 91:24 92:4 |
| **tiktok**   240:22 | 146:22 147:21 | **timeline**   205:13 | 98:16 102:15 |
| **time**   4:2 6:16 | 147:25 148:4 | **timelines**   155:7 | 109:24 110:13 |
| 7:15 13:8 | 149:8,16,24 | 155:14 | 110:20,21 |
| 14:13,15 18:16 | 150:5,7 151:25 | **times**   39:14,15 | 118:12 133:24 |
| 18:21 24:3,11 | 152:23 153:24 | 39:17 60:23 | 140:16,20 |
| 24:13,19 25:6 | 155:12 157:16 | 86:15,16 121:9 | 152:22 155:22 |
| 26:1,20 27:2 | 157:22 158:1 | 186:17 200:5 | 157:4 167:8 |
| 27:12 30:13 | 161:7,20 | 206:20 207:21 | 171:24 174:14 |
| 34:16 38:4,4,6 | 166:18,19 | 221:1 235:22 | 174:15,15 |
| 38:10,11,12,24 | 168:16,21 | 237:19 | 179:17 190:21 |
| 40:6 42:14,23 | 169:20 171:24 | **title**   3:2,5 17:17 | 201:10 202:4 |
| 44:2,5,20 45:4 | 176:23 183:16 | 18:11 28:13 | 206:18 209:11 |
| 47:4,15 51:23 | 183:24 185:9 | 61:24 71:10,11 | 209:17 210:1 |
| 51:25 52:3 | 186:24 187:17 | 97:7 122:20 | 214:23 219:15 |

Case No. 1:23-cv-01625-SKC-KAS Document 40-13 filed 08/04/25 USDC Colorado pg 122 of 128

| | | | |
|---|---|---|---|
| 226:18 227:1 | **toward** 160:8 | **treatment** 37:3 | **tti** 27:13,14,17 |
| 229:4 232:15 | 203:13 | 37:9,12 82:19 | 28:22 30:1 |
| **toll** 112:9 | **towards** 195:10 | 89:3,3 110:4 | 35:20 36:5 |
| **tone** 202:3 | 204:10 | 110:22 121:22 | 72:21 73:17,21 |
| 205:5 234:8,10 | **toxic** 89:25 | 158:10 172:11 | **turbotax** |
| 234:11,15,16 | **track** 14:19 | 197:24 207:8 | 113:11 |
| 234:20,23 | **traction** 15:22 | 209:7 224:1,6 | **turmoil** 166:20 |
| **took** 16:5 39:20 | **training** 16:14 | 230:3,12 | **turn** 61:21 |
| 59:12 89:10 | 18:13 19:1 | 235:18 | 68:18 69:11 |
| 93:15,16 | 28:6 83:11 | **treats** 167:17 | 123:20 |
| 114:23 140:9 | 162:21 218:25 | **trick** 143:25 | **turned** 226:25 |
| 154:6 156:6 | **transcribing** | **tried** 82:18 | **turning** 47:12 |
| 170:16 171:1 | 6:19 | 106:15 216:21 | 51:2 206:2 |
| 174:2,7 175:8 | **transcript** | **tries** 93:17 | 230:5 |
| 176:10 217:25 | 242:10 243:3 | **triggered** 40:21 | **turns** 90:6 |
| 230:16 233:17 | 244:13 245:6 | **triggers** 40:1 | **twice** 38:1 |
| **tool** 17:2 | 245:20 | **trouble** 84:12 | 199:25 |
| **top** 86:4 139:16 | **transfer** 80:6 | 168:18 | **twitter** 240:22 |
| 186:17 | 225:25 226:4 | **true** 69:1,7 | **two** 21:19 |
| **topic** 43:11 | **transition** | 94:13,14 | 23:25 39:14,17 |
| 59:14,15 | 140:4 198:20 | 209:12 244:13 | 39:18,18 48:14 |
| 178:18 205:15 | **trauma** 40:1,13 | **trust** 55:25 | 48:15 59:23 |
| 212:11 | 40:17,19 42:8 | 57:7,13 164:11 | 72:12 77:21 |
| **topics** 21:15 | **treat** 165:2 | 164:13 175:18 | 103:11 138:12 |
| 58:15 59:8 | **treated** 59:24 | **trusting** 164:13 | 140:4 152:2 |
| 60:12 209:13 | 65:5,9 90:4 | **truth** 244:9 | 158:20 180:1 |
| 233:7,8 | 100:5 104:9 | **truthfully** 8:1,5 | 186:25 189:15 |
| **total** 242:24 | 120:1 121:25 | **truthfulness** | 200:5 202:12 |
| **touch** 40:6,7 | 160:22 162:6 | 69:4 | 202:13 237:7 |
| 51:17 79:4 | 229:16 230:8 | **try** 6:23 93:23 | 237:11 238:8 |
| 80:1,21 83:16 | 230:13 | **trying** 41:6 | **type** 11:18 81:6 |
| 158:14 213:8 | **treating** 65:2 | 104:12 108:3 | **typewritten** |
| 218:5,6,8 | 89:1 106:21 | 172:18,21 | 244:12 |
| 219:3 237:2 | 122:3 | 179:2 186:5 | **typical** 193:10 |
| | | 222:22,23 | 194:1,5 |

