**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-01625-GPG-KAS

REHAB MOHAMED,

      Plaintiff,

v.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

      Defendant.

---

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
DATED AUGUST 4, 2023/SEPTEMBER 6, 2024 [DKT. # 83]**

---

Plaintiff responds to Defendant's Motion for Summary Judgment ("MSJ") as follows:

**<u>Response to Defendant's Statement of Undisputed Material Facts</u>**

**Movant's Fact ("MF") ¶ 1**: Admit.

**MF ¶ 2**: Admit.

**MF ¶ 3**: Admit.

**MF ¶ 4:** Admit.

**MF ¶ 5:** Admit.

**MF ¶ 6:** Admit.

**MF ¶ 7:** Admit.

**MF ¶ 8:** Admit.

**MF ¶ 9:** Admit.

**MF ¶ 10:** Deny. Mohamed did not receive "the largest raise possible." *Infra* Additional Disputed Facts ("AF")  ¶ 3.

**MF ¶ 11:** Deny. Director Liz Lacey also made the decision. *Infra* AF ¶ 2.

**MF ¶ 12:** Admit.

**MF ¶ 13:** Admit.

**MF ¶ 14:** Deny. This is inconsistent with SHRM's treatment of Mohamed. *Infra* AF ¶¶ 1, 2, 10, 11.

**MF ¶ 15:** Admit.

**MF ¶ 16:** Deny. Barley told Mohamed that she had no performance issues. *Infra* AF ¶ 11.

**MF ¶ 17:** Deny. Barley told Mohamed that she had no performance issues. *Infra* AF ¶¶ 11.

**MF ¶ 18:** Deny. *See* Responses to MF ¶¶ 14, 16, 17.

**MF ¶ 19:** Deny. "May 2020" is not in the cited testimony. Mohamed noticed Barley's racist treatment after the May 2020 review. (Respondent's Appx., p. 8-11, 22-25-Mohamed Dep. 146:19-149:6; 165:9-168:2.) *Infra* AF ¶¶ 4-9.

**MF ¶ 20:** Deny. MF ¶ 20 highlights conflicting testimony.

**MF ¶ 21:** Admit.

**MF ¶ 22:** Deny. SHRM terminated Mohamed on September 1, 2020. MF ¶ 58.

**MF ¶ 23:** Deny. MF ¶ 23 highlights conflicting testimony.

**MF ¶ 24:** Deny. The dates of Mohamed's complaints are disputed. MF ¶¶ 20, 23.

**MF ¶ 25:** Admit.

**MF ¶ 26:** Deny the sincerity of Barley's statements. *Infra* AF ¶ 18.

**MF ¶ 27:** Admit.

**MF ¶ 28:** Deny. The dates of Mohamed's complaints are in dispute. MF ¶¶ 20, 23, 24.

**MF ¶ 29:** Admit.

**MF ¶ 30:** Deny. Jackson's purported investigation was deeply flawed. *Infra* AF ¶¶ 45-52.

**MF ¶ 31:** Admit.

**MF ¶ 32:** Admit.

**MF ¶ 33:** Deny. SHRM discriminated against Mohamed through its agents.

**MF ¶ 34:** Deny that SHRM's Response was drafted in good faith. *Infra* AF ¶¶ 45-53.

**MF ¶ 35:** Deny that this was the purpose communicated to Mohamed. *Infra* AF ¶ 24.

**MF ¶ 36:** Admit.

**MF ¶ 37:** Deny that this was the focus of all the mediation sessions. *Infra* AF ¶ 24.

**MF ¶ 38:** Admit.

**MF ¶ 39:** Admit.

**MF ¶ 40:** Deny that Mohamed had no desire to improve her communication and that she "shut down and stopped communicating." *Infra* AF ¶¶ 28-29, 32-33, 37, 54.

**MF ¶ 41:** Deny the accuracy of Barley's report. *Infra* AF ¶¶ 25-27.

**MF ¶ 42:** Deny that Mohamed was unresponsive, canceling meetings, etc. *Infra* AF ¶¶ 28-29, 32-33, 37, 54.

**MF ¶ 43:** Deny that the projects were "key." *Infra* AF ¶¶ 62-63.

**MF ¶ 44:** Deny. Mohamed learned of the August 31 deadline on August 12. *Infra* AF ¶ 31.

**MF ¶ 45:** Deny that deadlines are determined using objective factors. *Infra* AF ¶ 30.

**MF ¶ 46:** Deny that Lessig's delay was "a common issue." *Infra* AF ¶¶ 25, 27, 29.

**MF ¶ 47:** Deny the implication that previous extensions were due to Mohamed. *Infra* AF ¶¶ 25-27, 33, 40.

**MF ¶ 48:** Deny the implication that prior extensions were due to Mohamed. *Infra* AF ¶¶ 25-27, 33, 40.

**MF ¶ 49:** Deny the implication that previous extensions were due to Mohamed and that the course deadlines were non-negotiable. *Infra* AF ¶¶ 25-27, 33, 39-44.

