**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-01625-GPG-KAS

REHAB MOHAMED,

     Plaintiff,

v.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

     Defendant.

---

### FINAL PRETRIAL ORDER

---

### 1.     DATE AND APPEARANCES

A Final Pretrial Conference was held on December 10, 2024 at 8:30 a.m. via Video-Teleconference before District Judge Gordon P. Gallagher. Ariel B. DeFazio, Lowrey Parady Lebsack, LLC, and Hunter A. Swain, Swain Law, LLC, appeared on behalf of Plaintiff, Rehab Mohamed. Tanja L. Darrow, M. Levy Leatherman, and Virginia LeeAnn Woodfork, Littler Mendelson P.C., appeared on behalf of Defendant, Society for Human Resource Management.

### 2.  JURISDICTION

This Court has original subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 451, 1331 & 1343, pursuant to 42 U.S.C. § 1981, and pursuant to 42 U.S.C. § 2000e *et seq.* This Court additionally has federal diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) because the parties reside in different states and the amount in controversy in this case exceeds $75,000.

### 3. CLAIMS AND DEFENSES

**Plaintiff:** This is an employment discrimination suit brought by Rehab "Ruby" Mohamed, who worked for Defendant Society for Human Resource Management ("SHRM") between April 2016 and September 2020. During her employment, Ms. Mohamed held the job titles of eLearning Specialist, Instructional Designer, and Senior Instructional Designer.

Ms. Mohamed is a black woman of Egyptian descent. Throughout her over five years of employment at SHRM, she was a model employee who consistently earned promotions, merit-based pay raises, and praise for her strong job performance. SHRM never once provided Ms. Mohamed any disciplinary or performance write-up during her employment.

In January 2020, SHRM promoted Ms. Mohamed to Senior Instructional Designer. In her new role, Ms. Mohamed began reporting directly to Instructional Design Manager Carolyn Barley. Soon after she began reporting directly to Barley, Ms. Mohamed observed that Barley treated her and other non-white employees differently than their white peers.

For instance, Barley subjected Ms. Mohamed's work to undeserved scrutiny and unreasonably strict supervision compared to her white peers. She also demanded to be present in Ms. Mohamed's vendor meetings without justification, minimized Ms. Mohamed's contributions by taking credit for Ms. Mohamed's ideas and work, and assigned Ms. Mohamed menial tasks. Barley did not subject white peers to similar treatment. Ebony Thompson, a Black coworker who also reported to Barley, shared with Ms. Mohamed that Barley similarly treated her worse than their white peers. White

peers, such as Senior Instructional Designer Carrie Mills, also observed Barley's race-discriminatory treatment of Ms. Mohamed and Thompson.

In early June 2020, Ms. Mohamed complained to Vice President of Education Jeanne Morris that Barley was subjecting her to race discrimination by treating her differently and holding her to stricter standards than her white peers. Barley organized a meeting with Ms. Mohamed and Barley to discuss Ms. Mohamed's discrimination complaints; Barley reacted defensively and immediately began retaliating against Ms. Mohamed, including by attempting to exclude her from a major project. Ebony Thompson also complained about Barley's race discriminatory treatment of her, and SHRM retaliated by firing Thompson just seventeen days after her complaint in early August 2020.

Throughout the summer of 2020 as Barley continued retaliating against Ms. Mohamed, Ms. Mohamed complained about race discrimination and retaliation to multiple SHRM executives, including CEO Johnny C. Taylor, Jr., Chief Human Resources Officer Sean Sullivan, and Chief Global Development Officer Nick Schacht. But SHRM's leadership failed to take meaningful action, and instead coordinated with Barley to retaliate against Ms. Mohamed by firing her for a pretextual reason within weeks.

Throughout early August 2020, Barley began regularly chastising Ms. Mohamed with vague and unfounded complaints about Ms. Mohamed's "tone," both in emails and in conversations. Meanwhile, throughout August, Ms. Mohamed repeatedly told Barley that she needed either additional time or assistance to complete one of her projects because the vendor she was working with had been unresponsive and uncooperative.

3

Barley responded by refusing to provide either, and set a firm September 1 deadline for completion of the project.

Once again, Barley's inflexibility and unwillingness to prove Ms. Mohamed the support she needed was markedly different than Barley's treatment of white subordinates. Throughout the summer of 2020, Barley had bent over backward to provide repeated deadline extensions and plenty of support to white colleagues to enable them to succeed. But in contrast, Barley set Ms. Mohamed up to fail by refusing to extend her deadlines, provide her support, or even respond to her inquiries about her workload.

