IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge Gordon P. Gallagher

Civil Action No. 22-cv-01625-GPG-KAS

REHAB MOHAMED,

      Plaintiff,

v.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

      Defendant.

---

## ORDER

---

Before the Court are Defendant's Renewed Motion for Judgement as a Matter of Law (D. 170), Defendant's Motion for New Trial (D. 171), and Defendant's Motion to Stay Execution of Judgment Without Filing Bond (D. 174). The Court DENIES the motions for the following reasons.

## I. BACKGROUND

This civil action arises from the termination of Plaintiff Rehab "Ruby" Mohamed by Defendant Society for Human Resources Management (SHRM). On October 10, 2024, the Court denied SHRM's motion for summary judgment (D. 89). Before trial, Mohamed dismissed all but two of her claims: (1) discrimination in violation of 42 U.S.C. § 1981 (Section 1981) and (2) retaliation under the same section. SHRM sought to exclude various evidence (D. 75; D. 105), which the Court denied without prejudice (D. 82; D. 119). SHRM also sought to bifurcate the trial between liability and punitive damages issues (D. 106), but the Court denied this motion (D. 119).

1

The Court held a five-day jury trial from December 1–5, 2025 (D. 141–45, 147–48). SHRM moved for judgment by written motion at the close of Mohamed's evidence (D. 146). The Court orally denied this motion (D. 147).  The jury returned a verdict for Mohamed on all claims, awarding $1.5 million in compensatory damages and $10 million in punitive damages (D. 154).

## II.  LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 50

Rule 50 provides that judgment as a matter of law is appropriate where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1). "[I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Although courts are to review all of the evidence, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Id*.  Moreover, the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe."  *Id*. at 150-151.  (citation omitted).  "Judgment as a matter of law is warranted only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion."  *United States ex rel. MMS Constr. & Paving, L.L.C. v. W. Sur. Co.*, 754 F.3d 1194, 1199 (10th Cir. 2014) (quotation omitted).

Where a party properly moves for judgment as a matter of law prior to the case being submitted to the jury, that party may renew the motion after the jury returns its verdict.  *See* Fed. R. Civ. P. 50(b).  Courts apply the same legal standard for a renewed motion under Rule 50(b) as is applied to the original motion for judgment as a matter of law under Rule 50(a).  *Hinds v. Gen.*

2

*Motors Corp.*, 988 F.2d 1039, 1045 (10th Cir. 1993).  However, there is an added limitation in that generally "[t]he renewed motion under Rule 50(b) cannot assert grounds for relief not asserted in the original motion."  *Marshall v. Columbia Lea Reg'l Hosp.*, 474 F.3d 733, 739-40 (10th Cir. 2007); *see also Perez v. El Tequila, LLC*, 847 F.3d 1247, 1255 (10th Cir. 2017) ("Arguments presented in a Rule 50(b) motion cannot be considered if not initially asserted in a Rule 50(a) motion.").  The Court should grant such relief "only where the proof is all one way or so overwhelmingly preponderant in favor of the movant so as to permit no other rational conclusion." *Hinds*, 988 F.2d at 1045 (citation omitted).  Motions under Rule 50(b) "should be cautiously and sparingly granted."  *Lucas v. Dover Corp., Norris Div.*, 857 F.2d 1397, 1400 (10th Cir. 1988).

### B. Federal Rule of Civil Procedure 59

Rule 59 provides that a court "may, on motion, grant a new trial on all or some of the issues – and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  A motion for a new trial may be granted where "the district court concludes the 'claimed error substantially and adversely' affected the party's rights."  *Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1217 (10th Cir. 2008) (quoting *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1297 (10th Cir. 1998)).  Such motions are "not regarded with favor and should only be granted with great caution."  *United States v. Kelley*, 929 F.2d 582, 586 (10th Cir. 1991).

### C. Federal Rule of Civil Procedure 62

Rule 62 addresses stays of proceedings to enforce a judgment.  It provides for an automatic 30-day stay of "execution on a judgment and proceedings to enforce it."  Fed. R. Civ. P. 62(a).