Case No. 1:23-cv-01625-SKC-CYC Document 40-13 filed 06/09/25 USDC Colorado pg 123 of 128

| u | | | |
|---|---|---|---|
| **u**  11:17 16:11 | **uncomfortable** | 154:6 165:9,11 | **unjustly**  36:21 |
| **u.s.**  229:8 | 222:9,15,18 | 181:7 189:14 | 36:24 38:8 |
| **ugly**  138:22 | 223:1,3,21 | 192:15 193:21 | **unquote**  112:10 |
| **uh**  6:1,7,7 11:1 | **under**  9:2,3 | 194:15,20 | 155:21 202:6 |
| 12:20 13:23 | 35:12 42:14 | 195:4,22 | **unrealistic** |
| 18:9 21:8 | 43:7 61:25 | 199:15 201:24 | 224:13 |
| 28:20 33:5 | 66:9 71:3 | 203:13 236:5 | **unresponsive** |
| 36:19 43:5 | 79:14 82:17,17 | **understands** | 241:22 |
| 45:1 47:3 | 82:25 83:12 | 87:13 209:19 | **unsafe**  43:8 |
| 52:23 64:14 | 85:24 86:24 | **undertaken** | 85:11 |
| 65:1,24 66:21 | 89:16,16 92:18 | 18:20 | **unsure**  18:14 |
| 67:19 68:24 | 103:24,24,24 | **undervalued** | **update**  183:24 |
| 69:21 71:6 | 129:16 149:7 | 65:6 82:11 | 236:20 |
| 72:20 75:18 | 151:8 154:23 | 106:22 | **updates**  151:12 |
| 88:24 119:6 | 155:2 159:25 | **undeserved** | 152:17 180:19 |
| 125:16 129:5,5 | 164:25 196:25 | 220:6,12 | 183:23 184:25 |
| 140:5 142:1 | 197:11 243:3 | **unease**  60:23 | 195:2 |
| 143:22 149:6 | **underlying** | **unemployed** | **upper**  101:3 |
| 149:23,23 | 201:19 | 9:8 25:4 | 102:6 108:15 |
| 155:9 169:18 | **undermined** | **unemployment** | 110:10 152:11 |
| 172:12,14 | 65:6 | 9:15,20 10:1 | 158:14 160:17 |
| 173:23 181:25 | **undermining** | 25:12,18 26:5 | 178:17 194:8 |
| 192:17 229:19 | 190:23 | 26:17 30:5 | 194:10 211:5 |
| 234:1 235:2 | **understand** | **unfair**  209:7 | **upset**  134:1 |
| **ultimately** | 5:16 6:12,22 | **unfold**  201:3 | 136:5 168:8,17 |
| 226:7 228:5 | 6:25 7:13 8:1,5 | **unfortunately** | 173:10,22 |
| 232:22 | 34:5,17 36:16 | 104:18 141:8 | 174:12,16 |
| **unable**  223:12 | 87:4 88:1,12 | **unhealthy**  68:7 | 183:1 202:5 |
| **unaware**  53:1 | 124:15 127:5,7 | **unheard**  86:14 | **usa**  69:18 70:15 |
| 65:25 | 151:20 153:2 | **unintended** | 70:19,22 71:3 |
| **unbearable** | 154:18 156:3 | 88:4 | 71:23 |
| 68:9 | 201:12,19,19 | **unit**  4:8 | **use**  17:2,4 |
| **unclarity**  20:23 | 203:17 221:16 | **united**  1:1 4:13 | 113:16 191:12 |
| 24:7 | **understanding** | 5:14 | 233:16 240:18 |
| | 22:5 31:4 34:2 | | 241:18 |