**MF ¶ 50:** Deny the accuracy of Schacht's response. *Infra* AF ¶¶ 25-31.

**MF ¶ 51:** Admit.

**MF ¶ 52:** Deny. Mohamed submitted her programs on August 27 and 28. *Infra* AF ¶ 54.

**MF ¶ 53:** Deny that Barley reviewed Mohamed's work. *Infra* AF ¶ 62.

**MF ¶ 54:** Deny that SHRM decided to fire Mohamed on September 1. *Infra* AF ¶¶ 57-59.

**MF ¶ 55:** Deny. Jackson was involved in the decision. (R's Appx., p. 37-Barley Dep. 17:1-16.)

**MF ¶ 56:** Deny. Others at SHRM made the decision before September 1. *Infra* AF ¶¶ 57-59.

**MF ¶ 57:** Deny. The reason for Mohamed's termination is disputed. *Infra* AF ¶¶ 54-63.

**MF ¶ 58:** Deny. The reason for Mohamed's termination is disputed. *Infra* AF ¶¶ 54-63.

**MF ¶ 59:** Deny that extending the deadlines was not an option. *Infra* AF ¶¶ 39-44.

<u>**Statement of Additional Disputed Facts**</u>

1.      SHRM hired Mohamed in 2016. (MF ¶ 1.) SHRM rated Mohamed as a Solid Performer or Role Model in all criteria for Q4 and 2019 overall and did not raise timeliness

or meeting deadlines as an issue. (R's Appx., p. 49-50-2019 Review; R's Appx., p. 56-57-Morris Dep. 101:11-17, 102:19-103:5,105:23-106:10.) Solid performer means an employee is doing their job. (R's Appx., p. 59-Morris Dep. 115:8-116:9.)

2.     In January 2020, Morris, Schacht, Barley, and Lacey promoted Mohamed to Senior Instructional Designer (R's Appx., p. 57-Morris Dep. 106:11-107:3.)

3.     Mohamed's new salary, $80,000 (MSJ Ex. A-4), was $8,000 above the minimum salary and $10,000 below the median (R's Appx., p. 73-Salary Ranges.)

**Barley treated Mohamed differently than Barley's white supervisees.**

4.     Morris was Mohamed's *de facto* manager until May 2020 after which she reported to Barley. (R's Appx., p. 6-10-Mohamed Dep. 144:19-145:18, 146:19-148:6; R's Appx., p. 38-Barley Dep. 21:19-24)

5.     Barley's other direct reports were Carrie Mills and Ann Godmere, both white, and Ebony Thompson, who is Black. (R's Appx., p. 74-75-Mills Decl. ¶¶ 1, 3, 8.)

6.     Barley treated Mohamed worse than Mills and Godmere by directing Mohamed not to meet alone with vendors, withholding information from her, and micromanaging her. (R's Appx., p. 12, 17-21-Mohamed Dep. 153:1-23, 158:6-160:6, 162:5-163:11.)

7.     Barley disparaged Mohamed's abilities, describing her as a "junior designer," and actively discouraged Mills from building rapport with Mohamed because she was fully remote although Godmere was also remote (R's Appx., p. 74-Mills Decl. ¶¶ 4-5.)

8.     Barley's tone with Mohamed was "overly aggressive" whereas Barley was friendly with Mills and Godmere. (R's Appx., p. 74-Mills Decl. ¶ 6.) On calls with Mohamed, Barley was "short, directive, and condescending" and talked at Mohamed for "roughly 80% of the

call." (R's Appx., p. 74-*id.* at ¶ 7.) Barley was "softer and jovial" with Mills and they had a more "equitable split of conversation." (*Id.*) Mills concluded that Barley was treating Mohamed differently because of her race and communicated this to others at SHRM. (R's Appx., p. 75-77-*id.* at ¶¶ 12-19.)

9.      Though Mohamed's work "above average," starting in April 2020, Barley asked Mills and Godmere to give Mohamed negative feedback. (R's Appx., p. 75-Mills Decl. ¶ 10.) Godmere's work was "poor" yet Barley used it "as a standard" for others. (*Id.*)

10.     In April 2020, Barley rated Mohamed for Q1 of 2020 as a Solid Performer or Role Model. (MSJ Ex. A-10.) The review contained comments about Mohamed's "timelines" and taking "ownership" of projects. (MF ¶ 17.)