SHRM made the decision to fire Ms. Mohamed and prepared her termination paperwork before her project deadline had even passed, and on the very same day that Ms. Mohamed made a written complaint of retaliation. SHRM failed to investigate Ms. Mohamed's retaliation complaint, and instead continued retaliating by firing her. On September 1, 2020, Barley fired Ms. Mohamed, citing her failure to complete her project by the firm deadline Barley had set in retaliation for Ms. Mohamed's discrimination and retaliation complaints.

Ms. Mohamed asserts claims for race discrimination and retaliation under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Ms. Mohamed is seeking economic damages, compensatory damages, and punitive damages, plus attorney fees, costs, and all other damages permitted by law.

**Defendants**:  Plaintiff Rehab "Ruby" Mohamed was born in Egypt. She began her employment with SHRM in June 2016 as an e-Learning Specialist. In June 2018, her role and duties changed when SHRM's Educational Department underwent a

4

reorganization. Plaintiff's role changed to Instructional Designer and she was primarily responsible for supporting the development and delivery of SHRM's e-Learning and Seminar products. Her duties involved applying proven instructional design methodologies to analyze, design, develop, customize, and maintain e-Learning programs and Seminars, and ensuring alignment with SHRM's goals, strategies, and competencies.

On January 29, 2020, Plaintiff was promoted to Senior Instructional Designer and received a salary increase taking effect on February 10, 2020. Prior to the promotion, Carolyn Barley, Manager of Instructional Design, encouraged Plaintiff to apply for the role expressing confidence in her readiness for the increased responsibilities and describing the promotion as a natural progression in her career. The decision to promote Plaintiff was ultimately made by Ms. Barley, Jeanne Morris, Vice President of Education, and Nick Schacht, Chief Global Development Officer. In her role as a Senior Instructional Designer, Plaintiff's duties expanded beyond those of an Instructional Designer. In addition to previous duties, Plaintiff was expected to manage stakeholder communications, engage in strategic planning, and operate with greater autonomy when developing programs. Her role also included conducting analyses and audits to assess business needs.

On May 21, 2020, Ms. Barley provided Plaintiff with a quarterly performance review. While she rated Plaintiff as a "Solid Performer", Ms. Barley identified areas of development as Plaintiff acclimated to her new role. Specifically, Ms. Barley emphasized the opportunity for Plaintiff to balance her creativity "against timeliness for improved efficiency and business impact." At the time of the review, Plaintiff did not

consider any of Ms. Barley's feedback to be discriminatory. In fact, Plaintiff testified that during the four years she had worked with Ms. Barley, she had not experienced any discriminatory treatment from her. This testimony underscores the absence of any pattern or history of discriminatory behavior in their working relationship.

As a newly promoted Senior Instructional Designer, Plaintiff took the lead on developing two significant courses in early 2020: the HR Digital Transformation ("Digital HR") course and the HR Compliance ("HR Compliance") course. To complete the Digital HR course, Plaintiff worked with the Subject Matter Expert ("SME"), Dr. Deborah Waddill, who authored the primary source material and was designated to facilitate the finished course. Similarly, Plaintiff worked with SME Lou Lessig, a Labor and Employment attorney, to complete the HR Compliance course. The timelines for both courses experienced significant extensions over the course of a seven-month period. The Digital HR course, originally set for completion in April 2020, had its deadline extended in May to the end of July and was later extended again to August 31, 2020. The HR Compliance course, originally set for completion in June 2020, was also extended to August 31, 2020. While Senior Instructional Designers typically require about four months to complete a course, Plaintiff received multiple extensions as she worked to navigate the challenges of working with SMEs. Ms. Barley and other leaders in the Education Department provided ongoing support to help Plaintiff navigate the nuances of working with SMEs to develop the course material as the lead designer.

On June 3, 2020, Plaintiff contacted Ms. Morris to raise concerns about Ms. Barley's management style. During their conversation, Plaintiff expressed frustration with what she described as Ms. Barley's tendency to micromanage her work. While Ms.

Morris noted that Plaintiff was emotional, she did not interpret the concerns as allegations of discrimination. The next day, Plaintiff, Ms. Morris, and Ms. Barley met via Zoom to discuss Plaintiff's concerns. Plaintiff provided examples of what she viewed as micromanagement, including giving her less autonomy as the other Senior Instructional Designers, Ann Godmere and Carrie Mills. Again, Plaintiff did not assert that this treatment was based on race. It is important to note that Ms. Godmere and Ms. Mills had significantly more experience and had been in the senior role much longer than Plaintiff.