After that time, "a party may obtain a stay by providing a bond or other security." Fed. R. Civ. P. 62(b).

The purpose of such a bond "is to secure an appellee from loss resulting from the stay of execution." *Miami Int'l Realty Co. v. Paynter*, 807 F.2d 871, 873 (10th Cir. 1986). The general rule is that a supersedeas bond will be equal to the "full amount of the judgment." *Strong v. Laubach*, 443 F.3d 1297, 1299 (10th Cir. 2006). However, "the district court has the discretion to reduce or waive the bond requirement if 'the appellant demonstrates a present financial ability to respond to the judgment that is likely to continue' or if the appellant's 'present financial condition is such that posting a full bond would impose an undue financial burden.'" *Lech v. Jackson*, No. 16-cv-01956-PAB-MJW, 2018 WL 2183984, at *1 (D. Colo. May 10, 2018) (quoting *Sierra Club v. El Paso Gold Mines, Inc.*, No. 01-cv-02163-OES, 2003 WL 25265871, at *8 (D. Colo. Apr. 21, 2003)). The party seeking to reduce or waive the bond requirement must demonstrate that such a departure is warranted and "present the court with a financially secure plan that will provide adequate security for the judgment creditor, in lieu of posting a supersedeas bond." *Sierra Club*, 2003 WL 25265871, at *2. In deciding the amount of a supersedeas bond, the Court may consider factors including:

> (1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the appellant's ability to pay the judgment is obvious enough that the cost of the bond would be a waste of money; and (5) whether the appellant is in such dire financial circumstances that a bond would place the appellant's other creditors at risk.

*Myers v. Mid-West Nat'l Life Ins. Co.*, No. 04-cv-00396-CMA-KLM, 2009 WL 306366, at *2 (D. Colo. Feb. 6, 2009) (citing *Dillon v. City of Chicago*, 866 F.2d 902, 904–05 (7th Cir. 1988)).

## III. ANALYSIS

### A. Defendant's Renewed Motion for Judgement as a Matter Of Law (D. 170)

SHRM filed a written Rule 50(a) motion, and its Rule 50(b) motion is largely identical (*compare* D. 146 *with* D. 170). It argues that Mohamed failed to establish that she was terminated under circumstances giving rise to an inference of discrimination (D. 170 at 7). SHRM also asserts that she did not engage in protected activity or causation with respect to her retaliation claim (id. at 8–10). Finally, it asserts that it had legitimate reasons for her termination (*id*. at 10).[1]

These arguments are unconvincing in face of the evidence presented at trial. As the Court explained in its summary judgment order:

> Contrary to Defendant's arguments, it is relatively straightforward to form a narrative from the disputed and undisputed facts showing discrimination and retaliation caused Mohamed to be terminated:
>
> Just months after [Carolyn] Barley began to supervise Mohamed, she complained of racial discrimination based on Barley micromanaging her [in comparison to white colleagues]. This complaint is a protected activity under Title VII. *See [Davis v. Unified Sch. Dist.*, 500, 750 F.3d 1168, 1171 (10th Cir. 2014)]. It upset Barley. Mohamed's colleagues corroborated her complaints that Barley treated non-white employees differently. Because of Mohamed's complaints or as part of her discriminatory micromanagement, Barley imposed rigid deadlines on Mohamed that Barley would not have given to Mohamed's white colleagues. Mohamed complained that this action was retaliatory and, either in retaliation for the initial complaint or this new complaint, one or more of Defendant's employees decided to terminate Mohamed. Indeed, Defendant began drafting Mohamed's termination documents on the same day that she complained of retaliation. Mohamed turned in her projects by the arbitrary deadline, but it did not matter what she turned in because the decision had already been

---

[1] SHRM also argues that the evidence did not support an award of punitive damages (D. 170 at 15–16). SHRM was aware that Mohamed sought punitive damages but did not raise this argument in its Rule 50(a) motion; it is therefore forfeit (*see* D. 146). *Marshal*, 474 F.3d at 739-40. Regardless, the Court would reject it for the reasons indicated below.