Case No. 1:23-cv-01625-SKC-KAS Document 40-13 filed 08/04/25 USDC Colorado pg 124 of 128

| | | | |
|---|---|---|---|
| **used** 86:3<br>232:22 233:5<br>241:11 245:20<br>**using** 191:20<br>**usually** 26:10<br>44:9 68:13,14<br>87:18 89:8,18<br>90:5 93:14<br>143:6 159:8<br>178:21 183:23<br>185:15 186:1<br>193:7 194:21<br>200:9 | **vendors** 152:16<br>153:4,21<br>158:14 160:16<br>**vent** 44:10<br>**venting** 95:14<br>**verbal** 6:4<br>**verbally** 223:3<br>**verification**<br>68:25<br>**verify** 245:9<br>**veritext** 4:18,19<br>245:14,23<br>**veritext.com**<br>245:15 | 242:5<br>**view** 184:8<br>**views** 184:10<br>186:16<br>**virginia** 120:11<br>120:20 132:13<br>132:16 134:7<br>166:8 200:3<br>**virtual** 123:13<br>128:8 130:18<br>130:21 198:12<br>232:20<br>**virtually**<br>128:13 | **wages** 9:3 30:5<br>**wait** 148:18<br>**walker** 56:15<br>111:23 112:13<br>112:17<br>**wall** 41:12<br>**walsh** 119:8,12<br>119:15,17,21<br>120:1,5,17,19<br>120:22 121:11<br>121:25 122:3<br>122:12,14<br>165:2 |
| **v** | **version** 123:22<br>232:20 | **vision** 19:24<br>20:19 145:21 | **walsh's** 121:22<br>**want** 8:7 17:25 |
| **v** 245:4 246:1<br>**vacation** 189:3<br>189:11<br>**vague** 115:2<br>**validating**<br>139:2<br>**validation** 67:1<br>95:17<br>**valuable**<br>186:19<br>**value** 187:3<br>190:23<br>**values** 217:3<br>**vendor** 51:14<br>51:15 52:7<br>151:12 153:8<br>176:13 178:11<br>190:17 191:2<br>195:5 237:1<br>**vendor's**<br>194:23 | **versus** 4:10<br>**vice** 165:11<br>**video** 1:9 2:2<br>4:5,8 91:14<br>112:23 113:2<br>157:25 201:15<br>201:15 203:8,9<br>203:10,12<br>211:23 235:14<br>242:7<br>**videoconfere...**<br>73:5 91:12<br>**videographer**<br>1:24 4:3,18<br>46:20 47:6,9<br>112:22 113:1<br>157:19,24<br>198:24 199:3<br>235:4,9,13 | **visit** 18:4<br>**visits** 32:19<br>39:18<br>**voice** 39:25<br>209:12<br>**voiced** 208:22<br>208:25<br>**voluntary**<br>20:12<br>**volunteered**<br>191:10 239:5<br>**vp** 188:4<br>**vs** 1:5 | 18:12 42:20<br>55:8 58:14<br>60:10 84:12,13<br>105:8,20<br>110:18 124:13<br>124:14 150:15<br>154:16,16<br>171:14 175:18<br>177:2 178:22<br>183:20 184:10<br>185:16 186:9<br>186:22 192:9<br>196:7,15<br>202:11,16<br>210:12 213:20<br>232:10 235:7<br>241:22 242:15<br>242:17 |
| | | **w** | **wanted** 13:8<br>44:2 140:17 |
| | | **w** 31:14 121:17<br>**waddill** 52:4,7<br>52:10<br>**wage** 31:13 | |