11.     When Mohamed asked Barley about the comments, Barley assured her that her performance was "solid," she had "[n]o issues at all," and SHRM required constructive feedback in reviews. (R's Appx., p. 13-16-Mohamed Dep. 154:23-157:5.)

**In early June 2020, Mohamed complained about Barley's race discrimination.**

12.     On June 3, 2020, Mohamed told Morris that Barley was discriminating against her, which SHRM and Morris both deny. (R's Appx., p. 24-25-Mohamed Dep. 167:21-168:2; R's Appx., p. 82-McIntosh 30(b)(6) Dep. 27:14-28:24; R's Appx., p. 59-60, p. 64-Morris Dep. 116:22-118:11, 144:8-23.)

13.     Mohamed repeated her concerns about race discrimination in a meeting with Morris and Barley on June 4, which upset Barley. (MSJ MF ¶ 23.) Morris was dissatisfied with Barley's "defensive" response and addressed it with her later. (R's Appx., p. 61-Morris Dep. 128:1-23.)

14.     In mid-to-late June 2020, Jackson met with Morris and Barley's team without Barley. (R's Appx., p. 62-Morris Dep. 135:15-21, 135:24-136:5.) Mohamed and Thompson both reported that Barley was micromanaging them because of their race; Mills and Godmere did not report similar concerns. (R's Appx., p. 63-*id.* at 138:3-139:5.)

15.     On a July 6 phone call, Mohamed provided Jackson with examples of Barley's discriminatory behavior. (R's Appx., p. 113-114-Jackson Dep. 340:19-343:11, 347:3-15.)

16.     On July 7, Jackson met with Barley and Mohamed; Mohamed reiterated her discrimination complaints. (R's Appx., p. 33-Mohamed Dep. 217:5-20; R's Appx., p. 108-Jackson 250:17-252:4.) Jackson promised to follow up; he never did. (R's Appx., p. 33-34-Mohamed Dep. 217:8-218:17; R's Appx., p. 108-109, 113, 116-Jackson Dep. 250:15-20, 259:6-260:14, 343:12-18, 368:18-22.)

17.     On July 15, Mills told Schacht that Barley was treating Mohamed differently based on race. (R's Appx., p. 76-Mills Decl. ¶ 13.) Schacht assured Mills that he would "coach" Barley (*id.*); he does not recall this meeting (R's Appx., p. 124-Schacht Dep. 82:24-83:8.)

**Barley begins retaliating against Mohamed.**

18.     Barley was quite distressed by Mohamed's complaints (R's Appx., p. 65-Morris Dep. 174:6-10; R's Appx., p. 75-Mills Decl. ¶ 11) and frustrated that Mohamed repeated them to Schacht, Sullivan, and SHRM's CEO (R's Appx., p. 66-Morris Dep. 194:18-23, 196:3-12). Barley told Mills that she "was not capable of being racist" because she has a biracial child. (R's Appx., p. 75-Mills Decl. ¶ 11.)

19.     Barley told Mohamed to skip a June 25 project meeting or to stay quiet if she did attend. (R's Appx., p. 26-27-Mohamed Dep. 183:1-184:20.) Barley was frustrated that

Mohamed attended and participated, supposedly because the project was monopolizing designer time; however, she invited Godmere. (R's Appx., p. 75-Mills Decl. ¶ 9)

**Mohamed escalated her discrimination complaints to others at SHRM to no avail.**

20.    On July 21, Mohamed brought her race discrimination complaints to CEO Taylor; he sent her to Chief HR Officer Sullivan. (R's Appx., p. 2-5-Mohamed Dep. 77:16-80:2.)

21.    Mohamed spoke with Sullivan on July 22 and 23. (R's Appx., p. 138-Sullivan Dep. 154:15-24.) To Sullivan, these were intake calls to guide Jackson's investigation. (R's Appx., p. 130, 132, 137-*id.* at 51:10-52:21, 72:17-20, 150:6-151:1.)

22.    In early August, Sullivan arranged for Long to serve as a facilitator/mediator for Mohamed and Barley. (MSJ Ex. A-15; R's Appx., p. 140-Long Dep. 35:14-17.)