SHRM first became aware of Plaintiff's belief that Ms. Barley was discriminating against her because of race on June 12, 2020. During their weekly one-on-one, Plaintiff suggested that Ms. Barley was treating her differently than she would a white male. Initially, Ms. Barley was confused by Plaintiff's allegations as there were no white male employees on the Instructional Design team. However, recognizing the seriousness of these allegations and wanting to ensure that HR addressed the matter, Ms. Barley reported Plaintiff's concerns Mike Jackson, Manager of Employee Experience. Mr. Jackson promptly launched an investigation. Over the course of several weeks, Mr. Jackson conducted interviews with Plaintiff, Ms. Barley, Ms. Godmere, Ms. Mills and Ebony Thompson, another Instructional Designer on the team. He also sat in on Plaintiff's discussions with Sean Sullivan, Chief Human Resource Officer.

While the investigation was ongoing, Mr. Sullivan recommended that Plaintiff and Ms. Barley participate in mediation facilitated by Bernée Long, Director of Organizational Learning and Talent Development. Given Plaintiff's prior experience with mediation to resolve a workplace conflict with a previous manager, Mr. Sullivan believed

it could help improve her working relationship with Ms. Barley. Plaintiff actively participated in multiple mediation sessions and expressed appreciation for Ms. Long's efforts, including sharing educational videos on implicit bias with Ms. Barley. However, in mid-August, Plaintiff abruptly withdrew from the mediation without providing an explanation.

In late July 2020, Plaintiff requested approval from Ms. Barley to take vacation from July 29 to August 7, 2020. Although, the request was sudden, Ms. Barley approved it based on Plaintiff's assurances that she was on track to meet the August 31, 2020 deadline for Digital HR and HR Compliance courses. However, upon returning to work, Plaintiff became upset when Ms. Barley declined to consider further extending the course deadlines. Plaintiff complained the non-responsive SMEs and lack of necessary source material were preventing her from completing the courses. Ms. Barley was surprised by these concerns as she and other leaders in the Education Department had previously discussed several strategies with Plaintiff in June and July to address these challenges. Moreover, SHRM was unable to extend the deadlines further as the courses were set to launch in the fall and had already been advertised. Given Plaintiff's numerous extensions and challenges communicating with the SMEs, Ms. Barley placed Plaintiff on an informal coaching plan where she checked in with her more and attempted to identify performance solutions. Plaintiff asserts that SHRM's refusal to grant a third and fourth deadline extension constituted retaliation. This is simply not true. Ultimately, Plaintiff submitted incomplete courses on August 27 and August 28, 2020. Considering the courses' incompleteness and the fact that Plaintiff had had nearly double the allotted time to complete them, Ms. Barley recommended her termination on

8

September 1, 2020. This recommendation was subsequently affirmed by Ms. Morris, Mr. Schacht, and Mr. Sullivan. The day before this decision was made, SHRM concluded its investigation into Plaintiff's complaints of discrimination and retaliation and concluded they could not be substantiated.

Despite Plaintiff's assertions, SHRM did not consider Plaintiff's race in deciding to terminate her employment. Plaintiff was terminated for legitimate, non-discriminatory reasons as she failed to complete her duties ahead of critical deadlines. Plaintiff focuses on the fact that Mr. Jackson prepared a draft termination letter nearly a week before Ms. Barley recommended her termination, but Mr. Jackson repeatedly testified that no one asked him to prepare the documents. He prepared the documents ahead of a medical leave and it was possible that they would not be needed if Plaintiff had turned in complete courses. Further, Ms. Barley had placed Plaintiff on an informal coaching plan given her repeated extensions. All actions taken by SHRM with respect to Plaintiff were in good faith and would have been made regardless of any discriminatory motive.

SHRM makes good faith efforts to prevent and promptly correct discrimination and retaliation from occurring in the workplace and is therefore not liable to the extent that employment decisions of any of its agents were contrary to its good faith efforts to comply with the law. SHRM effectively maintains and publicizes policies prohibiting harassment and discrimination in the workplace and trains its employees and supervisors to comply with those policies.  Accordingly, Plaintiff cannot recover punitive damages even if she were to prevail on liability.

## 4.  STIPULATIONS

1.  SHRM hired Ms. Mohamed as an e-Learning Specialist on April 18, 2016.

2.  Ms. Mohamed was born in Egypt.

3.  SHRM is a human resources membership association providing education, certification, and networking opportunities to its members.