5

> made to terminate her based on the pretext that she did not meet the deadlines.

(D. 89 at 9–10).

When viewed in the light most favorable to Mohamed, as the evidence must be in light of the verdict, the trial record supports and reinforces this narrative. It suggests that Mohamed was treated differently than her similarly situated white colleagues, including those in similar roles with the same supervisor working on similar projects. Even if Mohamed's first complaints about Barley were not explicitly about race discrimination, it was clear to SHRM very shortly thereafter that Mohamed was complaining about being treated differently than her white colleagues (D. 160 Trial Tr. Vol. 2 at 188:9–13). This upset Barley to the extent that she wrote that she wanted Mohamed "held accountable" for her race complaints and took various actions, along with her colleagues, to get rid of Mohamed (*see id*. at 204–08).

By way of example, the testimony of Carrie Mills touched on many of these themes, directly and indirectly. Mills, who is white, worked in essentially the same role as Mohamed and reported to the same supervisor, Barley. It was reasonable for the jury to conclude they were similarly situated. *See Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1232 (10th Cir. 2000) ("An employee is similarly situated to the Plaintiff if the employee deals with the same supervisor and is subject to the same standards governing performance evaluation and discipline.") (quotation marks omitted). Although there were many issues on which the jury could have seized on to find Mills and another white colleague were treated better, her related testimony could also be seen to show retaliation and pretext. In particular, she testified that in mid-August, i.e., around the time Mohamed explicitly asserted that the imposed deadlines were discriminatory and retaliatory, Barley came to Mills in something of a panic—"She said she needed to speak to me urgently and

6

privately. She was, again, red-faced, sweaty" (D. 161, Trial Tr. Vol. 3 116:16–17).   Barley then

imposed the same deadlines on Mills as she had given Mohamed:

> The tone that she used with me was unlike she ever had before. She
> was very rushed and said that I had to have my project done by the
> end of August; there was no flexibility, that if it was not complete
> by the end of August, I would face career repercussions at SHRM,
> that our -- the people above us, so, like, Jeanne Morris and Nick,
> were going to be watching for this and that there was a larger context
> and reason that she could not share with me at the time.
>
> * * *
>
> She had never been strict about a deadline up until this point. And
> then for her to be strict about a deadline with just a couple weeks
> remaining seemed like -- I mean, it was very inflexible. It was unlike
> -- it was just also the way she spoke to me, that prescriptive, that
> directive, no jovialness to it.

(*id*. at 116:19–117:11).   In the context of an organization that trains people on HR tasks in view of

discrimination law, i.e., that knows what evidence could be helpful, this can reasonably be viewed

as a transparent post hoc attempt to concoct evidence of equal treatment, a culture of rigid

deadlines, a basis for the associated deadline, etc.   Essentially, viewing it in favor of Mohamed

and drawing reasonable inferences, one could infer that management knew that they were in a

pickle because Mohamed had seen through their termination scheme and sought to concoct some

evidence for SHRM's benefit in a ham-fisted manner.  *See Doebele v. Sprint/United Mgmt. Co.*,

342 F.3d 1117, 1135-36 (10th Cir. 2003) ("The plaintiff need not show both that the defendant's

reasons were a pretext *and* that the real reason was discrimination—the fact of pretext alone may

allow the inference of discrimination.").

Ultimately, Mills did not meet the deadline but suffered no repercussions.  Mohamed was

terminated.

As SHRM argues, it put forward non-discriminatory and non-retaliatory reasons for Mohamed's termination.  But there is no reason that a jury was required to credit that evidence, particularly in view of evidence like the example above.[2]  Mohamed met her burden when the evidence is viewed in her favor.  This motion is denied.