Case No. 1:23-cv-01625-SKC-KAS   Document 40-13   filed 08/04/25   USDC Colorado   pg 125
pg 125 of 128

| | | | |
|---|---|---|---|
| 176:23,25 | 74:1 121:9 | **withdrawn** | 201:12,13 |
| 179:11,12,13 | **weekly** 103:5 | 43:15 | 209:20 210:5 |
| 210:1,17 | 132:6 175:16 | **withheld** 152:8 | 211:10,10 |
| 232:19 | 176:17 184:23 | 225:9,11 | **wonderful** |
| **wants** 59:6 | 195:1 | **withholding** | 164:5 |
| 178:23 | **weeks** 23:25 | 159:24 178:8 | **wondering** |
| **war** 85:10 | 25:4 72:11 | 178:13 197:13 | 36:1 |
| **watch** 203:10 | 203:1,4 224:11 | **witness** 64:4 | **word** 93:2,2 |
| **way** 72:18 76:2 | 235:22 237:22 | 66:12 96:6 | **words** 126:3 |
| 76:6,23 79:23 | 237:23 | 99:12 106:23 | 136:4 137:5 |
| 85:1,22 86:23 | **weight** 68:7 | 108:4 244:8 | 167:25 218:4 |
| 87:16 92:13 | **welcome** 77:24 | 245:8,10,12,19 | 228:24 |
| 93:3 103:20 | **went** 39:15 | **witnessed** 96:4 | **work** 13:9,12 |
| 121:24 133:18 | 59:9 110:9 | 97:25 98:12,21 | 16:21 22:19 |
| 136:5 145:6 | 115:3 143:11 | 98:24 99:5,20 | 26:1 30:8 40:4 |
| 150:2 156:5 | 187:23 225:23 | 100:24 101:5 | 40:5 41:17 |
| 159:4 160:5 | **white** 59:17,18 | 102:18 103:1,7 | 43:10,14 46:10 |
| 167:5 169:1,3 | 60:18 65:2,9 | 103:10 105:23 | 48:23 51:20,21 |
| 170:19 174:25 | 70:7 79:18 | 107:5,16 108:1 | 51:24 52:10 |
| 178:12 183:1 | 82:11,20 84:15 | 109:10,20 | 53:9 54:17 |
| 189:2 194:25 | 85:23 89:1,16 | 110:22 111:2 | 59:16 72:7 |
| 211:6 215:1 | 110:23 119:16 | 111:13,24 | 74:1 76:10,13 |
| 216:11 218:1 | 129:15 133:22 | 223:5 | 76:18 78:12,25 |
| 228:3 244:15 | 160:23 161:1 | **witnesses** | 83:12 85:10 |
| **ways** 49:5,6 | 167:18 186:4 | 113:16,22,24 | 86:2 87:25 |
| 141:22 172:19 | 197:3 201:12 | **witnessing** | 104:10 108:21 |
| **we've** 54:17 | 229:16,17,20 | 110:3,6 214:20 | 109:1,1 110:7 |
| 105:12 175:12 | 230:6 235:18 | **woman** 37:21 | 114:19 120:8 |
| 194:24 | 235:20 238:22 | 41:10 43:19 | 120:10,19 |
| **website** 192:19 | **willing** 36:8 | 79:17 85:20,21 | 131:21 138:14 |
| **websites** 13:24 | **willingness** | 87:3,5,18 88:2 | 145:7 150:21 |
| **wedding** 50:12 | 90:9 | 89:6 90:12,17 | 155:14 156:1,1 |
| 50:13 | **winding** 152:12 | 121:19,20 | 163:9,20,21 |
| **week** 3:10 | **wish** 175:3 | 170:18,18 | 167:6 171:19 |
| 25:12 26:4,17 | 179:14 | 186:3 201:10 | 175:17 188:9 |