23.    Long asked to meet with Mills, who confirmed that Barley was discriminating against Mohamed. (R's Appx., p. 76-Mills Decl. ¶ 15.) Mills told Long that Barley gave Godmere and Mills, but not Mohamed, "considerable leeway with deadlines." (*Id.*)

24.    On August 27, Mohamed opted out of further mediation because the focus had shifted to scrutinizing her. (R's Appx., p. 31-32-Mohamed Dep. 204:7-205:8.) No one told Mohamed that mediation was mandatory, but SHRM held her decision to opt out against her. (R's Appx., p. 52-Morris Dep. 19:4-7, 20:8-25.)

**Barley imposed an unrealistic and inflexible deadline for Mohamed's projects.**

25.    In August 2020, Mohamed was working on two courses: Digital Transformation: Cultivating Elastic HR ("Digital HR") and Employment and Compliance Law ("Compliance Law"). (R's Appx., p. 78-79-Mills Decl. ¶¶ 30, 33.) Both had been delayed due to factors outside of Mohamed's control. (R's Appx., p. 79-*id.* at ¶¶ 32-33.)

26.     SHRM had scheduled Digital HR for July 2020 but rescheduled it for October after no one registered. (R's Appx., p. 69-Morris Dep. 212:15-25.) Once Mohamed completed the course in July, she was told to incorporate new material. (R's Appx., p. 53-*id.* at 31:9-13, 31:19-22, 32:5-20.)

27.     Lessig was originally designing Compliance Law; due to his dilatory work, Mohamed volunteered to become the designer and use Lessig as a SME in June. (R's Appx., p. 142-Email re Compliance program; R's Appx., p. 28-29-Mohamed Dep. 190:13-191:13.) SHRM supported this change. (R's Appx., p. 141-Email re Compliance program.) Lessig was notorious for tardiness. (R's Appx., p. 53-Morris Dep. 30:14-21.)

28.     On August 10, Barley asked Mohamed, Mills, and Godmere for updates on their projects. (MSJ Ex. A-19, SHRM 0145-46.)

29.     Mohamed responded on August 11 that the target completion date for Digital HR should be adjusted given the need to add new material and the completion date for Compliance Law might be affected by Lessig. (MSJ Ex. A-19, SHRM 0145.)

30.     On August 12, Barley, using mostly subjective factors, set August 31 as the deadline for both courses (MSJ Ex. A-19, SHRM 0145; R's Appx., p. 39, 48-Barley Dep. 45:13-46:12, 282:21-284:21.)

31.     Mohamed first learned of the August 31 deadline on August 12. (R's Appx., p. 30-Mohamed Dep. 192:5-13.) Morris assumed that Barley and Mohamed had negotiated the deadline before. (R's Appx., p. 67-68-Morris Dep. 202:1-5, 203:15-204:1, 204:18-205:2.)

32.     Mohamed responded by asking for Barley's advice on how to deal with issues that were causing delays with both courses. (MSJ Ex. A-19, SHRM 0144.)

33.    On August 14, Mohamed explained the delay in the completion dates for both courses. (MSJ Ex. A-19, SHRM 0143.) She copied Morris and Schacht. (*Id.*)

34.    Schacht pushed Barley to respond to Mohamed's August 12 email to "correct her quickly, or to support an eventual case for termination." (R's Appx., p. 146-Email re A suggestion.) Jackson helped Barley draft the email at Sullivan's direction. (R's Appx., p. 144-45-Email re A suggestion; R's Appx., p. 135-36-Sullivan Dep. 118:23-121:12.)

35.    In Schact's response, he criticized Mohamed's "tone" and claimed that her explanation for the delay was "kicking the problem up." (MSJ Ex. A-19, SHRM 0142.)

36.    Mohamed responded by thanking Schacht and then wrote again on August 19 and complained of retaliation. (MSJ Ex. A-19, SHRM 0141-142.) She noted that SHRM was criticizing her performance and tone for the first time and setting her up to fail with an unrealistic deadline, all just weeks after she complained of race discrimination. (*Id.*)

37.    Regardless, Mohamed kept Barley and others updated on her progress over the next few weeks. (MSJ Ex. A-19, SHRM 0140.)

38.    In the three weeks before Mohamed's termination, Barley told Mills that Mohamed was not going to meet her deadlines. (R's Appx., p. 77-Mills Decl. ¶ 20.)

**Barley was flexible with her white supervisees' deadlines.**

39.    Mills was confused by Barley's focus on Mohamed's deadlines because "neither [Mills] nor Ann Godmere were held to the same standard. Project deadlines were viewed as flexible and were frequently extended by [Barley]." (R's Appx., p. 77-Mills Decl. ¶ 20.)