4.  In July 2018, Ms. Mohamed's position changed from e-Learning Specialist to Instructional Designer.

5.  On January 29, 2020, SHRM notified Ms. Mohamed that she received a promotion to Senior Instructional Designer. The promotion was effective February 10, 2020 and included a salary increase.

6.  When Ms. Mohamed was first promoted, she reported initially to Jeanne Morris, Vice President of Education. By May 2020, Ms. Mohamed began reporting to Carolyn Barley, Manager Instructional Design.

7.  Ms. Barley oversaw Ms. Mohamed as well as three other Senior Instructional Designers: Ann Godmere (white), Carrie Mills (white), and Ebony Thompson (Black).

8.  On September 1, 2020, SHRM notified Ms. Mohamed that it was terminating her employment the next day.

## 5.  PENDING MOTIONS

None.

## 6.  WITNESSES

a.      List the nonexpert witnesses to be called by each party.  List separately:

 See each party's Witness List.

b.      List the expert witnesses to be called by each party. List separately:

 See each party's Witness List.

## 7.  EXHIBITS

a.      Exhibits to be offered by each party.

(1)      Plaintiff: See Plaintiff's Exhibit List.

(2)      Defendants:  See Defendant's Exhibit List.

b.      Copies of listed exhibits must be provided to opposing counsel and any
*pro se* party no later than 30 days before trial.  The objections contemplated by
Fed. R. Civ. P. 26(a)(3) shall be filed with the clerk and served by hand delivery
or facsimile no later than 14 days after the exhibits are provided.

## 8.  DISCOVERY

Discovery was completed on September 11, 2023.

## 9.  SPECIAL ISSUES

None.

## 10.  SETTLEMENT

a.      Counsel for the parties met by telephone  on November 22, 2024, to
discuss in good faith the settlement of the case.

b.      The participants in the settlement conference included counsel with the
full authority of the respective parties.

c.      The parties were promptly informed of all offers of settlement.

d.      Counsel for the parties are open to holding future settlement conferences.

e.      It appears from the discussion by all counsel and any *pro se* party that
there is little to some possibility of settlement.

11

f.    Counsel for the parties    considered ADR in accordance with D.C.COLO.LCivR.16.6.

## 11.  OFFER OF JUDGMENT

Counsel and any *pro se* party acknowledge familiarity with the provision of Rule 68 (Offer of Judgment) of the Federal Rules of Civil Procedure.  Counsel have discussed it with the clients against whom claims are made in this case.

## 12.  EFFECT OF FINAL PRETRIAL ORDER

Hereafter, this Final Pretrial Order will control the subsequent course of this action and the trial, and may not be amended except by consent of the parties and approval by the court or by order of the court to prevent manifest injustice.  The pleadings will be deemed merged herein.  This Final Pretrial Order supersedes the Scheduling Order.  In the event of ambiguity in any provision of this Final Pretrial Order, reference may be made to the record of the pretrial conference to the extent reported by stenographic notes and to the pleadings.

## 13.  TRIAL AND ESTIMATED TRIAL TIME; FURTHER TRIAL PREPARATION PROCEEDINGS

1.    Trial to a Jury.

2.    Five days beginning Monday July 21, 2025 at 8:00 a.m.,

3.    Before United States District Judge Gordon P. Gallagher. The trial will be held in Courtroom C202 (Byron Rogers Courthouse-Denver, Colorado).

DATED this ___10th_____ day of _____December_____, 2024.

BY THE COURT

_____
District Judge Gordon P. Gallagher

APPROVED:

Lowrey Parady Lebsack, LLC

*s/Ariel B. DeFazio*
Ariel B. DeFazio
1490 Lafayette Street, Suite 304
Denver, CO 80218
Phone: (303) 593-2595
Fax: (303) 502-9119
ariel@lowrey-parady.com

Swain Law, LLC

*s/Hunter A. Swain*
Hunter A. Swain
1490 North Lafayette Street, Suite 303
Denver, CO 80218
Phone: (720) 815-5281
hunter@swainemploymentlaw.com
*Attorneys for Plaintiff*

Littler Mendelson P.C.

*s/Tanja L. Darrow*
Tanja L. Darrow
633 West 5th Street, 63rd Floor
Los Angeles, CA 90071
Phone: (213) 443-4300
Fax: (213) 443-4299
tdarrow@littler.com

*s/Virginia LeeAnn Woodfork*
M. Levy Leatherman
Virginia LeeAnn Woodfork
1900 Sixteenth Street, Suite 800
Denver, CO 80202
Phone: (303) 362-2880
Fax: (303) 629-0200
lleatherman@littler.com
vwoodford@littler.com
*Attorneys for Defendants*