### B. Defendant's Motion for New Trial (D. 171)

SHRM takes issue with two of the Court's pre-trial rulings: (1) allowing Mills to testify and (2) declining to bifurcate liability and punitive damages (D. 171 at 6–7, 9).

The Court resolved SHRM's challenge to Mills by written order (D. 82).  The testimony and evidence presented at trial reinforces the Court's prior conclusion that, "[t]o the extent that Defendant [was] presented with difficulties due to Mohamed contacting Mills late in the discovery process, these difficulties are of Defendant's own making" (*id*. at 4).  While SHRM seeks to fault Mohamed for failing to disclose Mills as a person with knowledge, etc., the undisputed evidence at trial suggested that SHRM (unlike Mohamed) was well aware of Mills' potential relevance but failed to disclose her and related evidence.  Mills was properly allowed to testify because Mohamed's related disclosures were timely and ultimately harmless (*id*.).  SHRM points to nothing the occurred at trial that would alter these conclusions.

SHRM argues that the decision not to bifurcate was prejudicial solely based on the admission of "earnings of certain SHRM employees and SHRM's overall revenue" that it asserts would not have otherwise been admissible (D. 171 at 9).  Notably, it points to no emphasis placed

---

[2] While the Court provides this one example, the trial record is replete with similar evidence which, viewed in Mohamed's favor, supports the verdict.  The Court has reviewed all evidence and the entire record in relation to these motions.

on this information by Mohamed or improper arguments founded on it, for example, arguing for liability based on this information. Ultimately, the trial proved correct the Court's expectation that bifurcation was unnecessary.

SHRM also challenges certain rulings made during trial including: (3) the jury instructions in relation to but-for-causation, (4) testimony referencing Ebony Thompson's termination, (5) admission of Barley's notes, and (6) alleged arguments that a higher standard applied to SHRM (D. 171). These arguments largely ignore the trial record and do not provide a basis for the Court to conclude that SHRM's rights were substantially and negatively affected. SHRM does not argue cumulative error, so the Court considers each issue in isolation.

Without citing any specific instruction as faulty, SHRM asserts that the jury was improperly instructed on the but-for-causation standard (D. 171 at 3–4). This is wholly unhelpful and ignores that the Court gave a "SAME RESULT" instruction that embodies and restates the but-for-causation standard by explaining explicitly that, "[e]ven if you find that SHRM violated Section 1981, if you find by the preponderance of the evidence that SHRM would have terminated Ms. Mohamed's employment regardless of her race, or whether she engaged in protected activity under Section 1981, you must find in SHRM's favor" (D. 149 at 21).

Similarly, SHRM's argument that the evidence related to Thompson's termination was inadmissible because, among other things, Mohamed "did not need Ms. Thompson's alleged statements or termination to show that she held a good-faith belief that she was subjected to conduct prohibited by Section 1981" ignores that SHRM has vigorously contested that Mohamed

had a good-faith basis for her complaints (D. 171 at 6).[3]  Nothing was made of this brief testimony

beyond its proper purpose of supporting a good-faith basis for Mohamed's complaints.

SHRM asserts that "Barley's notes constituted inadmissible hearsay," but this is plainly

incorrect because much of the notes were not statements by others.  Indeed, the most problematic

portion of the notes for SHRM, in which Barley indicated she wished Mohamed were "held

accountable" for her race complaints simply expresses the Barley's apparent mental state and

motivations in the context of recording notes related to her work role (*see* D. 160 Trial Tr. Vol. 2

at 204–08).  *See* Fed. R. Evid. 803(3).  Barley's work notes are not hearsay and were plainly

admissible.  *See* Fed. R. Evid. 801(d)(2)(D).[4]

SHRM's arguments that there was some "improper theme throughout the trial, including

during testimony and argument" that "portray[ed] SHRM as a so-called 'model employer' or

suggesting that it should be held to a higher standard than other employers based on its expertise

in human resources" simply lacks support in the record (D. 171 at 8).  SHRM's knowledge of

human resources laws and proper processes was relevant to issues in the trial, including whether

---

[3] Before ruling on the admissibility of this evidence, the following colloquy occurred:

> THE COURT: Are you challenging that the Plaintiff had a good faith basis for making her discrimination complaint?
> MS. DARROW: This particular plaintiff?
> THE COURT: This particular plaintiff. I mean, she has to have a good faith basis for making her complaint. One of the things that she can include in that is information about others. So it goes to her state of mind. So are you --
> MS. DARROW: We absolutely are challenging that, Your Honor.