Case No. 1:23-cv-01625-SKC-SBP ... Document 40-13 filed 08/04/25 USDC Colorado pg 126
pg 127 of 128

| | | | |
|---|---|---|---|
| 209:23 226:7 | **workplace** | 151:22 152:21 | 181:21,21 |
| 226:14,21,25 | 41:11 43:6 | 157:2 | 182:6 195:22 |
| 230:19,22 | 44:5,13 85:22 | **wrong** 76:2 | 202:15 225:16 |
| 234:6 239:6,9 | 87:19 88:5,9 | 84:10 121:18 | 242:14 |
| 239:11 | 89:18 201:11 | 189:10,17 | **year** 30:14,18 |
| **workbook** | 201:14,25 | **wrongdoing** | 30:20 34:3,6 |
| 238:4 | 208:20,24 | 41:14 89:22 | 38:15 50:4 |
| **worked** 34:19 | 209:8,21 | 91:25 96:19,25 | 52:2,12 131:7 |
| 44:6 48:22 | 211:13 | 99:11,23 112:3 | 141:23,23 |
| 51:13 54:17 | **workplaces** | 171:21 | **years** 13:8 38:3 |
| 122:18 131:17 | 44:9 | **wrongdoings** | 38:15 60:16 |
| 193:10 200:1 | **works** 131:18 | 41:4 98:24 | 164:17,22 |
| **workforce** 87:5 | 138:13 | **wrote** 149:12 | **yep** 16:9 30:11 |
| 87:6 | **worry** 89:14 | 149:13 155:24 | 91:7 106:14 |
| **working** 13:7 | 151:21 156:23 | 157:9,9 204:19 | 121:10 |
| 17:10 18:16,21 | 223:15 | 205:11 225:1 | |
| 27:17 48:25 | **worse** 76:8 | | **z** |
| 51:10 52:25 | 185:17 188:24 | **x** | **z** 89:7 178:24 |
| 70:14,22 73:17 | 188:25 | **x** 2:10 89:7 | **zero** 42:13 |
| 78:24 97:6 | **worsen** 231:22 | 178:24 237:21 | **zone** 85:11 |
| 108:18 110:9 | **worsened** | | **zoom** 91:14 |
| 111:1 129:1,16 | 231:17 232:13 | **y** | |
| 130:19 132:11 | **worst** 158:11 | **y** 89:7 178:24 | |
| 132:15 134:6 | **worth** 164:11 | **yeah** 38:23 | |
| 138:12 147:3,8 | **write** 149:15 | 39:16 46:9 | |
| 166:5,7 177:13 | 162:20 230:24 | 49:8 55:15 | |
| 178:1 188:21 | **writes** 177:5 | 63:10 65:24 | |
| 189:14 190:5 | **writing** 140:17 | 71:10 81:9 | |
| 202:18,20 | 140:21 141:7 | 85:7 88:22 | |
| 206:15 209:4 | 144:17 146:13 | 111:5 115:2 | |
| 211:24 236:20 | 165:24 205:17 | 117:10 118:16 | |
| 237:7,8,10,11 | **written** 2:1,18 | 119:9 123:4 | |
| 237:12,14 | 113:15,23 | 124:9 134:11 | |
| 238:8,9,10 | 114:14 116:13 | 145:3 148:6 | |
| | 140:15 143:8 | 150:15 164:5 | |
| | | 165:17 180:12 | |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.