40.    Deadlines are not rigid, as projects can be delayed due to many factors. (R's Appx., p. 54-55-Morris Dep. 77:6-15, 80:2-82:12.) SHRM gives itself "buffer time, because

projects almost never go according to plan." (R's Appx., p. 118-19-Schacht Dep. 20:17-18, 21:10-14.) Completion dates are adjusted due to unforeseen circumstances. (R's Appx., p. 119-*id.* at 23:16-24:12.) The decision to extend a completion date is up to the education department. (R's Appx., p. 119-120-*id.* at 24:13-25:6, 25:8-12.)

41.    Barley expected Senior Instructional Designers to develop a course in about six months but she regularly extended Mills's deadlines. (R's Appx., p. 78-Mills Decl. ¶ 27.)

42.    Not once did Mills "ever meet the target competition deadline for a major project." (R's Appx., p. 78-Mills Decl. ¶ 26.) Mills missed an August 2020 target completion deadline for a project by one week without consequence. (R's Appx., p. 78-*id.* at ¶ 29.) Yet, Barley never disciplined Mills or mentioned these missed deadlines in Mills's performance review. (R's Appx., p. 78-*id.* at ¶ 26.)

43.    At least once, Godmere claimed that she completed a course when she had not; she was not disciplined or scrutinized. (R's Appx., p. 77-Mills Decl. ¶ 22.)

44.    Mohamed's replacement missed a target completion deadline by nearly a month and was not immediately terminated. (R's Appx., p. 70-Morris Dep. 229:4-230:10.)

**SHRM's investigation of Mohamed's complaints was tainted by irregularities.**

45.    Jackson learned about Mohamed's race discrimination complaints from Barley on June 12. (R's Appx., p. 42, 45-Barley Dep. 88:1-23, 106:14-18; R's Appx., p. 103-Jackson Dep. 163:17-18.) Jackson advised Barley to document her interactions with Mohamed. (R's Appx., p. 40, 43-44-Barley Dep. 49:2-21, 100:13-102:4; R's Appx., p. 103-104-Jackson Dep. 164:20-165:4.)

46.     Sullivan claims Jackson was solely responsible for investigating Mohamed's complaints (R's Appx., p. 130, 132, 137-Sullivan Dep. 51:10-52:21, 72:17-20, 150:6-21) while Jackson claims he and Sullivan shared responsibility and he turned over sole responsibility for the investigation to Sullivan by late July (R's Appx., p. 98-99, 101, 111-12-Jackson Dep. 104:19-106:5, 146:24-148:23, 294:8-19, 296:22-297:3, 298:20-299:14); Sullivan denies this (R's Appx., p. 133-Sullivan Dep. 78:3-11). Jackson does not take responsibility for the investigation's integrity. (R's Appx., p. 100-Jackson Dep. 144:3-19.)

47.     Jackson is "far from an experienced expert" in race discrimination. (R's Appx., p. 99, 105-Jackson Dep. 108:9-13, 177:8-178:4.) Mohamed's is the only discrimination complaint that he has investigated in ten years in HR. (R's Appx., p. 85-*id.* at 25:8-21.) Jackson never interviewed Mohamed for the investigation. (R's Appx., p. 109, 113-14-*id.* at 259:6-11, 341:3-344:7.)

48.     SHRM had no procedures for investigating employee discrimination complaints. (R's Appx., p. 131-Sullivan Dep. 54:20-25.) Sullivan expected Jackson to follow best practices, including documenting witness interviews in writing, investigating new allegations as they arose, and maintaining neutrality. (R's Appx., p. 134-*id.* at 86:20-88:25.) Sullivan agrees that failing to follow these practices casts doubt on the investigation's integrity. (R's Appx., p. 134-*id.* at 87:18-24.)

49.     Sullivan expected Jackson to determine Mohamed's race for the investigation. (R's Appx., p. 129-30-Sullivan 48:24-49:25.) Jackson does not know Mohamed's race and did not ask her. (R's Appx., p. 95-97-Jackson Dep. 92:16-98:2.)

50.     Jackson and Sullivan began discussing Mohamed's termination before August 13. (R's Appx., p. 106-107-Jackson Dep. 244:18-245:9.)

51.     As part of his investigation, Jackson spoke with Mills, who corroborated Mohamed's discrimination complaint. (R's Appx., p. 76-Mills Decl. ¶ 16.) Jackson did not document Mills's statements in his notes. (R's Appx., p. 115-Jackson Dep. 367:1-7.)

52.     Jackson was responsible for investigating Mohamed's August 19 retaliation complaint (R's Appx., p. 132-Sullivan Dep. 72:10-23); however, he last spoke to Mohamed on July 7 and had completed his investigation and provided his recommendations to Sullivan by August 12. (R's Appx., p. 102, 109-110-Jackson Dep. 150:12-151:7, 152:9-13, 259:6-11, 291:14-293:4.)