(D. 159 Trial Tr. Vol. 1 at 233:24–234:9).

[4] To the extent that any of the statements recorded in Barley's notes could be properly considered hearsay despite being statements of SHRM's employees in the relation to their business duties, they are nonetheless subject to various exceptions under Fed. R. Evid. 803.  Regardless, the role of these statements at trial, if any, was minor in comparison to the strong probative value of Barley's recordings of her work-related thoughts, and SHRM has not shown prejudice from the admission of her records of conversations.  *See Equal Emp. Opportunity Comm'n v. Jetstream Ground Servs., Inc.*, No. 13-cv-02340-CMA-KMT, 2016 WL 8201623, at *2 (D. Colo. Nov. 3, 2016), *aff'd*, 878 F.3d 960 (10th Cir. 2017) ("Thus, it is only those errors that have caused substantial harm to the losing party that justify a new trial.  Those errors that are not prejudicial do not call for relief under Rule 59." (citation omitted)).

its explanations were pretextual and it acted with malice or reckless indifference (*see* D. 149 at 25). The evidence and argument at trial was appropriately tied to these issues, for example, in the instance discussed above that could be seen as an attempt to use knowledge of discrimination law to craft a pretext in the face of potential liability.

Finally, SHRM makes a broad challenge to the damages award in this case, asserting that the compensatory damages and punitive damages awards were excessive (D. 171 at 10–16). It also makes a conclusory argument for remittitur (*id*. at 16).

A damages award, whether for compensatory or punitive damages, "itself must be supported by substantial evidence." *Wulf v. City of Wichita*, 883 F.2d 842, 874 (10th Cir. 1989) (citation omitted). "Additionally, absent an award so excessive or inadequate as to shock the judicial conscience and raise an irresistible inference that passion, prejudice or another improper cause invaded the trial, the court's determination of the amount of damages is inviolate." *Id*. (cleaned up).

In analyzing the constitutionality of a punitive damage award, the Court examines factors including: "(1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 409 (2003); *see also BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574–75 (1996)

With respect to remittitur, "[i]f the court finds that insufficient evidence exists, or finds the amount of the verdict a product of jury passion or prejudice, the court then may determine a reasonable amount as plaintiff's damages and allow plaintiff to remit the excess over such

amount." *O'Gilvie v. Int'l Playtex, Inc.*, 821 F.2d 1438, 1448 (10th Cir. 1987) (citations omitted). "[R]emittitur is not proper unless the amount of damages awarded is so excessive that it shocks the judicial conscience." *Id*. (same).

Although the damages awards in this case were quite large, the Court finds that they were supported by the evidence and does not find them excessive. SHRM is correct that Mohamed's testimony directly addressing damages and emotional distress was limited. But significant testimony also addressed the totality of the circumstances surrounding her claim. Taken together, this evidence was sufficient to support the substantial damages award. *See McInerney v. United Air Lines, Inc.*, 463 F. App'x 709, 723 (10th Cir. 2011) (citing *Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408, 1416 (10th Cir. 1997)). Viewing the evidence in the light favorable to Mohamed, the evidence suggested not only acute emotional suffering during the process leading to her termination but also chronic emotional suffering thereafter as a result. As Mohamed argues (D. 182 at 10–11), the evidence indicated suffering building from the stress of the initial perception that she was being treated differently than white colleagues to crushing disillusion and desperation as the company turned against her and set her up to fail as a pretext for termination. She testified to the lasting impacts of these events in the forms of deadening her ambition and loss of trust in others, particularly in work environments where she had previously excelled and was open to sharing herself, including her race and cultural background. Mohamed watched her claims of discrimination and retaliation, which the jury unambiguously found to be substantiated, systematically disregarded and dismissed as she was isolated from assistance and told, in effect, that she was the problem.