53.     SHRM notified Mohamed on August 31 that it concluded that her discrimination and retaliation complaints were unfounded. (MF ¶ 34.)

**The timing of SHRM's decision to terminate Mohamed is disputed.**

54.     Mohamed turned in a final version of Digital HR to Barley on August 27. (R's Appx., p. 147-Email re Digital Transformations Program.) At that point, only three people were registered for the program. (R's Appx., p. 153-Email re Daily Count Report.) Mohamed turned in a final version of Compliance Law with the content from Lessig on August 28. (R's Appx., p. 35-Mohamed Dep. 226:7-13.)

55.     SHRM and Barley claim that Barley decided to terminate Mohamed on September 1 solely because she failed to meet the August 31 deadline. (R's Appx., p. 83-McIntosh 30(b)(6) Dep. 86:4-88:14; R's Appx., p. 37, 46-Barley Dep. 18:8-10; 111:17-21.)

56.     Jackson claims that Mohamed was terminated for three reasons: missing deadlines, communication issues with Barley, and generalized unsatisfactory performance. (R's Appx., p. 92-95-Jackson Dep. 75:13-76:21; 78:17-80:10; 88:22-89:14.)

57.     HR employee Maldonado learned of Mohamed's termination "a few days" before September 1 and wrote a termination letter dated August 31 at Sullivan and Jackson's direction. (R's Appx., p. 156-57-Maldonado 30(b)(6) Dep. 73:4-75:6, 77:6-78:21; R's Appx., p. 159-Aug. 31 Separation Agreement.)

58.     Drafts of Mohamed's termination documents were created on August 19, 21, 28, 30, and 31. (R's Appx., p. 47-Barley Dep. 121:19-123:8; R's Appx., p. 86-91-Jackson Dep. 50:24-53:10, 53:19-55:9, 56:5-61:9, 64:22-25, 65:25-67:5, 71:2-72:14.)

59.     Sullivan approved all terminations; he approved Mohamed's "late in August " but he is unsure whether this was before or after the August 31 deadline had passed. (R's Appx., p. 126-29-Sullivan Dep. 32:5-11, 37:10-20, 44:1-4, 47:12-16.)

60.     SHRM's policy required Jackson or Sullivan to ensure adherence to SHRM's progressive discipline policy prior to approving Mohamed's termination. (R's Appx., p. 94-Jackson Dep. 86:9-20; R's Appx., p. 161-Policy.) Schacht does not know if a written progressive discipline policy exists. (R's Appx., p. 121-Schacht Dep. 33:14-17, 34:7-9.)

61.     When an employee's performance is insufficient, SHRM gives them a chance "to correct the deficiency" and a further opportunity "but not necessarily in all cases"; it depends on what "we think is reasonable." (R's Appx., p. 121-Schacht Dep. 33:14-34:2, 35:4-9.) SHRM disciplines employees short of termination, including through warnings, training, and demotion. (R's Appx., p. 122-23-*id.* at 51:20-52:21, 53:2-21.)

**The August 31 deadline was not critical.**

62.     Barley reassigned Digital HR to Mills without a completion date. (R's Appx., p. 78-Mills Decl. ¶ 30.) The course had already been canceled. (*Id.*) Barley did not know how complete the course was; it was done within a week. (R's Appx., p. 79-*id.* at ¶ 31.)

63.     Barley reassigned Compliance Law to Godmere and told her to get content from Lessig and not to do any design work. (R's Appx., p. 79-Mills Decl. ¶ 34.)

<u>Argument</u>

The Court may grant summary judgment only if SHRM has shown that "there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court must draw all reasonable inferences in Mohamed's favor. *Orr v. City of Albuquerque*, 531 F.3d 1210, 1215 (10th Cir. 2008). "[A]ll doubts concerning pretext must be resolved in [the] plaintiff's favor" because showing pretext defeats summary judgment." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323-24 (10th Cir. 1997).

**I.     Mohamed meets Section 1981 and Title VII causation requirements.**

**A.  Mohamed can establish that race was a "but-for" cause of her termination.**

Mohamed's Title VII discrimination claim requires her to prove her race was a "motivating factor" in her termination. (MSJ at 14.) 42 U.S.C. § 1981 requires her to prove "but-for" causation. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020). SHRM misstates this causation standard, claiming that Mohamed must prove race was *the* but-for cause. (MSJ at 14.) She need establish only that her

race was *a* but-for cause. *See Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1277-78 (10th Cir. 2010) (but-for means "the factor that made a difference").