One incident captures some of the flavor of this process. After Barley, with the assistance of senior management ghost-writing her emails, imposed rigid deadlines on Mohamed for the first time in the wake of her discrimination complaints, Mohamed sought assistance and resources for her tasks of the sort she had previously expected and received. Instead of being assisted by her team, she was informed in no uncertain terms that no assistance whatsoever was provided and she was harshly criticized by senior management essentially for seeking assistance. A jury can reasonably understand the devastating short-term and long-term effects of such actions in context. An award of $1.5 million in these circumstances does not shock the judicial conscience.

Likewise, the Court does not find the punitive damages reward constitutionally excessive. SHRM contends that "the constitutional reprehensibility factors confirm that SHRM's conduct lies at the low end of the spectrum" (D. 171 at 14). But this essentially ignores the substantial evidence showing, when viewed in favor of Mohamed, systematic acts to retaliate against Mohamed taken with the aid and consent of senior management for raising discrimination complaints that the jury found substantiated. This is perhaps not the height of reprehensibility in the employment discrimination context simply because it is not overt racism and retaliation, but it is far from the low end.

As to the second factor, simple division shows that the award here is within the "single-digit ratio between punitive and compensatory damages" that "are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution." *State Farm*, 538 U.S. at 425.

With respect to the last factor, the damages award here, while perhaps in excess of most[5] prior verdicts in this Circuit for employment discrimination cases, is in line with past affirmed punitive damages awards when inflation is taken into account.  In the absence of statutory penalties, the "fundamental question is whether [SHRM] had reasonable notice that its [conduct] could result in such a large punitive award."  *Cont'l Trend Res., Inc. v. OXY USA Inc.*, 101 F.3d 634, 641 (10th Cir. 1996).  If anyone knew the possibility of high potential punitive damages for employment discrimination and malicious retaliation, it was SHRM, which trains businesses on related issues including potential liability.  In 1996, the Tenth Circuit authorized punitive damages of $6,000,000.00 for harm that was "entirely economic" even in the absence of "harm to health and safety."  *Id*. at 642.[6]  This is less than the punitive damages awarded here when adjusted for inflation.  The jury's award in this hard-fought case is "sufficient to cover plaintiffs' reasonable costs of litigation with enough left over to reward plaintiffs for pursuing a case the jury obviously thought justified significant punishment of [SHRM]'s behavior."  *Id*. at 643.  The Court denies this motion.

**C. Defendant's Motion to Stay Execution of Judgment Without Filing Bond (D. 174)**

SHRM seeks only a stay of execution during the pendency of the motions resolved above (D. 174 at 5).  Because the Court has resolved these motions, it denies the stay request as moot.

---

[5] A jury awarded $5 million in compensatory damages and $15 million in punitive damages in a Section 1981 racial discrimination and retaliation case in this District last year.  *See Joppy v. HCA-HealthOne LLC*, No. 22-cv-00986-CNS-STV, ECF No. 380 (D. Colo. Aug. 19, 2025).  Post trial motions, including motions seeking remittitur, remain pending.

[6] As discussed above, there was substantial evidence of harm to Mohamed's mental health.

## IV. CONCLUSION

Accordingly, it is ORDERED that Defendant's Renewed Motion for Judgement as a Matter

of Law (D. 170) and Defendant's Motion for New Trial (D. 171) are DENIED.  It is FURTHER

ORDERED that Defendant's Motion to Stay Execution of Judgment Without Filing Bond (D. 174)

is DENIED AS MOOT.


DATED April 15, 2026.

BY THE COURT:

Gordon P. Gallagher
United States District Judge