Neither causation standard requires direct evidence of discriminatory intent, such as race-based comments or actions that are "discriminatory on their face." (MSJ at 15.) "It is well settled that a plaintiff can show intentional discrimination [under § 1981] . . . by indirect evidence." *Perry v. Woodward*, 199 F.3d 1126, 1134 (10th Cir. 1999).

Race discrimination "can be inferred from the mere fact of differences in treatment" between a black plaintiff and her white peers. *McAlester v. United Air Lines, Inc.*, 851 F.2d 1249, 1260 (10th Cir. 1988). Explicit evidence of racial animus (such as racial slurs) is not required. *Id.*; s*ee also White v. Home Depot U.S.A., Inc.*, No. 05-cv-00683-PSF-MJW, 2006 U.S. Dist. LEXIS 54076 (D. Colo. Aug 3, 2006) (SJ denied with only difference in treatment between black plaintiff and white coworkers).

Mohamed can prove racially disparate treatment. SHRM claims that it fired her for missing a deadline, but the same month white peer Mills missed a deadline without any discipline at all. (*See* AF ¶ 42.) Based on this differential treatment alone, a reasonable jury could conclude that Mohamed's race was a motivating factor and a "but-for" cause for her termination. Mohamed can also prove causation and discriminatory and retaliatory intent through pretext, which is discussed below. *Infra* Section II.

**B. Mohamed can establish that her discrimination complaints were a "but-for" cause of her termination.**

Under § 1981 and Title VII, a plaintiff must show: "(1) . . . engag[ing] in protected opposition to discrimination; (2) a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection existed between the protected

activity and the materially adverse action." *Clay v. UPS*, 983 F. Supp. 2d 1331, 1343 (D. Kan. 2013), aff'd, 599 F. App'x. 334 (10th Cir. 2015). It is undisputed that Mohamed made discrimination and retaliation complaints and was terminated. Title VII and § 1981 claims also require establishing but-for causation. (MSJ at 18.)

"A retaliatory motive may be inferred when an adverse action closely follows protected activity." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999); *see Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994) (six-week period between protected activity and adverse action may, by itself, establish causation), *overruled on other grounds by Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186 (10th Cir. 1998). Mohamed complained of retaliation on August 19, 2020;[1] Jackson began preparing her termination documents the same day. (AF ¶¶ 36, 58.) Thirteen days later SHRM fired her. (MF ¶ 58.) Based on this timing alone, a jury could conclude that Mohamed would not have been fired but for her protected complaints.

## II.   Pretext allows a reasonable jury to find discriminatory and retaliatory intent.

Because SHRM claims that Mohamed was terminated for missing a deadline on two projects, she may establish causation by showing pretext. *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017). Pretext can be established in multiple ways, including by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."

---

[1] Mohamed had earlier made multiple other protected complaints. (AF ¶¶ 12-16, 20-21.)

*Olson v. GE Astrospace*, 101 F.3d 947, 951-52 (3d Cir. 1996) (citations omitted). "[A]t the summary judgment stage, the inference of discrimination permitted by evidence of pretext must be resolved in favor of the plaintiff." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1125 (10th Cir. 2005). Mohamed is not required "to offer *any* evidence of actual discrimination when attempting to show pretext." *Id.* (emphasis added).

Evidence of the falsity of SHRM's claimed reason for Mohamed's termination is sufficient alone to defeat summary judgment. *See Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1380-81 (10th Cir. 1994). Ample evidence shows the falsity of SHRM's claim that it decided to terminate Mohamed on September 1 solely because she missed the August 31 project deadlines. Sullivan approved Mohamed's termination "late in August." (AF ¶ 59.) Maldonado knew about Mohamed's termination "a few days" before September 1 and drafted a severance agreement dated August 31. (AF ¶ 57.) SHRM employees drafted or edited Mohamed's termination documents on August 19, 21, 28, 30, and 31. (AF ¶ 58.) Genuine disputes of fact exist that allow a jury to find that SHRM decided to fire Mohamed before the August 31 deadline upon which it relies.[2]

A reasonable jury could also find that SHRM did not fire Mohamed solely for missing deadlines because white peers also supervised by Barley missed comparable deadlines without being terminated. *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (employer "treated [plaintiff] differently from other similarly-situated

---

[2] Evidence that SHRM decided to fire Mohamed before the August 31 deadline makes it implausible that the deadline was the genuine reason for the termination. Implausibility is another form of pretext. *Payan v. UPS*, 792 Fed. Appx. 634, 645 (10th Cir. 2019).

employees who violated work rules of comparable seriousness"). Mills never once met a deadline but was never disciplined, let alone terminated. (AF ¶ 42.)

Disturbing procedural irregularities in SHRM's "investigation" also establish pretext. *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 889-890 (10th Cir. 2018). Jackson does not know Mohamed's race, did not interview Mohamed, and did not follow up on new factual allegations or new complaints by her. (AF ¶¶ 47-49, 42.) Jackson did not remain neutral or impartial, and instead acted as an advocate for Barley–the subject of the investigation–while it was ongoing; he instructed Barley to create written documentation and helped Barley write an email to Mohamed to support "an eventual case for termination." (AF ¶¶ 34, 45.) These failures violated the investigatory "best practices" expected by Sullivan. (AF ¶ 48.) And while the investigation was ongoing, Jackson prepared the first draft of Mohamed's paperwork. (AF ¶ 58.) No wonder Jackson does not take responsibility for the integrity of the investigation as a whole. (AF ¶ 46.) A reasonable jury could conclude that SHRM's sham "investigation" of Mohamed's discrimination complaints was a pretextual cover for her termination.

Use of subjective criteria by a decision-maker is also evidence of pretext because "[o]bviously subjective decision making provides an opportunity for unlawful discrimination." *Bauer v. Bailar*, 647 F.2d 1037, 1046 (10th Cir. 1981); *see Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217-18 (10th Cir. 2002). Here, Barley had absolute discretion to extend the deadline on which SHRM relies to justify Mohamed's termination. (AF ¶¶ 39-40.) She chose not to extend the deadline and then to fire Mohamed. (MF ¶¶ 56, 59.) Barley admits that she used largely subjective criteria to set the August 31

deadline. (AF ¶ 30.) Further, SHRM uses subjective criteria to determine when progressive discipline short of termination is appropriate. (AF ¶ 61.) A reasonable jury could conclude that SHRM used subjective criteria as a pretext for discrimination and retaliation.

Finally, SHRM's inconsistency in the reasons given for Mohamed's termination is evidence of pretext. *See Payan v. UPS*, 792 Fed. Appx. 634, 645 (10th Cir. 2019). SHRM and Barley both say that Mohamed was terminated solely because of a missed deadline (AF ¶ 55), while Jackson points to the deadline *plus* other reasons. (AF ¶ 56.)

## III.   Factual disputes allow a reasonable jury to award punitive damages.

As the movant, SHRM must show the absence of disputed material facts. But SHRM points to no undisputed facts that would insulate it from punitive damages. To dispose of Mohamed's punitive damages claim, SHRM must show that it made good-faith efforts to comply with the law by adopting anti-discrimination policies, educating its employees about those policies and statutory prohibitions, and *actually enforcing* those policies. *Kennedy v. Life Care Ctrs. of Am.*, 2023 U.S. Dist. LEXIS 5148, at *30 (D. Colo. Jan. 11, 2023). SHRM offers no such evidence whatsoever.

Punitive damages are appropriate where management or HR employees participated in discriminatory conduct. *See id.* at **29-31 (SJ denied where HR participated in plaintiff's termination). Here, Barley–Mohamed's manager and the subject of her complaints–decided to fire her. (MF ¶ 56.) Sullivan and Jackson, two high-ranking HR employees, provided Barley cover with a flawed investigation and orchestrated Mohamed's termination in concert with Barley. (AF ¶¶ 34, 45-53, 57-61.) Summary

judgment is inappropriate because a jury could conclude that SHRM "violated the law with at least reckless indifference." *Id.* at *29.

## Conclusion

In light of the above, Plaintiff Rehab Mohamed respectfully requests that the Court deny SHRM's Motion for Summary Judgment in its entirety.

Dated: September 9, 2024.

<div style="margin-left: 40%;">

*s/Hunter A. Swain*
Hunter A. Swain
SWAIN LAW, LLC
1490 N. Lafayette St., Ste. 303
Denver, CO 80218
(720) 815-5281

*s/Ariel B. DeFazio*
Ariel B. DeFazio
LOWREY, PARADY, LEBSACK, LLC
1490 N. Lafayette St., Ste. 304
Denver, CO 80218
(303) 293-2595

*Attorneys for Plaintiff Rehab Mohamed*

</div>

## **CERTIFICATE OF SERVICE**

I certify that on September 9, 2024 I filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Tanja Darrow
tdarrow@littler.com

Virginia L. Woodfork
vwoodfork@littler.com

Malcolm Levy Leatherman
lleatherman@littler.com

*Attorneys for Defendant SHRM*

s/Ariel B. DeFazio
Ariel B. DeFazio